IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, and<br><br>LOCKHEED MARTIN CORP. and L3 COMMUNICATIONS CORP.,<br><br>Defendant-Intervenors. | No. 02-1909C<br>(Judge Braden) |

**PLAINTIFFS' POST-TRIAL BRIEF REGARDING LIABILITY UNDER SECRECY ACT**

Lawrence J. Gotts
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
(202) 551.1700
(202) 551.1705 (fax)

Attorneys for Plaintiffs
*Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

OF COUNSEL:

Mark Koehn
Elizabeth Miller Roesel
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
(202) 551.1700
(202) 551.1705 (fax)

April 25, 2007

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. PROCEDURAL AND FACTUAL BACKGROUND ..... 3

A. Pretrial Proceedings ..... 3

1. The Court's April 2006 Infringement Decision ..... 3

2. The Parties' Cross-Motions For Partial Summary Judgment ..... 3

B. Evidence Presented By Honeywell ..... 4

C. Evidence Presented By The Government ..... 5

D. Facts Relevant To Secrecy Act Liability Under The Government's Theory ..... 5

1. Before David McLure First Reviewed Honeywell's '269 Application, The Government Had Not Developed An NVG Compatible Full Color Display System – And, In Fact, Issued A Military Specification Prohibiting Use Of Full Color Displays With NVGs ..... 5

2. In March 1986, Mr. McLure Reviewed The '269 Application And Recommended That It Be Subject To A Secrecy Order ..... 9

3. After Reviewing The '269 Application, Mr. McLure Continued His Work On The Committee Drafting MIL-L-85762A - Including Meetings With Ferdinand Reetz, James Byrd And Laurie Bryner ..... 11

4. After Becoming Chair Of The Committee Drafting MIL-85762A, Mr. McLure Again Reviewed The '269 Application In 1987 And 1988 Prior To Issuing MIL-L-85762A In August 1988 ..... 16

5. The Government Annually Renewed The Secrecy Order On The '269 Application Initially Recommended By Mr. McLure Until It Was Lifted On September 2000 – After The Government Had Begun Purchasing And Using The Designated Display Systems ..... 19

6. During The Secrecy Order Period From April 1986 To September 2000, Honeywell Had An Active Licensing Program And Would Have Attempted To License And/Or Enforce The '914 Patent But For The Government's Delay In Issuing It ..... 20

III. ARGUMENT ..... 21

A. Honeywell Is Entitled To Just Compensation Under *Both* Prongs Of The Section 183 ........ 21

B. Under The First Prong Of Section 183, Honeywell Is Entitled To Just Compensation For "Damage Caused By Reason Of The Order Of Secrecy" ........ 22

1. The First Category of "Damage Caused By Reason Of The Order Of Secrecy" Is Royalties For The Government's Procurement Of The Designated Display Systems For The U.S. Military During The Secrecy Order Period ........ 24

2. The Second Category of "Damage Caused By Reason Of The Order Of Secrecy" Is Royalties For The Government's Procurement Of The F-16/CMFD And C-130H/RDU Display Systems For Foreign Militaries During The Secrecy Order Period ........ 28

3. The Third Category of "Damage Caused By Reason Of The Order Of Secrecy" Is Damages For Lockheed Martin's Direct Commercial Sales Of The C-130J/CMDU Display System During The Secrecy Order Period ........ 29

4. The Government's "Connection" Or "Link" Argument Pertains Solely To The Second Prong Of Section 183 ........ 32

C. Honeywell Is Also Entitled To Just Compensation For "Use By The Government Of The Invention Resulting From His Disclosure" Under The Second Prong Of Section 183 ........ 33

1. The Second Prong Of The Secrecy Act Provides a Separate and Independent Legal Basis for Compensation to Honeywell ........ 34

2. The Legislative History Of The Secrecy Act Does Not Suggest That Honeywell Must Prove A Connection Or Link Beyond What Is Required To Prove Its Claim For Patent Infringement ........ 39

3. No Binding Case Law Requires That Honeywell Must Prove A Connection Or Link Beyond The Need To Prove Liability For Infringement ........ 41

D. Even If Section 183 Were Construed To Require A Connection Or Link, Honeywell Has Proven Such Link ........ 42

1. The Evidence Demonstrates A Connection Or Link Between The Government's Use Of The Invention And '269 Application ........ 43

(a) Mr. McLure Actually Reviewed The '269 Application At Least Three Times During The Period From March 1986 To May 1988. .......... 43

(b) Mr. McLure Was A Participating Voting Member Of The Committee That Issued MIL-L-85762A From At Least February 1986 Through August 1988 And Its Chairman From September 1986 Through August 1988 .......... 45

(c) The Presence And Timing Of The Term "A Narrow Band Of Red" In Minutes For An April 1986 Meeting Of The Committee Drafting MIL-L-85762A Is Compelling Evidence Of Copying Or Derivation .......... 48

(d) The Designated Display Systems Procured Pursuant To MIL-L-85762A Are Substantially Similar To Honeywell's Patent Disclosure That Led To The '914 Patent, As Evidenced By The Court's Finding Of Infringement .......... 51

IV. CONCLUSION .......... **ERROR! BOOKMARK NOT DEFINED.**

## TABLE OF AUTHORITIES

**Cases**


*Amini Innovation Corp. v. Anthony California, Inc.,* 439 F.3d 1365 (Fed. Cir. 2006) .......... 52

*Barnhart v. Thomas*, 540 U.S. 20 (2003) .......... 35

*Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350 (4th Cir. 2001) .......... 50

*Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923 (7th Cir. 2003) .......... 43

*Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 388 F. Supp. 2d 37 (N.D.N.Y. 2005) .......... 51

*Coakwell v. United States,* 372 F.2d 508 (Ct. Cl. 1967) .......... 25, 27

*Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352 (Fed. Cir. 2003) .......... 35, 36

*DCS Communications Corp. v. DGI Technologies, Inc.*, 898 F. Supp. 1183 (N.D. Tex. 1995) .......... 44

*Eckes v. Card Prices Update*, 736 F.2d 859 (2d Cir. 1984) .......... 43

*Farrand Optical Co. v. United States,* 317 F.2d 875 (2d Cir. 1963) .......... 41

*Farrand Optical Co. v. United States,* 325 F.2d 328 (2d Cir. 1963) .......... 41, 42

*FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500 (5th Cir. 1982) .......... 46

*Foster v. American Mach. & Foundry Co.*, 492 F.2d 1317 (2d Cir. 1974) .......... 29

*Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988) .......... 50

*Goodyear Aerospace Corp. v. United States,* No. 37-78 and 177-78, 1980 WL 20828 (Ct. Cl., March 17, 1980), *aff'd*, 225 Ct. Cl. 753 (1980) .......... 25, 27, 32, 33

*Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605 (1950) .......... 37

*Halpern v. United States,* 258 F.2d 36 (2d Cir. 1958) .......... 39

*Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512 (Fed. Cir. 1995) .......... 37

*Honeywell Int'l v. United States*, 70 Fed. Cl. 424 (2006) .......... 1, 3, 36, 52, 53

*Honeywell Int'l, Inc. v. United States*, 66 Fed. Cl. 400 (2005) .......... 53

*Hughes Aircraft Co. v. United States,* 534 F.2d 889 (Ct. Cl. 1976)....28, 29, 34

*Lockheed Martin Corp. v. United States,* 42 Fed. Cl. 485 (1998) .... 28, 31

*Lumex, Inc. v. Highsmith*, 919 F. Supp. 624 (E.D.N.Y. 1996) .... 47

*Marcam Corp. v. Orchard*, 885 F. Supp. 294 (D. Mass. 1995) .... 47

*McDonnell Douglas Corp. v. United States,* 670 F.2d 156 (Ct. Cl. 1982) .... 21, 30

*Motorola, Inc. v. Computer Displays Int'l, Inc.*, 739 F.2d 1149 (7th Cir. 1984) .... 52

*Nobelman v. American Savings Bank*, 508 U.S. 324 (1993) .... 35

*Pepsico, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995) .... 43

*RKI, Inc. v. Grimes,* 177 F. Supp. 2d 859, 876 (2001) .... 47

*Robinson v. United States,* 236 F.2d 24 (2d Cir. 1956) .... 25, 29

*Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167 (7th Cir. 1997) .... 50

*United States Surgical Corp. v. Origin Medsystems, Inc.*, No. C-92-1892-VRW ENE, 1993 WL 379579 (N.D. Cal. Jan. 12, 1993) .... 43

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17 (1997) .... 37

*Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 137 (D. Conn. 1997) .... 46

**<u>Treatises</u>**

Manual of Patent Examining Procedure (MPEP) § 608 .... 35

**<u>Regulations</u>**

28 U.S.C. § 1498 ....1, 22, 28

35 U.S.C. § 112 .... 36

35 U.S.C. § 151 .... 39

35 U.S.C. § 181 .... 1, 25, 26, 33, 39

35 U.S.C. § 271 .... 22, 29

35 U.S.C. § 284 .... 37

35 U.S.C. § 42 ........................................................................................................ 39

37 C.F.R. 1.72(b) ........................................................................................................ 35

# LIST OF MATERIALS CITED

## Joint Exhibits

| | |
|---|---|
| JTX 43 | F-16/CMFD - Prime Item Development Specification for the Color Multifunction Display |

## Plaintiffs' Exhibits

| | |
|---|---|
| PTX 12 | MIL-L-85762 entitled *Military Specification Lighting, Aircraft, Interior, AN/ANVIS-6 Aviator's Night Vision Imaging System (ANVIS) Compatible* |
| PTX 13 | MIL-L-85762A entitled *Military Specification Lighting, Aircraft, Interior, Night Vision Imaging System (NVIS) Compatible* |
| PTX 307 | C-130/RDU - Interface Control Document for the Pilots Remote Display Unit |
| PTX 309 | C-130J/CMDU - Critical Item Development Specification for the C-130J Color Multipurpose Display Unit |
| PTX 501 | '269 Application |
| PTX 503 | Secrecy Order Recommendation Review Sheet For '269 Application Signed and Dated March 4, 1986 |
| PTX 505 | Secrecy Order Recommendation Review Sheet For '269 Application Signed and Dated March 25, 1988 |
| PTX 506 | Secrecy Order re '269 Application stamped "MAILED APR 02 1986" |
| PTX 507 | Charlie Townsend's June 10, 1986 Letter To Allied Corporation |
| PTX 508 | Secrecy Order Recommendation Review Sheet For '269 Patent Application Signed and Dated April 7, 1987 |
| PTX 509 | Secrecy Order and Permit for Disclosing Classified Information re '269 dated April 20, 1987 |
| PTX 510 | Secrecy Order and Permit for Disclosing Classified Information re '269 dated May 6, 1988 |
| PTX 511 | Secrecy Order and Permit for Disclosing Classified Information re '269 dated July 6, 1990 |
| PTX 513 | Secrecy Order and Permit for Disclosing Classified Information re '269 dated August 22, 1991 |
| PTX 515 | Secrecy Order and Permit for Disclosing Classified Information re '269 dated September 15, 1992 |
| PTX 517 | Renewal of Secrecy Order re '269 dated May 7, 1993 |
| PTX 520 | Renewal of Secrecy Order re '269 dated May 6, 1994 |
| PTX 522 | Renewal of Secrecy Order re '269 dated May 3, 1995 |

| | |
|---|---|
| PTX 524 | Renewal of Secrecy Order re '269 dated April 30, 1996 |
| PTX 526 | Renewal of Secrecy Order re '269 dated April 24, 1997 |
| PTX 528 | Renewal of Secrecy Order re '269 dated April 24, 1998 |
| PTX 530 | Renewal of Secrecy Order re '269 dated April 21, 1999 |
| PTX 531 | Renewal of Secrecy Order re '269 dated September 7, 2000 |
| PTX 535 | '268 Application |
| PTX 537 | Secrecy Order Recommendation Review Sheet For '268 Application Signed and Dated March 4, 1986 |
| PTX 538 | Navy Memorandum re 4/3/86 meeting re U.S. patent application Serial No. 786,268 |
| PTX 539 | Navy Memorandum re 4/4/86 meeting re U.S. patent application Serial No. 786,268 |
| PTX 541 | Secrecy Order Recommendation Review Sheet For '268 Patent Application Signed and Dated March 4, 1988 |
| PTX 554 | Letter re MIL-L-85762 changes dated August 26, 1988 |
| PTX 555 | Trip Report dated September 19, 1986 |
| PTX 557 | Charter for Joint Aeronautical Commanders' Group (JACG) Panel On Aviation Lighting |
| PTX 559 | Memo from C. Pieroway to Distribution List re Panel minutes for April 8-9, 1986 meeting |
| PTX 560 | Memo from C. Pieroway to Distribution List re Panel minutes for September 29-30, 1986 meeting |
| PTX 562 | Naval message re April 8-9, 1986 meeting of JACG Panel on Aviation Lighting & JACG Program Status Report |
| PTX 564 | Honeywell's Feb. 1, 2001 letter re Solicitation of Expressions of Licensing Interest |
| PTX 566 | Various Honeywell letters re Solicitation of Expressions of Licensing Interest |
| PTX 568 | Various Honeywell letters re Solicitation of Expressions of Licensing Interest and mailing list |
| PTX 573 | Letter and emails between Lockheed Martin and Honeywell |
| PTX 575 | Letter and emails between Lockheed Martin and Honeywell |
| PTX 576 | Letter and emails between Lockheed Martin and Honeywell |
| PTX 577 | Letter and emails between Lockheed Martin and Honeywell |
| PTX 578 | Letter and emails between Lockheed Martin and Honeywell |
| PTX 579 | Letter and emails between Lockheed Martin and Honeywell |
| PTX 580 | Letter and emails between Lockheed Martin and Honeywell |
| PTX 581 | Letter and emails between Lockheed Martin and Honeywell |

| | |
|---|---|
| PTX 586 | Defendant The United States Responses to Plaintiffs Proposed Findings of Uncontroverted Fact |
| PTX 603 | Reetz Notebook |
| PTX 606 | F. Reetz, *Rationale Behind The Requirements Contained In Military Specifications MIL-L-85762 and MIL-L-85762A* |
| PTX 1002 | Summary of Damages |
| PTX 1005 | CMFD Sales Data |
| PTX 1007 | Delay Compensation |

**Defendants' Exhibits**

| | |
|---|---|
| DE 303 | L. Bryner, *The Effects of Red Cockpit Lighting on Night Vision Imaging Systems (NVIS)* |
| DE 318 | Navy memorandum dated July 25, 1985 |
| DE 321 | Trip Report, Jim Byrd and George Hobe dated September 19. 1986 |

**Depositions**

Deposition Transcript of David R. McLure dated May 24, 2005 (hereinafter "McLure Dep.")

