**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., and HONEYWELL INTELLECTUAL PROPERTIES, INC., | |
| Plaintiffs, | No. 02-1909C |
| v. | |
| | Judge Susan G. Braden |
| THE UNITED STATES, | |
| Defendant, | |
| and | |
| LOCKHEED MARTIN CORPORATION and L3 COMMUNICATIONS CORPORATION, | |
| Defendant-Intervenors. | |

**DEFENDANT THE UNITED STATES' POST-TRIAL REPLY BRIEF ON COUNT I (INVENTION SECRECY ACT)**

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

CHRISTOPHER L. CRUMBLEY
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 307-0415
Facsimile: (202) 307-0345

Of Counsel:
TREVOR M. JEFFERSON
Attorney
Department of Justice

June 8, 2007

Attorneys for the United States

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. Honeywell Mischaracterizes the Invention Secrecy Act in Several Ways . . . . . . . . . . . . . 2

A. The First Prong of Section 183 Cannot be Read as Broadly as Honeywell Asserts Without Violating Accepted Tenets of Statutory Construction . . . . . . . . 2

B. The Government's Use of the Invention Must Result from Honeywell's Disclosure in Order to Give Meaning to All Words of the Statute . . . . . . . . . . . . 5

C. In Analogizing to Trade Secret and Copyright Law, Honeywell Ignores the Doctrine of Independent Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. Honeywell Gets its Facts Wrong, and Does Not Consider Record as a Whole . . . . . . . . 11

A. There Is No Evidence of Actual Copying, and the Facts Do Not Support an Inference of Copying . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1. There is No Evidence that the MIL-L-85762A Committee Had Meaningful Access to the Invention . . . . . . . . . . . . . . . . . . . . . . . . . 12

2. Honeywell's "Evidence" of Similarity was Created by Counsel's Repeated Misquotation of a Single Phrase and Has No Grounding in the Actual Record in this Case . . . . . . . . . . . . . . . . 14

B. The Record Clearly Supports the Conclusion that the Government Independently Developed the Military Specification . . . . . . . . . . . . . . . . . . . . . . . 18

III. Honeywell Is Not Entitled to Compensation For Any of the Three "Categories" of Damages it Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A. No Compensation is Due for Procurement by the Government for its Own Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. No Compensation is Due for Procurement by the Government for Foreign Military Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. No Compensation is Due for Lockheed Martin's Direct Commercial Sales to Foreign Governments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

*Calhoun v. Lillenas Publishing*,
298 F.3d 1228 (11th Cir. 2002) . . . . . . . . . . 10

*Canadian Commercial Corp. v. United States*,
173 U.S.P.Q. 362 (Ct. Cl. 1972) . . . . . . . . . . 9, 10

*Constant v. United States ("Constant I")*,
617 F.2d 239 (Ct. Cl. 1980) . . . . . . . . . . 8

*Constant v. United States (Constant II")*,
1 Ct. Cl. 600 (1982) . . . . . . . . . . 4, 24

*Curl v. International Business Machines, Corp.*,
517 F.2d 212 (5th Cir. 1975) . . . . . . . . . . 10

*Goodyear Aerospace Corp. v. United States*,
1980 WL 20828 (Ct. Cl. 1980) . . . . . . . . . . 7

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995) . . . . . . . . . . 3, 5

*Keeler Brass Co. v. Continental Brass Co.*,
862 F.2d 1063 (4th Cir. 1988) . . . . . . . . . . 10

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) . . . . . . . . . . 9

*Lear Siegler v. United States*,
225 Ct. Cl. 663 (1980) . . . . . . . . . . 4

*Leesona Corp. v. United States*,
599 F.2d 958 (Ct. Cl. 1979) . . . . . . . . . . 7

*Library of Congress v. Shaw*,
478 U.S. 310 (1986) . . . . . . . . . . 4

*McDonnell Douglas Corp. v. United States,*
670 F.2d 156 (Cl. Ct. 1982) . . . . . . . . . . 3

*Motorola, Inc. v. United States*,
729 F.2d 765 (Fed. Cir. 1984) . . . . . . . . . . 6

*Nichols v. Pierce*,
740 F.2d 1249 (D.C. Cir. 1984) . . . . . . . . . . 4, 8

*Stein v. United States*,
133 F. Supp. 2d 265 (D. Mass. 2001) . . . . . . . . . . 5

**STATUTES**

22 U.S.C. § 2356 . . . . . . . . . . 22

28 U.S.C. § 1498(a) . . . . . . . . . . 22

35 U.S.C. § 183 . . . . . . . . . . passim

35 U.S.C. § 271 . . . . . . . . . . 6

35 U.S.C. § 282 . . . . . . . . . . 6

**LEGISLATIVE MATERIALS**

*Patent Disclosure: Hearings on H.R. 4687 Before the House Subcomm. No. 3, Comm. on the Judiciary, 82d Cong.* (1951) . . . . . . . . . . 4, 7, 24, 25

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., and HONEYWELL INTELLECTUAL PROPERTIES, INC., | |
| Plaintiffs, | No. 02-1909C |
| v. | |
| | Judge Susan G. Braden |
| THE UNITED STATES, | |
| Defendant, | |
| and | |
| LOCKHEED MARTIN CORPORATION and L3 COMMUNICATIONS CORPORATION, | |
| Defendant-Intervenors. | |

**DEFENDANT THE UNITED STATES' POST-TRIAL REPLY BRIEF**
**ON COUNT I (INVENTION SECRECY ACT)**

In a vain attempt to salvage its claims under the Invention Secrecy Act, Honeywell's Post-Trial Brief ("HW Br.") presents the Court with a story stitched together from limited, selective, and out-of-context citations to the trial transcript and a highly suspect misstatement of a portion of the documentary record. Along the way, plaintiffs also present inaccurate and overly broad interpretations of the controlling statute and case law. Even so, plaintiffs fail to establish that there was a grand scheme by Government employees to appropriate an invention from Honeywell, nor does the circumstantial evidence establish that appropriation occurred inadvertently. Rather, if the Court looks to the testimony of all four of the Government

employees who appeared at trial, the evidence will show that there was no need to appropriate the ideas of others, because the Government was fully capable of independent development, and in fact came up with the specification Honeywell complains of on its own.

