**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL, INC., and HONEYWELL INTELLECTUAL PROPERTIES, INC., | ) | |
| Plaintiffs, | ) | No. 02-1909C |
| v. | ) | |
| | ) | Judge Susan G. Braden |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| LOCKHEED MARTIN CORPORATION and L3 COMMUNICATIONS CORPORATION, | ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT THE UNITED STATES' POST-TRIAL MEMORANDUM REGARDING DEFENSES TO INFRINGEMENT**

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

CHRISTOPHER L. CRUMBLEY
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 307-0415
Facsimile: (202) 307-0345

Of Counsel:
TREVOR M. JEFFERSON
Attorney
Department of Justice

August 24, 2007

Attorneys for the United States

**TABLE OF CONTENTS**


TABLE OF CONTENTS. . . . . . i

TABLE OF AUTHORITIES. . . . . . iii

I. INTRODUCTION. . . . . . 2

II. LEGAL SUMMARY. . . . . . 3

A. *KSR International Co. v. Teleflex Inc.*. . . . . . 4

B. *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*. . . . . . 7

III. ANALYSIS. . . . . . 8

A. The Public Availability of the Contested Prior Art References Has Been Established. . . . . . 8

1. Reetz Masters Thesis (DE-301). . . . . . 10

2. Task & Griffin III (DE-508) and Task IV (DE-509 and DE-510). . . . . . 14

B. The Presumption of Validity and Burden of Proof. . . . . . 15

C. Claim 2 Would Have Been Obvious to One of Ordinary Skill in the Art. . . . . . 18

1. The Person of Ordinary Skill in the Art. . . . . . 18

a. A Person of Skill in the Art Would Investigate Display Technologies. . . . . . 21

b. A Person of Skill in the Art Would Investigate Complementary Filtering. . . . . . 22

c. A Person of Skill in the Art Would Choose Proper Filters. . . . . 24

2. Exemplary Combinations of Prior Art that Render Claim 2 Obvious. . . 26

a. Claim 2 Would Have Been Obvious Over Reetz (DE-301) in Combination With Uchida (DE-515) or the ‘963 Patent (DE-519). . . . . . 27

b. Claim 2 Would Have Been Obvious Over Verney Alone. . . . . . 32

3. Honeywell Cannot Introduce New Requirements into Claim 2 to Navigate Around the Prior Art.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

a. The Prior Art Filters "Pass a Narrowband of the Red Color Band". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

b. Uchida, the '963 Patent, and the '843 Patent Disclose "Local Color Displays". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

c. References Using PVS-5 Goggles are Applicable. . . . . . . . . . . . 41

4. The Prior Art Does Not Teach Away From Claim 2. . . . . . . . . . . . . . . . 43

5. No "Secondary Considerations" Have Been Proven by Honeywell. . . . 46

a. There Was No Long-Felt Need. . . . . . . . . . . . . . . . . . . . . . . . . 46

b. Commercial Success Has Not Been Linked to the Invention. . . 47

c. There is Objective Evidence of Obviousness. . . . . . . . . . . . . . . 48

6. Claim 2 Would Have Been Obvious in October 1985.. . . . . . . . . . . . . . 50

D. Two References Anticipate Claim 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

E. Claim 2 is Not Supported by the Originally Filed Written Description. . . . . . . 54

1. The Broad Scope of Claim 2 Was Not Possessed by Mr. Cohen. . . . . . 55

2. Honeywell's Expert Uses an Analysis Unsupported by Law.. . . . . . . . . 58

F. Claim 2 Was Applied in an Indefinite Manner. . . . . . . . . . . . . . . . . . . . . . . . . 59

G. The Government Has an Implied License to Use Honeywell's CMFD.. . . . . . . 61

IV. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

# TABLE OF AUTHORITIES

## CASES

*AMP Inc. v. United States*,
389 F.2d 448 (Ct. Cl. 1968). . . . . . . . . . 62, 63

*Amazon.com Inc. v. BarnesandNoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001). . . . . . . . . . 40

*Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*,
396 U.S. 57 (1969).. . . . . . . . . . 46

*Bruckelmyer v. Ground Heaters, Inc.*,
445 F.3d 1374 (Fed. Cir. 2006). . . . . . . . . . 11

*Compare Honeywell v. United States*,
70 Fed. Cl. 424 (2006). . . . . . . . . . 31, 32, 60

*In re Cronyn*,
890 F.2d 1158 (Fed. Cir. 1989). . . . . . . . . . 10, 11, 13, 14

*Ecolochem Inc. v. Southern Cal. Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000). . . . . . . . . . 49

*Fromson v. Advance Offset Plate, Inc.*,
755 F.2d 1549 (Fed. Cir. 1985). . . . . . . . . . 46

*Gould v. American Hawaiian S.S. Co.*,
331 F. Supp. 981 (D. Del. 1971). . . . . . . . . . 63

*Graham v. John Deere Co.*,
383 U.S. 1 (1966).. . . . . . . . . . passim

*Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*,
340 U.S. 147 (1950).. . . . . . . . . . 60

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994). . . . . . . . . . 43

*In re Hall*,
781 F.2d 897 (Fed. Cir. 1986). . . . . . . . . . 11, 14

*Honeywell v. United States*,
66 Fed. Cl. 400 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Hybridtech Inc. v. Monoclonal Antibodies, Inc.*,
802 F.2d 1367 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*In re Icon Health and Fitness Inc.*,
2007 WL 2189161 (Fed. Cir. August 1, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

*KSR Intern. Co. v. Teleflex Inc.*,
550 U.S. __, 127 S. Ct. 1727 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*In re Kaslow*,
707 F.2d 1366 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Leapfrog Enterprises Inc. v. Fisher-Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Lockheed Aircraft Corp. v. United States*,
553 F.2d 69 (Ct. Cl. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Massachusetts Inst. of Tech. v. AB Fortia*,
774 F.2d 1104 (Fed. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Morton Intern., Inc. v. Cardinal Chem. Co.*,
5 F.3d 1464 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
864 F.2d 757 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Norian Corp. v. Stryker Corp.*,
363 F.3d 1321 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ormco Corp. v. Align Tech, Inc.*,
463 F3d 1299 (Fed. Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*Orthopedic Equipment Co., Inc. v. United States*,
702 F.2d 1005 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*In re Rouffet*,
149 F.3d 1350 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Thomas & Betts Corp. v. Litton Sys. Inc.*,
720 F.2d 1572 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Union Pacific Resources Co. v. Chesapeake Energy Corp.*,
236 F.2d 684 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United Carbon Co. v. Binney & Smith Co.*,
317 U.S. 228 (1942).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Adams*,
383 U.S. 39 (1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Univis Lens Co.*,
316 U.S. 241 (1942).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Vas-Cath Inc. v. Mahurkar*,
935 F.2d 1555 (Fed. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc.*,
103 F.3d 1571 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Wyer*,
655 F.2d 221 (CCPA 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## STATUTES

Del. Code Ann. tit. 8, § 259 . . . . . . . . . . 63

35 U.S.C. § 102 . . . . . . . . . . 2

35 U.S.C. § 103 . . . . . . . . . . 2

35 U.S.C. § 112 . . . . . . . . . . 3, 54

35 U.S.C. § 282 . . . . . . . . . . 15

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL, INC., and HONEYWELL INTELLECTUAL PROPERTIES, INC., | ) | |
| Plaintiffs, | ) | No. 02-1909C |
| v. | ) | |
| | ) | Judge Susan G. Braden |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| LOCKHEED MARTIN CORPORATION and L3 COMMUNICATIONS CORPORATION, | ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT THE UNITED STATES' POST-TRIAL MEMORANDUM**
**REGARDING DEFENSES TO INFRINGEMENT**

Defendant, the United States ("the Government"), submits this Memorandum to summarize the evidence presented at the trial held before this Court on November 13-15 and December 11-15, 2006, and in support of the Government's renewed request that the Court enter judgment in its favor that claim 2 of plaintiffs' U.S. Patent No. 6,467,914 ("the '914 patent") is invalid. At trial, the defendants carried their burden of proving that claim 2 of the '914 patent is invalid for anticipation, obviousness, indefiniteness, and/or lack of written description. In addition, the Government established that it is entitled to an implied license defense as a matter of law, with respect to any products sold to it by Honeywell.

# I. INTRODUCTION

> "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."

*KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. __, 127 S. Ct. 1727, 1739 (2007).

This statement by Justice Kennedy in the Supreme Court's recent *KSR* decision should leave no doubt that claim 2 of Honeywell's '914 patent is invalid as obvious. As the evidence at trial showed, at its core claim 2 is nothing more than the situation *KSR* describes above as an exemplary case of obviousness. The "display system" claimed by Honeywell is made up of *familiar elements* that were widely known in October 1985: a display, a night vision goggle, and a set of commonplace filters. These elements are combined in Claim 2 using a *known method* in 1985, commonly described in the art as "complementary filtering." And, as the testimony at trial showed, this combination did nothing more than *yield predictable results* which would have been expected by a person of ordinary skill in the art in 1985. For this reason alone, and as will be further set forth below, Claim 2 of the '914 patent should be held invalid by this Court, as it is obvious under the provisions of 35 U.S.C. § 103.

In addition, the Government proved at trial that two prior art references do more than make claim 2 obvious; rather, they teach each and every element of the claimed invention. The Task and Griffin III reference (DE-508) discloses a set of filters used with a projected map display, to make it compatible with night vision goggles. Similarly, the Reetz thesis (DE-301) teaches the use of various filters to make colored indicators compatible with night vision goggles. By teaching each element of claim 2, these references render the claim invalid for anticipation, under 35 U.S.C. § 102.

The Government also proved at trial that Claim 2 is invalid, because Honeywell's constant and wholesale rewriting of its patent applications, leading ultimately to the "pour over" of one application into another, significantly broadened the scope of Claim 2 beyond what was originally disclosed to the PTO by the inventor, Richard Cohen, in 1985. As a result, the claim's scope is not supported by the written description provided in the original application, and is invalid under 35 U.S.C. § 112.

Finally, the evidence at trial proved that claim 2 is invalid, because one of ordinary skill in the art cannot determine the "metes and bounds" of the claimed invention, as it has been construed and applied by the Court. As Dr. Task testified, requiring only that light in the "red color band" be "measurable" or "perceptible," without also providing some guidance on how "measurable" or "perceptible" is to be defined, one of skill in the art cannot consistently apply the Court's claim construction to potentially infringing devices. As such, the claim is invalid under 35 U.S.C. § 112.

The Government also argued persuasively at trial that it is entitled to a defense of implied license, at least to displays sold to it by Honeywell or its predecessor corporations. For example, the F-16 CMFDs found to infringe by the Court were sold to the Government by Honeywell, and the Government obtained an implied license to use these devices free and clear of any subsequent infringement claims from Honeywell or its successors. The fact that, through a merger, Honeywell obtained rights to the '914 patent after selling the CMFDs to the Government does not permit Honeywell to now interfere with the Government's quiet enjoyment of the CMFDs.

## II. LEGAL SUMMARY

The relevant legal standards applicable to the Government's defenses were set forth comprehensively in the Government's pretrial brief. Further discussion of the relevant precedent

will be found below, as these standards are applied to the facts of the present case. Two significant recent cases, however, merit the Court's attention, and should be discussed at the outset.

### A. *KSR International Co. v. Teleflex Inc.*

In April of 2007, after the conclusion of the defenses trial, the Supreme Court strongly reaffirmed the doctrine of obviousness in its *KSR* decision. At issue was the "teaching, suggestion, motivation" ("TSM") test that had been created by the Federal Circuit. In striking down the TSM test as a requirement for a finding of obviousness, the Court noted that an "expansive and flexible approach" to obviousness should be used by courts. 127 S. Ct. at 1739. Using broad language, Justice Kennedy noted the importance of the obviousness doctrine to ensuring that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws. Were it otherwise patents might stifle, rather than promote, the progress of useful arts." *Id*. at 1746.

A brief summary of the facts in *KSR* illustrates the import of the decision and its application to the case at hand. The patent-in-suit claimed an adjustable automobile pedal that was combined with an electronic sensor for detecting the pedal's position. *Id*. at 1733. The prior art contained numerous disclosures of electronic sensors for use of pedals, but did not apply those to adjustable pedals with a fixed pivot point. *Id.* at 1735. A separate prior art patent, the Asano patent, taught adjustable pedals that used a fixed pivot point, but did not use electronic sensors. *Id.* Combining the teachings of these references provided all elements of the claim at issue in the case. *Id.* at 1738. However, the Federal Circuit reversed the District Court's finding of invalidity, holding that one of ordinary skill in the art would not have been motivated to

combine the references, and citing its TSM test as a requirement for a finding of obviousness. *Id.* at 1738.




