IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., and<br>HONEYWELL INTELLECTUAL PROPERTIES INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, and<br><br>LOCKHEED MARTIN CORP. and<br>L3 COMMUNICATIONS CORP.,<br><br>Defendant-Intervenors. | ) | No. 02-1909C<br>(Judge Braden) |

**PLAINTIFFS' POST-TRIAL OPPOSITION BRIEF REGARDING DEFENSES**

Lawrence J. Gotts
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
(202) 551-1700
(202) 551-1705 (fax)

Attorneys for Plaintiffs
*Honeywell International Inc. and*
*Honeywell Intellectual Properties Inc.*

OF COUNSEL:

Mark Koehn
Elizabeth Miller Roesel
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
(202) 551-1700
(202) 551-1705 (fax)

October 12, 2007

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. DEFENDANTS FAILED TO PROVE THAT THE INVENTION OF CLAIM 2 WOULD HAVE BEEN OBVIOUS TO ONE OF ORDINARY SKILL IN THE ART IN 1985 .......... 4

A. Defendants Must Prove The Underlying Facts With Clear And Convincing Evidence .......... 7

B. The '914 Invention Is Not Simply The Application Of Complementary Filtering To A Full Color Display .......... 9

C. A Graham v. Deere Analysis, Which Defendants Fail To Provide, Demonstrates The Nonobviousness Of The Claimed Invention .......... 11

1. First Graham Factual Inquiry: The Scope And Content Of The Prior Art Does Not Include An NVG Compatible Full Color Display .......... 13

a. Reetz (DE-301) Teaches The Shared-Aperture Filter Technique, With Holes In The Filters For Allowing Light From The Instrument Panel To Pass Through Unfiltered .......... 15

b. Boehm (DMX-4) Describes Various Solutions For NVG Compatibility, But Not Filtering A Full Color Display .......... 16

c. Verney (DE-511) Describes An Infrared Blocking Filter For A Red Warning Light .......... 16

d. Uchida (DE-515) Teaches LCD Displays, But Not For Use In Aircraft Cockpits Or With NVGs .......... 17

e. The '963 Patent (DE-919) Teaches Projection Displays For Non-Aircraft, Non-NVG Applications .......... 17

2. Second Graham Factual Inquiry: Defendants Fail To Accurately Identify The Differences Between The Patented Invention And The Prior Art, Which Are Significant .......... 18

a. The Prior Art Discloses No Display That Is Both NVG Compatible And Full Color .......... 18

b. The Prior Art Does Not Disclose Or Suggest Filters For Passing A Narrowband Of The Red Color Band At The Display And For Blocking The Narrowband At The NVGs .......... 19

c. The Prior Art Does Not Disclose Or Suggest Making An NVG Compatible Full Color Display By Using Separate Filters For Red, Green And Blue .......... 21

d. Defendants' Attempt To Identify The Differences Between The Patented Invention And The Prior Art Is Inaccurate And Incomplete .......... 21

3. Third Graham Factual Inquiry: Defendants Rely On A Level Of Ordinary Skill In The Art Inconsistent With The Court's Definition...... 23

4. Ordinary Skill In The Art In 1985 Would Not Have Been Sufficient To Bridge The Gap Between The Prior Art And The Patented Invention ........................................................................ 27

a. Even If One Of Ordinary Skill Were To Apply Complementary Filtering To A Full Color Display In 1985, The Result Would Not Be The '914 Invention Because Known Complementary Filters Would Not Have Passed A Narrowband Of The Red Color Band ........................................ 28

b. It Would Not Have Been Obvious In 1985 To Choose Filters Having The Functionality Of The Third And Fourth Filters Of Claim 2 ............................................................ 31

(1) There Is No Evidence That A Person Of Ordinary Creativity Would Have Deviated From The NVG Compatibility Solutions That Were Consistently Described And Implemented In The Prior Art ................ 31

(2) Defendants Failed To Demonstrate That One Of Ordinary Skill In The Art Would Have Understood That A Full Color Display Could Be Achieved By Using A Filter That Passes A Narrow Band Of The Red Color Band............................................................ 36

(3) Contemporaneous Evidence Indicates That Achieving Both Full Color And NVG Compatibility Could Not Have Been Predicted In 1985......................... 39

c. It Would Not Have Been Obvious In 1985 To Make An NVG Compatible Full Color Display Using Separate Filters For Red, Green And Blue ........................................................ 40

5. The Patented Invention Is Contrary To The Conventional Wisdom In 1985 That Red Light Should Be Removed For NVG Compatibility ........................................................................... 44

D. Defendants' Prior Art Combinations Do Not Demonstrate Obviousness ........... 48

1. The Patented Invention Would Not Have Been Obvious In View Of Reetz (DE-301) Combined With Uchida (DE-515) Or The '963 Patent (DE-519) ......................................................................... 48

a. Reetz' Shared-Aperture Filter Technique Is A "Whole Different Paradigm" From The '914 Invention ........................... 49

b. The Government's Combination Of Reetz (DE-301) With Uchida (DE-515) Is Illogical From The Perspective Of One Of Ordinary Skill ............................................................... 53

c. The Government Failed To Prove That Reetz (DE-301) Combined With Uchida (DE-515) Would Have A "Narrowband Of The Red Color Band" ..... 54

d. The Government Failed To Prove That One Of Ordinary Skill In The Art Would Substitute Another Filter For The CS-4-94 In Order To Pass More Red ..... 58

2. The Patented Invention Would Not Have Been Obvious In View Of Verney (DE-511) Alone ..... 60

a. The Government's Newly Minted Obviousness Argument Is Unsupported By Any Testimony Or Opinion From Dr. Task ..... 60

b. Verney (DE-511) Fails To Suggest Separate Filtering Of Red, Green And Blue ..... 61

c. Verney (DE-511) Fails To Suggest A Fourth Filter For Blocking Light At The NVGs ..... 62

d. Verney's Approach To NVG Compatibility Is Very Different From The '914 Invention ..... 63

3. The Patented Invention Would Not Have Been Obvious In View Of Boehm (DMX-4) Combined With Uchida (DE-515) Or The '963 Patent (DE-519) ..... 65

a. It Would Be Clearly Erroneous To Conclude That One Of Ordinary Skill Would Apply The Complementary Filters Taught By Boehm (DMX-4) To A Full Color Display, When Boehm Himself Did Not Do That ..... 66

b. L-3 Fails To Demonstrate Obviousness Of Separate Filters For Red, Green And Blue ..... 67

c. L-3 Failed To Prove That Boehm (DMX-4) Combined With Uchida (DE-515) Or '963 Patent (DE-519) Would Have A "Narrowband Of The Red Color Band" ..... 68

d. L-3 Blatantly Mischaracterizes The Teachings Of Boehm (DMX-4) ..... 70

E. The Objective Facts Strongly Support A Finding Of Nonobviousness ..... 73

1. There Was A Long Felt Need For Red Light In Military Aircraft Cockpits ..... 73

2. The Prior Art Evidences A Desire For NVG Compatible Full Color Displays, But Proposes No Solution For Achieving Both Simultaneously ..... 74

3. The Original Mil Spec – MIL-L-85762 – Demonstrates "Failure Of Others" And Strongly Supports Nonobviousness ..... 75

4. Commercial Success Supports Nonobviousness ..... 82

F. Defendants' Remaining Assertions Do Not Demonstrate Obviousness ............. 85

1. Defendants Have Not Proven That The Revised Specification -- MIL-L-85762A -- Was Independently Developed ................................. 85

2. Neither Mr. Cohen's Credentials, His Company Internal Memo, Nor The Absence Of A Prototype Supports Obviousness ....................... 86

G. KSR Supports A Finding Of Nonobviousness................................................ 88

1. The Facts Of This Case Are Substantially Different From KSR............. 88

2. The Presumption Of Validity Is Not "Diminished" In This Case ........... 92

III. THE GOVERNMENT FAILED TO PROVE THAT CLAIM 2 IS ANTICIPATED BY THE PRIOR ART ........................................................................ 97

A. The Government Has Not Demonstrated That Reetz (DE-301) Discloses Each And Every Element Of Claim 2 ............................................................ 97

1. No "Local Color Display" In Reetz (DE-301)........................................ 98

2. No "First Filter For Filtering The Blue Color Band" In Reetz (DE-301) ................................................................................................. 100

3. No "Narrowband Of The Red Color Band" In Reetz (DE-301)............ 101

4. No "Fourth Filter" In Reetz (DE-301) ................................................. 102

B. The Government Has Not Demonstrated That Task & Griffin III (DE-508) Discloses Each And Every Element Of Claim 2 ............................................ 103

1. No "Display Of Colors" In Task & Griffin III (DE-508) ...................... 103

2. No "Local Color Display" In Task & Griffin III (DE-508).................. 105

3. No "Plurality Of Filters" In Task & Griffin III (DE-508) ..................... 105

4. No "Narrowband Of The Red Color Band" In Task & Griffin III (DE-508) ............................................................................................ 106

5. No "Fourth Filter" In Task & Griffin III (DE-508) .............................. 107

C. Neither Of The Government's Anticipation References Discloses A Full Color Display With Red, Green And Blue Primaries ....................................... 108

IV. THE GOVERNMENT FAILED TO PROVE PUBLIC AVAILABILITY OF THE REETZ THESIS (DE-301) ............................................................................. 109

A. Public Availability Of Alleged Prior Art Must Be Shown By Clear And Convincing Evidence .................................................................................... 110

B. The Documentary Evidence Shows That The Reetz Thesis Was First Cataloged In Penn State's Online Library Catalog System On November 5, 1985............................................................................................................ 110

C. The Evidence That The Reetz Thesis Might Have Been Publicly Available Prior To October 10, 1985 Is Far From Clear And Convincing ....................... 111

1. Dr. Fidishun Lacks Any Personal Knowledge Of Penn State's Library Practices Prior To 1995 And Her Testimony That The December 1983 Reetz Thesis Was Cataloged And Shelved No Later Than October 1983 Cannot Be Correct In Any Event ................. 111

2. Ms. Wiant's Testimony About Penn State's Library Practices During The Early 1980s Is Incompetent As Not Based On Personal Knowledge, Speculative, And Simply Insufficient............................... 113

D. The Court Should Not Rely On Ms. Wiant's Testimony About Cataloging Practices In 1983 Because It Was Hopelessly Tainted By The Government's Witness Coaching ..................................................................... 118

1. Ms. Wiant's First Affidavit Reflects Her Best Effort To Recall 1983 Library Practices For Theses And Says Nothing About Cataloging.......................................................................... 118

2. Without Interviewing Her Beforehand, The Government Gave Ms. Wiant Portions Of Dr. Fidishun's Deposition And Manufactured The Second Affidavit Of Ms. Wiant To Include That She Adopted Portions Of Dr. Fidishun's Testimony And New Facts The Government Wanted To Prove ........................................................... 119

3. Under These Circumstances, The Court Has Ample Justification For Not Relying Upon Ms. Wiant's Testimony About Cataloging Practices In 1983.................................................................... 121

V. DEFENDANTS FAILED TO PROVE THAT THE ORIGINALLY-FILED APPLICATION LACKS A WRITTEN DESCRIPTION OF THE INVENTION OF CLAIM 2.......................................................................................... 123

VI. DEFENDANTS FAILED TO PROVE THAT CLAIM 2 IS INVALID FOR INDEFINITENESS.................................................................................... 131

A. The Government Is Estopped From Arguing Indefiniteness Because The Court Adopted The Government's Proposed Construction For "Red Color Band" ........................................................................................ 131

B. There Is No Clear And Convincing Evidence That The Court's Requirement For Perceptible Light In The Red Color Band Renders The Claim Indefinite ......................................................................................... 135

VII. L-3 HAS NOT PROVEN ITS SECTION 112 DEFENSES........................................ 137

A. There Is No Clear And Convincing Evidence That Claim 2 Is Invalid For Lack Of Enablement ........................................................................... 137

B. There Is No Clear And Convincing Evidence That Mr. Cohen Believed LCD Display Technology Was The Best Mode ............................................... 141

VIII. L-3 HAS NOT PROVEN INEQUITABLE CONDUCT............................................. 143

A. The Addition Of Dr. Scoughton As A Co-Inventor Was Correct When Made And There Is No Evidence Of Inequitable Conduct In Connection With The Correction Of Inventorship ........ 144

B. There Is No Proof Of Materiality, Knowledge, Or Intent With Respect To The Hunt Reference Or The Rejection In The Abandoned ‘270 Application ........ 145

IX. L-3 HAS NOT PROVEN THAT THE ‘914 PATENT IS UNENFORCEABLE DUE TO PROSECUTION LACHES ........ 147

X. THE GOVERNMENT FAILED TO PROVE THAT IT HAS AN IMPLIED LICENSE UNDER THE ‘914 PATENT ........ 149

XI. CONCLUSION ........ 156

# I. INTRODUCTION

As of October 1985, when Honeywell's patent application was filed, no one had made or described a display that could ***both*** display in full color (red, green and blue) ***and*** be compatible with night vision goggles. This was true notwithstanding the undeniable desirability of such a display.

While Defendants argue that it would have been obvious to one of ordinary skill in the art in 1985 to apply complementary filtering to a full color display to make it compatible with night vision goggles, the '914 invention is not so simple. The invention solves the problem of NVG compatibility while retaining the full color capability of the display by using separate filters for the red, green, and blue color bands, where the filter for the red color band passes a narrowband of the red color band, which is substantially blocked by a filter on the NVGs.

This novel solution was nowhere disclosed or suggested in the prior art. Instead, prior art approaches to the problem of NVG compatibility involved removing red light from the cockpit, making it impossible to have a display that was both full color and NVG compatible. Experts in the field believed that red light was not compatible with NVGs, thus deterring any inquiry into any cockpit lighting that required that red light be displayed in the vicinity of NVGs. *KSR International v. Teleflex Inc.*, 127 S. Ct. 1727, 1740 (2007) ("when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious").

Notwithstanding the fact that the many who had attempted to solve the NVG compatibility problem never arrived at the solution of the '914 patent, and notwithstanding the fact that all of the many other solutions that others tried focused on removing red light, rather than requiring it, Defendants still contend that the invention was "excruciatingly" or "painfully" obvious to one of ordinary skill in the art at the time of the invention. Defendants do not and

cannot back up this rhetoric with clear and convincing evidence. To the contrary, Defendants' conclusory assertions of obviousness are directly contradicted by the actions taken and documents created by the Government's own witnesses, including Mr. Reetz and its expert, Dr. Task, in 1985 and before. These contemporaneous, non-litigation actions and documents confirm that the conventional wisdom in 1985 taught away from the invention. *Cf. KSR*, 127 S.Ct. at 1745 (patentee "has not shown anything in the prior art that taught away from the use of" adjustable pedal of prior art).

For example, if it were obvious to those of ordinary skill in the art in October 1985 that a full-color, NVG-compatible display could be achieved, then why, in January 1986, did a committee of Government experts issue a military specification governing NVG compatible lighting (MIL-L-85762) that effectively ***banned red light and full color displays***, despite Dr. Task's opinion at the time that the MIL spec should retain red "if at all possible"? (PTX-12; Tr. 1730.)

Similarly, why did the Army spend $52 million prior to 1985 to ***remove red light*** from its aircraft cockpits to achieve NVG compatibility? (Bradford Tr. 209-10.)

If the invention was so obvious, why did the Government in early 1986 reconvene the committee of experts to ***investigate whether it was possible to get red back into the cockpit***? (DE-303 at GVT012-3234.)

Why, if the invention was so obvious, did Mr. Reetz, an expert with more than ordinary skill in NVG compatibility and the author of the Government's most heavily-relied upon prior art reference, use a filter (CS-4-96) that ***blocked red*** from the moving map display in the TA-7 aircraft in 1984, thereby destroying its full color capability? (Reetz Tr. 337-39.)

Why did that same Mr. Reetz, in an article written in April 1985, describe NVG compatibility of color displays as something that still "***need[s] to be investigated,***" if the invention was already obvious by then? (DE-146 at GVT019-1646.)

And why did Mr. Verney, author of another of the Government's prior art references, describe NVG compatibility of color CRTs in May 1985 as a "future design issue[]" and "perhaps ***one of the greatest challenges in lighting system design***"? (DE-511 at GVT009-0782.)

Last, but by no means least, why, on earth, if the invention was so "excruciatingly" and "painfully" obvious, would the Government, as soon as it reviewed Honeywell's patent application in March 1986, determine that ***it posed a national security risk*** and issue a ***secrecy order*** that was renewed every year for over 14 years? (PTX-503; DMX-36 at D000150.)

There is only one plausible answer: as explained in detail below, the '914 invention was ***not*** obvious in 1985. Defendants' *post hoc* assertions of obviousness are hardly clear and convincing in the face of these facts, which demonstrate that the invention was not obvious to the numerous experts in the field in the 1985, much less to a person of ordinary skill in the art.

Defendants' myriad other defenses, namely, anticipation, written description, indefiniteness, enablement, best mode, inequitable conduct, prosecution laches, and implied license, are given little or no attention in Defendants' briefs and are equally without merit.

Notably, one of the Defendants' main pieces of evidence is not even prior art. Defendants failed to meet the clear and convincing evidence standard of proof with respect to public availability of the Reetz thesis (DE-301), a cornerstone of their obviousness and anticipation defenses.

Finally, Defendants have offered no evidence or argument whatsoever supporting their invalidity or unenforceability defense as to claims 1 and 3. Unchallenged, these claims remain valid.

For these reasons, as elaborated below, Honeywell is entitled to judgment with respect to the Defendants' affirmative defenses.

## II. DEFENDANTS FAILED TO PROVE THAT THE INVENTION OF CLAIM 2 WOULD HAVE BEEN OBVIOUS TO ONE OF ORDINARY SKILL IN THE ART IN 1985

Defendants have failed in at least three ways to meet their burden of proving obviousness.

*First*, Defendants have failed to prove that applying prior art complementary filtering to a full color display would have resulted in a display system having a filter on the display that passes a "narrowband of the red color band" and a filter on the NVGs that blocks that narrowband. As "complementary filtering" references, Defendants rely upon Reetz (DE-301) and Boehm (DMX-4), but have submitted ***no evidence***, much less clear and convincing evidence, that the filters disclosed in those references (CS-4-94 and BG-7) would pass a "narrowband of the red color band" when combined with a full color display. On the contrary, Dr. Task conceded that he made ***no analysis*** of what would happen if the CS-4-94 filter were placed over a full color display. (Tr. 667.) Furthermore, Mr. Tannas submitted unrebutted testimony that the prior art complementary filters would not pass a "narrowband of the red color band" when combined with a full color display. (*See*, *e.g.*, PTX-834 at 104-05, ¶ 324; *id.* at 129, ¶ 397.) Recognizing this deficiency in their evidence, Defendants resort to asserting that one of ordinary skill would substitute other, more appropriate filters for the complementary filters taught by the prior art.

*Second*, there is no clear and convincing evidence that it would have been obvious to one of ordinary skill in the art in 1985 to modify the complementary filters taught by the prior art, or to choose or select different filters from those actually taught by Defendants' prior art, in order to achieve the functionality of the claimed "third" and "fourth" filters of the patented invention. In fact, Defendants have failed to identify any pair of filters that performs the function of the claimed third and fourth filters and could be substituted for the prior art complementary filters. Although Defendants point to the Verney filter, Dr. Task admits that Verney discloses neither complementary filtering, nor a fourth filter at the NVGs. (Tr. 1699-89, 1707-08.) Defendants provide no explanation for why one of ordinary skill in the art would discard one filter of a complementary pair of filters over the cockpit lights and NVGs, and substitute another filter that is not complementary. Obviousness cannot be shown because the substitution Defendants advocate is contrary to the conventional wisdom at the time of the invention that red light should be removed for NVG compatibility, as well as the actions taken by Mr. Reetz, Dr. Task, and others skilled in the art at the time.

*Third*, Defendants have not proven that it would have been obvious to one of ordinary skill in the art to make an NVG compatible full color display using separate filters for red, green and blue. Significantly, Dr. Task admitted that separately filtering the red image to pass a narrow band of frequencies "was probably a unique idea at the time." (Tr. 1605-06.) The suggestion to use the full color LCD display of Uchida (DE-515) or the full color projection display of the '963 patent (DE-519) comes solely from the teachings of the '914 patent. Indeed, applying complementary filtering to the full color CRT displays discussed in Defendants' other references (*e.g.*, Boehm, DMX-4 or Verney, DE-511) would ***not*** result in the invention of claim 2. Defendants submit ***no evidence,*** much less clear and convincing evidence, that one of

ordinary skill in the art would substitute a full color LCD or projection display for the CRT displays discussed in those references.[1]

Thus this case is not like *KSR*, where all but one element of the claim was disclosed in a single prior art reference and another related reference supplied the missing element, leaving the Court with the narrow issue of obviousness to combine. In this case, the prior art references do ***not*** disclose all of the elements of the claim, even when combined as proposed by Defendants. An analysis of the four-step inquiry mandated by *Graham v. Deere* and affirmed by *KSR* demonstrates that bridging the differences between the prior art and the '914 invention was not obvious to one of ordinary skill in the art in 1985.

Indeed, what Defendants seemingly propose is that the prior art be combined *and then further modified* to alter the essence of its performance and function, in a manner that went in the opposite direction from the teachings of the prior art and the filtering solutions that were consistently implemented by the witnesses it presented at trial. This approach is infested with exactly the hindsight analysis that Courts have steadfastly prohibited. *KSR*, 127 S.Ct. at 1742 ("[a] factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning"); *W.L. Gore & Associates., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983) ("[t]o imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art reference or references of record convey or suggest that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher"), *cert. denied*, 469 U.S. 851 (1984).

---

[1] These three gaps in Defendants' evidence are discussed in greater detail in Section II.C.4. below, which explains that ordinary skill in the art in 1985 would not have been sufficient to bridge the gap between the prior art and the patented invention. (*See* page 27, *infra*.)

Nor can Defendants refute the real world contemporaneous documents and evidence demonstrating that the patented invention was not apparent to those of ordinary skill in 1985. In this case, the Court need not speculate or hypothesize as to what those of ordinary skill in the art might have done – here the unchallenged evidence establishes what those of ***extraordinary*** skill in the art ***actually*** did. Despite a strong desire to maintain red in the cockpit and incorporate full color displays, Government experts having more than ordinary skill in the art nevertheless eliminated red in 1985. (*See* Section II.C.4.6, pages 31-40 and II.E.1.-3., pages 74-82, *infra*.)

### A. Defendants Must Prove The Underlying Facts With Clear And Convincing Evidence

To prove obviousness, Defendants must demonstrate that the differences between the claimed invention and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). As Defendants acknowledge, "accused infringers must prove the facts surrounding invalidity by clear and convincing evidence." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 Fed. Cir. 2001) ("Throughout the obviousness determination, a patent retains its statutory presumption of validity, *see* 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to the underlying facts") (citation omitted).

The ultimate determination as to whether the invention would have been obvious is a question of law, but this legal determination depends upon four underlying factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) any objective evidence of nonobviousness, such as long felt need, commercial success, the failure of others, or copying. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966). Defendants must prove

these factual predicates with clear and convincing evidence. *McGinley* 262 F.3d at 1349 (Fed. Cir. 2001) (obviousness is a question of law based on underlying facts); *Schumer v. Laboratories. Computer System, Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002) (issued patents enjoy a presumption of validity, and therefore the evidence to show invalidity must be clear and convincing).

In *KSR*, the Supreme Court reaffirmed the framework for applying the statutory language of section 103, as set forth in *Graham v. Deere*, emphasizing that "[t]he analysis is objective." *KSR*, 127 S. Ct. at 1734. Though it re-affirmed the *Graham v. Deere* analysis, the Supreme Court rejected a strict application of the "teaching, suggestion, or motivation" (TSM) test, criticizing the Federal Circuit for having analyzed the obviousness issue "in a narrow, rigid manner inconsistent with § 103 and our precedents." *Id.* at 1746. The Court found "[t]here is no necessary inconsistency between the [TSM] test and the *Graham* analysis," but it cautioned that the test should not be transformed into "a rigid rule limiting the obviousness inquiry." *Id.* at 1732. Instead, the Supreme Court endorsed a flexible, expansive and functional approach, as exemplified by the Court's own precedents.[2]

The *KSR* Court also repeated the admonition that "that when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id.* at 1740, citing *United States v. Adams*, 383 U.S. 39, 51-52 (1966). Similarly, the Court reaffirmed that "[a]s is clear from cases such as *Adams*, a patent

---

[2] Contrary to L-3's repeated mischaracterizations, Honeywell has never relied upon TSM as the exclusive test of obviousness in this case. (*See* 11/6/06 HW Pretrial Br. at 21; Tr. 855 (Honeywell opening argument).) Rather it has consistently been Honeywell's position that the prior art, even when combined, does not disclose all the elements of the claim. Hence, teaching, suggestion or motivation to combine references is not the central issue in this case, although it was the gravamen of *KSR*.

composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S. Ct. at 1741. Indeed, the Supreme Court commented that it is to be ***expected*** that the various elements of most patentable inventions will be found, uncombined, in the prior art: "inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *Id.*

Under this legal framework, the questions to be resolved by the Court at this stage are: (1) whether the facts that Defendants rely upon for their obviousness defense have been proven by clear and convincing evidence; and (2) whether the facts proven by such evidence suffice to establish obviousness.

### B. The '914 Invention Is Not Simply The Application Of Complementary Filtering To A Full Color Display

Defendants argue that the invention of claim 2 of the '914 patent is merely the application of known complementary filtering to known full color displays, and that one of ordinary skill in the art would have known how to use that technique, to create a full color, NVG compatible display prior to October 1985. (*See* Gov't Br. at 20-25.) The '914 invention, however, is not simply a combination of known complementary filtering with recognized aircraft full color displays. Rather, the '914 invention improved full color displays and night vision goggles in a significantly ***different*** way than had been done in the past to address NVG compatibility. *Cf. KSR*, 127 S. Ct. at 1740. Prior art NVG compatibility techniques involved blocking red light from cockpit light sources, not filtering such light to pass a narrowband of the red color band. Thus, the '914 invention could not have been made in 1985 merely by fitting the teachings of the prior art together like the pieces of a puzzle. *Compare KSR*, 127 S. Ct. at 1742 ("a person of ordinary skill will be able to fit the teachings of multiple patents together like

pieces of a puzzle") *with Chemical Separation Technology, Inc. v. United States*, 51 Fed. Cl. 771, 817 (2002) ("some pieces [of the puzzle] are missing and were actually supplied by the inventors here"). Instead, the '914 patent's technology required an inventive approach to the problem of how to make a full color display NVG compatible.

Moreover, the '914 invention represented a shift in paradigm that was contrary to the teachings of the prior art. *KSR*, 127 S. Ct. at 1740 ("when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious"). Prior to the invention, NVG compatibility was achieved by eliminating the color red. (*See, e.g.*, Reetz Tr. 333 (with PVS-5 NVGs, "we had to modify the cockpit lighting to eliminate the red interval [*sic* integral] lighting and introduce the blue-green interval [*sic*, integral] lighting"); Bradford Tr. 194 ("red lighting … was taken out of the aircraft so that it would meet the requirements to work well with the goggles").) Those tasked with making cockpits NVG compatible before the '914 invention – including those of *more than* ordinary skill in the art – focused solely on NVG compatibility, not preserving color. Indeed, Dr. Task testified that the "only reason" to filter a display was to separate the spectral distribution from the NVGs – not to preserve or enhance the colors of the display.

> One of ordinary skill in the art would understand that the *only reason to filter the display* and/or the NVGs with a wavelength selective filter is to *separate the spectral distributions of the two sufficiently to allow the NVGs to function*.

(DE-500 at 46, ¶ 98 (emphasis added.).) The focus and objective of the prior art was to make sure that the NVGs functioned, regardless of the effect on the colors of the cockpit lighting. As a consequence, color in the cockpit was sacrificed. Thus, prior to the '914 invention, there was no appreciation that it was even possible to filter a display such that it would be ***both*** full color and NVG compatible. (Tannas Tr. 1150 ("It's not obvious that it could even be achieved").)

Nor did the prior art teach any compromise between red light (or full color) and NVG compatibility. (*See, e.g.*, Reetz 7/27/06 Tr. 893-94 ("Q: You didn't try to establish a narrow band of red, and see how that would work with the goggles, is that right? A: That's not where I started. I didn't start with that premise, no.").) Instead, the focus was solely on NVG compatibility.

The inventors of the '914 patent took a new and nonobvious approach. Claim 2 requires the "third filter" to pass a "narrowband of the red color band." The specification teaches that this filter should be selected so that it passes "the band at which most light is transmitted by a phosphor coating" of the display. (JTX-1, '914 patent, col. 5, lines 10-11; PTX-501 at D000010-11 (original '269 application).) ***The "third filter" does not merely cooperate with a filter on the NVGs***, but rather is specifically tailored to the spectrum of light emitted by the display. The inventor shifted the focus from being concerned solely with the NVG compatibility, to making a "design compromise" between NVG compatibility and a full color display. Defendants' so-called "complementary filtering" prior art fails to teach the concept of passing a narrowband of red as a compromise for achieving simultaneous full color and NVG compatibility.

### C. A *Graham v. Deere* Analysis, Which Defendants Fail To Provide, Demonstrates The Nonobviousness Of The Claimed Invention

Consideration of obviousness requires an analysis and specific findings with respect to each of the *Graham v. Deere* factors. *KSR*, 127 S.Ct. at 1741 ("[t]o facilitate review this analysis should be made explicit"); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 663 (Fed. Cir. 2000) ("[o]ur precedent clearly establishes that the district court must make *Graham* findings before invalidating a patent for obviousness"); *Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d 955, 961 (Fed. Cir. 1986) ("the failure of the district court to make sufficient *Graham* findings further supports our conclusion that *Graham* was not in fact properly applied").

Defendants have provided ***no such analysis.*** Specifically, Defendants fail to address the scope and content of the prior art and do not accurately identify the differences between the '914 invention and the prior art. *Graham v. Deere,* 383 U.S. at 17-18 ("Under 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.") Instead, Defendants focus almost entirely on the person of ordinary skill in the art – but even there Defendants' arguments go astray, as they ignore the Court's determination of the level of ordinary skill and instead focus on a person with added skills not included in the Court's definition.

Defendants cannot meet their burden by simply ignoring the wide gap between the prior art and the claimed invention. And, unlike the defendant in *KSR*, the Government and L-3 improperly rely upon the person of ordinary skill in the art not merely to ***combine*** elements that are taught by the prior art, but actually to ***invent*** (in hindsight) elements that are nowhere found in the prior art. More particularly, even though Defendants' obviousness argument is premised on the combination of complementary filtering and full color displays, Defendants identify no prior art that discloses complementary filters that perform the function of the third and fourth filters of claim 2. Instead, Defendants argue that one of ordinary skill in the art would somehow know to choose the claimed filters from among "millions" of filters available at the time, select certain types of full color displays not then used in aircraft, substitute one filter for another, and/or redesign filter cutoffs or modify the filters to perform functions that are nowhere found in the prior art and contrary to the conventional wisdom. This is hindsight, not obviousness.

Defendants cannot prove through hindsight testimony in 2006 propositions that are directly contrary to the actions of their own witnesses and the contemporaneous real-world 1985 evidence – much of which is from the very same witnesses offering their contrary views in 2006.

### 1. First *Graham* Factual Inquiry: The Scope And Content Of The Prior Art Does Not Include An NVG Compatible Full Color Display

The first of the four steps in the *Graham* obviousness inquiry is to determine the scope and content of the prior art.

The Court's *Markman* opinion sets forth a comprehensive summary of "the state of the NVG technology in 1985, at the time the '914 patent was filed," based upon Dr. Task's expert report. *Honeywell International, Inc. v. United States*, 66 Fed. Cl. 400, 418 (2005) (quoting from PMX-35 at 4-7, ¶¶ 8-15).) While the Government makes no attempt to summarize the state of the art in 1985 in its brief, L-3's "history of night vision goggles and complementary filtering" deviates substantially from Dr. Task's summary of the state of the art in his first expert report, which has already been adopted by the Court, and is unsupported by the record.[3]

Although Dr. Task's direct testimony discusses 25 different references, and Defendants relied upon fourteen of those at trial, they have now focused their contentions on five references: Reetz (DE-301), Verney (DE-511), Boehm (DMX-4), Uchida (DE-515) and the '963 patent

---

[3] For example, L-3's assertion that "[t]he compromise shifted towards more red in the cockpit instead of better NVG performance," citing Tr. 357-58 (Reetz Direct), is not linked to any date and misrepresents Mr. Reetz' testimony. (*Compare* L-3 Br. at 8 *with* Tr. 357-58 ("So, again, advisory is green, cautions were yellow, warnings were red. So, now, we come along with the night vision goggles, and we said, well, if you want to use this particular set of night vision goggles, you can no longer have red warning lights …").) There is no evidence of any compromise or shift toward more red that occurred prior to October 1985. L-3's assertion that "they determined that sufficient red light would not affect the goggles if they set the filter cutoff point to 665 nm" is similarly flawed. (L-3 Br. at 8.) Neither L-3's assertion, nor Mr. Reetz' testimony pertains to the time period before October 1985. (Reetz Tr. 363 ("So version A of the spec, which eventually came out in 1988").) Indeed, L-3's footnote discusses the amendment to MIL-L-85762, which occurred in 1988. (PTX-13 (MIL-L-85762A, dated August 26, 1988).)

(DE-519). (*See* DE-500 at ii-iii (Task direct, table of contents); Tr. 718-20 (listing prior art references for obviousness).)

Assuming "public availability" of the Reetz reference (DE-301),[4] Honeywell agrees that Reetz (DE-301), Verney (DE-511) and Boehm (DMX-4) are otherwise within the scope and content of the relevant art. But neither Uchida (DE-515) nor the '963 patent (DE-519) is "reasonably pertinent" to the problem addressed by the '914 invention, which the Government defines as "placing a full color display in a cockpit and making the display compatible with a pilot's night vision goggles." (Gov't Br. at 20; *see also* JTX-1, '914 patent, col. 2, lines 3-5 ("it is desired to operate ANVIS goggles in a cockpit or similar environment in which a full color display is illuminated").) *See Heidelberger Druckmaschinen AG v. Hantscho Commercial Products, Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994) ("in order to determine whether a reference is reasonably pertinent to the inventor's field of endeavor, one looks to, among other things, the problem confronting the inventor;" holding that the district court erred by relying on "generally non-analogous fields of the prior art"). As discussed in greater detail in Section II.C.4.c. below, neither Uchida (DE-515) nor the '963 patent (DE-519) relates to aircraft cockpits or NVG compatibility, and it would not have been obvious in 1985 to try an LCD display or projection display to achieve NVG compatibility. (*See* page 16, *infra*.) Defendants assert obviousness based upon Uchida (DE-515 or the '963 patent (DE-519) for one reason and one reason only – to reconstruct (improperly) in hindsight the claimed invention, including the separate red, green and blue filtering concept that is one of the significant claimed attributes of the invention. However,

---

[4] Honeywell addresses the obviousness and anticipation issues as if Reetz (DE-301) were prior art; but as detailed in Section IV below, Defendants have not met their burden of proof on this issue. (*See* page 109, *infra.*)

there is no evidence that those in the relevant art in 1985 would have looked to these displays which had no known cockpit applicability in 1985.

**a. Reetz (DE-301) Teaches The Shared-Aperture Filter Technique, With Holes In The Filters For Allowing Light From The Instrument Panel To Pass Through Unfiltered**

Reetz (DE-301) discusses the shared-aperture filter technique for use with AN/PVS-5A night vision goggles in two helicopter models. (DE-301 at GVT018-0985.) This technique uses a filter with a pin-hole through it over the NVGs. The user views the instrument panel by looking through the NVGs; the full spectrum of light from the instrument panel enters the NVG through the pin-hole. (DE-301 at GVT018-0989.) Reetz (DE-301) describes the selection of the optimum pin-hole size and filter material for the shared-aperture filters. (DE-301 at GVT018-0993-1003, GVT018-1023-44.) The thesis concludes that Schott RG-665 filter material should be used for the shared aperture filters. (DE-301 at GVT018-1045.)

The reference also discusses modification of the cockpit lighting to accommodate the use of NVGs, teaching the conventional wisdom that "[t]he predominantly red lighting presently used in the cockpit has to be modified to greatly reduce the output in the red and near-IR portion of the spectrum (approximately 600-900 nm)." (DE-301 at GVT018-1003.) To accomplish this modification, Reetz (DE-301) discusses filters for the existing incandescent lamps, namely Corning CS-4-94 and CS-4-96 filters. (DE-301 at GVT018-1003-22.) Reetz (DE-301) concludes that amber caution indicators and white advisory indicators can be filtered with CS-4-96 filter material, and that red warning indicators and green advisory indicators can be filtered with CS-4-94 filter material. (DE-301 at GVT018-1045.) As discussed below, there is no evidence that either of those combinations pass a narrowband of the red color band.

Significantly, Reetz (DE-301) does not describe or even reference any full color displays.

**b. Boehm (DMX-4) Describes Various Solutions For NVG Compatibility, But Not Filtering A Full Color Display**

Boehm (DMX-4) describes NVGs with 2nd and 3rd generation image intensifier tubes and the problems encountered with conventional cockpit lighting when using NVGs. (DMX-4 at D000586-87.) The paper states "[t]here are many solutions possible to make cockpit lighting NVG compatible," and lists seven separate solutions for different cockpit light sources. One solution is "[f]ilters, to reduce the red and near IR part of the incandescent lighting." A separate solution is "[m]ulti-function display (MFD) operation in the I[nstrument] panel." (DMX-4 at D000600.)

Boehm (DMX-4) recommends the Schott BG-7 dyed glass filter for the conventional incandescent lighting. (DMX-4 at D000601.) Boehm (DMX-4) discusses cut-off filters in front of the NVGs, stating that an OG 570, OG 590, and an RG 630 have been "successfully tested with the 2nd and 3rd generation NVG." (*Id.* at D000603.) Boehm (DMX-4) also discusses a monochrome or color multi-function display (MFD) based on cathode ray tube (CRT) technology, as well as liquid crystal display (LCD) indicators with blue/green electroluminescent backlighting. But there is no mention of filtering the color multi-function display or the LCD indicators.

**c. Verney (DE-511) Describes An Infrared Blocking Filter For A Red Warning Light**

Verney (DE-511) reports "some important findings" resulting from Sikorsky Aircraft's UH60A Black Hawk helicopter night vision lighting development program. (DE-511 at GVT009-0773.) *First,* with respect to the integral lighting that illuminates the aircraft instruments but is not annunciating (*i.e.*, not caution and warning), Verney (DE-511) teaches that the lighting must be "corrected so that it does not adversely affect the NVGs. This means that the lighting is blue-green in color and has minimal energy between 600 and 950 nanometers on

the electromagnetic spectrum." (DE-511 at GVT009-0780.) *Second*, with respect to the caution and warning lights, Verney (DE-511) recommends dimming along with an infrared blocking filter having the spectral transmission shown in Figure 14. (DE-511 at GVT009-0780.) According to Verney, "[t]his filter when combined with a source that is dimmable provides an effective warning since the energy emitted from the display stands out in the NVG without adversely affecting their performance." (*Id.*) Verney also discusses "[f]uture [d]esign [i]ssues," stating that "[p]erhaps one of the greatest challenges in lighting system design is in the area of CRTs." (DE-511 at GVT009-0782.)

#### d. Uchida (DE-515) Teaches LCD Displays, But Not For Use In Aircraft Cockpits Or With NVGs

Uchida (DE-515) deals with LCD technology. It discusses multicolor LCDs using both the subtractive color system (cyan, magenta and yellow primaries) and the additive color system (red, green and blue primaries) and concludes that the additive color system is more practical. (DE-515 at GVT009-0486.) Schematic transmissive spectra for the primary three colors of the additive mixture system are shown in Figure 2. (*Id.*) This document makes no mention at all of cockpits or night vision goggles, let alone the problems faced by using NVGs in a cockpit near color displays.

#### e. The '963 Patent (DE-919) Teaches Projection Displays For Non-Aircraft, Non-NVG Applications

The '963 patent (DE-519) discloses a large image projection system having three light sources behind three liquid crystal display (LCD) panels, three filters (red, green and blue) either behind or in front of the LCD panels, and three lenses in front of the LCD panels to project the image onto a single screen creating a complete multi-colored picture. (DE-519, Abstract, Fig. 1, col. 1, lines 60 to col. 2, line 2.) Applications for the projection system are said to include computer screens, radar apparatus, advertising displays and theatre backgrounds. (DE-519, col.

1 (summary of the invention).) Like Uchida (DE-515), this document makes no mention of cockpits or night vision goggles or related problems or solutions.

### 2. Second *Graham* Factual Inquiry: Defendants Fail To Accurately Identify The Differences Between The Patented Invention And The Prior Art, Which Are Significant

The following paragraphs describe the differences between the '914 invention and the prior art. Additional differences are discussed in the context of Defendants' asserted prior art combinations in Section II.D., below. (*See* page 48, *infra*.)

#### a. The Prior Art Discloses No Display That Is Both NVG Compatible And Full Color

The first significant difference between the '914 invention and the prior art is that the prior art discloses no display that is both NVG compatible and full color (with red, green and blue). (PTX-834 at 74, ¶ 241.) Indeed, at trial, Mr. Dunn admitted that, as of the end of calendar year 1985, he was not aware of anybody who had achieved night-vision goggle compatibility with a full color display. (Tr. 281-82.) Consistent with that testimony, Mr. Reetz admitted that, he still had not applied complementary filtering to a full color display as of late 1985. (7/27/06 Tr. 883-84 ("In late 1985 and early 1986, just at the time the original spec came out, did you use complementary filtering on full color displays in that time period? A: I'm going to say no, we did not.").)[5] Dr. Task likewise admitted that, as of 1985, complementary filtering had not been applied to a color CRT or LCD display. (DE-500 at 13, ¶ 32.) Dr. Task also admitted that neither of the two most prominent references discussed in his direct testimony -- Reetz (DE-301)

[5] As discussed below, Mr. Reetz did modify the moving map display in the TA-7C aircraft, which he later testified was a full color display. (Tr. 337 ("The only full color display that I remember in the TA-7 was a moving map display").) But the solution Mr. Reetz implemented blocked red, such that it was no longer a full color display. (Reetz 7/26/07 Tr. 570 ("Q: … when you put that filter over the display, it was no longer a full color display, right? A: That's correct. Well, when you say full color, it blocked the red from the visible spectrum, the 4-96."))

or Task & Griffin III (DE-508) –deals with a full color display. (Task Tr. 533, 596.) Boehm (DMX-4) discloses a color CRT multi-function display, but it fails to disclose or suggest any method or technique for making the display NVG compatible while retaining its full color capability. While Verney (DE-511) also discusses color CRTs, it fails to teach any method for making them compatible with NVGs. Indeed, Dr. Task admitted that Verney does not teach complementary filtering or a filter over the NVGs, and the reference itself characterizes NVG compatibility of color CRTs as "perhaps one of the greatest challenges in lighting system design." (Task Tr. 1687-88, 1708; DE-511 at GVT009-0782.)

Though L-3 attempts to argue that the Court's claim construction does not require a full color display, the Government acknowledges that the problem addressed by the invention was "placing a full color display in a cockpit." (*Compare* Gov't Br. at 20 *with* L-3 Br. at 20.) For purposes of obviousness, full color is an advantage of the '914 invention that distinguishes it from the prior art. *Adams*, 383 U.S. at 48 ("the fact that the Adams battery is water-activated sets his device apart from the prior art" even though "[i]t is true that claims 1 and 10 … do not mention a water electrolyte").

**b. The Prior Art Does Not Disclose Or Suggest Filters For Passing A Narrowband Of The Red Color Band At The Display And For Blocking The Narrowband At The NVGs**

In a second important difference, the prior art fails to disclose the underlying concept that enables the invention to achieve both full color and NVG compatibility, namely a narrowband of the red color band emitted by the display that is blocked at the NVGs. Nor does the prior art disclose the way this is implemented by the invention, namely a filter at the display for filtering the red color band and passing a narrowband of the red color band and a filter at the NVGs that cooperates with the display filter and blocks the narrowband of the red color band from being admitted to the NVGs. (PTX-834 at 75, ¶ 243.) This second difference between the prior art and

the '914 invention is illustrated by the following graph, which compares the transmission spectrum of the CMFD lamp filter (as an example of the "third filter" of claim 2) with the four different filters disclosed in the references relied upon by Dr. Task as teaching complementary filtering, namely Task & Griffin III (DE-508); Reetz (DE-301), Lloyd (DE-521) and Boehm (DMX-4).




(PTX-834 at 76, ¶ 244.) Dr. Task characterized the prior art filters shown in PTX-916 as "complementary filter art" in his oversized claim chart introduced during the Government's rebuttal case. (DE-558.)[6] PTX-916 dramatically demonstrates the difference between prior art

---

6 Notably, the Verney filter, which the Government accused Mr. Tannas of leaving off of PTX-916, is not listed under "complementary filter art" in DE-558, which Dr. Task provided in rebuttal to Mr. Tannas' testimony. As noted above, Dr. Task readily admitted at trial that Verney (continued...)

complementary filtering and the function of the third filter claimed in the '914 patent. (Tannas Tr. 1399 (PTX-916 shows "a significant difference between complementary filtering and patent '914 filtering").) The claimed "third filter" as illustrated by the CMFD Lamp Filter is designed, unlike the prior art, to work in combination with an appropriate full color display light source, to allow a narrowband of the red color band to pass through (shown by the different location of the right vertical edge of the CMFD Lamp Filter plot compared to the other four plots). The '914 invention does not simply unite old elements with no change in their respective functions. *Cf. KSR*, 127 S. Ct. at 1739. On the contrary, as demonstrated by PTX-916, the third filter of claim 2 (as well as the fourth) has a significantly different purpose and function than the complementary filters used in the prior art. (PTX-834 at 81, ¶ 262.)

**c. The Prior Art Does Not Disclose Or Suggest Making An NVG Compatible Full Color Display By Using Separate Filters For Red, Green And Blue**

In another important difference between the prior art and the '914 invention, the prior art fails to disclose making an NVG compatible full color display using separate filters for red, green and blue. (PTX-834 at 74, ¶ 242.) Neither the Government nor L-3 points to anything in the prior art or elsewhere suggesting the use of separate filters for red, green and blue for making an NVG compatible full color display.

**d. Defendants' Attempt To Identify The Differences Between The Patented Invention And The Prior Art Is Inaccurate And Incomplete**

Completely ignoring this requirement of section 103 and *Graham v. Deere*, L-3 does not even attempt to identify the differences between the prior art and the patented invention. Though

---

does not disclose complementary filtering. (Task Tr. at 1708.) Thus, Verney does not even teach the technique of complementary filtering, the centerpiece of Defendants' obviousness defense.

the Government attempts to meet this requirement by asserting that "the only difference is that not all elements of the claim appear in one reference" (Gov't Br. at 28), this assertion fails to take into account the three key differences discussed above between the patented invention and the prior art, namely:

- a display that is both full color and NVG compatible;
- a filter at the display that passes a narrowband of the red color band, and a filter at the NVGs that blocks that narrowband; and
- an NVG compatible display having separate filters for red, green and blue.

Defendants cannot establish the elements of an obviousness defense by simply disregarding the Supreme Court-mandated *Graham v. Deere* inquiry regarding the differences between the prior art and the patented invention. This inquiry is designed to prevent the use of impermissible hindsight in place of an evaluation of the prior art, its differences and the level of skill in the art at the time of the invention. *KSR,* 127 S.Ct. at 1742; *Graham*, 383 U.S. at 36 (warning against a "temptation to read into the prior art the teachings of the invention in issue" and instructing courts to "guard against slipping into the use of hindsight"); *see also Ruiz,* 234 F.3d at 664 ("The necessity of *Graham* findings is especially important where the invention is less technologically complex … In such a case, the danger increases that … one [may] fall victim to the insidious effect of a hindsight syndrome …");[7] *Al-Site Corp. v. VSI International, Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) ("[T]he level of skill in the art is a prism or lens through which a judge or jury views the prior art and the claimed invention. This reference point

[7] Honeywell does not mean to suggest that the technology involved in the '914 patent is not complex. Even Dr. Task would agree "it is complex." (2/3/05 Markman Tr. 1109 (discussing difficulty of "red color band" issue: "It may just be a matter of spending more time with the area because there's a lot of technical information here. … And it is complex."))

prevents these deciders from using their own insight or, worse yet, hindsight, to gauge obviousness.")

### 3. Third *Graham* Factual Inquiry: Defendants Rely On A Level Of Ordinary Skill In The Art Inconsistent With The Court's Definition

The Court has already determined the level of ordinary skill in the art in its claim construction decision:

> As a predicate to the following patent claim construction, the court has determined that one of ordinary skill in the art in 1985 would be knowledgeable about night vision compatible aids, compatible instrument and panel lighting, and manufacturing displays for military cockpits.

*Honeywell*, 66 Fed. Cl. at 428. The Government agrees that the Court's definition at the *Markman* stage is applicable to the obviousness inquiry. (Tr. 1156 (Government counsel: "One of ordinary skill in the art in 1985 is the same, and it has to be the same in the *Markman* proceeding[,] in the infringement stage and then in the validity stage. You have to have the same person. … we can't change horses midstream …").)

Nevertheless, in a transparent attempt to bridge the significant gap between the prior art and the '914 invention, the Government does just that. It 'changes horses" by deviating from the Court's definition, and turning one of ordinary skill in the art into one of extraordinary/inventive skill. (Gov't Br. at 19.) Thus, the Government, through its expert, substitutes "well versed" for "knowledgeable" and adds numerous subject areas of expertise not present in the Court's determination. In particular, the Government and Dr. Task argue that the skilled artisan would have been well versed in or be able to easily understand each of the following subjects:

- optical filter techniques
- optical filter types (band pass, low pass, high pass, etc.)
- color display emission spectra

- full color display types (superposition of color images vs. spatial integration, for example)
- monochromatic display transducers
- the relationship between wavelengths and color
- radiometry
- photometry
- the wavelengths of the visible spectrum
- the spectral sensitivity of the specific night vision goggles (light amplifying devices)
- cockpit geometry

(Gov't Br. at 19.) None of this is expressed in the Court's determination of one of ordinary skill. The Government's and Dr. Task's extensive list of subject areas goes far beyond the Court's definition. Dr. Task offered no obviousness testimony whatsoever applying the Court's finding of one of ordinary skill in the art, but instead improperly based his analysis on his own enhanced definition of the level of ordinary skill.

The Government's criticisms of Mr. Tannas are misplaced. Honeywell does not, as Defendants assert, seek to turn the person of ordinary skill in the art into an automaton. *Cf. KSR*, 127 S. Ct. at 1742. Defendants, on the other hand, seek to imbue the person of ordinary skill in the art with knowledge and insight exceeding that found in any prior art reference or that demonstrated by persons who had more than ordinary skill at the relevant time. Rather, as the record makes clear, Mr. Tannas applied the Court's definition of the level of skill. (Tr. 1377 ("Q: …[D]id you rely upon this definition set forth in the Court's opinion in reaching your conclusions regarding obviousness of claim 2 in this case? A: Yes, I did. It is multi-disciplined,

and I think it is appropriate.")) Furthermore, Mr. Tannas agreed with the Government that Mr. Reetz possessed more than mere ordinary skill in the art. (*See* Tannas Tr. 1460 (agreeing with Government counsel that Mr. Reetz "had a level of ordinary skill in the art in all of the three relevant fields in 1985" by saying that he "possessed that and more").) Despite his extraordinary skill in the art, and despite the fact that the Government contends that his masters thesis (DE-301) teaches the key concept of the '914 invention, Mr. Reetz' writings and actions prior to October 1985 demonstrate that the invention was not obvious. Specifically, Mr. Reetz: (a) chose a filter for the full color moving map display in the TA-7C that blocked red, making it no longer full color, (b) described color CRTs as an area that "needs to be investigated" in his 1985 article, and (c) played an instrumental role in developing the military specification -- MIL-L-85762 – that excluded red light and full color displays from cockpits that were required to be NVG compatible, despite the acknowledged desire for red and full color displays in 1985. (Reetz Tr. 337-39; Reetz 7/26/06 Tr. 570, 573-74; Task Tr. 1730 (Task's opinion in 1985 was that the MIL spec should retain red "if at all possible"); DE-146 at GVT019-1646; Gov't 4/25/07 Br. at 6.)[8]

In addition to this improper reliance on an unduly enhanced level of skill in the art, Defendants also fail to consider the level of skill in the art at the time of the invention. As the Court aptly noted at trial, the question of ***when*** to make the value judgment of whether the invention would have been obvious goes to the nub of the issue to be decided. (Tr. 31-32.) *KSR*, 127 S.Ct. at 1742 (cautioning against "arguments reliant upon *ex post* reasoning"); *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566 (Fed. Cir.) ("[t]o reach a proper conclusion

---

[8] These portions of the record are discussed in more detail in the Section II.C.4.b. (*See* pages 31, *infra*.)

under § 103, the decisionmaker must step backward in time and into the shoes worn by that 'person' when the invention was unknown and just before it was made") (*cert. denied*, 481 U.S. 1052 (1987).

While Defendants concede that obviousness must be determined as of 1985, they nevertheless fail to focus on the state of the art and level of skill in the art that existed at that time. For example, the Government relies on Mr. Dunn's testimony that choosing filters was a matter of "mathematics and physics." (Tr. 262-63.) But the Government neglects to mention that Mr. Dunn's testimony pertained to the time period *after* MIL-L-85762A, which issued in 1988. (Tr. 263; PTX-13 (MIL-L-85762A, dated August 26, 1988); *cf.* Gov't Br. at 25, 29.) Similarly, L-3 relies upon Mr. Reetz' testimony as supposed support for their argument that one of ordinary skill would have been aware of an engineering trade off between maximizing goggle performance and allowing more colors in the cockpit. (Tr. 362-63; *cf.* L-3 Br. at 10-11, 41, 47.) But Mr. Reetz' testimony pertains to the time period leading up to "version A of the spec, which eventually came out in 1988," again a time period not relevant to the obviousness issue. (Tr. 363.) Defendants' evidence regarding the level of ordinary skill in the art cannot be deemed clear and convincing in the face of such uncertainties as to the time period being discussed by the witnesses.

The best evidence of the level of ordinary skill in the art is the contemporaneous writings and actions of the persons working in the field in 1985. Testimony as to what those skilled in the art *actually did* in 1985 and before, instead of what they could have or would have done, is far more reliable and persuasive. And, in the face of such contemporaneous evidence, such contrary *post hoc* testimony simply cannot reach the high water mark of clear and convincing evidence.

**4. Ordinary Skill In The Art In 1985 Would Not Have Been Sufficient To Bridge The Gap Between The Prior Art And The Patented Invention**

The differences between the prior art and the patented invention are nowhere found in the prior art, and the level of skill in the art would not have led those of ordinary skill in the art to the invention. To the contrary, such ordinarily skilled artisans would have been directed away from the invention because the contemporaneous prior art and accepted wisdom taught that red should be removed from the cockpit for NVG compatibility.

The Government fails to apply *Graham v. Deere*, but instead focuses on three issues that do not reflect the *Graham v. Deere* standard. Thus, the Government posits, incorrectly, that:

> 1. The artisan would study various known technologies for creating a full color display;
>
> 2. He would apply to these known technologies the standard technique for night vision goggle compatibility, the complementary filtering method described throughout the prior art; and
>
> 3. The artisan would choose appropriate filters to make complementary filtering work with the displays being studied, to produce the desired full color display.

(Gov't Br. at 21.) In addition to the fact that these are not the correct inquiries under *Graham v. Deere*, these issues were not the subject of testimony and were not set forth in any of the evidence. The Government's analysis does not clearly identify the scope and content of the prior art. The Government's three steps provide no analysis of the differences between the prior art and the patented invention and no explicit analysis of how or why those differences would have been bridged by one of ordinary skill in the art. Simply put, the Government supplants the Supreme Court mandated *Graham v. Deere* analysis with its own improper and unsupported three-part inquiry. In doing so, it simply fails to prove obviousness.

The Government's analysis is also not based upon "ordinary" skill and creativity that existed in 1985, but is aimed at reconstructing claim 2 of the '914 patent though hindsight. Steps 1 and 3 in particular are motivated by the teachings of the '914 patent, not by ordinary skill in the art in 1985. For example, the Government provides no explanation for why one of ordinary skill in the art would suddenly decide, breaking away from the prior art, that the red color band should be filtered to pass a narrowband of the red color band. Likewise, it provides no explanation for why one of ordinary skill would "choose" filters having functionality different from the complementary filters that had already been proven to work with full color displays, such as the CS-4-96 filter that Mr. Reetz used in his TA-7C experiments. The Government also provides no explanation for why one of ordinary skill in the art would study alternative technologies for creating a full color display, when full color displays using CRT technology were already being used in aircraft. (*See* Boehm (DMX-4); Breitmaier & Reetz (DE-146); Verney (DE-511).) Why experiment with new display technologies, including technologies having no known applicability to aircraft, when the problem being addressed was NVG compatibility?

**a. Even If One Of Ordinary Skill Were To Apply Complementary Filtering To A Full Color Display In 1985, The Result Would *Not* Be The '914 Invention Because Known Complementary Filters Would Not Have Passed A Narrowband Of The Red Color Band**

Even if one skilled in the art were to apply complementary filtering to a full color display in 1985, there is no evidence that the result would be the invention of claim 2. Indeed, the Government implicitly concedes that combining prior art complementary filtering techniques with a full color display would *not* yield the patented invention when it argues that one of ordinary skill in the art would need to "choose appropriate filters to make complementary filtering work with the displays." (Gov't Br. at 21.) If the appropriate complementary filters were taught by the prior art, then no such "choos[ing]" would be necessary.

Moreover, there is no evidence that any of the complementary filters that were known in the prior art would satisfy the requirements of the "third" and "fourth" filters of claim 2 when combined with a full color display. While Defendants argue that the CS-4-94 filter disclosed in Reetz (DE-301) and the BG-7 filter disclosed in Boehm (DMX-4) would pass a "narrowband of the red color band," they rely upon Task's testimony regarding the light that would be passed by such filters *if placed over an incandescent bulb.* An incandescent bulb is *not* a full color display. Dr. Task conceded that he made *no analysis* of what would happen if the CS-4-94 filter were placed over a full color display. (Tr. 667.) Dr. Task also conceded that he made no explicit analysis of whether CS-4-94 or any other filter would pass light in the red color band (above 620 nm) that would be perceptible. (Tr. 561.) In contrast, Mr. Tannas submitted unrebutted testimony that the prior art complementary filters would not pass a "narrowband of the red color band" when combined with a full color display. (PTX-834 at 104-05, ¶ 324; *id.* at 129, ¶ 397; *see also* Tannas Tr. 1149-50 (if CS-4-94 filter were applied to a full color display in 1985, "[i]t [would] greatly diminish[] the red and change[] the whole character of the display … you would have goggle compatibility you just wouldn't have a full color display anymore").)

Further, the presence of a "narrowband of the red color band" cannot be demonstrated with a filter transmission spectrum alone, but requires analysis of the light emitted by the display. (PTX-834 at 27, ¶ 93 ("In order to determine whether a particular display 'emits light within the red color band … that is perceptible' it is essential to have reliable information regarding the wavelengths of light emitted by the display and the amount of light emitted at each wavelength, i.e., an emission spectrum for the display").) *See Honeywell International, Inc. v. United States,* 70 Fed. Cl. 424, 464 (2006). Accordingly, the transmission spectrum of BG-7 from Boehm (DMX-4) is not relevant to the claim. (*Cf.* Gov't Br. at 37, DE-526-21.) The

Government's exhibit, DE-529-21, should not be confused with the exhibits relied upon by Honeywell to show a narrowband of the red color band in the infringement phase. (*See* PTX 834 at 32-33, ¶¶ 110-12 (explaining difference between PTX-431 and Dr. Task's analysis).) The Government's exhibit merely shows the transmission spectrum for the filter, ***not*** the spectrum of light emitted by the display.

Thus, unlike the facts of *KSR*, this case does not involve the simple combination of prior art complementary filtering techniques with a known cockpit display. There is absolutely no disclosure in the prior art of complementary filters to pass a narrowband of the red color band on a full color display.

One way to approach the issue of obviousness is to imagine the person of ordinary skill sitting in a room with the relevant prior art references posted on the wall and consider whether the invention would have been apparent to that person. *Application of Winslow*, 365 F.2d 1017, 1020 (C.C.P.A. 1966) ("the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references – which he is presumed to know hanging on the walls around him"); *see also* *http://www.supremecourtus.gov/oral_arguments/argument_transcripts/04-1350.pdf* at 9 (Justice Breyer commented during oral argument in *KSR* that Judge Rich's *Winslow* methodology was "very enlightening"). Mr. Tannas applied this analysis and concluded that none of the prior art NVG compatibility solutions can be applied to a full color display to make it NVG compatible and still have full color that the user of the goggles can see. (PTX 834 at 81, ¶ 261.) Consistent with Mr. Tannas' conclusion, the Government implicitly concedes that the '914 invention does not result from applying known complementary filtering techniques because one skilled in the art would need to "choose appropriate filters." (Gov't Br. at 21.) Thus, Defendants cannot prove

obviousness because critical claim elements – the third and fourth filters -- are missing from the prior art, even when combined. *Chemical Separation,* 51 Fed. Cl. at 816 (2002) ("[b]ecause critical elements are missing in all the prior art cited by defendant, no level of combination of those references can possibly yield the claims in question").

**b. It Would Not Have Been Obvious In 1985 To Choose Filters Having The Functionality Of The Third And Fourth Filters Of Claim 2**

**(1) There Is No Evidence That A Person Of Ordinary Creativity Would Have Deviated From The NVG Compatibility Solutions That Were Consistently Described And Implemented In The Prior Art**

There is no evidence, much less clear and convincing evidence, to support Defendants' assertion (Government Factual Inquiry 3) that one of ordinary skill in the art applying the complementary filtering technique to a full color display in 1985 would have designed a filter for the display that passes a "narrowband of the red color band" and a filter for the NVGs that blocks that narrowband. Stated another way, there is no evidence that one of ordinary skill in the art would have used filters having ***different*** functionality than those described in the prior art references that address complementary filtering.

Indeed there is no evidence that one of ordinary skill in the art would have deviated from what is taught by the cited references and the NVG compatibility solutions implemented by the Government's witnesses (Messrs. Bradford, Reetz and Task) during the relevant time period. The known solutions may have achieved NVG compatibility, but they did not achieve full color. (Task Tr. 1702 ("the specific filters that are shown probably would not be suitable to one skilled in the art" for modifying an aircraft cockpit so you could "retain the full color display and still have a full gamut of colors"); *see also* Tannas Tr. 1094 (filtering could be done to make a

display compatible with the night vision goggle, but "not necessarily so that it stays as a full color display").)

As Mr. Tannas testified, it was not obvious in 1985 that the combination of full color and NVG compatibility could be achieved.

> Q: … And so one of ordinary skill in the art would then look for other filters if they wanted to make that display compatible with goggles and still retain the full color. Wouldn't they?
>
> A: I don't know what goes in the mind of an inventor.
>
> Q: Well, Mr. Tannas --
>
> A: It's not obvious that it could even be achieved. So there's quite a few summary statements by quite a few of the references that suggest that to get full color display compatibility with a night-vision goggle, you should turn off the red, cover up the red, turn down the red. There's no suggestion at any place in the literature that you could possibly share the red and have enough red to keep and maintain a full color display, while at the same time being compatible with the goggle. So that is the genius[ness] of the invention.

(Tannas Tr. 1150.) Mr. Tannas' testimony ***directly refutes*** Defendants' argument that one of ordinary skill in the art would "choose appropriate filters" to make a display that is both full color and NVG compatible in the manner claimed in the '914 patent.

Contrary to the Government's assertion, its current argument that one of ordinary skill in the art would "choose appropriate filters … to produce the desired full color display" does not accurately reflect Dr. Task's direct testimony. (*Cf.* Gov't Br. 21.) Instead, Dr. Task testified that one of ordinary skill in the art would apply complementary filtering *exactly* as it had been applied in the prior art.

> How would one of ordinary skill in the art have known to apply the well-known and widely used complementary filtering technique to a full color liquid crystal display in 1985? *Just as I applied complementary filtering* to the full color projection map display of

> the Pave Low III, or Reetz applied such filters to the cockpit displays of his test aircraft, …

(DE-500 at 93, ¶ 205, emphasis added.) By way of example, Dr. Task opined that one of ordinary skill in the art would use BG-7 (from Boehm, DMX-4) as the "third filter" of claim 2. (DE-500 at 96, ¶ 210; DE-526-18.) Further, in his oversized claim chart submitted during the Government's rebuttal case, Dr. Task specifically identified BG-7, BG-18, CS-4-94 and Glendale Green as the relevant filters from the "complementary filter art." (DE-558.)[9] Under Honeywell's cross-examination during the Government's rebuttal case, however, Dr. Task had to admit that the complementary filters taught by the prior art "would not be suitable" for making a full color display NVG compatible while retaining full color. (Task Tr. 1702.)

If choosing the appropriate complementary filters to produce a the "desired full color display" was a "simple matter" that "the artisan would have known how to do in 1985," as the Government contends, then why are there repeated examples before the '914 invention of skilled artisans choosing the ***wrong*** complementary filters, *i.e.*, filters that did ***not*** give the "desired full color display"?

- Boehm (DMX-4) chose BG-7. (*See* DE-558, first page.) Dr. Task admits BG-7 "would not be suitable" for retaining full color. (Tr. 1702.)
- Lloyd (DE-521) chose BG-18. (*See* DE-558, fifth page.) Dr. Task admits BG-18 "would not be suitable" for retaining full color. (Tr. 1702.)

[9] Curiously, Dr. Task listed the BG-18 filter in his claim chart (DE-558), even though earlier in the trial he denied that it was one of his examples of complementary filters. (Tr. 1337, 1444 ("I did not use the BG-18 as an example of something that passed the red color band").)

- Reetz (DE-301) chose CS-4-94. (*See* DE-558, seventh page.) Dr. Task admits CS-4-94 "would not be suitable" for retaining full color. (Tr. 1702.)
- Task & Griffin I chose a "blue filter" for a CRT display and a Glendale Green filter for the moving map display. (*See* DE-558, ninth page.) Dr. Task admits the blue filter or Glendale Green filter "would not be suitable" for retaining full color. (Tr. 1702.)
- Mr. Reetz chose CS-4-96 when modifying the full color moving map display in the TA-7, which "blocked the red light from the map." (Tr. 337-38; *see also* 7/26/06 Tr. 570, 573-74; 7/27/06 Tr. 830-31.)
- Mr. Bradford chose BG-7B with the goal of removing red ambient light. (Tr. 155.)

Thus, actual evidence of what those of at least ordinary skill in the art were doing in 1985 belies Defendants' hindsight-based obviousness claim.

More particularly, the Government argues there were "numerous individuals" who possessed ordinary skill in the art in 1985, including Dr. Task, Mr. Reetz and James Byrd. (Gov't Br. at 19.) Both Dr. Task and Mr. Reetz claim to have worked on NVG compatibility of full color displays using complementary filtering, but neither effort resulted in the '914 invention. In particular, when Mr. Reetz applied complementary filtering to a full color moving map display in the TA-7 aircraft in 1984, he chose the CS-4-96 filter, which blocked red light from the display. (Reetz Tr. 337-39; Reetz 7/27/06 Tr. 830-31; *see* PTX-834 at 80, ¶ 258; *see also* DE-500 at 71, ¶ 152 (TA-7C report "in effect, describes the complementary filter approach"); DE-324 (TA-7C report).) Indeed, Mr. Reetz testified that, when he put the CS-4-96

filter over the moving map display, it was no longer a full color display. (Reetz 7/27/06 Tr. 570 ("Q: when you put that [CS-4-96] filter over the display, it was no longer a full color display, right? A: That's correct. Well, when you say full color, it blocked the red from the visible spectrum, the 4-96.") Thus, Mr. Reetz' solution for dealing with full color displays was to take out the red. (*Id.* at 573-74 ("Q: At least as reflected in Defendant's Exhibit 323 [*sic,* 324], your solution for dealing with full color displays in the cockpit was just to take the red out, correct? A: In this particular instance, yes.")

Whereas Mr. Reetz recommended using the Corning CS-4-94 filter over the red warning lights in the helicopters that were the subject of his masters thesis, when he applied the same Corning filters in the TA-7 jet aircraft a year or so later, he chose the CS-4-96 filter for the full color moving map display. In Defendants' parlance, Reetz moved the cutoff in the ***opposite direction*** from what Defendants assert would have been obvious. (*See* Reetz 7/27/06 Tr. 810 ("[t]he problem is if you put the 4-96 over the red, you couldn't even see it because it blocked all the red"); *id.* at 830-31 ("Q: Remind me again, did the 4-96 let any red energy through? A: No, it blocked the red light. Q: Did it block all the red light? A: No, not all of it. It blocked enough so that you could not see red with your eye."))

Similarly, when Dr. Task modified the moving map display in the Pave Low III helicopter, which he contends was "full color," he chose a Glendale Green filter, which also blocked red light from the display. (PTX-834 at 26, ¶ 89.) Another example is Scoughton (DE-522) which describes a full color CRT display, which was made NVG compatible using a pull-down filter. The filter resulted in a yellow, green and blue display, rather than a red, green, blue display. (*See* Tannas Tr. 1199-1200 ("So when they pulled the filter down, … [t]hey just diminished red too much, and so you didn't have full color anymore").) Thus, Defendants'

hypothesized knowledge of one of ordinary skill is not only contrary to the teachings of the prior art references, it is contrary to the actions taken by Mr. Reetz, Dr. Task and others having more than ordinary skill in the art. (PTX-834 at 136-37, ¶ 418 (providing examples of conventional wisdom from contemporaneous documents); Tannas Tr. 1460 (Mr. Reetz had more than ordinary skill in the relevant fields in 1985).)

Thus, contrary to Defendants' arguments, the "third" and "fourth" filters were not selected from "a finite number of identified, predictable solutions." *Cf. KSR*, 127 S. Ct. at 1742. The "identified, predictable" solutions were complementary filters such as BG-7, BG-7B, CS-4-94, CS-4-96, Glendale Green, Task & Griffin I's blue filter, or Scoughton's pull-down filter. But Mr. Cohen rejected those solutions and invented a new and different solution that was not obvious in view of the NVG compatibility approaches that were known in the prior art. Defendants provide no reason, much less clear and convincing evidence, why one of ordinary skill would have deviated from the NVG compatibility solutions that were consistently described and implemented in the prior art. (*See* PTX-916 (graph comparing filter spectra), reproduced at page 20, *supra*.) *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) ("[a] person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom").

**(2) Defendants Failed To Demonstrate That One Of Ordinary Skill In The Art Would Have Understood That A Full Color Display Could Be Achieved By Using A Filter That Passes A Narrow Band Of The Red Color Band**

To the extent Defendants are asserting it would have been obvious to try any one of the millions of filters it acknowledges were in existence in the prior art, it runs afoul of the substantial body of case law rejecting obviousness where there is a large number of possible options. *Takeda Chemical Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1359 (Fed. Cir.

2007) (rejecting "obvious to try" argument under KSR where "the prior art disclosed a broad selection of compounds any one of which could have been selected as a lead compound for further investigation"); *Gillette Co. v. S.C. Johnson & Son Inc.*, 919 F2d 720 (Fed. Cir. 1990) ("we have consistently held that "'obvious to try' is not to be equated with obviousness under 35 U.S.C. §103").

The Government's argument that "Mr. Reetz studied a number of possible filters for use on NVGs, and ultimately decided on a filter at 665 nm – directly in the middle of claim 2's 'red color band'" (Gov't Br. at 25) supports Honeywell's position, not Defendants'. As Mr. Tannas explained, despite the choice of the RG-665 filter for the NVGs, Mr. Reetz failed to recognize that the use of that filter would permit the use of red light or full color displays in the cockpit. (PTX-834 at 138-39, ¶ 423 ("[t]here is no indication in DE-301 that Mr. Reetz understood that using the RG-665 filter would permit the use of red light or full color displays in the cockpit").) In choosing filters for the various cockpit lights and displays, Mr. Reetz made no attempt to tailor the filters to the light source or pass particular color bands. (PTX-834 at 60, ¶ 191 ("the only purpose served by the CS-4-94 and CS-4-96 filters in [Reetz] DE-301 was to block light to which the NVGs were sensitive, not to pass any certain wavelengths or color bands for the purpose of displaying color").)

The evidence thus fails to demonstrate that one of ordinary skill in the art understood that both full color and NVG compatibility could even be achieved, much less the concept of passing a narrow band of the red color band. (Reetz 7/27/06 Tr. 893-94 ("Q: You didn't try to establish a narrow band of red, and see how that would work with the goggles, is that right? A: That's not where I started. I didn't start with that premise, no."); PTX-834 at 139, ¶ 423 ("[i]f Mr.

Reetz had understood the concept of passing a narrow band of the red color band, he would not have selected the CS-4-94 or CS-4-96 filters, which block red").)

Contrary to L-3's argument, there is no evidence of a known trade off between maximizing goggle performance and allowing more colors in the cockpit. As Mr. Reetz thesis (DE-301) demonstrates there was still no recognition that red light could be used with NVGs. (PTX 834 at 138, ¶ 423.) The prior art does not discuss "cut offs" for the complementary filters that were placed over the cockpit lights and displays and does not propose "varying the cut off" to allow more colors in the cockpit. (*See* Bradford Tr. 159-60 ("Q: Are cutoff wavelengths an accurate description for the complementary glass? A: No."); *cf.* L-3 Br. at 10.) Nor does the prior art suggest any compromise between NVG compatibility and full color. Rather, the prior art reflects a lack of concern for having color in the cockpit, and instead teaches that full color must be sacrificed for NVG compatibility. Boehm (DMX-4), for example, teaches that "only special <u>green</u> and <u>blue</u> illumination in the cockpit" should be used with NVGs. (DMX-4 at D000597.) Similarly, Task & Griffin II (DE-507) teaches "limiting the interior lighting to blue-green visible wavelengths only" for NVG compatibility. (DE-507 at GVT011-0690.)

The Government improperly relies on Mr. Tannas' statement that "one skilled in the trade . . . could pick this up and do it …." (Tannas Tr. 1354.) This testimony lends no support to Defendants' obviousness argument and is certainly ***not*** an admission that one of ordinary skill in the art "would have already known" to use the third and fourth filters of claim 2, as the Government tries to suggest. On the contrary, Mr. Tannas' statement concerns enablement, not obviousness. That is, Mr. Tannas was addressing whether the person of ordinary skill in the art ***who has read the '914 patent*** would know how to implement the invention based upon the disclosure of the patent. Indeed, Mr. Tannas' statement was in response to L-3's questions

regarding whether the ‘914 patent “tell[s] you how to make the device that is the subject of the claims.” (Tr. 1353-54.) It goes without saying that the ‘914 patent is *not* prior art and cannot be used to demonstrate the level of ordinary skill in the art. *See Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 956 (Fed. Cir. 1997) (Court must “focus on conditions as they existed when the invention was made” because “[g]ood ideas may well appear ‘obvious’ after they have been disclosed, despite having been previously unrecognized”).

**(3) Contemporaneous Evidence Indicates That Achieving Both Full Color And NVG Compatibility Could Not Have Been Predicted In 1985**

The result achieved by the patented invention – a cockpit display that is simultaneously full color and NVG compatible -- was far from “predictable.” *Cf. KSR*, 127 S. Ct. at 1739. Contemporaneous and prior art documents indicate that there was a great deal of uncertainty surrounding whether it would have been possible to make a full color display NVG compatible while retaining its full color capability. For example, in April 1985, Mr. Reetz wrote that NVG compatibility of multi-color CRTs is an area where “possible solutions need to be investigated.” (DE-146 at GVT019-1646.) Mr. Verney considered NVG compatibility of color CRTs to be “[p]erhaps one of the greatest challenges in lighting system design.” (DE-511 at GVT009-0782.) And the Navy considered NVG compatibility of full color CRTs to be an “unresolved issue.” (DE-318 at GVT019-1659 (“unresolved issues [that] will require further study [include:]. . . [o]btaining a better understanding of … three-color cathode ray tubes (CRTs) … and other currently non-NVG compatible government furnished equipment (GFE) with various night vision systems”).)

Using filters to achieve a display that was both full color and NVG compatible was neither predicted, nor predictable, as evidenced by the fact that a committee of Government

experts – after "lots of machinations between the services" -- issued a specification that effectively prohibited the use of red light and full color displays with NVGs, despite the strong desire to retain red light and put full color displays in the cockpit. (Bradford Tr. 209 ("Pilots have always had and desired full color display cockpits"); Task Tr. 1585 ("That was the desire, to put a full color display in the cockpit"); *id.* at 1698 (MIL-L-85762 "was done through a joint committee and lots of machinations between the services and they came up with a specification that *eliminated* -- in order to meet their specification, you could not have a substantial amount of red light within the cockpit") (emphasis added); *id.* at 1730 ("It was my opinion that *if at all possible* the MIL spec which was in consideration should be such that it would *retain red* and yellow in the cockpit") (emphasis added).)

In fact, Dr. Task testified:

> [O]ne of the reasons that I wanted to go [to the ALI meeting] was to have the opportunity to face-to-face make my input on what I thought should be done toward the MIL spec, and that would have included most likely the -- from the notes that I saw in my notebook, the issue of wanting to *retain red* and yellow in the cockpit *if at all possible* with respect to the MIL spec.

(*Id.* at 1734, emphasis added.) Defendants cannot prove that the application of complementary filtering to make a display that is both NVG compatible and full color would have been within the ordinary level of skill in the art, when a committee of Government experts failed to recognize that possibility in 1985.

In short, there is no clear and convincing evidence that one of ordinary skill in the art would know how to bridge the gap between prior art complementary filtering and the "third" and "fourth" filters of claim 2.

**c. It Would Not Have Been Obvious In 1985 To Make An NVG Compatible Full Color Display Using Separate Filters For Red, Green And Blue**

Defendants provide no reason why one or ordinary skill in the art trying to solve the NVG compatibility problem in 1985 would have selected a display that would satisfy claim 2, namely one that uses separate filters for red, green and blue. *KSR*, 127 S.Ct. at 1741 ("it can be important to identify a reason that would have prompted a person of ordinary skill in the art to combine the elements in the way the claimed invention does"); *Lucent Technologies Inc. v. Gateway, Inc.*, No. Civ. 02 CV 2060 BCAB, 03 CV 0699 BCAB, 03 CV 1108 BCAB, 2007 WL 2274416. at *16 (S.D. Cal. Aug. 6, 2007) ("[a] reason for the combination is still an important consideration [post-*KSR*], even though it need not be a rigid formula").

Defendants' selection of Uchida's LCD display or the '963 patent's projection display results from an impermissible hindsight reconstruction of the invention based on the teachings of the patent-in-suit. *KSR*, 127 S.Ct. at 1742 ("[a] factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning"); *Grain Processing Corp. v. American Maize-Products. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("[c]are must be taken must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims,'") aff'd, 185 F.3d 1341 (Fed. Cir. 1999) (quoting *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012 (Fed. Cir. 1983)).

Defendants identify no evidence supporting why one of ordinary skill would attempt his NVG compatibility experiment with display technologies that had never been put in an aircraft, namely full color LCDs or projection displays. There is no evidence that one of ordinary skill would be aware of the advantage provided by the use of separate filters for red, green and blue when it comes to filtering for NVG compatibility. (*See* DMX-36 at D000010 ("[t]he use of monochromatic CRTs 51-53 permits the outputs of the different CRTs 51, 52, 53 to be filtered in

different manners"); *id.* ("using separate cathode ray tubes 51-53 or other display transducers, it is possible to more easily filter offending colors from reaching the ANVIS 13"); Task Tr. 1605-06 (separately filtering the red image "was probably a unique idea at the time").) There is certainly no evidence of any reason why one of ordinary skill would start with an LCD or projection display, such as Uchida or the '963 patent, when CRTs were already being used in aircraft.

The Government states that "the prior art is replete with examples of different display technologies" (Gov. 4 Br. 22) But the Government identifies nothing in the prior art or elsewhere supporting its 1985 proposed selection of a full color LCD display such as Uchida (DE-515) or a full color projection display such as the '963 patent (DE-519) in place of the CRT displays that were actually used in aircraft cockpits at the time. (*See* DE-146 at GVT019-1646 (Breitmaier & Reetz); DE-511 at GVT009-0782 (Verney); DMX-4 at D000606 (Boehm).) The Government admits that "none of [Uchida, '963 patent or '843 patent] disclose the use of their displays in aircraft." (Gov't Br. at 41.) L-3 admits that "liquid crystal displays ("LCDs") were in their infancy in 1985 and were not found in aircraft." (L-3 Br. at 11.) Similarly, Mr. Tannas testified that the projection display technology of the '963 patent "was not seriously considered for avionics application at all in [the 1985] time frame." (Tr. 1064.) Accordingly, Defendants have failed to demonstrate a reason for investigating various display technologies, much less for selecting the particular technologies disclosed in Uchida (DE-515) and the '963 patent (DE-519).[10]

---

[10] *In re Icon Health and Fitness, Inc.*, 496 F.3d 1374 (Fed. Cir. August 2007) does not support Defendants' argument. In *Icon*, the problem addressed by patent-in-suit did not "require[] any particular focus on treadmills," and therefore prior art addressing a folding bed was considered pertinent. *Id.* at 1380. Here, on the other hand, the Government defines the

(continued...)

In fact, Defendants all but concede that the sole reason for selecting Uchida or the '963 patent is to reconstruct the claimed invention in hindsight. Defendants and Dr. Task canididly recognized that none of the prior art previously used or contemplated for use in aircraft included the requisite claimed separate filters for red, green and blue. Dr. Task testified that he selected Uchida (DE-515) as a secondary reference because it discloses multiple filters like the '914 patent, not because there was any suggestion in the prior art or elsewhere to provide an NVG compatible LCD display using complementary filtering. (PTX-834 at 87-88, ¶ 279; Task 10/11/06 Depo. Tr. 254-55 ("Q: Why were you looking for a reference that disclosed multiple filters? A: Because that's how one ends up naturally obtaining a -- a situation where you get something that looks like it infringes the 914 patent as issued.").) Thus, Defendants have engaged in impermissible hindsight reconstruction,.

The Government and L-3 also overlook a critical piece of testimony from Dr. Task, which demonstrates that the '914 invention would not have been obvious and represented a "unique idea at the time."

> **THE COURT: … Are you saying to me the patent the way it was originally filed was not obvious and the change made it become obvious?**
>
> **THE WITNESS: I believe, Your Honor, that is true. … I think the original 269 application would *not necessarily have been obvious*** because it allowed you to use a notch filter -- you can't use a notch filter with a full color display in front of it because it would render it into [not] a full color display. ***But by taking the red part of the image and using a separate -- his example was a red CRT, and now I have got all the red light over***

---

problem addressed by the '914 invention as "placing a full color display in a cockpit, and making the display compatible with a pilot's night vision goggles." (Gov't Br. at 20.) This definition excludes Uchida (DE-515) and the '963 patent (DE-519) from the scope of pertinent prior art because the Government admits that neither reference discloses the use of their displays in aircraft.

> ***here separate, now I can put one filter in front of it and let only a small narrow wavelength through*** and then combine it with the other colors -- because in the original, it shows how the three separate red, green and blue images come together at the screen. ***My eye sees a full color image, but the red is contained in a narrow band of frequencies and now I only have to filter that narrow band at the night-vision goggles to get rid of the red problems. I think that was probably a unique idea at the time.***

(Task Tr. 1605-06.) Dr. Task's description of the features he considers nonobvious are found expressly in the limitations of claim 2 of the '914 patent. *First*, Dr. Task's description of separately filtering the red image is embodied in claim 2, which requires separate filters for the red, green and blue color bands. *Second,* Dr. Task's description of having the red "contained in a narrow band of frequencies" is also embodied in the claim, which requires that red be filtered to pass a "narrowband of the red color band," which is blocked at the NVGs.

The relevance of Dr. Task's admission is strengthened by L-3's assertion in its doctrine of equivalents brief that the amendments filed in 2002 were "clearly narrowing amendments." (L-3 11/7/06 Br. at 6.) If the originally-disclosed invention was unique and nonobvious, and the scope of the invention was narrowed by the amendments filed in 2002, it follows quite logically that the invention defined by the issued claims of the '914 patent are nonobvious.

Defendants cannot possibly sustain their "clear and convincing evidence" burden of proof in the face of Dr. Task's admission that the idea of separately filtering the red image so that the red is contained in a narrow band of frequencies, and then filtering out that narrowband at the night vision goggles was unique and nonobvious.

#### 5. The Patented Invention Is Contrary To The Conventional Wisdom In 1985 That Red Light Should Be Removed For NVG Compatibility

Defendants have failed to demonstrate that the prior art does not "teach away" from the '914 invention. *McGinley*, 262 F.3d at 1349 (Fed. Cir. 2001) (defendants must prove the underlying facts with clear and convincing evidence); *Winner International Royalty Corp. v.*

*Wang*, 202 F.3d 1340, 1349 (Fed. Cir.) ("[w]hat a reference teaches and whether it teaches toward or away from the claimed invention are questions of fact") (*cert denied*, 530 U.S. 1238 2000). A concept that pervaded the mindset of those working to solve NVG compatibility issues was that red light cannot be tolerated in an NVG compatible cockpit. It was understood that red and infrared (IR) light interferes with the use of NVG and impedes a pilot's (or other crewmember's) ability to see outside the cockpit using the NVG. Therefore, there was a belief that red light had to be eliminated to make the cockpit NVG compatible. (PTX-834 at 136, ¶ 417.)

In his direct testimony, Mr. Tannas quoted from numerous references supporting the conventional wisdom that red light needed to be eliminated for NVG compatibility. (PTX-834 at 136-37, ¶ 418 (citing six different contemporaneous articles teaching that red light is incompatible with NVGs and cannot be used in a cockpit that is required to be NVG compatible); *see also* Tannas Tr. 1292 ("the goal is to reduce [red] to a level that you have an acceptable performance out of your goggle"). Reducing red to a level that it does not interfere with the NVGs is ***not*** the same concept as the '914 patent because, at that level, the red light would not be perceptible, as required by the Court's claim construction. *Honeywell,* 70 Fed. Cl. at 464. (Tannas Tr. 1396-97 (if the red light is reduced to a level where you would get acceptable performance out of Gen III night-vision goggle, then there is "no possibility it could be seen by a human observer").) Mr. Cohen's invention went in a different and unobvious direction – filtering the display to pass a narrowband of the red color band that is perceptible and provides a full color display.

At trial, the Government quibbled with Mr. Tannas' use of the word "eliminate," but the Government's own witnesses used the same word in describing the actions taken by the

Government to achieve NVG compatibility. (Reetz Tr. 392 ("Because we wanted to suppress the energy, the cockpit lighting energy in the red and the infrared part of the spectrum … you had to essentially *eliminate* -- it wasn't zero, but reduce, significantly reduce the amount of energy output from the cockpit lights at wavelengths above roughly 625 nanometers") (emphasis added); *id.* at 361 ("the jet air crews had a different opinion than the helicopter air crews about the *elimination of red*, and their conclusion was we needed to keep red") (emphasis added); Bradford Tr. 152 (agreeing that "it [was] an engineering decision to eliminate the red and infrared in the cockpit"); *id.* at 155 (agreeing that "the goal [was] to remove that red ambient light").)

Moreover, the Government's actions speak louder than its words. Consistent with the conventional wisdom and prior art teaching, prior to 1985, the Army spent ***$52 million*** to retrofit their aircraft cockpits to eliminate red light. (Bradford Tr. 194 ("red lighting … was taken out of the aircraft so that it would meet the requirements to work well with the goggles"); Bradford Tr. 210 (Army "spent about $52 million putting the retrofit lighting in the cockpits").)

This is not the only action the Government took that is consistent with the conventional wisdom and inconsistent with its position now that the '914 invention is "painfully" and "excruciatingly" obvious. Significantly, at the time of the invention, the Government had announced and was about to issue a military specification for NVG compatible cockpit lighting that effectively prohibited the use of red light and full color displays with NVGs. (DE-146 (April 1985 Breitmaier & Reetz article announcing proposed standard); PTX-12 (MIL-L-85762 dated Jan. 1986); *see* Honeywell's 4/25/07 Secrecy Act Br. at 6 (discussing MIL-L-85762); DE-500 at 17, ¶ 40 ("red light is not compliant with (i.e., could not meet the requirements of) the original military specification MIL-L-85762"); *id.* at 99, ¶ 216 ("there was no way to make a

color display compliant with this proposed military standard"); Tannas Tr. 1265 ("one of ordinary skill in the art in 1985 would have assumed that the problem of compatibility between night vision goggles and full color displays had been solved by taking the red out of the display").) In January, 1986, the Government issued MIL-L-85762, which everyone agrees *eliminated* red, with no exceptions, even for warning lights. (*See* Byrd 7/27/06 Tr. 998 (implementation of the original military standard required retraining of pilots to recognize yellow instead of red for warning).) It did so notwithstanding the contemporaneous beliefs of others, including its very own Dr. Task that red should be retained in the specification "if at all possible." (Tr. 1730.)

The Government's argument that MIL-L-85762 would not discourage those of ordinary skill from allowing red in the cockpit flies in the face of the concept of teaching away, as endorsed by Supreme Court in *Adams* and *KSR*. If a Government specification that bans any embodiment of the invention is not teaching away, then what is? Further, the unsupported *ex post* testimony that those skilled in the art supposedly knew of other tradeoffs but decided to prohibit them anyway is ***not*** clear and convincing in view of Dr. Task's testimony to keep red "if at all possible." (Tr. 1730.)

Defendants cannot demonstrate obviousness in the face of the evidence that the accepted wisdom in 1985 taught away from the '914 invention. *Adams*, 383 U.S. at 51-52 (rejecting Government's obviousness argument where there was evidence of "long-accepted factors" that would "deter any investigation into such a combination as is used by [the patentee]"); *In re Sullivan*, No. 08/405, 454, 2007 WL 2433841, at *4 (Fed. Cir. August 29, 2007) (unpublished) (vacating lower tribunal's finding of obviousness because it failed to take into account declaration testimony that prior art taught away from the claimed invention and that the

invention was contrary to what experts in the field believed); *Arkie Lures*, 119 F.3d at 958 (reversing finding of obviousness where evidence showed that the inventor "persisted against the accepted wisdom, and succeeded"); *W.L. Gore*, 721 F.2d at 1552 (The inventor "proceeded contrary to the accepted wisdom of the prior art by dramatically increasing the rate and length of stretch *and* retaining crystallinity. That fact is strong evidence of nonobviousness.") (emphasis added)

### D. Defendants' Prior Art Combinations Do Not Demonstrate Obviousness

The conclusion that the invention of claim 2 would not have been obvious to one of ordinary skill in 1985 is reinforced by considering the particular combinations of prior art references proposed by Defendants. At trial, Defendants paraded a litany of prior art, in the hopes that its "scattershot" approach might blindly hit some target. (*See* Tr. 718-20.) Post-trial, Defendants seemingly abandon most of this and focus on a handful of "exemplary" combinations, which they presumably consider their strongest. The "exemplary" combinations of prior art that Defendants now focus on, however, only further demonstrate the flaws in Defendants' obviousness analysis. Those flaws include those highlighted above, as well as specific deficiencies in each specific combination of prior art, as follows:

#### 1. The Patented Invention Would Not Have Been Obvious In View Of Reetz (DE-301) Combined With Uchida (DE-515) Or The '963 Patent (DE-519)[11]

The Government asserts obviousness based upon Reetz (DE-301) in combination with Uchida (DE-515). Apart from the fact that Defendants have failed to establish Reetz qualifies as

[11] Although the Government's first "[e]xemplary [c]ombination of [p]rior [a]rt" is Reetz (DE-301) in combination with Uchida (DE-515) or the '963 Patent (DE-519), its claim chart addresses only Reetz (DE-301) and Uchida (DE-515). (Gov't Br. at 26-28.) Honeywell will respond accordingly.

prior art, this argument requires multiple changes and substitutions to the disclosure of Reetz (DE-301). For example, Reetz (DE-301) teaches the shared aperture filter technique with PVS-5 night vision goggles, but the Government's argument requires a substitution of ANVIS goggles. (Gov't Br. at 42.) Reetz (DE-301) teaches to use of a CS-4-94 filter over the red warning and green advisory lights, but the Government's argument requires substitution of a full color LCD display. (Gov't Br. at 27.) Finally, the Government's argument would require discarding the CS-4-94 filter and substituting some other filter from among the "millions" that were known to those of ordinary skill in the art (in a manner contrary to the conventional wisdom that red should be eliminated). (Gov't Br. at 30.) All that is left from the original teachings of Reetz (DE-301) is the RG-665 shared aperture filter. Even then, that filter does not satisfy the requirement for a "fourth filter" in claim 2 because the hole in the middle allows light to pass through unfiltered. Clearly, the Government's argument is based on hindsight reconstruction of the invention, ***not*** a consideration of the scope and content of the prior art and the ordinary skill in the art.

#### a. Reetz' Shared-Aperture Filter Technique Is A "Whole Different Paradigm" From The '914 Invention

In contrast to the '914 invention, the shared-aperture filter technique described in Reetz (DE-301) permits the person wearing the NVGs to look *through* the NVGs to see the instrument panel. The shared-aperture filters allow light from the cockpit instruments to pass through a pin-hole opening in the filter to be amplified by the NVGs and displayed on a monochrome screen in front of the pilot's eyes. (DE-301 at GVT018-0989 ("when one views the instrument panel when wearing NVG equipped with the shared aperture filter the light from the instrument panel enters the NVG through the small center lens"); *id.* at GVT018-0991 ("the shared-aperture filter could be simplified by replacing the lens in the center of the long-pass filter with a pin-hole"); *id.* ("the

shared-aperture filter technique consists of a long-pass filter with a small hole drilled in the center"); *id.* at GVT018-0992, Fig. 4; *see also* PTX-834 at 54-55, ¶¶ 170-71 & 70, ¶¶ 223-24 (explaining shared-aperture filter technique of Reetz (DE-301); Tannas Tr. 1419 (light was purposely allowed to pass through the pin hole so that you could read the display from the goggle)).)

As Mr. Reetz explained, the shared-aperture technique is a "whole different paradigm" from the "look-around" approach in the '914 patent.

> Q: So you actually read the instruments through the goggles?
>
> A: Through the goggles.
>
> Q: *It is a whole different paradigm, isn't it?*
>
> A: *Exactly.* There is actually a little infrared diode on these. You would turn on the infrared diode to illuminate the cockpit and they would literally read off air speed, altitude. So that a person flying the air plane [without NVGs] couldn't see the instruments.

(Reetz 7/27/06 Trial Tr. 891-92 (emphasis added); *see also* Reetz Tr. 413 ("[t]he whole point of the thesis [DE-301] was to come up with a concept to allow you to view the cockpit lights through the night vision goggles …").)

The shared-aperture filter technique of Reetz (DE-301) is not only a different paradigm, but is *outside the scope* of claim 2 of the '914 patent. Claim 2 requires a "local color display" and a "night vision aid" that function together to form a "display system." The Court has defined "local color display" as "a device that may be used together or in combination with optical filters and shows or exhibits at least one color perceptible to an . . . or observers utilizing a night vision aid." *Honeywell,* 70 Fed. Cl. at 466. In the system taught by Reetz (DE-301), there can be no "local color display" because an observer utilizing a night vision aid looks look *through* the NVGs to see the cockpit instruments and displays and therefore none of the colors of the display

are perceived by the observer utilizing the night vision aid. (*See*, DE-521 at GVT008-1982 (“The shared aperture system … suffers from certain fundamental disadvantages. … The image is monochrome and cannot distinguish between colours.”); *see also* DMX-4 at D000606 (“if the pilot looks through the goggles onto the MFD, the colours disappear. The pilot sees the MFD as monochromatic green through the goggles. The various colours are presented by differing shades of green …”).)

In addition, in the system taught by Reetz (DE-301), there is no “fourth filter” as required by claim 2 because light from a cockpit display passes unfiltered through the hole in the center of the shared aperture filters. (PTX-834 at 70, ¶ 224.) In other words, rather than being substantially blocked by a fourth filter, such light from the cockpit passes directly through the aperture to the NVG ***unfiltered***.

Moreover, the shared aperture filter technique was expressly distinguished by Honeywell during prosecution of the ‘914 patent. In particular, Honeywell argued that the invention is patentable over the Swift patent, which discloses filters over the NVGs that have a hole or aperture that transmits light of all wavelengths. (DMX-36 at D000465-66 (Honeywell’s response to office action); *see* PTX-834 at 70-71, ¶¶ 225-27 (discussing prosecution history relating to Swift patent).) In view of the prosecution history, claim 2 cannot be construed as covering shared aperture filters and therefore cannot be found invalid as obvious in view of Reetz (DE-301.) *Graham*, 383 U.S. at 33 (“[c]laims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been

narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent").[12]

The differences between Reetz (DE-301) and the invention of claim 2 cannot be bridged merely by substituting ANVIS goggles for PVS-5's or moving a crewmember from the back seat to the front seat, as the Government erroneously asserts. (Gov't Br. at 42-43.) The shared aperture filter technique with PVS-5's is the "whole point" of Reetz (DE-301) and an entirely different paradigm for NVG compatibility than the look-around method using ANVIS. (Reetz 7/27/06 Trial Tr. 891-92; Reetz Tr. 413.) Defendants present *no evidence* that one of ordinary skill would disregard the fundamental teaching of Reetz (DE-301) by substituting ANVIS goggles without shared apertures or view the teachings of DE-301 as relevant to such ANVIS. With the benefit of having read the '914 patent, the Government seeks to extract from Reetz (DE-301) only those features it believes match up with the invention and discard the rest – including the fundamental teaching of shared aperture filters. Reetz (DE-301) reports no calculations, laboratory experiments or flight tests for any filters without shared apertures.

Finally, while Defendants rely upon the RG-665 filter material recommended in Reetz (DE-301), they present *no evidence* that one of ordinary skill in the art would view Reetz (DE-301) as teaching the use of the same material for filters that do not have a hole through the middle. Indeed, Dr. Task never even discussed the differences between filters with holes and filters without and simply disregards those differences in his analysis.

---

12 Arguments made by the patentee to distinguish prior art during prosecution limit the scope of the claims for purposes of invalidity in the same manner as they do for infringement. *See PODS Inc. v. Porta Stor Inc.*, 484 F.3d 1359, 1368 (Fed. Cir. 2007) (arguments made to distinguish prior art during prosecution history "clearly and unmistakably shows that [plaintiff] limited its claims to a rectangular-based frame").

**b. The Government's Combination Of Reetz (DE-301) With Uchida (DE-515) Is Illogical From The Perspective Of One Of Ordinary Skill**

There is also no clear and convincing evidence that one of ordinary skill in the art would combine Reetz (DE-301) with Uchida (DE-515) in the manner proposed by the Government. The combination makes no logical sense and is another hindsight-based attempt to reconstruct the elements of the claim.

*First*, there is no evidence that one of ordinary skill in the art would combine the shared aperture filter technique of Reetz (DE-301) with a full color display, such as the LCD display of Uchida (DE-515). It cannot be disputed that the shared aperture filter technique does not permit the person wearing NVGs to see colors. (*See* DE-521 at GVT008-1982.) Accordingly, one of ordinary skill would have no reason to introduce color into the cockpit by combining a full color display with the shared aperture filter technique. (Tannas Tr. 1068 ("It's difficult to comprehend why you would put a local color display into something that couldn't see the local color display."))

*Second*, the Government presents no evidence that one of ordinary skill would combine an incandescent bulb from the warning, caution and advisory indicators of Reetz (DE-301) with the full color LCD display of Uchida (DE-515), as the Government proposes in its claim chart. (Gov't Br. at 27.) Incandescent bulbs are not useful as a light source for an LCD display because, unlike fluorescent backlights, the spectral energy distribution of an incandescent bulb varies with the voltage, so that when the display is dimmed for night viewing, the colors would change. (Task Tr. 567-68.)

The Government's suggested combination of Reetz (DE-301) with Uchida (DE-515) is far different from the combination at issue in *KSR*, where the position sensor was designed for an

automobile pedal and fit logically on the adjustable pedal of Asano. Here, the Government is attempting to force together puzzle pieces that do not fit.

**c. The Government Failed To Prove That Reetz (DE-301) Combined With Uchida (DE-515) Would Have A "Narrowband Of The Red Color Band"**

The Government also presents *no evidence* that the CS-4-94 filter of Reetz (DE-301) would pass a "narrowband of the red color band" when combined with the full color LCD display of Uchida (DE-515). Instead, the Government's claim chart cites Dr. Task's calculations using the CS-4-94 transmission curve and a typical incandescent lamp emission curve. (Gov't Br. at 28.) Dr. Task's calculations fail to meet Defendants' burden of proof for at least two reasons. *First*, as discussed in the previous subsection, there is no evidence that one of ordinary skill in the art would use an incandescent lamp as a light source for a full color LCD display, and the evidence is indeed to the contrary. And Dr. Task has not provided any testimony on whether CS-4-94 would pass a "narrowband of the red color band" when combined with an LCD display having a typical backlight, such as a fluorescent lamp. *Second*, even ignoring the irrelevance of an incandescent lamp, the Government has not proven that CS-4-94, when combined with the LCD display of Uchida, would pass "light within the 'red color band,' *i.e.*, 620 nm to 780 nm, that is perceptible." *Honeywell*, 70 Fed. Cl. at 464. These deficiencies in the Government's evidence are detailed below:

The Government relies solely on Dr. Task's opinion that a CS-4-94 filter would pass a "narrowband of the red color band" when placed over an incandescent lamp, but offers no evidence that the result would be the same when the same filter were combined with a full color LCD display. Dr. Task made no such analysis.

> Q: In your written direct, you don't present any analysis of what would happen if you put that 494 filter over one of the primaries of a full color display, have you?

A: That is correct, I have not.

(Task Tr. 667.) In fact, the portions of Dr. Task's direct testimony cited in the Government's claim chart address *anticipation,* not obviousness. (DE-500 at ¶58,, ¶¶ 121 & 189.) Dr. Task never indicated that his calculations using an incandescent lamp emission curve have any relevance to a full color LCD display or his opinion regarding obviousness. The Government takes its own expert's testimony completely out of context in a failed attempt to fill the gaps in its obviousness proofs.

Honeywell, on the other hand, presented unrebutted testimony of Mr. Tannas that "[i]f the CS-4-94 filter were used with the LCD display of [Uchida] DE-515 … it would not pass a narrowband of the red color band." (PTX-834 at 104-05, ¶ 324.) Mr. Tannas supported his testimony with a calculation of the spectral energy distribution of light that would be emitted by a typical LCD backlight (TB-29 lamp) filtered with the CS-4-94 filter from Reetz (DE-301). (*Id.* at 105-06, ¶ 328; PTX-929 (CS-4-94 Filter, TB-29 Lamp and Convolution); Tannas Tr. 1434 (TB-29 lamp is "one that's used in military back lights of liquid crystal displays").) Based on his calculation, Mr. Tannas concluded that "the CS-4-94 filter suppresses the red color band to such a degree as to make it insufficient as a red primary for a full color display." (PTX-834 at 106, ¶ 329.) Dr. Task does not disagree. (Tr. 669 (CS-4-94 filter "would certainly reduce … the intensity of the red primary on a full color display, depending on what wavelengths were in that red primary").)

Even assuming *arguendo* that one of ordinary skill in the art would combine an incandescent lamp, the LCD display of Uchida (DE-515), and the CS-4-94 filter from Reetz (DE-301), the Government still has not met its burden of proof with respect to "narrowband of the red color band." The Court construed "red color band" as "a range of color from 620 nm to

780 nm." *Honeywell*, 70 Fed. Cl. at 433. In the infringement opinion, the Court elaborated on that construction as follows:

> [T]he court construed that the predetermined red color band must not only be "a specific range of wavelengths within the red color band," i.e., 620 nm to 780 nm, but also that the "local color display" limitation in Claim 1 requires that the predetermined red color band be perceptible to an observer or observers utilizing the night vision aid. … Claim 1 of the '914 patent requires only that the "local color display" emit light within the "red color band," *i.e.*, 620 nm to 780 nm, that is perceptible.

*Honeywell*, 70 Fed. Cl. at 464. The Court has made clear that the "perceptible" requirement applies equally to "narrowband of the red color band" in claim 2. (Tr. 18 (Government counsel: "So whether this comes out of the claim 1 discussion or the claim 2 discussion is the same. THE COURT: That was my intent."); Tr. 1195 (THE COURT: "we defined narrow band of the red color band to be a narrow range of wavelengths within the red color band which would have to be perceptible"); *see also* DE-500 at 37, ¶ 78 ("one of ordinary skill in the art would understand that 'perceptible' must refer to whether or not the amount of light that is passed by the filter that is within the red color band is 'perceptible'").)

The Government has offered *no evidence* that a "local color display" comprising an incandescent lamp, the LCD display of Uchida (DE-515) and the CS-4-94 filter from Reetz (DE-301) would "emit light within the 'red color band,' *i.e.*, 620 nm to 780 nm, that is perceptible." *Honeywell*, 70 Fed. Cl. at 464. Dr. Task admitted he did no explicit analysis of whether the perceptible requirement was met by the prior art.

> Q: Well, the test is whether the energy above 620 would be perceptible, correct?
>
> A: Yes.
>
> Q: So you have not anywhere analyzed separately the energy in the prior art above 620, as you say you need to do, to determine whether or not that is perceptible, have you?

A: I have not done an explicit analysis of that …

(Tr. 561) Because perceptible light in the red color band is a requirement of the claim, the Government has not met its burden of proof.

Task's calculations of the spectral distribution of light passed by the CS-4-94 filter using a typical incandescent lamp emission curve *prove nothing* relevant to the requirement of claim 2, for the additional reason that they ignore the filtering effect of the LCD display itself. The Government relies upon the color pixel filters taught by Uchida (DE-515), but then disregards those filters (and the rest of the LCD stack) in its attempt to prove a "narrowband of the red color band." Uchida (DE-515) shows a cross-section of a multicolor LCD as including two glass plates, two transparent electrodes, a liquid crystal layer, and color filters. (DE-515 at GVT009-0487, Fig. 4.) An LCD also includes first and second polarizers. *Honeywell,* 70 Fed. Cl. 441-42. Dr. Task acknowledged that these components will affect the spectral distribution emitted by the display, but his calculations fail to take them into account. (Task Tr. 678 ("Each filter that you put in front of the light source will certainly have an effect."))[13] Accordingly, Dr. Task's spectral analysis cannot be relied upon as demonstrating that the Government's hypothetical display system -- Reetz (DE-301) plus Uchida (DE-515) plus an incandescent light source -- would emit a narrowband of the red color band. It is patently insufficient to point to filter transmission spectrum and simply assume that a narrowband of the red color band would be passed if such filter was used with a full color LCD, such as Uchida (DE-515) or a projection display such as the '963 patent (DE-519). Dr. Task admits he performed no such analysis, and

[13] While Mr. Tannas' calculations also disregard the filtering effect of the color filters and other LCD components, taking these filters into account would only further reduce the amount of light in the red color band. In other words, while it is fair for Mr. Tannas to disregard these components in formulating his opinion that the light in the red color band would not be perceptible, it is not fair for Dr. Task to ignore these filters in reaching the opposite conclusion.

Defendants have a glaring failure of evidence on this point. The only evidence, from Mr. Tannas, is to the contrary.

**d. The Government Failed To Prove That One Of Ordinary Skill In The Art Would Substitute Another Filter For The CS-4-94 In Order To Pass More Red**

The Government has presented *no evidence*, much less clear and convincing evidence, that one of ordinary skill in the art would reject the CS-4-94 filter taught by Reetz (DE-301) and look for another filter "with the goal of locating a filter that passed sufficient red light." (Gov't Br. at 30.) That "goal" is based upon the teachings of the '914 patent, not the prior art or ordinary skill in the art. As discussed above, the goal of prior art complementary filters was to block red light to the greatest extent possible, not to strike any compromise between full color and NVG compatibility. (*See* Section II.B., pages 10-12, *supra*.) There is no evidence, much less clear and convincing evidence, that one of ordinary skill in the art would make the substitution of filters suggested by the Government.

And there are at least three reasons why such a substitution would not have been made. *First*, the Government's suggested substitution of filters is contrary to the conventional wisdom that red light should be removed for NVG compatibility. (PTX-834 at 136-37, ¶ 418; *see* Section II.C.5, pages 44, *infra*.) *Second*, Reetz (DE-301) determined that the CS-4-94 filter over the indicators and the RG-665 shared aperture filter over the NVGs functioned together to accomplish his objectives. There is no suggestion in Reetz (DE-301) or elsewhere that substituting a *different* filter over the cockpit lights would permit the NVGs to function. (The Government's proposed modification can be analogized to substituting only one sock in a matched pair – the result is a pair of mismatched socks that do not function together.) *Third*, one of ordinary skill in the art would have no reason to substitute a different filter for the CS-4-94 in

Reetz (DE-301) in order to pass more red light because the person using NVGs with shared aperture filters could not see colors anyway.

Although Defendants seek to rely upon Mr. Tannas' testimony that there were "probably millions" of filters known that could be used to filter displays, that testimony supports nonobviousness and refutes Defendants' position entirely. Millions is certainly not the "finite number" of predictable solutions discussed in *KSR.* The Government identifies no convincing reason, based on knowledge and skills that existed in 1985, for why one of ordinary skill in the art would discard the CS-4-94 filter and substitute a different filter from among the millions of possible filters with no direction in the prior art to do so. Moreover, any evidence the Government points to cannot be deemed clear and convincing in view of the fact that, when Mr. Reetz (who had more than mere ordinary skill in the art) applied complementary filtering to a full color display, he chose the CS-4-96 filter, which blocked red to an even greater extent than the CS-4-94 filter used over the red indicators in his masters thesis. (Reetz Tr. 338-39 (to make that moving map display in TA-7 compatible with night vision goggles, Reetz put a filter over it "to block the red light, so anything that would have appeared red actually be black"); Reetz 7/27/06 Tr. 830-31; *see* PTX-834 at 80, ¶ 258; DE-324.) Mr. Reets chose a filter with *destroyed* the full color functionally of the full color display, not withstanding that he might have chosen from among the millions of different filters. (Reetz 7/26/06 Tr. 570.) It would be error to conclude that one of ordinary skill in the art would make the Government's proposed modification to the complementary filtering technique of DE-301 when applying it to a full color display, when the author himself (Mr. Reetz) did not do so.

The Government argues that "the Verney filter is sufficient to operate as the 'third filter' of claim 2" (Gov. Br. 31), but cites no evidence that one of ordinary skill in the art would

substitute the Verney filter for the CS-4-94 filter taught by Reetz (DE-301) or expect the Verney filter to "complement" the RG-665 shared aperture filter taught by Reetz (DE-301). The Government's obviousness argument hinges on the combination of complementary filtering and a full color display. But Verney does not teach complementary filtering, and there is no suggestion anywhere to substitute the Verney filter in a complementary filtering solution. Nor is there any evidence that the Verney filter and the RG-665 shared aperture filter of Reetz (DE-301) would be "complementary." (Task Tr. 1708.) According to the Government, the Verney filter passes the band from 620 to 680 nm. (Gov't Br. at 25, 30.) Reetz (DE-301) recommends a shared aperture filter with a "cut-on" wavelength of 665 nm. (DE-301 at GVT018-1045.) If the CS-4-94 filter were replaced with the Verney filter, as the Government suggests, the band from 665 nm to 680 nm would not be blocked from interfering with the NVGs. There is no evidence that the Government's proposed filter combination would enable the NVGs to function. Thus, even the very hindsight modification of the modification proposed by the Government would fail to meet the claim. The Government's attempt to cobble together the invention from various unrelated components found in the prior art must therefore be rejected.

### 2. The Patented Invention Would Not Have Been Obvious In View Of Verney (DE-511) Alone

#### a. The Government's Newly Minted Obviousness Argument Is Unsupported By Any Testimony Or Opinion From Dr. Task

The Government's post-trial brief presents an entirely new defense, namely that Verney (DE-511) alone renders claim 2 of the 914 patent invalid for obviousness. Since this defense was never presented previously, it should come as no surprise that it finds no support in the record. Dr. Task never provided any such opinion. Instead, Dr. Task relied upon Verney only "[i]f necessary … to provide the motivation to modify." (DE-500 at 11-12, ¶ 27; *see also* Tr.

719 (Government identifies DE-511 as a reference to be considered by the Court only if an "explicit teaching, [suggestion], motivation to combine is necessary").)

The concept of complementary filtering is the lynchpin of Defendants' and Dr. Task's obviousness argument. Indeed, according to Dr. Task, "[t]he basic concept" embodied in claim 2 of the '914 patent "is one of complementary filtering." (Tr. 1539.) Yet Dr. Task admits that this basic concept is not taught by Verney. (Task Tr. 1708; *see also* Tannas Tr. 1404 (Verney "didn't have complementary filtering"); PTX 834 at 77, ¶ 247 ("DE-511 does not teach complementary filtering").) How can Verney alone possibly render claim 2 obvious when it fails to teach what Defendants contend is the "basic concept" of the invention?

The Court should reject the Government's last ditch effort to come up with a new obviousness argument that is unsupported by any testimony or opinion from its expert.

**b. Verney (DE-511) Fails To Suggest Separate Filtering Of Red, Green And Blue**

The Government's obviousness argument regarding Verney is so vague and undeveloped, it is not even clear what it contends is the "local color display" or the "local source of light." Furthermore, while the Government argues that claim 2 would have been obvious over Verney *alone,* its claim chart quotes Mr. Tannas' testimony regarding two other references – Uchida (DE-515) and the '963 patent (DE-519). (Gov't Br. at 34.) The Government makes no argument that Verney discloses "a first filter for filtering the blue color band of the local source of light" or "a second filter for filtering the green color band of the local source of light." The Government cites Mr. Tannas' testimony, but he merely agreed that the LCD display in Uchida (DE-515) and the projection display in the '963 patent (DE-519) each have blue and green filters. The Government makes no attempt to tie this testimony to Verney, the Verney filter, or any particular "local color display." Wholly unanswered is the question of how or why one of ordinary skill in

the art would combine the blue and green filters that Mr. Tannas agrees were disclosed in Uchida (DE-515) and the '963 patent (DE-519) with anything that is taught by Verney. The Government's claim chart and terse few paragraphs addressing the Verney filter and the "geniusness" of the invention fall far short of meeting its burden.

**c. Verney (DE-511) Fails To Suggest A Fourth Filter For Blocking Light At The NVGs**

The Government's assertion that "Verney would have taught one of ordinary skill in the art to use a 'fourth filter' as described in claim 2" (Gov. Br. 33) is *directly contradicted* by Dr. Task's testimony that "Verney does not talk about a filter that is used over the night-vision goggles." (Tr. 1688-89.) Dr. Task's interpretation of the spectral sensitivity curve for the Generation 3 NVGs in Figure 8 of Verney is that it is an "unfiltered curve." (Tr. 1696 (interpreting DE-511 at GVT009-0776, Fig. 8).) Indeed, Dr. Task testified: "I don't remember in reading this that there was an indication in here that he had used a filter over the night-vision goggles." (Tr. 1696-97.)

The Government attempts to contradict its own expert's interpretation of Verney (DE-511) with the testimony of Messrs. Bradford and Reetz. But neither of those witnesses said anything about Verney (DE-511) or the night vision goggles discussed in Verney (DE-511). Mr. Bradford testified that, in testing conducted at the Night Vision Labs at Fort Belvoir, he selected a 625 nm cutoff for "what ended up as the ANVIS A filter." (Tr. 158.) Mr. Reetz testified that he used ANVIS with a 625 nm minus blue filter in his TA-7C tests; that these were the goggles that the Army had developed; and that this was the filter to which MIL-L-85762 was intended to apply. (Tr. 338, 340, 352.) But none of this testimony compels the conclusion that the ANVIS referenced in Verney had a 625 nm cutoff filter. In fact, there is other evidence demonstrating that the minus blue filters on ANVIS goggles had a cutoff at 600 nm, not 625 nm, as asserted by

the Government. Specifically, the Aeronautical Design Standard (DE-517) states that "for the third generation ANVIS … *a filter is applied to the lens which yields a sharp cutoff of sensitivity near 600 nanometers.*" (DE-517 at GVT055-000016, emphasis added.) The 600 nm cutoff for the minus blue filter on ANVIS is further confirmed by the following excerpt from an article authored by an Army major at Fort Belvoir from the same April, 1985 AGARD conference as Breitmaier & Reetz (DE-146).

> There are two configurations of the third generation tube currently in production. One configuration … is used in the Aviator's Night Vision Imaging System (ANVIS). The objective lenses in this system are coated with a dielectric film (called a minus blue filter) that rejects wavelengths less than 600 nm, so the ANVIS is compatible with the blue-green crewstation lighting.

*Image Intensifiers: Past and Present,* R.W. Verona, presented at the Aerospace Medical Panel Symposium, Athens, Greece, April 22-24, 1985 (GVT008-0547-48, GVT019-1755-57) (attached as Exhibit A).[14]

In short, the testimony of Messrs. Bradford and Reetz is unrelated to the Verney article (DE-511) and is certainly not sufficient to support a finding in direct conflict with the testimony of the Government's expert regarding how one of ordinary skill in the art would interpret that reference.

**d. Verney's Approach To NVG Compatibility Is Very Different From The '914 Invention**

Verney (DE-511) makes a distinction between (1) integral lighting, which is constantly illuminated during night flight, and (2) caution and warning indicators, which illuminate only momentarily in an emergency and must quickly capture the pilot's attention. With respect to the

---

[14] This article is not in the trial record. However, to the extent the Court gives consideration to the Government's entirely new Varney obviousness theory, this evidence (which confirms the other record evidence cited above by Honeywell) would also be properly considered.

former, Verney (DE-511) teaches the conventional wisdom that "red or white integral lighting systems cannot be activated while the pilot is using NVGs due to their adverse interaction" and therefore integral lighting must be corrected to be "blue-green in color" with "minimal energy between 600 and 950 nanometers." (DE-511 at GVT009-0773, 0780; PTX-834 at 141-42, ¶ 427-29; *see also* Tannas Tr. 1166 ("Verney teach[es] away from the '914 patent … [Verney] shows the diagram of how you should do cockpit lighting of the [instrument] panels, and he shows a graph … where the cutoff is 600 nanometers, not even going into the red color band").) Full color displays, of course, fall in the category of lighting that is constantly illuminated, not simply illuminated momentarily. (Reetz 7/26/06 Tr. 571.) Verney teaches that such lighting must be corrected to be "blue-green in color" in accord with the conventional wisdom.

Verney (DE-511) teaches a special case for caution and warning indicators. (Tannas Tr. 1169 (Verney "has a special case for caution and warning"); *see also* Reetz 7/26/06 Tr. 572 (warning lights are a different character than full color display in the sense that they only go off when there is an emergency).) With respect to red warning lights, Verney teaches the combination of an infrared blocking filter and dimming, so that the warning light can be seen through the NVGs without adversely affecting their performance. (DE-511 at GVT009-0780 ("This filter when combined with a source that is dimmable provides an effective warning since the energy emitted from the display stands out in the NVG without adversely affecting their performance"); Tannas Tr. 1162 ("the Verney application of the filter was to put over a red warning light such that the night-vision goggle could see the red warning light through the goggle").) The Verney application "is a complete different paradigm than the paradigm of the ['914] patent." (Tannas Tr. 1163.) Whereas the '914 patent requires a filter that blocks red light from being admitted to the NVGs, Verney teaches the opposite – that the red light should

"stand[] out in the NVG without adversely affecting their performance." (DE-511 at GVT009-0780.) Moreover, one of ordinary skill in the art would understand that, because Verney teaches that the filtered red warning light does not adversely affect the performance of the NVGs, the red warning light would have to be dimmed to a level where it is not perceptible to the human observer. (Tannas Tr. 1396-97; *see also* Task Tr. 1694 ("I don't know how far you would have to dim it down" in order not to adversely affect the performance of the NVGs).) In contrast, the Court's claim construction requires that the "narrowband of the red color band" that is emitted by a local color display be perceptible. *Honeywell*, 70 Fed. Cl. at 464.

Accordingly, Verney (DE-511) is completely unrelated to the '914 invention and certainly does not come close to providing a stand-alone clear and convincing basis for a finding of obviousness.

**3. The Patented Invention Would Not Have Been Obvious In View Of Boehm (DMX-4) Combined With Uchida (DE-515) Or The '963 Patent (DE-519)**

L-3 focuses its obviousness argument on the combination of Boehm (DMX-4) and Uchida (DE-515) or the '963 patent (DE-519), but there is also no clear and convincing evidence that the '914 invention would have been obvious in view of this combination of references. Boehm (DMX-4) was among the references that were considered by the USPTO examiner during prosecution of the '914 patent. (DMX-36 at D000521.) Accordingly, there can be no argument that the presumption of validity is weakened in any way with respect to Boehm (DMX-4). *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (satisfying clear and convincing burden of proof is "'especially difficult' when the infringer attempts to rely on prior art that was before the patent examiner during prosecution"). Moreover, as described below, L-3's assertions regarding the teachings of Boehm are unsupported and contradicted by the Boehm article itself, as well by Dr. Task. L-3 offered no testimony at trial to support its interpretations

of Boehm (DMX-4), which are at odds with the article on its face. Most certainly, L-3's unsupported interpretation of Boehm (DMX-4) fails under a clear and convincing evidence standard.

**a. It Would Be Clearly Erroneous To Conclude That One Of Ordinary Skill Would Apply The Complementary Filters Taught By Boehm (DMX-4) To A Full Color Display, When Boehm Himself Did Not Do That**

According to Dr. Task, Boehm (DMX-4) teaches both complementary filters *and* full color CRT displays. (DE-500 at 64-65, ¶¶ 130-31.) But Boehm (DMX-4) itself fails to combine the two to provide NVG compatibility. It would be clear error to conclude that one of ordinary skill in the art would combine the complementary filters of Boehm (DMX-4) with a full color display, when Boehm himself declined to make that combination. (PTX 834 at 144-45, ¶ 440.)

Boehm (DMX-4) teaches seven "[d]ifferent solutions for NVG compatible cockpit lighting." (DMX-4 at D000600.) One of those solutions is "[f]ilters, to reduce the red and near IR part of the incandescent lighting." (*Id.*) In particular, Boehm recommends the BG-7 filter for the incandescent lights. (*Id.* at D000601.) Another, different NVG compatibility solution is "[m]ulti-function display (MFD) operation in the I[nstrument] panel." (*Id.* at D000600.) Boehm elaborates by stating that "[i]f the red level of the MFD can be reduced, the colour CRT … [is] NVG compatible." (*Id.* at D000606.) In other words, Boehm (DMX-4) suggests that a full color CRT can be made NVG compatible by reducing the red level of the MFD, *e.g.*, by turning down the intensity of the red gun of the CRT. (PTX-834 at 144, ¶ 438; Tannas Tr. 1300 ("that was the state of the art at this time with color CRTs, turn it off, cover it up and turn it down").) Boehm (DMX-4) does not suggest filtering the CRT, and in fact he considered "filters" and "multi-function display (MFD) operation" to be "[d]ifferent solutions." (PTX-834 at 144, ¶ 438; DMX-4 at D000600.)

**b. L-3 Fails To Demonstrate Obviousness Of Separate Filters For Red, Green And Blue**

L-3 first suggests that, because Boehm (DMX-4) mentions liquid crystal displays (LCDs), the Court could find obviousness based upon Boehm alone. L-3's cavalier suggestion is nowhere supported by any expert testimony or other evidence. Dr. Task identified what he believed were two anticipatory references and at least eighteen different combinations of references for obviousness. (DE-500 at 12 (table showing nine primary references and two color display references); Tr. 718-19 (Government's listing references relied upon for obviousness).) Dr. Task apparently listed *all* references or combinations of references that he thought were possible. But nowhere in Dr. Task's exhaustive list of obviousness grounds did he opine that Boehm (DMX-4) alone anticipates or by itself renders the '914 invention obvious. L-3's argument is based upon its lawyers' view of Boehm (DMX-4), unsupported by any record evidence or expert testimony. *See Chemical Separation,* 771 Fed. Cl. at 816 ("defendant's counsel was neither qualified as an expert nor did he testify at trial, and this court will not permit him essentially to testify in his brief").

L-3 next suggests that "*if the court requires more*," Boehm (DMX-4) can be combined with Uchida (DE-515). But it would be clear error to combine these references merely because "the court requires more" than just Boehm (DMX-4) to find all elements of the claim. *Grain Processing*, 840 F.2d at 907 ("[c]are must be taken must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references …'") (citation omitted).

Moreover, as Dr. Task has pointed out, Boehm (DMX-4) expressly discusses a "colour CRT [that] uses a mixture of blue, green and red" and teaches certain steps for NVG compatibility and speculates as to others. (DMX-4 at D000606; DE-500 at 65, ¶ 131.))

Specifically, Boehm (DMX-4) teaches to use a glare shield above the CRT and to adapt the illumination level to the NVG phosphor screen. (DMX-4 at D000606.) Boehm (DMX-4) also speculates that "if the red level of the MFD can be reduced, the colour CRT … [is] NVG compatible." (*Id.*)

L-3 provides no explanation for why one of ordinary skill in the art would discard the full color CRT discussed in Boehm (DMX-4) and replace it with another full color display, such as the full color LCD display described in Uchida (DE-515) or the full color projection display described in the '963 patent (DE-519). (*Cf.* L-3 Br. at 37.) L-3 points to no evidence in the record demonstrating a benefit or rationale for such a substitution of display technologies. Clearly, the only reason L-3 seeks to combine the references is to supply the blue and green filters that are nowhere found in Boehm (DMX-4). But separate filtering of red, green and blue is part of the '914 invention and cannot be relied upon as a reason for combining the prior art teachings. (*Cf.* Task Tr. 1605-06 (conceding that separately filtering the red image was a "unique idea at the time").) But that is exactly what Dr. Task did – select prior art with separate filters for red, green and blue "[b]ecause that's how … you get something that looks like it infringes the 914 patent as issued." (PTX-834 at 87-88, ¶ 279; Task 10/11/06 Depo. Tr. 254-55.)

#### c. L-3 Failed To Prove That Boehm (DMX-4) Combined With Uchida (DE-515) Or '963 Patent (DE-519) Would Have A "Narrowband Of The Red Color Band"

L-3 also contends that the BG-7 filter disclosed in Boehm (DMX-4) satisfies the requirement for a "third filter" in claim 2, but points to *no evidence,* much less clear and convincing evidence, that the BG-7 filter of Boehm (DMX-4) would pass a "narrowband of the red color band" when combined with the full color LCD display of Uchida (DE-515) or the full color projection display of the '963 patent (DE-519). Whereas Dr. Task made spectral analyses of the CS-4-94 filter of Reetz (DE-301) and the Glendale Green filter of Task & Griffin III (DE-

508) using a typical incandescent lamp emission curve, his direct testimony includes *no such analysis* for the BG-7 filter of Boehm (DMX-4) relied upon by L-3. (*Compare* DE-500 at 52, 53, 59 (spectral analyses of CS-4-94 and Glendale green filters) *with id.* at 64-66 (discussing Boehm DMX-4).) In fact, Dr. Task never offered any express opinion, whether at trial or in his written submissions, that BG-7 passes a "narrowband of the red color band." His direct testimony makes little mention of BG-7 and never expressly asserts that the filter passes a "narrowband of the red color band." (DE-500 at 41; *id.* at 64, ¶ 130; *id.* at 96, DE-526-18; *see also* DE-558, first page (claim chart mentions BG-7 filter, but says nothing about passing a narrowband).)

In any event, as discussed above, the presence of a "narrowband of the red color band" cannot be proven with a filter spectrum alone. (*See* Section II.C.4.a., pages 54, *supra*.) Accordingly, Dr. Task's exhibits DE-526-20 and DE-526-21 are not sufficient evidence to conclude that this element of the claim is met.

Even assuming that a spectral analysis of BG-7 using an incandescent lamp emission curve would give results similar to those obtained by Dr. Task for CS-4-94 and Glendale Green, such an analysis fails to meet Defendants' burden of proof for the same reasons discussed above with respect to Reetz (DE-301). (*See* Section II.D.1.c., at p. 54 *supra*) In particular, there is no evidence that one of ordinary skill in the art would use an incandescent lamp as a light source for a full color display, and Dr. Task has not addressed whether BG-7 would pass a "narrowband of the red color band" when combined with full color display, such as Uchida (DE-515) or the '963 patent (DE-519). Furthermore, L-3 has not proven that BG-7, when combined with a full color display, would pass "light within the 'red color band,' *i.e.*, 620 nm to 780 nm, that is perceptible." *Honeywell*, 70 Fed. Cl. at 464.

Dr. Task made no explicit analysis of perceptible light in the red color band. (Tr. 561.) Dr. Task's spectral calculations are flawed in any event, because they ignore the filtering effect of the colored filters and other LCD components taught by Uchida (DE-515). (Task Tr. 678.) Honeywell, on the other hand, presented unrebutted testimony and theoretical calculations by Mr. Tannas demonstrating that the BG-7 dyed glass filter would ***not*** pass a narrowband of the red color band if it were used with the LCD display of Uchida (DE-515) or the projection display of the '963 patent (DE-519). (PTX-834 at 128-32, ¶¶ 395-405; PTX-937 (BG-7 Filter, TB-29 Lamp and Convolution).) Accordingly, Defendants have failed to satisfy their burden of proof with respect to Boehm (DMX-4) and "narrowband of the red color band," and in fact have an utter failure of proof on this issue, that cannot now be cured by lawyer speculation or assumption.

**d. L-3 Blatantly Mischaracterizes The Teachings Of Boehm (DMX-4)**

L-3's assertions regarding Boehm (DMX-4) are unsupported by the reference itself or any expert's testimony, and certainly fail under a clear and convincing evidence standard. Boehm (DMX-4) may teach complementary filtering for incandescent lights, but, contrary to L-3's post-trial assertions, it does *not* teach complementary filtering "when needed [to] look down to view a color display with the naked eye," nor does it teach "the use of filters that are placed over displays." (*Cf.* L-3 Br. at 15-16.) L-3 cites Dr. Task's written direct, but that testimony provides no support for L-3's assertion. Dr. Task states: "Boehm also provides a discussion of a CRT, color, multi-function display (MFD) that uses a mixture of blue, green and red that could be used in the NVG compatible cockpit *if it is properly located and the light level is set appropriately*." (DE-500 at 65, ¶ 131, citing DMX 4 at D000606, emphasis added.) Dr. Task has never asserted that Boehm (DMX-4) discloses complementary filtering of a full color

display, but instead suggests the opposite, namely NVG compatibility by turning down the light levels or locating the display out of the field of view of the goggles. By Dr. Task's own admission, Boehm teaches away from the use of complementary filtering to achieve simultaneous full color capability and NVG compatibility by employing other conventional compatibility methods for such full color displays.

Contrary to L-3's argument, Boehm (DMX-4) also does not teach that "a NVG filter [that] can be used at 570 nm, 590 nm or 630 nm depending on how much color is needed." (*Cf.* L-3 Br. at 15-16.) The reference does state that these filters "have been successfully tested with the 2nd and 3rd generation NVG," but says nothing about choosing these filters based upon "how much color is needed," as L-3 falsely asserts. (DMX-4 at D000603; L-3 Br. at 16).) Nothing in Boehm (DMX-4) suggests that the various NVG filters were even tested in the presence of cockpit lights. The only record evidence regarding testing of various filters over the NVGs did *not* involve testing in the presence of cockpit lights. Specifically, Mr. Bradford described a "matrix test" of various NVG filters performed using "various reflectance targets, such as the sand, chlorophyll, asphalt, concrete." (Tr. 177-78; *see also id.* at 143 ("I administered the actual application of different filters on to the aviator's night-vision imaging system while we had test pilots view the imagery through the system"); *id.* at 145-46 ("we were trying to optimize the image quality of the goggle itself").) Neither Dr. Task, nor Mr. Tannas interpreted Boehm (DMX-4) in the manner suggested by L-3. *Chemical Separation,* 771 Fed. Cl. at 816 ("[m]ere attorney argument is no substitute for evidence of what one of ordinary skill in the art would have perceived").

Boehm (DMX-4) states that "[t]he view around the goggles produces a good coloured image," but contrary to L-3's assertion, Boehm nowhere suggests that this "good coloured

image" was produced by filtering the CRT or reducing the red level. (DMX-4 at D000606.) Boehm also nowhere suggests "splitting the red color band." In order to split the red color band, there must be both a filter on a display and a filter on the NVGs, *both* of which must have a cutoff in the red color band. (PTX-834 at 81, ¶ 262 ("The third and fourth filters of claim 2 … are used to "split" the red color band, so that the third filter passes a "narrowband of the red color band" and the fourth filter substantially blocks that narrowband of the red color band from being admitted to the night vision goggles").) Boehm (DMX-4) discloses no filters for use on full color displays, and the BG-7 filter taught for use on incandescent lights does *not* split the red color band. (*Id.* at 129-31, ¶¶ 397-402.)[15]

Finally, L-3 incorrectly asserts that Boehm (DMX-4) describes "how the system may be applied to liquid crystal displays." (L-3 Br. at 16.) L-3 is vague as to what it means by "the system," but contrary to L-3's intimations, Boehm (DMX-4) nowhere suggests filtering a full color LCD display for NVG compatibility. *First*, there is no indication that the "liquid crystal display (LCD)" mentioned in Boehm (DMX-4) is a full color LCD with red, green and blue filters, as discussed in Uchida (DE-515). Since Boehm (DMX-4) teaches "blue/green [electroluminescent] EL backlighting," rather than a triband fluorescent backlight, one of

15 L-3 wrongly accuses Mr. Tannas of disregarding the Court's claim construction and reading limitations into the claim. L-3's criticism is misplaced. Defendants bear the burden of proof, and Dr. Task presented no analysis of whether the BG-7 filter of Boehm (DMX-4) passes a narrow band of the red color band when combined with a full color display. Moreover, there is no dispute that Boehm (DMX-4) does not expressly disclose a narrowband of the red color band, which means that Defendants must rely upon inherency. The factors considered by Mr. Tannas, for example, the 50% point of the filter and the presence of a red primary, are just that – factors that would be considered relevant by experts in the field. They are not new tests for infringement or invalidity, but rather evidence that would be relied upon by one of ordinary skill in the art in determining whether the Court's requirement for perceptible light in the red color band is inherently satisfied. Defendants cannot prevail by attacking Mr. Tannas' analysis, when Dr. Task presented no analysis of his own in order to satisfy Defendants' burden of proof.

ordinary skill in the art would understand that the LCD is monochrome without color filters. *Second*, there is no suggestion in Boehm (DMX-4) to filter the monochrome LCD display for NVG compatibility. Instead, Boehm (DMX-4) teaches to use the blue/green EL backlighting, which is inherently NVG compatible without filtering. (*See* DMX-4 at D000600 ("[o]ne good solution for a modification or a new design is EL illumination").)

L-3's obviousness argument is based upon a hindsight mischaracterization of the teachings of Boehm (DMX-4), which is unsupported by any evidence in the record. An objective review of the reference and the expert testimony relating to Boehm (DMX-4) leads to only one conclusion: there is no clear and convincing evidence of obviousness.

### E. The Objective Facts Strongly Support A Finding Of Nonobviousness

#### 1. There Was A Long Felt Need For Red Light In Military Aircraft Cockpits

Red light had been used in military aircraft cockpits for decades prior to October, 1985. (Reetz 7/27/06 Tr. 850 ("for the last 40 years, we had red in the cockpit in terms of warning lights"); PTX-833 at 14, ¶ 56 ("[r]ed has been in the cockpit for many decades"); *id.* at 13, ¶ 54 ("[t]he color red has been the traditional color for such uses as Fire Warning alerts, for emergency warnings on Warnings, Cautions, and Advisory (WCA) panels, enemy missile lock-on display symbol, and terrain collision alarms"); Lawrence Tr. 1023 ("[r]ed's been in the cockpit ever since I can remember"); Task Tr. 1730-31 ("Q: And it was and is the convention to have red in the cockpit, right? … A. for information displays, yes.")

Red light is critical for warning lights. (PTX-833 at 14, ¶ 56 ("red has always been perceived as the color that denotes danger and we find, as pilots and test pilots, red to be extraordinarily valuable in that role"); Lawrence Tr. 1026 ("[t]he perception of danger in the cockpit has always been associated with the color red for pilots, and to get rid of that is going to

mitigate that perception a little bit").) Red is also necessary for full color maps. (Scoughton 9/14/04 Dep., DE-61 at 62 ("a digital map is kind of useless if you can't see red. [You can s]ee water and grass and that's about it"); *id.* at 73 (explaining necessity for full color digital maps); *id.* at 193 ("while you could sidestep the issue of red in relation to warning … in a cockpit, … I didn't see any reasonable way to take red out of a display and put up a presentable map image for a crew member").)

The need for red light in the cockpit did not disappear when NVGs began to be used in the cockpit. (PTX-833 at 13-14, ¶ 55 ("[a]ll aircraft in all services … had been using the color red to denote danger for many years and there was no desire amongst the members of the CDWG [Cockpit Display Working Group] to change the philosophy of using red"); *see also* Task Tr. 1730 ("Q: And red is what pilots grow up with and take their training with in the 1985 time period? A: That is correct, in general.")

**2. The Prior Art Evidences A Desire For NVG Compatible Full Color Displays, But Proposes No Solution For Achieving Both Simultaneously**

The Government argues both sides of the issue when it comes to the need for displays that were both full color and NVG compatible. On the one hand, the Government's three-part analysis is premised upon "the *design need* of placing a full color display in a cockpit, and making the display compatible with a pilot's night vision goggles." (Gov't Br. at 20, emphasis added.) On the other hand, the Government argues that no such "design need" existed because "full color displays in aircraft cockpits were a nascent technology" and "there was no need to apply … complementary filtering to [full color displays] to provide NVG compatibility." (Gov't Br. at 21-22.) Such contradictory factual assertions do not amount to clear and convincing evidence of obviousness.

Moreover, the prior art itself demonstrates a desire for full color NVG compatible displays in military aircraft cockpits. Boehm (DMX-4), Verney (DE-511), and Breitmaier & Reetz (DE-146) each discusses full color displays in the context of NVG compatibility, but fails to propose any definitive solution for enabling that goal to be achieved. Boehm (DMX-4) discusses reducing the red level of a full color CRT, but nowhere suggests that the CRT would still be full color after reducing the red level. (DMX-4 at D000606.) Verney (DE-511) characterizes NVG compatibility of color CRTs as "[p]erhaps one of the greatest challenges in lighting system design," and proposes no specific solution to the problem. (DE-511 at GVT009-0782.) Breitmaier & Reetz (DE-146) places NVG compatibility of full color displays in the category of areas that "need to be investigated." (DE-146 at GVT019-1646.) Consistent with the contemporaneous documentation, Mr. Bradford testified that "[p]ilots have always had and desired full color display cockpits." (Tr. 209.) And Dr. Task agreed "[t]hat was the desire, to put a full color display in the cockpit." (Tr. 1585.) These unequivocal expressions of interest in having full color displays in military aircraft cockpits leave no doubt that a need for the invention existed during the period leading up to October, 1985.

Defendants point to no documents from 1985 or earlier supporting a lack of interest in NVG compatibility with respect to full color displays, whether because of daylight readability or the absence of fielded displays. Surely the Government and its contractors do not postpone solving problems with military equipment until it has actually been fielded.

### 3. The Original Mil Spec – MIL-L-85762 – Demonstrates "Failure Of Others" And Strongly Supports Nonobviousness

The chronology of the Government's development of the military specification for NVG compatible interior aircraft lighting -- MIL-L-85762 – strongly supports a finding of nonobviousness. The evidence demonstrates that the Government, and particularly Mr. Reetz,

spent a great deal of time researching NVG compatibility and consulting with industry prior to issuance of the original military specification, MIL-L-85762. (*See* PTX-603.) During that time period, there was a strong interest expressed by Dr. Task and others in the human factors and pilot communities in retaining red in the cockpit. (Task Tr. 1730, 1734; Reetz 7/27/06 850.) Yet despite this extensive knowledge (including a knowledge of complementary filtering techniques), a committee of Government experts led by Mr. Reetz issued an NVG compatibility specification that eliminated red and prohibited full color displays. (PTX-12 (MIL-L-85762, dated Jan. 1986).) Only later, after Honeywell's patent application was filed, did the Government reconvene the committee to investigate how to get red back into the cockpit. (PTX-13 (MIL-L-85762A, dated Aug. 26, 1988).) If it was so well-known or obvious how to allow red and full color displays in the cockpit with NVGs, then why, after so much research and effort, was red banned?

Ferdinand Reetz was "instrumental" in drafting the original version of MIL-L-85762. (Gov't 4/25/07 Br. at 6; *see* Reetz 7/27/06 Tr. 84 (Mr. Reetz was the "prime author" of the NVG compatibility portion of the original mil spec).) Mr. Reetz began researching techniques for making cockpit lighting compatible with NVGs in 1981 and 1982. (Gov't 4/25/07 Br. at 5.) This research resulted in his 1983 masters thesis, DE-301, which the Government relies upon as teaching complementary filtering. (*Id.*) In 1983 and 1984, Mr. Reetz worked on modifications to a TA-7 aircraft to allow the use of NVGs. (Reetz 7/26/06 Tr. 563.) The project was intended to demonstrate the concept of making a jet attack airplane capable of performing its mission around the clock as opposed being daytime only. (*Id.* at 564.) Mr. Reetz' TA-7 research is documented in DE-324, which Dr. Task says describes the complementary filtering approach to NVG compatibility. (*Id.* at 563; DE-500 at 71, ¶ 152.)

During the period 1982 to 1985, Mr. Reetz spent the bulk of his time working on NVG compatibility issues. (Reetz 7/26/06 Tr. 496.) During this time period, Mr. Reetz was drawing information from a variety of sources, including industry. (*Id.*) Mr. Reetz' logbook records discussions he had with people from different industries, including filter manufacturers, aircraft manufacturers, and fellow government engineers regarding NVG compatibility issues. (PTX-603 (Reetz Logbook), including at GVT019-3061, 3068-69 3074, 3119, 3120, 3134, 3169, 3212, 3229, 3244, 3272, 3318, 3319 (Archie Sherbert of Boeing); GVT019-3017, 3028, 3061, 3068-69, 3075, 3102, 3120, 3203, 3204, 3208, 3223, 3322 (Dennis Schmickley of Essex, who is also acknowledged in the Reetz thesis (DE-301)); GVT019-2815, 2816, 2820, 2828, 2831, 2837, 2840, 3250, 3262, 3303, 3305, 3327, 3357 (Mike Matthew of the WAMCO filter company (Reetz 11/14/2006 Tr. 465)); 3244, 3283 (Dr. Task); GVT019-3085, 3214, 3235, 3236 (Gordon Lloyd of the Royal Airforce Establishment).)

Mr. Reetz' work on NVG compatibility culminated in the issuance of a military specification, MIL-L-85762, which was his "main concern" during the time period 1983 to 1985. (Reetz Tr. 373-74.) Although he was instrumental in drafting the MIL spec, Mr. Reetz was not the only contributor. (Task Tr. 1698 (MIL-L-85762 "was done through a joint committee and lots of machinations between the services"); Reetz 7/26/06 Tr. 497 ("We had a Tri-Service Committee … and on that committee was a representative from industry, so he was there to represent industry. And from time to time, he would bring information to the committee that the industry wanted to share with us.").) According to Mr. Reetz, the Tri-Service committee made a "conscious decision to exclude red." (Reetz 7/27/06 Tr. 850; *see also id*. at 7/27/06 Tr. 880 (no full color display would comply with original MIL spec).)

While the Government has filled the record with *post hoc* excuses for why red was eliminated in the original version of the MIL spec, at least three Government witnesses have conceded that there was a strong desire to keep red if at all possible. These concessions are fatal to the Government's excuse that those of ordinary skillknew how to use red andfull color displays, while restraining NVG compatibility, but simply chose not to because it was unimportant all the time.

*First*, Dr. Task testified that it was his opinion that the MIL spec should retain red "if at all possible," and that he traveled across the country to an Aerospace Lighting Institute (ALI) meeting on the West Coast specifically to provide this input on the MIL spec. (Tr. 1730 ("It was my opinion that *if at all possible* the MIL spec which was in consideration should be such that it would *retain red* and yellow in the cockpit" (emphasis added)); *id.* at 1734 ("one of the reasons that I wanted to go [to the ALI meeting] was to have the opportunity to face-to-face make my input on what I thought should be done toward the MIL spec, and that would have included … the issue of wanting to *retain red* and yellow in the cockpit *if at all possible* with respect to the MIL spec.") (emphasis added).)

*Second*, Mr. Reetz conceded that "[h]uman factor engineers … were concerned about removing red from the cockpit" and that "there was some argument from them, [that] we need to maintain red." (Reetz 7/27/06 Tr. 850.)

*Third*, Mr. Byrd agreed that, at the time the MIL spec was issued, "[t]here were reasons to try to keep red." (Byrd 7/27/06 Tr. 998.) Mr. Byrd testified as follows:

> Q: … [A] red light would not be compliant with the original military specification, MIL-L-85762? Is that right?
>
> A: Yes.

Q: And as a practical matter, it was impossible to use a full color display, that displays red, and still comply with that original military specification; is that right?

A: Yes.

Q: And that original military specification issued in January of 1986; is that right?

A: Yes.

Q: And at that time, the time leading up to January of 1986, there was a demand to have red light in the cockpit, wasn't there?

A: There was certainly some interest, yes.

Q: There was a desirability for a red light, for example, for warning lights; is that right?

A: Desirability, yes.

Q: And there was also a desirability for red light for full color maps; is that right?

A: Yes.

Q: And to implement that original military standard or specification, that would have required that aircraft cockpits be modified to remove red lights; is that correct?

A: That's right. Any red light would be changed along with all the other lighting panels that had to be changed.

Q: So, for example, red warning lights would have had to have been eliminated from the cockpit; is that right?

A: Eliminated or filtered to yellow, yes.

Q: And implementation of the original military standard would have required retraining of pilots to recognize different colors for warning, for example, yellow for warning instead of red; is that right?

A: Yes.

Q: So is it fair to say that in the time period leading up to issuance of the original military specification, there were many reasons to try to keep red in the cockpit; is that right? …

THE WITNESS: There were reasons to try to keep red, yes.

(Byrd 7/27/06 Tr. 996-98.) Even if the Court credits Mr. Reetz' hearsay testimony that air crews said that eliminating the use of red for warning indicators would not be a problem, that testimony cannot be deemed clear and convincing in view of the overwhelming evidence that eliminating red was an undesirable solution that was difficult and expensive to implement.

In December 1985 -- two months *after* the filing date of the '914 patent -- the Government established a committee to investigate the possibility of using red lighting components with NVGs and draft a revised specification for NVG compatible lighting – MIL-L-85762A. (DE-303 at GVT012-3234 ("[i]n December, 1985, a Joint Aeronautical Commanders Group (JACG) on Interior Aviation Lighting was established … to address NVIS compatible aircraft lighting … [and] revis[e] MIL-L-85762 … [and] investigat[e] the possibility of using red lighting components with NVIS"); McLure 7/25/06 Tr. 343 ("Q: … one of the issues under study [by the Panel on Aviation Lighting] was to get red back in the cockpit; is that right? A: To get a third color in the cockpit, yes, that's correct."); PTX-557 at GVT019-1952 (Charter for Joint Aeronautical Commanders' Group Panel on Aviation Lighting: "[t]he panel will in 1986 … coordinate the development of data to determine the effects of red light and multi color displays on NVIS and coordinate on specification and standard revisions"); PTX-562 at GVT019-1948 (April, 1986 JACG Program Status Report: "NADC is conducting a study to attempt to come up with a 'red', which would be compatible with TACAIR night-vision goggles, and thus get 'red' back into the cockpit").) The main objective of revising the specification in 1986 was to get red back into the cockpit, including for full color displays. (Byrd 7/27/06 Tr. 999 ("Q: And the main objective of revising that specification was to try to get red back into the cockpit; is that right? A: Yes. Q: Including revising the specification to allow the use of full color displays in the cockpit; is that right? A: That was a goal, yes."))

If keeping red in the cockpit with NVGs was a simple and known engineering tradeoff, as Defendants contend, then the Government had plenty of reasons to write the original MIL spec to permit red. Stated differently, if keeping red in the cockpit with NVGs was an available option in 1985, then why didn't the Government write the original MIL spec the way it was written three years later – with two NVG compatibility options, one with red and one without? Instead, the Government issued MIL-L-85762, which eliminated red and full color displays.

The Government's *post hoc* explanation – that they knew how to keep red, but nevertheless made a conscious decision to eliminate it for greater NVG sensitivity – is both unsupported and illogical. *First*, the undisputed evidence shows that a not insignificant segment of the pilot and human factors communities had a strong desire to keep red. (Task Tr. 1730, 1734; Reetz 7/27/06 850.) *Second*, there is *no contemporaneous evidence* supporting this *post hoc* explanation. Defendants point to nothing that indicates that the Tri-Service committee was aware of other options, but nevertheless chose to eliminate red. For example, neither the Breitmaier & Reetz article (DE-146) announcing the proposed standard, nor Mr. Reetz's 1987 Rationale Document (PTX-606) provides any support for Defendants' litigation-inspired rationale for eliminating red in 1986, when it was so critical for warning lights and broader implementation of full color displays. *Third*, military specifications are not drafted in contemplation of only the present, but are drafted to pick up anticipated future procurement requirements. (*See, e.g.,* Reetz 7/26/06 Tr. 504 ("… in general, we develop a requirement and we will put the requirement on the street. And then it is up to the industry to tell us whether or not they can meet that requirement … you don't necessarily even know if anybody can do it until

you establish the requirement …").)[16] There is no dispute that full color displays were within the contemplated near term realm in 1985, and certainly other red lighting was already in existence. (DE-146 at GVT019-1646 (NVG compatibility of multi-color CRTs is an area where "possible solutions need to be investigated"); DE-511 at GVT009-0782 (NVG compatibility of color CRTs is "[p]erhaps one of the greatest challenges in lighting system design"); DE-318 at GVT019-1659 (Navy memo indicating that NVG compatibility of full color CRTs is an "unresolved issue").) Try as they may, Defendants simply cannot explain away the retrograde elimination of red in the 1986 specification as anything short of the absence of an obvious alternative solution at that time. They certainly have not provided clear and convincing evidence to the contrary.

**4. Commercial Success Supports Nonobviousness**

The Court's finding of infringement with respect to the designated display systems, together with the expert opinions of Mr. Tannas and Julie Davis, demonstrate commercial success and its nexus with the invention. *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir.) (a "prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent"), *cert denied*, 488 U.S. 956 (1988); *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) ("[w]hen a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed

---

16 While Col. Lawrence testified that "[s]pecifications are always behind," there is no evidence that MIL-L-85762, which issued in January 1986, was behind the state of technology as it existed in October 1985. (Tr. 1009; PTX-12 (MIL-L-85762, Jan. 1986).) The Government did not even convene the committee to investigate getting red back into the cockpit and possibly revising the MIL spec until December, 1985. (DE-303 at GVT012-3234; PTX-557 at GVT019-1952; PTX-562 at GVT019-1948.)

and claimed in the patent, it is presumed that the commercial success is due to the patented invention”).

In particular, Mr. Tannas testified “[t]here is a high demand for aircraft cockpit displays for military use that are both full color (including red) and NVG compatible. Customers for NVG compatible aircraft will not accept substitute products that do not have both of these features.” (PTX-834 at 83, ¶ 266.) Ms. Davis opined that there is a high demand for the benefits of the patented technology and a lack of alternative technologies for providing the same benefits, backing up her opinion with numerous references to documentary evidence and the deposition testimony of Defendants’ witnesses. (PTX-1351 [Davis Direct] at 24-29, ¶¶ 101-19.) Finally, Ms. Davis quantified the sales of the infringing display systems. For example, according to the Government’s non-confidential demonstrative exhibits from the damages trial, legacy Honeywell sold 1,269 CMFDs yielding $58,090,403 in revenues, and L-3 sold 764 CMDUs and 345 RDUs. ((DE-602v, w.)[17] Commercial success of the ‘914 invention is further demonstrated by the fact that the infringing displays are “critical to the business of L-3.” (L-3 5/3/06 Intervention Br. at 2 (“The display system is the major product manufactured and sold by the responsible L-3 division and is critical to the business of L-3”).)

Defendants have not rebutted Honeywell’s *prima facie* evidence of commercial success and nexus. Defendants’ only argument is that the commercial success of the infringing displays is attributable to daylight readability, not NVG compatibility, citing the testimony of Mr. Dunn. (Gov’t Br. at 47; L-3 Br. at 51.) Mr. Dunn’s testimony is not relevant to the commercial success issue for at least two reasons. *First*, even though he had no involvement with aircraft cockpit

---

[17] Honeywell does not concede that the Government’s sales figures are accurate, although they are very close to those calculated by Honeywell’s expert, Ms. Davis.

displays at the time, Mr. Dunn nevertheless limited his testimony regarding daylight readability to the 1981-85 time period. (Tr. 233, 238.) Honeywell has made no allegation that the invention was commercially successful during that time period. On the contrary, the CMDUs, RDUs and CMFDs that demonstrate commercial success were sold during the period from 1993 to the present. (PTX-1007, Schedule B.) *Second,* Mr. Dunn's testimony regarding daylight readability pertained to CRT displays. (Dunn Tr. 239 ("[t]he shadow mask CRT, some of the earlier technologies were incapable of providing sufficient brightness").) There is no evidence that daylight readability was a problem for LCDs. Each of the display systems relied upon for commercial success includes a full color NVG compatible AMLCD display.

Defendants cannot and do not deny that there is customer demand for benefits of the patented technology – full color and NVG compatibility. Such demand is demonstrated, for example, by the technical performance specifications for the CMDU, RDU and CMFD, which require that the displays be both full color (with red, green and blue primaries) and NVG compatible. (PTX-309 at LHM00007992-98; PTX-307 at GVT052-0566-68; JTX-43 at H57972-74, H57976-79; *see also* PTX-1212, Pierce 7/31/06 Depo. Tr. 125-26 (L-3 Senior Director of Marketing testifying that L-3's customers want NVIS compatibility for every CMDU and RDU that is sold).) The existence of such demand is reinforced, for example, by display manufacturer's marketing materials and Government press releases announcing the upgrade of aircraft to include the infringing display systems, both of which tout the advantages of full color and NVG compatibility. (PTX-1335 at 17 (Honeywell press release re CMFD "Continuous F-16 technology upgrades have greatly expanded the types of situational data available to the pilot, which in turn have made color displays more useful in the cockpit"); PTX-1231 (Air Force Posture Statement 2000: "To 'Own the Night,' the Air Force is pursuing a multi-faceted

strategy. First, we are upgrading our F-16 aircraft with the Night Vision Imaging System (NVIS). This upgrade ensures the aircraft internal and external lighting is compatible with night vision devices.").)

The prominence of the patented technology in marketing materials alone demonstrates a sufficient link between the patented invention and the commercial success. *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) ("[t]he prominence of the patented technology in Baxter's advertising creates an inference that links the Gambro invention to this success").

Even if other features, such as daylight readability or low weight, also contribute to the demand for the infringing display systems, the presence of these features does not sever the link between the patented technology and commercial success of the infringing products. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991) ("[i]t is not necessary, however, that the patented invention be solely responsible for the commercial success, in order for this factor to be given weight appropriate to the evidence, along with other pertinent factors"). Honeywell is simply not required to disprove every possible alternative reason to purchase a product encompassing the patented technology. *Demaco*, 851 F.2d at 1394 ("[a] requirement for proof of the negative of all imaginable contributing factors would be unfairly burdensome, and contrary to the ordinary rules of evidence"). Accordingly, the commercial success of the infringing display systems supports a finding of nonobviousness.

## F. Defendants' Remaining Assertions Do Not Demonstrate Obviousness

### 1. Defendants Have Not Proven That The Revised Specification -- MIL-L-85762A -- Was Independently Developed

The development of the revised MIL spec – MIL-L-85762A – cannot be relied upon as evidence of independent development, when it is undisputed that the Navy's lead representative

on the Tri-Service committee – David McLure -- reviewed Honeywell's '269 patent application *before* the first meeting of the committee. (Plaintiffs' 4/25/07 Secrecy Act Br. 8-12; *see also* Gov't 4/25/07 Secrecy Act Br. at 8 ("David McLure reviewed the '269 patent application on behalf of the Navy").) Regardless of the Court's view of whether the Government's access to the '269 application was "meaningful," the fact of such access is undisputed, which means that the development of MIL-L-85762 was *not* independent as a matter of law. *Hilton Davis Chemical Co. v. Warner-Jenkinson Co., Inc.*, 62 F.3d 1512, 1520 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997) ("[i]ndependent development means that the accused infringer had *no knowledge* of the patented invention when it developed its product or process") (emphasis added). The Government admits that MIL-L-85762A is "the same invention" as the '914 invention, and it is undisputed that each of the three infringing display systems was procured pursuant to this MIL spec. (Gov't Br. at 49; *see* Plaintiffs' 4/25/07 Secrecy Act Br. 51.) Accordingly, Defendants have no clear and convincing proof of independent development.

**2. Neither Mr. Cohen's Credentials, His Company Internal Memo, Nor The Absence Of A Prototype Supports Obviousness**

As the Government concedes, "it is certainly not the rule that an inventor must build a prototype or be highly educated to arrive at a patentable invention." (Govt. Br. at 49.) In fact, the inventor's credentials are all but irrelevant to the validity of the patent. *Custom Accessories*, 807 F.2d at 962 ("[t]he actual inventor's skill is not determinative"). Accordingly, Defendants' attempt to disparage Mr. Cohen's capabilities as an inventor have no bearing on obviousness.

The Government's attacks are baseless in any event. Mr. Cohen was a prolific inventor with extensive technical knowledge in various fields relating to the '914 patent. For example, while an employee of Honeywell's predecessor (Bendix), Mr. Cohen was awarded seventeen patents relating to analog computers, aircraft computers, electronic circuits, aircraft displays,

displays for the space shuttles and filters. (Cohen 9/21/04 Depo. Tr., DE-54 at 21, 29; ID-71 (Mr. Cohen's resume).) Mr. Cohen's inventiveness received praise from two of the Government's witnesses, Mr. Reetz and Dr. Task. (Reetz 7/26/06 Tr. 589 ("I remember [Mr. Cohen] talked about certain polarizers. And the reason I remember is it was a pretty novel idea. It was not something that I don't think anybody else had thought of beforehand, so I remember that."); Task Tr. 1605-06 ("What was originally submitted for the 269 patent … was probably a unique idea at the time").) Mr. Cohen's knowledge and expertise are far above the level where there should be any question about whether he was capable of making an invention that involved more than routine skill in the art.

In a further attempt to introduce irrelevancies, the Government misrepresents Mr. Cohen's testimony by falsely asserting that "Mr. Cohen was actually *unable* to ever build a prototype of the invention that used the complementary filters of claim 2." (Gov't Br. at 49, emphasis in original.) Contary to the Government's accusation, Mr. Cohen never said he was "unable" to build a prototype using complementary filters. Rather, he said such a prototype would have taken more time to build. (Cohen 9/21/04 Depo. Tr., DE-54 at 175 ("[o]f the three approaches, the easiest one to show proof of concept was the polarizers … the color filters … would require special multilayer color filters which would take more time"); *see also* Cohen 9/22/04 Depo. Tr., DE-54 at 354 ("Q: … Did you ever develop a prototype for that concept [complementary cooperative filters]? A. No.")) Accordingly, the factors relied upon by the Federal Circuit in *Leapfrog*[18] are not present in this case, and the Government's reliance on that case is based upon a misrepresentation of Mr. Cohen's deposition testimony.

Moreover, by statute, the court cannot make specialized training of the inventor or the

[18] *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

creation of a prototype a prerequisite for patentability. 35 U.S.C. § 103(a) ("[p]atentability shall not be negatived by the manner in which the invention was made"); 35 U.S.C. § 103 Revision Notes and Legislative Reports, 1952 Notes ("it is immaterial whether [the invention] resulted from long toil and experimentation or from a flash of genius"); *Life Technologies, Inc. v. Clontech Laboratories., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000) ("the path that leads an inventor to the invention is expressly made irrelevant to patentability by statute").

Mr. Cohen's memorandum reporting to his colleagues at Bendix regarding a 1984 American Helicopter Society Symposium is likewise not relevant to the obviousness inquiry. (DE-57.) The memo is an internal company memo, and there is no way to separate Mr. Cohen's independent thinking from what he learned from others. Moreover, as a confidential, nonpublic document authored by the inventor, it cannot be relied upon to prove knowledge of one of ordinary skill in the art or anything else relevant to the obviousness issue. *See In re Omeprazole Patent Litigation*, 490 F. Supp. 2d 381, 520 (S.D.N.Y. 2007) (concluding that certain documents were not prior art because "no party has presented any evidence that [the documents] were accessible to the public prior to the critical date").

### G. *KSR* Supports A Finding Of Nonobviousness

#### 1. The Facts Of This Case Are Substantially Different From *KSR*

The issue before the Supreme Court in *KSR* was whether it would have been obvious to one of ordinary skill to combine the teachings of the prior art to make an improved gas pedal for an automobile. The Government summarized the facts of *KSR* as follows:

> The patent-in-suit claimed an adjustable automobile pedal that was combined with an electronic sensor for detecting the pedal's position. [*KSR*, 127 S. Ct.] at 1733. The prior art contained numerous disclosures of electronic sensors for use of pedals, but did not apply those to adjustable pedals with a fixed pivot point. *Id.* at 1735. A separate prior art patent, the Asano patent, taught adjustable pedals that used a fixed pivot point, but did not use

> electronic sensors. *Id.* Combining the teachings of these references provided all elements of the claim at issue in the case.

(Gov't Br. at 4.) Based upon these undisputed facts, the Supreme Court concluded that a "person having ordinary skill in the art could have combined Asano with a pedal position sensor in a fashion encompassed by claim 4, and would have seen the benefits of doing so." *KSR*, 127 S. Ct. at 1743.

There are fundamental differences between the facts of *KSR* and this case that make the Supreme Court's obviousness conclusion inapplicable here. Furthermore, the Supreme Court affirmed legal principles that support nonobviousness of the '914 patent.

*First*, in *KSR*, there was no evidence of any teaching in the prior art that would have discouraged one of ordinary skill from making the claimed combination, nor any evidence or argument that combining the position sensor with the adjustable pedal produced any unexpected or synergistic result. *KSR*, 127 at 1745 ("Teleflex has not shown anything in the prior art that taught away from the use of Asano"). Here, on the other hand, there is an abundance of evidence demonstrating that one of ordinary skill in the art believed that red light interfered with the use of NVGs and teaching away from any combination that required that red light be used in the presence of NVGs. (*See* Sections II.C.5. and II.E.1.-3., pages 44 & 66 *supra*.) Contrary to the teachings of the prior art, the invention was able to achieve an unexpected and synergistic result: a display that was both full color (including red) and NVG compatible. Accordingly, this case differs significantly from *KSR* because of the evidence of teaching away.

*Second*, in contrast to this case, in *KSR*, it was undisputed that "combining the teachings of these references provided all elements of the claim at issue in the case." (Gov't Br. at 4.) The patentee in *KSR* was precluded from making any argument that combining an electronic sensor with the Asano adjustable pedal failed to satisfy the limitations of the disputed claim. *KSR*, 127

S. Ct. at 1743. Here, on the other hand, even Defendants' asserted prior art combinations do not result in the '914. (*See* Sections II.C.4.and II.D., pages _____, *supra*.)

*Third*, while in *KSR*, both pieces of prior art related to the relevant art (automotive pedals), Defendants here are relying upon prior art (Uchida (DE-515) and the '963 patent (DE-519)) that does not relate to aircraft cockpits or NVG compatibility. In *KSR*, the prior art disclosed an electronic sensor designed for use with an automobile pedal, and other prior art (Asano) described a particular type of automobile pedal. Here, in contrast, Defendants reach beyond full color displays designed for aircraft cockpits (*e.g.*, the CRT displays discussed in Boehm (DMX-4)) and instead seek to combine "complementary filtering" with *other* full color displays disclosed in references that Defendants admit are unrelated to aircraft cockpits. (*See* Gov't Br. at 41 ("none of [Uchida, '963 patent or '843 patent] disclose the use of their displays in aircraft"); *see also* L-3 Br. at 11 "liquid crystal displays ("LCDs") were in their infancy in 1985 and were not found in aircraft").) These and other factual distinctions require a different result here than in *KSR*.

The legal principles articulated in *KSR* fully support a finding here of nonobviousness. In *United States v. Adams*, 383 U.S. 39 (1966), which is cited with approval in *KSR*, the Supreme Court rejected obviousness arguments that are similar to those made by Defendants here. The Court summarized the Government's arguments as follows:

> The Government concludes that wet batteries comprising a zinc anode and silver chloride cathode are old in the art; and that the prior art shows that magnesium may be substituted for zinc and cuprous chloride for silver chloride. Hence, it argues that the 'combination of magnesium and cuprous chloride in the Adams battery was not patentable because it represented either no change or an insignificant change as compared the prior battery designs.' And, despite 'the fact that, wholly unexpectedly, the battery showed certain valuable operating advantages over other batteries

> (these advantages) would certainly not justify a patent on the essentially old formula.'

*Adams,* 383 U.S. at 48. As in *Adams,* Defendants argue here that complementary filtering is "old in the art," and that the prior art shows that full color displays having red, green and blue filters may be substituted for the cockpit lights in Reetz (DE-301) and Boehm (DMX-4), and that filters that pass and block a "narrowband of the red color band" may be substituted for the complementary filters used in Reetz (DE-301) and Boehm (DMX-4). Defendants' arguments should be rejected for the same reasons as the Court rejected the Government's argument in *Adams.*

> Despite the fact that each of the elements of the Adams battery was well known in the prior art, to combine them as did Adams required that a person reasonably skilled in the prior art must ignore that (1) batteries which continued to operate on an open circuit and which heated in normal use were not practical; and (2) water-activated batteries were successful only when combined with electrolytes detrimental to the use of magnesium. These *long-accepted factors*, when taken together, would, we believe, *deter* any investigation into such a combination as is used by Adams. This is not to say that one who merely finds new uses for old inventions by shutting his eyes to their prior disadvantages thereby discovers a patentable innovation. We do say, however, that known disadvantages in old devices which would naturally discourage the search for new inventions may be taken into account in determining obviousness.

*Adams,* 383 U.S. at 51-52 (emphasis added). More than forty years later, the Supreme Court in *KSR* endorsed the principle of "teaching away" embodied in the *Adams* case:

> The [*Adams*] Court relied upon the corollary principle that when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious. … When Adams designed his battery, the prior art warned that risks were involved in using the types of electrodes he employed. The fact that the elements worked together in an unexpected and fruitful manner supported the conclusion that Adams's design was not obvious to those skilled in the art.

*KSR*, 127 S. Ct. at 1740. As in *Adams,* long-accepted factors deterred any investigation into a cockpit display system that required that red light be used in the vicinity of NVGs. The prior art taught that red light should be removed from cockpit light sources to make them NVG compatible. As in *Adams*, the result achieved by the '914 invention – a cockpit display that is both full color (including red) and NVG compatible -- was unexpected. If it had been expected that such a display could be achieved, the Government would not have issued MIL-L-85762, banning red light and full color displays, in spite of the desires of Dr. Task and others that red be retained. *KSR* reaffirms that such teaching away makes it more likely that the invention is nonobvious. *KSR*, 127 S. Ct. at 1740.

**2. The Presumption Of Validity Is Not "Diminished" In This Case**

The Supreme Court indicated that the presumption of validity seemed "much diminished" in *KSR* because the key prior art teaching was not disclosed to the PTO. *KSR*, 127 S. Ct. at 1737-38, 1745. Here, in contrast, references disclosing the key concepts relied upon by Defendants – complementary filtering and full color displays – were considered by the Examiner.

Defendants' obviousness arguments center around the concept of complementary filtering. But many of the prior art references that Defendants rely upon as disclosing complementary filtering were considered by the Examiner. For example, L-3 contends that "[t]he Boehm reference identifies a method of complementary filtering." Boehm (DMX-4) was disclosed to the USPTO by Honeywell and appears in the prosecution history of the '914 patent. (DMX-36 at D000584-610.) Dr. Task also relied upon Task & Griffin III (DE-508), Breitmaier & Reetz (DE-146), and the German Patent (DE-504) as disclosing complementary filtering, and the Government continues to argue that Task & Griffin III (DE-508) anticipates claim 2. (*See* DE-500 at 45, ¶ 96 (Task's list of references that address complementary filtering).) Each of

Task & Griffin III (DE-508), Breitmaier & Reetz (DE-146) and the German Patent (DE-504) was disclosed to the USPTO by Honeywell and appears in the prosecution history of the '914 patent. (DMX-36 at D000573-583 (Task & Griffin III); *id.* at D000623-633 (Breitmaier & Reetz); *id* at D000376-387 (German Patent).)

While the Government also relies upon Reetz (DE-301) as teaching complementary filtering, Dr. Task made no distinction between the complementary filtering taught by Reetz (DE-301) and the complementary filtering taught by Boehm (DMX-4), Task & Griffin III (DE-508), Breitmaier & Reetz (DE-146), or the German Patent (DE-504), all of which were considered by the Examiner. In fact, the shared aperture filter technique that is the subject of Reetz (DE-301) is disclosed in another reference, the Swift patent, which was expressly considered by the Examiner and addressed by Honeywell in a response to an office action. (DMX-36 at D000253 (Swift patent); *id.* at D000459 (Examiner's office action addressing Swift patent); *id.* at D000465-66 (Honeywell's response to office action); *see* PTX-834 at 70, ¶ 225 (Tannas direct: "[t]he Swift patent discloses shared-aperture filters that are very similar, if not identical, to those discussed in [Reetz] DE-301").) Furthermore, the Examiner's comments demonstrate that he viewed the Swift patent as inherently disclosing complementary filtering as a technique for preventing interfering radiation from overpowering a pilot's night vision goggles. (DMX-36 at D000459 (interpreting Swift as teaching a filter on the NVGs that transmits all light except for one narrow spectral band, where the narrow band is the same as that defined by a pass filter over a light source).) Accordingly, there can be no argument that complementary filtering was not considered by the Examiner.

References disclosing full color displays were also before the Examiner. Both Boehm (DMX-4) and Breitmaier & Reetz (DE-146) disclose full color CRT displays. (DMX-4 at

D000606 ("A colour CRT uses a mixture of blue, green and red"); DE-146 at GVT019-1646 ("A multi-color CRT requires the use of three different phosphors – blue, green, and red").) As indicated above, both Boehm (DMX-4) and Breitmaier & Reetz (DE-146) were disclosed to the USPTO by Honeywell and appear in the prosecution history of the '914 patent. DMX-36 at D0000623 (Breitmaier & Reetz); *id.* atD000584-610 (Boehm).) A full color display is likewise disclosed in the Aron '442 patent (DE-501), which Honeywell also cited to the USPTO. (DMX-36 at D000521; *see* DE-500 at 81, ¶ 181 (Task Direct describes Aron patent as disclosing "the use of multiple filters to filer the output of the light emitted from a full color display").)

The Government apparently has so little confidence in its obviousness arguments that it resorts to unfounded speculation regarding how many hours the Examiner spent looking at the prior art and amended claims submitted by Honeywell. Invalidity cannot be proven with baseless accusations that the Examiner failed to do his job. The prosecution history demonstrates that the Government's allegations are groundless in any event. Contrary to the Government's assertion, January 16, 2002 was not the only date on which the Examiner reviewed Honeywell's prior art submission that included Boehm, Task & Griffin III and Breitmaier & Reetz. Examiner Buczinski represented that he considered that prior art on *three separate occasions*: on January 16, 2002 and January 24, 2002 during prosecution of the '760 application and again on June 25, 2002 during prosecution of the '269 application. (DMX-38 at D001534 (PTO Form 1449 with Examiner Buczinski's initials indicating that he considered prior art on "16 Jan. '02"); DMX-38 at D001705 (PTO Form 1449 with Examiner Buczinski's initials indicated that he considered prior art on "24 Jan. '02"); DMX-36 at D000521 (PTO Form 1449 with Examiner Buczinski's initials indicating that he considered prior art on "25 June '02").) In fact, on January 24, 2002, Examiner Buczinski went so far as to independently research and then

fill in the missing dates for the Task & Griffin III and Breitmaier & Reetz articles, providing yet further confirmation that he carefully considered these materials. (DMX-38 at D001705.) Thus, even if the Government's hour-counting exercise deserves attention, it is simply wrong and misleading. The examiner considered the prior art on several occasions, and went the extra step of researching the dates himself. This hardly suggests irregularity or a lack of diligence on his part.

While the Government characterizes the "pour-over" as an "irregularity" in the prosecution history, the Government offered no testimony of any patent office official or USPTO expert regarding such allegations of irregularity. Nor is there any evidence that the Examiner was "confused" by the procedure followed by Honeywell. To the contrary, the Examiner took steps to ensure that Honeywell's transfer of the specification and claims from the '760 application complied with the applicable rules and procedures for amending the application. (DMX-36 at D000491 (Advisory Action containing Examiner's note: "The transfer of the drawings and specification from 09/632,760 is technically infeasible but the same matter would be entered if formally submitted in this application along with the claims."))

Moreover, the transfer of claims from the '760 application actually provided the Examiner a second opportunity to considere the claims that issued in the '914 patent. Examiner Buzinski reviewed those claims and issued a Notice of Allowance that was mailed on January 25, 2002 in the '760 application. (DMX-38 at D001672-74 (Preliminary Amendment dated January 23, 2002, adding new claims 15-17); DMX-38 at D001706 (Notice of Allowability and Notice of Allowance dated 1/25/2002).) Five months later, the Examiner reviewed those claims a second time and issued a Notice of Allowance for the same claims in the '269 application on July 1, 2002. (DMX-36 at D000634-38 (Amendment After Final Rejection dated June 20, 2002,

adding new claims 8-10); *id.* at D000639, D000691 (Notice of Allowability and Notice of Allowance dated 7/1/2002).)

While it appears that the Examiner mistakenly listed the wrong claim numbers (12-14) on the January 25, 2002 Notice of Allowability and the Index of Claims, this clerical error is irrelevant and the prosecution history as a whole clearly demonstrates that he approved claims 15-17 that were submitted with Honeywell's January 23, 2002 amendment. Examiner Buczinski wrote that the Notice of Allowability was responsive to "the amendment filed 23 Jan. 2002." (DMX-38 at 1706) The only claims presented in the January 23, 2002 amendment are claims 15-17 (now claims 1-3 of the '914 patent). It makes no sense to assume that the Examiner intended to allow claims 12-14, which he had finally rejected four months earlier, forcing Honeywell to file a Continued Prosecution Application (CPA). (DMX-38 at D001516-18 (final rejection of claims 12-14 dated 10/02/01); DMX-38 at D001519-22 (Continued Prosecution Application dated December 21, 2001).) The Notice of Allowability unequivocally indicates that it was responsive to applicant's submission on January 23, 2002, which contained claims 15-17, not claims 12-14, which were submitted on September 25, 2001. (DMX-38 at D001510-15 (September 25, 2001 amendment adding new claims 12-14).) Indeed, claims 12-14 were no longer pending in the application at that time.

Accordingly, prior art disclosing the key concepts relied upon by Defendants as demonstrating obviousness (complementary filtering and full color displays) was considered by the Examiner, and if anything, the presumption of validity is strengthened, not diminished by considering the prosecution history.

## III. THE GOVERNMENT FAILED TO PROVE THAT CLAIM 2 IS ANTICIPATED BY THE PRIOR ART

Anticipation was a major focus of the defenses trial. This defense was prioritized in both Dr. Task's written testimony and the Government's pre-trial brief. Now, however, the Government has now all but abandoned the defense, devoting only two cursory pages to anticipation in its brief. L-3 submits no argument or summary whatsoever regarding anticipation and merely adopts the Government's position.

To prove anticipation, Defendants must prove that every element of claim 2 is found in a single prior art reference. *Xerox*, 458 F.3d at 1322. *Xerox Corp. v. 3Com Corp.*, 458 F.3d 1310, 1322 (Fed. Cir. 2006) ("Invalidity by anticipation requires that the four corners of a *single*, prior art document describe every element of the claimed invention") (quoting *Advanced Display Systems, Inc. v. Kent State University.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)) (emphasis added) *cert. denied*, 532 U.S. 904 (201). While Defendants assert each of Reetz (DE-301) and Task & Griffin III (DE-508) anticipates, each of those references is plainly missing multiple elements of claim 2. Defendants' anticipation therefore falls woefully short.

### A. The Government Has Not Demonstrated That Reetz (DE-301) Discloses Each And Every Element Of Claim 2

The Government admits that "*not all the elements of the claim appear in one reference*." (Gov't Br. at 28, emphasis added.)[19] In fact, the Government's claim chart for Reetz (DE-301) has *empty boxes* for claim elements 2(a)(1) and 2(a)(2) – the first and second filters. (*Id.* at 27-28.) Thus, Reetz (DE-301) cannot anticipate. *Xerox*, 458 F.3d at 1322.

---

19 L-3 is also bound by the Government's admission because, although it does not address anticipation in its brief, it has fully adopted the Government's arguments. (L-3 Br. at 1, n.1.)

### 1. No "Local Color Display" In Reetz (DE-301)

The Government failed to demonstrate that Reetz (DE-301) discloses a "local color display" as defined by the Court. Although it was never spelled out in his direct testimony, at trial it became apparent that Dr. Task contends that a series of discrete cockpit indicator lights is a "local color display." (Task Tr. 604 ("Q: … So the thing you're calling the display system here is basically a series of light bulbs on a cockpit panel with a filter over them in different places, and that's what you're calling the local color display in the Reetz paper, right? A: Basically, that's right."); *see* DE-500 at 56, ¶ 116, DE-526-37 (demonstrative showing red warning light, amber IFF caution light, and green IFF test and reply lights).) This position is just silly. A bunch of light bulbs that operate independently from one another is not the "display" required by claim 2.

According to the Court's definition, a "local color display" is "*a device* that … shows or exhibits at least one color perceptible to an observer or observers utilizing a night vision aid." *Honeywell*, 70 Fed. Cl. 433 (emphasis added).

A series of discrete indicator lights is *not* a device and therefore not a "local color display." (PTX 834 at 51, ¶ 161 ("The "IFF Caution," "IFF Test," "IFF Reply" and red warning light ("Fire 'T' Handles" or "APP Fire Light") are not a single "device," but multiple discrete devices."); Task Tr. 641 ("I don't think I would consider all three of those things in that configuration a device, especially if you've got the cockpit big enough for those three or four or five feet.") (emphasis added); PTX 833 at 24, ¶ 87 (Col. Lawrence's sketch showing location of IFF Caution light, IFF Test light, IFF Reply light, the Fire "T" Handles and Fire Warning Lights in the CH-46 helicopter).)

Indeed, Dr. Task admitted that Reetz (DE-301) does not state where any of the three lights (IFF caution, IFF test, and IFF reply) are located relative to one another, nor does it

indicate that these three lights function together as a single device. (Tr. 637; *cf.* DE-301 at [page 33]; see also Gov't 10/23/05 Br. at 25 ("it hardly makes sense to call the tire on the F-16's landing gear and a filter inside a cockpit display a 'device;' it is more accurate to say that they are two devices which are parts of a larger assembly – the aircraft").) Further, Dr. Task admitted that he has no basis for believing that the three IFF lights are inside a single box as depicted in DE-526-37. (Tr. 632 ("Q: Have you ever seen one taken out of a cockpit? A: No, I don't believe I have."); *id.* at 633 ("Q: But did you ever pull it out to see it's actually all in one box? A: No , I never pulled it out to see if it's all in one box.…"); *id.* at 634 ("Q: So you don't know what's behind the panel, do you? A: From that standpoint, I guess I don't know what's behind any of that panel."))

Aside from the absence of any "device" that can be called a "local color display," Reetz (DE-301) also fails to disclose a display that "shows or exhibits at least one color perceptible to an observer or observers utilizing a night vision aid." As discussed above, Reetz (DE-301) teaches the shared aperture filter technique for use with PVS-5A night vision goggles. These NVGs have a have a face mask that obscures the peripheral vision and prevents the user from looking under or around the goggles to see the cockpit instruments and displays. (DE-301 at GVT018-0978, 985, 988; Reetz Tr. 412 (photograph at page GVT018-0986 of DE-301 "is a picture of the AN/PVS-5 night vision goggles, and it shows the facemask, and you can see the two [image intensifier] tubes sticking out, and the facemask was around the tubes, and that fit against your face so you couldn't see anything, wouldn't let any other light into the eyes."); Task Tr. 657-58 ("Q: … And as we said, it's difficult to look beneath the goggles at the display, and it's not intended for that, correct? A: It's difficult, not impossible, and it's not intended for that."); PTX 834 at 52-53, ¶¶ 165-68.))

Dr. Task also admitted at trial that he did not accurately represent the PVS-5A night vision goggles in his demonstrative exhibit DE-526-37 because he left off the facemask. (Tr. 657 ("Q. Can we agree it's not what it looks like you have on Plaintiff's Trial Exhibit 830? A: That's correct. There is a facemask that goes with this."); *see also* Tr. 652 (copy of DE-526-37 marked as PTX 830).) Dr. Task also admitted there is no disclosure of cutaway goggles (that is, goggles without the face mask) in Reetz (DE-301). (Tr. 655 ("I don't recall any discussion of cutaway goggles.")) The Government's arguments regarding modifying the PVS-5 NVGs or substituting the ANVIS goggles are irrelevant in the context of anticipation, which requires that each and every claim element be disclosed in a single prior art reference.

**2. No "First Filter For Filtering The Blue Color Band" In Reetz (DE-301)**

The Government attempts to stretch the prior art beyond the breaking point by asserting that an amber or green filter is a "first filter for filtering the blue color band." Dr. Task never even asserted that Reetz (DE-301) *discloses* a "first filter for filtering the blue color band of the local source of light," much less could he support such an assertion. (PTX-834 at 58, ¶ 181 ("[o]ne of ordinary skill in the art would not recognize any of the amber and green color filters over the IFF Caution, IFF Test and IFF Reply indicator lights as a 'first filter for filtering the blue color band of the local source of light.'") Instead, he cautiously asserted that "[a]ny of the 3 color filters on the IFF Instrument *could be considered* the first filter." (DE-500 at 57, DE-526-38 (emphasis added in part and omitted in part).) Moreover, Dr. Task admitted he did not even look for a blue filter in Reetz (DE-301). (Tr. 649 ("I did not try to find a blue filter.")) Accordingly, the Government failed to demonstrate that Reetz (DE-301) discloses a "first filter for filtering the blue color band of the local source of light."

### 3. No "Narrowband Of The Red Color Band" In Reetz (DE-301)

The Government also failed to prove that the CS-4-94 filter discussed in Reetz (DE-301) is a "third filter for filtering the red color band of the local source of light and passing a narrowband of the red color band." As discussed above, the Court's construction for this claim element requires that perceptible light in the red color band be emitted by the local color display. *Honeywell*, 70 Fed. Cl. at 464. (*See also* Tr. 1195.) Reetz (DE-301) contains no express disclosure of a filter for passing a narrowband of the red color band. In fact, the reference teaches the opposite, namely using the CS-4-94 to "filter the incandescent lights to reduce their output in the red and near-IR." (DE-301 at GVT018-1003; *id.* ("[t]he predominantly red lighting presently used in the cockpit has to be modified to greatly reduce the output in the red and near-IR portion of the spectrum (approximately 600-900nm)."); PTX 834 at 60, ¶ 190 ("[t]he purpose of using the CS-4-94 filter over the red warning indicators and green advisory indicators in DE-301 was to block red, not to pass a narrowband of red").)

The Government also failed to demonstrate that CS-4-94 inherently satisfies the requirement for a filter for passing a narrowband of the red color band. *Dayco Products., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1369 (Fed. Cir. 2003) ("'To serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence[; however, s]uch evidence *must make clear that the missing descriptive matter is necessarily present in the thing described in the reference*'") (emphasis and bracketed language in original) (quoting *Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991)).

In fact, the Government's only evidence on "narrowband of the red color band" with respect to Reetz (DE-301) is Dr. Task's calculations using the CS-4-94 transmission curve and a one possible idealized incandescent lamp emission curve. (DE-500 at 58-60, ¶ 121, DE-526-46,

DE-526-40.) These calculations are not sufficient, however, to demonstrate that the filtered indicator lights emit a "narrowband of the red color band" because: (1) they fail to show the presence of perceptible red light in the red color band; and (2) they fail to take into account unknown variables such as the emission spectrum of the incandescent lamp and the transmission spectra of the red and green colored filters which are also in the light path. (PTX 834 at 62-64, ¶¶ 199-208.) Indeed, Dr. Task admitted he did no explicit analysis of whether the perceptibility requirement was met. (Tr. 561.)

In addition, Dr. Task admitted that the green and red colored filters would have an effect, which he did not determine. (Tr. 678 ("Q: … [Y]ou haven't determined the effect of those green, amber, or red filters on the emission coming out of any of the light sources, correct? A: That's correct. I have not quantitatively determined anything along those lines.").)

Accordingly, the Government failed to demonstrate there is a "narrowband of the red color band," either expressly or inherently, in Reetz (DE-301).

**4. No "Fourth Filter" In Reetz (DE-301)**

The Government also failed to demonstrate that Reetz (DE-301) discloses a "fourth filter which filters light at the night vision aid … to substantially block said narrowband of the red color band from being admitted to the night vision aid." As discussed above, Reetz (DE-301) teaches shared aperture filters having a hole though the center of the filter for allowing light from the cockpit instruments and displays to pass through unfiltered and be amplified by the NVGs. (*See* page 49, *supra*.) Such shared aperture filters were expressly distinguished in the prosecution history of the '914 patent. (DMX-36 at D000465-66.) Accordingly, the shared aperture filters of DE-301 cannot be said to disclose the "fourth filter" of claim 2. No other type of filter at the NVGs is discussed in the reference. *See PODS*, 484 F.3d at 1368. Such filters most certainly would not substantially block a narrow band of the red color band (even there

were one, which has not been demonstrated), since the light from the display passes through the aperture or hole in the filter to the goggles unfiltered and unimpeded. This is not disputed or challenged.

### B. The Government Has Not Demonstrated That Task & Griffin III (DE-508) Discloses Each And Every Element Of Claim 2

#### 1. No "Display Of Colors" In Task & Griffin III (DE-508)

The Government also failed to demonstrate that Task & Griffin III (DE-508) discloses, either expressly or inherently, a "display system," which the Court defined as requiring a "display of colors." *Honeywell*, 70 Fed. Cl. 433. Dr. Task contends that the incandescent illuminated moving map display discussed in Task & Griffin III (DE-508) satisfies the requirement for a "display of colors." (DE-500 at 84 (claim chart); *see also* Task Tr. 682 (moving map display "is what I am treating as the local color display").) But there is no evidence, much less clear and convincing evidence, that one of ordinary skill in the art would conclude that the moving map display is ***necessarily*** a "display of colors -- yet that is the standard Defendants must meet." *Dayco*, 329 F.3d at 1369 (to prove anticipation by inherency, the "***evidence must make clear that the missing descriptive matter is necessarily present*** in the thing described in the reference").

Instead, the evidence showed that one of ordinary skill in the art would understand that the moving map display is a projector, similar to a slide projector, that can be used with various transparent films containing maps. (PTX 834 at 8, ¶ 19; Task Tr. 683 (moving map display uses a ". . . transparency film, much like a 35 mm slide projector").) Just as the slides are not part of the slide projector, the transparent film is separate from the moving map display and is not considered part of the display itself. (PTX 834 at 8, ¶ 20; PTX 833 at 28, ¶ 99 (Col. Lawrence: "moving map displays all required insertion of a film or cartridge that would contain the map or

maps used in the display"); Task Tr. 704 ("Q: … the film isn't part of the device, right? It's no more part of the device than my VHS tape is for my VCR, right? A: I guess you could consider it that way, although without that critical component, that would just be a yellow light …").) Without the film, there is no "display of colors" – it would just be a yellow light. (Task Tr. 704.)

Significantly, there is no clear and convincing evidence that one of ordinary skill in the art would believe that the film for the moving map display mentioned in Task & Griffin III (DE-508) is necessarily a color film. (PTX 834 at 9-10, ¶¶ 21-26; PTX 833 at 28, ¶ 99 (Col. Lawrence: "maps were sometimes in color and sometimes in black and white"); *see also* Task Tr. 687 ("Q: … Is there anything in the article itself that anywhere refers to the moving map display as being color? A: No, I'm relying upon one of ordinary skill in the art to know).) Neither Dr. Task's personal recollection regarding the moving map display in his Pave Low III experiments, nor the disclosure of other non-prior art documents nowhere referenced in Task & Griffin III (DE-508), is relevant to the issue of whether that reference anticipates.[20] The relevant inquiry instead concerns what one of ordinary skill in the art would understand from reading Task & Griffin III (DE-508) – and Defendants have failed to demonstrate that one of ordinary skill would necessarily conclude that the moving map display is a "display of colors." *Finnegan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999) ("[t]he mere possibility that Figure 2 might be understood by one of skill in the art to disclose nonresonance ejection is insufficient to show that it is inherently disclosed therein").

[20] Dr. Task cited DE-527 ("Final Report: Pave Low III Prototype Development Test and Evaluation") as support for his assertion that the moving map display in Task & Griffin III (DE-508) was a full color display, but Defendants submitted no evidence that DE-527 is prior art.

**2. No "Local Color Display" In Task & Griffin III (DE-508)**

Moreover, Court's construction for "local color display" requires that the colors of the display be visible to a person wearing NVGs. *Honeywell,* 70 Fed. Cl. at 433 ("a device that … shows or exhibits at least one color percepitible to an observer or observers utilizing a night vision and aid"). Task & Griffin III (DE-508) disclose AN/PVS-5 NVGs, which had a full face mask and do not permit the wearer to see the colors of the display. (PTX 834 at 11-16, ¶¶ 30-42.) Dr. Task agreed:

> Q: Now, once again, this article [Task & Griffin III, DE-508] deals with the old-style goggles that you cannot look underneath, isn't that right?
>
> A: It's the old-style goggles which makes it difficult for you to look underneath.
>
> Q: And they're not intended to look underneath?
>
> A: They're not designed for that, that's correct.
>
> Q: And that's what's disclosed in the article, that's what's used in the article for its purposes and its analyses, right?
>
> A: That is correct.

(Tr. 699-700.) Accordingly, the Government failed to meet its burden of proof with respect to a "local color display" in Task & Griffin III (DE-508).

**3. No "Plurality Of Filters" In Task & Griffin III (DE-508)**

The Government failed to demonstrate that Task & Griffin III (DE-508) discloses "a plurality of filters at the local color display" including "first" and "second" filters In his direct testimony, Dr. Task asserted that the first and second filters correspond to: (1) the transparency film used with the moving map display, and/or (2) the micro-louvre that was placed over the moving map display in Task & Griffin III (DE-508). (DE-500 at 49-50 ¶¶ 106-07.) Dr. Task's opinion is based on an incorrect interpretation of claim 2 as not requiring wavelength selective

filters. (Task Tr. 727 ("Q: Is it your opinion in this case that the filters that are being described in Claim 2 of the '914 patent are not necessarily wavelength selective filters? A: That is correct. My reading of the claim construction for filters and Claim 2 indicates that those are filters but are not necessarily wavelength selected filters."))

In contrast to the Government's argument at trial, L-3 now admits that claim 2 requires wavelength selective filters. (*Compare* Tr. 733-34 ("there's nothing in the Court's claim construction … that says anything about selective wavelength filters"); *with* L-3 Br. at 71 ("the court expressly construed the claims to include … wavelength selective filters"). The transparency film of the moving map display is not a "first" or "second" filter because it is not part of the display and is not necessarily color. (PTX 834 at 18, ¶¶ 51-54; *id.* at 19, ¶ 58.) Moreover, even if the transparency film were considered a first filter, there is no second filter because the micro-louvre is *not* wavelength selective. (PTX 834 at 20-23, ¶¶ 62-73; *see also* Task Tr. 726 ("A micro-louvre is like a miniature venetian blind … what it does is it allows light that is emitted in certain directions to be passed, mostly, and a light that goes in other directions are not passed …").) Accordingly, the Government failed to meet its burden of proof with respect to the "first" and "second" filters in Task & Griffin III (DE-508).

#### 4. No "Narrowband Of The Red Color Band" In Task & Griffin III (DE-508)

The Government failed to prove that the Glendale Green filter mentioned in Task & Griffin III (DE-508) is a "third filter for filtering the red color band of the local source of light and passing a narrowband of the red color band." There is no evidence that the Glendale Green filter passed perceptible red light in the red color band when placed over the moving map display of Task & Griffin III (DE-508). *Cf. Honeywell*, 70 Fed. Cl. at 464. The Government's only evidence on "narrowband of the red color band" with respect to Task & Griffin III (DE-508) is

Dr. Task's calculations using the Glendale Green transmission curve *from a different reference* (Bertelson, DE-516), which the Government has now *withdrawn* as prior art. (Gov't Br. at 10, n. 1.) Indeed, Task & Griffin III (DE-508) itself contains no transmission spectrum for Glendale Green. (*See* PTX 834 at 31, ¶ 106.) Moreover, even if they were based on Task & Griffin III (DE-508), Dr. Task's calculations are not sufficient to demonstrate that the filtered moving map display emits a "narrowband of the red color band" because: (1) they fail to show the presence of perceptible red light in the red color band; and (2) they fail to take into account unknown variables such as the emission spectrum of the incandescent lamp and the transmission characteristics of the transparency film and other optical components of the moving map display. (PTX 834 at 28-32, ¶¶ 97-109.) Indeed, Dr. Task admitted he did no explicit analysis of whether the perceptibility requirement was met. (Tr. 561.) Accordingly, the Government failed to meet its burden of proof with respect to the "narrowband of the red color band" in Task & Griffin III (DE-508).

**5. No "Fourth Filter" In Task & Griffin III (DE-508)**

The Government failed to demonstrate that the red plastic filter that was placed over the NVGs in Task & Griffin III (DE-508) is a "fourth filter" that "substantially block[s] at least said narrowband of the red color band from being admitted to the night vision aid." The transmission spectrum for this red filter demonstrates that it does not substantially block light in the range from 620 nm to 780 nm. (PTX 834 at 45-46, ¶¶ 142, 147; DE-508 at D000578.) Merely because the NVGs functioned as intended does not mean that they substantially blocked red light, as required by the claim. (PTX 834 at 46, ¶ 148.)

For all these many reasons, Defendants' ancitipation defense fails.

### C. Neither Of The Government's Anticipation References Discloses A Full Color Display With Red, Green And Blue Primaries

Neither Reetz (DE-301) nor Task & Griffin III (DE-508) discloses a full color display having red, blue and green primaries. (Task Tr. 533 ("Q: … you would agree with me that neither of those articles … describes a full color display having a red, green, and blue primary, correct? A: That is correct.")) Dr. Task admitted "[i]f the Court determined that the Claim 2 was restricted to only full color displays having red, green, and blue primaries, then, no, I believe that the Task and Griffin 3 and the Reetz thesis would not contain the elements required." (Tr. 534-35; *id.* ("Q: And would not anticipate, correct? A: Would not anticipate."))

L-3 has now admitted that claim 2 requires at least blue and green primaries.

> The '914 patent discusses the integration of a NVG with "full color displays." Pieces of this general, full color limitation can be found in the preamble and element (a)(1)-(2) of Claim 2.

(L-3 Br. at 20.) Elements (a)(1) and (2) are "a first filter for filtering the blue color band …" and "a second filter for filtering the green color band …," which L-3 now concedes include "pieces of this general, full color limitation." ('914 patent, col. 6; L-3 Br. at 20.) L-3's concession is backed up by evidence that one of ordinary skill in the art would recognize red, green and blue as the three primaries of a full color display. (Tannas Tr. 1209-10 ("[a]nyone skilled as defined by the Court … would consider those red, green and blue colors to be the red, green and blue primaries of a color display"); Tannas Tr. 1227 ("[t]he first filter is to optimize the energy that comes from the blue color band and perhaps other places to create the primary color blue of a full color display"); *see also* '914 patent, col. 4, lines 46-47 ("[e]ach color band 51-53 provides a monochromatic image in one primary color for the full color display").) Even Dr. Task admits that claim 2 is directed to the Figure 3 embodiment, which is a full color display. (Tr. 523.) Dr.

Task's admission that, if claim 2 requires a full color display having red, green and blue primaries, it is not anticipated, is therefore dispositive of the Government's anticipation defense.

## IV. THE GOVERNMENT FAILED TO PROVE PUBLIC AVAILABILITY OF THE REETZ THESIS (DE-301)

After failing in the first instance to put on evidence to meet the critical public availability element o fits anticipation and prior aft defenses, the Government engaged in a belated, intensive fact finding and discovery effort to try back-fill its failures of proof. The Court granted Defendants leave to do so, noting that it would have been empowered not to do so and cautioning the Government regarding its evidentiary failure. Even after such failures and subsequent warnings, the complex and questionable record developed by Defendants still falls far short of proving, by clear and convincing evidence that the August 1983 Reetz thesis (DE-301) was publicly available prior to October 10, 1985. Defendants' sole evidence is deposition testimony of Dr. Dolores Fidishun, a librarian with no personal knowledge about Penn State library practices prior to 1995, and Ms. Delores Wiant, a clerk whose deposition testimony on cataloging procedures was hopelessly tainted by improper Government witness coaching. Although Ms. Wiant testified about typing up some catalog cards, due date cards and card pockets, the record is clear that she did not do so for the Reetz thesis. In any event, Defendants' evidence on library practices falls short because Defendants failed to provide any competent evidence – such as testimony based upon personal knowledge – as to when the Reetz thesis arrived at the Penn State libraries. Defendants never even sought this critical discovery. At best, the evidence shows that a version of the December 1983 Reetz thesis was cataloged on November 5, 1985 – after the October 10, 1985 critical prior art date.

### A. Public Availability Of Alleged Prior Art Must Be Shown By Clear And Convincing Evidence

The Federal Circuit has affirmed that public availability of alleged prior art must be established by clear and convincing evidence. *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004) (affirming grant of summary judgment in favor of plaintiff because "there was not clear and convincing evidence that the [prior art] was actually available at the [public] meeting"); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986) (the burden of proving public availability by clear and convincing evidence is upon the defendant challenging the validity of an issued patent, *cert denied*, 480 U.S. 947 (1987).

### B. The Documentary Evidence Shows That The Reetz Thesis Was First Cataloged In Penn State's Online Library Catalog System On November 5, 1985

In 1983, the Penn State Great Valley library (formerly known as King of Prussia) obtained a computerized online library catalog system known as the library information access systems or LIAS. (DE-668 at 150-51 (Fidishun Deposition); DE-679 at H73844; DE-684 at H74032 (col. 1, bottom) and H74034 (col. 3).) LIAS catalogs library resources using what are known as MARC records – machine-readable cataloging records – that adhere to a format established by the Library of Congress. (DE-668 at 50-51, 142-43.) The MARC record from LIAS for the Reetz thesis shows that the MARC record was created on November 5, 1985. (DE-668 at 142-46, 192-194; DE-686 (Penn State's MARC record for Reetz thesis).)

Dr. Fidishun, a librarian and Penn State's Rule 30(b)(6) designee, agreed that November 5, 1985 is the earliest date for which there is any documentary record anywhere at Penn State that the Reetz thesis even existed. (*Id.*)[21] That the Reetz thesis was first cataloged on

---

[21] Dr. Fidishun's testimony about the creation date field used in MARC records is consistent with literature about MARC records and Penn State's LIAS online library catalog. (continued...)

November 5, 1985 is consistent with the actual copy of the Reetz thesis from the Penn State Great Valley library that has "stickers or labels" indicating that it is "an engineering thesis" under the "new system" and such labels show "computerized … dot matrix print" used in the 1985 timeframe. (DE-668 at 20-25, 236-239; DE-670; DE-672.) It is also consistent with the stamped "November 7, 1985" check out date in that copy of the Reetz thesis. (Govt Br. 12-13; DE-688 (Ms. Wiant deposition) at 39; DE-691 at PS-00001.)

In short, the sole documentary evidence establishes that as of 1983 the Penn State Great Valley library was utilizing LIAS, and the MARC record from that system for the Reetz thesis shows a November 1985 cataloging date. No other documentary evidence supports any earlier cataloging date, whether using a manual card catalog system or otherwise.

### C. The Evidence That The Reetz Thesis Might Have Been Publicly Available Prior To October 10, 1985 Is Far From Clear And Convincing

Without any supporting documentary evidence, the Government contends that the Reetz thesis was first cataloged via old-fashioned card catalog procedures (using typed up paper cards), shelved, and available to the public at Penn State "no later than one month after it was submitted" to the library and, in any event, "no later than October 1983." (Govt Br. 11 and 13.) As shown below, the Government's evidence is riddled with holes and inconsistencies, and hardly meets their burden of clear and convincing proof.

#### 1. Dr. Fidishun Lacks Any Personal Knowledge Of Penn State's Library Practices Prior To 1995 And Her Testimony That The December 1983 Reetz Thesis Was Cataloged And Shelved No Later Than October 1983 Cannot Be Correct In Any Event

(DE-668 at 142-46, 148-49; DE-678 (Library of Congress MARC record explanation); DE-679 (LIAS: Online Catalog at Penn State University).)

The Court should reject the Government's invitation to rely on Dr. Fidishun's testimony that the Reetz thesis would have been first cataloged and shelved "no later than October, 1983." (Govt Br. at 11 (*citing* DE-668 at 41-43.) ***First***, Dr. Fidishun has no first hand knowledge of anything that occurred at Penn State libraries prior to 1995. (DE-668 at 10, 16, 93, 105-106, 117-19, 203-206.) That Dr. Fidishun may have some generalized knowledge of library practices ***elsewhere*** is completely irrelevant. The Federal Circuit has never suggested that the public availability of a prior art reference at a particular library may be proven with evidence of general library practice at a different library. *Cf. In re Hall*, 781 F.2d 897, 899-900 (Fed. Cir. 1986) (accepting evidence of practice at the particular library where prior art was shelved). To the contrary, actual personal knowledge of the cataloging, indexing, and shelving practices at the library alleged to have made the prior art reference publicly available is required. *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, No. 95-2318-SLR, 1998 WL 151411, at *10 (D. Del. Mar. 13, 1998) (finding testimony speculative and not probative of general indexing, cataloging, and shelving procedures at libraries at issue because witness had no actual first-hand knowledge of the procedures employed by the university libraries and admitted there were "many details of the cataloging with which [he] would not be familiar"), aff'd, 228 F.3d 1330 (Fed. Cir. 2001), *cert. denied*, 532 U.S. 1019 (2001); Fed. R. Evid. 602 (requiring personal knowledge for testimony from non-expert witnesses).

***Second***, Dr. Fidishun's testimony also is plainly wrong as shown by the December 1983 date on the face of the Reetz thesis from the Penn State Great Valley library. (DE-670 at PS-0041.) How could Penn State possibly catalog, index, and shelve the Reetz thesis by October 1983, when the document is dated December 1983? This internal discrepancy calls into serious question the competency and reliability of Dr. Fidishun's speculation more generally. The only

thing clear is that Dr. Fidishun lacks personal knowledge, and her testimony is at best incorrect speculation based upon practices after 1995.

### 2. Ms. Wiant's Testimony About Penn State's Library Practices During The Early 1980s Is Incompetent As Not Based On Personal Knowledge, Speculative, And Simply Insufficient

The Court also should reject the Government's invitation to rely on Ms. Wiant's testimony that the Reetz thesis would have been first cataloged and shelved "no later than one month after it was submitted" to the library. (Govt Br. at 13.) First, Ms. Wiant's lack of memory of the relevant facts in the relevant time frame is evident from her non-answer that she "could have" had some role in dealing with theses in the 1980s. (DE-688 at 27 ("Q: As a library assistant did you have any role in the general library practice with respect to theses, for example, did you receive them once they were signed? A: I could have, yes[.]").) Second, Ms. Wiant explained that she had been a clerk who handled inter-library loan requests, not a librarian, and spent "not much" time dealing with theses. (DE-688 at 11 ("Clerical … I do not have a library degree"); *id.* at 28 (no formal or informal training about how to process a thesis), *id.* at 39 ("I was in charge of the library loans"); *id.* at 53 ("Q: Okay. What percentage of your time did you deal with the Master's theses? A: Well, not much, … ").) She testified that a "librarian would do the … actual cataloging" and Ms. Wiant would merely "type the cards." (DE-688 at 27-28.)

Dr. Fidishun herself did not purport to rely upon Ms. Wiant with respect to cataloging practices. She testified that Ms. Wiant worked at Penn State libraries in 1983 but was not familiar with cataloging. (DE-668 at 95-97 ("Dolores Wiant … was a library assistant, but she did not do the functions … she wasn't a librarian, so she didn't do anything with cataloging or anything like that… . She was a library assistant and always had been a library assistant and … was head of interlibrary loan."); *id.* at 206-208 ("Q: You mentioned Dolores Wiant. She was not a librarian? A: Right. Q: And in fact, she never did any cataloging or indexing? A: Right.

Q: She ran the reference desk and was happy to stamp your books saying thanks very much, come back with the book, hopefully? A: Right. … Q: But based on your interaction with Dolores -- A: She would not have had knowledge of most of that stuff.”)) Dr. Fidishun’s assessment of Ms. Wiant is particularly compelling because Dr. Fidishun testified as Penn State’s Rule 30(b)(6) designee and because Ms. Wiant later testified that Dr. Fidishun was her supervior (DE-688 at 76) and must have know Ms. Wiant’s limitations.

Even assuming that Ms. Wiant’s knowledge as a clerk who typed up catalog cards is enough to provide competent testimony of cataloging practice, Ms. Wiant’s testimony is speculative and insufficient for several reasons. *First*, Ms. Wiant repeatedly testified that she was not good at recalling dates, thus casting a shroud of doubt over the entirety of her testimony as to *when* the Reetz thesis might have become publicly available.

> Q: Okay. You mentioned earlier that you were … bad with dates or not terrific with dates; is that what you said earlier?
>
> A: Right, as far as years are concerned, yes. (DE-688 at 64.)
>
> Q: When did you start at the library as a library assistant, what year, if you can recall?
>
> A: Truthfully, I do not remember, … .I'm not good with numbers. (*Id.* at 9.)
>
> Q: The library did not start binding theses until 1988?
>
> A: Some time after that. I'm not exactly sure. (*Id.* at 14.)
>
> Q: So it's fair to say that the Master's theses at the Great Valley library weren't put onto an online system until after 1988?
>
> A: That's hard to say. As I say, I'm terrible with numbers, and I don't remember. (*Id.* at 21.)
>
> Q: Is it fair to say that that time [-- the time Ms. Wiant first heard about the Reetz these], some time prior to June 2004 -- was it very long before 2004?

> A: I do not know. I really don't remember.
>
> Q: Well, dates are very important for our discussion today, so let me just step through a couple dates. Was it in 1999?
>
> A: As far as dates are concerned, I really do not know.
>
> Q: Okay. And I'm not trying to be difficult, but I want to step through a couple dates.
>
> A: I just don't know.
>
> Q: Was it in year 2000 or 2001? …
>
> A: I just don't know. (*Id.* at 43-44.)
>
> Q: Do you know approximately when that was [that Ms. Wiant was first contacted about the Reetz thesis after her retirement in June 2004]?
>
> A: No, I do not. (*Id.* at 45.)

In light of the clear and convincing evidentiary standard, it would be clearly erroneous to rely upon Ms. Wiant's admittedly sketchy recollection of dates and timeframes for cataloging procedures in the mid-1980s.

*Second*, there is no evidence establishing when the Reetz thesis was first provided to any Penn State library.[22] Ms. Wiant explained that before the library could have a chance to catalog, index, and shelve a thesis, the library first had to receive the thesis from the administration office of the advisor associated with the student who authored the thesis. (DE-688 at 110, 113-14.)

---

[22] Ms. Wiant confirmed that Penn State's original copy of the Reetz thesis includes no indications of the date that it was submitted to the library (DE-688 at 33-34) and she was unaware of any paper record available at Penn State that identified when the Reetz thesis was cataloged, indexed, or shelved. (*Id.* at 108-109.) She agreed that there was no documentary record corroborating her testimony about how quickly theses would be cataloged, indexed, or shelved. (*Id.* at 110.) And the record is clear that Mr. Reetz did not know when his thesis was first publicly available. (Reetz Tr. at 469 ("Q: Mr. Reetz, … do you know, have any knowledge about the public availability of your Master's thesis? A: No, I don't.").)

Ms. Wiant did not claim to have any personal knowledge of any administration office with respect to provision of theses to the library. She admitted that her testimony about how quickly a thesis might be cataloged, indexed, and shelved *assumed* that it was quickly provided to the library by the relevant administrative office. (*Id.*) The Government introduced no testimony from Mr. Reetz, his advisors, the engineering department or anyone else to fill this critical evidentiary gap. In fact, it never even attempted to fill this critical gab through discovery, notwithdstanding the "do over" afforded to it by the Court to prove its case. Contrary to the Government's argument, these facts are far from the situation in *In re Hall*, 781 F.2d 897, 899-900 (Fed. Cir. 1986). In *Hall*, the library had evidence of the precise date that the library received the prior art reference (*i.e.*, November 4, 1977) and the library's general practices were then applied from that date to estimate the date that cataloging, indexing, and shelving would have occurred. *Id*. at 899. Here, without a shred of evidence regarding when the Reetz thesis was provided to the library, there is no starting point from which to apply such estimates.

*Third*, although Ms. Wiant testified about an era when she would type up cards for a paper card catalog and, at the same time, the accompanying due date cards and card pockets that would go in the back of books and theses, there is no evidence that she typed up such cards with respect to any copy of the Reetz thesis. (DE-688 at 27-28, 114-15, 118.) And Penn State has no paper catalog card with respect to the Reetz thesis. (DE-668 at 45.)

*Fourth*, when confronted with Penn State's copy of the Reetz thesis shelved at the Great Valley Library, Ms. Wiant admitted that the due date card and card pocket both had stickers with dot-matrix printing that was not a result of her typing efforts.[23] Ms. Wiant agreed, consistent

[23] DE-691 at PS-0001 (pocket card); DE-703 (due date card); DE-688 at 122-24 ("Q: … looking back at the original [Penn State copy of the Reetz thesis shelved at Great Valley], you (continued...)

with Dr. Fidishun's testimony, that such stickers reflected the newer system known as the LIAS system. (DE-688 at 124-25; DE-668 at 20-25 ("stickers or labels" indicating "an engineering thesis" under "the new system"); *id.* at 236-239 (stickers specifying "ENG/ENG SCI" on the Reetz thesis due date card and card pocket are in "computerized … dot matrix print".) She also recalled, as did Dr. Fidishun, that 1985 was smack in the middle of the era of dot matrix printing. (DE-688 at 116, 238.) Ms. Wiant testified, consistent with the documentary record, that in 1983 the Penn State Great Valley campus (then known as King of Prussia) replaced the original card catalog with an online card catalog with terminals known as LIAS. (DE-688 at 91-92, 102-104; DE-701 at H73844; DE-702 at H74032 (col. 1, bottom) and H74034 (col. 3).) She also agreed that LIAS was "the one place where [the library] documents when [a reference] gets into the catalog" and could not dispute the documentary record that in 1981, the original card catalog closed and online cataloging began. (DE-688 at 92-93, 104-105.)

In sum, Ms. Wiant's testimony about ***when*** the Reetz thesis might have been cataloged, indexed, and shelved is unsupported by any documentary evidence and is, in fact, contrary to evidence discussed above that: (1) the Penn State Great Valley library started using the computerized LIAS online catalog system in 1983; (2) the MARC record from that system shows that the Reetz thesis was first cataloged on November 5, 1985; and (3) the original Reetz thesis included 1985-era computerized, dot matrix printed stickers on the due date card and card pocket.

---

see that *there is a pocket part in the original* -- A: Right. Q: -- *that has the dot matrix printing on it*? A: Right. Q: Is it your understanding at the time that the actual library card that went in it had the exact same label on it? A: No. *Because this I would not have done, I mean, I did not do that. What I would have done would have been just typed right on the pocket.*") (emphasis added.). Although the Government tries to suggest that Ms. Wiant handled the Reetz thesis in 1985 because her handwriting is on the due date card, the handwriting actually shows a 1989 date. (*Compare* Govt Br. at 12-13 *with* DE-691.)

As in *Norian Corp.*, Defendants lack "substantial evidence of actual availability" of the prior art reference before the critical date. *Norian Corp.*, 363 F.3d at 1330 (affirming grant of summary judgment in favor of plaintiff because "there was not clear and convincing evidence that the [prior art] was actually available at the [public] meeting" because "[a]though there was testimony that it was the general practice at [such public] meetings for presenters to hand out abstracts to interested attendees, the lack of substantial evidence of actual availability of the [prior art] adequately support[ed] the [district] court's conclusion that dissemination of the [prior art] was not established"); *see also Freeman v. Minnesota Mining & Manufacturing Co.*, 693 F. Supp. 134, 149 (D. Del. 1988)**,** (testimony by library organizer and affidavit by librarian failed to establish clear and convincing evidence that prior art was publicly available in 1975 where there was no "reliable" evidence that the prior art "was actually indexed and shelved in the library in 1975"). *aff'd in part, rev'd in part*, 884 F.2d 1398 (Fed. Cir. 1989) (unpublished) Unlike *In re Hall,* Defendants provided no competent evidence establishing the date that the library received the prior art reference. In re *Hall*, 781 F.2d at 899.

### D. The Court Should Not Rely On Ms. Wiant's Testimony About Cataloging Practices In 1983 Because It Was Hopelessly Tainted By The Government's Witness Coaching

#### 1. Ms. Wiant's First Affidavit Reflects Her Best Effort To Recall 1983 Library Practices For Theses And Says Nothing About Cataloging

On September 21, 2006, the Government emailed Penn State requesting an affidavit to satisfy the Government's "goal" of "establish[ing] … that the [Reetz] thesis] … was publicly available in PSU's library system prior to mid-1985." (DE-685; DE-692.) Thereafter, Penn State's lawyer interviewed Ms. Wiant, drafted her affidavit signed on October 11, 2006, and provided it to the Government well-prior to the start of the defenses trial on November 13, 2006. (Exhibit B (Penn State's 10/17/2006 letter to Government with enclosures); DE-688 at 49-50, 54;

DE-689.) According to Ms. Wiant, she did her "very best at that point to put down everything [she] could recall." (DE-688 at 49-50, 54-55.) Ms. Wiant's first affidavit included nothing about cataloging practices and, in that respect, is consistent with Dr. Fidishun's testimony that Ms. Wiant was not involved in cataloging.

**2. Without Interviewing Her Beforehand, The Government Gave Ms. Wiant Portions Of Dr. Fidishun's Deposition And Manufactured The Second Affidavit Of Ms. Wiant To Include That She Adopted Portions Of Dr. Fidishun's Testimony And New Facts The Government Wanted To Prove**

The Government drafted Ms. Wiant's second affidavit and sent it to Penn State's lawyer on January 23, 2007 to get her to sign it without first interviewing her about her personal knowledge. As Ms. Wiant later explained, she did not speak to any Government lawyers until February 19, 2007 when Messrs. Brady and Jefferson both called her. (DE-688 at 56-57.)[24] In fact, according to Penn State's lawyer who worked with the Government and Ms. Wiant, the Government "drafted the second affidavit the[] way they wanted" and apparently "based everything on her first affidavit (which [Penn State's lawyer] drafted) and what Dr. Fidishun said in her deposition[, including t]he stuff about the card catalog [that] came out of the [Dr. Fidishun] deposition." (Exhibit C (Email from Penn State lawyer Matt Rogers dated February 14, 2007).)

Worse, the Government drafted Ms. Wiant's second affidavit to also contain new facts contrary to Dr. Fidishun's testimony. For instance, Dr. Fidishun testified that the old paper card catalog with theses cards was not directly available to the public. (DE-668 at 73.) Yet the

---

24 DE-688 at 57-58 ("Q: Okay. Do you have any idea how Mr. Brady would know what would go in your second affidavit if he had never spoken to you? … Q: If you know? A: No, I don't know, no. Q: You hadn't told him what to put in this [second] draft affidavit; is that right? A: No.").

Government drafted Ms. Wiant's second affidavit to state: "I recall a card catalog of master's theses being available to the general public[.]" (DE-693, ¶ 5.). In addition, Dr. Fidishun testified that Dolores Wiant, didn't do anything with cataloging, indexing or anything like that and "she would not have had knowledge of most of that stuff." (DE-668 at 95-97, 206-208.) Yet the Government drafted Ms. Wiant's second affidavit to advance "personal knowledge" about "cataloging … theses[.]" (DE-693, ¶ 4.)

The Government also sent to Ms. Wiant (via Penn State's lawyer) portions (but not the entirety) of Dr. Fidishun's deposition transcript that they wanted her to adopt through the second affidavit that the Government drafted. At her later deposition, Ms. Wiant made clear that the process leading to her signing her second affidavit was that, without being interviewed further by anyone on the subject, she was asked "to read over" portions of Ms. Fidishun's deposition and sign the second affidavit drafted by Government lawyer Mr. Brady. (DE-688 at 51, 58-59.) The following exchange demonstrates beyond a doubt that Ms. Wiant's second affidavit was not based upon her untainted personal recollections:

> Q: Did they ask you about your own recollection about it before they showed you Ms. Fidishun's testimony?
>
> A: I don't think so, no.
>
> Q: Because at that point your best recollection had been put down in your first affidavit; is that right?
>
> A: Yes.

(DE-688 at 63, 65 ("Q: But you made your best effort to get it all into the first affidavit? A: Right. This is the way it was done."))

The Government's own email exchange with Penn State's lawyer on January 25, 2007 also demonstrates that the Government was inappropriately influencing Ms. Wiant to go beyond her first affidavit and adopt portions of Dr. Fidishun's deposition transcript:

| | |
|---|---|
| Penn State's lawyer: | I have forwarded the affidavit and deposition transcript to Ms. Wiant for her review. *She is a little hesitant about doing this a second time*, but I'll let you know as soon as I hear something. |
| Government lawyer Mr. Brady: | *I appreciate that.* We have to amend our witness list by close of business tomorrow. *Will it be possible to speak with Ms. Wiant tomorrow about her recollection and how she feels about the contents of the affidavit/depo transcript?* |

(DE-695 (emphasis added).)

Ms. Wiant was thus a pawn in the Government's efforts to obtain testimony. There can be little doubt that her testimony was influenced by Dr. Fidishun's testimony, which was inappropriately provided to her by the Government and which itself was not based on 1985 contemporaneous personal knowledge, since Dr. Fidishun did not join Penn State untl 1995.. Ms. Wiant cannot be expected to differentiate between her own personal knowledge and knowledge she gained from reviewing testimony that was improperly shared with her. This is precisely why the Government should not have provided Ms. Fidishun's testimony to Ms. Wiant - particularly without even first interviewing her to elicit her own personal knowledge.

**3. Under These Circumstances, The Court Has Ample Justification For Not Relying Upon Ms. Wiant's Testimony About Cataloging Practices In 1983**

Courts routinely condemn and often sanction violations of the traditional rule against the sharing of transcripts as was done here by the Government.

> The harm may be even more pronounced with a witness who reads trial transcript than with one who hears the testimony in open court, because the former need not rely on his memory of the testimony but can thoroughly review and study the transcript in formulating his own testimony.

*Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373 (5th Cir. 1981). For instance, in the case of *United States v. Zacarias Moussaoui*, No. 01-455 (E.D. Va.) in which a Government

attorney emailed trial transcripts to several witnesses, the court recognized that it could not determine the extent to which the witnesses' testimony had been tainted[25] but nonetheless ordered that evidence on the relevant component of the Government case be excluded.[26] Such orders or other sanctions are not unusual. *See, e.g.*, *Miller*, 650 F.2d 1373 (affirming decision to prohibit a witness from testifying because the witness had read another witness's testimony).

In this case, the Government hopelessly tainted whatever independent knowledge and recollections Ms. Wiant might have had about Penn State's cataloging practices in 1983 by having her read and adopt Dr. Fidishun's speculations about what the practice might have been. That Ms. Wiant's testimony was susceptible to such tampering is confirmed by her admitted difficulty with dates and by the fact that she attempted to record her complete recollections in her first affidavit. At minimum, the Court should seriously consider how the Government's provision of Dr. Fidishun's testimony to Ms. Wiant impacted Ms. Wiant's ability to testify about cataloging practices from her own personal knowledge. *See United States v. Cropp*, 127 F.3d 354, 363 (4th Cir. 1997) (affirming trial court's instruction to the jury that the violation of the

---

[25] Transcript of Evidentiary Hearing Before the Honorable Leonie M. Brinkema, U.S. District Court Judge, *United States v. Zacarias Moussaoui,* No. 01-455 (E.D. Va. Mar. 14, 2006), at *215-16, Exhibit D hereto ("Whether these witnesses have actually been tainted or not is almost impossible to tell" because the court "just can't tell the degree to which their testimony may have changed because of this improper communication.")

[26] *Id.* at 217 ("[T]he appropriate sanction in [the Court's view … is to strike out of the case that portion of the case that [the Court] feel[s] has been irremediably contaminated by the misconduct of this [Government] attorney, and so [the Court is] removing from this case any and all witnesses and evidence dealing whatsoever with the, what we will call the aviation component of this case. The witnesses who would have testified and the exhibits that would have been produced relating to aviation issues will be out.")

sequestration order is relevant in determining the witness' credibility, *cert denied*, 522 U.S. 1098 (1998)).

Even if the Court determines that such testimony should not be disregarded in its entirety, the improper influence prompted by the Government's improper provision of Dr. Fidishun's testimony should factor heavily in the reliability and weight, if any, to be credited such evidence. Moreover, even crediting Ms. Wiant's testimony, the Government has simply failed to establish that the Reetz thesis was, contrary to the documentary evidence, received and promptly catalogued in 1983. Factoring in the lack of reliability of Ms. Wiant's testimony due to Government tampering – the Government is left with no competent evidence of a 1983 publication date. At a minimum, the evidence is far from clear and convincing.

Because publicly availability of the Reetz thesis prior to October 10, 1985 has not been established, its content cannot be used as evidence to invalidate the '914 patent, either alone or in combination with other references.

## V. DEFENDANTS FAILED TO PROVE THAT THE ORIGINALLY-FILED APPLICATION LACKS A WRITTEN DESCRIPTION OF THE INVENTION OF CLAIM 2

Defendants' arguments regarding written description are squarely refuted by L-3's November 7, 2006 brief on doctrine of equivalents.[27] In a failed attempt to support its written description defense, the Government argues that when claim 2 was submitted, "the scope of the '914 patent was *expanded* in several ways …." (Gov't Br. at 55, emphasis added.) Similarly, L-3 argues that an "egregious *broadening* of claims … took place in 2002." (L-3 Br. at 62,

[27] Defendant L-3 Communications Corporation's Memorandum On The Doctrine Of Equivalents, submitted as Exhibit A to L-3 Communication Corporation's Motion for Leave to File Memorandum on Doctrine of Equivalents, filed November 7, 2006, hereinafter "L-3's 11/7/06 Br."

emphasis added.) These assertions are directly contradicted by L-3's argument that the additional limitations that were added to claim 2 "are clearly *narrowing* amendments." (L-3 11/7/06 Br. at 6, emphasis added.) In fact, the 2002 amendments did not broaden or expand the scope of the '914 patent beyond the original disclosure of the '269 application.

As the Government conceded at trial, the issue of whether the 2002 amendments introduced new matter that deviated from the original disclosure of the '269 application would have been "the easiest thing for the patent examiner to find." (Tr. 11 ("THE COURT: Well, this to me seems to be the weakest of your arguments, and it is also the area where it would seem to me this is the easiest thing for the patent examiner to find. MR. CRUMBLEY: It is, Your Honor. …").) Indeed, as reflected in the '760 file history, the Examiner considered the amendments to the specification and substitute drawings and expressly approved them. (DMX-38 at D001702 (Examiner's initials approving revised Figure 3); *id.* at D001706 (Notice of Allowability approving amendments to specification and drawings filed on 23 Jan. 2002).) In fact, the examiner even instructed the applicant regarding the appropriate procedure for transferring these amendments to the '269 application – refuting entirely Defendants' repeated but unsupported mantra that some highly irregular "pouring over" occurred between the applications. Far from irregular, the applicants were following the express instructions of the USPTO, and both the procedure and substance of the amendments were expressly considered and approved by the Examiner. (DMX-36 at D000491.) Defendants have provided no basis, let alone clear and convincing evidence, for second-guessing the examiner's consideration of the propriety of these amendments.

Defendants simply have not met their burden of proving that the 2002 amendments introduced new matter that is not supported by the written description of the original '269

application. *See* Robert L. Harmon, *Patents and the Federal Circuit,* 8th ed. at 284 (BNA Books 2007) ("It seems a safe prediction that the Federal Circuit will demand that a good deal of weight be given to the PTO determination that new matter has not been introduced and will insist that the statutory presumption of validity apply here with full force and effect"). Whether couched as a "new matter" or "written description" defense, the inquiry is the same: "whether the material added by amendment was inherently contained in the original application." *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1352 (Fed. Cir. 2000) ("the new matter prohibition is closely related to the adequate disclosure requirement").

While Defendants make sweeping assertions regarding broadening and expansion, they fail to identify any particular limitation of claim 2 that is not supported by the originally-filed '269 application. As detailed in Mr. Tannas' direct testimony, there is a written description supporting each element of the claim. (PTX 834 at 162-66, ¶¶ 497-506.) Contrary to Defendants' arguments, Figure 3 of the original '269 application shows each element of claim 2 of the '914 patent.




(PTX 834 at 162, ¶ 498.) This evidence was unrefuted at trial.

Defendants erroneously argue that the original disclosure of the '269 application is limited to the particular type of display shown in original Figure 3. That is clearly not the case since the '269 application expressly states that other display configurations may be used. (DMX-36 at D000011 ("[w]hile specific configurations of the local display 13 or 37 have been described, it is understood that the present invention can be applied to *a wide variety of display* and vision aid *devices*") emphasis added.) The invention possessed by Mr. Cohen thus was clearly not limited to a display having three separate CRTs as shown in original Figure 3. *See Lampi Corp. v. American Power Products, Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) ("[i]t is a familiar principle of patent law that a claim need not be limited to a preferred embodiment").

Nor is the particular display configuration shown in Figure 3 essential to the invention, as argued by Defendants. Defendants rely upon the statement in the '269 application that "[i]n the

case of the local display 37 using separate cathode ray tubes 51-53 *or other display transducers*, it is possible to more easily filter offending colors from reaching the ANVIS 13." (PTX-501 at D00010, emphasis added.) While this statement describes an advantage of the invention, that advantage is not limited to the particular display configuration shown in Figure 3 having three separate CRTs. On the contrary, "*other display transducers*" were expressly contemplated. In light of the express reference to CRTs *and* "other display transducers," particularly when coupled with the express statement that the invention is applicable to a "wide variety of display …devices," Defendants' assertions that the claims are limited to the particular CRT embodiment of original Figure 3 lack any support in the record.

The breadth of the originally-disclosed invention is reflected in claim 1 of the '269 application, where the preamble recites that "the local source of light includes a plurality of distinct monochromatic color generators." (*Id.* at D000013.) Mr. Byrd's testimony demonstrates that, from the perspective of one of ordinary skill, "distinct monochromatic color generators" could include the distinct types of phosphors used in LCD backlights. Specifically, Mr. Byrd testified that the fluorescent lamps contain "distinct types of phosphors" which "generate the light of multiple colors, which is then emitted by the display." (Byrd 7/27/06 Tr. 1032-33.) Thus, contrary to Defendants' argument, the original '269 application imposes no requirement that the "monochromatic color generators" be physically separate devices, such as the three separate CRTs shown in Figure 3. *See Lampi,* 228 F.3d at 1378 ("Although the patent drawings show only identical half-shells, … that does not compel the conclusion that the written description of the '875 patent is so narrowly tailored as to preclude Lampi from claiming non-identical half-shells …. The drawings in the patent are merely a "practical example" of the invention.")

The Government's complaint that original Figure 3 "does not show 'color bands' or the output of the display" (Gov't Br. at 56) similarly conflicts with the evidence, since Dr. Task's own exhibits demonstrate that one of ordinary skill in the art would understand that the light emitted by CRTs 51-53 is red, green and blue. In particular, Dr. Task submitted the following graphics illustrating his understanding of original Figure 3, both of which show that CRTs 51, 52 and 53 emit red, green and blue color bands, respectively.




(DE-500 at 3, DE-526-3; *see also* PTX 834 at 167, ¶ 512 ("Slide DE-526-3 of Task's testimony accurately shows how one of ordinary skill in the art would understand Figure 3 of the original application").




(DE-550, DE-526-8 (excerpt).) Dr. Task further admitted that "[o]ne of ordinary skill in the art at the time of the patent would recognize the configuration shown in Figure 3 of the original '269 application as a standard method of achieving full color by superimposing three separate images at the viewing screen, the red image from the red primary color, the green image from the green primary color and the blue image from the blue primary color." (*Id.* at 33, ¶ 69.) The Government's "color bands" argument is thus belied by the testimony of its own expert.

Finally, the Government erroneously argues that none of the three designated display systems could be found to infringe the '269 application as originally filed. Contrary to the Government's argument, Honeywell has already demonstrated, based upon the trial testimony of the Government's display engineer, Mr. Byrd, and Mr. Tannas, that the designated display systems satisfy the 1987 Allowed Claims, which are not significantly different from the originally-filed claims of the '269 application. (HW 6/8/07 Secrecy Act Br. at 22-25; PTX-501 at D000013-14 (originally-filed claims); *id.* at D000108 (amendment to preamble of claim 1); *id.* at D000124 (amending claim 1 to specify location of filter "on the night vision aid"); *see also* Gov't's 4/25/07 Secrecy Act Br. at 23-24 (quoting 1987 Allowed Claims).) This testimony also is unrefuted by Dr. Task or any other evidence.

Contrary to L-3's argument, the inventor was "in possession of a 'plurality of filters at the local color display.'" (*Cf.* L-3 Br. at 62.) Original Figure 3, which is reproduced multiple times

in Defendants' briefs, clearly shows a plurality of filters (61, 62, 63) at the local color display. L-3's argument that "the original disclosure must support *all claimed locations* of key components" misses the mark entirely. (*Id.* at 63, emphasis added.) Claim 2 does not specify any particular location for the first, second and third filters, other than "at the local color display." Claim 2 is nevertheless adequately supported by the original disclosure because the precise location of the filters is not an essential element of the invention. *See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572, 1582 n.7 (Fed. Cir. 1996) ("[i]f [the inventor] did not consider the precise location of the lockout to be an element of his invention, he was free to draft claim 24 broadly (within the limits imposed by the prior art) to exclude the lockout's exact location as a limitation of the claimed invention").

L-3's argument that "the inventors were not in possession of a system that places the filters outside the display" makes no difference (and no sense) in this case because the filters of the displays that have been found to infringe are likewise not "outside the display." Indeed, Defendants unsuccessfully argued that the accused products had no "plurality of filters" precisely because the pixel filters of the CMDU, RDU and CMFD were *part of* the display. (*See* Lockheed Martin 10/24/05 Br. at 56.) The cases cited by L-3 are inapposite because, in contrast to those cases, Defendants are unable to identify any particular limitation of claim 2 that is not supported by the original disclosure. Claim 2 is not invalid merely because it is broad enough to cover undisclosed embodiments, such as LCDs. *Ethicon,* 93 F.3d at 1582 n.7 ("[s]uch a claim would not be unsupported by the specification even though it would be literally infringed by undisclosed embodiments"); *see also Bilstad v. Wakalopulos,* 386 F.3d 1116, 1124 (Fed. Cir. 2004) ("disclosure of a species may be sufficient written description support for a later claimed genus including that species").

## VI. DEFENDANTS FAILED TO PROVE THAT CLAIM 2 IS INVALID FOR INDEFINITENESS

Defendants' arguments regarding indefiniteness borders on the offensive, in view of the fact that the Court's constructions and interpretations with which Defendants new quibble came directly from Defendants and their expert . At the *Markman* stage, this Court construed "red color band" consistent with the definition proposed by the Government. At the infringement stage, the Court adopted the "perceptible" requirement proposed by Dr. Task. A claim term that is amenable to construction is *per se* not indefinite. "Red color band" is not only amenable to construction -- *it has already been construed.* Therefore, the Government cannot argue indefiniteness without challenging the Court's claim construction, which it is judicially estopped from doing. There is no simply authority for the Government's novel legal theory that a claim term can be indefinite "as applied." But even if the Court were to consider Dr. Task's opinion that the Court's infringement decision created indefiniteness, that opinion was soundly refuted by Mr. Tannas. Hence, even under Defendants' mistaken view of the law, the evidence is far from clear and convincing in their favor.

### A. The Government Is Estopped From Arguing Indefiniteness Because The Court Adopted The Government's Proposed Construction For "Red Color Band"

The issue of whether or not the claims are sufficiently definite is "inextricably intertwined with claim construction." *Energizer Holdings, Inc. v. International Trade Commission*, 435 F.3d 1366, 1368 (Fed. Cir. 2006) (quoting *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999)). A claim can be found indefinite *only* if it so insolubly ambiguous that it cannot be construed. *Id.* at 1371 ("[a] claim that is amenable to construction is not invalid on the ground of indefiniteness"); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) ("[o]nly claims 'not amenable to

construction' or 'insolubly ambiguous' are indefinite"); *Bancorp Services, L.L.C. v. Hartford Life Insurance Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004) ("a claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness").

> "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." … In this regard it is important to note that an issued patent is entitled to a statutory presumption of validity. *See* 35 U.S.C. § 282 (2000). "By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of validity and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal."

*Datamize*, 417 F.3d at 1347-48 (quoting *Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)). The district court in *Datamize,* for example, rejected the plaintiff's proposed construction and instead found the disputed claim term "hopelessly indefinite." *Datamize*, 417 F.3d at 1346-47 (disputed term was "aesthetically pleasing"). In each of *Energizer, Bancorp* and *Exxon,* on the other hand, the trial court followed the same path and the Federal Circuit reversed and remanded because it concluded that the disputed claim term could be construed. *Energizer*, 435 F.3d at 1371 ("it is apparent that the claim can be construed"); *Bancorp,* 359 F.3d at 1372 ("[w]e agree with [plaintiff] that the meaning of the term … is reasonably discernible and that the asserted claims … are therefore not invalid for indefiniteness"); *Exxon*, 265 F.3d at 1376-84 (resolving alleged ambiguities in disputed claim terms).

In this case, the Government argued during the *Markman* phase that, unless the Court adopted the Government's proposed construction for "red color band," the claim would be indefinite. *Honeywell,* 66 Fed. Cl. at 468 (quoting 2/1/05 Tr. 573: "if you adopt their definition,

it is indefinite because you cannot find whether you are inside the claim or outside the claim"). Persuaded by the Government's indefiniteness argument, the Court adopted nearly word-for-word the construction proposed by the Government, with only insignificant changes to the nanometer limits. *Honeywell,* 66 Fed. Cl. at 470-71 ("[t]he court, however, declines to construe 'red color band' without defining a specific range of light wavelengths, because the claim would be indefinite …"). *Compare Id.* at 466 (Defendants' proposed construction: "red color band: a range of color in the range from 622 to 770 nanometers") *with Honeywell,* 70 Fed. Cl. at 433 (Court's construction: "red color band" "a range of color from 620 nm to 780 nm").

At the infringement stage, the Government urged a further requirement with respect to "narrowband of the red color band," namely that light must be "visible and perceptible." Specifically, Dr. Task testified:

> All parties have stipulated that "predetermined red color band" means "a specific range of wavelengths within the red color band" and that "narrowband of the red color band" means "a narrow range of wavelengths within the red color band." In evaluating the designated displays with respect to these elements of the '914 patent one must also recognize that a display must emit sufficient light such that the result is <u>visible</u> and <u>perceptible</u> by the observer. These properties of the display are made evident in the Court's claim construction for "local color display," "local source of light" and "color bands." Perceptibility is evident in these constructions, which incorporate terms such as "visible" and "perceptible."

(DE-202 at 6 (emphasis in original).) The Court's infringement decision incorporates Dr. Task's reasoning. Specifically, in determining whether the designated display systems meet the requirement for a "predetermined red color band," the Court relied upon the construction for "local color display," and specifically the requirement that the "local color display" exhibit "at least one color perceptible to an observer or observers." Based upon that construction, the Court concluded that, in order to satisfy the requirement for a "predetermined red color band" (and by implication also a "narrowband of the red color band"), "the 'local color display' [must] emit

light within the "red color band," i.e., 620 nm to 780 nm, *that is perceptible*." *Honeywell,* 70 Fed. Cl. 464 (emphasis added).

> As the court explained, "a display system would be irrelevant without an observer or observers capable of perceiving the display, necessarily a 'local color display' also must be perceptible to an observer or observers, i.e., one utilizing a night vision aid." [*Honeywell*, 66 Fed. Cl. at 444.] Therefore, the court construed that the predetermined red color band must not only be "a specific range of wavelengths within the red color band," i.e., 620 nm to 780 nm, but also that the "local color display" limitation in Claim 1 requires that the predetermined red color band be perceptible to an observer or observers utilizing the night vision aid.
>
> [deleted], Claim 1 of the '914 patent requires only that the "local color display" emit light within the "red color band," i.e., 620 nm to 780 nm, that is perceptible. Claim 1 does not require that a majority of the wavelengths, or any specific percentage thereof, be within the red color band or that other light be excluded, nor does Claim 1 require that light emitted be perceived as red.

*Honeywell,* 70 Fed. Cl. 464.

Thus, contrary to the Government's argument, the requirement for light within the red color band that is perceptible comes from *Dr. Task*, not Honeywell. (*Cf.* Gov't Br. at 60.) Indeed, the Government's post-trial brief on infringement argued that "Honeywell only looks at whether there is some measurable light in the Court's range" and "the viewer's *perception* of the display must be considered." (Gov't 10/23/05 Br. at 42, 44 (emphasis added).)

In sum, the Government advised the Court at the *Markman* stage that any indefiniteness problem would be cured by construing the "red color band" with reference to a particular nanometer range of wavelengths. Then at the infringement stage, the Government urged that, in evaluating the designated displays with respect to "narrowband of the red color band," the Court should also require that the display emit sufficient light such that the result is visible and perceptible. The Government has *never* argued that "red color band" is not amenable to construction. Rather, the Government advocated the very constructions that were adopted by the

Court. Defendants cannot meet the Federal Circuit's standard for indefiniteness because: (1) the disputed claim term is not only amenable to construction, it has already been construed, and (2) the Government is judicially estopped from challenging the construction that it urged the Court to adopt.

### B. There Is No Clear And Convincing Evidence That The Court's Requirement For Perceptible Light In The Red Color Band Renders The Claim Indefinite

Defendants' indefiniteness argument is based upon Dr. Task's testimony that "[t]here are several problems with this test of perceptible." (DE-500 at 37, ¶ 80.) Dr. Task's criticisms of the "perceptible" test are difficult to accept in view of the fact that, in prior stages of this case, he expressly urged the Court to adopt perceptibility as a criterion for evaluating the "narrowband of the red color band." (DE-202 at 6 (quoted above).) Moreover, Dr. Task's rationale for including a perceptibility requirement was based on language in other claim constructions that he likewise urged the Court to adopt. In particular, during the *Markman* phase, Dr. Task actively sought to include a perceptibility requirement in the constructions for "display" and "local source of light." (DE-52 at 7, ¶ 24 (the term "display" should include "in a form that can be perceived by the human eye"); *id.* at 8, ¶ 26 (the term "local source of light" should include "to be seen by the human eye").) Although Honeywell had objected to the word "perceptible" because "color is inherently perceptible," the Government argued it was not superfluous, and the Court agreed. *Honeywell*, 66 Fed. Cl. at 440-41 (citing 01/31/2005 Tr. at 240-42; *id*. at 443 (citing 01/31/2005 Tr. at 246-47); *id*. at 444. Only after the infringement ruling did Dr. Task alert the Court to his opinion that "one skilled in the art could not determine whether a particular display infringed or did not infringe claim 2" because of a "lack of criteria for … perception." (DE-500 at 36, ¶ 77.) Dr. Task's criticisms of the perceptible test are less than clear and convincing in view of his earlier testimony endorsing this as a claim requirement.

Moreover, Defendants completely disregard Mr. Tannas' testimony on the indefiniteness issue. Mr. Tannas addressed each of Dr. Task's criticisms of the perceptibility requirement and provided sound reasons why they should be rejected. (PTX 834 at 155-61, ¶¶ 476-96.) In particular, Mr. Tannas opined that: "The requirement for 'perceptible' light within the red color band also does not make the claim indefinite. Such a determination can readily be made by one skilled in the art by examining the emission spectrum of a display as measured by a spectroradiometer, which is a measurement that is routinely made by display engineers, both now and at the time of the invention." (*Id.* at 155-56, ¶ 478.) Further, Mr. Tannas opined that "[i]n very close cases, there are well-established scientific methods for determining whether light within a particular wavelength band is perceptible," identifying the "well-established calculation known as CIELUV DeltaE*" as one method that was available to those of ordinary skill in the art in 1985. (*Id.* at 157, ¶ 483 & 159, ¶ 489.) Defendants never cross-examined Mr. Tannas with regard to this testimony, and Dr. Task had no response to Mr. Tannas' testimony during the Government's rebuttal case. Accordingly, it is reasonable to assume Dr. Task has no reason to disagree. *Exxon Research*, 265 F.3d at 1380 ("The government's expert admitted that the 'period sufficient' can be ascertained by conducting activity checks. Therefore, a person of ordinary skill in the art would understand the scope of that claim limitation, which is all that paragraph 2 of section 112 requires.")

Thus, even if the Government were not deemed estopped from challenging the very construction (and its application) it advanced in this case, Dr. Task's testimony falls woefully short of carrying Defendants' burden of proof -- particularly in the face of Mr. Tannas' unchallenged testimony to the contrary.

## VII. L-3 HAS NOT PROVEN ITS SECTION 112 DEFENSES

L-3 raises two section 112 defenses that have never been raised by the Government and are unsupported by any testimony from Dr. Task. Neither has any merit.

### A. There Is No Clear And Convincing Evidence That Claim 2 Is Invalid For Lack Of Enablement

L-3 has no evidence, much less clear and convincing evidence, supporting its belatedly asserted enablement defense. *Johns Hopkins University v. Cellpro, Inc.*, 152 F.3d 1342, 1359 (Fed. Cir. 1998) ("burden rested upon [defendant], who had to prove by clear and convincing evidence facts establishing a lack of enablement"). L-3's attorney argument is no substitute for expert testimony addressing whether the disclosure of the '269 application is sufficient to enable a person skilled in the art to make and use the claimed invention. *Id.* at 1360 ("it is imperative when attempting to prove lack of enablement to show that *one of ordinary skill in the art* would be unable to make the claimed invention without undue experimentation") (emphasis in original).

To the extent there is relevant expert testimony, it supports that the claimed invention is enabled. As L-3 acknowledges, Mr. Tannas' testified that "[o]ne skilled in the trade … could pick this [patent] up and do it," *i.e.*, make a display system and filtering system to split the red color band. (Tr. 1354; *see also id.* at 1353-54 ("Q: It doesn't tell you how to make the device that is the subject of the claims, does it? A: It tells you how to make it. It says split the red color band …").) Mr. Tannas' testimony is reinforced by Dr. Task's admission that "[i]t would be possible, using 1985 era technology, to build a display that would provide a 'red color band' as required by the '914 patent." (DE-202 at 23, ¶ 51.) Mr. Tannas' testimony regarding a "hint" or "little clue" or "little trick" has nothing to do with L-3's accusation of inadequate disclosure, which relates to how to make the invention using a single light source and wavelength selective

filters. (L-3 Br. at69.) Instead Mr. Tannas' testimony pertains to how to "split the red color band and divide it up between the night vision goggle and the viewer," as to which there is no dispute regarding enablement. (Tr. 1352.) L-3 identifies no expert testimony or other evidence supporting its newly contrived allegation of inadequate disclosure.

The fact that Mr. Cohen did not actually make a prototype using color filters does not make his disclosure of the invention non-enabling. The requirement for a working model of the invention was removed from the patent statute long ago. *See* Manual of Patent Examining Procedure ("MPEP"), § 608.03 at 600-126 (8th ed., Aug. 2006 revision) ("[w]ith the exception of cases involving perpetual motion, a model is not ordinarily required by the Office to demonstrate operability of the device").) The patent statute requires an adequate disclosure of the invention, but there is no requirement to actually make a prototype in order to obtain a valid patent. *See Falko-Gunter Falkner v. Inglis,* 448 F.3d 1357, 1366 (Fed. Cir. 2006) (fact that patentee had not actually produced the claimed vaccine was not dispositive "because an actual reduction to practice is not required for written description"), *cert. denied*, 1275 S. Ct. 1151 (2007); *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1307 (Fed. Cir. 2001) (rejecting defendant's argument that the patent is not enabled because the inventors failed to prepare coatings from each of the precursors suggested in the specification).

The focus of L-3's enablement defense is the erroneous assertion that "there is … no disclosure in the Original Application of how to create the system of Claim 2 using wavelength selective filters with a single source of light." (L-3 Br. at 71.) L-3's assertion is nothing but unsupported attorney argument. Dr. Task does not even agree with L-3 that claim 2 requires wavelength selective filters. (Task Tr. 726 ("[m]y reading of the claim construction for filters and Claim 2 indicates that those are filters but are not necessarily wavelength selected filters").)

Contrary to L-3's assertion, the '269 application *does* disclose how to create the system of claim 2 using wavelength selective filters with a single source of light. Original Figure 3 is just such a system. In that embodiment, a single local source of light includes CRTs 51, 52 and 53, and a color band is generated by a phosphor coating on each CRT for providing one primary color for the full color display. (PTX-501 at D000010 ("[e]ach CRT 51, 52, 53 provides … one primary color for the full color display"); *id.* at D000010-11 ("the narrow color band may be defined as the band at which most light is transmitted by a phosphor coating on the CRT"); PTX-501 at 162, PTX-920; *id.* at 167, ¶ 512 (in Figure 3 of the original application, "the local source of light includes three cathode ray tubes (CRTs), 51, 52, and 53, each of which provides one primary color (red, green or blue) of the full color display 37").) Indeed, originally-filed claims 1 and 4 of the '269 application are directed to just such a single local source of light. (DMX-36 at D000013 ("the local source of light includes a plurality of distinct monochromatic color generators," which may be "monochromatic cathode ray tubes of distinct colors").) Original Figure 3 teaches how to filter the single source of light using wavelength selective filters (filters 61, 62 and 63) by arranging the filters parallel to one another, rather than sequentially. (*See* Tannas Tr. 1258 ("Q: … If you had one light source, you couldn't put three filters over one light source unless they were sequential, right? A: Sure you could. … That's the way most liquid crystal displays are maintained, three filters over one light source.").)

L-3 argues in support of its enablement defense that LCD display technology is not explicitly disclosed in the original '269 application, but that argument is legally insufficient. Merely because the claims are broad enough to cover a display system that is implemented using an LCD does not mean that LCDs needed to be explicitly described in order to have an enabling disclosure. "Enablement does not require the inventor to foresee every means of implementing

an invention at pains of losing his patent franchise." *Invitrogen Corp. v. Clontech Laboratories.,* 429 F.3d 1052, 1071 (Fed. Cir. 2005) (rejecting defendant's argument that, because the specification does not enable point-mutated RT and the claims do not exclude it, the patent must be invalid for lack of enablement). Moreover, there is no requirement for the specification to enable someone to make the products that have been found to infringe. *Durel,* 256 F.3d at 1306 ("[t]he dispositive question of enablement does not turn on whether the accused product is enabled"). Rather, "[t]he enablement requirement is met if the description enables *any mode* of making and using the invention." *Invitrogen,* 429 F.3d at 1071 (quoting *Johns Hopkins,* 152 F.3d at 1361) (emphasis added)). Here, the enablement requirement is satisfied because original Figure 3 and the description of that embodiment in the '269 application would have enabled a person skilled in the art to make and use the claimed invention. L-3 has submitted no evidence to the contrary.[28]

[28] The four cases cited by L-3 are inapposite. In the first two cases, the conclusion of no enablement was based upon evidence of teaching away in the specification and unsuccessful attempts by the patentee to make a particular embodiment of the claimed invention. *Liebel-Flarsheim Co. v. Medrad, Inc.,* 481 F.3d 1371, 1378-79 (Fed. Cir. 2007) (affirming conclusion of no enablement based on fact that the specification taught away from pressure-jacketless system, and inventors' admission that they tried unsuccessfully to produce that embodiment); *AK Steel Corp. v. Sollac and Ugine,* 344 F.3d 1234, 1244 (Fed. Cir. 2003) (upholding finding of lack of enablement because "the specification clearly and strongly warns" that a particular embodiment would not work and evidence that patentee was unable to use that embodiment despite its desire to do so). In this case, on the other hand, there is no evidence of any unsuccessful attempts to implement the invention using LCD display technology or wavelength selective filters with a single source of light, and the '269 application does not teach away from such an embodiment. On the contrary, the originally-filed claims were directed to a single source of light with wavelength selective filters. (DMX-36 at DE000013.) In the second two cases, the specification of the patent-in-suit lacked any instructions to enable a person skilled in the art to carry out a particular method step *recited in the claim*. *National Recovery Technologies, Inc. v. Magnetic Separation Systems, Inc.,* 166 F.3d 1190, 1197 (Fed. Cir. 1999) ("[t]he written description does not at all purport to enable one of ordinary skill in that art to determine where irregularities exist in the containers"); *Genentech, Inc. v. Novo Nordisk, A/S,* 108 F.3d 1361, 1367 (Fed. Cir. 1997) (the "specification is so lacking with respect to the (continued...)

### B. There Is No Clear And Convincing Evidence That Mr. Cohen Believed LCD Display Technology Was The Best Mode

In a futile attempt to gin up a best mode defense, L-3 selectively quotes from the deposition of the inventor, Mr. Cohen, resulting in a misrepresentation of his testimony. (L-3 Br. at 72-73.) L-3 was not even at the deposition, and those that were (the Government and Lockheed Martin) declined to raise any argument that Mr. Cohen concealed the best mode. L-3's defense is baseless and contrived, and rests upon a misleading and incomplete presentation of the evidence.

Read in its entirety, Mr. Cohen's testimony fails to support the first prong of the best mode inquiry, which "is highly subjective and focuses on the inventor's state of mind as of the date of filing the application." *Bayer AG v. Schein Pharmaceuticals, Inc.*, 301 F.3d 1306, 1320 (Fed. Cir. 2002). In order to prove a best mode violation, L-3 would have to demonstrate that Mr. Cohen "considered a particular mode of practicing the invention to be *superior to all other modes* at the time of filing." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1330 (Fed. Cir. 2002) (emphasis added); *see also In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation*, 831 F. Supp. 1354, 1364 (N.D. Ill. 1993), ("[t]he first inquiry focuses on whether the inventor knew of a mode of practicing his invention at the time he filed his patent application which he considered to be better than any other") *aff'd*, 71 F.3d 1573 (Fed. Cir. 1995).

While Mr. Cohen considered LCD display technology to be within the scope of his invention, there is no evidence that he believed LCDs were "superior to all other modes" of

---

limitation of paragraph (b) of claim 1 that providing testimony regarding the skill in the art has been an exercise in futility"), *cert denied*, 522 U.S. 963 (1997). Here, in contrast, the claims are not directed to a method, and L-3 cannot identify any particular element of claim 2 that is not enabled by the specification.

practicing the invention at the time the patent application was filed. On the contrary, Mr. Cohen testified that "liquid crystal was in [his] mind, [b]ut it was *not at the foremost* of [his] mind because it … had not reached the preeminence it has now." (DE-54 (Cohen 9/22/04 Dep. Tr.) at 443.) Mr. Cohen testified that he was instead focused on CRTs because "the CRT was the preeminent technology at the time" and "that was the approach [he] spent most of [his] time on." (*Id.* at 442-43.)

Although L-3 quotes at length from Mr. Cohen's testimony, it omits those portions that negate any best mode defense. In particular, L-3 misleadingly crops out of its block quote Mr. Cohen's testimony that LCD technology "was *not at the foremost* of [his] mind." (*Id.* at 443 (emphasis added).) L-3 also misrepresents Mr. Cohen's testimony by asserting that he "admitted that an LCD was not disclosed." (L-3 Br. at 74.) What Mr. Cohen actually said is that "the original *drawing*" (*i.e.*, original Figure 3) did not show the possibility of using LCD technology. (DE-54 at 441, emphasis added.) But he testified that the *text* of the original specification was intended to be more generic as to the type of display technology that could be used to practice the invention. It could be CRT technology, or it could be liquid crystal. (DE-54 at 440 ("The original drawing was more specific than the text because the original drawing just showed like three CRT's, but it didn't have to be. It's anything that generates the particular colors[. You] could get the filtering at the pixel level or you can get the filtering after the pixel level[.] As long as the light coming out of that particular pixel gets modified by the filter.").) In addition, Mr. Cohen testified that the revised version of Figure 3 "more accurately reflects what we said in the text in the specification." (DE-54 at 441.) L-3 also omits that testimony from its block quotation.

Accordingly, because there is no clear and convincing evidence that Mr. Cohen considered LCD display technology to be superior to all other modes of practicing his invention in 1985, L-3 has failed to prove its best mode defense. *In re Mahurkar*, 831 F. Supp. at 1364 (crediting inventor's testimony that he considered the design shown in the patent drawings to be "the best way to form the catheter" and rejecting best mode defense).

**VIII. L-3 HAS NOT PROVEN INEQUITABLE CONDUCT**

There is no evidence supporting either of L-3's trumped up allegations of inequitable conduct, which the Government has declined to join. (*See* Tr. 83 ("there is a limited amount of resources and time available to [the Justice Department] when we're preparing a case … [w]e do have to pick and choose among available defenses …"); *id* at 313 ("The Court: "And I certainly wouldn't leap into that [inequitable conduct] area easily if the government hadn't decided that it was worth putting their resources, quite candidly").) *First*, L-3 has not proven any misrepresentation in connection with the addition of Mr. Scoughton as a co-inventor to the '269 application in September, 2001. The change in inventorship was correct at the time it was made, and L-3 has not proven otherwise. *Second*, L-3 has failed to demonstrate materiality, knowledge or intent to deceive with respect to the Hunt reference or the 1987 rejection over the Hunt reference in the '270 application. Contrary to L-3's baseless allegations, no material information was withheld or misrepresented during prosecution of the '760 application. (*See* Tr. at 312-13 (The Court: "the facts of this case don't strike me as … being inequitable").)

Tellingly, the only record evidence cited by L-3 is the prosecution histories.[29] The depositions of the inventors, Messrs. Cohen and Scoughton, are in the record, but L-3 was unable

---

29 L-3's brief contains a single cite to the Cohen deposition, as support for *Honeywell's* argument that Dr. Scoughton's only contribution to the '760 invention was the circular polarizers.

to find a shred of testimony from their depositions that substantiated its inequitable conduct allegations. In a failed effort to generate evidentiary support for its defense, L-3 took the depositions of Honeywell's patent expert, former USPTO Administrative Law Judge Michael Sofocleous, and two prosecuting attorneys, Stanley Protigal and Loria Yeadon. In fact, as the Court will recall, L-3 deposed Ms. Yeadon twice, the second time under Court supervision pursuant to a motion to compel. Despite having put the Court and Honeywell to the expense and inconvenience of this additional deposition, L-3 did not even offer the Protigal or Yeadon depositions in evidence, much less cite them in its brief. (*Compare* L-3 11/7/06 Pretrial Br. at 23 ("L-3 will put on evidence from … the deposition of Ms. Loria Yeadon … that would support a finding of inequitable conduct") *with* Tr. at 847 (defense rests without offering Ms. Yeadon's deposition testimony).) Instead, L-3 bases its inequitable conduct allegations solely on its own misinterpretations of the prosecution histories, unsupported by the testimony of any fact or expert witness. As a result, L-3 never identifies who, if anyone, allegedly engaged in inequitable conduct, nor provides any evidence of that person's intent.

### A. The Addition Of Dr. Scoughton As A Co-Inventor Was Correct When Made And There Is No Evidence Of Inequitable Conduct In Connection With The Correction Of Inventorship

There is no dispute that Dr. Scoughton made an inventive contribution with respect to polarizers. (*See* L-3 Br. at 79, citing DE-54 at 469 (Cohen deposition).) There is also no dispute that, at the time Dr. Scoughton was added as a co-inventor in the '269 application, the pending claim was amended to recite polarizers. (DMX-36 at D000464 (amending claim 1 to add element (d), "first and second polarizing filters …"); *see* L-3 Br. at 79 ("applicants responded on September 21, 2001 by …amending two polarizing filters into that claim").) Thus, the addition of Dr. Scoughton as a co-inventor on September 21, 2001 was correct and appropriate at the time because the pending claim included a reference to polarizers, to which Dr. Scoughton made an

inventive contribution. There was no misrepresentation in connection with the correction of inventorship on September 21, 2001, and L-3 identifies none.

L-3's assertions regarding the identification of inventors in *other* applications and at *other* points during the prosecution do not transform Honeywell's September 2001 submission into inequitable conduct. Even if L-3 identified other mistakes in identifying inventors, there is no evidence that these mistakes, if any, amount to inequitable conduct. Nor do such other mistakes, if any, lend support to L-3's assertion that Honeywell misrepresented the inventorship on September 21, 2001. The record is devoid of support for L-3's allegation of misconduct in connection with the September 2001 correction of inventorship.

**B. There Is No Proof Of Materiality, Knowledge, Or Intent With Respect To The Hunt Reference Or The Rejection In The Abandoned '270 Application**

L-3's allegation of inequitable conduct in connection with the Hunt patent and the rejection over the Hunt patent in the '270 application was made for the first time in its pre-trial brief. Contrary to the requirement of RCFC 9(b), L-3 never pleaded this new theory of inequitable conduct, and it should be rejected for that reason alone. *Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003) ("inequitable conduct, while a broader concept than fraud, must be pled with particularity," affirming "the district court's decision declining to address the alleged inequitable conduct issue because it was not properly raised"); *see also Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions P.C.*, 482 F.3d 1347, 1356-57 (Fed. Cir. 2007) (affirming dismissal of inequitable conduct defense as lacking "the requisite particularity"

because it "does not identify what relevant and undisclosed prior art was known to the patentee"), petition for *cert.* filed, 76 USLW 3066 (U.S. Aug. 14, 2007) (No. 07-192).[30]

L-3's new theory of inequitable conduct is wholly unsupported in any event. There is no evidence that the Hunt patent is material to patentability of the '914 patent. For example, L-3 submitted no expert testimony on the issue of materiality. Nor is there evidence that anyone substantively involved in prosecution of the '914 patent had any knowledge of the Hunt patent, its alleged materiality or the rejection over the Hunt patent in the abandoned '270 application. Moreover, even if materiality and knowledge could be shown, there is no evidence of any intent to mislead the USPTO. L-3's defense fails on every element of proof. *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326, 1342-43 (Fed. Cir. 2005) ("One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO").

The '270 application was prosecuted by Stanley Protigal, who left Honeywell's predecessor, Allied Signal, in 1988. The '270 application was abandoned and then placed under secrecy order in 1987, long before the secrecy order was lifted and prosecution resumed in the '269 application. (L-3E-106 at H04109 (Notice of Abandonment dated 9/16/1987); *id.* at H04113 (Secrecy Order dated 10/14/1987).) There is no evidence that Ms. Yeadon, or anyone else who was substantively involved in the prosecution of the '269 application in September,

30 Apparently recognizing that their new theory is far too late, L-3 relies upon it as merely "a "circumstance[ ]" from which the Court may infer Honeywell intended to deceive the Patent Office with respect to inventorship. (L-3 Br. at Section C.2.) This makes no sense because the new theory has nothing to do with inventorship.

2001 had any knowledge of the references cited in the abandoned '270 application or the rejections that were made by the Patent Office in that application. The Hunt reference is not included in L-3's Trial Exhibit L-3E-106 (Honeywell's internal file for '270 application), and the patent has not been offered or admitted in evidence. L-3 cannot possibly prove materiality without proffering a copy of the allegedly undisclosed prior art. Although it is too late for L-3 to introduce Ms. Yeadon's deposition testimony, it would not support their allegations in any event. Ms. Yeadon testified that she did not recall ever reviewing the '270 file history or learning about any prior art that might have been cited therein. (Yeadon 11/7/06 Dep. Tr. at 54-58, attached as Exhibit E hereto.) Without evidence of Ms. Yeadon's knowledge, there is no factual predicate from which to infer that she intended to deceive the USPTO by not mentioning the long-abandoned '270 application or the Hunt reference in her September 21, 2001 submission as L-3 alleges. *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1341 (Fed. Cir. 2006) (although intent may be inferred from the facts and circumstances, "[t]here still must be a factual basis … for a finding of intent").

L-3's inequitable conduct defense is nothing but empty attorney rhetoric, void of support in the record.

## IX. L-3 HAS NOT PROVEN THAT THE '914 PATENT IS UNENFORCEABLE DUE TO PROSECUTION LACHES

In pursuit of yet another defense in which the Government declined to join, L-3 argues that, because 17 years elapsed between Honeywell's filing of the '269 patent application and issuance of the '914 patent, the doctrine of prosecution laches applies to bar Honeywell's lawsuit under Section 1498. (L-3 Br. 85-88.)

As the Federal Circuit has warned, the doctrine "should be applied only in egregious cases of misuse of the statutory patent system." *Symbol Technologies, Inc. v. Lemelson Medical,*

*Education & Research Foundation, LP.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005), *amended on rehearing in part*, 429 F.3d 1051 (Fed. Cir. 2005). This is clearly not such a case. As L-3 admits, "the delay in issue resulted in large part because of the secrecy order." (L-3 Br. at 86.) Indeed, the Secrecy Order accounts for over 14 years of the 17 year period from filing to issuance. (DMX-36 at D000081 (initial Secrecy Order dated April 2, 1986); *id.* at D000150 (order rescinding Secrecy Order dated September 7, 2000).) A three-year prosecution is a far cry from the 18 to 39 year delay that was found "egregious" in *Lemelson* and is in line with the average pendency of patent applications at the USPTO. *Id.* at 1386. *See* http://www.uspto.gov/web/offices/com/annual/2005/060404_table4.html (2005 statistics show average pendency for patent applications ranges from 26 to 44 months, depending upon the technology). None of the cases cited by L-3 involved patents that were subject to a Secrecy Order. Contrary to L-3's suggestion, Honeywell could not have submitted new or amended claims prior to the lifting of the Secrecy Order because prosecution was deemed "closed." (DMX-36 at D000132 (Notice of Allowability dated 11/14/87).) Even if Honeywell had continued to prosecute the '269 application, there is no reason to believe that a patent would have issued any sooner. Prosecution laches simply does not apply here. (*See* Tr. at 81 ("The Court: I don't think this is a case of patent prosecution laches.").)

L-3's inflammatory allegations of bad-faith conduct, patenting over, obviousness and inadequate disclosure are baseless and have been fully addressed in other sections of this brief. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 n.2 (Fed. Cir. 2004) ("it is not improper for an applicant to broaden his claims during prosecution in order to encompass a competitor's products, as long as the disclosure supports the broadened claims"), *cert. denied*, 543 U.S. 925 (2004); *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1247 (Fed. Cir. 2002)

("[w]hile it is legitimate to amend claims or add claims to a patent application purposefully to encompass devices or processes of others, there must be support for such amendments or additions in the originally filed application"); *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) ("[N]or is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application. Any such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in the marketplace is simply irrelevant."), *cert. denied* 490 U.S. 1067 (1989). Indeed, L-3 ignores altogether the public interest in enforcing valid patents. *See, e.g., PPG Industries Inc. v. Guardian Industries, Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996) (affirming preliminary injunction enjoining sale of infringing products based in part on "strong public policy favoring the enforcement of patent rights").

## X. THE GOVERNMENT FAILED TO PROVE THAT IT HAS AN IMPLIED LICENSE UNDER THE '914 PATENT

"In a suit for patent infringement, the burden of proving the establishment of an implied license falls upon the defendant." *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 924 (Fed. Cir. 1984); *see also Dekalb Genetics Corp. v. Pioneer Hi-Bred International, Inc.* No. 96 C 50112, 2001 WL 92118 at *5 (N.D. Ill. Jan. 30, 2001) (defendant "bears the burden of proving, with clear and convincing evidence, that an implied license arose through legal estoppel or through [patentee's] conduct"). There are several theories under which an implied license could be found to arise: "by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel." *Wang Laboratorie., Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1580-82 (Fed. Cir.), *cert denied*, 522 U.S. 818 (1997). But "judicially implied licenses are *rare* under any doctrine." *Id.* at 1581 (emphasis added).

Here, the Government advances two legal theories, namely the first sale doctrine of *Univis Lens*[31] and what it refers to as the "corollary doctrine of legal estoppel." (Gov't Br. at 62.) Neither theory fits the facts of this case. The *Univis Lens* first sale doctrine is inapplicable because Honeywell had no rights under the '914 patent at the time it sold the CMFDs in question. The doctrine of legal estoppel is likewise inapplicable because there is no express license from which any rights under the '914 patent could be implied. Even if one of these or some other legal theory were applicable, the Government has failed to prove any course of conduct or other facts that would permit the Court to take the rare step of implying a license under the '914 patent, where none exists.

It is black letter law of the first sale doctrine that the sale of a patented product by someone other than the patentee or his licensee does not give rise to an implied license. *Boesch v. Graff*, 133 U.S. 697, 703 (1890) ("purchasers from [licensee in Germany] could not be thereby authorized to sell the articles in the United States in defiance of the rights or patentees under a United States patent"); *Sanofi, S.A. v. Med-Tec Veterinarian Products, Inc.*, No. Civ. A. 83-2198, 1983 WL 417 at *6 (D. Kan. Sept. 16, 1983) (defendant had no implied license to resell patented product purchased from patentee's subsidiary); *see also Dekalb*, 2001 WL 92118 at *9 ("since Monsanto was not the owner of the '956 patent at the time the license was granted … [plaintiff's] patent rights cannot be exhausted through any license between Monsanto and [defendant]"). No rights under the '914 patent can be implied from Honeywell's sale of CMFDs prior to December 1999 because Honeywell had no rights under the patent at that time.

> It is well settled that the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser the right of

---

31 *United States v. Univis Lens Co.*, 316 U.S. 241, 251-52 (1942) (holding that Univis' patent licensing arrangement violated the Sherman Act).

> unrestricted ownership as against the vendor. *But the purchaser does not acquire any right greater than those possessed by the owner of the patent.*

*Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc.*, 565 F. Supp. 931, 939 (D.N.J. 1983) (emphasis in original) (quoting *Featherstone v. Ormonde Cycle Co.*, 53 F. 110, 111 (C.C.N.Y. 1892)); *accord* John Gladstone Mills III, Donald C. Reiley III, and Robert C. Highley, 1 *Pat. L. Fundamentals* § 1:19 (2d ed. 2007) (copy attached as Exhibit F). In this case, by purchasing the CMFDs from Honeywell (through Lockheed Martin), the Government could not acquire any right greater than that possessed by Honeywell (or Lockheed Martin). It is undisputed that, prior to December 1999, Honeywell had *no rights* under the '914 patent. The patent had not even issued yet and was still under Secrecy Order. But more importantly, the pending '269 application was owned by Honeywell's competitor, AlliedSignal. (PTX 401 (chain of title for '914 patent); Yeadon 8/1/05 Tr. 98-99 (Allied Signal Technologies Inc. (ASTI) owned '269 application from 1995 until December 1999 acquisition of Honeywell Inc.).) Because Honeywell had no rights under the '914 patent, it could not grant a license, either express or implied, to anyone. *Sanofi*, 1983 WL 417 at *6 ("Sempa-Chimie, as subsidiary of Sanofi, was not the holder of the patent rights and therefore could not grant a license to anyone").

The Government's second theory, which it calls the "corollary doctrine of legal estoppel," likewise fails under the facts and evidence (or lack thereof) in this case. In contrast to equitable estoppel (which the Government does not contend applies in this case), "[l]egal estoppel refers to a narrower category of conduct encompassing scenarios where a patentee has *licensed or assigned a right*, received consideration, and then sought to derogate from the right granted." *Wang*, 103 F.3d at 1581 (emphasis added). "Legal estoppel 'is merely shorthand for saying that a grantor of a property right or interest cannot derogate from the right granted by his own subsequent acts.'" *Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert &*

*Salzer Maschinenfabrik AG*, 829 F.2d 1075, 1080 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 1063 (1988) (quoting *AMP v. United States*, 389 F.2d 448, 453 (Ct. Cl. 1968), *cert denied*, 484 U.S. 1063 (1968)).

In this case, the patentee – Honeywell – has not licensed or assigned any right, nor sought to derogate from any right granted. Honeywell cannot be legally estopped from enforcing its patent because Honeywell never granted any rights to the Government from which any estoppel could arise. Indeed, the Government identifies no express agreement (*i.e.*, license or assignment) that could give rise to an implied license by legal estoppel under the '914 patent. In contrast to the *AMP* case relied upon by the Government, there is no express license or other agreement between Honeywell and the Government. In applying the doctrine of legal estoppel in *AMP*, it was "necessary to define the property right granted to defendant by plaintiff, and also to show how plaintiff is attempting to derogate or detract from that right." *AMP*, 389 F.2d at 453. Here, on the other hand, it is impossible to define any property rights granted by Honeywell to the Government because there is no express agreement between the parties.

Aside from the absence of any express agreement, there are other factual distinctions that make *AMP* inapplicable. *First*, of "crucial importance" to the result in that case was the fact that the parties' agreement "license[d] the Government *to use an idea* and not just the Byrem Patent itself." *AMP*, 389 F.2d at 454 (emphasis added). Here, in contrast, Honeywell has not licensed the Government to use any idea. At best, the Government wrongly asserts that it has a license limited to the CMFDs; the Government makes no argument, nor could it, that it has any broader license to use any idea or invention belonging to Honeywell.

*Second*, in contrast to *AMP*, Honeywell is not seeking to derogate from any right granted by asserting an after-acquired patent against the Government. After it sold the CMFDs in

question, Honeywell, Inc. was acquired by AlliedSignal Inc., and the combined company took the name Honeywell International. (Yeadon 8/1/05 Tr. 79 ("Allied Signal acquired Honeywell, Inc. and took the name Honeywell International. And that transaction occurred in December 1999.").) It is undisputed that Honeywell Inc., the seller of the CMFDs, never acquired any rights in the '914 patent. In this respect, the facts of this case are closer to *Spindelfabrik* than to *AMP*. In *Spindelfabrik*, the Court rejected defendant's legal estoppel defense because, even if the license agreement entered into by defendant could be construed as granting rights under the licensor's after-acquired patents, no license could be implied under patents owned by the plaintiff. *Spindelfabrik*, 829 F.2d at 1082 ("[t]he right [defendant] paid for in the 1982 agreement was freedom from suit by [licensor], not [plaintiff]"). Similarly, in this case, even if Honeywell, Inc.'s sale of CMFDs carried with it an implied license not to sue the Government under Honeywell Inc.'s patents (even after-acquired patents), it did *not* include any license under patents owned by third parties, such as AlliedSignal. *Dekalb*, 2001 WL 92118 at *9 ("*Amp* is distinguishable from the present case because Monsanto was not the patentee at the time the licence [*sic*, license] was granted to [defendant]").

The Government concludes its discussion by asserting that "[p]ost merger Honeywell is therefore subject to the same implied license that legacy Honeywell granted the Government pursuant to the sale of the CMFD…." (Gov't Br. at 63.) This is the same "stepping into the shoes" argument that was rejected in *Spindelfabrik*. Specifically, even if it were assumed that legal estoppel would prevent Honeywell Inc. from suing under the '914 patent if Honeywell Inc. were to acquire it, and further assuming that AlliedSignal assumed that promise not to sue when it acquired Honeywell Inc., that commitment does not include a promise by AlliedSignal (or Honeywell International) not to sue under AlliedSignal's own '914 patent. *Spindelfabrik*, 829

F.2d at 1081 ("even assuming *arguendo*, that such estoppel against Murata exists, the final two prongs of [defendant's] 'stepping in the shoes' argument would fail;" a commitment not to sue under Murata's patents "does not include a promise not to sue under [plaintiff's] own '946 patent").

Moreover, the Government's assertion defeats, rather than proves, an implied license defense. Under a first sale theory, there was no license implied under the '914 patent when Honeywell Inc. sold the CMFDs because Honeywell Inc. had no such rights to grant. Under a legal estoppel theory, Honeywell Inc. granted no license to the Government "pursuant to the sale of the CMFD" as there was no express agreement from which other rights may be implied as a matter of law. Simply stated, none of the rights granted at the time of the sale are being derogated, because legacy Honeywell had no such rights.

Even if the doctrine of legal estoppel were deemed applicable to the circumstances of this case, the Government has a complete failure of evidence with regard to the required elements for establishing any such estoppel in this case. Proof of legal estoppel would require proof by the Government that Honeywell Inc. knew about the '914 patent at the time it sold the CMFDs. *Lever Brothers, Co. v. Proctor & Gamble Co.,* 668 F. Supp. 924, 940 (D.N.J. 1987) ("[a] related element of the implied license defense … is that the patent owner who has granted certain rights and from whom correlative implied rights are later sought, must be shown to have *known* that the implied rights were necessary to enable the licensee to enjoy the granted rights") (emphasis added). Here, the Government has not demonstrated that Honeywell Inc. knew, at the time it sold the CMFDs, that a license under the '914 patent would be needed by the Government in order to use the CMFDs for their intended purpose. *Id.* ("[defendants] have not demonstrated that [plaintiff] knew, at the time it licensed the Gaiser and McQueary patents to [defendant], the

Morton patents would be needed by [defendant] in order to produce a fabric softening product"). Accordingly, the absence of proof of Honeywell Inc.'s knowledge of the '914 patent provides another reason to reject the Government's implied license defense under a legal estoppel theory.

Further, "[a] mere sale does not import a license except where the circumstances plainly indicate that the grant of a license should be inferred." *Bandag*, 750 F.2d at 925 (rejecting implied license defense because defendant failed to demonstrate that he engaged in infringing conduct in reliance on the conduct of plaintiff). The circumstances of this case do not "plainly indicate" that the grant of a license under the '914 patent should be inferred. As in *Spindelfabrik*, the Government points to nothing in AlliedSignal's acquisition of Honeywell, Inc. that addresses the '914 patent or other AlliedSignal patent rights. There is no evidence tending to show any understanding on the part of either party to the transaction that either Honeywell International or HIPI was to forego enforcing rights under the '914 patent or any other patent then owned by AlliedSignal. *See Spindelfabrik*, 829 F.2d at 1081. "[A]n implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party." *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559 (Fed. Cir. 1983) (rejecting implied license defense). The Government has failed to identify any conduct of any *owner* of the '914 patent that could give rise to an implied license. *Id.* ("the conduct of [plaintiff] must be considered in determining whether [defendant] could *properly* infer that it had consent from the *owner(s)* to make or use the infringing [products]") (emphasis in original); *see also Lever Brothers*, 668 F. Supp. at 940 (D.N.J. 1987) ("[t]he party seeking invocation of the implied license doctrine must demonstrate 'any language used by *the owner of the patent* or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent'") (emphasis added).

Here, the Government relies solely on the sale of the CMFDs by Honeywell, Inc. But as in *Stickle*, the conduct relied upon is not the conduct of an *owner* of the '914 patent. Accordingly, there can be no estoppel or implied license. The Government put on no evidence in support of its affirmative defense, and thus there is a failure of evidence with regard to requisite elements for sustaining an implied license defense with respect to the CMFDs.

## XI. CONCLUSION

For all of the forgoing reasons, the Court should reject Defendants' affirmative defenses and enter judgment of liability for Honeywell under 28 U.S.C. § 1498 and the Secrecy Act, 35 U.S.C. § 183.

Dated: October 12, 2007

Respectfully submitted,

/s/ Lawrence J. Gotts

Lawrence J. Gotts
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
(202) 551.1700
(202) 551.1705 (fax)

Attorneys for Plaintiffs
*Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

OF COUNSEL:

Mark Koehn
Elizabeth Miller Roesel
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, NW
Washington, DC 20005
(202) 551.1700
(202) 551.1705 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of PLAINTIFFS' POST-TRIAL OPPOSITION BRIEF REGARDING DEFENSES was filed electronically and served via First Class Mail, postage prepaid, on October 12, 2007, on:

John H. Horne, Esq.
Powell Goldstein LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, N.W.
Atlanta, GA 30309-3488
Tel: (404) 572-6600
Fax: (404) 572-6999
Email: jhorne@pogolaw.com

John W. Harbin, Esq.
King & Spalding
1180 Peachtree Street, NE
Atlanta, GA 30309
Tel: (404) 572-4600
Fax: (404) 572-5100
Email: jharbin@kslaw.com

Counsel for L-3 Communications Corporation

John Fargo, Esq.
Christopher L. Crumbley, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 307-0458
Fax: (202) 307-0345
Email: john.fargo@usdoj.gov
Christopher.crumbley@usdoj.gov

Counsel for United States

Thomas J. Madden, Esq.
Paul A. Debolt, Esq.
Venable LLP
Terrell Place
575 – 7th Street, N.W.
Washington, D.C. 20004-1601
Tel: (202) 344-4000
Fax: (202) 344-8300
Email: tjmadden@venable.com
padebolt@venable.com

Counsel for Lockheed Martin Corporation

/s/ Sandra Kostelecky

LEGAL_US_E # 76782009.1

# EXHIBIT A

AGARD-CP-379

NORTH ATLANTIC TREATY ORGANIZATION

ADVISORY GROUP FOR AEROSPACE RESEARCH AND DEVELOPMENT

(ORGANISATION DU TRAITE DE L'ATLANTIQUE NORD)

AGARD Conference Proceedings No.379

# VISUAL PROTECTION AND ENHANCEMENT

Papers presented at the Aerospace Medical Panel Symposium held in Athens, Greece, 22—24 April 1985.

CONTENTS


| | Page |
|---|---|
| PANEL AND MEETING OFFICIALS | iii |
| OPENING ADDRESS<br>by D.Apostolakis | vii |
| TECHNICAL EVALUATION REPORT<br>by D.H.Brennan | ix |
| | Reference |
| IMAGE INTENSIFIERS: PAST AND PRESENT<br>by R.W.Verona | 1 |
| FLIR, NVG AND HMS/D SYSTEMS FOR HELICOPTER OPERATION: A REVIEW<br>by H.-D.V.Böhm | 2 |
| OPERATIONAL EXPERIENCES WITH NIGHT VISION GOGGLES IN HELICOPTER LOW-LEVEL FLIGHT AT NIGHT<br>by H.Haidn | 3 |
| EVALUATION OF HELICOPTER HELMET-MOUNTED DISPLAY MOCK-UP<br>EVALUATION D'UNE MAQUETTE DE VISUEL POUR HELICOPTERE<br>by G.Santucci and C.Valot | 4 |
| DISCUSSION: PAPERS 1—4 | D1 |
| VISUAL AND SPECTRORADIOMETRIC PERFORMANCE CRITERIA FOR NIGHT VISION GOGGLES (NVG) COMPATIBLE AIRCRAFT INTERIOR LIGHTING<br>by W.A.Breitmaier and F.Reetz III | 5 |
| NIGHT VISION SUPPORT DEVICES: HUMAN ENGINEERING INTEGRATION<br>by L.V.Genco | 6 |
| MICRO-HEADS-UP DISPLAY FOR ENHANCEMENT OF NIGHT VISION GOGGLE OPERATIONS<br>by R.Simmons, K.Kimball and B.Hamilton | 7 |
| AEROMEDICAL LESSONS LEARNED WITH NIGHT VISION DEVICES<br>by D.R.Price and W.E.McLean | 8 |
| DISCUSSION: PAPERS 5—8 | D2 |
| THE INTEGRATION OF NIGHT VISION GOGGLES WITH UNITED KINGDOM AIRCREW PROTECTIVE HELMETS*<br>by A.J.F.MacMillan | 9 |
| NIGHT VISION BY NVG WITH FLIR<br>by G.C.Bull | 10 |
| PARTICULAR PROBLEMS OF AIRWORTHINESS FROM AN OPHTHALMOLOGICAL VIEW<br>by J.Draeger, K.Hanke and H.Wirt | 11 |
| DISCUSSION: PAPER 11 | D3 |
| Paper 12 withdrawn | |
| COMPUTER VISUAL SIMULATION OF CONTRAST SENSITIVITY DEFICITS INDUCED BY LASER AND CHEMICAL ANTIDOTE EXPOSURE<br>by H.Zwick, D.Monroe and L.Sherman | 13 |
| NEW GLASSES FOR PRESBYOPIC PILOTS<br>by J.Draeger, H.Wirt and K.Hanke | 14 |


*Issued in Classified Publication CP-379 (Supplement)

MMENDATIONS

he technologies of visual protection and enhancement are constantly changing there is a need for ymposia on these topics. The mix of disciplines including engineering, visual science, logy, psychology and military aviation should continue.



# IMAGE INTENSIFIERS: PAST AND PRESENT

MAJ(P) Robert W. Verona, Ph.D.
Research and Development Coordinator
Night Vision and Electro-optics Laboratory
United States Army Electronics Research and Development Command
Fort Belvoir, Virginia 22060-5606

Summary

The evolution of the image intensifier is presented from the first through the third generation. Technological advancements during the past two decades, such as the microchannel plate (MCP) and the gallium arsenide photocathodes, have significantly improved the image intensifier's projected life time and performance capabilities. Improved manufacturing techniques have contributed to the intensifier's extended life and expanded performance capabilities. This continued progress attests that the image intensifier continues to be a viable sensory extension helping man achieve his goal, the conquest of darkness!

## Introduction

An image intensifier is an electronic viewing device that amplifies dim ambient light reflected from objects and presents this amplified image on a fluorescent screen. An image intensifier thus provides a means of multiplying the available reflected light so it can be seen by the eye.

This paper presents the evolution of the image intensifiers from the first generation, through the second generation, to the current third generation. The theory of operation, capabilities and limitations, and performance comparisons are presented for all three generations.

## Background

Some of the first night vision enhancement devices were search lights. They were simple and effective, but were cumbersome and required large amounts of energy to operate. Their biggest problem, however, was their conspicuity! Friend and foe were able to take advantage of the light. A covert night vision enhancement device was needed that could be used only by specially equipped individuals. Near-infrared viewers and near-infrared search light filters were the answers.

The high-power search lights were modified with infrared filters which blocked visible light and passed only near-infrared (700 to 1,200 nm) energy. A simple image converter tube was used to view the illuminated scene. This approach had its draw-backs as near-infrared viewers became commonplace and useable by friend and foe. A passive viewing device was needed that did not emit detectable radiation, but simply used available light. The image intensifier was the answer.

Image intensifiers are completely passive, that is, they are not detectable by the enemy. The first generation of military image intensifiers were introduced to the field in 1965. There are currently three generations of image intensifiers used by the US military, each generation representing a tremendous technological advancement. (See Figure 1.)



FIGURE 1. Photograph of first, second and third generation intensifier tubes without power supplies and potting. Only one stage of the first generation tube is shown.

## First Generation Image Intensifiers

There are two major configurations of first generation image intensifier tubes: three stage tubes and demagnification tubes. The three-stage configuration is formed by

fiber-optic coupling three single-stage unity-magnification tubes to achieve the desired amplification. The demagnification configuration tubes concentrate the electron image from the photocathode to a 300% smaller phosphor screen to achieve the desired amplification.

The scene being viewed through the image intensifier device is focused on a photosensitive material, the photocathode, as shown in Figure 2. The photocathode surface emits electrons proportional to the amount of light striking it from each point in the scene. The emitted electrons are accelerated from the photocathode toward a phosphor screen by an electric field. The light emerging from the phosphor screen is proportional to the number and velocity of the electrons striking it at each point. The observer views the amplified scene image appearing on the phosphor screen through an eyepiece.



FIGURE 2. Diagrams of first generation imageintensifier tube. Diagram (a) shows a single-stage tube and diagram (b) shows a three-stage tube.

The amount of amplification, or gain, of an image intensifier is expressed as the ratio of light-in to light-out. Three-stage tubes typically have a gain of about 40,000 and demagnification tubes typically have a gain of about 2,000. Resolution limit for the first generation tubes is about 30 to 35 line-pairs/mm. First generation tubes use S-20 photocathodes. These multialkali photocathodes have an average luminous efficiency of approximately 350 microamps/lumen. The S-20 photocathode is sensitive from 400 to 850 nm, with a broad peak from 500 to 800 nm. Since the sensitivity of the photocathode extends into the near infrared, they are able to detect near-infrared sources while remaining undetectable.

The first generation intensifiers are very susceptible to blooming from bright light sources. If a bright light source appears in the device's field-of-view, the overall contrast of the intensified image is greatly reduced. If the light source is sufficiently bright, the protection circuitry in the intensifier power supply momentarily shuts down the intensifier. The peak full area luminance displayed on the phosphor screen is normally on the order of 5 to 10 footlamberts.

First generation image intensifiers are very robust and have a very long life, well into the ten-thousand hour range. Gradually the sensitivity of the photocathode diminishes and the phosphor screen shows the blackened burn marks from staring at bright point light sources. The weakest parts of the first generation systems are the battery and the oscillator module that converts the battery energy to an alternating current source for the inteaifier's power supply.

## Second Generation Image Intensifiers

Many of the first generation intensifier limitations were overcome by the second generation intensifier tube technology. The second generation image intensifier tubes are significantly smaller and lighter than the first generation. One version of the second generation tube is so small that two intensifiers may be used in a binocular head mounted system, the Night Vision Goggles. This miniaturization is achieved by the use of a microchannel plate (MCP). The MCP is used in conjunction with the photocathode to produce the required light amplification.

Light from the scene being viewed is focused on the photocathode, the same way it was in the first generation intensifier (see Figure 3). The photocathode material is also the same, an S-20 multialkali. But now, the electrons emitted from the photocathode impinge on a microchannel plate (MCP).

The MCP, shown in Figure 4, is a thin 1 mm wafer of tiny glass tubes which channel the electrons from the photocathode to the phosphor screen. As the electrons pass through the millions of glass tubes, they strike the emissive material coating the channel walls and cause the emission of secondary electrons. The tiny channels are tilted about 8 degrees so the electrons are sure to strike the walls many times on their way to the phosphor screen. Thousands of electrons exit the MCP for each electron that enters from the photocathode. The emerging electrons maintain their relative spatial position



and strike the display screen phosphor. The photocathode, MCP, and phosphor screen are in "proximity focus," that is, located very close to each other, so that the electrons do not diverge and blur the image. The phosphor screen is usually deposited on a fiber optic inverter. This inverter twists the image 180 degrees so that the scene appears erect when viewed through the eyepiece.



FIGURE 3. Diagrams of second generation 18 mm goggle and inverter image intensifier tubes.



FIGURE 4. Diagram of microchannel plate (MCP) used in second and third generation image intensifier tubes.

The mass production of the MCP was the technological advancement that made the second generation possible. The MCP minimizes the contrast reduction imposed by bright light sources in the image intensifier's field-of-view. Individual channels can saturate without causing the entire device to saturate as in the first generation systems. However, local area contrast degradation still results from the localized saturation. A bright light source produces high electron densities at the MCP and phosphor screen. The high electron densities sometimes form a halo around the image of the bright light source. This halo degrades the contrast of adjacent portions of the intensified image.

An automatic brightness control (ABC) helps to protect the observer from bright flashes. The ABC does not control the number of electrons released from the photocathode; the ABC controls the MCP voltage to hold the output tube luminance to a specified level. The ABC keeps the peak display luminance between 0.2 and 0.3 footlamberts for a full range of input energy.

A bright source protection (BSP) circuit may also be incorporated in the power supply. The BSP protects the tube by limiting the number of electrons leaving the photocathode. The BPS greatly reduces the voltage between the photocathode and the input side of the MCP when the input light levels cause excessive photocathode current to flow.

The gain of the second generation tubes averages about 20,000 to 30,000--somewhat less than the first generation tubes. The second generation intensifiers require less power than their predecessors which means smaller, longer-lasting batteries. The first generation intensifier batteries are 6.75 volts and the second generation intensifier batteries are 2.7 volts.

The end of life for second generation tubes is primarily caused by ion bombardment of the photocathode. The photocathode becomes contaminated by ions given off by the MCP as it is struck by electrons from the photocathode. These ions splashing back on the photocathode cause a gradual loss of luminous efficiency. The higher the light level at the imaged scene, the more ions generated, and the shorter the life expectancy of the second generation tube. Another factor that contributes to the death of the tube is a gradual drop in secondary emission through the MCP. Generally, second generation tubes operate for 2,000 to 4,000 hours at 1/4 moonlight illumination.

## Third Generation Image Intensifiers

The third generation image intensifier tubes perform much better than the first or second generation tubes under starlight illumination levels. The third generation tubes are as small as the second generation tubes, yet live as long as the first generation tubes, greater than 10,000 hours.

The third generation intensifiers, shown in Figure 5, schematically look like the second generation intensifiers. Light from the scene being viewed is focused on the photocathode. The third generation tubes, however, use a gallium arsenide photocathode bonded to a glass faceplate. The gallium arsenide photocathode surpasses the photosensitivity of the S-20 multialkali photocathodes beyond 550 nm. The sensitivity of the third generation photocathode is more than 1,000 microamps/lumen compared to the 350 microamps/lumen average of the first and second generation photocathodes.



FIGURE 5. Diagram of third generation image intensifier tube.

The electrons emitted from the photocathode impinge on the MCP as they did in the second generation tubes, but now, they must pass through a metal oxide film applied to the MCP. This metal oxide film is transparent to the electrons, but not to the ions that could cause photocathode death. The metal oxide film traps the ions and prevents them from contaminating the photocathode. There are, however, some repercussions resulting from the presence of the oxide film.

The metal oxide ion barrier deposited on the photocathode side of the MCP requires the bias voltage between the photocathode and MCP to be increased from 200 to 800 VDC. This increased bias voltage requires the photocathode-to-MCP spacing to be increased to prevent arcing. The increased bias voltage raises the electric field strength which helps to maintain the focus of the electron image from the photocathode to the MCP. This gives the third generation tubes a typical resolution capability of 36 line-pairs/mm instead of 28 line-pairs/mm with the second generation tubes. The full area display luminance is also higher with the third generation devices with a range of 0.7 to 1.2 FL.

It is important to remember that there are no inherent qualities of the third generation that would lead to improved resolution. The first and second generation tubes could have the same resolution. Manufacturing and methods improvements make the difference, not the inherent operating physics.

Depositing metal oxide on the second generation's MCP would also improve life, but it would cause a 30% decrease in the signal-to-noise ratio. This decrease in the signal-to-noise ratio is unaffordable in the second generation technology but affordable in the third generation technology. One minor draw-back of the increased photocathode to MCP spacing is an increase in halo size from bright light sources when compared to second generation performance.

The third generation intensifiers with their gallium arsenide photocathodes are more usable during lower light levels than the first and second generation intensifiers. The gallium arsenide extends the tubes' spectral sensitivity range to 950 nm (see Figure 6), a region where near-infrared radiation from the stars is plentiful. The photon rate is five to seven times greater in the region of 800 to 900 nm, where the third generation photocathode sensitivity peaks, than in the visible region in the neighborhood of 500 to 600 nm. The increased luminous efficiency of gallium arsenide is also much greater than the S-25 photocathode, thus providing another three fold increase.

There are two configurations of the third generation tube currently in production. One configuration has a fiber optic inverter and a miniaturized power supply. This tube is used in the Aviator's Night Vision Imaging System (ANVIS). The objective lenses in this system are coated with a dielectric film (called a minus blue filter) that rejects wavelengths less than 600 nm, so the ANVIS is compatible with the blue-green crewstation lighting. The other third generation tube configuration has no fiber optic inverter and is used in the AN/PVS-7, One Tube Night Vision Goggles, and Cat Eyes.



The luminance output of the first, second, and third generation devices is determined by the amount of current the power supply will provide. The total current drawn by the display is limited; the light generated by this current can be concentrated in one spot or distributed over the entire screen. The values provided in this paper are for full screen illumination; half the screen would be twice as bright. Small areas can be much brighter than the full-display luminance quoted in the tube specifications.



FIGURE 6. Comparison of sensitivities between second and third generation image intensifier tubes. Also shown is night sky irradiance.

## Future Developments

Will there be a fourth generation? Probably not, is the answer image intensifier developers profess. There are, however, several improvements they would like to make on the third generation intensifiers. The third generation demagnification tube may be a low-cost, efficient image intensifier. For some applications, small size may not be a controlling factor, so the elimination of the expensive MCP and the enlargement of the photocathode may prove to be an alternative to present designs. Developers are also improving the photocathode manufacturing techniques and expect to make photocathodes with a luminous efficiency approaching 2,000 microamps/lumen in the near future.

# EXHIBIT B

**McQUAIDE BLASKO** ATTORNEYS AT LAW

811 University Drive, State College, Pennsylvania 16801-6699
Additional offices in Hershey and Hollidaysburg

(814) 238-4926 FAX (814) 234-5620
www.mqblaw.com

October 17, 2006

**Via U.S. Mail**

Trevor M. Jefferson
United States Department of Justice
Civil Division
Commercial Litigation Branch IP Staff
1100 L ST NW, Room 11112
Washington, DC 20005

**In Re: *Honeywell v United States* - Reetz Masters Thesis**

Dear Mr. Jefferson:

As you requested, enclosed please find: (1) copies of the cover, spine and title page for both copies of the above-referenced masters thesis, (2) a CD containing PDF images of the covers, spines, and title pages, and (3) an affidavit signed by a retired Pennsylvania State University employee who is familiar with the indexing and shelving procedures used by the University in 1983.

If you have any further questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

McQUAIDE BLASKO

By: Matthew T. Rogers
Matthew T. Rogers

Enclosures
cc: Ann M. Snowman (w/out enclosures)
Gary C. Schultz (w/out enclosures)
Wendell V. Courtney, Esq. (w/out enclosures)

McQUAIDE, BLASKO, FLEMING & FAULKNER, INC.

State College Office: John W. Blasko R. Mark Faulkner David M. Weixel Steven S. Hurvitz James M. Horne Wendell V. Courtney Darryl R. Slimak Mark Righter Daniel E. Bright Paul J. Tomczuk Janine C. Gismondi John A. Snyder April C. Simpson Allen P. Neely Pamela A. Ruest Katherine V. Oliver Katherine M. Allen Wayne L. Mowery, Jr. Chena L. Glenn-Hart Livinia N. Jones Cristin R. Long Matthew T. Rogers Frederick R. Battaglia Anthony A. Simon Dominick J. Muracco

Hershey Office: Grant H. Fleming Maureen A. Gallagher Michael J. Mohr Jonathan B. Stepanian

Hollidaysburg Office: Thomas M. Reese J. Benjamin Yeager Sean M. Burke Michael P. Routch

John G. Love (1893-1966) Roy Wilkinson, Jr. (1915-1995) Delbert J. McQuaide (1936-1997)

PENNSTATE

1855

University Libraries

The Pennsylvania State University
University Park, PA 16802

To: Trevor M. Jefferson
U.S. Dept. of Justice
Civil Division
Commercial Litigation Branch IP Staff
1100 L St. NW, Room 11112
Washington, DC 20005

From: Ann Snowman
Head, Access Services
University Libraries
The Pennsylvania State University
208-B Paterno Library
University Park, PA 16802-1812

Re: Reetz Thesis

Mr. Jefferson:

Per your request, enclosed is a CD containing PDF images of the covers, spines, title pages of both copies of Ferdinand Reetz' 1983 master's thesis; bound in AACO oaktag and clasp binders, available from Pennsylvania State University Libraries.

Also included are prints of the PDF images.

Regards,

Ann Snowman

Ann Snowman
Head, Access Services
University Libraries
The Pennsylvania State University
208-B Paterno Library
University Park, PA 16802-1812
E-mail: ams32@psulias.psu.edu
Phone: (814) 863-1362

Encl: 3

An Equal Opportunity University

REETZ, FERDINAND III

# Shared-Aperture Filter Technique for Use with AN/PVS-5A Night Vision Goggles

by
Ferdinand Reetz III

ENGS 1983

The Pennsylvania State University
The Graduate School
King of Prussia Center for Graduate Studies

# Shared-Aperture Filter Technique for Use with AN/PVS-5A Night Vision Goggles

By
Ferdinand Reetz III

Submitted in Partial Fulfillment
of the Requirements
for the Degree of

Master of Engineering/Engineering Science
December 1983

COPYRIGHT © BY FERDINAND REETZ III

I grant the Pennsylvania State University the nonexclusive right to use this work for the University's own purposes and to make single copies of the work available to the public on a not-for-profit basis if copies are not otherwise available.

FERDINAND REETZ III

Approved:

June 29, 1983 — Jack Stern

Date — Advisor

July 5, 1983 — H. E. Weber

Date — Assistant Dean, Graduate School

ABSTRACT

This paper describes the work that has been performed in order to develop a "shared-aperture" filter technique for use with AN/PVS-5A Night Vision Goggles (NVG).

When the AN/PVS-5A are equipped with shared-aperture filters and when they are used with appropriate cockpit lighting, the wearer is able to look outside the cockpit (to view terrain) and inside the cockpit (to view the instrument panel) without refocusing the NVG.

The tests successfully demonstrated the use of the shared-aperture filter technique for use with the AN/PVS-5A NVG. In addition, a recommended procedure for modification of the CH-46E and UH-1N helicopter cockpit lighting systems (to make them compatible with the shared-aperture filter technique) is given.

DATE DUE

| | | | |
|---|---|---|---|
| NOV 7, 1995<br>ILL [illegible]<br>8-2-89 | | | |
| GAYLORD | | | PRINTED IN U.S.A. |

ENG,EYE [illegible]
REETZ, FERDINAND
SHAPED-APERTURE FILTER TECHNIQUE FOR
USE WITH AN/PVS-5A NIGHT VISION GOGGLES.

ENG,EYE [illegible]
REETZ, FERDINAND
SHAPED-APERTURE FILTER TECHNIQUE FOR
USE WITH AN/PVS-5A NIGHT VISION GOGGLES.

| DATE DUE | BORROWER'S NAME |
|---|---|
| NOV 7 19[illegible] | [redacted] |
| 8-22-89 | [redacted] |
| 9-5-89 | [redacted] |
| 10-6-89 | [redacted] |

A00002614960

# AFFIDAVIT OF DELORES WIANT

The undersigned, Delores Wiant, having been duly sworn and authorized according to law, hereby states that she is authorized to make this Affidavit and that the following is true and correct to the best of her knowledge, information and belief.

1. In 1983, I was employed as a library assistant for The Pennsylvania State University ("University") at the King of Prussia Graduate Center, now known as the Penn State Great Valley School of Graduate Professional Studies.

2. I am familiar with the typical practices used by the University in 1983 to index and shelve master's degree theses in the University's library at the King of Prussia Graduate Center.

3. After a King of Prussia Graduate Center graduate student's master's degree thesis was approved by the student's adviser(s), the thesis was submitted to the University's library at the King of Prussia Graduate Center as well as the University's main library system, and was thereafter indexed and shelved according to the University's typical practices in 1983.

4. After a master's degree thesis was indexed and shelved according to the University's typical practices in 1983, the thesis was made available to the public.

Oct 11, 2006
Date

Delores Wiant
Delores Wiant

COMMONWEALTH OF PENNSYLVANIA }
} SS.
COUNTY OF Montgomery }

On this, the 11 day of October, 2006, before me, the undersigned notary public, personally appeared Delores Wiant, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seals.

[SEAL]

Alana Cemini
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Alana Cemini, Notary Public
Upper Merion Twp., Montgomery County
My Commission Expires July 20, 2009
Member, Pennsylvania Association of Notaries

# EXHIBIT C

**Koehn, Mark R.**

---

**From:** Matt Rogers [MTRogers@mqblaw.com]

**Sent:** Wednesday, February 14, 2007 2:44 PM

**To:** Koehn, Mark R.

**Subject:** Honeywell v. U.S., No. 02-1909C - Quick Question

Mark,

That is a question for Josh - I do not know what they were thinking, but I personally think they probably based everything on her first affidavit (which I drafted) and what Dr. Fidishun said in her deposition. The stuff about the card catalog came out of the deposition. As you know, they drafted the second affidavit they way they wanted, and then gave it to me, I provide absolutely no input on the initial draft. I then reviewed the affidavit with her to see if the statements the government wrote were correct in her opinion. She wanted some changes made to the affidavit and I did so at her request. I then forwarded the affidavit to you and Josh.

I hate to be glib about this, but I can't speak for the government.

Matt

---

**From:** Koehn, Mark R. [mailto:markkoehn@paulhastings.com]
**Sent:** Wednesday, February 14, 2007 2:34 PM
**To:** Matt Rogers
**Subject:** RE: Honeywell v. U.S., No. 02-1909C - Quick Question

Matt:

So what was the Government's factual basis for all of the statements in the draft Affidavit Of Delores Wiant that Josh Brady emailed to you on January 23, 2007 for you to forward to Ms. Wiant?

---

Mark Koehn | Paul, Hastings, Janofsky & Walker LLP | 875 15th Street, N.W., Washington, D.C. 20005 | direct: 202 551-1876| main: 202 551 1700 | direct fax: 202 551 0276 | cell: 301 717 3226 | markkoehn@paulhastings.com| www.paulhastings.com

---

**From:** Matt Rogers [mailto:MTRogers@mqblaw.com]
**Sent:** Wednesday, February 14, 2007 2:22 PM
**To:** Koehn, Mark R.
**Subject:** Honeywell v. U.S., No. 02-1909C - Quick Question

Mark,

No one from the Government has spoken to Ms. Wiant. All Government contact has gone through me.

Matt

---

**From:** Koehn, Mark R. [mailto:markkoehn@paulhastings.com]

**Sent:** Wednesday, February 14, 2007 12:51 PM
**To:** Matt Rogers
**Subject:** Honeywell v. U.S., No. 02-1909C - Quick Question

Matt:

Please identify for me each date, if any, that the Government interviewed Delores Wiant and for each interview, how long it lasted and whether you attended.

Thanks.

---

**Mark Koehn** | Paul, Hastings, Janofsky & Walker LLP | 875 15th Street, N.W., Washington, D.C. 20005 | direct: 202 551-1876| main: 202 551 1700 | direct fax: 202 551 0276 | cell: 301 717 3226 | markkoehn@paulhastings.com| www.paulhastings.com

************************************************************
IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations govern
************************************************************

This message is sent by a law firm and may contain information that is privileg

For additional information, please visit our website at www.paulhastings.com.

************************************************************
IRS Circular 230 Disclosure: As required by U.S. Treasury Regulations governing t
************************************************************

This message is sent by a law firm and may contain information that is privileged or

For additional information, please visit our website at www.paulhastings.com.

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA, . Criminal No. 1:01cr455
.
vs. . Alexandria, Virginia
. March 14, 2006
ZACARIAS MOUSSAOUI, . 9:30 a.m.
a/k/a Shaqil, a/k/a .
Abu Khalid al Sahrawi, .
.
Defendant. .
. .
. . . . . . . . . . .

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: ROBERT A. SPENCER, AUSA
DAVID J. NOVAK, AUSA
DAVID RASKIN, AUSA
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
and
JOHN W. VAN LONKHUYZEN, ESQ.
U.S. Department of Justice
Counterterrorism Section
10th and Constitution Avenue, N.W.
Room 2736
Washington, D.C. 20530

FOR THE DEFENDANT: GERALD THOMAS ZERKIN
KENNETH P. TROCCOLI
ANNE M. CHAPMAN
Assistant Federal Public Defenders
Office of the Federal Public
Defender
1650 King Street
Alexandria, VA 22314

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

was there or not, but, again, this case, unlike most, is very transparent. That order of February 22nd, which came a week after that hearing, at the hearing I orally announced the rule, it was actually written and published on the 22nd, was available on the Moussaoui website for anyone in the world to see.

Now, I do think in hindsight, and a lot of this case involves hindsight, it probably was not judicious of the prosecution not to get that order out to its various constituencies, because it is true, if you don't know about an order, you may not realize you are violating it.

I have trouble believing that any experienced attorney would not have an appreciation in a major trial of at least checking to see if there was a rule on witnesses. This is a standard practice in both civil and criminal litigation, and so it is shocking to me that that would not have been looked into.

But regardless of the motivation, it is clear that the Court's intent in passing that rule was violated. And, you know, we even talked about the rule and the parameters of it. We made sure that victims were not included within it. We made sure that both -- experts for both sides were excluded from it, and so it is not something that was done as just a quick knee-jerk response to a request for a rule on witnesses.

Then during the testimony today, however, more things came out. Whether these witnesses have actually been tainted or not is almost impossible to tell. Certainly the best offense is a

good defense, and to the extent that witnesses might have been alerted to issues that they hadn't been thinking about, especially those government witnesses who might have been hostile, there clearly could be damage done to the defense's ability to make its case.

I don't think I can tell from this record. I mean, the six witnesses who did testify appear to be honest, credible people. I just can't tell the degree to which their testimony may have changed because of this improper communication.

I am, however, further concerned about this case because of the actions of Ms. Martin in telling witnesses -- telling at least one witness that he could not speak with the defense and by clearly misrepresenting to the prosecuting team that three witnesses -- that two witnesses had explicitly said they would not agree to meet with defense counsel for an interview, and then relying upon that information, the prosecutors communicated that to the defense.

As I said earlier, I think based upon this quantum of not only violation of the Court's order but certainly in terms of telling a witness not to talk to opposing counsel, that's a violation of the ethical canons for lawyers and, I'm not even sure, a government requirement that may have been violated there as well.

There's just a number of errors that are so serious that I think that at least a portion of the government's case has been

# EXHIBIT E

CR
VW



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -x
HONEYWELL INTERNATIONAL :
INC., and HONEYWELL : No. 02-1909C
INTELLECTUAL PROPERTIES, :
INC., : Judge Susan G. Braden
Plaintiffs, :
vs. :
THE UNITED STATES, :
Defendant, :
and :
LOCKHEED MARTIN CORP., :
Defendant-Intervenor, :
and :
L-3 COMMUNICATIONS :
CORPORATION, :
Defendant-Intervenor. :
- - - - - - - - - - - - - - -x

DEPOSITION OF LORIA B. YEADON

Washington, DC

Tuesday, November 7, 2006

REPORTED BY:

Victoria L. Wilson

sometime after learning about the '268 and '269 but I don't recall specifically when.

Q You learned about those in 2000, is that your testimony, when the secrecy order was lifted?

A Yes, I think the '268 first; the secrecy order lifted as to it first.

Q Okay. And did you --

A Well, actually, I would have learned about the '268 even prior to the secrecy order lifting because there would have been renewal orders, so I would have learned about, at least, existence of it, I didn't know the substance of it, but I would have known about it in -- maybe even in '99, which is when I think I signed the first renewal order.

Q Okay. And did there come a time when you reviewed the Honeywell files for the '270 application?

A I actually don't recall ever reviewing the '270.

Q Did you have anyone review the '270 application?

A Did I have anyone?

Q Let me rephrase it. After the time you learned of the secrecy orders being lifted -- well, I guess I'll rephrase based on your testimony. After the time in 1999, you signed the secrecy order form?

A The renewal order, yes, I signed that.

Q Okay. At any time after that, including after the secrecy orders were lifted, did you have anybody review the '270 file Honeywell had?

A I don't recall initiating a review of the '270. I think it was brought to my attention because I didn't -- I didn't know that it existed. I didn't know about it until -- it was a pretty long time after I knew about the '268 and '269.

Q Was it 2000, though, that you learned of the '270 application?

A I don't recall. I don't recall when I learned about it.

Q Okay. Did you come to learn that there had been claims in the '270 application that were rejected?

MR. GOTTS: Do you want to put a time

period on that?

THE WITNESS: I don't recall.

BY MR. HARBIN:

Q At any time.

A I don't recall. I knew -- only thing I knew about the '270 is that it existed and I learned that pretty long after I learned about the '268 and '269 and I don't recall any -- anything about its prosecution and, frankly, I didn't know -- I don't recall there being a prosecution; I just thought it died but I don't know why.

Q Did you come to learned that the '270 application was abandoned by Honeywell or its predecessor?

A I just know it died. I didn't know if it was abandoned. I don't know what the circumstances were.

Q Did you ever review that file, the '270 file concerning prior art that might be -- let me rephrase the question.

Did you ever review the '270 application concerning prior art that might be referenced in the

application?

A I don't recall reviewing it, period. And in terms of the prior art, I didn't know that there would be any, had no reason to believe there would be any. So I don't -- I just don't know. I just don't recall, because I didn't know much about it, period.

Q Well, you have prosecuted patents multiple times, haven't you?

A Sure.

Q Isn't it common to have prior art either copied in a file or referenced in an application file?

MR. GOTTS: Objection; lack of foundation. Objection to the form of the question.

THE WITNESS: Well, it really depends. It depends on what happened in the case. If there was -- if there was some prosecution or if there was foreign filings or something like that, perhaps, but I don't -- I -- the fact of the matter is I didn't know and I still don't know, maybe. Are you telling me there was prior art in the '270? I didn't know

about it.

BY MR. HARBIN:

Q That's not my job.

A Okay. Well, by your questions, you are suggesting something. I'm just trying to understand it. But I don't -- I didn't have any reason to believe that there was any art in the '270 or even that the '270 existed.

Q So you don't know even today if there is any prior art referenced in the '270 application?

A I don't.

Q And I take it you did not instruct anyone to review the '270 application to determine if there was prior art or other relevant information in the application.

A Since I didn't know about it, I would find it hard to believe that I instructed someone to review it.

Q Well, you have testified you did find out about the '270 application at some point.

A Yes, at some point.

Q And it could have been as early as the

# EXHIBIT F

**Patent Law Fundamentals**
**Database updated September 2007**
John Gladstone Mills III, Donald C. Reiley III, and Robert C. Highley

**Part I. Basic Principles of Patent Protection**
**Chapter 1. What a Patent Is**

References; Correlation Table

§ 1:19. Patent rights, physical embodiments, and implied license to use

**West's Key Number Digest**

West's Key Number Digest, Patents 1

**A.L.R. Library**

A.L.R. Index: Patents

Patents are endowed by statute with the attributes of personal property. [FN1] Such property is said to be abstract, incorporeal, or intangible in that it can and often does have an existence (i.e., an ownership) separate and distinct from a material or physical object (the legal term for which is "chattel") incorporating or embodying the same. Patents are not "goods" in commerce under Lanham Act § 43(a), 15 U.S.C.A. § 1125(a).[FN2] When one purchases a device which embodies one or more claims of a subsisting patent, albeit from the patentee or from one whom the patentee has authorized to make and/or sell, one does not thereby acquire any rights in the patent apart from what is called an implied license to use the very object or chattel purchased. [FN3] Such implied license to use includes the right to repair.[FN4]

A license, express or implied, is a defense to a cause of action for patent infringement.[FN5] To support the defense of an implied license, an accused infringer must establish two elements:[FN6] (1) the circumstances of the sale of the device accused of infringing must plainly indicate that the grant of a royalty-free license by the patent owner should be inferred; and (2) the equipment involved must have no noninfringing uses. When an equipment purchaser is notified at the time of sale of a requirement for a patent license, such express notice precludes the grant of an implied license under the patent. [FN7] The scope of such implied license does not so extend to repair or replacement as to obviate the fact that *directly* infringing repair parts still *directly* infringe.[FN8]

The Uniform Commercial Code contains a provision to the effect that unless otherwise agreed, a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claims of any third person by way of infringement or the like.[FN9] The Federal Circuit has held that U.C.C. § 2-312(c) is not preempted by the marking provisions of 35 U.S.C.A. § 287(a).[FN10] Intellectual property has been deemed not to be a "good" for purposes of Lanham Act § 43(a), 15 U.S.C.A. § 1125(a).[FN11] There is no warranty that a buyer's use of such goods will be free of all infringement.[FN12]

It is well settled that the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser the right of unrestricted ownership as against the vendor.[FN13] But the purchaser does not acquire any right greater than those possessed by the owner of the patent.[FN14] Long ago the Supreme Court noted that, where a sale is absolute, and without any conditions, the rule is well settled that the purchaser may continue to use the implement or machine purchased until it is worn out, or he may repair it or improve upon it as he pleases, in the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

same manner as if dealing with property of any other kind.[FN15] In the words of the Court:[FN16]

> Undoubtedly the general rule is that if a patentee makes a structure embodying his invention and unconditionally makes a sale of it, the buyer acquires the right to use the machine without restrictions, and when such machine is lawfully made and unconditionally sold, no restriction upon its use will be implied in favor of the patentee. By such unconditional sale the machine passes without the limit of the monopoly.

The owner of a patent may, however, by express conduct, negate or limit the extent of an implied license to use apparatus, products, and/or processes embodying his patent(s). In fact, the owner of a patent can choose any number of ways to exploit his patent(s). If he has claims drawn to both apparatus and a method of use thereof, he can charge one price for the apparatus and an additional fee each time the claimed method is used.[FN17] Moreover, it has been held that the acquisition of a patented embodiment from a *subsidiary* of the patent owner is not in itself sufficient to establish the grant of an implied license from the parent corporation/patent owner.[FN18] To restrict the right of a purchaser of an apparatus embodying a patented invention to use it for the purposes for which it is pecularily adapted, there must appear some express or implied agreement by which the mode or time or place of the use has been limited.[FN19]

A license implied-in-fact[FN20] also may arise with respect to embodiments of a patented invention which--though not expressly authorized by the patent owner--result from a failure of the patent owner to enforce its patent rights, i.e., by acquiescence, by conduct, by estoppel (legal or equitable),[FN21] or by laches.[FN22] Whether such an implied-in-fact license exists is a question of law.[FN23]

Where one separately acquires the components of a patented combination from or through the owner of the patented combination there is deemed to exist an implied license to assemble the combination.[FN24] Unless the circumstances indicate otherwise, an implied license arising from the sale of a component to be used in a patented combination extends only to the life of the component whose sale and purchase created the license.[FN25] An accused infringer that asserts an implied license as a defense to a suit for patent infringement must demonstrate that any patent under which an implied license is asserted is necessary for the exercise and enjoyment of explicitly granted rights.[FN26] Where a party argues that the sale of a device carries with it an implied license to use that device in practicing a patented invention, that party has the burden to show that, inter alia, the purchased device has no noninfringing uses.[FN27] A license, moreover, does not amount to an interest in the patent but rather merely to immunity from suit for patent infringement. Ordinarily ownership of a physical object or chattel embodying a patent may be transferred independently of the intangible patent rights. Interesting questions of law arise when attempts are made by the patentee to restrict (as by notice to such effect on the chattel itself) distribution of the same after the chattel has passed into the channels of trade. *See* Ch 19. Cognate problems arise when the patent is a combination of mechanical elements and one or more of such elements wears out. Is replacement permissible repair or impermissible reconstruction? *See* Ch 20.

As a general rule the first sale terminates the exclusive right to vend the chattel in which the invention is embodied.[FN28] Such sale need not be a truly voluntary one, but can consist of some reasonable and recognized form of compulsory transfer, such as a judicial sale;[FN29] the sale of embodiments by an aggrieved seller to remedy a buyer's breach pursuant to state-based common law;[FN30] or pursuant to a provision of the Uniform Commercial Code.[FN31]

[FN1]35 U.S.C.A. § 261.

[FN2]Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1575, 37 U.S.P.Q.2d (BNA) 1626, 1631 (Fed. Cir. 1996); Tubeco, Inc. v. Crippen Pipe Fabrication Corp., 402 F. Supp. 838, 848, 187 U.S.P.Q. (BNA) 746 (E.D. N.Y. 1975), aff'd, 538 F.2d 314 (2d Cir. 1976); Hans-Jurgen Laubeand Oxidwerk HJL AG v. KM Europa Metal AG, 47 U.S.P.Q.2d (BNA) 1058, 1060, 1998 WL 148427 (S.D. N.Y. 1998). *Compare,*Repap Enterprises Inc. v. Kamyr Inc., 27 U.S.P.Q.2d (BNA) 1685, 1690, 1993 WL 322881 (E.D. Pa. 1993). *See* § 5:57, *infra.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

[FN3]Pettibone Corp. v. Fargo Mach. & Tool Co., 447 F. Supp. 1278, 1281, 198 U.S.P.Q. (BNA) 42, 45-46 (E.D. Mich. 1978); Leesona Corp. v. U. S., 198 U.S.P.Q. (BNA) 4, 19-20, 1978 WL 14862 (Ct. Cl. Trial Div. 1978).

[FN4]Porter v. Farmers Supply Service, Inc., 790 F.2d 882, 229 U.S.P.Q. (BNA) 814 (Fed. Cir. 1986); National-Standard Co. v. UOP, Inc., 616 F.2d 339, 205 U.S.P.Q. (BNA) 590 (7th Cir. 1980).

[FN5]35 U.S.C.A. § 282. *See* §§ 20:10 to 20:37, *infra.*

[FN6]Met-Coil Systems Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 231 U.S.P.Q. (BNA) 474, 476 (Fed. Cir. 1986); Jacobson v. Cox Paving Co., 19 U.S.P.Q.2d (BNA) 1641, 1652, 1991 WL 328445 (D. Ariz. 1991), aff'd, 949 F.2d 404, 21 U.S.P.Q.2d (BNA) 2040 (Fed. Cir. 1991).

[FN7]Met-Coil Systems Corp. v. Korners Unlimited, Inc., 803 F.2d 684,231 U.S.P.Q. (BNA) 474, 476 (Fed. Cir. 1986); Jacobson v. Cox Paving Co., 19 U.S.P.Q.2d (BNA) 1641, 1652, 1991 WL 328445 (D. Ariz. 1991), aff'd, 949 F.2d 404, 21 U.S.P.Q.2d (BNA) 2040 (Fed. Cir. 1991).

[FN8]Laitram Corp. v. Cambridge Wire Cloth Co., 229 U.S.P.Q. (BNA) 933, 935, 1986 WL 89633 (D. Md. 1986). *See* § 20:4, § 20:7, *infra.*

[FN9]U.C.C. § 2-312. *See* § 17:30, *infra.* See generally P.A. Alces & H.F. See, The Commercial Law of Intellectual Property (Little Brown & Co. 1994).

[FN10]Cover v. Hydramatic Packing Co., Inc., 83 F.3d 1390, 1393, 38 U.S.P.Q.2d (BNA) 1783, 1785-86 (Fed. Cir. 1996). *See* §§ 2:18 to 2:25, *infra.*

[FN11]Hans-Jurgen Laube and Oxidwerk HJL AG v. KM Europa Metal AG, 47 U.S.P.Q.2d (BNA) 1058, 1060, 1998 WL 148427 (S.D. N.Y. 1998). *See* § 5:57, *infra.*

[FN12]Motorola, Inc. v. Varo, Inc., 656 F. Supp. 716, 718, 1 U.S.P.Q.2d (BNA) 1575, 1577, 2 U.C.C. Rep. Serv. 2d 437 (N.D. Tex. 1986).

[FN13]U.S. v. Univis Lens Co., 316 U.S. 241, 249-51, 62 S. Ct. 1088, 86 L. Ed. 1408, 53 U.S.P.Q. (BNA) 404, 407-08 (1942); B.B. Chemical Co. v. Ellis, 314 U.S. 495, 497, 62 S. Ct. 406, 86 L. Ed. 367, 52 U.S.P.Q. (BNA) 33, 35 (1942); Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 460-61, 58 S. Ct. 288, 82 L. Ed. 371, 36 U.S.P.Q. (BNA) 35, 36 (1938); Met-Coil Systems Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 685-86, 231 U.S.P.Q. (BNA) 474, 475 (Fed. Cir. 1986); Porter Needle Co. v. National Needle Co., 17 F. 536, 537 (C.C.D. Mass. 1883).

[FN14]**Featherstone v. Ormonde Cycle Co., 53 F. 110, 111 (C.C.S.D. N.Y. 1892)**; Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc., 565 F. Supp. 931, 220 U.S.P.Q. (BNA) 416, 421 (D.N.J. 1983). *See* § 19:1, § 19:24, *infra.*

[FN15]Mitchell v. Hawley, 83 U.S. 544, 21 L. Ed. 322 (1872). *See* § 20:7, *infra.*

[FN16]Adams v. Burke, 84 U.S. 453, 21 L. Ed. 700 (1873); Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 77 F. 288, 290 (C.C.A. 6th Cir. 1896).

[FN17]Signode Corp. v. Weld-Loc Systems, Inc., 700 F.2d 1108, 1114, 218 U.S.P.Q. (BNA) 293, 297 (7th Cir. 1983).

[FN18]Sanofi, S.A. v. Med-Tech Veterinarian Products Inc., 222 U.S.P.Q. (BNA) 143, 148-49, 1983 WL 417 (D.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Kan. 1983).

[FN19]Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., 101 F. 831, 835 (C.C.A. 6th Cir. 1900). *See* § 19:24, *infra.*

[FN20]Zapata Industries, Inc. v. W.R. Grace & Co.-Conn., 51 U.S.P.Q.2d (BNA) 1619, 1625, 1999 WL 33268643 (S.D. Fla. 1999).

[FN21]Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc., 103 F.3d 1571, 1580, 41 U.S.P.Q.2d (BNA) 1263, 1271 (Fed. Cir. 1997). *See* § 20:45, *infra.*

[FN22]Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1272, 51 U.S.P.Q.2d (BNA) 1225, 1233-34 (Fed. Cir. 1999). *See* § 20:45, *infra.*

[FN23]Met-Coil Systems Corp. v. Korners Unlimited, Inc., 803 F.2d 684,687, 231 U.S.P.Q. (BNA) 474, 476-77 (Fed. Cir. 1986).

[FN24]International Election Systems Corp. v. Shoup, 452 F. Supp. 684, 200 U.S.P.Q. (BNA) 79, 95 (E.D. Pa. 1978), aff'd, 595 F.2d 1212 (3d Cir. 1979).

[FN25]Carborundum Co. v. Molten Metal Equipment Innovations, Inc., 72 F.3d 872, 37 U.S.P.Q.2d (BNA) 1169, 1173 (Fed. Cir. 1995).

[FN26]Lever Bros. Co. v. Procter & Gamble Distributing Co., 668 F. Supp. 924, 5 U.S.P.Q.2d (BNA) 1239 (D.N.J. 1987). *See* § 20:9, *infra.*

[FN27]Glass Equipment Development, Inc. v. Besten, Inc., 174 F.3d 1337, 1341-42, 50 U.S.P.Q.2d (BNA) 1300, 1302-03 (Fed. Cir. 1999); Carborundum Co. v. Molten Metal Equipment Innovations, Inc., 72 F.3d 872, 878, 37 U.S.P.Q.2d (BNA) 1169, 1172 (Fed. Cir. 1995); Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 925, 223 U.S.P.Q. (BNA) 982, 998 (Fed. Cir. 1984).

[FN28]*See* § 19:24, *infra.*

[FN29]Wilder v. Kent, 15 F. 217, 219 (C.C.W.D. Pa. 1883); Sawin v.Guild, 21 F. Cas. 554, 555 (C.C. Mass. 1813).

[FN30]Platt & Munk Co. v. Republic Graphics, Inc., 315 F.2d 847, 853- 54, 137 U.S.P.Q. (BNA) 268, 273 (2d Cir. 1963) (copyright).

[FN31]McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917, 922, 36 U.S.P.Q.2d (BNA) 1289, 1292 (Fed. Cir. 1995).

© 2007 Thomson/West

PATLAWF § 1:19
END OF DOCUMENT