**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., and HONEYWELL INTELLECTUAL PROPERTIES, INC., Plaintiffs, | No. 02-1909C |
| v. | Judge Susan G. Braden |
| THE UNITED STATES, Defendant, | |
| and | |
| LOCKHEED MARTIN CORPORATION and L3 COMMUNICATIONS CORPORATION, Defendant-Intervenors. | |

**DEFENDANT-INTERVENOR L-3 COMMUNICATIONS' REPLY TO PLAINTIFFS' POST-TRIAL OPPOSITION BRIEF REGARDING DEFENSES**

John W. Harbin
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Attorneys for Defendant-Intervenors
L-3 Communications Corporation

Of Counsel:
Charles A. Pannell, III
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

November 9, 2007

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................ 1

A. Claim 2 Of The '914 Patent Is Obvious........................................................ 2

1. Honeywell's Arguments Against A Finding Of Obviousness Lack Merit........................................................................................ 2

i. The Prior Art's Reference To Red Light Reduction Is Not A Teaching Away ......................................................... 3

a. If The Prior Art Teaches Away, So Too Does Honeywell's Patent ................................................... 5

b. The MIL Spec And Other References That Describe Red Light Reduction Reflect A Compromise, Not A Lack Of Skill ................................... 5

ii. Honeywell's Argument that Individual Reference's Lack Specific Elements of Claim 2 is meaningless ............................. 10

iii. Honeywell Contradicts The Holdings Of KSR............................ 11

a. Honeywell's Argument That The Patent Is Non-Obvious Because The Prior Art Does Not Teach Or Suggest Combining References Is False And Contrary To KSR. ................................................... 12

b. Honeywell's Attempt To Limit The Court's Review To Problems Addressed In The Patent Is Contrary To KSR .................................................. 14

c. A Court Should Not Overemphasize The Risk Of Hindsight As Honeywell Suggests.................................. 16

d. The Facts Of KSR Demonstrated Even Less Of A Case For Obviousness Than The '914 Patent ............... 16

iv. Just Because An Application Is Deemed A Potential National Security Risk Does Not Mean The Alleged Invention Is Non-Obvious................................................ 18

2. L-3 Has Proven The Graham Factual Inquiries With Clear And Convincing Evidence ......................................................................... 19

i. The Burden Of Proof ............................................................ 19

ii. The Scope And Content Of The Prior Art .................................. 20

a. Honeywell's Argument That The Court Should Not Consider Uchida And The '963 Patent Have Been Explicitly Rejected By The Supreme Court And Recent Federal Circuit Case Law............................. 20

b. Boehm ..... 22

c. Verney ..... 22

d. Honeywell Ignores The Content Of Other Art Presented By The Defendants, Namely The German Patent ..... 24

iii. The Differences Between The Prior Art And The Claimed Invention ..... 25

iv. The Defendants' Definition Of A Person Of Ordinary Skill In The Art Comports With The Court's Definition ..... 28

3. Considering The Graham Factual Inquires, Claim 2 Of The '914 Patent Would Be Obvious To A Person Of Ordinary Skill In The Art As A Matter Of Law ..... 30

i. Boehm Combined With Uchida Or The '963 Patent Would Be Obvious To A Person Of Ordinary Skill In The Art In Light Of The Many References That Teach, Suggest, And Motivate Their Combination ..... 31

a. The Fact That Boehm Did Not Make The Actual Invention Has No Bearing On An Obviousness Analysis, But His Suggestion Of What Can Be Done Is Relevant ..... 32

b. The Combination Of Boehm (Disclosing A Filter For Red) Is An Obvious Combination With Uchida (Disclosing Filters For Green And Blue) ..... 33

c. There Is No Requirement That The Red Band Filter Pass A Significant Amount Of Light As Honeywell Suggests ..... 34

d. Honeywell's Arguments Of Mischaracterization Are Baseless Red Herrings ..... 39

ii. The German Patent Teaches A Formula For Applying Complementary Filtering To Any Display Depending On What Wavelengths Of Light The Engineer Prefers To Keep ..... 41

iii. KSR Explicitly Recognizes That Common Sense And Ordinary Creativity Can Be Used To Fill The Gap ..... 42

4. Secondary Considerations Cannot Save The '914 Patent From Such A Strong Prima Facie Showing Of Obviousness ..... 44

i. The Solution For Red Light Compatibility Was Developed Before There Was Any Long Felt Need. ..... 45

ii. Failure Of Others - MIL Spec ..... 46

iii. Commercial Success ..... 46

iv. Independent Development - Military Saw The Old Version Of Patent And Not Newer Version That Is Inadequately Described ........ 48

5. The Presumption Of Validity Is In Substantial Question ........ 50

B. Honeywell Has Not Rebutted L-3's Assertions That The '914 Patent Is Invalid Because The Original Specification Fails To Comply With The Disclosure Requirements Of 35 U.S.C. § 112 ........ 51

1. Honeywell Has Not Rebutted L-3's Showing That The Original Specification Does Not Demonstrate The Inventors Were In Possession Of What Is Claimed In The Patent At The Time Of Filing ........ 54

i. Honeywell's Rebuttals To Defendants' Clear And Convincing Showing That The Specification Does Not Disclose A System For Filtering A Single Multiband Source Of Light Are Legally Inaccurate And Factually Insufficient ........ 55

ii. Honeywell's Argument That The Specification Does Not Need To Describe The Locations Of Filters That Are Expressly Included In The Court's Claim Construction Is Without Merit And Is Based On Inaccurate Statements Of Law ........ 61

2. Honeywell Does Not Show That One Of Ordinary Skill In The Art Would Understand The Terms Of Claim 2 To Define The Bounds Of The Invention, And Therefore Does Not Rebut Defendants' Clear And Convincing Evidence That Claim 2 Is Indefinite ........ 63

3. L-3 Has Proven That The Original Specification Does Not Enable One Of Ordinary Skill In The Art To Practice The Full Scope Of Claim 2, And Honeywell's Rebuttals Fall Short ........ 65

i. Honeywell's Expert Admitted That Claim 2 Is Either Not Enabled Or Obvious ........ 65

ii. Honeywell Incorrectly Asserts That The Enablement Of Any Mode Of Practicing The Invention Satisfies The Enablement Requirement ........ 67

4. Honeywell Has Failed To Rebut The Clear And Convincing Evidence That The '914 Patent Does Not Disclose The Best Mode Of Practicing The Invention ........ 68

i. Honeywell's Argument That Mr. Cohen Did Not Consider LCD Technology To Be The Best Mode Of Practicing Claim 2 Is Contradicted By Mr. Cohen's Clear Statements To The Contrary ........ 68

ii. Honeywell's Argument That, Because "The Original Specification Was Intended To Be More Generic," The Best Mode Is Described, Fails ..... 69

C. Honeywell Has Not Rebutted L-3's Clear And Convincing Showing That The '914 Patent Is Unenforceable As A Result Of The Applicants' Inequitable Conduct ..... 70

1. Honeywell Has Not Rebutted L-3's Evidence That The Applicants Made Material Misrepresentations To The Patent Office ..... 71

2. Honeywell's Assertion That There Is No Proof Of Materiality, Knowledge, Or Intent Is Incorrect As A Matter Of Law ..... 73

D. Honeywell Has Not Rebutted L-3's Clear And Convincing Showing That The '914 Patent Is Unenforceable Due To Prosecution Laches ..... 75

CONCLUSION ..... 76

## TABLE OF AUTHORITIES

### CASES

Alza Corp. v. Mylan Labs., Inc.,
464 F.3d 1286 (Fed. Cir. 2006)....28, 44

Amgen Inc. v. Hoechst Marion Roussel, Inc.,
314 F.3d 1313 (Fed. Cir. 2002)....58, 62

Auto. Techns. Int'l, Inc. v. BMW of North Am., Inc.,
No. 2006-1013, -1037, 2007 U.S. App. LEXIS 21271 (Fed. Cir. Sept. 6, 2007)....54, 67

Bayer AG v. Schein Pharms., Inc.,
301 F.3d 1306 (Fed. Cir. 2002).... 68-70

Beckson Marine v. Nfm, Inc.,
292 F.3d 718 (Fed. Cir. 2003)....36

Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs. Ltd,
394 F.3d 1348 (Fed. Cir. 2005)....71

Chem. Separation Tech., Inc. v. United States,
51 Fed. Cl. 771 (Fed. Cl. 2002) ....25

Clinical Prods. Ltd. v. Brenner,
255 F. Supp. 131 (D.D.C. 1966) ....18

Dayco Prods., Inc. v. Total Containment, Inc.,
329 F.3d 1358 (Fed. Cir. 2003)....73

Eaton Corp. v. Rockwell Int'l Corp.,
323 F.3d 1332 (Fed. Cir. 2003).... 34-35

Eli Lilly & Co. v. Barr Labs., Inc.,
251 F.3d 955 (Fed. Cir. 2001)....68, 69

Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.,
471 F.3d 1369 (Fed. Cir. 2006)....19

Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.,
93 F.3d 1572 (Fed. Cir. 1996)....62

Falko-Gunter Falkner v. Inglis,
448 F.3d 1357 (Fed. Cir. 2006)....66

Ferring B.V. v. Barr Labs., Inc.,
437 F.3d 1181 (Fed. Cir. 2006)....................................................................................71

FMC Corp. v. Manitowoc Co.,
835 F.2d 1411 (Fed. Cir. 1987)....................................................................................74

Fox Indus., Inc. v. Structural Preservation Sys., Inc.,
922 F.2d 801 (Fed. Cir. 1990)......................................................................................73

Genentech, Inc. v. Novo Nordisk A/S,
108 F.3d 1361 (Fed. Cir. 1997)....................................................................................65

Gentry Gallery, Inc. v. Berkline Corp,
134 F.3d 1473 (Fed. Cir. 1998)....................................................................................58

Graham v. John Deere Co.,
383 U.S. 1 (1966)................................................................................................ Passim

Honeywell Int'l, Inc. v. United States,
66 Fed. Cl. 400 (Fed. Cl. 2005) ......................................................................... 29, 61-62

Honeywell Int'l, Inc. v. United States,
70 Fed. Cl. 424 (Fed. Cl. 2006) .........................................................................35, 56, 64

In re Farrenkopf,
713 F.2d 714 (Fed. Cir. 1983)......................................................................................43

In re Icon Health and Fitness, Inc.,
496 F.3d 1374 (Fed. Cir. 2007)................................................................................ Passim

In re Robertson,
169 F.3d 743 (Fed. Cir. 1999)......................................................................................55

In re Translogic Tech.,
No. 2006-1192, 2007 U.S. App. LEXIS 23969 (Fed. Cir. Oct. 12, 2007) ...........................15

Iron Grip Barbell Co., Inc. v. USA Sports, Inc.,
392 F.3d 1317 (Fed. Cir. 2004)....................................................................................44

KSR International Co. v. Teleflex, Inc.,
127 S. Ct. 1727 (2007)........................................................................................ Passim

Lampi Corp. v. Am. Power Prods., Inc.,
228 F.3d 1365 (Fed. Cir. 2000)............................................................................... 58-59

Leapfrog Enters., Inc. v. Fisher-Price, Inc.,
485 F.3d 1157 (Fed. Cir. 2007)................................................................................31, 34

Leibel-Flarsheim Co. v. Medrad, Inc.,
481 F.3d 1371 (Fed. Cir. 2007)....54, 66

Liquid Dynamics Corp. v. Vaughan Co.,
449 F.3d 1209 (Fed. Cir. 2006)....36

Lockwood v. Am. Airlines, Inc.
107 F.3d 1565 (Fed. Cir. 1997)....55

Moba, B.V. v. Diamond Automation, Inc.,
325 F.3d 1306 (Fed. Cir. 2003).... 54-55

Nilssen v. Osram Sylvania, Inc.,
No. 2006-1550, 2007 U.S. App. LEXIS 23733 (Fed. Cir. October 10, 2007) .... 70-71, 74

Orthopedic Equip. Co. v. United States,
702 F.2d 1005 (Fed. Cir. 1983)....28

Pandrol USA, LP v. Airboss Ry. Prods.,
320 F.3d 1354 (Fed. Cir. 2003)....63

Pfund v. United States,
40 Fed. Cl. 313 (Fed. Cl. 1998) ....44, 46

PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,
491 F.3d 1342 (Fed. Cir. 2007)....39, 44

PIN/NIP, Inc. v. Platte Chem. Co.,
304 F.3d 1235 (Fed. Cir. 2002).... Passim

Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.,
204 F.3d 1368 (Fed. Cir. 2000)....6, 50

Solomon v. Kimberly-Clark Corp.,
216 F.3d 1372 (Fed. Cir. 2000)....63

SRI Int'l v. Matsushita Elec. Corp. of Am.,
775 F.2d 1107 (Fed. Cir. 1985)....63

Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found.,
422 F.3d 1378 (Fed. Cir. 2005).... 75-76

Teleflex, Inc. v. Ficosa N. Am. Corp.,
299 F.3d 1313 (Fed. Cir. 2002)....69

United States Gypsum v. Nat'l Gypsum Co.,
74 F.3d 1209 (Fed. Cir. 1996)....69

Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.,
412 F.3d 1319 (Fed. Cir. 2005)....................23

Warner-Lambert Co. v. Teva Pharms. USA, Inc.,
418 F.3d 1326 (Fed. Cir. 2005)....................71

**STATUTES**

35 U.S.C. § 102....................1, 10, 18

35 U.S.C. § 103....................Passim

35 U.S.C § 112....................Passim

**OTHER AUTHORITIES**

Examination Guidelines for Determining Obviousness Under 35 U.S.C. § 103 in View of the Supreme Court Decision in *KSR International Co. v. Teleflex Inc.*, 72 Fed. Reg. 57526 (Oct. 10, 2007)....................50

## ARGUMENT

Defendants have shown that the patent at issue, the '914 patent, should be invalidated and held unenforceable on several grounds. Defendants have presented overwhelming evidence that the patent is invalid for obviousness pursuant to 35 U.S.C. § 103 under any test, but particularly under the liberalized standard for obviousness announced by the Supreme Court this year in the KSR case, and for inadequate disclosure, pursuant to 35 U.S.C § 112.[1] Honeywell's arguments in response misstate the facts in several fundamental ways and often run directly contrary to the applicable law, including the Supreme Court's decision in KSR. Moreover, in attempting to validate the '914 patent, Honeywell is forced to take contradictory and unsupportable positions. For example, Honeywell must argue on the one hand that those of ordinary skill in the art in 1985 were not skilled enough to find the combination of prior art references obvious. Honeywell must argue on the other hand that those of ordinary skill in the art were skilled enough to understand the paltry disclosures in the original patent disclosure. Honeywell's arguments collapse under the weight of these flaws and inconsistencies.

Additionally, L-3 has shown that during prosecution Honeywell delayed the patent prosecution to draft claims to capture what the industry independently developed in the prior decade and a half. The evidence is plain that Honeywell did whatever necessary to receive a patent, including misrepresenting the inventorship of the patent and withholding prior art references from the Patent and Trademark Office ("PTO"). Accordingly, not only is Claim 2 of the '914 patent invalid for obviousness and lack of adequate written description, the '914 patent should be held unenforceable for inequitable conduct and prosecution laches.

[1] The evidence also supports the defense of anticipation under 35 U.S.C. § 102. L-3 adopts the government's briefing on that issue.

## A. CLAIM 2 OF THE '914 PATENT IS OBVIOUS

### 1. Honeywell's Arguments Against A Finding Of Obviousness Lack Merit

L-3 will begin this reply brief by addressing Honeywell's principal arguments against obviousness and show how each is erroneous. As L-3 will show, Honeywell repeatedly makes factual assertions that are incorrect and often mischaracterize the evidence. In regard to Honeywell's legal arguments, Honeywell makes arguments that are directly contrary to the law and one on important issue Honeywell repeatedly argues an inapplicable legal standard. In the next portion of the reply brief, L-3 will review why under a proper obviousness analysis Claim 2 is invalid and rebut Honeywell's attempts to critique L-3's analysis.

Honeywell makes four principal arguments against an obviousness finding, each of which is erroneous. First, Honeywell's repeatedly argues that the prior art "teaches away" from the invention (Plaintiff's Post-Trial Opposition Brief Regarding Defenses at 1, 2, 27, 44-45, 71, 89 (hereinafter "H. Br."). As L-3 will show, even a cursory reading of the prior art belies that argument. Second, Honeywell devotes a significant portion of its brief attempting to demonstrating what elements or combination of elements are missing from individual prior art references. However, that is a misleading argument that invokes an inapplicable legal standard. The obviousness test of Section 103 presumes that no individual reference contains all the elements of the claim. The test involves reviewing multiple references and deciding whether the multiple references, in combination, render the claimed invention obvious. L-3 will review how the prior art references contain each and every element of Claim 2 and render the claim painfully obvious. Third, Honeywell argues that certain important prior art references should not be considered because they do not address the same problem the '914 patent addresses. In making this argument and others, however, Honeywell ignores – and its arguments run contrary to – the

explicit rulings of the Supreme Court in KSR International Co. v. Teleflex, Inc., 127 S. Ct. 1727 (2007) and subsequent Federal Circuit decisions concerning how courts should evaluate an obviousness defense. Fourth, Honeywell argues that the fact that the application and related patent were placed under secrecy orders means they are not obvious. Labeling a patent or application as secret on the basis of national security, however, is not a comment on patentability, despite Honeywell's suggestion to the contrary. Each of these issues is discussed below.

*i. The Prior Art's Reference To Red Light Reduction Is Not A Teaching Away*

Throughout its brief and in several questions at the beginning of its brief, Honeywell continually repeats how the prior art requires red light to be reduced in cockpits to make them NVG compatible. A centerpiece of this argument is the military specification, MIL-L-85672 ("MIL Spec"), which requires cockpits to reduce or eliminate red lighting for NVG compatibility. Honeywell suggests that the MIL Spec and other references were written because no one knew how to practice the "invention" of the '914 patent, and that no one at the time knew how to allow red light in the cockpit when NVGs were being used. These statements are incorrect. Moreover, the '914 patent does not solve the problems addressed by the MIL Spec and would not affect its implementation.