**Hearing/Trial Transcripts**

Trial Transcripts (August 4, 2005 and July 24, 2006- July 27, 2006) (hereinafter "[date] Tr."

**Legislative History**

| | |
|---|---|
| PTX 596 | H.R. Rep. No. 82-1028 (1951) |
| PTX 598 | *Hearing on H.R.4687 Before Subcomm. No. 3 Comm. On The Judiciary H.R.*, 82d Cong. (1951) |
| PTX 599 | *Hearing on H.R.6389 Before Subcomm. No.4 Comm. On The Judiciary H.R.*, 81st Cong. (1950) |
| PTX 600 | Act of 1910 |

**Stipulations**

| | |
|---|---|
| PTX 587 | Lockheed Martin stipulation dated June 27, 2006 |
| PTX 588 | Lockheed Martin stipulation dated June 22, 2006 |
| PTX 589 | Government stipulation dated July 6, 2006 |
| PTX 605 | Lockheed Martin stipulation dated July 24, 2006 |

# I. INTRODUCTION

Plaintiffs Honeywell International Inc. and Honeywell Intellectual Properties Inc. (collectively "Honeywell") submit this post-trial memorandum with respect to liability issues under the Secrecy Act, 35 U.S.C. § 181 *et seq.*, that were tried to the Court on July 24 - 27, 2006 with respect to the three designated display systems previously found to infringe under 28 U.S.C. § 1498, subject to affirmative defenses. *Honeywell Int'l v. United States*, 70 Fed. Cl. 424 (2006).

Honeywell's right to relief under section 183 of the Secrecy Act arises from two undisputed facts. First, U.S. Patent Application Serial No. 06/786,269 (the "'269 application") that issued as Honeywell's U.S. Patent No. 6,467,914 (the "'914 patent") was subject to a Secrecy Order from April 2, 1986 to September 7, 2000. Second, the designated display systems that have been found to infringe under 28 U.S.C. § 1498 were manufactured, used and/or sold, during that time period, both by the Government and commercially. These two undisputed facts, alone, entitle Honeywell to "just compensation for the damage caused by reason of the order of secrecy and/or use by the Government of the invention resulting from [Honeywell's] disclosure." 35 U.S.C. § 183. Contrary to arguments the Government has made, the Secrecy Act imposes no requirement for proof of a "connection" or "link" between the Government's use and the '269 application, beyond what is required to prove liability for patent infringement. Thus, under a proper interpretation of section 183, the Court need not make any other factual findings in order to find the Government liable under the Secrecy Act, subject only to the Government's affirmative defenses.

Moreover, even if there were a "connection" or "link" requirement, the facts proven at the July 2006 trial establish such a connection or link between the '269 application and the Government's use of the designated display systems. As discussed in more detail below, the Government procured the designated display systems pursuant to MIL-L-85762A – the military

specification that governs night vision goggle ("NVG") compatibility with full color displays. David McLure, the chairman of the Government committee that drafted MIL-L-85762A, testified that he repeatedly reviewed the '269 application while participating in and sponsoring research supporting the committee's work. Prior to the time Mr. McLure first reviewed the '269 application, Mr. McLure's committee had not yet made a determination regarding whether or how to get full color displays into the cockpit with NVGs. Only after Mr. McLure reviewed the '269 application three times over the course of nearly three years did his committee issue the updated military specification that enabled procurement of full color, NVG-compatible display systems, including the three designated displays.

Thus, even if the Court determines that liability under the Secrecy Act requires a connection or link, the evidence adduced at trial establishes such connection or link in view of Mr. McLure's review of the '269 application on multiple occasions at the very same time that he was working on, indeed chairing, a Government committee that was focused on resolving the very issue addressed by the '269 application.

It should be noted that Honeywell is not arguing that Mr. McLure or the Government did anything wrong, willful or with ill intent or motive. Indeed, the Government does and should have the authority to use inventions and information it obtains from industry to further our national security. The Government, however, must then compensate patent owners such as Honeywell for its use. Indeed, the Secrecy Act provides a statutory framework for that compensation, and Honeywell simply seeks such statutory compensation.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Pretrial Proceedings

#### 1. The Court's April 2006 Infringement Decision

In April 2006, the Court determined that Honeywell had established by a preponderance of the evidence, literal infringement of Claim 2 of the '914 patent and, alternatively, infringement under the doctrine of equivalents, subject to pending affirmative defenses. *Honeywell*, 70 Fed. Cl. at 479. Such infringement was found with respect to the three designated display systems, namely:

1) F-16/CMFD. The display system for F-16 aircraft including one or more Color Multifunction Display ("CMFD") manufactured by a Honeywell predecessor company which at the time had no rights to the '914 patent, together with one or more night vision goggles having a Class B or Class C minus blue filter ("NVG");

2) C-130H/RDU. The display system for C-130H aircraft including one or more Radar Display Unit ("RDU") manufactured by L-3 Communications Corporation ("L-3") (or its predecessor Avionics Display Corporation) together with one or more NVG; and

3) C-130J/CMDU. The display system for C-130J aircraft including one or more Color Multifunction Display Unit ("CMDU") manufactured by L-3 together with one or more NVG.

(*Id., see also*, PTX-586 at ¶¶ 18 (F-16/CMFD), 22 (C-130J/CMDU), and 24 (C-130H/RDU).)

#### 2. The Parties' Cross-Motions For Partial Summary Judgment

On May 31, 2006, Honeywell filed its motion seeking partial summary judgment of liability under the Secrecy Act. Specifically, Honeywell requested that the Court determine that Honeywell is entitled to "just compensation" pursuant to section 183 with respect to:

(1) the Government's procurement and use of the three designated display systems during the period when issuance of the '914 patent was delayed by a Secrecy Order applicable to the '269 application, and

(2) the manufacture, use, sale, offer for sale or importation of the same display systems (other than for use by or for the Government) during the same period.

On June 22, 2006, the Government cross-moved for partial summary judgment on Secrecy Act liability.

Subsequent to the parties' cross-motions, the Court held a trial from July 24 to 27, 2006, to hear evidence of the Government's liability under the Secrecy Act with respect to the '269 application that matured into the '914 patent. (5/22/2006 Scheduling Order; 7/27/06 Tr. 803 (Court) ("The record is going to close on the Secrecy Order when we finish today").) As noted by Honeywell during its opening, there is no dispute over the facts that support the Government's liability under the Secrecy Act. (7/24/06 Tr. 14-16.)

**B. Evidence Presented By Honeywell**

During the July 2006 trial, Honeywell called three Government employees and one former Honeywell employee in its case-in-chief. Two of the Government witnesses, David McLure and Ferdinand Reetz, are both electrical engineers and civilian employees of the United States Navy who worked together on the committee that issued MIL-L-85762A – the military specification that governs NVG compatibility with full color displays. (5/24/05 McLure Dep. 283; 7/24/06 Tr. 220-221; 7/25/06 Tr. 298-299 (McLure); 7/26/06 Tr. 491; 501, 515-519, 592-593 (Reetz).) Mr. McLure admitted that he repeatedly reviewed Honeywell's '269 application while working on the committee and met with Mr. Reetz once a week or more, including about red lighting. (7/25/06 Tr. 298-299; 328-332 (McLure); 7/26/06 Tr. 592-595 (Reetz); PTX-603 at GVT019-2864 (Reetz Notebooks).)

The third Government witness, James Byrd, is an electrical engineer and civilian employee of the United States Air Force who also worked with Messrs. McLure and Reetz on

the committee that issued MIL-L-85762A. (7/27/06 Tr. 775 (Reetz); 7/27/06 Tr. 918, 925-926, 1000-1009, 1030 (Byrd).)[1]

The Honeywell ex-employee, John Donofrio, was Vice President of Intellectual Property for Honeywell (and its predecessor) from 1996 to 2005 and served as General Counsel of Honeywell's Aerospace Division from 2000 to 2005. (7/24/06 Tr. 116-123 (Donofrio).) From 1996 until 2005, Mr. Donofrio was responsible for the company's licensing subsidiaries. (*Id.*)

### C. Evidence Presented By The Government

The Government called three Government employees in its case-in-chief: Messrs. Reetz and Byrd and Ms. Laurie Bryner. Ms. Bryner is an electrical engineer and civilian employee of the United States Navy who also worked with Messrs. McLure, Reetz, and Byrd on the committee that issued MIL-L-85762A. (7/27/06 Tr. 775 (Reetz); 7/27/06 Tr. 918, 925-926, 1000-1009, 1030 (Byrd), 1044 (Bryner).)

### D. Facts Relevant To Secrecy Act Liability Under The Government's Theory

#### 1. Before David McLure First Reviewed Honeywell's '269 Application, The Government Had Not Developed An NVG Compatible Full Color Display System – And, In Fact, Issued A Military Specification Prohibiting Use Of Full Color Displays With NVGs

As of July 1985, the Government had not developed an NVG compatible full color display system for use in its aircraft. (7/25/06 Tr. 298, 305-311 (McLure) ("that was certainly an area that needed further study … [it] was certainly something that was investigated over the time … it was certainly an issue where a better understanding was required…."); DE-318 (Navy memorandum dated July 25, 1985) at GVT019-1659 ("unresolved issues [that] will require further study [include:] [o]btaining a better understanding of … three-color cathode ray tubes

---

1 For Mr. Byrd's convenience, Honeywell reserved its direct examination of Mr. Byrd until the Government called Mr. Byrd in the Government's case-in-chief.

(CRTs) … and other currently non-NVG compatible government furnished equipment (GFE) with various night vision systems").) At this time, the Government recognized that the problem included addressing the impact of red light on NVGs. (DE-318 at GVT019-1658 ("an over-bright (or red) cockpit will result in a very dark image of the outside world which will be unacceptable" because red light will reduce the "gain" of the NVG).)

On January 24, 1986, the Government issued a military specification – MIL-L-85862 – that effectively prohibited red light, including full color displays, in military aircraft cockpits using NVGs. (7/27/06 Tr. at 925-926, 996 (Byrd); PTX-12 (MIL-L-85762 entitled *Military Specification Lighting, Aircraft, Interior, AN/ANVIS-6 Aviator's Night Vision Imaging System (ANVIS) Compatible*); PTX-606 (F. Reetz, *Rationale Behind The Requirements Contained In Military Specifications MIL-L-85762 and MIL-L-85762A*`); *id* at 4 ("MIL-L-85762 only addresses Type I, Class A NVIS."), *id.* at 12 ("Because Class A NVIS are extremely sensitive to colors with radiance at wavelengths longer than about 600 nm, red cannot be used in the cockpit."), *id.* at 18 ("[l]aboratory experiments have demonstrated that a full (three color) color display can not be used with Class A NVIS without suffering considerable NVIS performance degradation").)

MIL-L-85762 was problematic because it ended the use of red for warning lights that had persisted for over 40 years and forced pilots to undergo retraining for new color coding schemes. (7/27/06 Tr. 850 (Reetz) ("[h]uman factors engineers are people who are concerned about … what the color light should be [for cockpit controls and] … they were concerned about removing red from the cockpit [because] … for the last 40 years, [pilots] … had red in the cockpit in terms of warning lights. And so they were concerned [that] … we need to maintain red"); 7/27/06 Tr. 998 (Byrd) (to implement MIL-L-85762 red warning lights would have to be eliminated or

filtered to yellow and required retraining of pilots to recognize yellow instead of red for warnings); 5/24/05 McLure Dep. 335, 338.)

MIL-L-85762 was also problematic because it foreclosed the use of full color displays at a time when interest in their use for displaying full color maps was increasing. (7/27/06 Tr. 999 (Byrd) (the main objective or goal of revising MIL-L-85762, which ultimately issued as MIL-L-85762A, was to get red back into the cockpit and allow the use of full color displays); 7/27/06 Tr. 997 (Byrd) (in the time leading up to issuance of MIL-L-85762 "there were reasons to try to keep red" in the cockpit and "certainly some interest" in keeping red, including using red for warning lights and full color maps).)

Consequently, in December 1985 and even before issuing MIL-L-85762, the Government established a committee to draft a revised specification – MIL-L-85862A – and, in doing so, investigate the possibility of using red lighting components with NVGs, including full color displays. (DE 303 at GVT012-3234 ("[i]n December, 1985 a Joint Aeronautical Commanders Group (JACG) on Interior Aviation Lighting [also known as the Tri-Service Committee[2]] was established … to address NVIS compatible aircraft lighting … [and] revis[e] MIL-L-85762 … [and] investigate the possibility of using red lighting components with NVIS"); 7/27/06 Tr. 1051, 1066 (Bryner) (MIL-L-85762 needed to be revised because "no red indicators were fully compatible" with MIL-L-85762 and "[t]here was a preference to try to get red back into … cockpits, especially for warning lights…").)

By early 1986, a "Panel on Aviation Lighting" was established and was responsible for drafting the document that issued as MIL-L-85762A. (7/25/06 Tr. 315 (McLure).) One purpose of the panel "was to identify problem areas and develop common solutions" and another was

2 5/24/05 McLure Dep. 50-51.

"fostering information exchange on ... [NVIS] compatibility." (5/24/05 McLure Dep. 335-336; 7/25/06 Tr. 315-318, 348-351 (McLure); PTX-557 (Charter for Joint Aeronautical Commanders' Group (JACG) Panel On Aviation Lighting).) Another purpose of the panel was to "[c]oordinate the development of data to determine the effects of red light *and multi color displays* on [NVGs] … and coordinate on specification and standard revisions." (PTX-557 at GVT019-1952, emphasis added.)

During the 1986 through 1988 timeframe, Mr. McLure was the Navy's lead representative and sole voting member on the panel. (5/24/05 McLure Dep. 295, 302-303, 338, 283-285; 7/25/06 Tr. 325-327, 348, 383 (McLure).) Mr. McLure coordinated development of the information contained in MIL-L-85762A. (7/25/06 Tr. 406, 410 (McLure) (Mr. McLure "did work with the team in coordinating development of [MIL-L-85762A] …, which would have consisted of recommended inputs from both the technical experts and industry as to what should be contained in … [MIL-L-85762A]").)

Mr. McLure's position or role gave him responsibility with respect to various NVG compatibility issues. (7/26/06 Tr. 387 (McLure) ("[i]f an issue were to come up related to night-vision goggles or night-vision goggle technology, it would have come across [Mr. McLure's] desk because [he] was the one assigned to that particular position"); 7/26/06 Tr. 389 (McLure) (Mr. McLure "was involved in the procurement and purchase" of NVGs and "[t]he compatibility issue as between night-vision goggles and full color displays … [was] one of the issues in [his] job area").)