The following Brief will address the major misstatements of fact and law that appear in Honeywell's Brief.

## I. Honeywell Mischaracterizes the Invention Secrecy Act in Several Ways

Once again, Honeywell's Brief is replete with misinterpretations of the Invention Secrecy Act, and misstatements of the applicable precedent. While most of these errors have been previously addressed in the Government's opening post-trial brief, as well as its summary judgment briefs, a few new (but equally misguided) arguments by Honeywell must be addressed at this point.

### A. The First Prong of Section 183 Cannot be Read as Broadly as Honeywell Asserts Without Violating Accepted Tenets of Statutory Construction

As has been explained in both parties' previous briefs, the statutory provision of Section 183 contains two "routes" of recovery, permitting causes of action to be brought either before a Secrecy Order is lifted, or after a patent issues on an application. 35 U.S.C. § 183. In turn, each of these "routes" permit claims for two types of damages, that the parties have called "prongs." The parties have identified the first "prong" as covering "damage caused by reason of the order of secrecy," while the second "prong" covers "use by the Government of the invention resulting from [the] disclosure." *Id.*

It is common sense, as well as proper statutory construction, to conclude that neither of these "prongs" should be interpreted such that one wholly subsumes the other. To do so would

violate the rule that statutes should be read to give meaning to all words. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 562 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant"). In other words, if Congress intended the first prong of the Invention Secrecy Act ("damage caused by reason of the order of secrecy") to be read broadly enough to cover all use by the Government of an invention, then there would have been no reason to include the second prong of Section 183.

Amazingly, Honeywell's Brief suggests just such an intent by Congress. Under Honeywell's view, any use by the Government of an invention during a Secrecy Order is compensable under *either* the first or second prong of Section 183. *See* HW Br. at 22-24. This conclusion is rationalized by Honeywell's "time-shifted infringement" theory, which claims that any act that would be an infringement after a patent issued, would be "damage caused by reason of the order of secrecy" under the first prong of the Invention Secrecy Act.

The fault in this reasoning is evident - if correct, there could be no situation where a Government use under the second prong ("use by the Government of the invention resulting from the disclosure") would not *also* be a "time-shifted infringement," according to Honeywell. Under Honeywell's interpretation, the first prong of Section 183 would swallow the second prong, a clear violation of statutory construction.

Honeywell's interpretation of the first prong of Section 183 is also contradicted by the case law. In *McDonnell Douglas Corp. v. United States*, a case Honeywell has cited with approval, the court noted that "Section 183 provides for damages to be paid to patent holders in *two situations*: when the Government wrongfully uses the patented device during the period of secrecy, and when the secrecy order itself causes damages." 670 F.2d 156, 163 (Cl. Ct. 1982)

(emphasis added). By distinguishing the two "situations," the court expressly recognized that the two prongs of Section 183 apply to different situations, and are not overlapping as Honeywell asserts.

It bears repeating that Section 183 is a waiver of sovereign immunity. As such, the law requires the statute to be construed strictly, and read no more broadly than its terms require. *See Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986). To the extent any ambiguity exists in the Invention Secrecy Act, it is to be "resolved in favor of the narrower governmental liability." *Nichols v. Pierce*, 740 F.2d 1249, 1257 (D.C. Cir. 1984). Honeywell's broad reading of the first prong of Section 183 asks the Court to ignore this rule, and would impermissibly expand governmental liability.

As the Government has consistently noted in its briefs, the legislative history and the applicable precedent should lead the Court to the correct conclusion, that the first prong of the Invention Secrecy Act applies to *concrete, non-speculative* damages that arise from the imposition of the secrecy order. *See Constant v. United States*, 1 Ct. Cl. 600, 609 (1982) ("*Constant II*") (plaintiff must prove "actual damages"); *Lear Siegler v. United States*, 225 Ct. Cl. 663 (1980) (speculative damages not permitted; must produce "real concrete evidence of damages); *see also Patent Disclosure: Hearings on H.R. 4687 Before the House Subcomm. No. 3, Comm. on the Judiciary, 82<sup>d</sup> Cong.* at 21, 28, 32 (1951)("*1951 Hearings*"). Such damages can be, for example, lost capital investment in factories or personnel, or inability to obtain financing or implement a business plan. *See 1951 Hearings* at 22; *Constant II*, 1 Cl. Ct. at 604-05, 607. No case during the more than fifty-five years since the Invention Secrecy Act was enacted has

found that "damage caused by reason of the order of secrecy" covers the damages Honeywell claims, such as Governmental use, or inability to sue or license others.