U.S. Patent No. 6,237,565, Figure 3.

The Supreme Court began its opinion by "rejecting the rigid approach of the Court of Appeals." *Id.* at 1739. Rather, the Court endorsed a "functional approach" and reaffirmed its holding in *Graham v. John Deere Co*., 383 U.S. 1 (1966). *Id*. at 1734. The *Graham* case set forth three questions to be asked in reaching a determination on obviousness, namely:

1. "the scope and content of the prior art are to be determined";
2. "differences between the prior art and the claims at issue are to be ascertained"; and
3. "the level of ordinary skill in the pertinent art resolved."

*Graham*, 383 U.S. at 17-18. "Against this background the obviousness or nonobviousness of the subject matter is determined." *Id.*

The Court in *KSR* noted that while the sequence of the *Graham* questions might be considered in any order, they continue to define the controlling inquiry. 127 S. Ct. at 1734. An explicit finding of a "teaching, suggestion, or motivation to combine" the prior art references may still be used as supporting evidence of obviousness, but it is not required. *Id.* at 1741.

Central to the Court's opinion was a renewed emphasis on the person of ordinary skill in the art, and an admonition that the lower courts must be mindful that the person of ordinary skill brings knowledge and creativity to the obviousness inquiry. As Justice Kennedy put it, "a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 1741. In other words, in undertaking the obviousness inquiry, a court cannot restrict itself only to the exact teachings in the prior art, but rather must apply those teachings from the viewpoint of one of ordinary skill. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* By emphasizing the creativity that one of ordinary skill brings to the table, the Court's opinion rejected a narrow approach to obviousness that looks only within the confines of the prior art references.

The Court proceeded to apply this strengthened obviousness standard to the prior art, and found the claim at issue obvious as a matter of law. According to the Court, one of ordinary skill in the art would have seen the benefits of combining the widely known technique of using electronic pedal sensors to the adjustable pedal of Asano, and would have reached the claimed invention of an adjustable pedal having an electronic sensor. *Id*. at 1743. Citing previous cases, the Court noted that "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.* at 1740. In the case at hand, the application of a known technique (electronic sensors used on non-adjustable pedals) to a similar device (an adjustable pedal) was predictable, and therefore obvious. *Id.*

**B. *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.***

In *Leapfrog*, the Federal Circuit discussed and applied the *KSR* decision to affirm a District Court's holding that a patent was obvious. 485 F.3d 1157 (Fed. Cir. 2007). The court recognized the Supreme Court's admonishment that "[a]n obviousness determination is not the result of a rigid formula disassociated from the consideration of the facts of a case. Indeed, the common sense of those skilled in the art demonstrates why some combinations would have been obvious where others would not." *Id*. at 1161 (citing *KSR*).

The patent at issue in *Leapfrog* claimed an interactive learning device in which a child pressing a particular letter on the device activates a circuit and causes the device to generate the sound of the letter. *Id.* at 1158.



FIG._1

U.S. Patent No. 5,813,861, Figure 1.

A prior art patent (Bevan) taught a similar device, except that sounds were generated mechanically. *Id.* at 1161. Another prior art device, the SSR, was a children's learning toy that

operated electronically. *Id.* In finding the claimed invention obvious, the court noted that "[a]ccommodating a prior art mechanical device that accomplishes that goal to modern electronics would have been reasonably obvious to one of ordinary skill in designing children's learning devices." *Id.*

Importantly, the Federal Circuit also heavily relied on the knowledge of one of ordinary skill in the art in finding the claim obvious. The combination of the Bevan and SSR references provided all elements of the claimed invention, except one: a "reader." *Id.* at 1162. The court supplied this missing element not by looking to additional prior art, but rather by noting that "readers were well-known in the art at the time of the invention." *Id.* The court's holding is significant, as it shows that the level of ordinary skill in the art can be relied upon to provide missing elements, as long as those elements were well-known in the art.

## III. ANALYSIS

### A. The Public Availability of the Contested Prior Art References Has Been Established

As a preliminary matter, the public availability of the prior art references cited by Dr. Task has been established, either by testimony or through agreement with Honeywell. Honeywell has admitted that the following references were publicly available prior to October 10, 1985, the filing date of the '269 application that led to the '914 patent:

- U.S. Patent No. 4,515,442, entitled Optical Filter Device, issued May 7, 1985 ("the '442 patent") (DE-501)
- U.S. Patent No. 4,245,242, entitled Contrast Enhancement of Multicolor Displays, issued January 13, 1981 ("the '242 patent") (DE-502)
- U.S. Patent No. 4,663,562, entitled Contrast Enhancement Structure for Color Cathode Ray Tube, issued May 5, 1987 ("the '562 patent") (DE-503)

- U.S. Patent No. 4,219,843, entitled Projection Type Color Television System, issued August 26, 1980 ("the '843 patent") (DE-518)

- U.S. Patent No. 4,368,963, entitled Multicolor Image or Picture Projection System Using Electronically Controlled Slides issued January 18, 1983("the '963 patent") (DE-519)

- *The Night Vision Goggle Compatible Helicopter Cockpit,* H.-D.V. Boehm, Tenth European Rotorcraft Forum, August 28-31, 1984, The Hague, The Netherlands, pp. 40-1 - 40-26 ("Boehm") (DMX-4)

- Aircraft Night Lighting Systems, Maj. Chesley S. Pieroway, Business Aircraft Meeting & Exposition, April 12-15, 1983, Wichita, Kansas, SAE Technical Paper Series #830713, pp. 1-4 ("Pieroway I") (DE-512)

- Helicopter Cockpit Avionics Development or the Advanced Transport and Next Generation Aircraft, Craig Scoughton, Robert Johnston, and Richard Cohen, presented at the National Specialists Meeting on Advanced Cockpit Design by the American Helicopter Society, Grapevine, Texas, October 3-4, 1984. ("Scoughton et al.") (DE-522)

- Helicopter Cockpit Design for Night Goggle Compatibility, G.F.H. Lloyd, Paper No. 64, presented at Sixth European Rotorcraft and Powered Lift Aircraft Forum, Bristol, England, September 16-19, 1980 ("Lloyd") (DE-521)

- Electroluminescent Lighting and Other Techniques for Improving Night Vision Goggles Compatibility with Cockpit Displays, H. L. Task And L.L. Griffin, AGARD (Advanced Group For Aerospace Research & Development) Conference Proceedings No. 329, Advanced Avionics and The Military Aircraft Man/Machine Interface, 1982, Blackpool, UK, NTIS No. AGARD-CP-329), pp. 29-1 - 29-6 ("Task & Griffin I") (DE-506)

- Pave Low III: Interior Lighting Reconfiguration for Night Lighting and Night Vision Goggle Compatibility, H.L. Task & L.L. Griffin, Aviation Psychology III: Aviation, Space, and Environmental Medicine, December, 1982, AFAMRL-TR-82-3, pp. 1162-1165 ("Task & Griffin II") (DE-507)

- Hughes Helicopters AH-64A Electroluminescent Lighting, Tom C. Knight and James E. Ritter, presented at the National Specialists Meeting on Advanced Cockpit Design by the American Helicopter Society, Grapevine, Texas, October 3-4, 1984 ("Knight and Ritter") (DE-513)

- Aircraft Lighting Systems, Jay F. Verney, American Helicopter Society, 41st Annual Forum Proceedings, May 15-17, 1985, Ft. Worth, Texas, pp. 111-12 ("Verney") (DE-511)

- Overview of Advanced Display Technologies, J. Robert Trimmier, presented at the National Specialists Meeting on Advanced Cockpit Design by the American Helicopter Society, Grapevine, Texas, October 3-4, 1984 ("Trimmier") (DE-514)
- A Liquid Crystal Multicolor Display using Color Filters, Tatsuo Uchida, presented at Eurodisplay 1981, September 16-18, 1981 ("Uchida") (DE-515)
- German Patent Application, published as DE 33 13 899 Al, published on October 18, 1984 and translation (DE-504, -625)

DE-621, DE-622, DE-623, DE-624 (Honeywell stipulations); Damages Trial Transcript at 1753 (Gotts stipulation at trial to DE-504). Of these references, only the '442 patent, Boehm, and the German patent application were reviewed by the Examiner before allowing the '914 patent.

Honeywell refused to stipulate to three remaining references[1], however the testimony presented at trial and deposition firmly establish the prior art status of these references. In fact, the evidence proves that these references are not close questions at all; each was publicly available years before Honeywell's alleged invention date of October 10, 1985.

1. Reetz Masters Thesis (DE-301)

Through two depositions and documents provided by the Penn State libraries, the Government has established that the Reetz masters thesis was available to the public well before October 10, 1985, and therefore qualifies as prior art. As an academic paper, the Reetz thesis qualifies as prior art if it was "catalogued or indexed in a meaningful way" prior to the invention date, such that a member of the interested public could locate the reference. *See In re Cronyn*,

---

[1]Five references originally relied upon by Dr. Task have been withdrawn as prior art by Defendants: Brietmaier and Reetz (DE-146); Bertelson (DE-516); Aeronautical Design Standard (DE-517); TA-7C Report (DE-324); and Pieroway II (DE-520). The Government continues to assert that these references are relevant to demonstrating the level of skill in the art, and the Court may rely on these references for that purpose. *See Thomas & Betts Corp. v. Litton Sys. Inc.*, 720 F.2d 1572, 1580-81 (Fed. Cir. 1983); *see also Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 78 (Ct. Cl. 1977).

890 F.2d 1158, 1161 (Fed. Cir. 1989). As stated by the Federal Circuit, a reference is considered "publicly accessible":

> upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.

*Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006) (citing *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)).

Most relevant to the Reetz thesis is the case of *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986). In *Hall*, the court found that a thesis was publicly available because there was evidence that it had been indexed, catalogued, and shelved prior to the critical date ***at a single library in Germany***. *Id.* While there was no actual evidence of the shelving date of the thesis at issue, the court relied instead on the testimony of a director of the ***German*** library with regard to its typical practices. *Id.* at 899-900. The Federal Circuit found this to be "competent evidence of the general library practice [which] may be relied upon to establish an approximate time when a thesis became accessible." *Id.* at 899.

In the case at hand, the Reetz thesis presents a similar situation. Though information as to the actual date of shelving and indexing of the thesis was requested from Penn State, the library was unable to furnish this information. However, the Government deposed both a librarian (Dr. Dolores Fidishun) with knowledge of the typical practices of the library, as well as a library assistant (Ms. Delores Wiant) who was employed by the library during the mid-1980's.

Dr. Dolores Fidishun provided Rule 30(b)(6) testimony on behalf of Penn State establishing that the Reetz masters thesis would have been shelved and cataloged in the satellite Penn State library no later than October 1983. DE-668 at 41-43 (Fidishun Deposition).

Dr. Fidishun, who was trained by and worked with the local library staff who were familiar with procedures from 1983-1985, testified that the library's general practice was to create a card for the catalog that provided the author, title and subject for the thesis, place that card in a card catalog and shelve the thesis in the library. Id. at 26-28; 41-43. This process was typically completed within three months after the advisor signed the thesis. Id. at 26-28.

The Government also presented the testimony of Ms. Delores Wiant. From 1967 until she retired in 2004, Ms. Wiant was a library assistant at the satellite Penn State library that shelved the Reetz thesis. DE-688 at 8-12 (Wiant Deposition). Ms. Wiant, who provided two affidavits and direct testimony regarding the library's practices, personally received, assisted with cataloging, and shelved masters theses at the library from 1983 to 1985. Id. at 12-19; DE-689; DE-690. Indeed, she was one of two full-time staff members at the library during the mid-1980s and performed all duties during that period. DE-688 at 24-25; 52-53.

In her affidavits and deposition, Ms. Wiant testified that in her experience the Reetz thesis would have been filed within one month and most likely within two weeks of the date the advisors signed the thesis. DE-688 at 26-27. Her testimony was based on her personal involvement in adding masters theses to the library's catalog and collection. Id. at 27-29 (describing her duties in the receipt of masters theses, typing and filing the catalog cards and assisting library patrons in using the masters theses catalog). Upon review of the actual Reetz thesis from the library's collection, Ms. Wiant testified that its bindings and markings were consistent with the binding method and the markings used for masters theses from 1983 to1985. Id. at 15-16 (describing the binding method used in the 1983 time period); 30-31 (identifying the binding for the shelved Reetz thesis and its markings added by the library); 40-41 (identifying the color stickers added to Reetz thesis). Her testimony also established that the catalog card at the

back of the shelved Reetz thesis contained a stamped November 7, 1985 check out date and an interlibrary loan date marked in her own handwriting. Id. at 39-40. Her knowledge of the practices and procedures for handling masters theses from 1983 to 1985 at the library and her personal handling of the Reetz thesis during a later interlibrary loan is clear.