Despite Honeywell's eagerness to categorize the prior art as teaching away from the use of red light, several references from the time period recognize that narrowband emissions of red light, just like what is described in Claim 2 of the '914 patent (JTX-1 col.6, ll.12-28) can be used with NVGs.[2] Verney teaches that "NVGs can tolerate narrow band emissions for all colors of

[2] DE-511 GVT009-0782 (Verney); DMX-4 D000600 (Boehm); DE-508 D000580 (Task)); DE-514 GVT018-1671 (Trimmier).

light" and that in order to retain color from the display, an engineer could "block some of the infrared emissions similar to the approach used in the caution and warning lights." (DE-511 GVT009-0782.) This approach uses a filter almost identical to the one used by the products the Court found to infringe. But, Verney is not all. The Boehm reference recognizes that small portions of red light are "not that disturbing to the NVG" and suggests "[f]ilters, to *reduce* the red and near [infrared]." ((DMX-4 D000597, D000600) (emphasis added).) Moreover, Trimmier also recognizes the ability to have full color displays that are NVG compatible. (DE-514 GVT018-1667.)

This is not disputed by Honeywell's expert, Mr. Tannas. Despite his attempts to suggest otherwise (PTX-834 ¶ 241 (Tannas Direct)), on cross-examination Mr. Tannas had to recognize that the prior art taught *reducing* red as a method for NVG compatibility. (Tr. 1275-76 (Tannas Cross).)

> Q. Okay. So Verney is telling you that you can use some red light without adversely affecting the goggles. Right?
>
> A. Correct.

(Tr. 1169-70.) Honeywell conveniently fails to explain Tannas' contradictions despite L-3's assertions in its opening brief. ((See Defendant-Intervenor L-3 Communications' Post-trial Memorandum of Contentions of Fact and Law Regarding Defenses 46) (hereinafter "L-3 Br.").) Ultimately, Honeywell's arguments that the prior art teaches away amount to nothing more than hollow attempts to distinguish the '914 patent from the prior art in hopes that the prior art will appear to teach away.

*a. If The Prior Art Teaches Away, So Too Does Honeywell's Patent*

In addition, both the '914 patent and the prior art teach the same red light reduction. The '914 patent specifically requires a reduction of red and near infrared light when it calls for passing only a narrowband of red light. Honeywell's attempt to suggest the '914 patent does not "block[] red light from cockpit light sources" but instead "filter[s] such light" (H. Br. 9) amounts to nothing more than word games. As seen throughout its brief, Honeywell refers to filtering as "blocking" light (H. Br. 4, 16-17, 22, 64) as does Mr. Tannas. (See, e.g. PTX-834 20, 69, 100.) Because the prior art and the patent teach the same thing regarding red light – that only longer/redder wavelengths must be filtered out – one cannot teach away from the other.

*b. The MIL Spec And Other References That Describe Red Light Reduction Reflect A Compromise, Not A Lack Of Skill*

A case for obviousness is always premised on the fact that the invention as claimed in the patent was not exactly practiced in a single prior art reference. See 35 U.S.C. § 103(a) (stating that obvious differences over the prior art may not be patented though not identically disclosed in the art). While there can be several reasons why an invention is obvious but not practiced (economic viability, lack of implementing technology, etc.), there is seldom a more plain case for obviousness than this case. Here, the evidence is beyond dispute that engineers at the time knew how to apply complementary filters at both the display and the NVGs to block all red light on a component, or block all or part of other color bands. Concerning NVG compatibility, those in the art understood there is a tradeoff between NVG performance and the breadth of wavelengths in the cockpit. (Tr. 362-63 (Reetz); see also DE-301 GVT018-0989,-0993 (discussing decrease in spectral sensitivity); DMX-4 D000603 (discussing drop in NVG sensitivity as higher cut-off filters are applied).) The initial tradeoff, following a study of pilot preferences, was embodied by

the MIL Spec. (Tr. 363 (Reetz)). No one disputes that some pilots desired a system that allowed red light without any reduction in NVG performance, but this was simply a compromise that was made, a compromise that must still be accounted for under the ‘914 patent, as Honeywell admits. (H. Br. 11.) Throughout its brief, Honeywell does nothing to rebut the witnesses’ explanation other than pointing to the references’ notations to reduce red light. For the reasons stated above and below, however, this is insufficient.

There is no question that Reetz, Boehm, the German Patent, and other prior art references demonstrate just how well known complementary filtering was prior to 1985. (DE-500 ¶ 96 (Task Direct).) Perhaps the clearest example of this is the German Patent, a reference Honeywell completely ignores and fails to rebut despite L-3’s specific discussion of it in opening. (L-3 Br. 10, 32, 44-45.) The German Patent even provides a formula to apply NVG complementary filtering at different points depending on where the user prefers to draw the compromise between NVG performance and the light emitted at the displays.[3] (See infra Section A.3.ii; DE-500 ¶¶ 134-35.) In fact, the German Patent also provides a table describing an application of the formula. (See DE-505; see also DE-500 41 (noting that German Patent discloses red band filter cutoff at 650 nm, well within the defined red color band.)

Despite the benefits of complementary filtering, however, the NVG filters must still block energy from shorter wavelengths of the spectrum. That energy cannot be used by the NVGs to create a picture for the wearer. (DE-500 ¶¶ 95, 217, 224 (Task Direct).) This is

[3] While Honeywell contends that the German Patent was presented to the examiner during prosecution and therefore the patent examiner’s consideration of it is entitled to deference (H. Br. 93), the only version of the German Patent disclosed was written in German; Honeywell provided no translation, and there is no evidence that the examiner ever reviewed the technical content of the application. Cf. Semiconductor Energy Lab. Co. v. Samsung Elecs. Co., 204 F.3d 1368, 1374 (Fed. Cir. 2000) (affirming, in an inequitable conduct case, the district court’s ruling that failure to provide a full translation of a material Japanese reference was tantamount to a failure to disclose that reference).

especially true of interfering light in the red and infrared wavelengths, and that fact has not changed in the current versions of NVGs. (DE-500 ¶ 219.) Thus, as longer red wavelengths of light are allowed in the cockpit, those longer wavelengths must also be blocked at the NVG, which ultimately reduces the amount of light available for generating the NVG image.

Realizing this, engineers like Reetz performed studies and interviewed pilots to determine where the best tradeoff point would be.[4] (Tr. 354, 359-60, 362-63 (Reetz).) If the pilots wanted more red in the cockpit, they would have to sacrifice NVG sensitivity because the NVGs filters would have to block the longer wavelength emissions. (Tr. 257-58; 362-63.) As a result, helicopter pilots would not be able to see terrain as well or as detailed. (Tr. 364.) The engineers concluded that helicopter pilots prefer to have more detailed and enhanced night vision because they fly close to terrain and need as much amplification as possible. (Id.) The military decided that the best approach was to give helicopter pilots as much NVG sensitivity as possible, which meant they must eliminate longer, red wavelengths in the cockpit so that the NVG filter would allow more wavelengths from outside the cockpit without interference. (Tr. 361 (Reetz – "85762 was written primarily with helicopters in mind.") The more red light you allow in the cockpit, the more light you must block at the goggle. (Tr. 362.) This is a law of nature that cannot be changed. (DE-500 ¶ 218 (Task Direct).) Thus, the MIL Spec and various other references Defendants cite do not and never have taught away from the idea that red light compatibility in the cockpit could be accomplished. They simply state the results of the investigation – that the

[4] Honeywell does not deny the extensive research Reetz performed to determine where the cutoff should be for pilots. Despite Honeywell's spin that this research evidences a failure to invent the patent, both Reetz's thesis paper, his testimony, Dr. Task's testimony and contemporaneous references demonstrate that complementary filtering of color in the cockpit was a simple, well-known solution, and determining where to draw the line only required investigation of preferences and trade offs.

military at the time was willing to sacrifice red light in order to have more NVG acuity for helicopter pilots as they flew close to terrain at night.

When fixed-wing aircraft pilots became interested in NVGs, the decision was made to change the trade off. (Tr. 341, 362.) Fixed-wing pilots had different needs than helicopter pilots. (Tr. 362.) Namely, they did not fly as close to terrain, but when they did fly, they generally flew faster than helicopters and were more interested in red warning lights. (Tr. 361-64; PTX-833 ¶ 54 (Lawrence Direct).) They were willing to sacrifice NVG sensitivity in order to retain some red color for warning lights. (Tr. 362-63 (Reetz).) Bottom line, the MIL Spec and other references were not saying "reduce red" because it could not be done, they said "reduce red" because the military decided that it was more important for helicopter pilots to avoid trees than to see warning lights. (Tr. 364.)

This is a straightforward example of why the non-obviousness requirement is so important. Here, the military and designers made a decision on where to make a trade off filtering between NVG acuity and red warning lights. Though persons of skill in the art knew how to split the red color spectrum and allow any amount of red light in the cockpit without interference,[5] they did not do it because the military, through the MIL Spec, chose maximum NVG performance over red indicators.

This is akin to building an FM radio that can be tuned to 109 MHz. Most consumer FM radios, like those in cars, can be tuned to between 87.8 and 108 MHz. The reason for this is not because radio engineers cannot build a radio that will receive a broadcast at 109 MHz, it is simply because the Federal Communication Commission ("FCC") limits broadcast licenses to

[5] The logical extreme of this fact would be to allow all spectrums of red light in the cockpit by using an NVG filter that blocks all visible light. Of course, though this extreme would allow red light it would severely diminish the abilities of the NVGs.

108 MHz or less, so that other uses can be made of different bands (e.g. air traffic communications, television, etc.). If we picked up a reference on building a car radio today discussing setting the frequency dial between 87.8 and 108, it would not be teaching away, and no person of ordinary skill in the art would find it challenging to build a radio that goes to 109 MHz. No one would do so unless the FCC decided to grant licenses in a wider frequency band, but that does not mean it is technically infeasible to do so.

Honeywell argues that the Defendants developed this explanation post hoc, that no contemporaneous evidence supports the fact that engineers were concerned with reducing NVG sensitivity. (H. Br. 26.) This assertion is simply false. The Boehm reference clearly states that the "spectral sensitivity range, especially of the 2nd generation tube, is drastically reduced" when a filter is placed on the NVGs to block part of the spectrum. (DMX-4 D000603 (Boehm); DE-500 ¶ 97 (Task Direct).) Furthermore, the Reetz Thesis provides Table II that indicates how NVG performance (e.g., AN/PVS-5A) was reduced when filters were placed on the goggle.[6]

[6] Despite overwhelming evidence to the contrary, Honeywell continues to dispute whether the Reetz Thesis (DE-301) was published as prior art. (H. Br. 109-123.) In the interest of efficiency, L-3 adopts the Government's argument and will not brief the issue in detail. Suffice it to say that the facts and law are clear. All that is needed to prove public availability is "competent evidence of general library practice . . . to establish an approximate time when a thesis becomes available." In re Hall, 781 F.2d 897, 899 (Fed. Cir. 1986). Defendants have presented clear and convincing evidence that (1) Reetz received his masters degree and wrote his thesis in 1983 (Secrecy Tr. 491-92, 781), (2) it was university practice to sign off on theses in July of the year of graduation (DE-688 34 (Wiant Dep.)), (3) the library received theses for shelving shortly after signing (DE-668 22-23 (Fidishun Dep.)), and (4) no more than three months would pass before the theses were indexed, catalogued, and shelved (DE-688 26 (Wiant Dep.).) The evidence shows that the Reetz thesis was publicly available by October 1983, two years before the critical date. Reetz testified that he wrote his masters thesis, delivered it to his advisor, and graduated from Penn State in 1983. (Tr. at 412, 469). Ms. Wiant, a full time library assistant from 1967 to 2004, testified that the thesis was submitted to the library on July 5, 1983, based on her review of signatures on the thesis itself. (DE-688 34 (Wiant Dep.).) She further testified that theses are typically shelved as soon as possible. (DE-688 26 (Wiant Dep.).) Based on her extensive career at the Penn State library, Ms. Wiant testified that the "longest [time the shelving process] would take would be a month." (DE-688 25 (Wiant Dep.).)

(DE-301 GVT018-0999, -1002 (Reetz); DE-500 ¶ 97.) Thus, the compromise of sensitivity for color was well known before 1985.

*ii. Honeywell's Argument that Individual Reference's Lack Specific Elements of Claim 2 is meaningless*

Next, Honeywell repeatedly points out the individual pieces of prior art are lacking certain elements of Claim 2, as if the fact that a specific reference is missing an element will preclude obviousness. This position takes the form of Honeywell's repeated questions "If it is so obvious, why has it not been done before?"

- H. Br. 33-34 (asserting that individual filters would not be appropriate for a full color display);
- H. Br. 49 (arguing that Reetz requires the substitution of ANVIS for a full face mask goggle);
- H. Br. 61-62 (arguing that Verney does not separate filtering of red, blue, and green, and does not provide a fourth filter at the night vision goggles);
- H. Br. 66-67 (arguing that Boehm does not include a full color display); and
- H. Br. 68-69 (arguing that Boehm does not include a third filter).

This position, however, is not and cannot be the law of obviousness. Honeywell's misleading argument attempts to impose the stricter requirements of the anticipation defense under Section 102, which is triggered if all elements of a claim are present in a single prior art reference, onto the obviousness defense under Section 103.

The entire premise of the obviousness inquiry is that the entire invention cannot be found in one reference of the prior art.

---

Honeywell's inflammatory attacks on Ms. Wiant's credibility and testimony, and its specious attack on the government, are both irrelevant and incorrect. Ms. Wiant personally assisted in the receiving, cataloging, and shelving of theses during the relevant period, (DE-688 11-16) and her testimony based on personal knowledge is more than sufficient to establish the public availability of the Reetz Thesis under In re Hall. Honeywell had the chance to cross examine her about all of this and the basic testimony did not change.

> A patent may not be obtained though the invention is <u>not identically</u> disclosed or described as set forth in section 102 of this title if the <u>differences between the subject matter sought to be patented and the prior art</u> are such that the subject matter as a whole would have been obvious at the time the invention . . . .

35 U.S.C. § 103(a) (emphasis added). If all elements are present in a single reference, the defense becomes anticipation under § 102.

Section 103, by contrast, asks whether in light of all the teachings of the prior art, usually multiple references, the invention would be obvious such that it is no more than "the results of ordinary innovation," that, if granted, could "stifle, rather than promote, the progress of useful arts." <u>KSR</u>, 127 S. Ct. at 1746. Thus, the proper and common way to demonstrate obviousness is to take multiple prior art references, identify what elements of the claimed invention they contain, and show that a person of ordinary skill in the art would find it obvious to combine or modify other references to arrive at the invention. <u>Id.</u>

Like the radio example above, Honeywell cannot patent what is already being done at lower wavelengths, simply because no one is doing it at higher wavelengths. If that were the standard, there would be no point in having an obviousness test. A patentee could simply receive a patent by demonstrating no one is building car radios that tune to 109 MHz, therefore the applicant's radio that can tune in channel 109.1 MHz is patentable. <u>See</u> <u>KSR Int'l Co. v. Teleflex, Inc.</u>, 127 S. Ct. at 1734 (reciting that § 103 and <u>Graham v. John Deere Co.</u>, 383 U.S. 1 (1966) require courts to compare **differences**). By definition, obviousness under § 103 recognizes that the invention is not being practiced in the art as it stands, but nonetheless would be obvious given what is known to a person of ordinary skill in the art.

*iii. Honeywell Contradicts The Holdings Of <u>KSR</u>*

Despite this year's clarion call by the Supreme Court in <u>KSR</u> reversing a finding of non-obviousness, Honeywell argues the obviousness issues in this case as if the <u>KSR</u> decision were

never rendered. Honeywell's arguments contradict several specific holdings of KSR. In KSR, the Supreme Court considered § 103 and the obviousness standard for the first time in over 30 years. Its conclusion was that the standard for obviousness is, and always has been, "expansive and flexible." 127 S. Ct. at 1739. As such, the Supreme Court specifically identified several errors made by the Federal Circuit, including (1) an improper requirement that references exhibit a teaching, suggestion, or motivation to combine, (2) an improper focus solely on the problem faced by the patentee, and (3) an overly cautious focus on the danger of hindsight. Id. at 1739, 1741, 1742. Honeywell's arguments run contrary to these holdings. Furthermore, the decision in KSR is particularly telling because the facts of KSR demonstrate less reason to combine than the facts at issue here.

*a. Honeywell's Argument That The Patent Is Non-Obvious Because The Prior Art Does Not Teach Or Suggest Combining References Is False And Contrary To KSR.*

First, Honeywell argues that the prior art cannot make the '914 patent obvious because it does not teach, suggest, or motivate the combination of the prior art to arrive at the invention. Honeywell makes this argument in various forms throughout its brief:

- "This novel solution was nowhere disclosed or suggested in the prior art." (H. Br. 1.)
- "The suggestion to use the full color LCD display of Uchida (DE-515) or the full color projection display of the '963 patent (DE-519) comes solely from the teachings of the '914 patent." (Id. 5.)
- "Neither the Government nor L-3 points to anything in the prior art or elsewhere suggesting the use of separate filters for red, green and blue for making an NVG compatible full color display." (Id. 21.)
- "Steps 1 and 3 in particular are motivated by the teachings of the '914 patent, not by ordinary skill in the art in 1985." (Id. 28.)
- "Dr. Task testified that he selected Uchida (DE-515) as a secondary reference because it discloses multiple filters like the '914 patent, not because there was any

suggestion in the prior art or elsewhere to provide an NVG compatible LCD display using complementary filtering." (Id. at 43.)

- "There is no suggestion in Reetz (DE-301) or elsewhere that substituting a *different* filter over the cockpit lights would permit the NVGs to function." (Id. 58.)
- "But Verney does not teach complementary filtering, and there is no suggestion anywhere to substitute the Verney filter in a complementary filtering solution." (Id. at 60.)
- "Boehm (DMX-4) nowhere suggests filtering a full color LCD display for NVG compatibility." (Id. 72.)

(emphasis added throughout).

Honeywell's argument is flawed for two reasons. First, the prior art clearly *does* teach and suggest the combination of complementary filtering, like that found in Boehm and the German Patent, with full color displays, like those found in Uchida and the '963 patent.[7] More fundamentally, however, Honeywell's premise that there must be a "suggestion" or "teaching" is no longer the law. (L-3 Br. 15.)