As an electrical engineer, Mr. McLure understood the concepts and technologies of NVGs, full color displays, and the compatibility issues the panel was wrestling with. (7/25/06 Tr. 385 (McLure) ("I certainly became somewhat proficient").) In fact, his job involved helping

various aircraft programs apply the NVG compatibility specifications to particular aircraft. (7/26/06 Tr. 388 (McLure) (Mr. McLure's "job from the night-vision compatibility perspective was to ensure that, … the Navy requirements were included in the development of … the update of the MIL spec [*i.e.*, MIL-L-85762A] …, and basically to assist the platforms as appropriate in trying to … achieve compatibility, if they had questions on do [they] … use the MIL spec, don't [they] … use the MIL spec, coordinating the Naval requirements on" such matters).)

**2. In March 1986, Mr. McLure Reviewed The '269 Application And Recommended That It Be Subject To A Secrecy Order**

On March 4, 1986, Mr. McLure personally reviewed Honeywell's '269 application, which described a system for achieving compatibility between an NVG and a full color display. He thereafter completed a form documenting his recommendation that the '269 application be subject to a secrecy order. (5/24/05 McLure Dep. 104-106, 120, 127; 7/24/06 Tr. 231-234, 239-240, 242, 248-249 (McLure); 7/25/06 Tr. 267-268 (McLure); PTX-501 ('269 Application); PTX-503 (Secrecy Order Recommendation Review Sheet For '269 Application Signed and Dated March 4, 1986).) Mr. McLure was careful and serious in his substantive review of the '269 application. (7/24/06 Tr. 239 (McLure) (Mr. McLure "took [his] job seriously … and [was] careful in [his] determinations"); 7/25/06 Tr. 392 (McLure) (Mr. McLure "needed to review the substance of the application or else [he] couldn't recommend anything one way or the other").)[3]

The '269 application, entitled "Night Vision Goggles Compatible With Full Color Display," provided a solution to the problem facing Mr. McLure and the others on the committee

[3] Mr. McLure also claimed to have sent the '269 patent application back to the NAVAIR's patent office. (7/25/06 Tr. 270-271, 282 (McLure).) But Mr. McLure was unable to explain why Charlie Townsend, a patent counsel from that office, wrote to Allied Corporation (Honeywell predecessor) a few weeks later asking for another copy of the '269 patent application. (5/24/05 McLure Dep. 142-144; 7/25/06 Tr. 280-284 (McLure); PTX-507 (Charlie Townsend's June 10, 1986 Letter To Allied Corporation).)

that was drafting MIL-L-85762A. In particular, the '269 application disclosed to Mr. McLure an NVG compatible full color display system, including:

> For example if color CRT 51 projects an image in the *red spectrum*, a bandpass filter 61 may be used with CRT 51 so that only light within *a narrow range of frequencies* may be transmitted to the screen 55…. In this arrangement, the display unit of the offending color is filtered with a *narrow band bandpass filter* so that *light transmitted by the display unit is only within a very narrow color band*. In the case of CRT displays, the *narrow color band* may be defined as the band at which most light is transmitted by a phosphor coating on the CRT, typically a five to twenty nanometer band. Light blocking device 39 on the ANVIS 13 may therefore be a notch filter for blocking light corresponding the *narrow color band*.

(PTX 501, pages 7-8, emphasis added.)

Also on March 4, 1986, Mr. McLure personally reviewed Honeywell's U.S. Patent Application Serial No. 06/786,268 (the "'268 application"), which included an invention disclosure nearly identical to that in the '269 application, and completed a form documenting his recommendation that the '268 patent application also be subject to a secrecy order. (5/24/05 McLure Dep. 220-221; 7/24/06 Tr. 252-254 (McLure); 7/25/06 Tr. 272-274 (McLure); PTX-535 ('268 Application) at 7-8; PTX-537 (Secrecy Order Recommendation Review Sheet For '268 Application Signed and Dated March 4, 1986).)

Subsequently, on April 2, 1986, the United States Patent and Trademark Office issued a secrecy order with respect to the '269 patent application. (5/24/05 McLure Dep. 139-40; 7/25/06 Tr. 274-275 (McLure); PTX-506 (Secrecy Order re '269 Application stamped "MAILED APR 02 1986"); PTX-586 (Defendant The United States' Responses To Plaintiff's Proposed Findings Of Uncontroverted Fact) at ¶ 8.) The Secrecy Order stated that "[t]he Patent and Trademark Office has been notified by the Armed Services Patent Advisory Board, Department of Defense, Washington, D.C., that disclosure or publication of the subject matter in this application by

granting a patent would be detrimental to the national security." (5/24/05 McLure Dep. 140-41; 7/25/06 Tr. 275-276 (McLure); PTX-506.)

### 3. After Reviewing The '269 Application, Mr. McLure Continued His Work On The Committee Drafting MIL-L-85762A - Including Meetings With Ferdinand Reetz, James Byrd And Laurie Bryner

Shortly after reviewing the '268 and '269 patent applications, on March 13, 1986, Mr. McLure met with Mr. Reetz to discuss red lighting. (7/25/06 Tr. 328-332 (McLure); 7/26/06 Tr. 594-595 (Reetz); PTX-603 at GVT019-2864 (Reetz Notebook entry documenting that Messrs. McLure and Reetz "met on … red lighting").) During the late 1985 to 1988 timeframe, Messrs. McLure and Reetz were meeting at least once a week, to discuss, among other things, red lighting and NVG compatible lighting. (7/25/06 Tr. 328-332 (McLure) ("[Messrs. McLure and Reetz spoke] on a regular basis … certainly discussed night-vision lighting often … [and] dealt with night-vision compatibility"); 7/26/06 Tr. 592-593 (Reetz) ("[Messrs. McLure and Reetz spoke] probably once a week, twice a week … [or] every other day").)

On April 4, 1986, Mr. McLure participated in a meeting with persons from Allied and Bendix (Honeywell predecessors) about the '268 patent application that he had reviewed a month earlier. (5/24/05 McLure Dep. 225-232; 7/25/06 Tr. 278-280, 474 (McLure); PTX-538; PTX-539 (Navy file memoranda recognized by Mr. McLure).)

On April 8 and 9, 1986, *only a few days after his meeting with Honeywell about its pending patent application,* Mr. McLure joined Messrs. Reetz and Byrd and Ms. Bryner for a meeting of the committee that was drafting MIL-85762A. (7/25/06 Tr. 335-336, 394 (McLure); PTX-562 at GVT019-1947 (meeting sign-in sheet).) At the meeting, Mr. McLure reported about the Government's attempts to achieve NVG compatible red lighting to get red back into the cockpit, including handing out a status report. (7/25/06 Tr. 334-339, 348-351, 359-361

(McLure); PTX-559 (Panel minutes for April 8-9, 1986 meeting) at GVT019-1977; PTX-562 (Government documents reflecting an April 8-9, 1986 meeting of the Panel) at GVT019-1948 to -1950 (JACG Program Status Report from David R. McLure).) Among other things, Mr. McLure's status report stated that: "NADC is conducting a study to attempt to come *[sic]* with a 'red' which would be compatible with … night vision goggles and thus get 'red' back in the cockpit." (PTX-562 at GVT019-1950.)

On their face, the April 8-9, 1986 committee meeting minutes state that changes to MIL-L-85762 to be reflected in MIL-L-85762A will "address … NVIS compatible … full color … [displays] … and define a *narrow band of red*." (7/25/06 Tr. 361-363 (McLure); PTX-559 at GVT019-1977, emphasis added.)[4] Mr. McLure understood that the term "narrow band of red" referred to "red light in a narrow spectrum band." (7/25/06 Tr. 416-417 (McLure); PTX-559 at GVT019-1977.) Mr. McLure also understood the term "665 red" as used in the meeting minutes to refer to "the frequency of the cutoff filter." (7/25/06 Tr. 417 (McLure); PTX-559 at GVT019-1978.)

Signally, this "narrow band" terminology is *identical* to language used in the '269 application as well as the '268 application (PTX-501 at 7-8; PTX-535 at 7-8) that Mr. McLure had just discussed with Honeywell, but had not otherwise previously been used by Mr. Reetz, prior to the April 8 – 9, 1986 committee meeting, or the committee itself. (7/26/06 Tr. 622-623 (Reetz) ("Q: Is that a term that you used in that time period, as you recall? A: Myself? Q: Yes.

---

4 Mr. McLure confirmed that the meeting minutes were taken in the normal course of business and circulated to members and that, in his experience, the minutes fairly and accurately reflected the activities at the meetings. (5/24/05 McLure Dep. 340-341; 7/25/06 Tr. 352-353 (McLure).) Ms. Bryner, did not recall the April 8 – 9, 1986 Panel meeting but testified that, in her view, Joyce Vanderlind, who took the meeting minutes, had "a good grasp of what [the participants] were discussing." (7/27/06 Tr. 1074-1075; 1079 (Bryner).)

A: No. Q: Is it a term that you recall the committee using in that time period, other than in this memo? A: Other than in this memo? Q: Yes. A: No.”).) Prior to the April 8 – 9, 1986 committee meeting, Mr. Reetz’s NVG compatibility research had not focused on establishing a narrow band of red. (7/27/06 Tr. 893-894 (Reetz) (Q: You didn’t try to establish a narrow band of red, and see how that would work with the goggles, is that right? A: That’s not where I started. I didn’t start with that premise, no”).) Moreover, the concept of a “narrow band of red” bears a strong similarity to the “very narrow color band” “in the red spectrum” described in Honeywell’s ‘268 patent and ‘269 patent applications. (*Compare* PTX-559 at GVT019-1977 *with* PTX 501, pages 7-8 (quoted above).)

The April 8 - 9, 1986 meeting included discussion of filter cut-offs and other technical details of a system for achieving NVG compatibility with full color displays. (7/25/06 Tr. 394-395 (McLure) (the meeting included “discussion on ... what frequencies were appropriate for cutoff in terms of minimizing effect on NVG performance” and that Mr. McLure “certainly believed that” he personally presented information about the effort of “trying to get red back in the cockpit”).) Mr. McLure recalled that there was general discussion that:

> [S]ome evaluation on a variety of frequencies because ... the concern was that the more … [of] that third color [i.e., ‘a third primary color’ that ‘was reddish’] you allow into the cockpit, the more you degrade the performance of the goggles … [T]he higher the cutoff filter, the more red light you are letting in. Therefore, the more you are degrading the goggle performance.

(7/25/06 Tr. 416, 419-420 (McLure).)

Mr. McLure participated in these discussions and was comfortable with such level of discussion and understanding. (7/25/06 Tr. 390 (McLure) (Mr. McLure was not “in over [his] head”); 7/25/06 Tr. 403, 420 (McLure); 7/27/06 Tr. 1000-1009 (Byrd) (on the committee, Mr. McLure was “an interested participant from the Navy[,]” “aware of the issues relating to [NVG] compatibility[,]” a participant, including by talking, in discussions of “technical issues relating to

[NVG] compatibility and the revised standard[,]" and a participant in discussions about filter cut-off points).)

Several months later, on September 19, 1986, Mr. McLure met with Messrs. Reetz and Byrd about the way to achieve NVG compatible lighting with full color displays for CV-22 aircraft. (7/25/06 Tr. 365 (McLure); PTX-555 (Air Force memoranda dated September 19, 1986 recognized by Mr. McLure.) During this timeframe, such work was well within the scope of Mr. McLure's job responsibilities. (7/25/06 Tr. 366 (McLure) (Mr. McLure's "night-vision compatibility charter was basically to work with the [program managers for aircraft platforms] as they requested to support their either implementation of MIL-L-85762, or in some cases, their unique lighting requirements that might differ from the MIL spec that they need implemented"); 7/25/06 Tr. 371 (McLure) (the September 19, 1986 meeting was "consistent with the nature of what [Mr. McLure] was doing at that time").)

As described in a trip memorandum drafted by Mr. Byrd, the plan discussed at the meeting for achieving NVG compatibility with full color displays involved adding a 665 nm minus blue filter to the NVG and another filter to the display for cutting off some red light. (5/25/06 McLure Dep. 369-371; PTX-555 at GVT032-3096 ("[t]he plan is to require the color CRTs to be compatible with the '665' goggles as defined in the new draft revision of MIL-L-85762, meaning that the CRTs will have a filter bonded on which cuts off the deep red and near infrared emissions. NVGs must still be modified, since standard ANVIS-6 goggles are not compatible with any red light. This mod would consist of a substitute objective lens for the goggles, with a '665' filter deposited on it in place of the standard minus blue filter").)

During this period, the committee drafting MIL-L-85762A was working to assure itself that the draft specification could be met and, with respect to the full color displays for the CV-22

aircraft, the plan discussed at the September 19, 1986 meeting was "a way" the specification could be met. (5/24/05 McLure Dep. 326 ("from a technology perspective, … [the committee] needed to be able to assure [itself] that there was at least a way of meeting the [MIL-L-85762A] performance requirement."); 5/24/05 McLure Dep. 327-28 (the plan discussed in the September 19, 1986 trip memorandum "would be a way ... with respect to [the CV-22]"); 7/25/06 Tr. 373-374 (McLure); 7/27/06 Tr. 999-1000 (Byrd) (the only way to comply with MIL-L-85762A with respect to NVG compatibility with full color displays was to block the longer wavelengths of red and infrared); 7/27/06 Tr. 1072 (Bryner) ("we did gather a number of different light sources and filters in order to ensure … that we weren't setting the standard so high that we felt that it wouldn't be feasible"); DE-303 at GVT012-3234-3235 ("areas of concern … [included] determin[ing] the feasibility of meeting the established requirements with present technology"); PTX-555.)

The committee also recognized that, at least with respect to components for red lighting, MIL-L-85762A was right at the cutting edge of the technology at that point. (5/24/05 McLure Dep. 332 ("[F]or some of the lighting components associated with ANVIS red … I'd say [its] a fair statement [that the specification was right at the cutting edge]"); 7/25/06 Tr. 376 (McLure).)