**B. The Government's Use of the Invention Must Result from Honeywell's Disclosure in Order to Give Meaning to All Words of the Statute**

As the legislative history shows, Congress intended for the clause "resulting from [the] disclosure" in Section 183 to modify the term "use by the Government," and this understanding has been reflected in court decisions applying the statute. Honeywell ignores, and in fact does not even discuss in its Brief, the most recent persuasive authority directly on point, namely *Stein v. United States*, 133 F. Supp. 2d 265 (D. Mass. 2001). In that case, the District Court explicitly noted that "[u]nder section 183, recovery for use of an invention only stems from damages *from the disclosure* of the patent application by the Patent Office." *Id.* at 268 (emphasis added).

The Government has briefed at length the other cases dealing with the "resulting from" language of the statute, as well as the legislative history, and such discussion need not be repeated in this brief. Honeywell's Brief, however, makes four arguments that must be addressed herein.

*First*, Honeywell repeats its same refrain that "resulting from [the] disclosure" must modify "invention," not "use by the Government." HW Br. at 35-36. This theory, while novel, is a result of poor statutory construction, as it would effectively make the "resulting from" phrase either redundant or nonsensical. *See Gustafson*, 513 U.S. at 562. If, under Honeywell's theory, "invention" has its typical meaning, the phrase is nonsensical since an inventor's discovery (the "invention") does not "result from" his patent's disclosure. In fact, the situation is quite the contrary: the patent's disclosure is drafted to cover ("results from") what the invention is.

If, on the other hand, one accepts Honeywell's argument that Congress intended "invention resulting from the disclosure" to mean simply "a valid patent," the phrase is redundant. By statute, patents are presumed to be valid. 35 U.S.C. § 282. Section 183 itself mandates that a patent must be valid to maintain an Invention Secrecy Act claim, since it grants the United States the ability to raise all defense it is entitled to in an infringement action (including invalidity). Therefore, the use of the word "invention" in Section 183 in itself implies the existence of a valid patent. There would be no reason for Congress to modify "invention" with "resulting from [the] disclosure," simply to signify that validity is a requirement. Unless "resulting from [the] disclosure" is read to modify "use," the language of the statute makes no sense.

*Second*, Honeywell argues that since the provision of the Patent Act that covers suits against private parties, 35 U.S.C. § 271, does not require any link between the patent and the infringer's use, no such requirement should be present in Section 183. HW Br. at 36-37. There are at least two fatal errors in this line of reasoning. First, and most importantly, Section 271 simply does not contain the "resulting from [the] disclosure" language present in Section 183. This alone signifies that Congress intended a different compensation scheme to apply to the Government in Invention Secrecy Act proceedings. Second, Honeywell provides no support for its attempt to require a Section 183 suit to be identical to one under Section 271; in fact, suits against the Government are often subject to procedural and/or substantive rules that differ from those in private actions. *See Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed. Cir. 1984) ("[a]lthough a section 1498 action may be similar to a Title 35 action, it is nonetheless only

parallel and not identical."); *see also Leesona Corp. v. United States*, 599 F.2d 958, 968-69 (Ct. Cl. 1979).

*Third*, Honeywell attempts to argue that the legislative history supports its interpretation of the statute. The contrary is true, and has been previously treated by the Government's briefs. Most tellingly, the phrase "resulting from his disclosure" was inserted into the bill during the House committee's markup, at the same time that the phrase "provided that such use resulted from the applicant's disclosure" was deleted. *See 1951 Hearings* at 5-6. The similarity in wording between these two phrases, and the lack of commentary on the change, signals that the committee was merely cleaning up the text of the bill, with no change in meaning intended. The clear implication is that the two phrases were intended by Congress to have the same meaning, and "resulting from his disclosure" means "provided that such use resulted from the applicant's disclosure."

*Fourth*, the decided cases on point do not support Honeywell's interpretation. Honeywell focuses on *Goodyear Aerospace Corp. v. United States*, 1980 WL20828 at *3 (Ct. Cl. 1980). HW Br. at 32-33. Honeywell asserts that the court in *Goodyear* held that nothing more than infringing Government use during a secrecy order need be proven to establish a Section 183 claim. *Id.* The case clearly reads otherwise, and in fact supports the Government's position.

In denying the Government's motion for summary judgment, the Court in *Goodyear* noted that "[u]se by the Government . . . which infringes the claims of the yet-to-issue [] patent *may* give rise to a damage claim against the Government under 35 U.S.C. § 183." *Id.* (emphasis added). The inclusion of the word *may* in this sentence is significant; it means that a showing of infringement is a *necessary*, but not a *sufficient*, condition for a favorable ruling under Section

183. This alone negates the argument in Honeywell's Brief that a finding of infringement is *sufficient* grounds for a ruling in its favor in this case.

Additionally, Honeywell's brief ignores, and in doing so runs completely afoul of, the decision in *Constant v. United States* ("*Constant I*"), 617 F.2d 239 (Ct. Cl. 1980). As noted in previous briefs, the court in *Constant I* held that the measure of recovery under the two "routes" of Section 183 must be the same. *Id.* at 243, n.12. The statute contains similar wording in the second prong of each "route":

- "use of the invention by the Government, resulting from his disclosure." (first route)
- "use by the Government of the invention resulting from his disclosure." (second route)

35 U.S.C. § 183.

Under the *Constant I* decision, these phrases must have the same meaning. It is clear from the language of the first "route" that the phrase "resulting from his disclosure" does *not* modify the word "invention," as Honeywell would assert, but instead applies to "use." For the measure of compensation to be the same, this must be true of the second route as well. In the portion of the Invention Secrecy Act relevant to the present action, the phrase "resulting from [the] disclosure" modifies "use," not "invention," and is a prerequisite to recovery by Honeywell.[1]

---

[1]Even if the Court were to conclude that the language of Section 183 does not clearly support the Government's position, the language is, at the very least, ambiguous. In such cases where a statutory waiver of sovereign immunity contains an ambiguity, the law requires the Court to resolve the ambiguity in favor of narrower Government liability. *Nichols v. Pierce*, 740 F.2d 1249, 1257 (D.C. Cir. 1984).