Contrary to Honeywell's repeated insinuations, Ms. Wiant's recollection was not influenced by Dr. Fidishun's deposition excerpt nor was she swayed by her duty to the University. Instead, Ms. Wiant repeatedly stated that she testified truthfully (Id. at 54, 73) and relied on her personal recollection of the library's practices in stating that masters theses were filed within one month of receipt at the library from 1983 to 1985. Id. at 51-53; 64-65. In addition, her testimony based on her personal experience provides numerous details of the library's practices in the handling of masters theses. Id. at 118-121. Ms. Wiant's testimony establishes that a completed thesis received at her Penn State library from 1983 to 1985, such as the Reetz thesis approved in July of 1983, would have been cataloged, shelved and available to the public no later than one month after it was submitted. There is certainly no reason to believe that the Reetz thesis was not catalogued by October of 1985, over two years after it was approved, given this typical practice.

The Government expects that Honeywell will analogize the Reetz thesis to another Federal Circuit case, the *Cronyn* case cited *supra.* In *Cronyn*, the court ultimately found that a thesis was not sufficiently publicly available to qualify as prior art. 890 F.2d at 1161. The facts of *Cronyn* are clearly distinguishable from the Reetz thesis, however. In *Cronyn*, the only index to the library's theses was a set of 450 cards filed in a shoebox in the chemistry department's library, and the interested public could not access this index. *Id.* This contrasts rather strongly with the Reetz thesis at Penn State, which was cataloged in a card catalog that was openly

available to library patrons. DE-688 at 17-19. Contrary to Honeywell's anticipated argument, the Reetz thesis is much closer to the situation in *Hall*. If the court in *Hall* believed the evidence sufficient to ultimately find the reference, stored in a foreign library, publicly available, the same conclusion should be reached from the evidence at hand provided by Penn State.

2. Task & Griffin III (DE-508) and Task IV (DE-509 and DE-510)

A much simpler case is presented by the two Task references still in dispute, because the Court has uncontradicted testimony before it from the author and presenter of the documents, Dr. Task. Because these references were presented to the interested public several years prior to Honeywell's asserted invention date of October 10, 1985, they are prior art to the '914 patent.

In the case of scholarly papers presented at a conference, the relevant date for prior art purposes is the date on which the paper was presented at a conference, with copies of the presentation available to the attendees, or by request. *See Massachusetts Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1108-10 (Fed. Cir. 1985). At trial, Dr. Task testified that Task & Griffin III was a paper presented at the first annual Aviation Psychology Association conference, which took place at Ohio State in 1981. Tr. at 674; 786-787. This is uncontradicted by any other evidence in the record, and in fact is corroborated by the title page of the proceedings publication. DE-627. Dr. Task's presentation was disseminated to members of the association, as evidenced by the fact that he recalled his colleague, Dr. Diana Nelson, giving him a copy she received with her association materials. Tr. at 674-75; 787-788. It is therefore clear, and Honeywell cannot dispute, that the Task & Griffin III reference was publicly available in 1981, at least four years prior to the date the '269 application was filed.

Task IV, a set of slides and graphs used by Dr. Task in presentations to industry groups, presents a similar situation. Again, these materials were presented at publicly accessible forums

such as the Society for Automotive Engineers and the Aerospace Lighting Institute. Tr. at 702. Dr. Task provided uncontradicted testimony that he made these presentations at least as early as February 1984, over a year prior to the filing date of the '914 patent. Id. Again, this testimony establishes that the Task IV slides were publicly available prior art as of the date the '269 application was filed.

**B. The Presumption of Validity and Burden of Proof**

Patents that are issued by the PTO after full and careful consideration are afforded a statutory presumption of validity. 35 U.S.C. § 282. While the statute is silent on the practical effect of this presumption, the Federal Circuit has interpreted it to require that the facts proving any invalidity defense be established by "clear and convincing evidence."[2] *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1326 (Fed. Cir. 2004). It is important to understand that the Federal Circuit's standard applies only to the proof of underlying facts; there is no heightened standard that applies to the ultimate legal determination of invalidity. *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 767 (Fed. Cir. 1988).

The Supreme Court has recently noted that "the rationale underlying the presumption" is that "the PTO, in its expertise, has approved the claim." *KSR,* 127 S. Ct. at 1745**.** The Court in *KSR*, however, also noted that in cases where the PTO's ultimate determination is in question - such as where prior art is not presented to the examiner - the rationale for presuming validity

[2]While the Government does not ask this court to decline to follow the Federal Circuit's clear and convincing standard, we note that commentators have disputed whether a heightened standard of proof is in fact required by the Patent Act, and whether it is advisable from a policy perspective to have a higher burden of proof applied to invalidity. *See*, *e.g.*, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy, A Report by the Federal Trade Commission, October 2003, Ch. 5, pg. 26-28 (available at http://www.ftc.gov/opa/2003/10/cpreport.htm).

"seems much diminished." *Id.* Given the numerous prosecution irregularities in the applications that led to the '914 patent, the present case appears to be one in which the presumption is indeed "much diminished," if not voided completely.

One such irregularity occurred in January of 2002, when Honeywell filed an amendment that rewrote the entire specification of its '760 patent application, as well as filing new claims. DMX-38 at D001645. This amendment ultimately made its way into the '914 patent, because the contents of the '760 were later "poured over" into the '269 application. DMX-36 at D000634-38. As a further complication, Honeywell also sent over a hundred pages of prior art to the Examiner for review at the same time the amendment was entered. The Examiner signed off as having reviewed those references that afternoon, even though the fax was not received until 3:49 PM. DMX-38 at D001583; D001534. Based on these facts, it is unlikely the Examiner gave full consideration to the amendments and prior art submitted. This is crucial because, as will be discussed below, this amendment gave rise to the written description problems that the Government now raises as grounds for invalidity. It is questionable whether the court owes any deference to the PTO at all on the issue of written description.

These issues were compounded by confusion created by the "pour-over" of the '760 application into the '269 application. Just prior to abandoning the '760 application, the Examiner indicated that claims 12-14 in that application were allowed, even though Honeywell had already canceled those claims. DMX-38 at D001706 (Notice of Allowance); D001672 (Amendment). In actuality, the claims pending in the '760 application at the time were 15-17, which were identical to the issued '914 claims, but these were never *examined*, much less *allowed*. DMX-38 at D001743 (Index of Claims showing claims 15-17 never entered and claims

12-14 allowed). When Honeywell performed its "pour over" to the '269 application, though, it falsely told the PTO that the claims it was transferring - '760 claims 15-17 - had been allowed in the '760 application. DMX-36 at D000637. The Examiner promptly allowed those claims, which are the claims 1-3 of the issued '914 patent. DMX-36 at D000639. From this series of events, it would appear that the Examiner never reviewed the claims that are at issue in the present case. This certainly does not instill confidence that the "PTO, in its expertise, approved the claims." *See KSR*, 127 S. Ct. at 1745.

Finally, just as in *KSR*, the rationale for giving the '914 patent a presumption of validity is diminished with respect to several of the prior art references cited by Dr. Task. Just as the Asano patent was not before the PTO in *KSR*, the PTO did not have before it many of the patents Dr. Task believes invalidate the '914 patent.[3] Furthermore, while the Examiner did have before him the Boehm and Task & Griffin III references, these were part of the 110 page submission which the Examiner received and signed off on, all during the course of a couple of hours on the afternoon of January 16, 2002. For this reason, the presumption of validity for the '914 patent should be diminished with respect to this unexamined prior art.

---

[3]The preceding section indicates which of the prior art references were not before the Examiner during prosecution. The Federal Circuit has stated that the burden of proof for invalidity "is more easily carried when the references on which the assertion is based were not directly considered by the examiner during prosecution." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999); *Cf. KSR*, 127 S. Ct. at 1745 (noting with regard to the presumption of validity for references not before the PTO, that "the rationale underlying the presumption–that the PTO, in its expertise, has approved the claim–seems much diminished" in *KSR*.)

### C. Claim 2 Would Have Been Obvious to One of Ordinary Skill in the Art

Especially in light of the Supreme Court's decision in *KSR*, the Government provided ample evidence at trial which proves that claim 2 of the '914 patent would have been obvious to one of ordinary skill in the art as of October 10, 1985. Not only does the documentary prior art describe all the elements of claim 2, but the testimony of the witnesses at trial proves that the combination of these elements to arrive at the claimed invention would have been well within the abilities of, and obvious to, the skilled artisan. Furthermore, and quite tellingly, Honeywell's own expert made numerous admissions at trial which establish that most, if not all, of the elements of claim 2 were commonly known in the field in 1985. Claim 2 of the '914 patent is nothing more than "the predictable use of prior art elements according to their established functions." *See KSR*, 127 S. Ct. at 1740.

#### 1. The Person of Ordinary Skill in the Art

Given the Supreme Court's emphasis in *KSR* on the knowledge one of ordinary skill in the art brings to the obviousness inquiry, it is instructive to view the question of obviousness in the present case from the standpoint of the problems facing those of ordinary skill in the art in October of 1985. By beginning with the problem to be solved, rather than the claims of the invention, the court can also avoid using hindsight reasoning (a criticism Honeywell has leveled at Dr. Task's analysis). *See KSR*, 127 S. Ct. at 1742-43 (addressing hindsight).

In its *Markman* decision, the court set forth its understanding of a person of ordinary skill in the art. "[O]ne of ordinary skill in the art in 1985 would be knowledgeable about night vision compatible aids, compatible instrument and panel lighting, and manufacturing displays for military cockpits." *Honeywell v. United States*, 66 Fed. Cl. 400, 428 (2005). Applying this

instruction, Dr. Task concluded at trial that the person of ordinary skill in the art would possess several qualifications and skill sets relevant to the '914 patent:

> Specifically, the skilled artisan would have been well versed in or be able to easily understand optical filter techniques, optical filter types (band pass, low pass, high pass, etc.), color display emission spectra, full color display types (superposition of color images vs. spatial integration, for example), monochromatic display transducers, the relationship between wavelengths and color, radiometry, photometry, the wavelengths of the visible spectrum, and the spectral sensitivity of the specific night vision goggles (light amplifying devices) to be used. Knowledge of cockpit geometry might also be necessary to determine the level of blocking required of the filters such that the NVGs are not "overwhelmed." One of ordinary skill in the art would possess at least a B.S. in electrical or optical engineering or physics. Two to four years of experience in the areas identified above could also substitute for formal education.

DE-500 at ¶ 44. *See Orthopedic Equipment Co., Inc. v. United States*, 702 F.2d 1005, 1011-12 (Fed. Cir. 1983) (reviewing the educational backgrounds and skills of those active in the field to determine level of skill). Dr. Task stated that numerous individuals possessed this level of skill in 1985, including himself, Ferdinand Reetz, and James Byrd.[4] Id. at ¶ 46.

By contrast, Honeywell's expert, Mr. Tannas, attempted to describe the person of ordinary skill in way that reduces the knowledge of the artisan below what was required by the court's opinion. PTX-834 at ¶¶ 248-258. In attempting to redefine the level of ordinary skill, Mr. Tannas alleged that such a person *would not have existed in 1985*. Id. at ¶ 250 ("No one person had in-depth knowledge of all of the relevant fields or a skill level covering all of the facets of night vision goggles, full color electronic displays and operational application in an

---

[4]In fact, the Government was the only party to put on testimonial evidence from witnesses such as Dr. Task and Mr. Reetz who were active in the field in 1985. *See Orthopedic Equipment*, 702 F.2d at 1011 (considering "the testimony and educational qualifications of the witnesses who were working in the art"). Honeywell's witnesses were Col. Lawrence, who the Court recognized was merely a "user" of the technology in 1985, and Mr. Tannas, who had never worked in NVG compatibility until the mid-1990's. Tr. at 1019 (Lawrence); 1369-70 (Tannas).

aircraft cockpit nighttime environment.") As the court picked up on during the trial, this runs contrary to the court's claim construction and is an attempt to reduce the knowledge one of ordinary skill is understood to possess.[5] Tr. at 1151-57.

It is clear that Mr. Tannas' conception of the person of ordinary skill is contrary to the record and the court's ruling. For example, Mr. Tannas criticized Mr. Reetz's qualification as a person of ordinary skill in 1985, because "his expertise related primarily to night vision goggles and other sensor systems, but [] he did not consider himself to be a display engineer." PTX-834 at ¶ 251. This criticism of Mr. Reetz is unwarranted, and irrelevant in any event, because the court has never required the person of ordinary skill to be a "display engineer." A person of ordinary skill is simply "*knowledgeable* about night vision compatible aids, compatible instrument and panel lighting, and manufacturing displays for military cockpits." *Honeywell*, 400 Ct. Cl. at 428. Mr. Reetz, and numerous others, possessed ordinary skill in the art in 1985.