In perhaps its clearest holding, KSR specifically rejects the requirement for a teaching, suggestion, or motivation to combine. 127 S. Ct. at 1739 ("We begin by rejecting the rigid approach of the Court of Appeals. Throughout this Court's engagement with the question of obviousness, our cases have set forth an expansive and flexible approach inconsistent with the way the Court of Appeals applied its [teaching, suggestion, motivation] test here."). Instead, the Court held one should consider such things as the common sense and creativity of those in the art, and whether the "invention" was an obvious next step. KSR, 127 S. Ct. at 1742. Honeywell's continued assertion that the '914 patent in non-obvious because there is no "suggestion" in the prior art is false and contrary to KSR. Id. As L-3 and the Government both

[7] Indeed, Tannas admitted that the prior art, especially the German Patent, discussed complementary filtering. (Tr. 1085.)

asserted in their opening briefs, the reason to combine the prior art not only comes from the references themselves, but also the common sense and ordinary creativity found in those persons skilled in the art at the time. (See L-3 Br. 39-42; Gov't Br. 26); see also KSR, 127 S. Ct. at 1742.

*b. Honeywell's Attempt To Limit The Court's Review To Problems Addressed In The Patent Is Contrary To* KSR

Honeywell argues throughout its brief that the Court should not consider certain prior art references because they either do not address the specific problem of NVG compatibility, or they do not address aircraft cockpits.[8] These arguments, which will be addressed below in Section A.3, infra, are again factually incorrect. More importantly, the principle that a court should only consider prior art that addresses the problem addressed by the patent, the idea that persons skilled in various arts have blinders on as to what is happening in the rest of the world, was specifically rejected in KSR.

In KSR, the Supreme Court specifically held that one of the errors committed by the Federal Circuit was to require the prior art reference under consideration to address the same problem the patentee was trying to solve. 127 S. Ct. at 1742. Instead, the Court held, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." Id. Indeed, this holding was reiterated in In re Icon Health and Fitness, Inc., 496 F.3d 1374 (Fed. Cir. 2007), where the Federal Circuit held that springs used for folding beds could be considered in the art of treadmills. Id. at 1380. Thus, the Supreme Court explicitly rejected the theory that Honeywell now expounds. The Court noted that those skilled in the art are not mindless robots.

[8] H. Br. 20-21 n.6, 41-42 (arguing Verney should not be considered because it does not demonstrate complementary filtering and discounting Uchida and the '963 patent because they do not reference aircraft cockpits).

Furthermore, KSR held that courts should not reject an obviousness claim when there is good reason for a person to pursue options within their technical grasp. Id.

Since KSR, the Federal Circuit has had several opportunities to comment on what fields of art are relevant to a technology at issue. Icon, 496 F.3d at 1379; In re Translogic Tech., No. 2006-1192, 2007 U.S. App. LEXIS 23969 at *12 (Fed. Cir. Oct. 12, 2007). Each time the court has allowed references to be considered even though they are concern a different field than the patent in suit. For example, in Icon the Federal Circuit considered a patent for a treadmill that utilized a certain gas spring assist feature to fold the unit. Icon, 496 F.3d at 1377. Even though there were multiple elements to the claimed invention aside from the gas springs, id. (reciting "[a] treadmill," "a tread base having . . . an endless belt," and "a roller") the court considered similar gas springs used for beds – a completely different field of art. Id. at 1380.

Here, Honeywell cannot properly argue that references like Verney or Uchida cannot be considered. Verney in fact teaches how to make NVGs compatible with cockpit lighting and displays, the identical problem addressed by the '914 patent. (DE-511 GVT0009-0782.) As for Uchida, the situation is similar to Icon, as the Uchida display deals with a full color display and must be considered since one of skill in the art would consider it as a way to bring color displays to aircraft. In fact, other references, such as Boehm and Verney, *actually suggest that cockpit designers use LCDs like Uchida* in NVG compatible solutions. (DE-511 GVT009-0782; DMX-4 D000600 (Boehm); DE-514 GVT018-1671 (Trimmier).) Accordingly, even if the KSR decision had not been rendered, these references should be considered because Verney addresses the identical problem as the patent, and the prior art in this very field discusses using LCDs.

*c. A Court Should Not Overemphasize The Risk Of Hindsight As Honeywell Suggests*

Throughout its brief, Honeywell argues that to find the '914 patent invalid for obviousness would inject improper hindsight into the consideration. (See, e.g., H. Br. 12-13, 14, 22, 28, 34, 41, 53.) This argument, however, makes the same error the Federal Circuit made in KSR. 127 S. Ct. at 1742. While avoiding hindsight is no doubt important, this caution should not overshadow the need to consider the common sense and knowledge of those in the art and become a tool to rob the public of what it already knows. Id.

*d. The Facts Of KSR Demonstrated Even Less Of A Case For Obviousness Than The '914 Patent*

Honeywell also suggests that KSR is factually distinguishable because there was no teaching away and all elements of the invention were present. To the contrary, KSR is a less compelling case for obviousness than the one here. While it rejected the argument, the Court in KSR was presented with a similar "teaching away" argument as Honeywell presents here. Furthermore, unlike KSR, the elements of the prior art concerning NVG compatibility can be found and combined based not just on common sense, but also on the explicit teachings and suggestions in the prior art itself. KSR, 127 S. Ct. at 1742

First, even though KSR did not *find* a teaching away, it did consider and reject an argument similar to Honeywell's argument here. In KSR, the patentee argued that the prior art taught away from upgrading an existing gas pedal assembly with a modern electronic sensor because the existing assembly was "bulky, complex, and expensive." 127 S. Ct. at 1745. Indeed, the patentee in KSR even presented the declaration of its expert, who opined that the bulky, complex prior art would not solve the inventor's goal of making a "small, simple, and inexpensive pedal." Id. The Court rejected this conclusion because there was no indication that

the prior art "was somehow so flawed that there was no reason to upgrade it" and there was an indication that similar prior art pedals were upgraded the same way. Id.

Similarly, here, neither the prior art (e.g., Boehm, Reetz, the German Patent, Trimmier, etc.) nor any evidence presented by Honeywell suggests that the prior art was so flawed that there was a reason red light must be eliminated. Indeed, references like Verney (DE-511), Boehm (DMX-4), and Trimmier (DE-514) all indicate that narrow bands of red light could be used. This teaching is nothing different than the patent itself. (JTX-1 col.6 ll.21-23 (requiring a narrowband of the red color band).) Thus, if the prior art teaches away by teaching those in the art to reduce red and infrared light, then so does the '914 patent.

Furthermore, in KSR the Court held that a prior art reference like Asano could be upgraded with a modern sensor found on other gas pedals to arrive at the patent claim. 127 S. Ct. at 1743-45. The Court found this appropriate even though there were no references that specifically suggested to those in the art that they upgrade an adjustable pedal assembly like Asano with an electronic sensor. Instead, the Court found the required reason to combine the references from the "strong incentive to convert mechanical pedals to electronic pedals" and the prior art taught methods of doing so. Id. at 1744.

In this case, not only are all elements of Claim 2 found in the prior art (L-3 Br. 13-14; see infra Section A.2.iii), but here there are several prior art references that specifically suggest the combination of LCDs (or projection CRTs) with complementary filtering like that found in the prior art. Indeed one of these suggestions can actually be found in Boehm, which supplies all elements of Claim 2 except for the blue and green filters found in the LCD. This would be similar to the Asano patent in KSR suggesting that it be upgraded with an electronic sensor. The

Supreme Court found the combination obvious without any such suggestion in the Asano patent. Accordingly, the facts here are even more compelling than those in KSR.

*iv. Just Because An Application Is Deemed A Potential National Security Risk Does Not Mean The Alleged Invention Is Non-Obvious*

Honeywell further suggests, in a question posed on page 3 of its brief, that because the patent was placed under secrecy order it is not obvious. Honeywell's assertion is plainly flawed. When an application or patent is placed under secrecy, it is generally not reviewed for patentability, it is reviewed to determine whether it deals with sensitive technology that should not be immediately publicized or identifies security vulnerabilities in current technology. For example, the '914 patent as originally filed identified that NVGs have a vulnerability above a certain wavelength of light. An enemy could use this knowledge to cloak themselves from patrolling aircraft or to attempt to overwhelm NVGs at night. (Secrecy Tr. 437 (McLure).)

Honeywell's suggestion is further undercut by the fact that Honeywell drastically broadened its claims in 2002 to incorporate art developed in the preceding 17 years. (L-3 Br. 87.) As a result, Claim 2 is much broader than the claimed filings that were placed under secrecy order in 1985. See infra Section B (discussing the broadening of claims that ultimately claim what was not described in the original filings). The broader the claim, the more likely it will be found to be obvious. See Clinical Prods. Ltd. v. Brenner, 255 F. Supp. 131, 132 (D.D.C. 1966) ("[T]he main difficulty with broad claims such as that in suit is not that the claim is so broad as to be indefinite, like infinity, but rather is that such a broad claim is quite likely to be either anticipated under 35 U.S.C. § 102 or rendered obvious under 35 U.S.C. § 103.").

2. L-3 Has Proven The *Graham* Factual Inquiries With Clear And Convincing Evidence

Honeywell spends a great portion of its obviousness section arguing that the Defendants failed to set forth a Graham factual analysis. (H. Br. 11-44.) This claim is demonstrably false. In fact, Defendants and their expert witness described the factual inquiries of the Graham analysis in detail,[9] and provided a detailed chart comparing the prior art to the claimed invention. (L-3 Br. 13-14.) Honeywell, on the other hand, has failed to rebut many of the most important references, not the least of which was the German Patent, neither the fact that they are prior or the fact that they contain the elements of Claim 2.

*i. The Burden Of Proof*

For decades, the Supreme Court has required defendants to establish three facts by clear and convincing evidence: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; and (3) the level of ordinary skill in the art. KSR, 127 S. Ct. at 1745-46; Graham, 383 U.S. at 17.[10] Once these facts are established, however, "[t]he ultimate judgment of obviousness is a legal determination." KSR, 127 S. Ct. at 1745; (citing Graham, 383 U.S. at 17).

---

[9] See L-3 Br. 4, discussing the required Graham analysis, and 9-34 discussing the factors of the Graham analysis; DE-500 40-82 (Task Direct), describing in detail what is described in the prior art, and 18-20 describing a person of ordinary skill in the art.

[10] Secondary considerations are often considered the fourth factual inquiry of Graham. See Eli Lilly & Co. v. Zenith Goldline Pharms., Inc., 471 F.3d 1369, 1380 (Fed. Cir. 2006). Generally, the first three Graham inquiries are undertaken to determine whether there is a prima facie case of obviousness, and, if so, the court may still conclude non-obviousness upon a successful showing that secondary considerations should weigh against a finding of obviousness. See id. For simplicity, secondary considerations are discussed below in Section A.4, infra.

*ii. The Scope And Content Of The Prior Art*

The first Graham inquiry requires the Court to determine what is part of the relevant art and what that art discloses. Id. L-3 detailed the relevant pieces of art in its opening brief by first comparing the prior art to Claim 2 in a claim chart. (L-3 Br. at 13-14.) L-3 went on to discuss those elements of the art that Honeywell and Mr. Tannas disputed during trial. (Id. at 19-34.) Despite this analysis, Honeywell continues to assert incorrectly that many pieces of the prior art should not be considered.

*a. Honeywell's Argument That The Court Should Not Consider Uchida And The '963 Patent Have Been Explicitly Rejected By The Supreme Court And Recent Federal Circuit Case Law*

Shockingly, Honeywell continues to take the position that the Uchida and '963 Patent should not be considered as prior art to the '914 patent. (H. Br. 14, 17-18.) There is no question that these references disclose the full color display limitations of the '914 patent. (DE-500 77-80.) Notably, Honeywell is estopped from arguing that the LCD referenced in Uchida does not meet the full color limitations because the LCD display is identical to the one used in the infringing products. (DE-500 ¶ 175.)

Instead of addressing the striking importance of Uchida and the '963 patent, Honeywell argues that these references should not be considered because Uchida and the '963 patent do not explicitly describe the use of LCDs or projection displays in aircraft. (H. Br. 17-18.) By inference, Honeywell is arguing that the '914 patent not only invented complementary filtering, but also was the first to consider using LCDs in aircraft. As discussed in section A.iii.b, infra, such a conclusion is factually false and is contrary to the law.

Honeywell contends that Icon is inapposite because the patent in Icon did not require a focus on treadmills. (H. Br. 42 n.10.) This is clearly wrong. The claim language in the Icon

patent claimed the use of the springs in "treadmills," yet the court allowed art from beds to be considered. Here, Claim 2 does not even mention aircraft cockpits. (JTX-1 col.6 ll.12-28 ('914 Patent).)

Moreover, common sense would direct a person looking for full color displays to full color display technology, especially here where the actual art discussing complementary filtering for NVG compatibility in aircraft recommends and suggests the use of LCDs and projection CRTs like those described in Uchida and the '963 Patent. (L-3 Br. 38).[11] This fact would be equivalent of the prior treadmill art in Icon suggesting the use of bed spring art as technology to consider. It is telling, however, that the Federal Circuit never requires such explicit detail. Indeed, such rigid requirements are explicitly discouraged by the Supreme Court, and any court applying KSR must consider any prior art reference that "logically would have commended itself to an inventor's attention in considering the problem." Icon 446 F.3d at 1380; accord KSR, 127 S. Ct. at 1741. ("The obviousness analysis cannot be confined . . . by overemphasis on the importance of published articles and the explicit content of issued patents.").

Honeywell's theory that Uchida and the '963 patent should be discounted by the manner in which Dr. Task found the references is unpersuasive. (H. Br. 43.) Clearly, the references are part of the public domain and were within the common knowledge of a person of ordinary skill in the art. The fact that Uchida and the '963 patent describe how certain full color displays work would make them relevant to a person of skill in the art looking for color displays to place in aircraft. As Dr. Task explained, however, the person of ordinary skill in the art did not have to have a detailed understanding of how to manufacture such displays. (DE-500 ¶ 45 (Task Direct).) Thus, Dr. Task's search for LCD art in order to describe what elements would be found there

[11] Of course, a suggestion in the art may provide a helpful insight into the obviousness inquiry, but it is not a rigid requirement. KSR, 127 S. Ct. at 1741.

when references such as Verney, Trimmier, and Boehm, suggest their use is not inappropriate and in fact would be the exact path a person of skill in the art would have taken in 1985 if presented with such references. (See DE-500 ¶ 175.)

*b. Boehm*

Next, Honeywell complains that Boehm does not discuss filtering a full color display. (H. Br. 16.) This argument, as mentioned in Section A.1.ii, is another thinly-veiled attempt to confuse the issue by importing the stricter requirements of a § 102 anticipation defense into the obviousness inquiry. Honeywell's argument is that Boehm should not be considered part of the obviousness inquiry because it is missing a limitation of Claim 2.[12] This is not, and logically cannot be, the approach to obviousness. As discussed above, the obviousness defense presumes that individual references omit certain elements of the claim. At any rate, Boehm does refer to color display technology, which strongly suggests the combination of such technology with the complementary filtering discussed in Boehm, but neither Task nor L-3 attempts to prove its obviousness case by demonstrating Boehm discloses everything in the '914 patent. (L-3 Br. 16, 18, 19; DE-500 ¶ 96.) The relevant point under Section 103 is that, as Boehm itself suggests, it would have been obvious to one of skill in the art to combine Boehm with a prior art full color display such as Uchida. See supra Section A.2.ii.a.

*c. Verney*

Honeywell further asserts that Verney should be ignored because it treats integral and annunciating lights differently and suggests dimming the warning lights in combination with filtering. (H. Br. 63.) Again, this argument mischaracterizes the facts and the law and attempts to make distinctions that do not matter. First, there is no requirement – or inkling – in Claim 2

[12] Honeywell's argument is even more egregious because nowhere does Claim 2 mention a full color display.

that "integral" and "annunciating" lights should be treated differently. (See JTX-1 col.6 ll.12-28.) Second, Honeywell appears to assert that Verney should be discredited because the red light warning indicators would still interfere with the NVGs if used constantly. (H. Br. 64; PTX-834 ¶¶ 429,432 (Tannas Direct).) This argument, however, again demonstrates Honeywell's flawed reasoning that a prior art obviousness reference must meet each claim limitation to be considered. As the Defendants have shown, Verney primarily suggests to persons in the art that the filter shown in Figure 14 (reproduced in Section A.3.i.c, infra) can be used as the third filter to pass a narrowband of red light in NVG compatible operations as described in the reference. (DE-500 ¶ 129; L-3 Br. 13; Gov't Br. 30-31.) The additional filtering to prevent the light from adversely affecting the NVGs, as Honeywell describes (H. Br. 64-65 (citing DE-511 GVT009-0780 (Verney)), comes from the fourth filter at the NVGs.

The disclosures in Verney strongly suggest the use of the filter described in Figure 14 as a way to pass narrowband emissions of light, and specifically proposes doing so with LCDs. (DE-511 GVT009-0782.) The Verney filter is nearly identical to the infringing third filter, and of course, what invalidates before infringes after. See Upsher-Smith Labs., Inc. v. Pamlab, L.L.C., 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'").

Finally, Honeywell attempts to distinguish Verney by arguing that the only teaching in Verney is a combination of both filtering and dimming together. (H. Br. 64.) This is incorrect. Verney clearly describes two methods for using red in the cockpit: limited filtering and dimming (DE-511 GVT009-0780). While it suggests combinations of the two may be helpful in arriving at the ideal solution, Honeywell ignores the fact that it suggests either filtering *or* dimming and even suggests filtering to retain display color. (DE-511 GVT009-0782.) Accordingly, Verney

provides a significant teaching and motivation for using a narrowband of red light as a way to make NVGs compatible with CRTs or LCDs.

*d. Honeywell Ignores The Content Of Other Art Presented By The Defendants, Namely The German Patent*

In its rush to criticize the Defendants' evidence of obviousness, Honeywell has simply ignored key prior art references that disclose elements of Claim 2.[13] Perhaps chief among these ignored references is the German Patent. (DE-505.) As Dr. Task described, the German Patent provides an explicit recipe for persons of ordinary skill in the art to apply complementary filtering. (DE-500 ¶¶ 134-35.) The reference details how to filter a display and filter an NVG so that the functions of the two are not interfering. The German Patent teaches how to assign filters for both the display and the NVGs to successfully achieve the '914 invention, and how to vary the cut off depending on the longest wavelength an engineer wants to use. (Id.) For instance, by choosing wavelength $\lambda_1$ in the '914 patent, the teaching of the German Patent would describe which filters should be chosen to allow NVG compatibility with red light in the cockpit.