The September 19, 1986 meeting memo also demonstrates that other members of the Tri-Service Committee, including Messrs. Reetz and Byrd, were aware of the existence of a patent owned by Bendix (a Honeywell predecessor) and in fact discussed the polarizer filter embodiment that is disclosed in the Honeywell's '269 patent application. (PTX-555 at GVT032-3096 and DE-321 at GVT018-0808 ("The polarizer filter scheme proposed by Bendix was also discussed but is considered unacceptable [in part] because it … is patented by a sole source"); PTX-501 at 7-8.) None of the three trial witnesses who attended the meeting – Messrs. McLure,

Reetz, and Byrd – could recall who provided this information at the meeting. (7/25/06 Tr. 371-372 (McLure); 7/27/06 Tr. 951-953, 1029-1030 (Byrd); 7/26/06 Tr. 628-629, 635 (Reetz).)

Around September 26, 1986, the Government issued a report authored by Ms. Bryner about her laboratory tests that Mr. McLure sponsored for establishing specifications for the red lighting to be permitted under MIL-85672A. (7/27/06 Tr. 1067-1070 (Bryner); 7/27/06 Tr. 1071 (Bryner) ("[w]e were looking to establish [a] color region for the red … it was to establish color coordinates for a red warning"); 7/27/06 Tr. 1072 (Bryner) (Ms. Bryner's role on the committee was "laboratory testing to verify the requirements that were being set or to help establish color … requirements"); 7/27/06 Tr. 1073-1074 (Bryner) (Mr. McLure "represented the Navy at [the] committee … [and] was our program sponsor ... [who] was responsible for getting funding for our studies"); DE-303 (*The Effects Of Red Cockpit Lighting On Night Vision Imaging Systems (NVIS)*, September 26, 1986, by Laurie Bryner) at GVT012-3229, -3255 ("NVIS red" was "recommended for inclusion [and ultimately included] in the MIL-L-85762A as an optional color for warning indicators").)

### 4. After Becoming Chair Of The Committee Drafting MIL-85762A, Mr. McLure Again Reviewed The '269 Application In 1987 And 1988 Prior To Issuing MIL-L-85762A In August 1988

In September 1986, Mr. McLure became the chairman of the committee drafting MIL-L-85762A and continued in that role through August 1988 when MIL-L-85762A issued. (5/24/05 McLure Dep. 299-303; 345; 7/25/06 Tr. 327-328, 348, 368, 378-380 (McLure); PTX-560 (minutes for September 29-30, 1986 meeting at which Mr. McLure was elected chairman); PTX-554 (August 26, 1988 correspondence about MIL-L-85762 changes approved by David McLure who "chairs the ANVIS specification team"); PTX-13 (MIL-L-85762A entitled *Military Specification Lighting, Aircraft, Interior, Night Vision Imaging System (NVIS) Compatible*).)

On April 7, 1987, Mr. McLure again personally reviewed the '269 application and completed a form documenting his recommendation that the '269 application remain under a Secrecy Order. (5/24/05 McLure Dep. 145; 7/25/06 Tr. 284-287 (McLure); PTX-508 (Secrecy Order Recommendation Review Sheet For '269 Patent Application Signed and Dated April 7, 1987).) In doing so, Mr. McLure made another determination that disclosure of the '269 application would be detrimental to national security. (5/24/05 McLure Dep. 147 (the signed form reflects Mr. McLure's "fresh, affirmative determination that the disclosure [of the '269 patent application] would be detrimental to national security"); 7/25/06 Tr. 284-287 (McLure); PTX-508.) Mr. McLure also would have been the person to review the '268 patent application and render secrecy order renewal recommendation in 1987. (7/25/06 Tr. at 290-292 (McLure).)

Around September 17, 1987, the Government issued a report authored by Mr. Reetz and sponsored by Mr. McLure titled "Rationale Behind The Requirements Contained In Military Specifications MIL-L-85672 And MIL-L-85762A." (7/26/06 Tr. 528-529 (Reetz), 592-593 (Reetz) (Mr. McLure "was the fellow who provided [Mr. Reetz] funding to do the work on" MIL-L-85762A and was "sponsor" of Mr. Reetz' research.); PTX-606.) In the rationale document, Mr. Reetz wrote that "color coding … is extremely beneficial when it is necessary to get the pilot's attention" and "most pilots strongly prefer retaining red for warning lights" because "red indicates danger to most persons." (PTX-606 at GVT012-2651.) Furthermore, Mr. Reetz wrote that "[w]ith the advent of Class B NVIS [an NVG with 665 nm minus blue filter], flight tests have indicated that a limited amount of red could be used in the cockpit" and "NVIS red was selected based on experiments during which 20 test subjects were asked to identify a color they would call 'red' when compared against NVIS Yellow." (7/27/06 Tr. 853 (Reetz); PTX-606 at GVT012-2652.)

On March 4, 1988, Mr. McLure again personally reviewed the ‘268 patent application and completed a form documenting his “fresh determination” and recommendation that the ‘268 patent application continue to be subject to a secrecy order. (5/24/05 McLure Dep. 235-236; 7/25/06 Tr. 288-289 (McLure); PTX-541 (Secrecy Order Recommendation Review Sheet For ‘268 Patent Application Signed and Dated March 4, 1988).) Later that month, on March 25, 1988, for a third time, Mr. McLure personally reviewed the ‘269 patent application and completed a form documenting his “fresh determination” and recommendation that the ‘269 patent application continue to be subject to a secrecy order. (5/24/05 McLure Dep. 129-133, 219; 7/25/06 Tr. 287-288 (McLure); PTX-505 (Secrecy Order Recommendation Review Sheet For ‘269 Patent Application Signed and Dated March 25, 1988).)

Later that same year, on or about August 26, 1988, Mr. McLure’s committee issued MIL-L-85762A. (5/24/05 McLure Dep. at 301-303; PTX-13.) By providing the ability to use a 665 nm filter on the NVG, MIL-L-85762A allowed the use of more colors in aircraft cockpit displays, including red, , as disclosed in Honeywell’s patent applications. (5/24/05 McLure Dep. 276-277 (the red allowed by MIL-L-85762A “was commonly ... [or] colloquially referred to as red”); 7/25/06 Tr. 304-305 (McLure); 7/27/06 Tr. 999 (Byrd) (MIL-L-85762A permits a limited amount of red light to be used with NVGs having a Class B filter and the Class B filter was developed primarily to allow the use of full color displays in the cockpit).) The Government considered this to be a big or major change from the previous military specification. (5/24/05 McLure Dep. 284-285 (a “big update between [MIL-L-85762 and MIL-L-85762A] was adding in the ability for ... [NVGs] to use a 665 filter”); 7/25/06 Tr. 301-302 (McLure); 7/27/06 Tr. 853 (Reetz) (a “major” change was to allow “a Class B goggle ... with [a] 665 nm minus blue filter”).)

### 5. The Government Annually Renewed The Secrecy Order On The '269 Application Initially Recommended By Mr. McLure Until It Was Lifted On September 2000 – After The Government Had Begun Purchasing And Using The Designated Display Systems

Prior to rescinding of the Secrecy Order with respect to the '269 patent application on September 7, 2000, the Government renewed that order annually and, each time, determined that it "would … be detrimental to national security if [the patent application] were to be disclosed." (5/24/05 McLure Dep. 63-64; PTX-509; PTX-510; PTX-511; PTX-513; PTX-515; PTX-517; PTX-520; PTX-522; PTX-524; PTX-526; PTX-528; PTX-530; PTX-531; PTX-586 at ¶¶ 8-9, 12-14.)

During the period from April 2, 1986 to September 7, 2000, when the Secrecy Order was in effect, the Government procured and used each of the three designated display systems: C-130J/CMDU, C-130H/RDU and F-16/CMFD. (PTX-589 (Government stipulation dated July 6, 2006).) Also during this timeframe, one or more F-16/CMFDs and one or more C-130H/RDUs were procured by the U.S. Government for foreign governments through Foreign Military Sales. (PTX-589; PTX-587 (Lockheed Martin stipulation dated June 27, 2006); PTX-588 (Lockheed Martin stipulation dated June 22, 2006).) In addition, with respect to direct commercial sales during this timeframe, Lockheed Martin sold and delivered C-130J/CMDUs to several foreign governments through direct commercial sales. (PTX-587, PTX-589; PTX-605 (Lockheed Martin stipulation dated July 24, 2006).)

Each of these three designated display systems was procured pursuant to MIL-L-85762A – the specification drafted by Mr. McLure's committee. (JTX 43 (F-16/CMFD - Prime Item Development Specification for the Color Multifunction Display) at H57966-74, H57976-79; PTX 309 (C-130J/CMDU - Critical Item Development Specification for the C-130J Color

Multipurpose Display Unit) at LHM00007976-98; PTX 307 (C-130/RDU - Interface Control Document for the Pilots Remote Display Unit) at GVT052-0563-68.)

### 6. During The Secrecy Order Period From April 1986 To September 2000, Honeywell Had An Active Licensing Program And Would Have Attempted To License And/Or Enforce The '914 Patent But For The Government's Delay In Issuing It

Honeywell lost its opportunity to pursue licensing for the '914 patent because of the delay in its issuance caused by the Secrecy Order. (7/24/06 Tr. 170-71 (Donofrio); PTX-586 at ¶ 15 ("[i]ssuance of the '914 patent was delayed due to the issuance and renewal of the Secrecy Order with respect to the '269 patent application").)

Consistent with Honeywell's general practice, when the Secrecy Order regarding the application that matured into the '637 patent was lifted, Honeywell conducted a review to develop a list of potential licensees and sent letters to them. (7/24/06 Tr. 146, 150-51 (Donofrio); PTX-564; PTX-566 (Honeywell's letters to various potential licensees).) After the '914 patent issued, Honeywell sent another round of letters to potential licensees. (7/24/06 Tr. 156; PTX-568 (Honeywell's form letter and mailing list).) With respect to Lockheed Martin, Honeywell engaged in licensing discussions and, after Honeywell commenced litigation, settlement discussions. (7/24/06 Tr. 157-166 (Donofrio) (Mr. Donofrio had discussions with Lockheed Martin attorneys, Frank Menaker and Leo Wegemer); PTX-573; PTX-575 to -581 (Letter and emails between Lockheed Martin and Honeywell).)

Honeywell's licensing program for the '914 patent was a top priority from the point the Secrecy Order was lifted through 2005. (7/24/06 Tr. 152 (Donofrio) (the effort to license the '914 patent "was the most important or one of the top two or three most important programs that the company was undertaking").) Honeywell considered the '914 patent licensing and enforcement program very significant and would not have abandoned it. (7/24/06 Tr. 169-70

(Donofrio) (Honeywell "would never have ... just walked away, not while [Mr. Donofrio] was there"); 7/24/06 Tr. 199-200 (Donofrio).)

## III. ARGUMENT

### A. Honeywell Is Entitled To Just Compensation Under *Both* Prongs Of The Section 183

Honeywell's right to just compensation is established by the following provision of the Secrecy Act:

> The owner of any patent issued upon an application that was subject to a secrecy order issued pursuant to section 181 of this title, who did not apply for compensation as above provided, shall have the right, after the date of issuance of such patent, to bring suit in the United States Court of Federal Claims for just compensation for the damage caused by reason of the order of secrecy and/or use by the Government of the invention resulting from his disclosure. The right to compensation for use shall begin on the date of the first use of the invention by the Government. In a suit under the provisions of this section the United States may avail itself of all defenses it may plead in an action under section 1498 of title 28.

35 U.S.C. § 183. There is no dispute that Honeywell is the owner of the '914 patent (PTX-586 at ¶¶ 6-7), nor is there any dispute that "[i]ssuance of the '914 patent was delayed due to the issuance and renewal of the Secrecy Order with respect to the '269 patent application." (PTX-586 at ¶ 15.) Pursuant to the express language of section 183, Honeywell is entitled to "just compensation for the damage caused by reason of the order of secrecy and/or use by the Government of the invention resulting from his disclosure." With respect to Government use, Honeywell's right to compensation begins "on the date of the first use of the invention by the Government." 35 U.S.C. § 183.

Section 183 thus provides for recovery of *both* (1) "just compensation for the damage caused by reason of the order of secrecy," and (2) "just compensation for … use by the Government of the invention resulting from his disclosure." 35 U.S.C. § 183; *McDonnell Douglas Corp. v. United States,* 670 F.2d 156, 163 (Ct. Cl. 1982) ("section 183 provides for

damages to be paid to patent holders in two situations: when the Government wrongfully uses the patented device during the period of secrecy, and when the secrecy order itself causes damages"); *see also* Patent Disclosure: Hearings on H.R. 4687 Before Subcomm. No. 3, H. Comm. on the Judiciary, 82d Cong. 18 (1951) (PTX 598) (hereinafter "Patent Disclosure Hearing II") (comments of Paul A. Rose, Chairman, Committee on Laws and Rules, Representing the American Patent Law Association) ("[s]ection 3 [now section 183] provides for compensation to an applicant both for damages caused by an order of secrecy and for use of the invention by the Government"). The statute does not, however, draw a clear distinction between the two types of compensation, nor rule out the possibility that certain factual situations may give rise to a right to compensation under both prongs of the statute.

**B. Under The First Prong Of Section 183, Honeywell Is Entitled To Just Compensation For "Damage Caused By Reason Of The Order Of Secrecy"**

Under the first prong of section 183, Honeywell is entitled to the damages to which it would have been entitled for the infringing manufacture, use, sale or offer for sale of its patented invention by the Government and third parties under 28 U.S.C. § 1498 and 35 U.S.C. § 271, if issuance of its patent had not been delayed by a secrecy order. In other words, in cases where issuance of a patent has been delayed by a secrecy order, section 183 seeks to make the patent owner whole by allowing him to recover damages for the infringement that occurred during a time a patent was not allowed to issue due to a secrecy order.

Honeywell's "damage caused by reason of the order of secrecy" falls into three categories: (1) royalties for the Government's procurement of the three infringing display systems for the U.S. military during the period from April 2, 1986 to September 7, 2000 when a secrecy order was in place; (2) royalties for the Government's procurement of two of the infringing display systems for foreign militaries pursuant to Foreign Military Sales ("FMS")

during the secrecy order period; and (3) royalties for Lockheed Martin's commercial use and sale of the C-130J/CMDU display systems during the secrecy order period. In each case, such royalties are damages caused by reason of the order of secrecy and are therefore compensable under 35 U.S.C. § 183.