### C. In Analogizing to Trade Secret and Copyright Law, Honeywell Ignores the Doctrine of Independent Development

Conceding that it has been unable to provide the Court with any evidence that would prove that the Government's alleged use of the '914 invention actually resulted from Honeywell's disclosure, plaintiffs instead turn to a theory that the required link between the Government's use and Honeywell's disclosure can be proven by circumstantial evidence and implication. Honeywell derives these theories from doctrines of copyright law and trade secret. Even assuming *arguendo* that this is appropriate, Honeywell's discussion of the law is inadequate and therefore misleading. If Honeywell wishes for this Court to turn to other areas of law, it is important that the Court have a full understanding of the doctrine of independent development, which is critical to the present case.

In trade secret cases, plaintiffs are entitled to establish a *prima facie* case of misappropriation of a trade secret by showing that the defendant had access to a trade secret, and that the defendant's product bears a substantial similarity to the trade secret. *See Canadian Commercial Corp. v. United States*, 173 U.S.P.Q. 362, 364 (Ct. Cl. 1972). However, "[a]ccess to trade secrets, as with access to copyrighted material, merely establishes that defendant had an opportunity to copy, not that it actually copied." *Id.* A defendant can rebut this *prima facie* case with a showing that the relevant information was not gained by improper means. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) ("A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering").

Where independent development is a possible source for the defendant's product, the plaintiff must prove that the defendant actually derived the design from plaintiff's trade secret instead of through independent means. *See Canadian Commercial Corp*., 173 U.S.P.Q. at 364. In fact, a defendant's product need not be completely developed prior to it having access to the trade secret. *See Curl v. International Business Machines, Corp.*, 517 F.2d 212, 213 (5th Cir. 1975). In *Curl*, the court held that IBM demonstrated sufficient independent development by proving that its design was "essentially complete" prior to receiving any information from plaintiff. *Id.*

A similar doctrine exists in copyright cases, to which Honeywell also analogizes. Often called "independent creation," a defendant may rebut a plaintiff's *prima facie* case of access and substantial similarity by showing that a work was developed without reference to the plaintiff's work. *See, e.g., Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1232 (11th Cir. 2002) ("Proof of access and substantial similarity raises only a presumption of copying which may be rebutted by [defendant] with evidence of independent creation."); *Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1065-66 (4th Cir. 1988).

If Honeywell wishes the Court to apply trade secret or copyright law to the present case, it must also accept the application of independent development, which is fatal to its case. As will be discussed below, it is the Government's position that Honeywell has not established a *prima facie* case of access or substantial similarity. Nevertheless, even if a *prima facie* case has been established, it is clearly rebutted if the evidence shows that the Government independently developed the military specification MIL-L-85762A on its own, or at the very least made substantial progress in doing so, before David McLure allegedly had access to the invention of

the '914 patent. As the Government's opening post-trial brief established, the record is replete with evidence of independent development.

## II. Honeywell Gets its Facts Wrong, and Does Not Consider Record as a Whole

Honeywell's discussion of the facts overwhelmingly focuses on one person (Mr. David McLure[2]) and one phrase extracted from one set of meeting minutes. The phrase "narrow band of red," is repeatedly cited by Honeywell in its brief, is alternately called "telltale," "special terminology," and "parallel and unusual terminology," and forms the foundation for Honeywell's entire case of copying. HW Br. at 49-51. Unfortunately for Honeywell, its house of cards built on this foundation must ultimately fall, because *the quoted phrase never appears in the meeting minutes*. Honeywell misquotes the evidentiary record, and does so repeatedly to bolster its case of substantial similarity (and therefore copying).

On top of the inaccuracy in Honeywell's depiction, by directing the Court's attention to only an isolated phrase taken out of context, Honeywell focuses in on a solitary branch of a tree,

---

[2]Despite the fact that Mr. McLure testified at trial, Honeywell improperly cites to his deposition transcript throughout its brief. Mr. McLure's deposition was taken under Rule 30(b)(6), and as such can be used at trial, but only on the topics noticed. In this case, the Government designated Mr. McLure to testify as to the Secrecy Order placed on the '269 application, and does not object to Honeywell's citations on this topic.

However, Honeywell's Brief also cites to Mr. McLure's deposition testimony on other topics, such as his work on the MIL-L-85762A committee. Since this is outside his 30(b)(6) designation, it is his personal testimony, and therefore is hearsay that cannot be used since he testified at trial, and in Honeywell's own case, no less. *See Fed. R. Evid.* 802, 804. As such, the Government objects to these citations, and requests that the Court strike these citations from Honeywell's Brief. The Government would also respectfully request that the Court disregard any portions of Honeywell's Brief that rely on the deposition transcript for support.