"When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *See KSR*, 127 S. Ct. 1742. The testimony at trial established that the skilled artisan would investigate several "known options" when faced with the design need of placing a full color display in a cockpit, and making the display compatible with a pilot's night vision goggles:

---

[5]It is curious why Mr. Tannas chose to level this criticism at all, as it is also legally irrelevant. The person of ordinary skill is a *hypothetical* person, a legal construct similar to the "reasonable person" used in negligence cases. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). It therefore matters not whether the person of ordinary skill can be located in the body of one actual person.

1. The artisan would study various known technologies for creating a full color display;

2. He would apply to these known technologies the standard technique for night vision goggle compatibility, the complementary filtering method described throughout the prior art; and

3. The artisan would choose appropriate filters to make complementary filtering work with the displays being studied, to produce the desired full color display.

This is exactly the thought process mirrored by Dr. Task in his direct testimony. Dr. Task selected several "primary references" that taught complementary filtering on cockpit displays. DE-500 at ¶¶ 100-172. He also selected references that taught various types of full color displays that were known in 1985. DE-500 at 172-186. Finally, the testimony shows that it would have been well within the level of ordinary skill in the art to select appropriate filters to use on the displays. In fact, Honeywell's own expert admitted as much. Tr. at 1354 (Tannas).

The following sections explore more fully the steps that would be employed by a person of ordinary skill in the art when faced with the "design need" expressed in the '914 patent.

a. *A Person of Skill in the Art Would Investigate Display Technologies*

Trial testimony by both parties' witnesses established that in October of 1985, full color displays in aircraft cockpits were a nascent technology. Tr. at 236 (Dunn); 368-372 (Reetz); 954 (Lawrence). Along with reliability issues that remained to be solved, the industry was facing the problem of daylight readability. Tr. at 233-40 (Dunn). Simply put, bright sunlight shining on cockpit displays at high altitude tended to "wash out" the color displays and make them unreadable. Id. at 242-45. Until these problems, not addressed in the '914 patent, were solved, there was no need to apply the well-known complementary filtering technique to provide NVG

compatibility. Id. at 410 (Reetz: "[T]he problem with CRTs at that point was not so much making them compatible. Their problem was daylight readability.").

William Dunn, a veteran of the display field who had personal knowledge of the design issues that existed in 1985, testified that daylight readability was the largest problem facing color displays at the time. Id. at 233. In order to address this problem, Mr. Dunn informed the court that he investigated every known display technology, in order to determine if it provided some advantage that would make the display daylight readable. Id. at 253-55.

The prior art is replete with examples of different display technologies that the person of ordinary skill would have been aware of and investigated. For example, the Uchida reference (DE-515) discloses a full color LCD display, that uses red, blue and green subpixel filters in the same manner as those used by the infringing devices. There is also discussion of projection displays using incandescent lights (DE-508; DE-519) as well as CRT displays (DMX-4; DE-511). The inclusion of different types of displays in aircraft cockpits is advocated in several references. DE-514; DMX-4.

b. *A Person of Skill in the Art Would Investigate Complementary Filtering*

It is undisputed that a person of ordinary skill in 1985 would also have been aware of complementary filtering as a technique for making light sources compatible with night vision goggles. As Mr. Reetz testified, the technique began with the British in the early 1980's before being adopted by the United States military. Tr. at 425. Each of the Government's witnesses at trial testified that they were aware of this technique of using matched filters to reduce lighting interference in 1985. Tr. at 141 (Bradford); 261-2 (Dunn); 425 (Reetz); DE-500 at ¶ 38 (Task).

A person of ordinary skill in the art, when tasked with making a full color display night vision goggle compatible, would turn to the complementary filtering technique almost immediately. The artisan, investigating this technique, would find the numerous references cited by Dr. Task that thoroughly discuss the technique and methods for implementing it. DE-500 at ¶¶ 91-98 (citing DE-506, DE-507, DE-508, DE-509, DE-510, DE-504, DE-505, DMX-4, DE-513, DE-521, DE-301).

While he never raised an objection to the use of the term "complementary filtering" to describe the '914 patent during the *Markman* or infringement trials, Mr. Tannas attempted at the invalidity trial to challenge the use of this term. Tr. at 1083. Not only is Mr. Tannas' testimony a hollow attempt to distinguish the '914 invention from the prior art, it runs counter to the usage of several other fact witnesses, as well as the common usage in the field. Tr. at 148-49 (Bradford); 425 (Reetz); DE-500 at ¶ 38 (Task); DE-513 (Knight and Ritter has heading of "Complementary Color Filters").

It especially curious why Mr. Tannas attempts to distinguish the '914 patent from complementary filtering, considering that Mr. Cohen, the inventor, said he was familiar with the term "complementary filtering" in 1985:

> MR. COHEN: I understood the concept of what I called complementary filters.
>
> Q. What was your understanding of that concept?
>
> A. They were filters, once again, they were the same as cooperative. They were filters which worked in concert with each other to produce a particular desired result.

DE-54 at 356 (Cohen deposition).

In fact, Mr. Cohen stated that his invention embodied the concept of complementary filtering. Id. at 347-48. Contrary to Mr. Tannas' newfound objection to the term, the complementary filtering technique used in the prior art was well-known as of 1985, was known to the inventor, and was applicable to the '914 patent. There is no reason to doubt that complementary filtering would have been the first compatibility technique investigated in 1985 by those of skill in the art.

c. *A Person of Skill in the Art Would Choose Proper Filters*

Finally, once the person of ordinary skill in the art selected color displays to investigate, and decided to apply the complementary filtering technique common in the prior art, the implementation would be a simple matter of choosing the appropriate filters to use on the display to reduce the interference with the goggles to a tolerable level. DE-500 at ¶ 31 (Dr. Task believes it is "ludicrous" to assert, as Honeywell does, "that one of ordinary skill in the art would not know how to apply the known technique of complementary filters to different displays.").

Choosing the appropriate filters was not only something that the artisan would have known how to do in 1985 - there is evidence before the court that several people did so. For example, Mr. Bradford testified regarding his work at the Army's Night Vision Labs, choosing the appropriate filter to apply to the NVGs that the Army was planning to buy. Tr. at 142-147. Mr. Bradford tested filters with cutoffs ranging from 600 to 900[6] nanometers, and brought examples of these filters to show the court at trial. Id. at 146, DE-525 (pictures of filters for

[6]Significantly, the cutoffs Mr. Bradford tested were both within and outside the '914 patent's "red color band." This is further evidence that one of skill in the art in 1985 was well aware that filters could be applied to NVGs that "split the red color band," as Mr. Tannas has defined the "nub" of the invention.

testing). Once this objective lens filter was set, it was a matter of the display manufacturers choosing the appropriate complementary filter to use on the displays, an effort Mr. Dunn said involved only "mathematics and physics." Tr. at 263.

Mr. Reetz provided another example of how one of skill in the art in 1985 would have selected appropriate complementary filters. In his thesis, Mr. Reetz studied a number of possible filters for use on NVGs, and ultimately decided on a filter at 665 nm - directly in the middle of claim 2's "red color band." DE-301 at GVT018-1045. Mr. Reetz also determined which filters to place on the displays to complement these NVG filters. Id.

At trial, Mr. Tannas made several extremely damaging admissions on this point, that illustrate that selecting filters to implement the '914 patent (and "split the red color band") was well within the level of ordinary skill in 1985. Specifically, Mr. Tannas admitted that:

- The application of appropriate filters to NVGs and displays was well within the level of ordinary skill in the art. Tr. at 1080 ("Engineers and one skilled in the art know that they could put filters on *anything at any time in any way*.") (emphasis added).

- Using filters to filter color bands other than red was known in 1985. Id. at 1057, 1059-60 (admitting that filtering of green and blue color bands known).

- The filters as used in claim 2 were available in the industry as off-the-shelf technology. Tr. at 1347 ("The patent didn't invent the filter.")

- There was *nothing different* about filtering the red color band, as opposed to other color bands. Tr. at 1347 ("Q. And there's nothing scientifically different about filtering a portion of the red color band from, for example, a portion of the blue color band, correct? A. No. []") (nonresponsive portion of answer omitted).

Finally, and most damaging to Honeywell's case, Mr. Tannas admitted to the court that the '914 patent did not need to describe how to pick the filters to be used in implementing claim 2, *because one of skill in the art would have already known how to do so*:

> Q. Well, [the patent] tells you what the goal is, which is splitting the red color band, as you said, but it doesn't tell you how to make a display system and a filtering system do that, does it?
>
> A. No, it does not. And I don't think it has to. *One skilled in the trade, as defined by the courts, could pick this up and do it, I believe firmly.*

Tr. at 1354 (Tannas) (emphasis added).

Cumulatively, these admissions strongly demonstrate that a person of ordinary skill in the art would have, in 1985, been fully capable of selecting filters appropriate for implementing complementary filtering on any full color display, by choosing filters that would, in Mr. Tannas' words, "split the red color band."

In sum, by focusing on a person of ordinary skill in the art, the court can analyze the problem presented in the '914 patent in the same manner as that artisan would have in 1985. The court's analysis thus avoids hindsight while also remaining true to the Supreme Court's renewed focus on the knowledge that the person of ordinary skill brings to the table. By selecting art that would have been examined by the artisans of 1985, and applying the ordinary creativity to modify and implement that prior art, Dr. Task's analysis follows the same formula and conclusively demonstrates the obviousness of claim 2.

2. Exemplary Combinations of Prior Art that Render Claim 2 Obvious

At trial, Dr. Task testified that there were numerous possible combinations of the prior art that one of skill in the art would have undertaken in 1985, all of which ultimately render claim 2 of the '914 patent obvious. DE-500 at ¶ 27 (and accompanying chart). Dr. Task set forth many of these combinations in a summary claim chart that was presented to the Court as DE-558. While any of these combinations would be sufficient for a finding of obviousness, the Government will focus on two examples that are illustrative.

a. *Claim 2 Would Have Been Obvious Over Reetz (DE-301) in Combination With Uchida (DE-515) or the '963 Patent (DE-519)*

One of the combinations listed by Dr. Task is Reetz as a primary reference, in combination with either of the displays described in Uchida or the '963 patent. This combination provides all elements of claim 2 of the '914 patent, as summarized in the following claim chart:

| Claim 2 | Reetz (DE-301) | Uchida (DE-515) |
|---|---|---|
| A display system for use in association with a light amplifying passive night vision aid and a local color display including a local source of light having blue, red, and green color bands,<br><br>comprising: | DE-301 at GVT018-1026<br><br>Task: "this article describes the use of multiple filters over different colored light sources illuminated with incandescent light (which one of ordinary skill in the art would understand contains red, blue, and green color bands) in order to achieve satisfactory color perception, NVG operation, and indicator light visibility" DE-500 at ¶ 116. | DE-515 at GVT009-0486, Figure 2<br><br>Task: "Uchida discloses a multicolor liquid crystal display using three color filters" DE-500 at ¶ 173. |
| (a) a plurality of filters at the local color display including:<br><br>(1) a first filter for filtering the blue color band of the local source of light | | DE-515 at GVT009-0486, Figure 2<br><br>Task: "For the additive color mixture system, which most color displays use . . . the blue color filter as a short pass filter." DE-500 at ¶ 174 |
| (2) a second filter for filtering the green color band of the local source of light | | DE-515 at GVT009-0486, Figure 2<br><br>Task: "For the additive color mixture system, which most color displays use . . . the green color filter as a band pass filter" DE-500 at ¶ 174 |

| Claim 2 | Reetz (DE-301) | Uchida (DE-515) |
|---|---|---|
| (3) a third filter for filtering the red color band of the local source of light and passing a narrowband of the red color band; and | GVT018-1020; 1029<br><br>Task: "The filter over the red warning indicator, a CS-4-94 filter, serves as the third filter which filters the red color band and passes a narrow band of the red color band." DE-500 at ¶ 121.<br><br>Task: "An inspection of the CS-4-94 transmission curve (GVT018-1020) and calculations using a typical incandescent lamp emission curve would inform one of ordinary skill in the art that this filter passes a small portion of the Court-construed red color band wavelengths. Namely, from 620 nm out to about 650 nm." DE-500, ¶ 189. | |
| (b) a fourth filter which filters light at the night vision aid, said fourth filter cooperating with said plurality of filters to substantially block at least said narrowband of the red color band from being admitted to the night vision aid. | (GVT018-1044, lines 10-12)<br><br>Task: The fourth filter provided sufficient blocking to allow the NVGs to function: "There was little-to-no degradation (depending on light levels) of outside viewing capability of the AN/PVS-5A NVG when equipped with the shared-aperture filters" DE-500, ¶ 122 | |

The foregoing claim chart satisfies the first question of the *Graham* analysis - the scope and content of the prior art. With respect to the second question, the differences between the claimed invention and the prior art, the only difference is that not all elements of the claim appear in one reference - one of skill in the art must combine Reetz with Uchida or the '963

patent to arrive at the invention of claim 2. *See KSR*, 127 S. Ct. at 1743 (claim 4 invalid when Asano prior art combined with electronic sensors).