More importantly, the German Patent gives an example in which the "splitting" occurs at 650 nm, well within the red color spectrum. (Id. ¶ 137.) Thus, contrary to the argument of Honeywell and its counsel that the prior art focused on blocking all of the red spectrum (H. Br. 45), this prior art reference specifically describes splitting the red color spectrum, which the Court defined as 620nm to 780nm, by blocking some and allowing some to pass. Thus, the only Claim 2 limitations not explicitly referenced by the German Patent are the blue and green filters plainly found on color LCDs like Uchida and the '963 patent. (Id. ¶ 139.)

---

[13] While L-3 and the government used specific references as a demonstration of obviousness in order to simplify this Court's review, they never admitted the remaining references were irrelevant. To the contrary, the corresponding elements of each reference are highlighted and described throughout Dr. Task's expert report and L-3's brief. (See L-3 Br. 13-14, 18, 26, 30, 33.)

*iii. The Differences Between The Prior Art And The Claimed Invention*

Next, Honeywell suggests that L-3 failed to present evidence of the second Graham inquiry – the differences between the prior art and the claimed invention. (H. Br. 12.) Nothing could be further from the truth. First, L-3 provided a claim chart that identifies the disclosures of each reference and compares those disclosures to the claim elements,[14] something Honeywell fails to provide. In addition, L-3 described in detail how the four elements Honeywell's expert claimed were missing from the prior art combinations – (1) full color display, (2) splitting the red color band, (3) a filter at the NVG, and (4) a local display are in fact present in the prior art. (L-3 Br. 19-36.)

Notably, Honeywell retreats from Tannas' obviously false opinion that the prior art does not disclose any element of Claim 2 and is apparently a completely new device. (PTX-834 5-6.) Such an opinion would be highly suspect. Cf. KSR, 127 S. Ct. at 1741 ("[I]nventions in most, if not all, instances . . . will be combinations of what, in some sense, is already known."). Instead, Honeywell, departing from its expert's conclusions, argues that the key differences between the prior art and Claim 2 are that the prior art fails to disclose:

(1) a display that is both NVG compatible and full color (H. Br. 18);

(2) filters for passing a narrowband of the red color band at the display and for blocking the narrowband at the NVGs (the third and fourth filters) (H. Br. 19); and

(3) an NVG compatible full color display by using separate filters for red, green, and blue (H. Br. 21.)

Honeywell's argument, however, is merely attorney argument, which, as Honeywell notes, is not allowed. Chem. Separation Tech., Inc. v. United States, 51 Fed. Cl. 771, 816 (Fed. Cl. 2002).

---

[14] L-3 Br. 13-14

And Honeywell again misrepresents how a court should review the differences in the prior art under Graham.

As noted above in Section A.1.ii, supra, Honeywell cannot attempt to defeat obviousness or show discrepancies in a Graham analysis by stating that a particular prior art reference did not teach each element of a claimed invention. Whether a prior art reference contains all the elements of a claim is the analysis of the anticipation defense under § 102 rather than obviousness under § 103. See 35 U.S.C. § 103(a). For example, Honeywell points out that no one made NVG compatible full color displays, such as CRTs and LCDs, prior to 1985 and therefore these elements are not met in the prior art. (H. Br. 18.) Not only does this argument mischaracterize the testimony, it is blatantly wrong. The Trimmier reference suggests a "Full Color (NVG Compatible)" display. (DE-514 GVT018-1667.) Additionally, the German Patent provides a precise formula for making a display NVG compatible at any wavelength, including wavelengths for full color displays. (DE-505 GVT007-0926 (German Patent); DE-500 ¶¶ 134-35.)

Honeywell makes the additional irrelevant argument that because Reetz and Dunn were not aware of anyone having made an NVG compatible full color display or having applied complementary filtering to such a display, Claim 2 is not obvious. (H. Br. 18.) Reetz and Dunn, however, were noting simply that no one was practicing the invention on a full color display, but they did not suggest that a person of skill in the art would not find complementary filtering -- of full color displays -- obvious. In fact, complementary filtering of full color displays was not done at that time because (1) the initial compromise was to allow greater NVG abilities by reducing color (Tr. 362-63 (Reetz)); (2) most cockpits were not using color displays such as

LCDs or CRTs at the time;[15] and (3) the full color displays at the time had difficulties with daylight readability. (Tr. 233, 239-244 (Dunn Direct).)

Moreover, it is meaningless for Honeywell to simply combine elements of the claim and demonstrate that those combined elements are missing from any reference. This would undermine the entire Graham/KSR framework, which requires a court to determine which elements are present in the references and how it would be obvious for a person of skill in the art to combine those references. See KSR, 127 S. Ct. at 1734 (quoting Graham, 383 U.S. at 17-18).

As shown in the table below, each of Honeywell's proposed "missing elements" is actually a combination of two or more elements.

| | | |
|---|---|---|
| 1 | NVG Compatible **(Element 2(a)(3) & (b))** | Full Color **(Elements 2(a)(1)-(3))** |
| 2 | A third filter for passing a narrow red band **(2(a)(3))** | A fourth filter to block at the NVG **(2(b))** |
| 3 | A NVG Compatible display **(2(a)(3) & (b))** | Separate filters for red **(2(a)(3))**, green **(2(a)(2))**, and blue **(2(a)(1))** |

Honeywell then argues that references such as Verney (H. Br. 19), Boehm (Id. 19,20), Task III (Id. 20), and Lloyd (Id.) are not valid references because they do not have all of these elements. That argument is another untenable attempt to confuse the issues. Verney teaches the use of an almost identical filter to the one found to infringe on colored lighting, including red lighting. According to Honeywell's Graham analysis, however, Verney should be ignored because it does not teach both full color and the fourth filter at the NVG. While Honeywell can

[15] See Tr. 361 (Reetz); tr. 978 (Lawrence); PE-834 ¶ 252 (Tannas).

argue against a reason to combine references, it cannot randomly combine elements as it pleases and then describe how the references fail to meet those combinations of elements.[16]

*iv. The Defendants' Definition Of A Person Of Ordinary Skill In The Art Comports With The Court's Definition*

Honeywell next argues that the Defendants have not established the proper level of skill in the art as part of the third Graham inquiry. (H. Br. 23.) Its argument appears to focus on Dr. Task's explanation of what a person of ordinary skill in the art, as defined by the Court, would know (and for a third time Honeywell mischaracterizes the law by arguing that the entire claimed invention was not disclosed in the prior art).

First, neither Honeywell nor its expert disputes that Dr. Task or Mr. Reetz were competent witnesses that could testify to the level of skill in the art at the time.[17] Alza Corp. v. Mylan Labs., Inc., 464 F.3d 1286, 1294 (Fed. Cir. 2006) (stating that testimony of an expert witness that is relevant to the knowledge of a person skilled in the art is pertinent to the obviousness inquiry); Orthopedic Equip. Co. v. United States, 702 F.2d 1005, 1011-12 (Fed. Cir. 1983). Honeywell takes issue with Dr. Task's description of the technical knowledge such a person would possess. (H. Br. 23-24.) However, Task's description, while detailed, does not overstep the Court's description of a person of ordinary skill in the art. This Court described a person of ordinary skill in the art as a person "knowledgeable about [(1)] night vision compatible aids, [(2)] compatible instrument and panel lighting, and [(3)] manufacturing displays for

---

[16] There is a plain reason why Honeywell is illogically attacking the Graham analysis as opposed to the reason to combine. First, the Graham analysis, which is easily met in this case, is a question of fact, however the obviousness of the combination is a matter of law the Court must decide once it establishes the Graham facts. KSR, 127 S. Ct. at 1745. Second, KSR clearly weakens Honeywell's case for non-obviousness so they must take any conceivable approach to avoid reaching the question of whether the combination would be obvious.

[17] Indeed, Tannas admitted that Reetz had at least the level of skill in the art in the relevant fields in 1985. (Tr. 1460.)

military cockpits." Honeywell Int'l, Inc. v. United States, 66 Fed. Cl. 400, 428 (Fed. Cl. 2005) (hereinafter "Markman Op."). In describing the understanding of persons of ordinary skill at the time, Dr. Task listed subjects in which those persons would be competent. Each subject Honeywell complains of logically fits within the Court's description.

| Night Vision Compatible Aids | Compatible Instrument and Panel Lighting | Manufacturing Displays for Military Cockpits |
|---|---|---|
| • optical filter techniques<br>• optical filter types<br>• the relationship between wavelengths and color<br>• radiometry<br>• photometry<br>• wavelengths of the visible spectrum<br>• spectral sensitivity of NVGs | • optical filter techniques<br>• optical filter types<br>• full color display types<br>• monochromatic display transducers<br>• the relationship between wavelengths and color<br>• wavelengths of the visible spectrum | • optical filter techniques<br>• optical filter types<br>• color display emission spectra<br>• full color display types<br>• monochromatic display transducers<br>• the relationship between wavelengths and color<br>• wavelengths of the visible spectrum<br>• cockpit geometry |

This description is no different than an expert describing a person of ordinary skill in contract law as a person knowledgeable in the UCC, consideration, offers, acceptance, etc. As such, Dr. Task's expert conclusions are made from the proper perspective – that of a person of ordinary skill in the art.

If Honeywell believes that Dr. Task's description of these categories is in error, they have presented no evidence to suggest otherwise. Instead, Honeywell argues that because no one or no reference describes how to make the invention, then no person of ordinary skill in the art had sufficient knowledge to do so. (H. Br. 25, 26 (focusing on what persons of skill in the art in 1985

"actually did").) For a third time, then, Honeywell suggests that because all claim elements are not present in a single reference, the claim is *per se* non-obvious.

This argument remains fatally flawed, no matter how many times it is repeated or in what context. The entire premise of obviousness is that the invention was not practiced exactly, but was so obvious it is not patentable. Honeywell cannot now suggest that because a particular reference did not disclose the entire invention or that the reference discloses other techniques and practices, it is somehow a reflection on what a person of ordinary skill did not know. Such a conclusion would be absurd and would render the obviousness defense a nullity. Obviousness concerns piecing multiple prior art references together to form a larger puzzle. See KSR, 127 S. Ct. at 1742.

3. Considering The *Graham* Factual Inquires, Claim 2 Of The '914 Patent Would Be Obvious To A Person Of Ordinary Skill In The Art As A Matter Of Law

Once the Graham factual inquiries are answered, obviousness is a question of law. KSR, 127 S. Ct. at 1745. As discussed above, defendants were previously required to put forth a prima facie case for obviousness by demonstrating a teaching, suggestion, or motivation to combine prior art references to arrive at the claimed invention. The Supreme Court in KSR, however, recognized that this was not the only test to prove obviousness.

In KSR, the Court criticized the teaching, suggestion, motivation (TSM) test as too rigid, holding that the "obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." 127 S. Ct. at 722. Indeed, the Court reasoned that "[i]n many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends." Id. Therefore, the Court held, "[g]ranting patent protection to

advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." Id.

As discussed in detail in L-3's opening brief, the alleged invention of Claim 2 is plainly something that happened in the ordinary course without real innovation. Moreover, the reasons to combine the prior art references, e.g. Boehm and Uchida, can be found in the references themselves, the testimony of persons of ordinary skill in the art at the time, and even from the predictable results and common sense of the persons working in the art. (L-3 Br. 37, 39.) Thus, while the Court is not limited to finding explicit suggestions in the references themselves. KSR, 127 S. Ct. at 1741, the suggestions and motivation are there and elsewhere.

*i. Boehm Combined With Uchida Or The '963 Patent Would Be Obvious To A Person Of Ordinary Skill In The Art In Light Of The Many References That Teach, Suggest, And Motivate Their Combination*

When applying the traditional TSM test, practitioners normally refer to at least three references when considering an obviousness inquiry. Courts commonly find a patent to be obvious over the combination of reference "A" and reference "B" in light of a motivating reference "C."[18]

For example, as L-3 demonstrated, the elements disclosed in the Boehm reference ("A") combined with Uchida ("B") in light of the suggestions to combine NVG filtering and LCDs from Verney ("C") (DE-511 GVT009-0782) is sufficient to establish obviousness. Verney, however, is not the only motivating reference. Trimmier also suggests the combination of NVG compatibility techniques with LCDs. In fact, the prima facie case for obviousness is so strong

[18] This is not to say that obviousness is limited only to this inquiry. In fact, courts have recently recognized that even if the combination is missing an element, the combination may still be obvious if that missing element is well known. Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007).

that a motivating reference can be found without a third reference. The Boehm reference itself actually suggests the use of LCDs. (DMX-4 D000606.)

Honeywell seems to suggest three main problems with this analysis. First, Honeywell suggests that the Court should not consider the combination of Boehm and Uchida, because Boehm himself did not do so. Second, Honeywell argues there is no demonstration that separate filters for the red, green and blue filters is obvious. Third, Honeywell suggests that the product of Boehm and Uchida would not produce a narrowband of the red color band. Once again, these arguments are both factually and legally incorrect.

*a. The Fact That Boehm Did Not Make The Actual Invention Has No Bearing On An Obviousness Analysis, But His Suggestion Of What Can Be Done Is Relevant*

In yet another attempt to dress the same pig in different clothes, Honeywell argues that Boehm cannot be used to suggest the combination of complementary filtering and full color displays to arrive at the invention if Boehm himself did not practice the invention. Thus, Honeywell asserts that if the invention is not fully implemented in the prior art it is non-obvious. Again, this is a discussion of anticipation, not obviousness. There is no requirement that a prior art reference practice the invention as claimed in the patent to be relevant art.

There is little question that the Boehm reference meets all elements of Claim 2 except for the first and second filter limitations which are found in Uchida and also in the ‘963 patent. Notably, Boehm discloses the local source of light representing all color bands and a filter on the NVG. Moreover, Boehm clearly describes the use of several NVG filters that would block a narrowband of red, namely a “RG 630 cut-off filter from Schott.” (DMX-4 D000603; DE-500 ¶ 130 (Task Direct).) Boehm further discloses a third filter used to pass a narrow red band. (DMX-4 at D000590; DE-500 ¶ 121.)

While Honeywell criticizes Boehm and other references for failing to combine complementary filtering and LCDs like Uchida, it should be noted that such a combination was never made by the '914 inventor, Mr. Cohen. He admits to never building a prototype although he suggests LCDs "would be the way we do it." (DE-54 441 (Cohen Dep.).) As will be discussed below in Section B.1, infra, this raises serious questions about whether he was ever in possession of the idea in the first place, a violation of 35 U.S.C. § 112. Even if he were, however, such admissions demonstrate that the '914 patent is no different than the teachings in prior art references such as Boehm, Trimmier, and Verney, which actually go one step further and suggest to persons in the art that they actually use LCDs. Honeywell cannot criticize the prior art for failing to describe in detail a combination that even the '914 patent does not teach.

*b. The Combination Of Boehm (Disclosing A Filter For Red) Is An Obvious Combination With Uchida (Disclosing Filters For Green And Blue)*

Honeywell's next criticism is that L-3 represents Boehm to be an anticipating reference disclosing the entire invention. (H. Br. 67-68, 72.) L-3 has never argued as such. (L-3 Br. 13, 18.) L-3 has noted and continues to assert that Boehm AND Uchida (or the '963 patent) in combination will meet all elements of Claim 2. More specifically, L-3 agrees that Boehm does not directly disclose the blue and green filters in detail, however, they can be found in LCDs and other display references at the time. As L-3 has shown, however, Boehm definitely "suggests" the application of LCDs in the cockpit and in NVG compatibility applications.

In other words, though Boehm does not describe the green and blue filter specifically, it suggests their combination with its disclosure by referencing LCDs specifically. A person of ordinary skill in the art then would be motivated to use LCDs as a display, and make those LCDs NVG compatible in the same way Boehm suggests. Accordingly, the Court need not look

beyond Boehm to find the teaching, suggestion, or motivation to combine, which is one way to demonstrate obviousness under KSR.

Honeywell then asks why someone in the art would replace the cathode ray tubes in Boehm with LCDs in order to arrive at the claimed invention. The initial answer is simple: Boehm suggests the combination. (DE-500 ¶¶ 26-27 (Task Direct).) Furthermore, in the first opinion to interpret KSR, the Federal Circuit clearly stated that the modernization of an old idea with newer electronics, like LCDs, is obvious and cannot support a patentee's basis for validity. Leapfrog, 485 F.3d at 1162. In fact, there are multiple reasons for using LCDs instead of bulky CRTs like current televisions. Again, Honeywell cannot defeat obviousness by noting that the invention was never done before. That fact is assumed in obviousness, and the question is whether a person of skill in the art would find its creation obvious.

*c. There Is No Requirement That The Red Band Filter Pass A Significant Amount Of Light As Honeywell Suggests*

Honeywell next contends that the prior art combinations would not result in a narrowband of the red color band. This argument is flawed for multiple reasons. First, it is based on Tannas' mischaracterizations of the claim construction. Second, it ignores prior art that discloses an almost identical filter and display technology. Third, it ignores the ability of those in the art to modify and size components.

First, Tannas' expert testimony during invalidity departs from his testimony and his application of the Court's claim construction during the infringement phase of trial. This change in viewpoint not only impeaches his credibility as a witness, but is directly contrary to the law. Eaton Corp. v. Rockwell Int'l Corp., 323 F.3d 1332, 1343 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement." (internal quotations

omitted)). During the infringement phase of trial the Court relied on Tannas' description of the red band limitation to find infringement. As Tannas testified to the Court:

- "Well, perception is not part of any of the claim construction, nor the patent or anything." Honeywell Int'l, Inc. v. United States, 70 Fed. Cl. 424, 464 (Fed. Cl. 2006) (hereinafter "Infringement Op.").
- "[T]he actual color that the pilot sees is not part of the patent." Id.
- "There's no criteria, no test, no claims or claim construction [that the predetermined red color band has to be substantial energy]. . . . It has to be measurable." Id. (alterations in original).