The legislative history demonstrates that section 183 requires that a patent owner be compensated for damages attributable to the *delay in issuance of a patent*. The original secrecy act bill – H.R. 6389 – omitted any provision for "damage accruing to him by reason of the order of secrecy" that had existed under prior law. H.R. Rep. No. 82-1028, at 8 (1951) (PTX 596) (hereinafter "H.R. Rep. 82-1028").[5] That omission received the following criticism:

> The owner of a patent application held under secrecy order should not only be entitled to compensation based upon the use of the invention by the Government, *but also for losses occasioned otherwise by the delay in issuance of the patent.*
>
> The issue of a secrecy order not only deprives an applicant of income that he might normally expect from the use of the invention by the Government, but also might and probably would result in a loss of the enjoyment of his rights otherwise. Since the power to restrain is entirely with the Government, it follows in all justice that an applicant so restrained for the benefit of the Government, *should be entitled to a full accounting of the losses of his privileges that have resulted from the order, not only through uncompensated Government use but otherwise*. Modification of the proposed act in this respect, would also impose a heavier responsibility on the Government officials causing an order of this kind, and result in a stronger check against the needless use of such power.

Patent Disclosure: Hearings on H.R. 6389 Before Subcomm. No. 4, Comm. on the Judiciary, 81st Cong. 8 (1950) (PTX 599) (hereinafter "Patent Disclosure Hearing I") (emphasis added) (Statement in behalf of Aircraft Industries Association of America, Inc.)

Congress heeded this criticism and the next bill – H.R. 4687 – restored the provision for just "compensation for the damage ~~accruing~~ *caused* by the order of secrecy." Patent Disclosure

---

[5] H.R. Rep. 82-1028 was incorporated verbatim into S. Rep. No. 82-1001 (1951), as reprinted in 1952 U.S. Code Cong. & Admin. News 1321, 1951 WL 2343 (Leg. Hist.).

Hearing II at 5 (PTX 598) (committee print of H.R. 4687). The Congressional testimony on H.R. 4687 indicates that this first prong of the Secrecy Act was intended to provide compensation for a wide range of types of damages caused by issuance of a secrecy order, including damages attributable to both U.S. Government and non-U.S. Government, *i.e.,* commercial use of the invention during the period a secrecy order is in effect.

> The act says that the inventor who is damaged by a secrecy order will have a right to collect for damages resulting from or caused by the secrecy order. There is no limitation on what those damages might be.

Patent Disclosure Hearing II at 20 (PTX 598) (comments of Mr. Rose). During congressional debate on the proposed statute, it was expressly contemplated that "damage caused by reason of the order of secrecy" would result where the "normal period of utilization [of the invention is] cut down by reason of the secrecy order." *Id.* at 32 (comments of P.J. Federico, Examiner-In-Chief, U.S. Patent Office). Such damage is appropriately compensated by a royalty for both military (including FMS) and commercial use that occurs during the time a patent was subject to a secrecy order.

**1. The First Category of "Damage Caused By Reason Of The Order Of Secrecy" Is Royalties For The Government's Procurement Of The Designated Display Systems For The U.S. Military During The Secrecy Order Period**

Just as section 1498 provides a remedy for Government infringement that occurs *after* the issue date of the patent, section 183 of the Secrecy Act provides a remedy for Government procurement of the patented invention *prior* to the issue date, to the extent such procurement occurred while the patent was being withheld from issuance because of a secrecy order. This concept of time-shifted infringement in the case of Government procurement of a patented invention during the period a secrecy order is in effect is well-established in the case law. Section 183 is a "time extension provision" that extends the period during which a patent owner

can claim compensation for Government infringement to a time prior to issuance, if the grant of a patent was held up by a secrecy order. *Coakwell v. United States,* 372 F.2d 508, 511 (Ct. Cl. 1967) ("[p]laintiff is not claiming infringement of his patent prior to its grant and could not since his application was not under the *time extension provisions of Title 35 U.S.C. § 183* relating to patent applications under a secrecy order") (emphasis added).

In *Robinson v. United States,* 236 F.2d 24 (2d Cir. 1956), for example, the court suggests that section 183 picks up where section 1498 leaves off, by allowing a patent owner to recover compensation for Government use in a period when his patent has been withheld because of a secrecy order. The court explained:

> [Section 1498] provides a remedy for the recovery of compensation for use by the United States of an invention "described in and covered by a patent." Thus it has been held that a patentee may not recover under that section for use by the Government prior to the issuance of a patent. [citation omitted] The remedy of § 183, on the other hand, provides compensation for use by the Government in a period during which a patent has been withheld because of a secrecy order. For this period a patentee could not recover under § 1498.

*Id.* at 27 (reversing dismissal for lack of jurisdiction over secrecy act claim).

That section 183 provides a remedy for "time-shifted infringement" is also clear from the *Goodyear* case, where plaintiff sought "damages caused by [a] secrecy order imposed, pursuant to 35 U.S.C. § 181 *et seq*., by the Government." *Goodyear Aerospace Corp. v. United States,* Nos. 37-78 and 177-78, 1980 WL 20828 at *2 (Ct. Cl., March 17, 1980), *aff'd*, 225 Ct. Cl. 753 (1980). The Court made clear that to recover under section 183, a plaintiff needed only demonstrate infringement during the period a secrecy order was in effect:

> Plaintiff's evidence need only show that infringement occurred at a time relevant to this litigation. While in the usual infringement suit this period would be commensurate with the life of the patent, it may, in situations such as the one in this case [where the patent was subject to a secrecy order], also extend to a period predating the issuance of the patent. This is especially true in this instance since plaintiff, in order to establish liability under 35 U.S.C. § 183, must show that it was damaged as a result of the imposition by the Government of a secrecy order.

*Id.* at *3 (denying plaintiff's motion for summary judgment of infringement and liability under 35 U.S.C. § 181 *et seq*., solely because of a lack of evidence showing that actual sales of the infringing material were made to the Government during the relevant time period). Use by the Government of the patented invention is, of course, infringement. The case law could not be clearer that section 183 provides a remedy for the Government's procurement of the patented invention for its use during the secrecy order period.

The legislative history confirms that section 183 was intended to provide a remedy for Government infringement similar to that provided by section 1498, except that the remedy is "time-shifted" to cover the period during which patent issuance was delayed by a secrecy order:

> [T]he difference between this act and the act of the 1910 [now 28 U.S.C. § 1498] is that if the Government uses an invention which is placed under a secrecy order, then after the patent issues the inventor, the patentee, may collect for the use of it prior to the date of issuance of the patent. In other words, he may carry his claim back to the first date of use by the Government, whereas under the act of 1910 you only collect for damages after the issuing date of the patent. That, of course, is a proper provision because by this act the Government would have prevented the issuance of the patent. Therefore, it was proper, and it was put in the provisions of the act that the patentee would be entitled to compensation for use starting from the first date of use by the Government rather than from the date of issuance of the patent.

Patent Disclosure Hearing II at 20 (PTX 598) (comments of Paul A. Rose, Chairman, Committee on Laws and Rules, representing the American Patent Law Association).[6]

---

[6] Similar to present day Section 1498, the Act of 1910 provided: "whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims." (Act of 1910 (PTX 600).)

Thus, both the case law and the legislative history make clear that section 183 provides a remedy for Government infringement that occurs during the period a patent is withheld due to a secrecy order.

The parties have stipulated that each of the three designated display systems was procured and used by the Government during the secrecy order period. (PTX-587; PTX-588; PTX-589; PTX-605.) These Government procurements are compensable under Section 1498, to the extent these display systems were in the Government's inventory and available for use after issuance of the '914 patent in October 2002. *Coakwell,* 372 F.2d at 510-11 (under section 1498, plaintiff is entitled to recover compensation for defendant's use of patented devices on hand and available for use during the recovery period, but that were manufactured before and obtained by the defendant before the patent issued). Section 183 of the Secrecy Act provides the basis for compensation to Honeywell for the Government's procurement and use of these display systems during the secrecy order period.

It is important to note that this remedy is available under the *first prong* of section 183, "damage caused by reason of the order of secrecy," irrespective of the interpretation of the language "resulting from his disclosure" in the second prong of section 183. *Goodyear,* 1980 WL 20828 at *3 ("Use by the Government after the 6th of April which infringes the claims of the yet-to-issue '898 patent may give rise to a damage claim against the Government under 35 U.S.C. § 183"). Because the Government's procurement and use of the designated display systems is compensable under section 1498 to the extent such procurement and/or use occurred *after* issuance of the '914 patent, such procurement and use is also compensable as "damage caused by reason of the order of secrecy," to the extent it occurred *before* issuance of the '914 patent and during a period when issuance of a patent was delayed by a secrecy order.

Honeywell's right to such compensation is subject only to the "defenses [the Government] may plead in an action under section 1498 of title 28." 35 U.S.C. § 183.

### 2. The Second Category of "Damage Caused By Reason Of The Order Of Secrecy" Is Royalties For The Government's Procurement Of The F-16/CMFD And C-130H/RDU Display Systems For Foreign Militaries During The Secrecy Order Period

It is well-established that patent infringement claims arising from the U.S. Government's Foreign Military Sales (FMS) activities are within this Court's jurisdiction under 28 U.S.C. § 1498 and that a remedy is available to the patent owner under that statute. *See* 28 U.S.C. § 1498 (suit can be brought in Court of Federal Claims for "reasonable and entire compensation" for use or manufacture of the patented invention "by or for the United States"). "[T]he Government's foreign military sales and assistance activities" are considered to be "for the U.S. whthin [*sic,* within] the meaning of 28 U.S.C. § 1498." *Hughes Aircraft Co. v. United States,* 534 F.2d 889, 899 (Ct. Cl. 1976) (the principles of Section 1498 are "fully applicable to mutual security/foreign military assistance procurement on the part of the Government").

A portion of the F-16/CMFD and C-130H/RDU display systems procured by the U.S. Government were the subject of Foreign Military Sales to foreign allies, including European Participating Governments, Greece, Taiwan and Japan. (PTX-587; PTX-589; PTX 1002, Schedule D; PTX 1005, Schedule A1.)[7] Most of these Foreign Military Sales occurred during the period Honeywell's patent was being withheld due to a secrecy order. (PTX 1007, Schedule G.) If the '914 patent had issued prior to 1996, Honeywell would have had a claim against the U.S. Government under section 1498 for its Foreign Military Sales of the F-16/CMFD and C-

---

[7] *See Lockheed Martin Corp. v. United States,* 42 Fed. Cl. 485, 491 (1998) ("A foreign military sale involved two contracts: one between Lockheed and the U.S. for the procurement of the defense items from Lockheed, and the other between the U.S. and the foreign government, under which the U.S. sold the defense items to the foreign government.")

130H/RDU display systems that have been found to infringe. *Hughes,* 534 F.3d at 898. Accordingly, another aspect of Honeywell's "damage caused by reason of the order of secrecy" is the royalties Honeywell would have been entitled to recover under section 1498 with respect to the Government's Foreign Military Sales of the F-16/CMFD and C-130H/RDU display systems during the period a secrecy order was in effect. Such damages are clearly attributable to the delay in issuance of a patent to Honeywell for the '914 invention.[8] Again, it is worth noting that, because this remedy for Foreign Military Sales is available under the *first prong* of section 183, it is not affected by any argument or determination regarding the meaning of the language "resulting from his disclosure" in the second prong of the statute.

#### 3. The Third Category of "Damage Caused By Reason Of The Order Of Secrecy" Is Damages For Lockheed Martin's Direct Commercial Sales Of The C-130J/CMDU Display System During The Secrecy Order Period

To the extent the patented display systems have been manufactured, used, sold, offered for sale, or imported other than "by or for the United States," Honeywell's remedy is in district court pursuant to 35 U.S.C. §§ 271 and 284. Under well-established law, Honeywell is not entitled to recover damages under those statutes for any manufacture, use, sale or offer for sale that occurred prior to the issuance of the '914 patent. *Foster v. American Mach. & Foundry Co.*, 492 F.2d 1317, 1323 (2d Cir. 1974) ("[w]ith respect to the units sold before the issue date of the Foster patent, the sale could not have been, at the time, an infringement, or an inducement to infringe"); *see also Robinson*, 236 F.2d at 27. This limitation on Honeywell's recovery under

---

[8] The Government does not dispute that "[i]ssuance of the '914 patent was delayed due to the issuance and renewal of the Secrecy Order with respect to the '269 patent application." (PTX-586 at ¶ 15.)

sections 271 and 284 of the patent statute is another aspect of Honeywell's "damage caused by reason of the order of secrecy" pursuant to section 183.

The case law and legislative history also confirm that "just compensation for damage caused by reason of the order of secrecy" includes compensation for commercial, non-U.S. Government use of the invention during the period the patent is withheld due to a secrecy order. In *McDonnell Douglas,* 670 F.2d at 156, the Court ruled that the Government had a contractual right to use plaintiff's patented invention which precluded plaintiff's claim for compensation for Government use. Significantly, however, the Court held that plaintiff had a claim under section 183 for *commercial* use of the patented invention during the secrecy order period.

> To the extent that the § 183 claim depends upon issues also present in plaintiff's current infringement claim, it is obviously vitiated by our decision. The plaintiff cannot recover on a theory of infringement or improper use, because we have found that the defendant had a right to buy and use the invention. Plaintiff's only remaining claim under § 183 then, is for damages caused by the secrecy order itself. [Plaintiff's] petition does not allege any potential commercial use of the [patented] missile. However, if such non-government use can be established, as required by § 183, damages flowing from the secrecy order may conceivably be recovered.

*McDonnell Douglas,* 670 F.2d at 163-64 (remanding for further proceedings with respect to plaintiff's claim for "damage caused by reason of the order of secrecy"); Patent Disclosure Hearing I at 5 (PTX 599) (statement on behalf of the American Patent Law Association on H.R. 6389: "In time of peace particularly, there should be some provision for compensating an inventor who is prevented from patenting and exploiting his invention which well may have valuable civilian uses and applications"). Thus, "damage caused by reason of the order of secrecy" under section 183 includes damage attributable to the delay in issuing a patent, including compensation for commercial, non-U.S. Government infringement that occurs during the period a patent is withheld because of a secrecy order.

Here, Honeywell is entitled to "just compensation" to the extent its patented invention was made, used, sold, offered for sale or imported during the period when its patent was withheld due to the secrecy order. The parties have stipulated that C-130Js having CMDUs installed were the subject of direct commercial sales by Lockheed Martin to Italy, Australia and other foreign governments during the period from April 2, 1986 to September 7, 2000, when the Secrecy Order was in effect. (PTX-587; PTX-589; PTX-605.)[9] But for the Secrecy Order, Honeywell would have been granted a patent sooner and would have been able to pursue third party infringers, such as Lockheed Martin, either through licensing negotiations or a lawsuit, and collect a royalty for commercial manufacture, use, sale, offer for sale or importation of its invention. Mr. Donofrio's testimony establishes that, consistent with Honeywell's licensing program, Honeywell aggressively sought to license and enforce its patent rights as soon as the '914 patent issued. (*See* Section II.D.6. above.)