The particular cites objected to by the Government appear on the following pages of Honeywell's Brief: 7, 8 (2 citations), 12 (n.4), 15 (2 citations), 16, 18 (3 citations), 45, 46, 47, and 53.

losing sight of the forest surrounding it. The Court should not be tempted to make the same mistake. The record as a whole demonstrates that Government employees, four of whom testified at trial, independently developed the military specification Honeywell complains of. Honeywell has provided no evidence that rebuts this testimony, and there is no reason to doubt that these witnesses told the truth.

### A. There Is No Evidence of Actual Copying, and the Facts Do Not Support an Inference of Copying

In its brief, Honeywell makes no attempt to argue that there is any direct evidence whatsoever that the committee responsible for MIL-L-85762A copied, or derived any information from, Mr. Cohen's patent application. Conceding that it cannot prove actual copying, Honeywell must therefore resort to analogizing to trade secret and copyright law, and must rely on circumstantial evidence and inference to make its case. Ultimately, this evidence is insufficient to establish either element of Honeywell's *prima facie* case: 1) that the MIL-L-85762A committee drafters had access to the invention; or 2) that there is any substantial similarity between the military specification and the invention.

#### 1. There is No Evidence that the MIL-L-85762A Committee Had Meaningful Access to the Invention

Honeywell asks the Court to rule that access to the invention existed based on two facts: that Mr. McLure reviewed the '269 patent application, and that Mr. McLure was a member of the committee responsible for drafting MIL-L-85762A. HW Br. at 43-48. This is a gross oversimplification of the issue of access, and when examined more closely, the facts clearly prove that no meaningful access existed.

Contrary to the gloss put on the issue by Honeywell, the question to be asked is not simply, "did Mr. McLure have access to the '269 application?" Rather, the Court must ask whether the evidence shows that the members of the committee who *actually drafted the specification* had access to the *invention* that Honeywell claims. There are several reasons Honeywell's evidence falls far short.

*First*, it is not enough to show that Mr. McLure reviewed the '269 application, but rather Honeywell must show that Mr. McLure reviewed the *invention* that is claimed. Just as in copyright and trade secret law, patent law is concerned with protection of ideas, not particular documents. Section 183 echoes this focus, by providing liability for the Government's use of an *invention*, not for the use of an *application*.

This distinction is significant for at least two reasons. First, as Mr. McLure testified in court, his review of applications for security reasons was *not* a review of the inventions claimed in those applications. Tr. at 250. Rather, he looked for the disclosure of vulnerabilities of existing systems, the public release of which would be harmful to national security. Id. Since Mr. McLure was not reviewing the inventions themselves, it is extremely unlikely that he picked up any details of the inventions that could be communicated to those he worked with.[3]

*Second*, the focus of the inquiry must be on the access of those who actually did the drafting of MIL-L-85762A, a highly technical document. Mr. McLure provided uncontradicted (and in fact extensively corroborated) testimony that he provided no technical input into the specification, and that the drafting was done by people such as Mr. Ferdinand Reetz and Ms.

[3] It is also relevant that Mr. McLure spent a short amount of time reviewing each application (20 or 30 minutes at most), and that at the time he reviewed the '269 application, he had been at his job for less than a year. Tr. at 224, 250.

Laurie Bryner. Tr. at 448, 451-52 (McLure testimony); Tr. at 870-71, 1005-06, 1074 (corroboration by Reetz, Byrd, and Bryner). The question of whether Mr. McLure had access is therefore, by itself, completely irrelevant. Honeywell must prove that Mr. Reetz, or some other technical drafter, had access to the '914 invention through Mr. McLure. Due to the unlikelihood that Mr. McLure gleaned anything from his review of the '269 application, and the fact that he did not provide technical input to the committee drafters, it is hard to see how any such access existed.

*Third*, and most tellingly, there could have been no access to the '914 invention in 1986 by Mr. McLure or anyone else, *because in 1986 the presently claimed invention did not exist in the '269 application*. Not until the year 2000, when Honeywell amended the application to introduce new matter, did the application contain the invention that Honeywell has asserted against the Government. When Mr. McLure performed his review in 1986, the '269 application was directed to polarizers, shutters, or notch filters, and did not contain the phrase "narrow band of the red color band," which Honeywell repeatedly alludes to in its brief. Access to the '914 invention did not exist in 1986, simply because the invention itself did not exist then.

### 2. Honeywell's "Evidence" of Similarity was Created by Counsel's Repeated Misquotation of a Single Phrase and Has No Grounding in the Actual Record in this Case

The phrase "narrow band of red," allegedly quoted from the minutes of the April 1986 meeting of the committee drafting MIL-L-85762A, is repeated no less than fifteen times in Honeywell's brief. HW Br. at 12, 13, 46, 48, 49, 51, 53. Obviously, Honeywell believes it has found a "smoking gun" that definitively links the '269 patent to the MIL-L-85762A specification.

The brief even goes so far as to claim that "this 'narrow band' terminology is *identical* to language used in the '269 application." HW Br. at 12 (emphasis in original).

Honeywell's assertion is wrong on any number of levels. Even accepting Honeywell's quotation at face value, the phrase "narrow band of red" appears *nowhere* in the '269 application. It is hard to understand how Honeywell can therefore claim that the terminology is "identical" when simple inspection shows otherwise.