The court must therefore decide if such a combination would have been within the level of ordinary skill in the art, as required by the third *Graham* question. The testimony at trial establishes that such a modification would have been, as Dr. Task put it, "excruciatingly obvious to one of ordinary skill in the art seeing the pictures around the wall." Tr. at 1584. As Mr. Dunn testified, once a display is known, and a desired filtering characteristic is given, the rest is simply "mathematics and physics." Tr. at 262-63.

The obviousness of the combination of Reetz and either Uchida or the '963 patent is convincingly demonstrated by analogy to *KSR*. According to the Court, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." 127 S. Ct. at 1740. In the case of *KSR*, a technique (electronic sensors) was used to improve one device (non-adjustable pedals). Therefore, one of skill in the art would presumably improve similar devices (adjustable pedals) the same way, unless the actual application is beyond his skill. Electronic sensors on adjustable pedals were therefore obvious. *Id.*

A similar situation is presented in the combination of Reetz with Uchida or the '963 patent. Reetz teaches the use of a technique (complementary filtering) to improve devices such as lighted cockpit instruments. DE-301 at GVT018-1029 to -1030. The Uchida reference and '963 patent disclose similar devices - full color displays - that emit light and therefore present the same problems of interfering light in the cockpit. DE-515, DE-519. Following the reasoning

of the Court in *KSR*, one of skill in the art in 1985 would have recognized that the displays of Uchida and the '963 patent could be improved the same way as the indicators - by using complementary filtering. Such a modification would have been well within the skill level of the artisan, as even Mr. Tannas freely admits. Tr. at 1080, 1354. These facts lead to the unmistakable conclusion that the combination of Reetz with Uchida or the '963 patent would have been obvious in 1985.

The Government expects Honeywell to devote considerable effort to the argument that the "third filter" of Reetz (the CS-4-94 filter on the display) does not satisfy the "third filter" element of claim 2, because it does not pass sufficient light in the "red color band" to form a "red primary." While the Government believes that such a requirement for "sufficient light" is nowhere in the claims, Honeywell's argument is irrelevant.

Even assuming *arguendo* that the CS-4-94 filter of Reetz is insufficient because it blocks too much of the red color band, Honeywell's own expert has admitted that remedying this problem is well within the level of ordinary skill in the art. According to Mr. Tannas, in 1985 there were "probably millions" of filters known that could be used to filter displays, and one of skill in the art knew to test to determine the appropriate filters to use. Tr. at 1165, 1353-54. If one of skill in the art found the CS-4-94 filter insufficient, it would have been obvious to try any of the other filters known to those in the art in 1985, with the goal of locating a filter that passed sufficient red light.

Even without Mr. Tannas' admissions, it is clear that such filters were in the prior art in 1985. For example, the filter in Verney (DE-511) is a filter that passes a narrowband of the red color band (approximately the band from 620 to 680) and then substantially blocks the remainder

of the red color band. DE-511 at GVT009-0780, Figure 14. Honeywell cannot deny that the Verney filter is sufficient to operate as the "third filter" of claim 2, because the filter is almost identical to the backlight filters found in the infringing CMFDs, which the Court found satisfied the "third filter" element of claim 2. *Compare Honeywell v. United States*, 70 Fed. Cl. 424, 467 (2006) *with* DE-511 at GVT009-0780.




The Government proved at trial that the combination of Reetz with either Uchida or the '963 patent would have been obvious to one of skill in the art in 1985. Even if the CS-4-94 filter

of Reetz does not pass enough of the "red color band" to satisfy claim 2,[7] it would have been well within the level of ordinary skill in the art in 1985 to select another filter from the "millions" known in the art to pass sufficient red. For example, the filter of Verney was prior art in 1985 and would satisfy the "third filter" element.

b. *Claim 2 Would Have Been Obvious Over Verney Alone*

The combinations of prior art given by Dr. Task at trial were based on the written teachings of each prior art reference. However, at trial Honeywell's expert, Mr. Tannas, made numerous admissions that elements of claim 2 were known in the art. Combining these admissions with the teachings of Verney leads to the conclusion that claim 2 also would have been obvious over the teachings of Verney, by itself.

As noted above, Verney discloses a filter used to make red cockpit lights compatible with NVGs. DE-511 at GVT009-0777, -0780. The filter is described as having "excellent transmission throughout the visible region and cuts out the near infrared." Id. at GVT009-0780. The graph of the filter transmission provided by Verney shows a steep cutoff at 680 nm, within the "red color band" set by the court. Id. at Figure 14. Honeywell's expert admitted at trial that Verney's filter was commonplace, and that were "thousands of filters like the Verney filter, probably millions." Tr. at 1165. Mr. Tannas even termed Verney a "garden-variety filter" Id.

There can be no doubt that the filter used in Verney is the "third filter" of claim 2 that "passes a narrowband of the red color band." The filter passes light in the red color band from

---

[7]As noted above, Honeywell's argument that there must be some significant amount of the red color band passed by the filter is directly contrary to its argument at the infringement trial that there is no requirement for significant energy. *See Honeywell*, 70 Fed. Cl. at 464 ("Honeywell asserted that the red color band limitation . . . *does not require substantial red energy*, only that the CMDU produce red energy that is measurable.") (emphasis added).

620 to 680 nm, exactly as the CMFD filter discussed during the infringement does.

Verney would have taught one of ordinary skill in the art to use a "fourth filter" as described in claim 2. Verney illustrates testing his filter with ANVIS goggles. DE-511 at GVT009-0778, Figure 10. The court heard uncontradicted testimony at trial that these ANVIS goggles, as of 1985, were fitted with "minus blue" filters that blocked light beginning at 625 nm. Tr. at 136, 178 (Bradford); Tr. at 352 (Reetz). This filter must have "substantially blocked" the narrowband of the red color band, as Verney notes that his filter permitted the goggles to function for their intended purpose. DE-511 at GVT009-0780.

At trial, Mr. Tannas admitted that many of the elements of claim 2 were known in 1985. To the extent any claim terms cannot be satisfied by Verney alone, these admissions establish that any missing elements were well known in the art. Mr. Tannas' admissions are shown in the following claim chart:

| Claim 2 | Verney (DE-511) | Tannas Admissions |
|---|---|---|
| A display system for use in association with a light amplifying passive night vision aid and a local color display including a local source of light having blue, red, and green color bands,<br><br>comprising: | DE-511 at GVT009-0780<br><br>Task: "Verney discloses a filter that was designed to be used over displays" DE-500 at ¶ 127<br><br>Figure 10 of Verney shows use with an ANVIS filter | "That is just common sense . . . if you want to prevent two things from interfering with each other, you separate their performance with a filter." Tr. at 1096.<br><br>"The inventor didn't invent night vision goggles. He did not invent full color displays" Tr. at 1347. |

| Claim 2 | Verney (DE-511) | Tannas Admissions |
|---|---|---|
| (a) a plurality of filters at the local color display including:<br><br>(1) a first filter for filtering the blue color band of the local source of light | | "Q. So it's not the putting of a filter on a display what you claim was new in 1985? A. Right" Tr. at 1054<br><br>"Q. Uchida and the '963 patent both have a first filter for filtering their blue color band for rtheir local source of light? A. Correct" Tr. at 1059-60. |
| (2) a second filter for filtering the green color band of the local source of light | | "Q. Uchida and the '963 patent both have a second filter for filtering their green color band for rtheir local source of light? A. Correct" Tr. at 1060. |
| (3) a third filter for filtering the red color band of the local source of light and passing a narrowband of the red color band; and | DE-511 at GVT009-0780<br><br>Task: the "Infrared Blocking Filter Spectral Transmission" curve, which shows excellent transmission out to about<br>640 nm and measurable transmission out to about 700 nm. DE-500 at 128<br><br>Filter is very similar to filter used in CMFD | "Q. Filters like this CMFD lamp filter wer known in 1985, right? A. Yes, they were ." Tr. at 1149.<br><br>"[Verney] is a general, garden-variety filter." Tr. at 1165.<br><br>"It's very clear and distinct that [Verney is] suggesting that [the filter] be used to block the infrared on a color CRT." Tr. at 1171 |
| (b) a fourth filter which filters light at the night vision aid, said fourth filter cooperating with said plurality of filters to substantially block at least said narrowband of the red color band from being admitted to the night vision aid. | Verney tests filter with ANVIS goggle; DE-511, GVT009-0780<br><br>ANVIS goggles known to contain "minus-blue" filters in 1985; Tr. at 203, 352.<br><br>Light from the display can be seen in the NVGs without "adversely affecting their performance" DE-51, GVT009-0780 | "Q. And it was known in 1985 to put a filter on the front of a night vision goggle, right? A. Right." Tr at 1056. |

Through these admissions, Mr. Tannas significantly narrowed what he considered "inventive" about claim 2. According to Mr. Tannas, what he calls the "geniusness" of the invention is the interaction of the "third filter" and "fourth filter." Tr. at 1053-54. By characterizing the invention as a "little trick" or "hint," Mr. Tannas has narrowed the court's inquiry as well. Tr. at 1352 ("So the genusness [sic] of it comes into that hint - that little clue that says there's going to be success here if you do this little trick."). Mr. Tannas even goes so far as to characterize the "geniusness" as "little minutia." Id.

Verney discloses exactly this minute "geniusness" that Mr. Tannas identified. By admitting that the remaining portions of claim 2 were well known in the art, Mr. Tannas has created a situation strikingly similar to the one faced by the Federal Circuit in the *Leapfrog* case. In that case, the prior art identified several, but not all, elements of the disputed claim. 485 F.3d at 1162. That missing element was provided by the general knowledge in the art. *Id.* The same situation presents itself in this case - Verney supplies the "hint" of the invention of claim 2, and the court may rely on Mr. Tannas' admissions to supply the remaining elements, as they were admitted to be known in the art.

Nor is there any question that a combination of Verney with well-known displays, filters, and goggles would be within the ordinary level of skill in the art. Just as in *Leapfrog*, "[t]he combination is thus the adaptation of an old idea or invention . . . using newer technology that is commonly available and understood in the art." *Id.* Mr. Tannas has admitted that most of the elements of claim 2 were "an old idea or invention" in 1985. It would have been obvious to combine these teachings with "newer technology" such as the Verney filter, to arrive at the patented invention.

3. Honeywell Cannot Introduce New Requirements into Claim 2 to Navigate Around the Prior Art

At trial, Honeywell signaled several meritless attacks on the prior art used by Dr. Task to reach his opinion of obviousness. Most of these attacks involve Honeywell reading into claim 2 various requirements which appear nowhere in the claim itself, and then criticizing the prior art for not containing these new requirements. These attacks apparently are intended to focus the Court's attention away from the knowledge of the person of ordinary skill, and instead nitpick various irrelevant alleged distinctions between the prior art and the invention of claim 2. Especially given the damaging effect the Supreme Court's decision in *KSR* appears to have on Honeywell's case, this is not surprising, but all of Honeywell's arguments should fail.

a. *The Prior Art Filters "Pass a Narrowband of the Red Color Band"*

As noted above, the prior art set forth at trial disclosed any number of filters, many of which were sufficient to satisfy the "third filter" requirement that the filter "pass a narrowband of the red color band." DE-500 at ¶ 88. In other words, since these filters pass a "measurable" or "perceptible" amount of light in the range of 620 to 780 nanometers, they satisfy the "third filter" limitation of claim 2. For example, Dr. Task pointed out the filter in Boehm (DMX-4) passed a measurable and perceptible amount of light in the red color band.




At trial, Mr. Tannas attempted to argue that, in spite of meeting the construction set forth by the court, these filters still did not "pass a narrowband of the red color band."[8] Mr. Tannas fashioned this argument by introducing into claim 2 at least three new requirements never discussed at any prior stage of the case. The court recognized this during Mr. Tannas' testimony, and confronted the witness with it. Tr. at 1191-96, 1233 (THE COURT: "When you wrote your

[8]Confusingly, Mr. Tannas argued at the same time that the filters cited by Dr. Task pass some amount of measurable light at *every wavelength* of the red color band. Tr. at 1138. Presumably, Mr. Tannas believed that this meant that there was not a "narrowband" of the red color band present, because the filter passed the entire red color band. Mr. Tannas's argument appears to be that the prior art filters are passing *not enough* red light to have "significant energy," while at the same time also passing *too much* red light to have a "narrowband of the red color band."

report, you added - you used different words than the words I used. And so, you know, that certainly caught my attention because I'm trying to figure out if you've changed the premise on which we've been working.") The answer to the court's inquiry at trial is clearly yes, Mr. Tannas' new requirements do change the premises of the analysis - which is the only way he can distinguish the prior art from claim 2.