(See L-3 Br. 25.) However, during the invalidity trial Tannas obviously "switches horses." Attempting to preserve the patent, Tannas started arguing for certain limitations that he omitted or actually contended were irrelevant at the infringement stage. He now argues that the prior art does not invalidate because filters do not transmit a *significant amount* of energy above 620nm,[19] the filters do not have a 50% transmittance point above 620nm,[20] and the filters do not allow a red primary.[21] Tannas cannot now base his interpretations of passing a "narrowband of the red color band" on new tests that were not used for infringement in order to avoid invalidity. See Eaton Corp., 323 F.3d at 1343.

Second, Honeywell's conclusions blatantly ignore the use of the filter in Verney that is almost identical to the filter found to infringe.

---

[19] PTX-834 ¶¶ 298, 327, 349, 404 (Tannas Direct).

[20] Id. ¶¶ 213, 301, 326, 351, 354, 383, 398.

[21] Id. ¶¶ 302, 327, 329, 357, 404.




Honeywell does not dispute this point. (See H. Br.) In fact, Verney is one of the references that actually suggests the use of this type of filter to make NVGs compatible with narrow red band emissions (DE-511 GVT009-0782), including those emissions coming from LCDs. (DE-500 ¶ 129.) Therefore, the same third filter applied to the same LCD technology found to infringe must by law pass a narrow band of red light. Beckson Marine v. Nfm, Inc., 292 F.3d 718, 726 (Fed. Cir. 2003); Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1219 (Fed. Cir. 2006) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence," quoting Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330 (1960) (internal quotations omitted)).

Honeywell criticizes the Verney reference because it does not recommend the NVG filter and deals with reducing warning indicator interference instead of "integral" cockpit lighting. (H. Br. 60.) Claim 2 does not discuss "integral" lighting. And, as noted earlier in section A.2.ii.c, supra, Verney clearly recommends a solution for passing narrow band emissions of colored cockpit lighting and achieving NVG compatibility. Honeywell cannot dismiss the reference because it does not disclose one element. Again, that is not the law of obviousness. See supra Section A.1.ii. Moreover, the Verney filter is not "one of the millions" the Defendants randomly chose from, as Honeywell suggests. (H. Br. 36-37.) While the Defendants agree a person of skill in the art cannot be expected to test millions of filters, here, no such testing is required because the Verney filter is suggested and identified as appropriate for NVG compatibility in aircraft.[22] (DE-500 ¶ 129.) Verney further suggests filtering applied to LCDs. (Id.) Thus, contrary to Honeywell's unsupported conclusion (H. Br. 65), the Verney filter is not "unrelated to the '914 invention." See KSR, 127 S. Ct. at 1742 (stating that an invention would be obvious to try if there are "a finite number of identified, predictable solutions" (emphasis added)).

Third, Honeywell's conclusions about the narrowband of red light blatantly ignores the ordinary creativity of those in the art. KSR, 127 S. Ct. at 1742. The Federal Circuit has clearly stated that courts cannot "ignore the modifications that one skilled in the art would make to a device borrowed from the prior art." Icon, 496 F.3d at 1382. In Icon, the court rejected appellant's argument that a spring used for a bed mechanism would be too large if applied directly to the prior art treadmill mechanism. Id. Essentially, the court recognized that a person

[22] Also, there is no evidence that testing millions of filters would be required even absent the Verney reference. The evidence shows that those skilled in the art easily chose the filters to split the red color band. (Tr. 363 (Reetz); Tr. 262-63 (Dunn).) In fact, in 1984, a year before the '914 patent's filing date, Cohen was told by a filter salesman he would provide a filter to split the red spectrum. (DE-57 H03235 (Cohen Memo).)

of skill in the art is not a mindless automaton, but instead would know how to size components for the appropriate application.

Honeywell's argument is exactly the same and should be rejected in this case as well. Except for the Verney filter, Honeywell asserts that the other referenced filters, such as Boehm, amount to placing one filter that can transmit measurable amounts of light in front of an LCD backlight.[23] Honeywell further asserts that these prior art filters would not result in sufficient light. This is the exact argument rejected by Icon and amounts to nothing more than a sizing issue whereby Honeywell contends a person of skill in the art would not know how to turn the power up on a red emitter to transmit that color.

In fact, even Tannas and Honeywell admit that such sizing options and the ability to make modifications would be known to a person of ordinary skill in the art. When pressed to describe how a person of ordinary skill in the art could make the infringing device from the paltry written description filed in 1985, Tannas admitted that the only element he claimed was not known in the art at the time was how to "split the red color band," not pass a narrow band of light.

> Q. It doesn't tell you how to make the device that is the subject of the claims, does it?
>
> A. It tells you how to make it. It says split the red color band. Now, the detail of implementing that is another step. And then after you do that, then you go to another step, divide the filters. And after you do that, you go into the laboratory and do some tests. There's quite a bit of work to do after this concept is put forward.
>
> Q. Well, it tells you what the goal is, which is splitting the red color band, as you said, but it doesn't tell you how to make a display system and filtering system to do that, does it?

---

[23] In his direct testimony, Tannas provided spectral transmittance charts for the Reetz and Boehm filters, showing, respectively, 7% and 10% transmittance above 620nm. (PTX-834 131, 68.)

A. No, it does not. And I don't think it has to. One skilled in the trade, as defined by the courts, could pick this up and do it, I believe firmly.

(Tr. 1353-54 (Tannas Cross)(emphasis added).) Therefore, under Tannas' reasoning, as long as a person in the art knew to split the visible spectrum above 620nm, they could implement, or size, the appropriate components of the system to arrive at the invention. As Defendants have shown, the prior art explicitly teaches splitting the spectrum above 620nm. Moreover, as even Honeywell asserts in its criticisms of other art, a person of ordinary skill in the art obviously knows how to turn down the power to a red emitter. (H. Br. 66.) To accept Honeywell's argument would violate KSR's instruction that a person of skill in the art cannot be deemed a mindless automaton that does not know how to turn up the emitter to arrive at a properly sized invention. KSR, 127 S. Ct. at 1242; see also PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1363-64 (Fed. Cir. 2007) (noting that the scientific confirmation of a fact that is already suspected is not patentable).

*d. Honeywell's Arguments Of Mischaracterization Are Baseless Red Herrings*

In desperation, Honeywell tries to assert as many arguments in as many ways as possible, hoping to persuade the Court to not consider Boehm. They can be summarized as follows:

- Boehm discloses a blue, green, and red light that must be located correctly and set correctly;
- Though the reference describes using a 630nm filter to block emissions at the NVG, it does not disclose choosing that filter in order to obtain color or in the cockpit;
- Despite describing the display as producing a "good coloured image," Honeywell argues that Boehm does not say it was produced by filtering the CRT or reducing red; and
- Boehm does not suggest filtering a full color display for NVG compatibility.

(H. Br. 70-73.) These arguments all fall short of rebutting obviousness. First, Boehm plainly states that a person can view a display underneath the NVGs. (See DMX-4 D000589, D000588 (stating that "pilots have . . . developed helmet-mounted NVG. The reason for this development is that the pilot can look around the goggles into the cockpit and onto the instrument panels in front of him with the 'naked eye.'").)

Second, Honeywell bases its conclusions on the fact that Boehm did not specifically highlight or use the filters it describes. (H. Br. 71.) To the contrary, while Boehm may describe several options for NVG compatibility, there is no doubt that Boehm specifically describes using a 630nm filter to reduce interference with the NVGs. (DE-500 ¶ 130.) This type of filter would block a narrowband of the red band passed above 620nm. (Id. ¶ 131.) Though it never says it will block a narrowband of red light specifically, it does not have to. That would be apparent to one skilled in the art. (See id. ¶ 130 and accompanying figure.) The paragraph in question discusses choosing the filter based on the type of cockpit illumination to block. If the illumination has wavelengths over 620nm, it would include a red band under the Court's construction.

Honeywell then argues that the tests of the NVG filters should be discounted because they were not performed in the presence of cockpit lighting. (H. Br. 71.) This argument again mischaracterizes the evidence, even if there were such a requirement. The description of the various cockpit filters in Boehm states, "a special cut-off filter can be inserted in front of the goggles to reduce interference with the cockpit illumination." (DMX-4 D000603.) Furthermore, the entire point of the article is directed at a "Night Vision Goggle Compatible Helicopter Cockpit." (Id. D000585 (article title).)

Third, Honeywell asserts that Boehm does not split the red band because it does not suggest both filtering the display and filtering the NVGs. Clearly, the reference describes filtering the NVGs several times.[24] Next, the reference clearly describes filtering cockpit illumination, such as LCDs. (DMX-4 D000600 (suggesting a **"combination of the following solutions"**, including "[f]ilters, to reduce the red and near IR of the incandescent lighting" and "[l]iquid crystal display (LCD) with green/blue backlighting" (emphasis added)).)

Fourth, Honeywell again argues that Boehm should disclose the filtering of the red, green and blue spectrum like Uchida to be considered. As stated many times before, however, Boehm need not describe the green and blue filters in detail because this is not a discussion of anticipation. The Court need only determine whether a person of ordinary skill in the art could apply Boehm's reference to LCDs such as Uchida, and combine them.

Regardless, Tannas belies many of these red herring arguments. Tannas has admitted that once a person of skill in the art knew about splitting the red color band with the third filter, he could practice the invention. (Tr. 1353-54 (Tannas Cross).) If a person could not, then the '914 patent must fail under 35 U.S.C. § 112, discussed infra. Boehm and other prior art references plainly disclose splitting the red color band. This would include elements such as the green and blue filter limitations. Thus, Claim 2 is obvious.

*ii. The German Patent Teaches A Formula For Applying Complementary Filtering To Any Display Depending On What Wavelengths Of Light The Engineer Prefers To Keep*

Furthermore, while L-3 and the Government have focused many of their arguments around particular combinations of references in order to highlight the issues, the Court should

---

[24] See DMX-4 D000590 (bottom figure "cut-off filter in front of the NVG"), D000603 (discussing interchangeable cut-off filters); D000597 ("the most important factors for a NVG compatible cockpit . . . [is a] cut-off filter in front of the goggles").

not ignore the powerful teachings of other references. For example, the German Patent, is nowhere addressed in Honeywell's extensive brief, despite the fact that L-3 and Dr. Task discussed it and it discloses the formula for applying complementary filtering to *any* type of display.

With the German Patent, a person of skill in the art can determine the appropriate third and fourth filter for any application that requires NVG compatibility. All that is needed is the engineer's determination of how much color is needed in the cockpit (i.e. the splitting wavelength), and the formula in the German Patent will teach which filters to apply to the display and to the NVGs to make them compatible. (DE-500 ¶¶ 136-38.) For example, using Verney's suggestion to (1) pass narrowbands of red light through the Figure 14 filter and (2) use LCDs to display information, an engineer can take LCDs, like those found in Uchida, and select a wavelength cutoff to apply to that LCD as disclosed in Verney.[25] With that information, the engineer can then use the German Patent to determine the exact third and fourth filters needed to make the displays night vision compatible according to the '914 patent. (See DE-500 ¶ 27 (describing the combination of the German Patent (DE-504 and DE-505) with Uchida, in light of Verney as an obvious combination).)

*iii. KSR Explicitly Recognizes That Common Sense And Ordinary Creativity Can Be Used To Fill The Gap*

To sum up the prior sections, there is overwhelming evidence of obviousness found explicitly in the prior art references, such that the '914 patent would be obvious under even the strictest possible construction of the TSM test. In KSR, however, the Supreme Court instructed that these teachings, suggestions, and motivations, are not the only reasons to combine prior art

[25] For instance, an engineer may determine such a wavelength by looking at Figure 14 in Verney and the suggestion for retaining color by using that filter. (DE-511 GVT009-0780, -0782).

references. Indeed, KSR instructs that a court should consider not just explicit teachings, but also "the background knowledge possessed by a person having ordinary skill in the art" and not simply "published articles" or "issued patents." Id. at 1741-42. As detailed in L-3's opening brief (L-3 Br. 39-42), the testimony of Dr. Task, Reetz, Dunn, and Bradford showed what was known in the art at the time and how Claim 2 would be obvious in light of the prior art.

Furthermore, the memorandum from the inventor himself, referencing what others in the art knew about combining filtering techniques to arrive at the invention, shows the level of knowledge in the art. Mr. Cohen discussed in his words disclosures from third parties in 1984 of how a person could use complementary filtering to reduce some, but not all, red for NVG compatibility. (L-3 Br. 39-40.)

Honeywell criticizes the Cohen memorandum, which discloses what Cohen learned about NVG compatibility from *others* in the art a year before he applied for a patent. Honeywell asks that the Court not consider the document because it is not a public disclosure of prior art and because there is no way to separate Cohen's independent thinking. Cohen's thinking is, however, clear on the face of the document. He is describing the "Salient Points" of what he was told by each attendee he met. (DE-54 119 (Cohen Dep.).) For instance, he was told by Sikorsky's representative, Jack Carson, that "Sikorsky's Night Vision System Project Pilot uses IR suppressed red lights which are compatible with NVG." (DE-57 H03235.) Thus, it is clear the industry did not teach away and actually provided the key parts of Claim 2 that Cohen now claims is his invention. See In re Farrenkopf, 713 F.2d 714, 719-20 (Fed. Cir. 1983) (holding that an affidavit evidencing a sale, though not prior art, was evidence of what one of skill in the art would have done at the time).

Finally, as further discussed in L-3's opening brief and ignored by Honeywell, an invention may be obvious if it is merely a combination of elements that have a predictable result. KSR, 127 S. Ct. at 1739; (L-3 Br. 42-45.) Engineering tradeoffs and scientific confirmation of what is believed to be true are not patentable discoveries. See Pfund v. United States, 40 Fed. Cl. 313, 355-56 (Fed. Cl. 1998), aff'd No. 98-5097, 1999 U.S. App. LEXIS 733 (Fed. Cir. Jan. 20, 1999); PharmaStem, 491 F.3d at 1363-64. These principles apply squarely to this case. Per Tannas' own admission, the only teaching of the '914 patent is to split the red band, i.e., placing complementary filters in the red wavelengths 620nm and higher. (Tr. 1353-54.) It cannot be denied that the Boehm reference, the Reetz thesis, the German Patent, and other references disclose complementary filtering both at shorter wavelengths and also in the red band. Even if the references only discussed filtering of shorter wavelengths, the only difference would be to move the cutoff point to longer wavelengths into the red spectrum. As discussed earlier, supra Section A.1.i.b, this is akin to tuning a radio to a higher frequency. To argue this has not been done does not mean it is non-obvious.

4. Secondary Considerations Cannot Save The '914 Patent From Such A Strong Prima Facie Showing Of Obviousness

Recognizing it has a slim chance of defeating the case for prima facie obviousness, Honeywell asserts several secondary considerations. However, secondary considerations will rarely rebut a strong showing of obviousness. Alza Corp., 464 F.3d at 1293. Moreover, Honeywell's arguments about secondary considerations do not stand up to scrutiny. In a section that is longer than their expert's one-page consideration of the subject (see PTX-834 82-83 (Tannas Direct)), Honeywell attempts to make its case for secondary considerations by severely mischaracterizing testimony of government witnesses to stretch any fact into secondary evidence.

*i. The Solution For Red Light Compatibility Was Developed Before There Was Any Long Felt Need.*

Honeywell argues that there was a long felt need to have red, and more specifically full color displays, in the cockpit along side NVGs. (H. Br. 73-75.) This statement is incorrect. As the evidence at trial showed overwhelmingly, there was no long felt need for NVG compatible full color displays because (1) there were very few, if any, full color displays in existing aircraft at the time; (2) the difficult problem to solve was daylight readability, especially in bubble cockpits; and (3) military specifications at the time reflected the compromise to limit red light in the cockpit to maximize NVG performance. (L-3 Br. 49-51.)

In short, not only was there no long-felt need, those in the art understood and described the solution even before there was a practical need. Complementary filtering was well known at the time for allowing any wavelengths, including red.[26] As both the Reetz and Boehm references and the testimony of numerous persons discloses, however, the ability to use red light goes hand-in-hand with the spectral sensitivity of the NVGs.[27] As more red light is allowed in the cockpit, the more NVG sensitivity must be traded. (DE-500 ¶ 224.) Honeywell fails to mention or rebut this fact.

Thus, "[t]here was simply no 'long felt need' that the '914 patent addressed." (Id. ¶ 218.) Honeywell's manufactured "long felt need" amounts to nothing more than a distortion of the well-understood engineering tradeoff that was already known in the art. As such, cannot serve as

[26] DE-500 ¶ 96 (listing references that describe complementary filtering for red wavelengths); DE-505 (German Patent) (describing a formula to apply NVG complementary filtering at any wavelength).

[27] DMX-4 D000590, 603 (Boehm); DE-301 GVT018-1002, -1026 (Reetz); DE-500 ¶¶ 217-18, 224 (Task Direct); Tr. 362-63 (Reetz Direct); Tr. 147, 152, 178-79 (Bradford Direct); Tr. 1548-49, 1597 (Task Rebuttal).

a secondary consideration of non-obviousness. See Pfund, 40 Fed. Cl. at 355-56 (holding that an engineering tradeoff is not patentable).

*ii. Failure Of Others - MIL Spec*

Honeywell's contention that MIL-L-85762 demonstrates a failure of others also fails. As discussed, the MIL Spec only evidences the conscious tradeoff that was known before the '914 patent. (DE-500 ¶¶ 216-17; see Tr. 362-63 (Reetz Direct).) Honeywell details Reetz and other witnesses' desire for red, but to point out evidence and testimony that everyone in the community wanted red only addresses half the issue. Honeywell never directly addresses or rebuts the fact that to place red in a cockpit would require reducing NVG sensitivity, a condition the military tried to avoid for helicopter pilots flying close to terrain at night. (Tr. 364 (Reetz).) In fact, Honeywell presents no evidence to suggest this is not a known tradeoff and a problem with their own invention.

*iii. Commercial Success*

Next, Honeywell argues that the invention was commercially successful and that the success came from the fact that the use of the '914 invention solved the problem of integrating NVGs and full color displays. When seeking to prove a patent is non-obvious through secondary considerations, the patentee must present evidence that there is not only commercial success, but that there is a nexus between the commercial success and the patented feature. See Iron Grip Barbell Co., Inc. v. USA Sports, Inc., 392 F.3d 1317, 1324 (Fed. Cir. 2004).