Therefore, if the '914 patent had issued earlier (for example, in 1998), Honeywell would have been able to recover a royalty for Lockheed Martin's direct commercial sales of C-130J/CMDUs to foreign governments, either through licensing negotiations or a lawsuit in federal district court under section 271. The Government is liable for these damages, which are directly attributable to the Secrecy Order that delayed the issuance of the '914 patent.[10] Again, it is important to note that this remedy for infringing commercial sales during the secrecy order

---

[9] *See Lockheed,* 42 Fed. Cl. at 491 ("The sale of Lockheed's defense-related products to foreign governments occurred through two methods: 'direct foreign sales' and 'foreign military sales.' [citation omitted] In a direct foreign sale, Lockheed contracted directly with a foreign government for the sale of Lockheed's defense products and the U.S. government was not a party to the contract.")

[10] *See* note 7, *supra.*

period is available under the *first prong* of section 183, regardless of the interpretation of the language "resulting from his disclosure" in the second prong.

#### 4. The Government's "Connection" Or "Link" Argument Pertains Solely To The Second Prong Of Section 183

Section 183 of the Secrecy Act clearly provides two separate and independent grounds for seeking compensation: (1) "damage caused by reason of the order of secrecy" and/or (2) "use by the Government of the invention resulting from his disclosure." 35 U.S.C. § 183. No argument can be made that the first prong of the statute, "damage caused by reason of the order of secrecy," is in any way affected by the "resulting from his disclosure" language in the second prong.

In fact, the case law makes clear that liability under section 183 may be premised on the Government's procurement and use of an infringing product that occurs during the pendency of a secrecy order, without any further proof that the Government's use resulted from plaintiff's disclosure. *Goodyear,* 1980 WL 20828 at *3. In *Goodyear,* as in this case, the Government argued that the plaintiff had not shown the existence of all the elements required for recovery under section 183. Yet the court held that: "Plaintiff's evidence *need only show* that infringement occurred at a time relative to this litigation," for example, at a time during which plaintiff's patent was withheld from issue due to a secrecy order. *Id.* (emphasis added). The court made clear that liability is based upon proof of *infringement,* and imposed no other burdens of proof, *e.g.,* relating to use "resulting from his disclosure":

> Use by the Government after [the date of the Notice of Allowability] which infringes the claims of the yet-to-issue '898 patent may give rise to a damage claim against the Government under 35 U.S.C. § 183. Accordingly, the question of whether sales to the Government by [third party defendant] after this date infringe any claims of the '898 patent is relevant, material and the proper subject matter for partial summary judgment …"

*Id.* Although Goodyear's motion for partial summary judgment of liability under the Secrecy Act was denied, the denial was based solely on the absence of evidence that sales of the infringing product to the Government had occurred during the relevant time period. *Id.* The *Goodyear* decision makes clear that a patent owner is entitled to compensation based upon proof that the Government procured and used the infringing products during the secrecy order period, without the need for any other proof of a "connection" or "link" between those procurements and the disclosure of plaintiff's patent application.

The plaintiff in *Goodyear* sought "damages caused by the secrecy order imposed pursuant to 35 U.S.C. § 181." *Id.* The Court's decision therefore appears to be based upon the first prong of section 183, "damage caused by reason of the order of secrecy." *Goodyear* thus makes clear that a plaintiff is entitled to compensation under section 183 based upon proof that the Government procured infringing products at a time when a secrecy order was in effect, without any requirement of proof of any additional "connection" or "link" between the Government's use and the disclosure of plaintiff's patent application.

### C. Honeywell Is Also Entitled To Just Compensation For "Use By The Government Of The Invention Resulting From His Disclosure" Under The Second Prong Of Section 183

To the extent the Government procured and/or used Honeywell's patented invention during the period a secrecy order was in effect, Honeywell's claim is also compensable under the second prong of section 183 of the Secrecy Act. The parties have stipulated that each of the three designated display systems was procured and used by the Government during the secrecy order period. (PTX-587; PTX-588; PTX-589; PTX-605.) These Government procurements are compensable not only as "damage caused by reason of the order of secrecy," but also under the second prong of section 183, which provides for "just compensation for … use by the Government of the invention resulting from his disclosure." 35 U.S.C. § 183.

No court has ever considered whether Foreign Military Sales are compensable "use by the Government" under the Secrecy Act; however, the *Hughes* case clearly held that such sales "were for the benefit of the U.S. Government." *Hughes,* 534 F.3d at 898. Accordingly, this Court should likewise hold that the Government's Foreign Military Sales of F-16/CMFD display systems are "use by the Government" that are compensable under section 183 to the extent that the procurement took place while a secrecy order was in effect.

Although the Government has argued that the phrase, "use by the Government of the invention resulting from his disclosure," in the second prong of section 183 requires Honeywell to show a "connection" or "link" between the disclosure of its patent application and the Government's use, that requirement is found nowhere in the statute. Further, for the reasons discussed below, even were this Court to find such a requirement, that finding would not preclude Honeywell from recovering a royalty for the Government's admitted procurement and use of the infringing display systems during the secrecy order period.

**1. The Second Prong Of The Secrecy Act Provides a Separate and Independent Legal Basis for Compensation to Honeywell**

The second prong of section 183 provides a separate and independent basis for providing compensation to Honeywell for the Government's procurement and use of the infringing display systems during the secrecy order period. Specifically, section 183 provides that:

> The owner of any patent issued upon an application that was subject to a secrecy order issued pursuant to Section 181 of this title, who did not apply for compensation as above provided, shall have the right, after the date of issuance of such patent, to bring suit in the United States Court of Federal Claims for just compensation for the damage caused by reason of the order of secrecy ***and/or*** *use by the Government of the invention resulting from his disclosure*.

35 U.S.C. § 183 (emphasis added).

Though the Government contends that this second prong requires proof of a "connection" or "link" between the Government's use and the disclosure of Honeywell's patent application,

the statute includes no such requirement. Nor is it correct, as the Government contends, that the phrase "resulting from his disclosure" refers to the use by the Government, rather than the invention. As an initial matter, and as a matter of simple grammar that has been affirmed by many a court, a referential phrase (here, "resulting from his disclosure") should ordinarily be read as modifying only the noun or phrase that it immediately follows (here, "invention"). *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); Norman J. Singer, Sutherland on Statutes and Statutory Construction § 47.33, p. 369-72 (6th rev. ed. 2000) ["Sutherland"] ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent"). And, in fact, the United States Supreme Court has confirmed that construing a statute in accord with this rule is "quite sensible as a matter of grammar." *Barnhart*, 540 U.S. at 26, *quoting Nobelman v. American Savings Bank*, 508 U.S. 324, 330 (1993).

This is particularly true here of the phrase "resulting from the disclosure," because that is a term of art routinely used to modify the word "invention" when referring to an invention as it is described in the patent application or specification. *See, e.g., Cordis Corp. v. Medtronic AVE, Inc.,* 339 F.3d 1352, 1364 (Fed. Cir. 2003). ("[t]o fulfill the written description requirement, the patent specification must describe an invention in sufficient detail that one skilled in the art can clearly conclude that the inventor invented what is claimed. … The *disclosure* as originally filed does not, however, have to provide *in haec verba* support for the claimed subject matter at issue") (emphasis added; internal citations omitted); Manual of Patent Examining Procedure (MPEP) § 608, Disclosure ("in return for a patent, the inventor gives as consideration a complete revelation or disclosure of the invention for which protection is sought").[11]

[11] For example, the specification of the patent is required to include an "Abstract of the Disclosure." 37 C.F.R. 1.72(b); MPEP § 608.01(b).

Section 112, first paragraph of the patent statute sets forth the requirements for the disclosure of an invention in a patent application:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. Compliance with section 112, first paragraph, is determined by comparing the claims of the patent or patent application with the disclosure of the invention in the specification to determine whether the disclosure satisfies the written description, enablement and best mode requirements. *Cordis*, 339 F.3d at 1364 ("To fulfill the written description requirement, the patent specification must describe an invention in sufficient detail that one skilled in the art can clearly conclude that the inventor invented what is claimed.") In other words, to satisfy section 112, the claims of a patent must be adequately supported by the disclosure of the invention in the patent application. Once a patent issues, it is presumed to be valid under section 112, and the claims are presumed to be adequately supported by the disclosure of the invention in the patent application. In other words, if the patent is valid, the claimed invention is presumed to have resulted from the disclosure of the patent application. Therefore, a finding that a patent is not invalid and infringed inherently involves a determination that the invention "results from [applicant's] disclosure." No further proof of a "connection" or "link" between the infringement and the disclosure is required.

Nor does anything in section 183 support a standard for recovery that is inconsistent with the normal rule of liability for patent infringement under section 271 – namely, that a person who uses a patented invention is liable for infringement, regardless of whether he knew of the patent, unless the patent is proven invalid. Literal infringement is found solely on the basis of whether an accused device falls within the claims of a patent. *Honeywell*, 70 Fed. Cl. at 447 (*quoting*

*Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 607 (1950)) ("[i]n determining whether an accused device ... infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out *and that is the end of it*") (emphasis added). Knowledge and intent are simply irrelevant. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 35 (1997) ("Application of the doctrine of equivalents, therefore, is akin to determining literal infringement, and neither requires proof of intent"); *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1523 (Fed. Cir. 1995) ("[a]ccidental or innocent" infringement is still infringement. Intent becomes a requirement only if and when the patent owner seeks enhanced damages or attorney fees for willful infringement under 35 U.S.C. §§ 284-285"), *rev'd on other grounds,* 520 U.S. 17 (1997). "A patent owner may exclude others from practicing the claimed invention, regardless of whether infringers even know of the patent." *Hilton Davis,* 62 F.3d at 1519. Nothing in the statutory language of section 183 supports a standard that deviates from this rule.

Nonetheless, the Government has argued that recovery under this second prong of section 183 requires proof of a "connection" or "link" beyond that required for a finding of infringement, somehow requiring proof over and above what is otherwise required in a patent law remedy. Requirements such as those that the Government attempts to impose are instead found in trade secret law – which does generally require these types of additional showings due to the dramatically different nature of a trade secret.[12] The Secrecy Act is part of the patent statute,

[12] For example, one of the most difficult problems in trade secret litigation is defining the trade secret. No such problem exists in patent law because the claims define the invention. If the defendant has used the invention defined by the claims, there is infringement, regardless of whether the defendant knew about, had access to or copied the disclosure of the patent.

however, not a part of trade secret law, and concepts such as those that the Government attempts to impose are foreign and inimical to that statute. And section 183 itself reinforces the fact that it is a patent law remedy by expressly providing that "[i]n a suit under the provisions of this section the United States may avail itself of all defenses it may plead in an action under section 1498 of title 28." 35 U.S.C. § 183.

Moreover, the language of section 183 cannot reasonably be interpreted as requiring *both* "use … resulting from his disclosure," *i.e,* that the Government's use was derived from or based upon the disclosure of a patent application, *and* "use by the Government of the invention resulting from his disclosure," *i.e.,* that the Government used an invention described and claimed in the disclosure of the patent application. In other words, the Government cannot plausibly argue that section 183 requires proof *both* of a trade secret-like cause of action, *i.e.,* that the Government used Honeywell's patent disclosure, *and* a patent infringement cause of action, *i.e.,* that the Government's use satisfies each and every limitation of at least one claim of the '914 patent. Such an argument finds no support in the wording of the statute.

As discussed above, the only reasonable and grammatically sound interpretation is that "resulting from his disclosure" modifies "invention." The alternative interpretation (that "resulting from his disclosure" modifies "use") would convert section 183 to something more like a trade secret cause of action, imposing requirements that have never been and should not be part of a finding of liability under the patent statute. Accordingly, there is no support in the statutory language of section 183 or otherwise for Government's argument that Honeywell must prove a "connection" or "link" between the Government's use and the disclosure of Honeywell's patent application, beyond what is normally required to prove liability for patent infringement.

### 2. The Legislative History Of The Secrecy Act Does Not Suggest That Honeywell Must Prove A Connection Or Link Beyond What Is Required To Prove Its Claim For Patent Infringement

The legislative history reinforces the conclusion reached from the statutory language of the second prong of section 183. The Invention Secrecy Act, now codified at 35 U.S.C. § 181 *et seq.*,[13] was enacted in 1951 as a replacement for Public Law 700, a temporary act[14] that provided:

> When an applicant whose patent is withheld … and who faithfully obeys the order [of secrecy] … shall tender his invention to the Government of the United States for its use, he shall, if and when he ultimately receives a patent, have the right to sue for compensation in the Court of Claims, such right to compensation to begin from the date of the use of the invention by the Government.

An Act of Congress Approved July 1, 1940 (Public Law No. 700, 76th Cong.), H.R. Rep. 82-1028 at 8. (PTX 596.) Although Public Law 700 required the patent applicant to "tender his invention to the Government" by disclosing his patent application to the appropriate Government officials,[15] it imposed no requirement that the Government's use resulted from the applicant's

[13] "The present 35 U.S.C. §§ 181-188, now known as the Invention Secrecy Act of 1951, were enacted in July 1952 as part of a general revision and codification of the patent laws. Their provisions are substantially identical with those of … former 35 U.S.C. §§ 151-159, which was in fact the Invention Secrecy Act of 1951." *Halpern v. United States,* 258 F.2d 36, 38 (2d Cir. 1958).

[14] By its terms, Public Law 700 remained in force only during wartime and was about to expire due to treaties with Germany and Japan that ended World War II. *See* H.R. Rep. No. 82-1028, at 4 (1951).

[15] *Barlow,* 1936 WL 3032 at *50 (1936) ("The word "tender" used in the act of October 6, 1917, is not to be given any other meaning than its ordinary one. The statute is a remedial one, and the intent of Congress in exacting a tender of an invention for use was to put the Government upon notice that by user [*sic,* use] liability to pay the applicant therefor might arise. Its meaning is synonymous with "offer" and there is nothing in the act as a whole which in any way indicates that more was exacted of an applicant than bringing to the attention of the officials the fact of a pending application for a patent and that the Government might use it in any way it might choose.") Public Law 700 is identical in relevant part to the act of October 6, 1917 (40 Stat. 394, Ch. 95, 35 U.S.C. § 42). *See* H.R. Rep. 82-1028 at 4 ("On July 1, 1940, Public Law 700 was enacted to make the provision of the act of October 6, 1917, effective for 2 years despite the fact

(continued…)

disclosure. Instead, the prior act was interpreted as allowing a patent owner to recover compensation for the Government's use during the period his patent was withheld by a secrecy order to the same extent as if he had been issued a patent at the time of such use.