Honeywell's quotation of the record unfortunately cannot be taken at face value in this instance, however. Checking the actual April 1986 meeting minutes Honeywell cites, the relevant sentence reads: "[t]he changes [to MIL-L-85762] will address the allowable AR values for NVIS compatible green, yellow, full color and monochromatic CRTs, HUDs and define a *narrow band red*, including area." PTX-559 at GVT019-1977 (emphasis added). The document does not contain the phrase "narrow band *of* red" that Honeywell cites over and over again. This could be attributed to a typographical error and overlooked, if it had occurred once or twice. But Honeywell includes this incorrect citation in its brief at least fifteen times, *and never cites the passage correctly or in context.*

While the inclusion of the word "of" may appear minor at first, its constant insertion in Honeywell's brief serves a very distinct purpose, namely increasing the similarity between the phrase and the terminology used in Claim 2 of Honeywell's '914 patent, which recites "narrow band *of* the red color band." Since Honeywell's circumstantial case depends so heavily on

showing that the Government's use is substantially similar to Honeywell's invention, this minor alteration in fact takes on major significance.[4]

Looking at the actual terminology used, the phrase from the meeting minutes ("narrow band red") bears only passing similarity to the phrases used in the '269 application that Mr. McLure reviewed ("narrow range of frequencies" and "narrow color band"). DMX-36 at D0004-11. The only real similarity is in the use of the concept of a "narrow band." However, this is hardly a concept that is unique to the '269 application. For example, prior to the filing of the '269 application, a May 1985 presentation written by Jay Verney of Sikorsky Aircraft discusses CRTs that have "narrow band" emissions. DE-511 at GVT009-0782.

Putting Honeywell's factual misreadings aside, the fact of the matter is that Honeywell again focuses on the wrong question. Instead of asking whether the *meeting minutes* are substantially similar to the invention, Honeywell should be addressing whether the *military specification* is substantially similar. According to Honeywell's theory, the link between Honeywell's disclosure and the Government's use can only be supplied through the MIL-L-85762A specification that the displays were procured under. Since the meeting minutes did not lead to the purchase of any of the infringing displays, looking for similarity in the minutes answers no relevant questions.

---

[4] While we have not focused on erroneous citations of the record in replying to Honeywell's post-trial brief, or many of its preceding briefs, this is hardly the only factual inaccuracy that can be noted. The Government requests that the Court give careful consideration to the context surrounding any excerpted citations of testimony from the transcript. *Compare, e.g.*, HW Br. at 13 (noting the topics of discussion at the April 8-9, 1986 committee meeting, but citing Mr. McLure's trial testimony as sole support for this) *with* Tr. at 394-95 (Mr. McLure's actual testimony, in which he disclaimed any specific recollection of what occurred at a particular meeting and gave only general recollection of the meetings as a whole).

Even a cursory review of the military standard shows that neither the phrase “narrow band red,” nor anything approximating what Honeywell calls the “geniusness of the patent,” appears anywhere within MIL-L-85762A. *See* DE-3. As characterized by Mr. Tannas, the “geniusness” of the ‘914 invention is the “splitting of the red color band” by the “third filter” on the cockpit display. *See* PTX-446 (Tannas infringement direct testimony) at ¶¶ 153, 200; 8/4/05 Infringement Trial Tr. at 573-74. This is a critical point, because MIL-L-85762A says *nothing* about what filters, if any, should be placed on the display. The only filter mentioned in the specification is the one found on the night vision goggle, the “fourth filter” in Claim 2 of the ‘914 patent.

Nor does the phrase “narrow band red” appear in any other document in the record, other than the meeting minutes drafted by Ms. Vanderlinde, a non-technical committee scribe. If, as Honeywell claims, the “geniusness” contained in the patent were so critical to solving a problem facing the specification drafters and others in the technical field, one would expect that the technical papers written by Mr. Reetz, Ms. Bryner, Mr. Byrd, and others would reflect this terminology. But Mr. Reetz, in his authoritative document *Rationale Behind the Requirements Contained in Military Specifications MIL-L-85762 and MIL-L-85762A*, does not use the term “narrow band red.” *See* DE-143. Nor does Ms. Bryner, in her paper discussing her work in defining NVIS red and quantifying the effects of red cockpit lighting. *See* DE-303. Similarly, Mr. Byrd’s trip report, which Honeywell previously seized on as a “smoking gun” document, says nothing about “narrow band red.” DE-321. The fact that no technical article at the time discussed the concept of “narrow band red,” whatever that concept may be, is a strong signal that the words have little import beyond Ms. Vanderlinde’s meeting minutes.

Despite Honeywell's dogmatic focus on the meeting minutes and misquotation of Ms. Vanderlinde's phrase, plaintiffs have been unable to establish a substantial similarity between the claimed invention and the Government's use. This is not surprising, given Ms. Bryner's testimony to the Court at trial:

> THE COURT: And this emphasis was put on by the lawyers in the deposition?
>
> THE WITNESS: Yes.
>
> THE COURT: Not by the person making that note.
>
> THE WITNESS: Correct.
>
> . . .
>
> THE WITNESS: . . . You know, probably 21 years ago when the notes were taken, it was perfectly clear to all of us what it meant, but the connotation that's put on it at this date, I don't think is necessarily what was intended by the original minutes.

Tr. at 1080-81.

### B. The Record Clearly Supports the Conclusion that the Government Independently Developed the Military Specification

Even if Honeywell were somehow able to prove both access and substantial similarity, and establish a *prima facie* case of copying despite all the inadequacies listed above, in the end plaintiffs' case would fail to clear one final hurdle. Namely, the evidence proves that the Government, through the diligent work of the employees on the committee charged with drafting MIL-L-85762A, independently developed the specification. This overwhelming evidence of independent development overcomes any possible circumstantial case pieced together by Honeywell, and should conclusively establish that the Government's use did not in any way result from Honeywell's disclosure.