*First,* Mr. Tannas claimed that the prior art filters were insufficient, because they do not pass "significant" energy above 620 nm. PTX-834 at ¶¶ 298, 327, 349, 404. This is stunning, because Mr. Tannas explicitly *rejected* such a test during the infringement phase, when it was presented by Dr. Task, and the court cited his testimony as support for its infringement ruling. *Honeywell v. United States*, 66 Fed. Cl. 400, 464 (2005) ("There's no criteria, no test, no claims or claim construction [that the predetermined red color band has to be substantial energy]") (brackets in original). For Mr. Tannas to now return to a distinction that the court (and he himself) previously rejected for infringement, for the sole purpose of salvaging validity, is absurd and not permitted under the law. Honeywell cannot have the court's claim construction both ways.

At trial, the court recognized the impropriety of requiring "significant" energy. Tr. at 1193 (THE COURT: "Significant is not used in the claim."); 1195 (THE COURT: "[W]e defined narrow band of the red color band to be a narrow range of wavelengths within the red color band which would have to be perceptible. But there's nothing in the words of the patent that uses the word significant."). Mr. Tannas' attempt to redefine the claims to read around the prior art filters, as noticed by the court, must fail.

*Second*, and possibly related to his first added limitation, Mr. Tannas claims that the filter has to permit the display to have a "red primary." Not surprisingly, Mr. Tannas concludes that the prior art filters fail this test. PTX-834 at ¶¶ 302, 327, 329, 357, 404. Not only is this an attempt to back-door the same "significant energy" test into the claim construction that the court previously rejected, but it also suffers from an even more fatal flaw; namely, Mr. Tannas' new requirement would make the claim indefinite, because there is no way to define whether a display has a "red primary" without resorting to subjective evaluation. In fact, Mr. Tannas retreated to just such a "I'll know it when I see it" approach during cross examination. Tr. at 1340 ("I can see, from my own experience . . . it looks like a *pretty good red primary*.") (emphasis added). Again, Mr. Tannas himself rejected such an approach at the infringement trial, and this rejection was relied upon in the court's opinion. *Honeywell*, 66 Fed. Cl. at 464 ("the actual color that the pilot sees is not part of the patent").

*Third*, Mr. Tannas asserted the new requirement that a filter must have a 50% transmittance point within the red color band in order to "pass a narrowband of the red color band." PTX-834 ¶¶ 212, 301, 326, 351, 353, 383, 398. The court has never made reference to such a requirement, either in the *Markman* opinion or the ruling on infringement, and in fact pointed this out to Mr. Tannas at trial:

> THE WITNESS: At 50 percent point the filter is diminishing - retarding the energy in a significant way.
>
> THE COURT: But that's not what - that doesn't relate to what the patent says.
>
> THE WITNESS: No, it doesn't.

Tr. at 1192.

Nor does it make sense to require an arbitrary test for a 50% point, a parameter the record showed is not used in the art other than as a shorthand for describing a filter. Tr. at 158-59 (Bradford); 1639-43 (Task). As the witnesses noted, the 50% point of a filter tells you nothing about the "tail" of the filter - the small amount of transmitted light in the region that is critical to NVG compatibility. Tr. at 159-60 (Bradford); 1642 (Task: "if I just designate the 50 percent point . . . I still don't know what the tail is doing, and the tail on the curve is what gives us problems."). Mr. Tannas himself admitted during cross examination that a filter is still passing *some* light past its 50% point. Tr. at 1190-91. Whether a filter's 50% point is within the red color band therefore cannot answer the question of whether it is passing a red color band.

In sum, Mr. Tannas attempts to graft onto the "third filter" claim element several requirements that were never part of the court's claim construction, and which he himself rejected at earlier phases of the case. This is a blatant attempt by Honeywell to read the claims very broadly during the infringement phase (to include as many infringing devices as possible) and then narrow the claims during the invalidity phase (to avoid the prior art). While it is not uncommon to see plaintiffs attempt such a trick, it is legal error to permit it. *See Amazon.com Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.") (citing cases).

b. *Uchida, the '963 Patent, and the '843 Patent Disclose "Local Color Displays"*

Honeywell apparently intends to argue that the prior art that discloses color displays, such as Uchida (DE-515), the '963 patent (DE-519) and the '843 patent (DE-518), do not satisfy the "local color display" requirement of claim 2. This criticism is apparently grounded in the fact

that none of the references disclose the use of their displays in aircraft. PTX-834 at ¶ 279. Whether or not this is true, it is irrelevant to the court's consideration of this art.

"Common sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 127 S. Ct. at 1742. Once again, Honeywell may wish to ignore the creativity of one of ordinary skill in the art, but *KSR* instructs that the court cannot. As Mr. Dunn testified at trial, in order to solve problems with displays that existed in 1985, one of his activities was to research all different kinds of electronic displays to determine what technology would be most useful. Tr. at 253-55. One of ordinary skill in the art would not have ignored Uchida or the other display references, merely because they did not disclose use in a cockpit with night vision goggles.

c. *References Using PVS-5 Goggles are Applicable*

As a final attempt to discredit the prior art cited by Dr. Task, Honeywell argues that any reference which discloses the use of the older generation, PVS-5 goggles are inapplicable to claim 2, because they do not allow the pilot to see the display by looking under the goggle. PTX-834, ¶ 30. There is no support for such a contention. Once again, Honeywell's tactic is to strip the person of ordinary skill in the art of any independent thought, and limit the obviousness inquiry to what is within the four corners of the prior art document.

First of all, Honeywell's assertion is factually incorrect. Several witnesses at trial, including Honeywell's expert Col. Lawrence, testified that a common modification to PVS-5 goggles in 1985 was to cut away the facemask, to allow pilots to look under the goggles at the cockpit. Tr. at 130-31 (Bradford); 997 (Lawrence); 1590 (Task). Dr. Task even recalled that

without cutting away the facemask, it was possible to look under the PVS-5 goggles through the nose opening. Tr. at 656-57. One of skill in the art in 1985 would have realized that cutaway PVS-5 goggles were applicable to the prior art teachings and permit the very "look around" capability Honeywell believes is critical.

Even barring this factual inaccuracy, Honeywell's argument is in error because it assumes that one of skill in the art would never be motivated to substitute the PVS-5 goggles in the prior art with the newer ANVIS goggles that also existed in 1985. Mr. Tannas himself acknowledged that the ANVIS goggles were a known, improved model. Tr. at 1070. Even so, Honeywell attempts to convince this court that one of ordinary skill would not be able to substitute one model for the other in the teachings of the prior art, a conclusion that is contrary to law. Courts "do not ignore the modifications that one skilled in the art would make to a device borrowed from the prior art." *In re Icon Health and Fitness Inc.*, 2007 WL 2189161 at *5 (Fed. Cir. August 1, 2007).

Apparently, Honeywell's tactic for avoiding the clear teachings of the prior art is to, contrary to the Supreme Court's instructions in *KSR*, turn the person of ordinary skill into an automaton. The absurdity of Honeywell's position is demonstrated by Mr. Tannas' claim at trial that, even though the Reetz reference discloses the use of the ANVIS look-around goggle, it does not satisfy the court's claim construction. PTX-834 at ¶ 321. Under cross examination, Mr. Tannas attempted to distinguish the art because it was unclear whether the ANVIS user was *in the front or back seat of the cockpit*:

> Q. And for that person who was wearing the ANVIS goggle, the displays or the lighting in that aircraft would have been perceptible to him. The colors of the lighting would have been perceptible to him. Isn't that correct? Because he could look under the goggle.

A. I don't know. I don't know if he was sitting in the front seat. He may have been in the back seat. . . . There's no reference to that.

Tr. at 1079.

Apparently, Mr. Tannas believes that a person of ordinary skill in the art in 1985 would not have realized that the ANVIS user, even if he were in the back seat of the aircraft, could have also used the same goggle in the front seat. This flagrantly ignores the level of skill in the art that the artisan is presumed to have in the obviousness inquiry.

4. The Prior Art Does Not Teach Away From Claim 2

The Government also expects Honeywell to argue that, even admitting that all claim elements exist in the prior art, the art "teaches away" from claim 2, preventing a finding of obviousness. This argument must fail, for several reasons.

Courts have ruled that, in certain situations, a showing that the prior art teaches away from the claimed invention is evidence that the invention would not have been obvious. *See KSR*, 127 S. Ct. at 1739-40 (citing *United States v. Adams*, 383 U.S. 39, 40 (1966)). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

There is no evidence that those of skill in the art were discouraged from discovering the invention of claim 2 by the prior art that existed in 1985. Mr. Tannas' only evidence that the prior art teaches away consists of several out-of-context passages pulled from various prior art references. Honeywell's claims collectively suffer from the same fatal flaw that infects most of its invalidity analysis; namely, Honeywell wishes to strip the person of ordinary skill in the art of

any creativity or independent thought. Honeywell's analysis reduces the artisan to a mere "automaton" who would follow the letter of the prior art teachings exactly, an analysis expressly rejected by *KSR*. 127 S. Ct. at 1742. As echoed by the Federal Circuit, "we do not ignore the modifications that one skilled in the art would make to a device borrowed from the prior art." *In re Icon*, 2007 WL 2189161 at *5.

When viewed from the required viewpoint of one of ordinary skill in the art, it is apparent that there is no teaching away from claim 2. Mr. Tannas claimed at trial that the prior art taught that red light must be *eliminated* from the cockpit to achieve NVG compatibility.[9] PTX-834 at ¶ 417. Even if this were true, one of skill in the art would have understood that these references were merely recognizing the reality of the original MIL-L-85762 military specification, which made the conscious choice to reduce red in favor of increasing goggle performance. Tr. at 178 (Bradford); 353-54, 360 (Reetz). These references would not "discourage" one of skill in the art from seeking other engineering tradeoffs, such as allowing more red light in the cockpit while sacrificing some goggle performance - this was a principle that was well-understood in 1985. Tr. at 177-179 (Bradford discusses considering "tradeoff"). Once again, Honeywell is seeking to strip the person of ordinary skill of any independent thought or knowledge.

Furthermore, the references Mr. Tannas cited do not stand for the proposition that all red light must be *eliminated* from the cockpit, as he claims. Rather, as Dr. Task noted, these references encourage the use of a small amount of red light, with the understanding that the more red light is permitted, the more goggle performance is sacrificed. DE-500 at ¶¶ 222-224. For

---

[9]As discussed below, Mr. Tannas later recanted this statement, and admitted that, at most, the prior art teaches the advantages of *reducing*, not *eliminating*, red light. Tr. at 1273, 1294.

example, Verney teaches that "NVGs can tolerate narrow band emissions for *all* colors of light." DE-511 at GVT009-0782 (emphasis added). Boehm teaches the same concept, stating that a "small proportion of yellow and red is not that disturbing to the NVG." (DMX-4 at D000597) These statements, when viewed as one of skill in the art would view them, merely recognize the well-known engineering tradeoff that the Government's fact witnesses testified to at trial. Tr. at 177-79 (Bradford); 353-54, 360 (Reetz); DE-500 at ¶¶ 18, 32 (Task).

In fact, under cross examination, Mr. Tannas admitted that several of his cited "teachings away" actually only suggested *reducing*, not *eliminating*, red light. Tr. at 1268-1299. For example, Mr. Tannas retreated on his original assertion that Boehm required eliminating red light.

> Q. So, again, we talked about before, it's not eliminated, it's reduced to some appropriate level, right?
>
> A. Yes.

Tr. at 1294.

This distinction is key, because it is the same distinction made by the '914 patent - that a *small amount* of red light is permissible in the cockpit (the "narrow band of the red color band," in the language of the patent). The prior art teaches that by reducing red light to an acceptable level, it can be used in the cockpit - the same concept advocated by the '914 patent. Rather than teach away from the patent, the prior art teaches the same essential concept.

The only way Mr. Tannas can assert that the prior art teaches away from the '914 patent is to strip the person of ordinary skill in the art of independent thought and creativity. To do so ignores the central teachings of *KSR*. One of skill in the art in 1985 would have understood the references cited by Mr. Tannas to in fact teach *toward* the invention of claim 2, not away.

5. No "Secondary Considerations" Have Been Proven by Honeywell

Having failed to counter the strong *prima facie* case of obviousness, the Government expects Honeywell to retreat to secondary considerations in an attempt to rebut the Government's *prima facie* case. Honeywell has not produced any credible evidence of secondary considerations, however, and in fact several facts point in the direction of obviousness.