Here, L-3 has presented the testimony of three persons – Dr. Task, Reetz, and Dunn – who were experts and/or working in the field both before and after the 1985 filing date for the patent. (L-3 Br. 50.) They all testified that the technical hurdle regarding full color displays at the time was not making them NVG compatible, but instead making such a display readable in a

bubble cockpit during the daytime.[28] Honeywell's own witness, Col. Lawrence, acknowledged this was a problem. (Tr. 1005 (Lawrence Cross).)

Honeywell has done nothing to rebut this testimony except offer evidence of sales and state that NVG compatibility was an important feature. As Dr. Task, Reetz and Dunn testified, however, NVG compatibility was easily addressed once the industry was capable of producing a daylight readable display. (L-3 Br. 50; Tr. 261-63 (Dunn Direct).) Furthermore, Ms. Davis, Honeywell's damages expert, is not a person of ordinary skill in the field of art at the time and cannot offer a meaningful opinion as to whether the daylight readability was an issue for engineers at the time. (See Damages Tr. 1960 (proffering the witness as a damages expert).)

Honeywell does not rebut the testimony of Reetz or Dr. Task, choosing only to criticize the testimony of Mr. Dunn. (H. Br. 83-84.) These criticisms – (1) that his testimony regarding commercial success related only to the period from 1981-1985, and (2) that he testified to daylight readability of CRTs rather than LCDs – fail.

First, Mr. Dunn was asked specific questions during trial about the 1981 to 1985 time period. He testified regarding the extensive knowledge he had about the industry before 1985 as he attended trade shows and societies for display systems. (Tr. 232-33.) He also gave testimony regarding later time periods and problems with daylight readability in the years after 1985. (Tr. 250-51 (Dunn Direct).) This testimony about problems with daylight readability after 1985 shows that there was no real need, much less a long felt, unmet need for the alleged invention in 1985.

Second, Honeywell attempts to differentiate Dunn's testimony as pertaining to CRT technology and not LCDs. Here again, Dunn's actual testimony is to the contrary. He testified

---

[28] DE-500 ¶ 215 (Task Direct); Tr. 368-72 (Reetz Direct); Tr. 238, 243-44 (Dunn Direct).

that he investigated many display sources in the 80's including LCDs. (Tr. 253-56.) Regardless, there is sufficient evidence that LCD technology was in its infancy in 1985 and not widely used. (Tr. 1579-80 (Task rebuttal); Tr. 236 (Dunn Direct).)[29]

Thus, Honeywell has failed to establish any evidence of commercial success related to the patented technology. Color display technology did not enjoy commercial success until daylight readability issues were solved. NVG compatibility for color displays was obvious by 1985 to anyone in the art, it was only limited by the cockpit environment.

*iv. Independent Development - Military Saw The Old Version Of Patent And Not Newer Version That Is Inadequately Described*

Honeywell argues that MIL-L 85762 A ("MIL Spec A"), which allowed a reduced amount of red in the cockpit for fixed wing pilots, was not independently developed. Honeywell contends that the review of the original '269 patent application for secrecy purposes by David McLure, a civilian employee of the United States Navy (Secrecy Tr. 221), somehow influenced the development of MIL Spec A such that the military's use was not independently developed. This speculative argument ignores Mr. McLure's limited role in the MIL Spec A development, the original disclosure of the patent application, and the testimony of others who developed MIL Spec A and actually instructed the '914 inventor, Mr. Cohen, on how to implement it.

---

[29] Honeywell attempts to argue that L-3's prior discussion of the limited use of LCD in cockpits is evidence it would not be an obvious use to those persons of ordinary skill in the art at the time. (H. Br. 90.) This is not the law of obviousness. Application of Winslow, 365 F.2d 1017, 1020 (C.C.P.A. 1966) ("[T]he proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references – which he is presumed to know – hanging on the walls around him.") The simple fact that new, and often expensive, technology has not been widely implemented does not take it out of the art under consideration, it simply rebuts Honeywell's suggestion that the patent caused the commercial success of the invention. Moreover, if Honeywell is suggesting that a person of skill in the art could not foresee or implement an LCD, that admission will invalidate the patent because the patent is not enabling. See infra Section B.3.

Mr. McLure testified that he reviewed four to six patents, public release documents, and/or export licenses per week for secrecy, amounting to hundreds per year. (Secrecy Tr. 432-33, 463-64.) Furthermore, he testified that the original application involved here was a document he would spend less time reviewing on average – approximately 20 to 30 minutes. (Id. 433-34.) Mr. McLure did not disclose or discuss the contents of the patents he reviewed. (Id. 240.) More importantly, Mr. McLure did not assist in offering technical input into the development of MIL Spec A. (Id. 452.) That development and insight came primarily from Mr. Reetz. (Id. 452-53.) Mr. McLure's duty was to coordinate input from engineers and observe as the committee came to a resolution. There is no evidence to suggest Mr. McLure's review of the application influenced the development of MIL Spec A or that MIL Spec A was not independently developed.

Instead, Cohen's original disclosure at the time was dramatically different from the version that was amended in 2001. See infra Section B. Since Mr. McLure stopped reviewing patents in 1989 and would not be aware of any subsequent modifications to the application (Secrecy Tr. 446), he would not be aware of any additional disclosures that broaden the patent scope. In fact, there is evidence that it was the government that instructed Cohen on how to perform complementary filtering on color displays and not vice versa.

In the 1980's Cohen was proposing that the government use his polarizing technique as an alternative to complementary color filtering as described in Claim 2. (Tr. 423-24 (Reetz Direct).) Indeed, Cohen was fully aware that the military was developing a complementary filtering solution. (Id.) Accordingly, his attempts to post hoc patent over what the industry has done and what the industry suggested to him cannot be allowed.

5. The Presumption Of Validity Is In Substantial Question

In KSR, the Supreme Court announced that the presumption of validity is suspect when prior art references are not disclosed to the patent office. KSR, 127 S. Ct. at 1745. Here, there is no doubt that the Reetz thesis, Verney, Uchida, and the '963 patent were not before the examiner when the patent was considered. The German Patent was effectively undisclosed because no English translation was provided. See Semiconductor Energy Lab. Co., v. Samsung Elects. Co., 204 F.3d at 1374. (Under Semiconductor Energy, such an omission would be material to the patentability of the invention. Id.)

As L-3 has shown and Honeywell failed to rebut or even address, the German Patent details an exact formula to apply complementary filtering to any display/NVG system depending on the wavelengths desired in the cockpit, and it even describes, as an example, a filter cut off that allows a narrow red band of light. In fact, as described in Section A.2.ii, supra, Dr. Task testified that the combination of the German Patent and Uchida in light of Verney would render Claim 2 obvious (DE-500 ¶ 207). *None* of these references were considered by the examiner. Moreover, although Boehm, Task & Griffin III, Breitmaier & Reetz, and the German Patent (written in German) were before the examiner there is ample reason to question whether they were adequately reviewed by the examiner.

Second, all of these references were examined when the PTO was rejecting applications on obviousness grounds only if the examiner found an explicit teaching, suggestion, or motivation to combine prior art references. The Supreme Court has now held this standard is insufficient, and if used alone, erroneous. KSR, 127 S. Ct. at 1741. As evidence of KSR's importance, the Patent and Trademark Office has issued new regulations for examiners to evaluate obviousness in patent applications. See Examination Guidelines for Determining

Obviousness Under 35 U.S.C. § 103 in View of the Supreme Court Decision in *KSR International Co. v. Teleflex Inc.*, 72 Fed. Reg. 57526 (Oct. 10, 2007). Thus, the Supreme Court's clarification of the laws of obviousness raise substantial questions of whether Claim 2 of the '914 patent is valid, and certainly whether the examiner's cursory review of relevant prior art is entitled to any presumption.

Third, the over 100 pages of references disclosed to the examiner were considered and signed-off within a matter of hours, not days or weeks. The references were faxed to the PTO in the late afternoon of January 16, 2002 and were signed-off that same day. (L-3 Br. 53; DMX-38 D001534.) The examiner's automatic consideration and allowance after that date raises a substantial question as to the efforts exerted in considering these patents.

Fourth, the presumption of patent validity is never absolute. See KSR, 127 S. Ct. at 1745. If it were, patents could never be challenged. Here, the overwhelming evidence of obviousness, the examiner's cursory review of both the amended the patent application and some of the relevant prior art references swamps whatever presumption arises.

**B. Honeywell Has Not Rebutted L-3's Assertions That The '914 Patent Is Invalid Because The Original Specification Fails To Comply With The Disclosure Requirements Of 35 U.S.C. § 112**

In concert with the laws of obviousness and anticipation, 35 U.S.C. § 112 acts to protect the public from those applicants who seek to claim more than they have invented. Section 112 forces patent applicants to adequately describe and claim an invention, such that persons can determine when they invented it and what is now off limits to make, use and sell. Section 112 further requires an applicant to enable those in the art to make the invention because if the inventor does not teach the public how to make the invention, the inventor has not provided their part of the statutory and constitutional exchange that is at the very core of the patent laws: the

inventor enhances the public's knowledge in exchange for a limited monopoly on the embodiment of that knowledge.

The inventors named on the '914 patent have not upheld their end of the bargain. Rather, they described one way to make full color displays compatible with NVGs in 1985 – distinct individually filtered monochrome light sources – waited as the industry developed new ways of solving that problem, then redrafted their application to claim what the industry had done. All of this was done without regard to what the original disclosure actually supports.

Honeywell is fully aware that the invention described in Claim 2 is not supported by the original specification, and their attempt to make a case to the contrary forced their expert, Mr. Tannas, to admit that the invention would have been obvious to one of skill in the art. When confronted with the fact that the patent specification did not disclose how to make the invention in the claims, he had no choice but to assert that making the device would be common knowledge to a person of skill in the art once they knew to split the red color band:

> Q. Well, it tells you what the goal is, which is splitting the red color band, as you said, but it doesn't tell you how to make a display system and filtering system to do that, does it?
>
> A. No, it does not. And I don't think it has to. One skilled in the trade, as defined by the courts, could pick this up and do it, I believe firmly.

(Tr. 1353-54 (Tannas Cross) (emphasis added).) In fact, Tannas was forced to describe the "splitting" function as the "geniusness" part of the entire claim. (Tr. 1352.) As such, Honeywell's arguments that a particular reference does not disclose red, green or blue filters (H. Br. 21), or that another particular reference is not used in aircraft cockpits (H. Br. 17) are red herrings used to distract the Court from the crux of this case: if a person of ordinary skill in the art would not find it obvious to combine known color displays with known red, green, and blue

filters as Honeywell suggests (H. Br. 40), then that same person of ordinary skill in the art would not know how to construct the invention from the meager disclosure of the original application.

Furthermore, throughout its brief Honeywell suggests that the patent is non-obvious because Task and Reetz praised the original disclosure as a unique idea. (H. Br. 87.) This is a blatant mischaracterization of what the witnesses stated and highlights the purpose of the written description requirement. Both Task and Reetz praised aspects of the original disclosure. (Secrecy Tr. 589 (Reetz) (indicating that the use of circular polarizers was "a pretty novel idea"); Tr. 1605 (Task) (making an off-the-cuff comment that the separation of the light source into three monochrome sources of light and using a notch filter over the red source "was probably a unique idea at the time").)[30] However, 17 years later, as a result of Honeywell's stretching the claim boundaries beyond the breaking point to capture more and more of the intervening technology, they eventually ended up with claims much broader than the original disclosure. As a result, Claim 2 both outstripped its supporting disclosure and grew to read on the prior art, rendering the claim invalid both for obviousness and for lack of an adequate disclosure. See KSR, 127 S. Ct. at 1742 (noting that obviousness is determined with respect to the full scope of the claims).

Honeywell, aware of the fact that its obviousness position conflicts with its description requirement position, asserts that the portion of L-3's opening brief that is directed to section 112

---

[30] Honeywell uses an out of context quote from L-3's November 9, 2006 Doctrine of Equivalents Brief, along with this testimony, to try to show nonobviousness. (H. Br. 44.) Honeywell's blatant mischaracterizations of both cannot stand up to even the lightest scrutiny. In its brief, L-3 noted that Claim 2 was narrowed from the original filing in that the applicants specified an offending color (red) and required additional filters (3). (L-3 DOE Br. 6.) Neither narrowing has any bearing on the present invalidity arguments. Further, Dr. Task was commenting on the original *disclosure* not the original *claims*, which, Dr. Task had never analyzed for obviousness. (Tr. 1606.) Accordingly, Honeywell's argument is yet another attempt to introduce irrelevancies to distract the Court from the weakness of its rebuttal.

is "without merit" because the section 112 defenses are "given little or no attention in Defendants' briefs." (H. Br. 3.) This assertion is not only false, as one quarter of L-3's brief is spent on this issue, it is also a meaningless attempt to distract the Court from the clear and convincing evidence that the '914 patent does not comply with the written description requirement. Indeed, Honeywell's positions regarding the written description requirement are so tenuous that Honeywell is forced to rely on outdated case law and tests that the Federal Circuit has explicitly discredited to try to save the '914 patent from invalidity. Compare (H. Br. 140 (asserting that the enablement requirement is satisfied if the specification enables any mode of practicing the invention)), with Auto. Techns. Int'l, Inc. v. BMW of North Am., Inc., No. 2006-1013, -1037, 2007 U.S. App. LEXIS 21271 at * 27 (Fed. Cir. Sept. 6, 2007) ("We also reject [the] argument that because the specification enables one mode of practicing the invention . . . the enablement requirement is satisfied."). As L-3 has shown, Claim 2 is invalid because the originally filed disclosure does not support the full construed breadth of the issued claims. See Leibel-Flarsheim Co. v. Medrad, Inc., 481 F.3d 1371, 1380 (Fed. Cir. 2007) (noting the "irony" that a patentee who had pressed for broad claims then "had to show that such a claim was fully enabled, a challenge it could not meet.").

1. Honeywell Has Not Rebutted L-3's Showing That The Original Specification Does Not Demonstrate The Inventors Were In Possession Of What Is Claimed In The Patent At The Time Of Filing

At trial, the Defendants presented clear and convincing evidence that Claim 2 of the '914 patent is invalid for failure to comply with the written description requirement contained in the first paragraph of 35 U.S.C. § 112. This statute requires that a patent's specification, as filed, contain an adequate written description of the claimed invention. 35 U.S.C. § 112; Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1320 (Fed. Cir. 2003). Adequacy, in turn, requires

that the original specification support the *full construed scope* of the claims.[31] Lockwood v. Am. Airlines, Inc. 107 F.3d 1565, 1572 (Fed. Cir. 1997); PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1247 (Fed. Cir. 2002). The purpose of the written description requirement is to secure the *quid pro quo* of patent law by ensuring that the scope of a patentee's monopoly is commensurate with the knowledge granted to the public. See Moba, 325 F.3d at 1320. The original specification does not support the full scope of Claim 2, as construed. Honeywell's attempt to rebut L-3's points consists of a single record citation that is a gross mischaracterization of the actual testimony, and numerous inaccurate statements of law.[32]

*i. Honeywell's Rebuttals To Defendants' Clear And Convincing Showing That The Specification Does Not Disclose A System For Filtering A Single Multiband Source Of Light Are Legally Inaccurate And Factually Insufficient*

L-3 has provided clear and convincing evidence that the original specification of the '914 patent does not adequately describe a technology for filtering a narrowband of the red color band from a display having a single source of light. (See L-3 Br. Part B.1.i.) The Court construed Claim 2 to read on the filtering of a display with a single multiband source of light. (L-3 Br. 58.)

---

[31] Honeywell argues that written description inquiry is whether the claimed material is inherent in the original disclosure. (H. Br. 125.) While information can be "inherent" in a disclosure, Honeywell conveniently neglects to inform the Court that "to establish inherency, the extrinsic evidence 'must make clear that the missing descriptive matter is *necessarily present* in the thing described in the reference.'" In re Robertson, 169 F.3d 743, 745 (Fed. Cir. 1999) (quoting Continental Can Co. v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991)). Furthermore, Honeywell never argues that any of the missing disclosure of the original application inherently discloses any aspect of Claim 2.

[32] Honeywell repeatedly asserts that Defendants "fail to identify any particular limitation of claim 2 that is not supported by the originally-filed '269 application." (H. Br. 125.) Honeywell provides no authority for its assertion that such a requirement exists – the only requirement is that the disclosure must support the full construed scope of the claims. See PIN/NIP, 304 F.3d at 1247. Furthermore, the statement is incorrect. Defendants have provided clear and convincing evidence that the original specification does not support the full construed scope of a "local source of light" (L-3 Br. 58) and "a plurality of filters at the local color display." (L-3 Br. 62.)

Indeed, this construction was a necessary precondition for finding infringement of the CMFD display, which also uses a single multiband source of light. Infringement Op., at 57.

As Dr. Task testified, the original specification plainly indicates to one of ordinary skill in the art that the inventors were only in possession of a system that was limited to three separate and distinct monochromatic color generators. (DE-500 ¶¶ 69, 71.) Indeed, Dr. Task testified that using the wavelength selective filters disclosed in the original application over a single multiband source of light – such as the CMFD filter – "would not work with the bandpass filter originally disclosed by the inventor." (DE-500 ¶ 72.) If the disclosure of the original specification would result in an inoperative invention when applied to a single multiband source of light, certainly one of ordinary skill in the art would not understand the inventors to be in possession of such a system. (See id.)

Honeywell does not address this point in its response to Defendants' written description arguments. (See H. Br. 123-130.) Honeywell makes a passing effort to rebut the point in response to L-3's enablement defense, but falls well short.[33] (See H. Br. 138-39.)

In an argument that suspends both logic and reason, Honeywell asks the Court to consider three sources of light as a single source. Honeywell contends that Figure 3 of the original application "*does* disclose how to create the system of claim 2 using wavelength selective filters with a single source of light." (H. Br. 139.) Of course, Honeywell conveniently omits the word "multiband" when discussing L-3's argument, even though the claims clearly read on a single multiband source of light, which must, in turn, be supported by the claims. (H. Br. 139; L-3 Br. 58, 59.) As evidence, Honeywell boldly quotes directly from the original specification "'[e]ach CRT 51, 52, 53 provides one primary color for the full color display'" and

[33] Despite the fact that an entirely different legal standard applies to the written description and enablement requirements, L-3 will address Honeywell's point here.

that "'the local source of light includes three cathode ray rubes'" and then tells the Court that this disclosure is a single source of light. (H. Br. 139 (quoting DMX-36 D000010-11; PTX-920 167, ¶ 512).)