> The established process of procedure being thus arrested and the inventor's rights suspended [by a secrecy order], the inventor might still tender his patent to the Government for use - *i.e.*, disclose his application to the full extent - and with matters in this inchoate condition *not lose his right to sue and recover compensation for its use, if it was use, to the same extent as if he had letters patent at the time of user* [*sic,* use]. In other words, the law saved to the inventor all rights and privileges which might have resulted disastrously to any claim for compensation by reason of its passage without this saving clause.

*Barlow v. United States,* 82 Ct. Cl. 360, No. H-272, 1936 WL 3032 at *50 (1936) (ordering an accounting of compensation to be awarded to plaintiff) (emphasis added).

With the Invention Secrecy Act, Public Law 700 became permanent, along with several changes, none of which imposed any requirement to demonstrate any "connection" or "link" between the Government's use and the disclosure of the application that was subject to a secrecy order, beyond that required to prove liability for patent infringement. H.R. Rep. 82-1028 at 4 (PTX 596). The House report enumerates the following differences between section 3 of the Invention Secrecy Act (now section 183) and Public Law 700:

> Section 3 differs from Public Law 700 with respect to compensation payable to the owner of an application under a secrecy order. Like Public Law 700, however, it provides for compensation for damages caused by the order of secrecy or for governmental use. Section 3 prescribes a 6-year statute of limitations. It does not require tender of the invention to the Government precedent to recovery of compensation, nor does it defer presentation of a claim for compensation until after a patent issues on the application.…

H.R. Rep. 82-1028 at 5-6. (PTX 596.) Nothing in the House Report indicates that Congress intended to change Public Law 700 by requiring a patent owner to prove any "connection" or

---

that the United States was not at war"); *see Barlow*, 1936 WL 3032 at *50 (quoting the act of October 6, 1917).

"link" between the Government's use and the disclosure of a patent application that was subject to a secrecy order, beyond what is required to prove liability for infringement.

### 3. No Binding Case Law Requires That Honeywell Must Prove A Connection Or Link Beyond The Need To Prove Liability For Infringement

The Government's interpretation of the words "resulting from his disclosure" in section 183 is based upon *dicta* in a panel decision in *Farrand Optical Co. v. United States,* 317 F.2d 875 (2d Cir. 1963), that was overturned after *en banc* review. A three-judge panel in that case interpreted the words "resulting from his disclosure" in the *first part* of section 183 that provides for an *administrative* remedy as follows:

> Section 181 of the Act [footnote omitted] provides for two kinds of disclosure to which the § 183 phrase 'use of the invention … resulting from his disclosure' may reasonably relate. The first is the applicant's disclosure of the invention in his patent application: 'the Commissioner … shall make the application for patent in which such invention is disclosed available ….' The second is the disclosure by the Commissioner of Patents of the filed patent application to officers of designated defense agencies: 'Each individual to whom the application is disclosed shall sign a dated acknowledgment thereof ….' … If the sections are read together in this way the Government's unauthorized use of the invention for which compensation is provided must have directly resulted from the secrecy order and the steps leading to its issuance under § 181 of the Act.

*Farrand,* 317 F.2d at 879-80 (ellipses within internal quotations in original).

The foregoing passage is *dicta* from a panel decision *that was overturned after rehearing en banc*. *Farrand,* 317 F.2d at 883. After remand to the panel, the plaintiff was awarded a royalty on the Government's purchases of patented bomb sights from a third party, despite the absence of any proof that "the Government's unauthorized use … directly resulted from the secrecy order and the steps leading to its issuance." *Id.* at 879-80, 883*; Farrand Optical Co. v. United States,* 325 F.2d 328, 337 (2d Cir. 1963). Notwithstanding the dicta in the original panel decision, the Second Circuit held that plaintiff was entitled to "just compensation" under section 183, despite the fact that the Government's decision to procure the invention from a second

source *preceded* the issuance of a secrecy order, and therefore could *not* have been the result of the secrecy order or the disclosure of the patent application to defense agencies. Thus *Farrand* provides no support for the Government's urged additional requirement of proof of a "connection" or "link" between the Government's use and the disclosure of the patent application that was subject to a secrecy order.

### D. Even If Section 183 Were Construed To Require A Connection Or Link, Honeywell Has Proven Such Link

As discussed above, section 183 does not require any connection or link between the Government's use and Honeywell's patent disclosure, as the Government urges. Even if such a connection or link were required, that requirement is easily satisfied. The connection or link is Mr. McLure. The evidence clearly establishes that Mr. McLure reviewed Honeywell's '269 patent application at the same time that he was working on the Government committee responsible for developing the NVG compatible lighting standard that later governed the procurement of the infringing display systems. The Government cannot claim that its defense agencies never reviewed Honeywell's '269 patent application. Nor can it claim that it has never used the technology disclosed in that application – after all infringement has already been found. The fact that at least one Government employee who read Honeywell's patent disclosure was simultaneously involved in determining how the Government would solve the NVG compatibility problem for red lighting and full color displays is more than a sufficient connection or link.

But even under the strict standards applied in copyright and trade secret cases, a connection or link can be demonstrated. In these contexts, the courts routinely look to circumstantial indicia of copying, such as the timing of the creation of the accused work in relation to defendant's access to the protected work. *See, e.g., United States Surgical Corp. v.*

*Origin Medsystems, Inc.*, No. C-92-1892-VRW ENE, 1993 WL 379579 at *3, n. 2 (N.D. Cal. Jan. 12, 1993) (creation of defendant's product immediately after access to plaintiff's trade secret supported finding of misappropriation).

In addition, the trier of fact may infer derivation from proof of access along with proof of discrete similarities between the two texts – especially on special terms, misspellings, or purposely false information or so-called "traps." *See e.g., Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 926 (7th Cir. 2003) ("It is in order to avoid having to prove access that mapmakers will sometimes include a fictitious geographical feature in their maps; if that feature (what is called in the trade a 'copyright trap') is duplicated in someone else's map, the inference of copying is compelling."); s*ee also, Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir. 1984) ("[c]ourts have regarded the existence of common errors in two similar works as the strongest evidence of piracy") (*quoting* 3 M. Nimmer, Nimmer on Copyright § 13.03 [C] at 13-38.2-.3 (1983), now at 4 Nimmer § 13.03 [C] at 13-88.7 (2006)).

Also in the trade secret context, the courts applying the inevitable disclosure doctrine recognize that an employee with knowledge of a trade secret cannot unlearn or wall off portions of his brain. *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) ("[u]nless [defendant] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions … by relying on his knowledge of [plaintiff's] trade secrets").

### 1. The Evidence Demonstrates A Connection Or Link Between The Government's Use Of The Invention And '269 Application

#### (a) Mr. McLure Actually Reviewed The '269 Application At Least Three Times During The Period From March 1986 To May 1988.

The evidence is undisputed that Mr. McLure actually reviewed the '269 application at least three times during the period from March 1986 to May 1988. (5/24/05 McLure Dep. 104-

106, 120, 127, 129-133, 145, 219; 7/24/06 Tr. 231-234, 239-240, 242, 248-249 (McLure); 7/25/06 Tr. 267-268, 284-288 (McLure); PTX-501 ('269 Application); PTX-503 (Secrecy Order Recommendation Review Sheet For '269 Application Signed and Dated March 4, 1986); PTX-508 (Secrecy Order Recommendation Review Sheet For '269 Patent Application Signed and Dated April 7, 1987); PTX-505 (Secrecy Order Recommendation Review Sheet For '269 Patent Application Signed and Dated March 25, 1988).) Mr. McLure testified that he was careful and serious in his substantive review and, each time, determined that it "would ... be detrimental to national security if [the '269 patent application] were to be disclosed." (5/24/05 McLure Dep. 63-64; 7/24/06 Tr. 239 (McLure); 7/25/06 Tr. 392 (McLure).) During this same timeframe, Mr. McLure similarly reviewed the '268 application, which included a nearly identical specification, and also met with Bendix (Honeywell's predecessor) about that application. (5/24/05 McLure Dep. 220-221, 225-232, 235-236; 7/25/06 Tr. 272-274, 278-280, 288-292, 474 (McLure); PTX-501; PTX-535; PTX-537 (Secrecy Order Recommendation Review Sheet For '268 Application Signed and Dated March 4, 1986); PTX-541 (Secrecy Order Recommendation Review Sheet For '268 Patent Application Signed and Dated March 4, 1988); PTX-538; PTX-539 (Navy file memoranda recognized by Mr. McLure).) This is not a case where protected information – the '269 application – need be imputed to Mr. McLure because the direct evidence shows he repeatedly obtained and reviewed it. That he cannot presently recall the substance of the '269 application is not exculpatory – but rather compels the Court to give substantial weight to the circumstantial evidence.

In some contexts, an alleged copyist can overcome evidence of access or possession by proving that it developed its product in a "clean room." *DCS Communications Corp. v. DGI Technologies, Inc.*, 898 F. Supp. 1183, 1190 n. 3 (N.D. Tex. 1995). A "clean room" is a

technique used in the software industry to allow a company to incorporate the functional capabilities of its competitor's code without directly copying it. *Id.* Usually, a group of product developers will divide into two teams: one that disassembles the code and describes its functional aspects and one that writes the competing product's code from the first team's description. *Id.*

Under the circumstances of this case, the Government can point to no institutional controls or procedures comparable to a "clean room" with respect to its development of MIL-L-85762A. To the contrary, not only was Mr. McLure involved in the effort, he led the effort as chairman of the committee, sponsored and reported on research needed by the committee, and participated in meetings with the three other Government witnesses who testified at trial about the effort to draft MIL-L-85762A – Messrs. Reetz and Byrd and Ms. Bryner. There is no evidence that any committee member was somehow walled away, immune to, or independent of Mr. McLure's involvement in the effort and, as noted above, it was impossible for Mr. McLure to compartmentalize or disregard his repeated and substantive reviews of the '269 application.

**(b) Mr. McLure Was A Participating Voting Member Of The Committee That Issued MIL-L-85762A From At Least February 1986 Through August 1988 And Its Chairman From September 1986 Through August 1988**

The evidence is undisputed that Mr. McLure actually and actively participated in the committee that issued MIL-L-85762A – the military specification governing NVG compatibility with full color displays – before, during, and after the several times he reviewed the '269 and '268 applications. (5/24/05 McLure Dep. 299-303; 345; 7/25/06 Tr. 327-328, 348, 368, 378-380, 390, 403, 420 (McLure); 7/27/06 Tr. 1000-1009 (Byrd); PTX-560; PTX-554; PTX-13.) Mr. McLure sponsored the Navy research conducted in developing MIL-L-85762A, including Ms. Bryner's laboratory tests that recommended the specifications for the color red that had been

prohibited under the earlier MIL-L-85762 standard. (7/27/06 Tr. 1073-1074 (Bryner); DE-303; 7/26/06 Tr. 528-529, 592-593 (Reetz); PTX-606.) He met frequently (at least weekly) with Mr. Reetz about red lighting and NVG compatibility. (7/25/06 Tr. 298-299; 328-332 (McLure); 7/26/06 Tr. 592-599 (Reetz); PTX-603 (Reetz Notebooks) at GVT019-2864.) Mr. McLure consulted with program managers about whether and how to apply the NVG compatibility specification, including with respect to the CV-22 aircraft. In these conversations, Bendix's polarizer filter scheme was discussed as "patented" and "the plan" was to implement a 665 nm minus blue filter on the NVG and an additional cut-off filter on the full color displays. (PTX-555 at GVT032-3096; DE-321 at GVT018-0808.) Mr. McLure participated in meetings where "a narrow band of red" referring to a "red spectrum" were discussed – and he understood the meaning of those terms. (7/25/06 Tr. 361-363, 416-417 (McLure); PTX-559 at GVT019-1977 to -1978.) All of this activity was squarely within Mr. McLure's position with the Navy and responsibility on the committee during the 1985 through 1988 time frame. (5/24/05 McLure Dep. 299-303, 345; 7/25/06 Tr. 327-328, 348, 368, 378-380, 390, 403, 420 (McLure); 7/27/06 Tr. 1000-1009 (Byrd); PTX-560; PTX-554; PTX-13.)

At a minimum, such evidence demonstrates a connection or link: Mr. McLure could not have quarantined or segregated his knowledge of the '269 application any more than could an employee having knowledge of a trade secret. *See FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982) ("[e]ven assuming the best of good faith, [the defendant] will have difficulty preventing his knowledge of FMC's 'LongSweep' manufacturing techniques from infiltrating his work"); *Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 137, 147 (D. Conn. 1997) ("[s]imply put, 'the harm to the plaintiff cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid

disclosure'") (*quoting Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995)); *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 631 (E.D.N.Y. 1996) ("notwithstanding [defendant's] good intentions, there not only is a high risk, but it is inevitable that he will disclose important … trade secrets ... He cannot eradicate these trade secrets and this confidential information from his mind").

Using the factors courts commonly consider, it is clear that Mr. McLure's use or disclosure of the '269 application was inevitable:[16]

(1) The subject matter of the '269 application was squarely within and, indeed, a focus of Mr. McLure's committee that issued MIL-L-85762A. (PTX-501; DE 303 at GVT012-3234 ("In December, 1985 a Joint Aeronautical Commanders Group (JACG) on Interior Aviation Lighting [also known as the Tri-Service Committee[17]] was established … to address NVIS compatible aircraft lighting … [and] revis[e] MIL-L-85762 … [and] investigate the possibility of using red lighting components with NVIS."); (7/27/06 Tr. 999 (Byrd) (the main objective or goal of revising MIL-L-85762, which ultimately issued as MIL-L-85762A, was to get red back into the cockpit and allow the use of full color displays); 7/27/06 Tr. 1051, 1066 (Bryner).)

(2) Mr. McLure actually and repeatedly obtained and reviewed the '269 application while serving on and eventually chairing the committee. (5/24/05 McLure Dep. 283-287; 7/25/06 Tr. 297-299, 391-394 (McLure).)

(3) After reviewing Honeywell's '269 patent application, Mr. McLure did nothing to wall himself off from participation on the committee, including meetings with Messrs. Reetz and Byrd and Ms. Bryner, and, in fact, became its chairman. (5/24/05 McLure Dep. 299-303; 345; 7/25/06 Tr.