The facts establishing the Government's independent development of MIL-L-85762A were set forth in the Government's opening brief, and need not be repeated in full here. The evidence of independent development was elicited from four Government witnesses at trial, whose testimony Honeywell cannot contradict and whose credibility and veracity it cannot challenge. Mr. Reetz was the primary drafter of the specification, and obtained input from various other technical members such as Ms. Bryner. Tr. at 452-53 (McLure); 840-41 (Reetz). Mr. McLure's role was administrative in nature, not technical, and *all four witnesses* gave consistent testimony that Mr. McLure never provided technical input into the drafting of the specification. Tr. at 448 (McLure testimony); 870-71 (Reetz corroboration); 1005-06 (Byrd corroboration); 1074 (Bryner corroboration).

In the same vein, all the testimony was consistent that the drafters of the original specification MIL-L-85762 knew that red light could be permitted if one were willing to sacrifice NVG performance. Tr. at 542, 777, 849-50 (Reetz); 922-23 (Byrd). The revision to MIL-L-85762A that was begun by the committee in 1986 was merely a logical outgrowth of MIL-L-85762, not a revolutionary development. Tr. at 879-80 (Reetz); Tr. at 550 (Reetz: "we knew that could be done. I mean, that's not rocket science"). The committee drafters did not need to seek help from Mr. Cohen, either directly or through Mr. McLure's review of the patent application. Tr. at 870-71, 874-75 (Reetz).

The implication in Honeywell's argument - that the committee did not know how to write on its own a specification that would permit red light in the cockpit, and therefore had to turn to getting ideas from outside sources like Bendix - is in fact rather insulting to the career public servants who worked on the committee. Mr. Reetz and Ms. Bryner are both highly qualified

engineers who were publishing some of the most influential papers in the field of night vision goggle compatibility in the mid-1980s. Both testified that they did not need to look outside their own knowledge in order to re-introduce red light into the cockpit, and did not do so. Tr. at 542, 777, 849-50 (Reetz); 1060 (Bryner: "I think we knew that red could be used. It was more a matter of how much red we were going to allow to be used").

In making its argument that the military specification was not independently developed, Honeywell is in effect asking the Court to find that Mr. Reetz's and Ms. Bryner's testimony on independent development (and Mr. Byrd and Mr. McLure's corroboration of that testimony) is not credible. It is unclear whether Honeywell is claiming that the Government's four witnesses were lying to the Court, or that all four were suffering from the same faulty memories, but the record does not support either conclusion. Rather, there is strong, uncontradicted evidence that the Government developed the MIL-L-85762A specification on its own, without any assistance from others.[5]

## III. Honeywell Is Not Entitled to Compensation For Any of the Three "Categories" of Damages it Claims

For the first time, Honeywell's Brief provides a definitive breakdown of the types of damages it is claiming under each prong of Section 183, by categorizing its claims into three separate categories. While the foregoing discussion of the errors in Honeywell's Brief, as well as the Government's opening post-trial brief, sufficiently establish that Honeywell is entitled to no

---

[5]Of course, the committee drafters solicited comments on the specification from filter and display manufacturers, and wanted to be sure that the requirements of the specification could be met with existing technology. Tr. at 845-46. This type of industry input, however, is of a completely different character than input as to the foundational concepts of the specification itself, which is what Honeywell claims was derived from its patent application.

compensation under the Invention Secrecy Act for any "category," the framework Honeywell provides is useful for summarizing the reasons no compensation is due.

### A. No Compensation is Due for Procurement by the Government for its Own Use

The first category of procurement identified by Honeywell is also the most straightforward, involving the use of cockpit displays and night vision goggles by the United States military during the pendency of the Secrecy Order. HW Br. at 24-28. Contrary to Honeywell's argument, however, compensation for this use is not appropriate under either prong of Section 183.

Compensation for Government use under the first prong of Section 183, "damage caused by reason of the order of secrecy," is easily dismissed, as set forth in Section I.A. above. To read the first prong to cover Government use would render the second prong of Section 183 redundant. "Damage caused by reason of the order of secrecy" was never intended to cover Governmental use of an invention.

Compensation under the second prong, "use by the Government of the invention resulting from his disclosure," is also not due Honeywell. As has been outlined in the preceding sections, Honeywell has failed to establish any sort of "link" between its disclosure and the Government's use that would prove that the use "resulted from [the] disclosure." Conceding that it has no direct evidence of an actual link, Honeywell must resort to circumstantial evidence to salvage its case. Not only is this circumstantial evidence of access and substantial similarity insufficient, it is easily overcome by the Government's uncontradicted evidence of independent development.

Alternatively, the Government has contended that compensation under the second prong for Governmental use of displays and NVGs is not due, because there has been no evidence presented that the Government actually used the invention, as it existed in 1987. The claims that were pending in the '269 application during the secrecy order were vastly different in scope than those that issued with the '914 patent, and Honeywell has made no effort to show that these 1987 Allowed Claims are infringed by the Government's actions.

Finally, no compensation is due under this category (or any other category, for that matter) due to the fact that the 1987 Allowed Claims, which are the sole claims relevant to the Invention Secrecy Act proceeding, were found to be invalid by the PTO when the Secrecy Order was lifted in 2000. By acquiescing in this determination and introducing new claims, Honeywell is estopped from now arguing that the claims are valid.