In setting forth the three-step *Graham* obviousness inquiry, the Supreme Court also noted that "secondary considerations [such] as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Graham*, 383 U.S. at 17-18. However, secondary considerations will not render an obvious invention patentable. *See Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61 (1969). In other words, if a court determines from the three step *Graham* framework that a claimed invention would have been obvious, "secondary considerations cannot fill the gap." *See Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1557 (Fed. Cir. 1985).

From Mr. Tannas' testimony at trial, the Government expects that Honeywell will assert two secondary considerations, long-felt need and commercial success. Both of these lack merit. In fact, the Government produced evidence at trial of secondary considerations that reinforce a finding of obviousness.

a. *There Was No Long-Felt Need*

Mr. Tannas made a halfhearted attempt to assert at trial that in 1985 the industry had a long-felt need for night vision goggle compatible, full color displays that the '914 patent

addressed. PTX-834 at ¶¶ 263-65. These unsupported assertions were contradicted by the only fact witnesses to testify at the trial, and were confirmed by the admissions of Honeywell's other expert, Colonel Lawrence.

The record is clear that as of 1985, full color displays had yet to be widely implemented in aircraft cockpits. Tr. at 361 (Reetz); Id. at 978 (Lawrence). This had nothing to do with incompatibility with night vision goggles; rather, all witnesses agreed that daylight readability was the major problem facing color displays at the time. DE-500 at ¶ 215 (Task); Tr. at 368-72 (Reetz); Id. at 243-44 (Dunn).

With no fielded full color displays, it is nonsensical to then conclude that there was a long-felt need for these displays to be made compatible with night vision goggles, as Mr. Tannas asserts. Rather, the evidence is clear that the solution to making full color displays compatible with NVGs was known as of 1985, and was quickly implemented when these displays began being fielded in aircraft. Tr. at 361-366, 371 (Reetz); DE-143. Instead of a long-felt need, the record shows that once a need was felt, the military moved quickly to amend the MIL-L-85762 specification and address that need. Id.

b. *Commercial Success Has Not Been Linked to the Invention*

The Government also expects Honeywell to argue that the commercial success of the infringing products is evidence that the invention was not obvious, but this argument is even more fundamentally flawed than long-felt need. First, Mr. Tannas cites no evidence that the three products found by the Court to infringe were commercially successful, and just states that the products were "very successful." PTX-834 at ¶ 266. A bare assertion of this type is

insufficient to prove commercial success. The trial record as a whole is devoid of any such proof.

Second, and even more fatal to Honeywell's argument, is the failure of Mr. Tannas or any other witness to link together the alleged "commercial success" with the actual invention of the '914 patent. Honeywell ignores several holdings of the Federal Circuit, which require that there be some nexus between the success and the claimed invention. *See Ormco Corp. v. Align Tech, Inc.*, 463 F3d 1299, 1312 (Fed. Cir. 2006). If the success is due to features that are not claimed by the patent, a showing of commercial success is irrelevant. *See id.*

In the present case, there has been no proof that the commercial success of the infringing devices was due to their ability to use red with NVGs, rather than other features that are not claimed in the '914 patent. It is simply not enough to point out that the military required night vision goggle compatibility, and would not have bought an incompatible display; the same argument could be made for any required feature of the display, such as daylight readability or weight. In fact, the record shows that in 1985, daylight readability was the major problem facing color cockpit displays. Tr. at 233 (Dunn). If anything, commercial success of the displays after that point is attributable to daylight readability, not NVG compatibility.

c. *There is Objective Evidence of Obviousness*

Several facts at trial actually present objective evidence that the '914 patent was obvious, and that Mr. Cohen did nothing "inventive" to devise the system of claim 2.

*First*, it is undisputed that Mr. Cohen was not an expert in the field of the invention in 1985, as he admitted at his deposition. DE-54 at 88 (Cohen deposition). In his own estimation, Mr. Cohen was a "generalist" who worked in several fields at Bendix, looking for problems to

solve. Id. Mr. Cohen was actually *unable* to ever build a prototype of the invention that used the complementary filters of claim 2. Id. at 353-354.

While it is certainly not the rule that an inventor must build a prototype or be highly educated to arrive at a patentable invention, the absence of these things certainly counsels *against* the finding that any discovery was nonobvious. In a recent case, the Federal Circuit noted that its conclusion of obviousness was "further reinforced by testimony from the sole inventor at trial that he did not have a technical background, could not have actually built the prototype himself, and relied on the assistance of [another] to built a prototype of his invention." *Leapfrog*, 485 F.3d at 1162. The conclusion of obviousness in the case at hand is similarly reinforced by Mr. Cohen's inability to build a prototype, and his lack of specialized training.

*Second*, the obviousness of the '914 invention is reinforced by the relative ease with which the military updated the MIL-L-85762 specification to permit red light. The fact that someone other than the inventor independently developed the same invention is considered evidence of obviousness. *See Ecolochem Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000). As Mr. Reetz testified at trial (again, Honeywell put on no fact witness to rebut this testimony), once the military lighting committee was aware of a demand for red light in the cockpit, updating the specification was simply a matter of making two modifications to the specification: specifying a filter on the NVG at 665 nm (within the "red color band"), and allowing the cockpit lighting to interfere slightly more with the goggles. See Secrecy Act Trial Transcript at 852-53 (Reetz). This undisputed testimony is again strong evidence that the "invention" of claim 2 of the '914 patent was simply a design or engineering choice, not any inventive step.

6. Claim 2 Would Have Been Obvious in October 1985

"For over a half century, the [Supreme] Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men.'" *KSR*, 127 S. Ct. at 1739 (quoting *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152 (1950)). Yet, this is exactly what is being attempted by Honeywell in the present case. As Honeywell's expert admitted,

> [T]he inventor didn't invent night vision goggles. He did not invent full color displays. He didn't invent red, blue and green primaries. He invented a system to make them work together in a unique way better than anyone else had ever done.

Tr. at 1347-48.[10]

While the Government disputes that Mr. Cohen's system is "unique" or "better," the import of Mr. Tannas' statement is striking because of its parallels to *Great Atlantic & Pacific Tea*. The combination in the '914 patent, by Mr. Tannas' own admission above, only "unites old elements." Furthermore, there is "no change in their respective functions": the goggles, display, and filtering are all functioning in the exact same manner as shown in the prior art.

Mr. Tannas' only claim of inventiveness, the "hint" of the patent, is the manner in which the "third filter" and "fourth filter" cooperate to provide NVG compatibility. Tr. at 1352. Yet

[10]The approach Mr. Tannas takes, of attempting to distinguish the '914 because it works "better," was expressly rejected in *KSR*. *See KSR*, 127 S. Ct. at 1745 ("Teleflex may have made a plausible argument that Asano [the prior art] is inefficient as compared to Engelgau's [the patentee] preferred embodiment, but to judge Asano against Engelgau would be to engage in the very hindsight bias Teleflex rightly urges must be avoided."). Even if the invention of claim 2 is "better" than the prior art combinations, to discredit those combinations based on what is known today would be to engage in impermissible hindsight, since "better" performance is not claimed in claim 2.

this distinction does not hold up to scrutiny - as the record shows, complementary filtering in this manner was well-known in 1985. Tr. at 148-49 (Bradford); 425 (Reetz); DE-500 at ¶ 38 (Task). Mr. Tannas failed to explain in any way why the "cooperation" of the third and fourth filters of claim 2 differs from complementary filtering, and in fact admitted that filtering of the red color band is not scientifically different from filtering any other color band, such as the blue color band. Tr. at 1347.

The Government has therefore carried its burden of proving that claim 2 of the '914 patent would have been obvious to one of skill in the art in 1985. The claimed invention is nothing more than a combination of old elements, behaving in a way that was predictable and well-understood in 1985. *See KSR*, 127 S. Ct. at 1739. As Dr. Task has convincingly testified, undertaking a *Graham* analysis leads to the unequivocal conclusion that all elements of the claim are found in the cited prior art references (the first *Graham* inquiry, scope and content of the prior art); that the only difference between the prior art and claim 2 was the combination of elements (the second *Graham* inquiry); and that combining the references to reach claim 2 was well within the level of ordinary skill in the art (the third *Graham* inquiry).

**D. Two References Anticipate Claim 2**

While the court's determination on obviousness should be dispositive of the case, the Government asserts as an alternative ground for invalidity that claim 2 is also anticipated by two prior art references. Because these references (Reetz and Task & Griffin III) contain each and every element of the claimed invention, they anticipate the invention of claim 2.

Dr. Task's direct testimony clearly sets forth the elements of claim 2, and shows that each element is disclosed in the anticipatory references. DE-500 at ¶¶ 100-123. Furthermore, to

summarize his findings, Dr. Task prepared a claim chart that shows each element of claim 2 is present in the references. DE-500 at ¶¶ 187, 189.

Honeywell engages in a number of attacks on the Reetz and Task & Griffin III references, in an attempt to deny that they contain all elements of the claim. Similar to the counterarguments presented for obviousness, these attacks primarily consist of reading into the claim requirements that are not in the court's claim construction. For example, Mr. Tannas criticizes the use of PVS-5 goggles, which do not permit a "look-around." The Government has dealt with these criticisms in the preceding section on obviousness, and they need not be addressed again here.

One additional issue is presented by Honeywell, regarding the court's construction of "local color display." Specifically, the parties dispute whether, to have a "local color display" under the patent, it must be a "full color display," and specifically a full color display having red, blue, and green primaries.

Once the court construed claim 2, Defendants' position has consistently been that "local color display" requires nothing more than what is explicitly stated in the court's opinion: "a device that . . . shows or exhibits at least one color perceptible to an observer" *Honeywell*, 66 Fed. Cl. at 444. There is no requirement that the display be full color, or that the display have multiple primaries.

Nevertheless, Honeywell has attempted to read these requirements into the claim. At trial, Honeywell's counsel pointed to the fact that the "whole purpose" of the '914 patent was to have NVG compatible, full color displays. Tr. at 1676. Mr. Gotts furthermore pointed to the title of the patent to support this proposition. Id. As noted to the court at the time, "the purpose of the title is not to demarcate the precise boundaries of the claimed invention but rather to

provide a useful reference tool for future classification purposes." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1312 (Fed. Cir. 1999) (noting the "near irrelevancy of the patent title to claim construction"). It is therefore irrelevant that the title of the '914 patent includes "full color," when the claims as construed by the court have no such requirement.

Mr. Tannas' arguments that a "full color display" is required also should fail. Mr. Tannas even attempts to graft an additional requirement onto the claims, that the "first filter" and "second filter" must *create* the primaries of the local color display. Tr. at 1227. For example, Mr. Tannas argues that the "first filter for filtering the blue color band" was intended to create the blue primary, and by extension therefore claim 2 requires a blue primary. Id. This convoluted reasoning is unsupported by anything in the record, and furthermore ignores the court's claim construction. All that is required for a "local color display" is a display showing or exhibiting at least one color.

Even if the Court agrees with Honeywell's interpretation of the claim construction and determines that anticipation is not present, one conclusion can be drawn from the small differences between claim 2 and the disclosures of Reetz and Task & Griffin III. Namely, these minor differences are well within the level of skill in the art, and would have been obvious as noted in the previous section. For example, Honeywell's criticisms regarding whether full color displays are disclosed in Reetz or Task & Griffin III are largely irrelevant to the ultimate question of validity, since other prior art references (such as Uchida (DE-515) and the '963 patent (DE-519)) disclose full color displays having three primaries, and it would have been obvious in 1985 to substitute these displays for the displays disclosed in Reetz or Task & Griffin III.

### E. Claim 2 is Not Supported by the Originally Filed Written Description

The court has heard numerous times during the course of this lawsuit that Honeywell, shortly before the issuance of the '914 patent, engaged in a highly irregular "pour-over" of the contents of a related patent application into the '269 application.[11] By tinkering so heavily with the contents of the '269 application, Honeywell in fact ensured that the resulting '914 patent would be invalid. Specifically, Honeywell introduced new claims into the application that are so broad they were not supported by the patent application Mr. Cohen originally filed in 1985. As a result, the patent is invalid for failure to contain an adequate written description, under 35 U.S.C. § 112.

The written description requirement ensures that, as of the filing date of the patent application, the applicant was in fact in possession of the invention. *See Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). In the absence of such a requirement, a patent applicant would be free to incorporate new matter into his application, thereby enlarging the scope of patent protection to encompass newly developed technologies in the field. Therefore, when a patent applicant amends the claims of the application to cover new subject matter, "[t]he test for determining compliance with the written description requirement is whether the disclosure of the application as originally filed reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." *In re Kaslow*, 707 F.2d 1366, 1375 (Fed. Cir. 1983). One of ordinary skill in the art must "immediately discern" the

---

[11] At trial, the court indicated that since the PTO allowed the amendments and pour-over to occur, the court was inclined to defer to the PTO Examiner's determination on the written description issue. Tr. at 11. As noted in section II.B. above, however, the "pour-over" as well as other irregularities in the claims makes the presumption of validity suspect.

limitations of the claims when reading the original disclosure. *See Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000).