Honeywell then argues that original Figure 3 "teaches how to filter the single source of light using wavelength selective filters . . . by arranging the filters parallel to one another." (H. Br. 139.) Of course, the specification describes placing the filters in parallel over a "plurality of monochromatic color generators," and shows only that individual filters can be placed over a plurality of monochromatic cathode ray tubes *of distinct colors*. (DMX-36 D00013,-10,-20 (emphasis added).) Indeed, Honeywell's evidence – a quote from Mr. Tannas' cross examination – actually proves L-3's point: that there is *no disclosure in the original specification* that supports wavelength selective filtering over a single multiband source of light:

> [Mr. Crumbly]. Well, let me put it to you another way. I think I probably jumped a couple of steps there. If you had one light source, you couldn't put three filters over one light source unless they were sequential, right?
>
> [Mr. Tannas]. Sure you could.
>
> Q. How so?
>
> A. Well, why not?
>
> Q. Well, okay, Mr. Tannas. Let me ask it this way.
>
> A. That's the way most liquid crystal displays are maintained, three filters over one light source.

(Tr. 1258.) Of course LCDs are never disclosed in the original specification. (DE-54 at 441 (Cohen Dep.).) Therefore, by the inventor's own admission, the original application is inadequate because it never discloses wavelength selective filtering over a single multiband source of light. Honeywell's argument is not only technically inaccurate, it is not responsive to L-3's assertions, and is therefore without merit.

Honeywell's second rebuttal is equally without merit. Honeywell makes the unsupported statement that, because the original specification recites vague language such as "other display transducers" and that the invention "can be applied to a wide variety of display . . . devices," the invention is not limited to the embodiment disclosed in Figure 3. (See H. Br. 126-27.) These arguments fail for two reasons.

First, the law is settled that the disclosure of the original application must be such that one of ordinary skill in the art would understand the inventors to be in possession of the *full construed scope of the claimed* invention. PIN/NIP, 304 F.3d at 1247; Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1333 (Fed. Cir. 2002); Gentry Gallery, Inc. v. Berkline Corp, 134 F.3d 1473, 1479-80 (Fed. Cir. 1998); Cooper Cameron Corp. v. Kvaerner Oil-field Prods., Inc., 291 F.3d at 1317, 1323 (Fed. Cir. 2002). While it is true, as Honeywell points out, that an invention is not necessarily limited to its preferred embodiment, see Lampi Corp. v. Am. Power Prods., Inc., 228 F.3d 1365, 1378 (Fed. Cir. 2000), the disclosure must still describe the full scope and not simply certain embodiments. PIN/NIP, 304 F.3d at 1247. Vague terms that do not disclose any actual structure cannot substitute for actual description, especially in this case, where according to Mr. Tannas' definition, a "display transducer" would be anything that converts one form of energy into light. (Infringement Tr. 542.) Dr. Task has testified that the original specification provides no such disclosure of a "display transducer" beyond the three distinct CRTs shown in the original application. (DE-500 ¶ 69.)

Second, the lone case cited by Honeywell to support its contention that the disclosure of the original specification satisfies the written description requirement is inapposite. In Lampi, the infringer asserted that a claim directed to the shape of a plastic lamp enclosure was invalid for failure to meet the written description requirement. Lampi, 228 F.3d at 1377-78. The

infringer based its argument on the fact that the claim was construed to encompass a housing made from two half shells, but the drawing only disclosed *identical* half shells. Lampi, 228 F.3d at 1377-78. The court found that the specification, which described the enclosure as "'consisting of two separable half- shells'" that, to "'enable particularly easy and cost-effective manufacture . . . are identically shaped'" was "sufficient to support half-shells that are not identical." Id. at 1378.

Lampi differs from the present case in two significant aspects. First, the "non-disclosure" in Lampi was related to a minor non-functional detail (the shape of the housing), wherein non-disclosure here renders the fully construed claims non-functional (e.g., without the full disclosure of LCDs or the like, Claim 2 cannot function). (Tr. 1605; DE-500 ¶ 72.) Second, the specification in Lampi clearly disclosed "half-shells" and only limited them to being identical in a preferred embodiment. Lampi, 228 F.3d at 1378. Here, there is simply no disclosure of wavelength selective filtering of a single multiband source of light – the only method of filtering disclosed in the original specification was to provide three separate monochromatic color generators – one red, one blue, and one green – and to place a wavelength selective filter over each display. (DMX-36 D00009-10, 20.)

In a final attempt to rebut the clear and convincing evidence that one of skill in the art would not understand the original specification to support wavelength selective filters over a single multiband source of light, Honeywell presents a drastic distortion of Mr. Byrd's testimony to support its nonsensical assertion that the original disclosure somehow discloses filtering a single multiband light source. Honeywell theorizes that one of ordinary skill in the art would understand the individual phosphors of a light source such as the LCD backlight to be "'distinct monochromatic color generators,'" thereby showing "[t]he breadth of the originally-disclosed

invention." (H. Br. 127.) In support of this argument, Honeywell asserts that Mr. Byrd "testified that the fluorescent lamps contain 'distinct types of phosphors' which 'generate the light of multiple colors, which is then emitted by the display.'" (H. Br. 127 (quoting Secrecy Tr. 1032-33).)

In fact, Mr. Byrd testified that providing such a definition for the individual phosphors that make up the powdered coating on the inside of an LCD backlight, while not unreasonable in theory, would be confusing and not understood by one of ordinary skill in the art.

> [Ms. Roesel]. And each type of phosphor generates light when it is struck by a UV photon, that is emitted by the gas on the inside of the tube; is that right?
> [Mr. Byrd]. That's a reasonable description, yes.
>
> Q. And the phosphors generate the colors of the display; is that correct?
>
> A. <u>They generate the light of multiple colors</u>, which then is emitted by the display. It is a reasonable summary.
>
> Q. And the light emitted by a single type of phosphor, such as the green phosphor, could be called monochromatic; is that right?
>
> . . . .
>
> THE WITNESS: Certainly it could be, yes, it could be. Not that I would normally refer to it that way, but it could be.
> BY MS. ROESEL:
>
> Q. It would not be unreasonable, an unreasonable use of the term to call it monochromatic, would it?
>
> A. Not unreasonable, it might be unusual, it might be confusing to an engineer who has a different perception of what monochrome means.

(Secrecy Tr. 1032-43 (objections omitted).) Of course, Mr. Byrd never testified that a single color, or "green phosphor" is part of the coating of the LCD backlight. (<u>See</u> Secrecy Tr. 1032-43.) Moreover, when asked whether an LCD backlight would be referred to as a monochromatic source of light, Mr. Byrd believed that it would not.

[Mr. Jefferson]. Mr. Byrd, have you ever referred to an LCD lamp as a monochromatic light?
[Mr. Byrd]. I don't recall ever doing that, no.

Q. Have you ever seen an LCD back light for a full color display referred to as monochromatic at all?

A. Not that I can remember.

(Secrecy Tr. 1042-43.) Accordingly, to the extent that Honeywell attempted to rebut L-3's clear and convincing showing that the inventors were not in possession of an invention that included wavelength selective filtering over a single multiband source of light, that rebuttal comes up well short.

*ii. Honeywell's Argument That The Specification Does Not Need To Describe The Locations Of Filters That Are Expressly Included In The Court's Claim Construction Is Without Merit And Is Based On Inaccurate Statements Of Law*

As shown in its opening brief, L-3 also provided clear and convincing evidence that, because the original specification does not support the disposition of key components as included in the full construed scope of the claims, the '914 patent is invalid for failure to provide an adequate written description. (See H. Br. 62-67.) Specifically, L-3 noted the Court's *express* construction that the location of the filters is "not limited to a location internal or external to the local color display." Markman Op. at 444. Under this express construction and well established Federal Circuit precedent, satisfaction of the written description requirement requires the original specification to support a system with filters external to the display. PIN/NIP, 304 F.3d at 1247. L-3 also provided clear and convincing evidence that not only is a system with filters external to the display undisclosed, but that one of skill in the art would understand such a system to be non-functional based on the original application's disclosure. (L-3 Br. 61; Tr. 1605.) Honeywell

provides no facts in support of its rebuttal position, and makes a number of statements that are inconsistent with the law.

First, Honeywell argues that Claim 2 is supported by the specification because Claim 2 does not specify any location for the first, second and third filters. (H. Br. 130.) Of course, this statement is irrelevant[34] under the well settled precedent that the entire scope of the claims, as construed, must be supported by the specification in order for a claim to comply with the written description requirement. Moreover, Honeywell's statement ignores the Court's claim construction that expressly includes the filters external to the display. Markman Op. at 444.

Second, Honeywell attempts to argue, citing Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 93 F.3d 1572 (Fed. Cir. 1996), that Claim 2 is "adequately supported by the original disclosure because the precise location of the filters is not an essential element of the invention." (H. Br. 130 (emphasis added).) Honeywell's argument is again based on an incorrect statement of law. The Federal Circuit has stated unequivocally that there is no "essential element" test.[35] Amgen Inc., 314 F.3d at 1333. Again, the *only* test for an adequate written description is whether the originally filed specification supports the full construed breadth of the claims. Id. As the original specification and Dr. Task's testimony clearly show, no such support exists.[36]

---

[34] Indeed, in addition to being irrelevant, the statement is an admission that the applicants did not carefully draft Claim 2 to limit its scope to a point that is supportable by the original specification.

[35] Even if there was an "essential element" test, as Honeywell erroneously claims, Honeywell provides no support from the record for its assertion that "the precise location of the filters is not an essential element of the invention." (H. Br. 130.)

[36] Moreover, Honeywell's lone citation in support of its proposed "essential element" test has nothing to do with a determination of invalidity. The text Honeywell quotes from Ethicon relates to a district court's *claim construction* decision limiting a broad claim to a particular embodiment in the specification. Ethicon, 93 F.3d at 1582 n.7. The only issue on appeal in Ethicon was claim construction, and the court never discussed invalidity. See id.

Third, Honeywell posits that L-3's contention that the written description does not support the Court's *express* claim construction "makes no difference (and no sense)" because the filters on the displays that the Court found to infringe Claim 2 "are likewise not 'outside the display.'" (H. Br. 130.) Honeywell provides no legal support for this base assertion because it cannot – the assertion is entirely inconsistent with the law.

There is no question that a claim is construed without respect to the accused infringing device. SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc). By the same token, the accused device has no bearing on the invalidity analysis. Pandrol USA, LP v. Airboss Ry. Prods., 320 F.3d 1354, 1364 (Fed. Cir. 2003) ("Supreme Court precedent and our cases make clear that patent infringement and patent validity are treated as separate issues."). Thus, Honeywell's attempts to distract both the Court and the Defendants from the fact that Honeywell has provided no rebuttal evidence have failed. Defendants have proven that Claim 2, which was amended into the specification nearly twenty years after the filing of the application, is not supported by the originally filed specification, and is therefore invalid.

2. Honeywell Does Not Show That One Of Ordinary Skill In The Art Would Understand The Terms Of Claim 2 To Define The Bounds Of The Invention, And Therefore Does Not Rebut Defendants' Clear And Convincing Evidence That Claim 2 Is Indefinite

The second paragraph of 35 U.S.C. § 112 requires that a patent's claims be "sufficiently 'definite'" to provide the public with notice of the breadth and scope of the monopoly. 35 U.S.C. § 112; Solomon v. Kimberly-Clark Corp., 216 F.3d 1372, 1377 (Fed. Cir. 2000). A claim is indefinite if, in light of the specification, one of ordinary skill in the art would not understand the bounds of the claim.

Defendants presented clear and convincing evidence that one of ordinary skill in the art would not understand the bounds of Claim 2 as construed. Specifically, at the urging of Mr. Tannas, the Court considered its express construction of "perceptible" light to read on "measurable" light. Infringement Op. at 464. Dr. Task testified that one of skill in the art would not understand the bounds of either "perceptible" or "measurable." (DE-500 ¶ 77, 80.) The term "measurable" is especially suspect, given that a determination of whether light is measurable depends on the sensitivity of the device used to make the determination. (DE-500 ¶ 82.) Moreover, as Dr. Task testified, there is no universal standard to verify whether light is measurable or perceptible. (DE-500 ¶ 16.)

Neither Honeywell nor Mr. Tannas directly refute Dr. Task's assertion. Honeywell cites testimony from Mr. Tannas stating that "the 'well-established calculation known as CIELUV DeltaE*'" is a method of determining whether light is perceptible. (H. Br. 136.) This argument fails for three reasons. First, as Mr. Tannas stated, the CIELUV DeltaE* calculation is used to determine "whether the energy within a particular wavelength band results in a perceptible *difference* in color." (PTX-834 ¶ 489.) As Mr. Tannas discussed, CIELUV DeltaE* is used "for determining whether two samples have a perceptible difference in color." (Id. ¶ 490.) A formula for generating a comparison between two different samples does not teach one of skill in the art how to determine whether the output of a *particular* display is perceptible. Second, CIELUV DeltaE* does not address "measurability." (See id. 159-61.) Thus, Dr. Task's testimony – that one of ordinary skill in the art building a display would not know whether the light emitted by their display is "measurable" or "perceptibile" – stands unrebutted by any evidence of record, and is clear and convincing evidence that Claim 2 is indefinite. Third, Mr. Tannas did not suggest CIELUV DeltaE* as a technique for determining whether the light of the alleged devices

met the limitations of Claim 2, and as such the Court must disregard this last-ditch suggestion of the test to rescue his ill-conceived "measurable" standard. Accordingly, Honeywell has failed to rebut the clear and convincing evidence that the claims are indefinite.

3. L-3 Has Proven That The Original Specification Does Not Enable One Of Ordinary Skill In The Art To Practice The Full Scope Of Claim 2, And Honeywell's Rebuttals Fall Short

The enablement requirement, like the written description requirement, is codified in the first paragraph of 35 U.S.C. § 112. Enablement provides a separate legal standard, however, and requires that the original specification describe the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112. In its opening brief, L-3 showed that Honeywell's own expert provided clear and convincing evidence that the '914 patent does nothing more than toss out the mere germ of an idea, which cannot be enabling. Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1366 (Fed. Cir. 1997). L-3 also provided clear and convincing evidence that the original specification of the '914 patent teaches away from the full claimed scope of Claim 2, thereby invalidating that claim as a matter of law.[37] (L-3 Br. 69-71.)

*i. Honeywell's Expert Admitted That Claim 2 Is Either Not Enabled Or Obvious*

L-3 first pointed out that Honeywell's expert, Mr. Tannas, admitted that the original specification would not enable one of skill in the art to practice Claim 2 of the '914 patent. (L-3 Br. 68-69.) Under cross-examination, Mr. Tannas provided clear and convincing proof of the lack of enablement when he appears to admit that the original specification does not teach how to

[37] Honeywell's only purported rebuttal to this argument is to make the unsupported statement that "the '269 application does not teach away from [an embodiment using wavelength selective filtering over a single source of light]." (H. Br. 140 n.28.) Honeywell provides no support for this statement that directly controverts the clear language of the specification presented by L-3 in its opening brief. (L-3 Br. 70-71.)

make the invention. (Tr. 1354; L-3 Br. 69.) Furthermore, L-3 pointed out that the fact that the inventors never made a prototype of an embodiment of Claim 2 further supports the fact that Claim 2 is not enabled.[38]

Honeywell attempts to argue that Mr. Tannas' testimony relates to "how to 'split the red color band.'" (H. Br. 138.) By doing so, they also admit how inconsequential and obvious the invention was, and that many of their complaints regarding prior art elements are red herrings. See supra Section A.3.i.d. The testimony, reproduced in its entirety below, however, makes clear the impossible line Mr. Tannas is attempting to walk.

> Q. It doesn't tell you how to make the device that is the subject of the claims, does it?
>
> A. It tells you how to make it. It says split the red color band. Now, the detail of implementing that is another step. And then after you do that, then you go to another step, divide the filters. And after you do that, you go into the laboratory and do some tests. There's quite a bit of work to do after this concept is put forward.
>
> Q. Well, it tells you what the goal is, which is splitting the red color band, as you said, but it doesn't tell you how to make a display system and filtering system to do that, does it?
>
> A. No, it does not. And I don't think it has to. One skilled in the trade, as defined by the courts, could pick this up and do it, I believe firmly.

(Tr. 1353-54.) As can be seen, in one statement Mr. Tannas suggests there is "quite a bit of work to do" (e.g. an argument that the other combinations are not obvious), but immediately thereafter states a person would know how to practice the entire invention once splitting the red color band

[38] Honeywell notes that there is no requirement that applicants create a working model in order to obtain patent protection. (H. Br. 138.) While this is true, the failure to create a prototype is strong evidence that a claim is not enabled. See Leibel-Flarsheim, 481 F.3d at 1379 (affirming summary judgment non-enablement where the evidence showed that no prototype of the system had been made). Furthermore, the case law cited by Honeywell states only that the failure to provide a model is not dispositive of lack of enablement, not that the information is not probative of lack of enablement. Falko-Gunter Falkner v. Inglis, 448 F.3d 1357, 1366 (Fed. Cir. 2006).

is known (e.g., an argument that the specification enables the person of ordinary skill to build the invention.) Mr. Tannas cannot have it both ways. Claim 2 of the '914 patent is invalid under either § 103 or § 112.