---

16 For example, in *RKI, Inc. v. Grimes*, the court considered whether (1) the employee's position with the new employer is comparable to the position he held with the former employer; and (2) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." 177 F. Supp. 2d 859, 876 (2001); *see also* D. Peter Harvey, "*Inevitable*" *Trade Secret Misappropriation after PepsiCo, Inc. v. Redmond,* 537 PLI/PAT 199, 226-27 (1998) (listing factors used by courts to determine inevitable disclosure, including: (1) What is the scope of the defendant's new job? (2) Has plaintiff clearly identified the trade secrets which are at risk? (3) Has actual trade secret misappropriation already occurred? (4) Is it possible to "sanitize" the employee's new position?).

17 5/24/05 McLure Dep. 50-51.

327-328, 348, 368, 378-380 (McLure); PTX-560 (minutes for September 29-30, 1986 meeting at which Mr. McLure was elected chairman); PTX-554 (August 26, 1988 correspondence about MIL-L-85762 changes approved by David McLure who "chairs the ANVIS specification team").[18])

This record thus provides ample support for a finding of a connection or link.

**(c) The Presence And Timing Of The Term "A Narrow Band Of Red" In Minutes For An April 1986 Meeting Of The Committee Drafting MIL-L-85762A Is Compelling Evidence Of Copying Or Derivation**

According to the official minutes for the April 8 – 9, 1986 meeting of the committee that was drafting MIL-L-85762A, there was discussion that MIL-L-85762A will "address ... NVIS compatible ... full color ... [displays] ... and define *a narrow band of red*" (emphasis added).) (PTX-559 (Panel minutes for April 8-9, 1986 meeting) at GVT019-1977.) This "*narrow band* of red" terminology is nearly identical to that used in the '269 application that repeatedly refers to a "narrow band" and a "narrow color band," for example in its discussion regarding a display projecting an image in the "red spectrum" and using a filter so "light transmitted by the display unit is only within a very narrow color band." (PTX-501 at 7-8.) This same terminology is reflected in the '268 application that is nearly identical to the '269 application. (PTX-535 at 7-8.)

---

[18] Mr. McLure never told his supervisors that review of the '269 application should be assigned to others because Mr. McLure was studying the issue of NVG compatibility with full color displays on behalf of the Government. (7/25/06 Tr. 392-393 (McLure).) Mr. McLure justified his review the '269 and '268 applications while working on the committee that issued MIL-L-85762A by testifying that "[i]f every member of NAVAIR recused themselves because something came in within their technology area, you would have no one to review applications." (7/25/06 Tr. 393 (McLure).) But Mr. McLure admitted that his position was unique; he was the only Navy voting member on the committee that issued MIL-L-85762A. (7/25/06 Tr. 384-385 (McLure).)

As recollections have faded, these official minutes are the best evidence of what was discussed at the April 8 – 9, 1986 meeting and the closest thing to a video or audio recording of what occurred at that meeting. The minutes are probative of what was actually discussed, particularly because the person who took the committee meeting minutes, Joyce Vanderlind, was a non-technical person but one observed to have "a good grasp of what [the participants] were discussing" because "she attended all of the meetings." (7/27/06 Tr. 1074-1075 (Bryner).) Under these circumstances, it is highly unlikely that the committee scribe – Ms. Vanderlind, the minutes taker – would, on her own, concoct such terminology.

Notably, Mr. Reetz testified that "narrow band of red" was ***not*** a term he personally used during this timeframe and was not a term he recalled the committee using during this timeframe other than in the official meeting minutes. (7/26/06 Tr. 622-623 (Reetz) ("Q: Is that a term that you used in that time period, as you recall? A: Myself? Q: Yes. A: No. Q: Is it a term that you recall the committee using in that time period, other than in this memo? A: Other than in this memo? Q: Yes. A: No.").) Moreover, Mr. Reetz admitted that in his work about NVG compatibility, he did ***not*** focus on establishing a narrow band of red. (7/27/06 Tr. 893-894 (Reetz) (Q: You didn't try to establish a narrow band of red, and see how that would work with the goggles, is that right? A: That's not where I started. I didn't start with that premise, no").) Thus, Mr. Reetz had no explanation for the committee's use of the phrase and concept "narrow band of red" for the first time in the April 8 – 9, 1986 meeting minutes

The timing here is also probative and indeed uncanny. The April 8 – 9, 1986 meeting was less than one week after Mr. McLure met with Bendix about the nearly identical '268 application, which also uses the this special and unconventional terminology, and little over a month since he first reviewed the '269 and '268 applications on March 4, 1986. (5/24/05

McLure Dep. 225-232; 7/25/06 Tr. 278-280, 474 (McLure); PTX-538; PTX-539 (Navy file memoranda recognized by Mr. McLure); PTX-537 (Secrecy Order Recommendation Review Sheet For '268 Application Signed and Dated March 4, 1986); PTX-503 (Secrecy Order Recommendation Review Sheet For '269 Application Signed and Dated March 4, 1986.))

In this case, the evidence is clear that – *after* Mr. McLure reviewed the '269 application – the special terminology used in that application to explain how NVG compatibility with a full color display could be achieved found its way into the committee's discussions and official minutes regarding MIL-L-85762A. As such, the April 8 – 9, 1986 meeting minutes are especially compelling evidence of a connection or link between the disclosure of Honeywell's '269 patent application and the Government's development of the specification defining NVG compatibility for the designated display systems. Courts recognize that when there is no other plausible explanation for the use of parallel and unusual terminology, and when the probability that the accused copyist had duplicated them independently is remote, an inference of copying may be drawn. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1169-70 (7th Cir. 1997) ([Plaintiff] must produce evidence of access, all right - but…a similarity that is so close as to be highly unlikely to have been an accident of independent creation *is* evidence of access) (emphasis in original); *Gaste v. Kaiserman*, 863 F.2d 1061, 1067-68 (2d Cir. 1988) ("Though striking similarity alone can raise an inference of copying, that inference must be reasonable in light of all the evidence."); *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 354-55 (4th Cir. 2001) ("[a] copyright infringement plaintiff need not prove that the infringer actually saw the work in question; it is enough to prove that the infringer (or his intermediary) had the mere opportunity to see the work and that the subsequent material produced is substantially similar to the work.")

Moreover, courts also recognize that one powerful way to prove use of a trade secret is to show an abrupt and material shift in direction of research that coincides with exposure to confidential information. *See*, *e.g., Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 388 F. Supp. 2d 37, 54, 65-67 (N.D.N.Y. 2005). Even Mr. Reetz admits that he did not start with the goal of trying to establish a narrow band of red in his NVG compatibility work, did not use such terminology, and cannot recall the committee using it – other than in the telltale official meeting minutes. (7/26/06 Tr. 622-623 (Reetz); 7/27/06 Tr. 893-894 (Reetz).)

**(d) The Designated Display Systems Procured Pursuant To MIL-L-85762A Are Substantially Similar To Honeywell's Patent Disclosure That Led To The '914 Patent, As Evidenced By The Court's Finding Of Infringement**

Although Mr. McLure's repeated review of the '269 application and role on the committee that drafted MIL-L-85762A is more than adequate circumstantial evidence to support a connection or link, that the designated display systems found to infringe the '914 patent were procured pursuant to MIL-L-85762A provides even greater proof of such a link. (JTX 43 (F-16/CMFD - Prime Item Development Specification for the Color Multifunction Display) at H57966-74, H57976-79; PTX 309 (C-130J/CMDU - Critical Item Development Specification for the C-130J Color Multipurpose Display Unit) at LHM00007976-98; PTX 307 (C-130/RDU - Interface Control Document for the Pilots Remote Display Unit) at GVT052-0563-68.)

As noted above, in both trade secret and copyright contexts, courts routinely look to access or possession of protected information and the similarities between such information and devices or other information alleged to be misappropriated or infringing. For instance, in the trade secret context, in order to prove that a defendant's use of a trade secret or confidential material, generally a plaintiff need only show that defendant's product bears a substantial identity with the plaintiff's secrets. *See, e.g., Motorola, Inc. v. Computer Displays Int'l, Inc.*, 739 F.2d

1149, 1156 (7th Cir. 1984) ("trade secret law … protects the holder of a trade secret from uses *substantially* derived from that secret") (emphasis in original).

In the copyright context, the standard is comparable. Evidence of both access to the asserted copyrighted material and substantial similarity between the copyrighted material and accused infringing material is sufficient to support a finding of copying – a particular form of use. *See, e.g., Amini Innovation Corp. v. Anthony California, Inc.,* 439 F.3d 1365, 1368 (Fed. Cir. 2006) ("[c]opying requires evidence that a defendant literally copied the designs or, alternatively, that a defendant had access to the protected designs before creating the accused designs with an additional showing of substantial similarity not only of the general ideas but of the expression of those ideas as well").

In this case, the record provides ample evidence of the substantial similarity between the designated display systems that Government procured and used during the Secrecy Act period and Honeywell's '269 application. The Court already has determined that the three designated display systems infringe the '914 patent that issued from the '269 application. *Honeywell*, 70 Fed. Cl. at 478-79. Further, the evidence is undisputed that the Government procured the designated display systems pursuant to MIL-L-85762A. (JTX 43 (F-16/CMFD - Prime Item Development Specification for the Color Multifunction Display) at H57966-74, H57976-79; PTX 309 (C-130J/CMDU - Critical Item Development Specification for the C-130J Color Multipurpose Display Unit) at LHM00007976-98; PTX 307 (C-130/RDU - Interface Control Document for the Pilots Remote Display Unit) at GVT052-0563-68.) Consequently, if the '269 application is analogized to protected trade secret or copyright material possessed by Mr. McLure (as indicated above), the Court's infringement ruling amply demonstrates that the

designated display systems procured pursuant to MIL-L-85762A are substantially similar to the ‘269 application.

The revised standard, MIL-L-85762A, embodies the “geniusness” of the ‘914 patent, namely “the splitting of the … red color band into a lambda 1 and lambda 2, sharing part of it with the display and part of it with the night-vision goggle.” (8/4/05 Tr. 750-751 (Tannas).) By moving the cutoff of the NVG minus blue filter from 625 nm to 665 nm, and thereby permitting emission of a narrow band of red from the display, the Government adopted precisely the geniusness disclosed and claimed in the ‘914 patent, namely the splitting of the red color band (wavelengths from 620 to 780 nm per the Court’s claim construction) into two parts, lambda 1 (620 to 665 nm) for the display and lambda 2 (665 to 780 nm) for the NVGs in order to achieve full color in the cockpit without significant degradation in goggle performance. (5/24/05 McLure Dep. 284-285 (a “big update between MIL-L-85762 and MIL-L-85762A was adding in the ability for … [NVGs] to use a 665 nm filter”); 7/25/06 Tr. 300-302 (McLure); *Honeywell*, 70 Fed. Cl. at 433 (“red color band” means “range of color from 620 nm to 780 nm”) (*citing Honeywell Int’l, Inc. v. United States*, 66 Fed. Cl. 400, 471 (2005)).) As the Court’s infringement determination demonstrates, the infringing designated display systems embody this same “splitting” of the red color band as contemplated by the revised standard, MIL-L-85762A. *Honeywell*, 70 Fed. Cl. at 459-65 (“Each designated system ... contains a [deleted] filter that ‘passes the range of shorter wavelengths of the red color band ($\lambda_1$) and blocks the range of longer wavelengths of the red color band ($\lambda_2$).’”) While the Government could have pursued other ways of achieving compatibility between NVGs and full color displays, by adopting military standard MIL-L-85762A, it elected to use the invention disclosed and claimed in the ‘914 patent.

Specifically, the 665 nm Class B minus blue filter described in the revised standard, MIL-L-85762A, is the same type of filter as described in claim element 2(b) of the '914 patent: "a fourth filter which filters light at the night vision aid, said fourth filter cooperating with said plurality of filters to substantially block at least said narrowband of the red color band from being admitted to the night vision aid." ('914 patent, col. 6, lines 12-28.) Further, at the time MIL-L-85762A was being drafted, the Government contemplated that its requirements would be achieved by using "a filter [on the display] which cuts off the deep red and near IR emissions," *i.e.,* a filter that blocks the wavelengths of around 665 nm and greater. (PTX-555 at GVT032-3096; 7/25/06 Tr. 369-371 (McLure).) This is precisely the type of filter described in claim element 2(a)(3) of the '914 patent – "a third filter for filtering the red color band of the local source of light and passing a narrowband of the red color band." ('914 patent, col. 6, lines 12-28.)

Thus, the filters described and contemplated by the revised standard, MIL-L-95762A, are exactly the same types of filters that are disclosed and claimed in the '914 patent. This should come as no surprise, since Mr. McLure chaired the committee that drafted the revised standard during the same period he repeatedly reviewed the '269 patent application.

## IV. CONCLUSION

For all of the forgoing reasons, the Court should find the Government liable to Honeywell pursuant to the Secrecy Act.

Dated: April 25, 2007

Respectfully submitted,

Lawrence J. Gotts by Elizabeth Roesel

Lawrence J. Gotts
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
(202) 551.1700
(202) 551.1705 (fax)

Attorneys for Plaintiffs
*Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

OF COUNSEL:

Mark Koehn
Elizabeth Miller Roesel
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
(202) 551.1700
(202) 551.1705 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of PLAINTIFFS' POST-TRIAL BRIEF REGARDING LIABILITY UNDER SECRECY ACT was served via electronic mail and via First Class Mail, postage prepaid, on April 25, 2007, on:

John H. Horne, Esq.
Powell Goldstein LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3488
Tel: (404) 572-6600
Fax: (404) 572-6999
Email: jhorne@pogolaw.com

John W. Harbin, Esq.
King & Spalding
1180 Peachtree Street, NE
Atlanta, GA 30309
Tel: (404) 572-4600
Fax: (404) 572-5100
Email: jharbin@kslaw.com

Counsel for L-3 Communications Corporation

John Fargo, Esq.
Christopher L. Crumbley, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 307-0458
Fax: (202) 307-0345
Email: john.fargo@usdoj.gov
Christopher.crumbley@usdoj.gov

Counsel for United States

Thomas J. Madden, Esq.
Paul A. Debolt, Esq.
Venable LLP
Terrell Place
575 – 7th Street, N.W.
Washington, D.C. 20004-1601
Tel: (202) 344-4000
Fax: (202) 344-8300
Email: tjmadden@venable.com
padebolt@venable.com

Counsel for Lockheed Martin Corporation

Elizabeth M Roesel

Elizabeth Miller Roesel

LEGAL_US_E # 74930983.1