**B. No Compensation is Due for Procurement by the Government for Foreign Military Sales**

Honeywell places Foreign Military Sales in its second category of procurement. HW Br. at 28-29. In these situations, the Government purchased equipment from manufacturers on behalf of foreign governments, and then subsequently resold that equipment to those governments. Honeywell correctly notes that these types of transactions have been held to fall under a compensation scheme analogous to 28 U.S.C. § 1498(a). *See* 22 U.S.C. § 2356.

This category of procurement is also not compensable under either prong of the Invention Secrecy Act in this case. The arguments outlined above apply equally to Foreign Military Sales. Therefore, the first prong of Section 183 is not applicable to such procurement situations; and the

second prong does not apply because Honeywell has not shown "use," or that any use "resulted from [its] disclosure."

The Foreign Military Sales identified by Honeywell are not compensable for one additional, yet crucial, reason. The sales of CMFD and RDU displays during the pendency of the Secrecy Order that have been identified by Honeywell do not qualify as "use of the invention," *since not all elements of the claimed invention were bought or sold, or used together*. The 1987 Allowed Claims, as well as the claims that issued in the '914 patent, all require *both* a display and a night vision goggle to be in the "display system." The Foreign Military Sales, on the other hand, involved only *one component* of the claimed "display systems."

Unlike in the displays and goggles used by the Government, there is no evidence that the displays and goggles that were subject to Foreign Military Sales were ever used in combination by the United States prior to re-sale to foreign governments. As such, the *invention* was never used by the Government, and it is not compensable under the second prong of Section 183.

### C. No Compensation is Due for Lockheed Martin's Direct Commercial Sales to Foreign Governments

In its last category of sales, Honeywell identifies Direct Commercial Sales by Lockheed Martin of the C-130J aircraft containing CMDU displays. HW Br. at 29-32. Honeywell asserts that it would have obtained royalties on these sales, either through litigation or licensing, if the '914 patent had issued earlier. Honeywell makes no attempt to fit this claim under the second "use . . . resulting from [the] disclosure" prong, and instead focuses solely on the first prong of Section 183.

There are numerous reasons why Honeywell cannot claim compensation for this "lost opportunity" to obtain royalties, which have been treated at length in the Government's prior briefs. For example, Honeywell's claim of "lost opportunity" is clearly speculative and outside what Congress intended the Invention Secrecy Act to cover. Honeywell has also been unable to prove that but for the Secrecy Order, it would necessarily have recovered the royalties it seeks; therefore, Honeywell's claim suffers from a causation problem.

In addition to the foregoing, two additional points must be made in response to Honeywell's Post-Trial Brief. *First*, Honeywell's evidence of its lost opportunity is extremely thin, and based only on the testimony of its former in-house counsel, John Donofrio. HW Br. at 20-21. This situation is identical to the one confronted by the court in *Constant II*, where the plaintiff relied solely on its own *ipse dixit* testimony to attempt to establish damages, and the Court rejected this type of evidence as too speculative to permit recovery. *Constant II*, 1 Cl. Ct. at 607.

Testimony of the type provided by Mr. Donofrio also runs contrary to the legislative history. In discussing the kinds of damages that would be permitted under "damages caused by reason of the order of secrecy," the committee had the following exchange:

> MR. RAMSAY. But [the inventor] is going to testify that he never had a chance; that he *could have benefited, but he never had the chance*.
>
> MR. WILLIS. That would be speculative damages . . . We do not permit that in most States.

*1951 Hearings* at 22 (emphasis added).

This is tellingly similar to the testimony of Mr. Donofrio, and Honeywell's claim of damages - that it could have benefited from the patent had it issued earlier, but it never had the chance to do so. Clearly, Congress did not intend to permit such damages.

*Second*, Honeywell's Brief makes an admission that is fatal to its own claim. In its discussion of Section 183's legislative history, Honeywell notes that "during congressional debate on the proposed statute, it was expressly contemplated that 'damage caused by reason of the order of secrecy' would result where the 'normal period of utilization [of the invention is] cut down by reason of the secrecy order.'" HW Br. at 24, citing *1951 Hearings* at 24.

It is abundantly clear that this is not the situation in the present case. Honeywell is entitled to a "normal period of utilization" of its patent, namely a standard 17-year term. Honeywell has not lost any period of exclusivity due to the Secrecy Order, nor has it suffered because the market passed it by while the Secrecy Order was in place. By its own admission, Honeywell's is not the type of situation "expressly contemplated" by Congress in enacting the Invention Secrecy Act. Honeywell has the full term of the '914 patent to pursue commercial sellers such as Lockheed Martin; it need not turn to speculative damages under the Invention Secrecy Act to make it whole.

## IV. Conclusion

For the foregoing reasons, the Government respectfully requests a ruling in its favor that Honeywell is not entitled to any compensation under the Invention Secrecy Act. Honeywell has not established that the Government used the invention as defined by the 1987 Allowed Claims subject to the Secrecy Order; nor can it show that any Government use resulted from Honeywell's disclosure. Honeywell has also failed to carry its burden of proving non-

speculative, concrete damages caused by reason of the order of secrecy. As a result, the Government is not liable under Section 183.

Submitted by,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

Dated: June 8, 2007

s/*Christopher L. Crumbley*
CHRISTOPHER L. CRUMBLEY
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0415
Facsimile: (202) 307-0345

Attorneys for the United States

OF COUNSEL:
TREVOR M. JEFFERSON