1. The Broad Scope of Claim 2 Was Not Possessed by Mr. Cohen

As Dr. Task testified, one of skill in the art would understand that what Mr. Cohen described in the original '269 application was a *completely* different invention than what is claimed in claim 2. DE-500 at ¶ 62-63. Though the scope of the '914 patent was expanded in several ways, one easily identifiable alteration is Honeywell's complete abandonment of the display envisioned by Mr. Cohen in 1985. Claim 2 of the issued '914 patent only states that the system have a "local color display," which the court has construed as "a device that . . . shows or exhibits at least one color perceptible to an observer" *Honeywell*, 66 Fed. Cl. at 444. Furthermore, claim 2 specifies that this display must have red, blue, and green color bands to be filtered by the plurality of filters.

The types of displays that are encompassed by claim 2 are therefore very broad, and are defined only by their *output* (at least one color with red, blue, and green color bands). This is radically different than what Mr. Cohen disclosed in his original application ,which was a display defined by its *structure*:




FIG. 3

DMX-36, Figure 3 at D00020.

Original Figure 3 of the '269 application, shown above, does not show "color bands" or the output of the display. The portion of the original disclosure pertaining to this Figure states that it shows "an arrangement in which *three monochromatic cathode ray tubes* (CRTs) 51, 52, 53 are used to provide a color display." DMX-36 at DE-1046 (emphasis added). Mr. Cohen went on to state that there was an advantage to this structure which was crucial to his invention: "using *separate* cathode ray tubes 51-53 or other display transducers, it is possible to more easily filter offending colors from reaching the ANVIS." Id. (emphasis added). As Dr. Task pointed out, this use of *distinct* and *separate* display transducers was central to Mr. Cohen's idea of using a narrow bandpass filter - the invention would not work if the transducers were not separate. DE-500 at ¶ 72.

Significantly, none of the devices the court has found to infringe claim 2 of the '914 patent contain distinct and separate monochromatic display transducers - LCDs have a single white source of light that is passed through millions of tiny pixels, which generate the color image. This bears repeating - if the '914 patent claimed what Mr. Cohen originally disclosed, namely a display having distinct and separate monochromatic display transducers, *none of the three selected devices would have been found to infringe*.

It is therefore beyond question that, looking at the original application filed by Mr. Cohen in 1985, one of skill in the art would not have "immediately discerned" that Mr. Cohen possessed an invention that applied to all displays, regardless of the structure of those displays. Rather, the person of ordinary skill would have seen the numerous references by Mr. Cohen to the required structure of the display, and been led to believe that the structure was essential to the invention. In fact, Mr. Cohen told the person of ordinary skill this directly, in the "Summary of the Invention" he filed in 1985: "In accordance with the present invention, a full color local display which uses *separate* primary color light sources is made compatable [sic] with an ambient night vision (ANVIS) aid." DMX-36 at DE-1041 (emphasis added).

The gross injustice of permitting Honeywell to today claim a monopoly on something Mr. Cohen never possessed in 1985 is perhaps best demonstrated by analogy. Assume that a hypothetical inventor filed a patent application in 1985 disclosing a car having a particular structure, and stated that using the structure gave the car certain advantages. However, prior to issuance of the patent, the inventor assigned the application rights to his former employer, who then amended the application to cover not a particular car, but rather "a device for traveling long distances." The patent, changed from reciting a *structure* to claiming a *result*, has therefore been

broadened substantially, so that it now covers trains, ships, and airplanes. A person of skill in the art in 1985, however, would never have believed that the inventor possessed a claim to airplanes, when his patent application was directed to the structure of a car. This is exactly the erroneous conclusion that Honeywell asks this court to make.

2. Honeywell's Expert Uses an Analysis Unsupported by Law

While its practice throughout the rest of the invalidity trial was to remove from the person of ordinary skill in the art any semblance of creativity or independent thought, Honeywell attempted to avoid the written description problem by imbuing the person of ordinary skill with substantial prescience. Mr. Tannas dismisses the changes to the claims as mere "wording changes" that would have been immediately obvious to one of ordinary skill in 1985. PTX-834, ¶¶ 497-514. For example, Mr. Tannas believes that the change from "separate monochromatic display transducers" to simply "blue, red, and green color bands" is permissible, because "the invention possessed by the inventors as of the filing date *included* a local source of light having blue, red, and green color bands." Id. at ¶ 502.

Whether or not his factual assumptions are correct, Mr. Tannas engages in an exercise that is irrelevant under the law. "A disclosure in a parent application that merely renders the later-claimed invention obvious is not sufficient to meet the written description requirement; the disclosure must describe the claimed invention with all its limitations." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998). The question is not whether, having seen the "blue, red, and green color bands" in the issued claim, one of skill in the art would understand that the original disclosure had these features; rather, one must look at the *original disclosure* first, and determine whether one of ordinary skill in the art would "immediately discern" the scope of the

broadened claims. Stated differently, when read by the person of ordinary skill in 1985, would the application indicate that Mr. Cohen had conceived of the broad invention of claim 2?

Again, analogy demonstrates the fallacy of Mr. Tannas' reasoning. In the example given above, Mr. Tannas would note that the claim was directed to a device for traveling long distances, state that the inventor originally disclosed a car, and conclude that an example of the claimed device was disclosed in the original application. This is not what the law requires; rather, one must ask whether the original disclosure of a car (*structure*) shows that the inventor possessed all other structures that fall under the claimed device for traveling long distances (*result*). Mr. Tannas does not engage in the correct inquiry, and his testimony on the issue of insufficient written description should be afforded no weight.

### F. Claim 2 Was Applied in an Indefinite Manner

The Government also proved at trial that, as applied during the infringement phase of the case, claim 2 of the '914 patent is indefinite and therefore invalid. Specifically, the claim limitation "narrowband of the red color band," interpreted to require only that light within the range of 620 to 780 nm be "measurable" or "perceptible," is indefinite.

A patent claim is only definite if those of skill in the art would understand the scope of the claim when it is read in light of the specification. *See Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.2d 684, 692 (Fed. Cir. 2001). The claim language must be "sufficiently precise to permit a potential competitor to determine whether or not he is infringing." *Morton Intern., Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993). While the level of definiteness required depends on the subject matter of the patent, the claims

must be "as precise as the subject matter permits." *See Hybridtech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1385 (Fed. Cir. 1986).

At trial, Dr. Task provided extensive testimony regarding the indefiniteness of claim 2. DE-500 at ¶¶ 74-84. In Dr. Task's opinion, claim 2 was made indefinite when the Court adopted Honeywell's proposed interpretation of the "narrowband of the red color band" construction during the infringement phase. Honeywell persuaded the court to require that the device emit light that is either "measurable" or "perceptible." *Honeywell v. United States*, 70 Fed. Cl. 424, 464 (2006). As the evidence a trial proved, these standards are indefinite because one of ordinary skill in the art would not know what the minimum threshold for determining "measurability" or "perceptibility" might be.

Dr. Task's opinion as to indefiniteness was summed up with the following passage:

> While defining a "color band" without true wavelength boundaries would be indefinite, it is also indefinite to not set a threshold for determining the amount of light within those boundaries required in order for it to constitute a "color band." The Court's *Markman* construction would have been definite if the Court had used peak wavelength, dominant wavelength, or CIE space to apply the construction, as I had recommended. But the Court's adoption of Honeywell's "measurable" or "perceptible" requirements in applying the construction has made it indefinite.

DE-500 at ¶ 84.

Dr. Task testified that claim 2 is indefinite, no matter whether the court applies "measurability" or "perceptibility" as the standard. "Perceptibility" is problematic, because one of ordinary skill in the art would understand there are at least two interpretations of whether light is perceptible: color and brightness. Id. at ¶ 79. Furthermore, testing either of these interpretations requires the skilled artisan to make a number of assumptions about variables such as ambient light and display brightness. Id. at ¶ 80. The '914 patent gives no guidance as to these

variables; there is therefore significant risk that one artisan could determine that a light is perceptible using one set of assumptions, while another believes the same light to be imperceptible using different assumptions. This is quintessential indefiniteness, since one of ordinary skill in the art would not be able to determine the metes and bounds of the claim protection.

Using "measurable" as the standard does not solve the indefiniteness problem. While requiring light to be merely measurable removes the subjectivity of perception from the claim, it adds a completely different problem. As Dr. Task testified, what is considered "measurable" light is dependent on the sensitivity of the measuring device. Id. at ¶ 82. Again, the patent gives no indication of what device should be used, and there is a real risk that an artisan using one device might not be able to measure a particular light, while another using a more sensitive instrument can measure that light. Such uncertainty in the application of claim terms runs counter to the notice function of patents, and is the reason for the indefiniteness requirement. *See United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942).

**G. The Government Has an Implied License to Use Honeywell's CMFD**

Finally, even assuming *arguendo* that claim 2 of the '914 patent is valid, Honeywell cannot be permitted to recover damages on one of the devices found to infringe the patent, because the Government has a license from Honeywell to use this device. Specifically, the CMFD installed on the F-16 aircraft, which this court found to infringe the '914 patent, was sold to the Government by Honeywell. As a matter of law, the sale of the product to the Government created an implied license to use that product, that Honeywell is now estopped from claiming further compensation for the Government's use.

It is a fundamental equitable principle that once a party has sold a product and been compensated for the sale, the seller can no longer assert patent rights over that product. *See United States v. Univis Lens Co.*, 316 U.S. 241, 251-52 (1942). The sale therefore creates a type of implied license or covenant not to sue the buyer when the buyer uses the product in the manner intended by the parties. In *Univis*, the Court noted that:

> [T]he purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article, and that once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold.

*Id.* at 251.

The corollary doctrine of legal estoppel protects these implied licenses in situations "where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted." *See Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc.*, 103 F.3d 1571, 1581 (Fed. Cir. 1997). The doctrine of legal estoppel operates to prevent the patentee from obtaining double recovery for his patent rights - once during the sale of the product, and again from the infringement suit. This is exactly the situation presented in *AMP Inc. v. United States*, 389 F.2d 448 (Ct. Cl. 1968), which is particularly instructive in case at hand.

In *AMP*, the United States acquired a license to use a patented invention from AMP, and proceeded to purchase products covered by the licensed patent. *Id.* at 451. AMP subsequently bought a second patent, which also covered the products being bought by the Government. *Id.* The court held that AMP could not sue the Government for infringement, because AMP was "estopped from taking back in any extent that for which he has already received consideration." *Id.* at 452. Stating that the implied license was in the nature of a legal estoppel, "[t]he court intended to prevent plaintiff from derogating from his own grant by his subsequent acts." *Id.*

In the present case, having sold the Government its CMFD displays, and having been compensated for those sales, Honeywell cannot now "restrain the use and enjoyment" of the display by the Government. Honeywell's sale of CMFDs to the Government created an implied license to use those CMFDs for their intended purpose, as the Government has done. Just as in *AMP*, Honeywell is estopped from asserting later-acquired patent rights against the Government to recover additional compensation for products it sold without restriction to the Government.

The fact that AlliedSignal, the previous owner of the '914 patent, merged with Honeywell, the seller of the accused product, will not distinguish the current case from *AMP*. Honeywell is a Delaware corporation, and the merger agreement between AlliedSignal and Honeywell is governed by Delaware law. See Plaintiff's Amended Complaint, ¶ 3. As such, the merged company possessed all "rights, privileges, powers and franchises" of the predecessor companies, as well as being "subject to all the restrictions, disabilities, and duties of each." Del. Code Ann. tit. 8, § 259; *see also Gould v. American Hawaiian S.S. Co.*, 331 F. Supp. 981, 998 (D. Del. 1971). Post-merger Honeywell is therefore subject to the same implied license that legacy Honeywell granted the Government pursuant to the sale of the CMFD, and cannot maintain suit for infringement on these devices.

## IV. CONCLUSION

For all of the foregoing reasons, the Government submits that Claim 2 of the '914 patent is invalid, and the Government therefore is not liable to Honeywell for infringement. Alternatively, the Government submits that it has an implied license to use the '914 patent with respect to devices bought from Honeywell or its predecessors, and no liability exists for the

Government's use of these devices. Judgment in the Government's favor is respectfully requested.

Submitted by,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

Dated: August 24, 2007

s/*Christopher L. Crumbley*
CHRISTOPHER L. CRUMBLEY
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0415
Facsimile: (202) 307-0345

Attorneys for the United States

OF COUNSEL:
TREVOR M. JEFFERSON