*ii. Honeywell Incorrectly Asserts That The Enablement Of Any Mode Of Practicing The Invention Satisfies The Enablement Requirement*

Honeywell's final argument is based on an incorrect statement of law, and is similarly without merit. Honeywell attempts to argue that "'[t]he enablement requirement is met if the description enables *any mode* of making and using the invention.'" (H. Br. 140 (quoting Invitrogen, 429 F.3d 1052, 1071 (Fed. Cir. 2005).) In the recent case of Automotive Technologies International, the Federal Circuit expressly rejected the "argument that because the specification enables one mode of practicing the invention . . . the enablement requirement is satisfied." No. 2006-1013, -1037, 2007 U.S. App. LEXIS 21271 at *26-27. Indeed, the Federal Circuit was clear in holding that "in order to fulfill the enablement requirement, the specification must enable *the full scope of the claims*." Id. at *28 (emphasis added). Accordingly, Honeywell's argument that the specification satisfies the enablement requirement because it enables a single embodiment of Claim 2 is legally incorrect and unsupportable, and is therefore without merit.[39]

Thus, Honeywell has failed to rebut the clear and convincing evidence that the original specification teaches a mere germ of an idea, and is therefore invalid. Similarly, Honeywell has not rebutted L-3's evidence that the specification of the '914 patent teaches away from the full claimed scope of the invention, and is therefore invalid as a matter of law. Thus, Claim 2 of the '914 patent is invalid for failure to comply with the enablement requirement of 35 U.S.C. § 112.

---

[39] Honeywell also argues that "L-3 argues in support of its enablement defense that LCD display technology is not explicitly disclosed." (H. Br. 139.) This statement is false. (See L-3 Br. 68-71.)

4. Honeywell Has Failed To Rebut The Clear And Convincing Evidence That The '914 Patent Does Not Disclose The Best Mode Of Practicing The Invention

The best mode requirement is the last of the three disclosure requirements codified in the first paragraph of 35 U.S.C. § 112. The best mode requirement mandates that the "specification set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112 (emphasis added).

*i. Honeywell's Argument That Mr. Cohen Did Not Consider LCD Technology To Be The Best Mode Of Practicing Claim 2 Is Contradicted By Mr. Cohen's Clear Statements To The Contrary*

The first step of the best mode analysis requires a subjective inquiry into the inventor's state of mind at the time of filing. Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 963 (Fed. Cir. 2001). L-3 has provided clear and convincing evidence – the sworn testimony of Mr. Cohen himself – that he believed, at the time of filing, that the use of LCD technologies was the best mode of practicing the invention. (L-3 Br. 72-73.) Mr. Cohen stated clearly that "in 1985 I was looking at the liquid crystal as a color display," and further, that "I had looked at liquid crystal and I felt that would be the right way to go." (DE-54 441.)

Honeywell attempts to rebut this evidence by once again incorrectly stating the law and mischaracterizing the record. Honeywell incorrectly argues that Mr. Cohen's statement that liquid crystal "'was in his mind, but it was not at the foremost of [his mind]'" (H. Br. 142) somehow negates his statement that "as a color display, [LCD] would be the way we would do it" and that he "felt that would be the right way to go." (DE-54 441.) Honeywell cites no case law to support its assertion that the best mode must be "foremost" in the inventor's mind, whatever that means, because no such requirement exists. (See H. Br. 142); See Bayer AG v. Schein Pharms., Inc., 301 F.3d 1306, 1314 (Fed. Cir. 2002) ("The best mode requirement . . . 'requires an inventor to disclose a best mode known by him.'" (quoting In re Gay, 309 F.2d 769,

722 (C.C.P.A. 1962)). One need look no further than the language of the statute – "that the specification must disclose the best mode contemplated by the inventor of carrying out his invention" – to see the fallacy of Honeywell's assertion. 35 U.S.C. § 112. Mr. Cohen clearly stated that he contemplated LCD technology as "the way we would do it," as of the filing date of the '914 patent, and therefore contemplated LCD technology as the best mode of carrying out the invention.[40]

*ii. Honeywell's Argument That, Because "The Original Specification Was Intended To Be More Generic," The Best Mode Is Described, Fails*

The second step of the best mode analysis is simple: when, as here, the inventor had a best mode of carrying out the invention, the failure to disclose that best mode invalidates the patent. Eli Lilly, 251 F.3d at 963. The inventor need not intend to conceal the best mode. United States Gypsum v. Nat'l Gypsum Co., 74 F.3d 1209, 1215-16 (Fed. Cir. 1996). L-3 submitted clear and convincing evidence that the use of LCD technology was not disclosed in the original specification. (L-3 Br. 73-74.) Certainly, there can be no question that the original application does not disclose LCD display technology. (See DMX-36 D000004-20.) Furthermore, Mr. Cohen admitted that "the original drawing didn't show that possibility [LCDs as the color display] which was . . . a shame. It should have." (DE-54 441 (emphasis added).)

Honeywell attempts to rebut this clear evidence by arguing that "the text of the original specification was intended to be more generic as to the type of display technology that was used

[40] Even the language Honeywell quotes from Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1330 (Fed. Cir. 2002) does not support its position. Honeywell posits that Mr. Cohen's statement that LCD was not at the foremost of his mind somehow indicates that he didn't consider LCD to be a mode of practicing the invention that is superior to all others. Given that Mr. Cohen stated that LCD "would be the way we would do it" and that he "felt it would be the right way to go," (DE-54 439-43) there can be no other logical conclusion other than that Mr. Cohen felt that an LCD would be the mode of practicing the invention that is superior to all others.

to practice the invention." (H. Br. 142.) Honeywell does not provide any legal support for the position that the intent to be generic somehow discloses a best mode. (See id.) This is because Honeywell's position is unsupported by law: the best mode requirement can only be satisfied by actual disclosure of the best mode, even if that best mode would be known to one of ordinary skill in the art. Bayer, 301 F.3d at 1314 ("[S]ection 112 demands *actual disclosure* regardless of whether, as an abstract matter, practicing that mode would be within the knowledge of one of ordinary skill in the art.") .

Moreover, what the specification was intended to disclose and what it actually discloses are, of course, two different things, and Honeywell's argument is an admission that the best mode was not disclosed. Nowhere does Honeywell argue, nor is there any evidence in the record to suggest, that the use of LCD display technology is disclosed in the original specification of the '914 patent.[41] (See id.) Accordingly, Honeywell has failed to present anything having any tendency to rebut L-3's clear and convincing evidence that the '914 patent is invalid for failure to comply with the best mode requirement of 35 U.S.C. § 112.

**C. Honeywell Has Not Rebutted L-3's Clear And Convincing Showing That The '914 Patent Is Unenforceable As A Result Of The Applicants' Inequitable Conduct**

As shown in its opening brief, L-3 submitted clear and convincing evidence that the applicants committed inequitable conduct during the prosecution of the '914 patent and other related applications.[42] When a patent applicant violates the duty of "candor, good faith, and

41 Honeywell even goes so far as to state that "the revised version of Figure 3 'more accurately reflects what we said in the text.'" (H. Br. 142.) Not only is the content of the revised Figure 3 irrelevant to the best mode analysis, which, like the rest of the section 112 disclosure requirements, must be determined based on the original specification, Honeywell does not argue that the revised Figure or specification teaches an LCD display.

42 Inequitable conduct with respect to related applications is relevant because the Federal Circuit has recently held, contrary to Honeywell's assertions, that inequitable conduct as to a single patent in a family may be sufficient to invalidate the entire family. Nilssen v. Osram

honesty" owed to the patent office, that applicant has committed inequitable conduct, which renders any patent resulting from the application process unenforceable. Warner-Lambert Co. v. Teva Pharms. USA, Inc., 418 F.3d 1326, 1342 (Fed. Cir. 2005). Inequitable conduct requires a showing of a material misrepresentation during the prosecution of the patent, as well as intent to deceive the patent office.[43] Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1186 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 515 (2006).

1. Honeywell Has Not Rebutted L-3's Evidence That The Applicants Made Material Misrepresentations To The Patent Office

L-3 submitted clear and convincing evidence that the applicants made material misrepresentations during the prosecution that led to the '914 patent. A material misrepresentation can result either from affirmative misrepresentations of material facts or from the failure to submit known material art to the patent office. Warner-Lambert, 418 F.3d at 1342; (L-3 Br. 76-80, 82-83.) L-3 showed that the applicants did both. First, L-3 presented unrebutted evidence that the applicants made a material affirmative misrepresentation with respect to the addition and removal of Dr. Scoughton as an inventor in the '760 and '269 applications. (L-3 Br. 76-80.) Second, L-3 presented unrebutted evidence that the applicants failed to disclose material prior art during the prosecution of the application. (L-3 Br. 82-83.) Taken together, the acts cement the fact that the '914 patent is unenforceable as a result of the applicants' conduct during prosecution. Nilssen, at *29 (upholding the district court's finding of inequitable conduct based

---

Sylvania, Inc., No. 2006-1550, 2007 U.S. App. LEXIS 23733 at *12 (Fed. Cir. October 10, 2007).

[43] Honeywell first argues that, because the bulk of L-3's evidence comes from the prosecution histories of the related patents, somehow the charges of inequitable lack merit. To the contrary, the Federal Circuit constantly holds that direct evidence of intent rarely exists, and instead "is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information," which here, is embodied in the prosecution history. See Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs. Ltd, 394 F.3d 1348, 1354 (Fed. Cir. 2005).

on a number of isolated events, because "this case presents a collection of such problems . . . that indicated repeated attempts to avoid playing fair and square with the patent system.").

Regarding the misrepresentation of inventorship, Honeywell does not argue that inventorship is not material. (See H. Br. 143-147.) Moreover, Honeywell does not attempt to offer a good faith explanation for the many apparent irregularities involved with the applicants' representations of Dr. Scoughton's inventorship. (See id.) Rather, Honeywell simply states that "at the time Dr. Scoughton was added as a co-inventor in the '269 application, the pending claim was amended to recite polarizers." (H. Br. 144-45.) Honeywell has not rebutted L-3's showing that the circumstances of the various additions and removals of Dr. Scoughton indicate a misrepresentation.

When examiner Buczinski made clear that he would not allow any of the claims of the '269 application unless the applicants added Dr. Scoughton as an inventor, Honeywell amended circular polarizers into the claims so that Dr. Scoughton could be legitimately added. (L-3 Br. 79.) Of course, Honeywell never intended to claim circular polarizers, and removed all claims directed to that feature in the very next amendment.[44] Honeywell did not, however, bother to remove Dr. Scoughton, no doubt because the examiner would again raise his 102(f) and 102(g) rejections. (L-3 Br. 79.) Accordingly, while, as Honeywell asserts, the addition of Dr. Scoughton to the '269 application may have been correct at the time, it immediately became incorrect on the very next amendment, which certainly supports an inference that Dr. Scoughton was added merely to overcome a 102(f) or 102(g) rejection and not because he was an inventor of Claim 2.

---

[44] Of course, examiners have no knowledge of which subject matter is associated with which inventor unless the applicants provide that information.

Honeywell also attempts to argue that because the Hunt reference is not in evidence, L-3 cannot now show that the Hunt reference was material.[45] (H. Br. 145-47.) Honeywell's statement is inconsistent with the law. The Federal Circuit has held that, as a matter of law, the failure to disclose the rejection of substantially similar claims meets the threshold level of materiality. Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1368 (Fed. Cir. 2003). L-3 has shown – and Honeywell does not dispute – that the applicants amended claims into the '760 application related to temporal filtering, and that similar claims were rejected in the '270 application over the Hunt reference. (L-3 Br. 81; See H. Br. 145-47.) Accordingly, under Dayco, the rejection of claims directed to temporal filtering over Hunt and the applicants' subsequent failure to disclose Hunt while presenting claims directed to temporal filtering – both of which are in evidence as part of the prosecution histories of the '270 and '760 applications – are clearly material. The Hunt reference itself does not, as Honeywell asserts, need to be in evidence. The similarity of the claims and the fact that the rejection occurred is sufficient to establish its materiality.[46] Dayco, 329 F.3d at 1368.

2. Honeywell's Assertion That There Is No Proof Of Materiality, Knowledge, Or Intent Is Incorrect As A Matter Of Law

L-3 submitted clear and convincing evidence that the material misrepresentations were made with the intent to deceive the patent office. The Federal Circuit has consistently held that the failure to offer a good faith explanation for withholding known material prior art from the

[45] L-3 asserts that the nondisclosure of Hunt during the prosecution of the '760 application was an additional act in violation of the applicants' duty of disclosure that supports a finding of intent to deceive the patent office.

[46] It is irrelevant that the claims to which the inequitable conduct related were not the claims that ultimately issued. The Federal Circuit holds that inequitable conduct relating to any claim presented during prosecution violates the applicant's duty, and therefore renders any patent that ultimately issues unenforceable. Fox Indus., Inc. v. Structural Preservation Sys., Inc., 922 F.2d 801, 804 (Fed. Cir. 1990).

patent office supports an inference that the applicant had the requisite intent to deceive. Nilssen, at *28. As discussed above, Hunt was a known material reference as a matter of law. See supra Section C.1.

Instead of offering a good faith explanation for the failure to disclose Hunt, Honeywell attempts to negate intent by arguing that no one "substantively involved in the prosecution of the '914 patent had any knowledge of the Hunt patent, its alleged materiality, or the rejection over the Hunt patent in the abandoned '270 application." (H. Br. 146.) Leaving aside the fact that the '270 application, including the Hunt reference, was in Honeywell's files, Honeywell has apparently forgotten about the inventor named in the '269, '270, and '760 applications, Mr. Cohen. Federal Circuit precedent holds that the knowledge of the prosecuting attorney is charged to the applicant. FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1415 n.8 (Fed. Cir. 1987). Accordingly, the law charges Mr. Cohen with knowledge of the Hunt reference, as well as the rejection of temporal filtering claims over that reference. See id. Changes in the prosecuting attorney over the course of the prosecution are rightfully irrelevant.[47] Therefore, Honeywell's lone attempted rebuttal of L-3's assertions is legally insufficient, and fails to rebut L-3's clear and convincing evidence that the applicants involved in the prosecution that ultimately led to the '914 patent materially misrepresented information with the intent to deceive the patent office. Accordingly, the Court should find that the '914 patent is unenforceable because of the applicants' inequitable conduct.

[47] Indeed, allowing an inventor to hide from the duty of disclosure by switching attorneys during prosecution would nullify the duty of disclosure.

## D. Honeywell Has Not Rebutted L-3's Clear And Convincing Showing That The '914 Patent Is Unenforceable Due To Prosecution Laches

Finally, L-3 presented clear and convincing evidence that the '914 patent is unenforceable due to prosecution laches. When a patent issues after an "unreasonable and unexplained delay in prosecution" a court may invoke the equitable doctrine of prosecution laches to declare the patent unenforceable. Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., 422 F.3d 1378, 1385 (Fed. Cir. 2005). In making a finding of prosecution laches, a court should consider (1) the delay in issuance of the asserted patents, (2) the prosecution histories of the asserted claims, (3) the independent progress of other innovators in the field between the time of filing and the time of issuance, and (4) the prejudice to the public resulting from the delay. Id. at 1385. In its opening brief, L-3 showed that the applicants presented already-rejected claims in the '269 application to ensure that the application would not pass to allowance (or go abandoned) while the '760 application was used as a test bench to attempt to get the broadest possible claims without risking the extended patent term that would arise from the '269 application. (See L-3 Br. Parts C.2.iv & D.) L-3 also showed that allowing Honeywell to assert the claims of the '914 patent would withdraw the innovations of seventeen years of independent development from the public domain, and would force the public at large to bear the cost of paying Honeywell a royalty for a concept that it neither invented, nor properly disclosed to the public according to the constitutionally required quid pro quo of a patent grant. (L-3 Br. 87.)

Honeywell's only rebuttal consists of the average pendency of patent applications. (See H. Br. 148.) Honeywell does not contest L-3's assertions that Honeywell's presentation of already rejected claims was, in addition to being a violation of its duty of good faith and candor, an unreasonable delay in prosecution. The test for prosecution laches does not set forth a

minimum delay that would be unreasonable, and given Honeywell's lack of a response, there can be no doubt that, as stated in Symbol Technologies, the applicants' unreasonable delay is also "unexplained." 422 F.3d at 1385. Accordingly, the clear, convincing, and unrebutted evidence militates toward a finding of unenforceability as a result of prosecution laches.

**CONCLUSION**

L-3 and the Government have produced substantial evidence in the form of prior art references and the testimony of persons of ordinary skill in the art at the time that indicate Claim 2 of the '914 patent is obvious pursuant to 35 U.S.C. § 103 and that the patent's disclosure of the invention is inadequate pursuant to 35 U.S.C. § 112. Moreover, the Defendants have presented evidence that the patent is unenforceable due to inequitable conduct during prosecution of the '914 patent and laches. Accordingly, L-3 respectfully asks this Court to declare Claim 2 of the '914 patent invalid and unenforceable against Defendants.

Respectfully submitted, this 9th day of November, 2007.

KING & SPALDING

/s/ John W. Harbin
John W. Harbin
Georgia Bar No. 324130
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521
(404) 572-4600

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, and<br><br>LOCKHEED MARTIN CORP.,<br><br>Defendant-Intervenor, and<br><br>L-3 COMMUNICATIONS CORPORATION,<br><br>Defendant-Intervenor. | No. 02-1909C<br>Judge Susan G. Braden |

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of DEFENDANT-INTERVENOR L-3 COMMUNICATIONS CORPORATION'S REPLY TO PLAINTIFFS' POST-TRIAL OPPOSITION BRIEF REGARDING DEFENSES was served on November 9, 2007, via electronic mail to:

Thomas J. Madden, Esq.
Paul A. Debolt, Esq.
Venable LLP
Terrell Place
575- 7th Street, N.W.
Washington, D.C. 20004-1601
Tel: (202) 344-4000
Fax: (202) 344-8300
Email: tjmadden@venable.com
padebolt@venable.com

John Fargo, Esq.
Christopher L. Crumbly, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0458
Fax: (202) 307-0345
E-mail: john.fargo@usdoj.gov

christopher.crumbley@usdoj.gov
Counsel for United States

Counsel for Lockheed Martin Corporation

Lawrence J. Gotts
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700
(202) 551-1705 (fax)
Email: lawrencegotts@paulhastings.com

Attorney for Plaintiffs

Mark R. Koehn, Esq.
Elizabeth Roesel, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700
(202) 551-1705 (fax)
Email: markkoehn@paulhastings.com
elizabethroesel@paulhastings.com

Counsel for Plaintiffs

I further certify that a true copy of DEFENDANT-INTERVENOR L-3 COMMUNICATIONS CORPORATION'S REPLY TO PLAINTIFFS' POST-TRIAL OPPOSITION BRIEF REGARDING DEFENSES was electronically filed on ECF on November 9, 2007.

*s/Charles A. Pannell III*
Charles A. Pannell III