**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., and HONEYWELL INTELLECTUAL PROPERTIES, INC., Plaintiffs, | No. 02-1909C |
| v. | Judge Susan G. Braden |
| THE UNITED STATES, Defendant, | |
| and | |
| LOCKHEED MARTIN CORPORATION and L3 COMMUNICATIONS CORPORATION, Defendant-Intervenors. | |

**DEFENDANT THE UNITED STATES' CORRECTED POST-TRIAL REPLY MEMORANDUM REGARDING DEFENSES TO INFRINGEMENT**

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

CHRISTOPHER L. CRUMBLEY
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 307-0415
Facsimile: (202) 307-0345

Of Counsel:
TREVOR M. JEFFERSON
Attorney
Department of Justice

November [9]13, 2007

Attorneys for the United States

# TABLE OF CONTENTS


TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. CLAIM 2 OF THE '914 PATENT WOULD HAVE BEEN OBVIOUS. . . . . . . . . . ~~[-3-]~~3

A. Honeywell Ignores the Holdings of *KSR* in Criticizing the Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-3-]~~3

B. Contrary to Honeywell's Assertion, the Government Undertook a *Graham* Analysis, Leading to a Conclusion of Obviousness.. . . . . . . . . . . . . . . . . . . . ~~[-5-]~~5

1. Scope and Content of the Prior Art Was Evaluated in the Government's Opening Brief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-5-]~~5

a. Complementary Filtering Was Known in the Prior Art. . . . . . ~~[-6-]~~6

b. Full Color Displays Having Multiple Filters Were Known in the Prior Art. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-8-]~~8

c. Filters Were Known in the Prior Art and Appropriate Filters Could Have Been Selected. . . . . . . . . . . . . . . . . . . . . . ~~[-9-]~~9

2. The Differences Between the Prior Art and Claim 2 Were Assessed in the Government's Opening Brief. . . . . . . . . . . . . . . . . . . ~~[-9-]~~9

a. The Prior Art Contains All Elements of Claim 2.. . . . . . . . . ~~[-10-]~~10

b. Honeywell's Asserted Differences are Contrary to the *Graham* Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-10-]~~10

3. A Person of Ordinary Skill Could Have Combined the Prior Art to Arrive at the Claimed Invention. . . . . . . . . . . . . . . . . . . . . . ~~[-12-]~~11

a. The Government's Explanation of the Person of Ordinary Skill Follows the Court's Definition. . . . . . . . . . . . . . . . . . . . . . ~~[-12-]~~12

b. The Relevant Art is Predictable and Could Have Easily Been Modified to Reach the '914 Invention. . . . . . . . . . . . . . . . . ~~[-13-]~~13

C. Honeywell's Attempts to Argue Against Obviousness are Unavailing. . . . ~~[-15-]~~15

1. There is No Teaching Away From the Invention in the Prior Art. . ~~[-15-]~~15

2. Secondary Considerations Do Not Support Nonobviousness. . . . . ~~[-19-]~~19

a. There Was No Long-Felt Need for the '914 Patent. . . . . . . ~~[-20-]~~20

b. There is No Commercial Success Attributable to the Invention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-20-]~~20

c. Failure Of Others Is Not Reflected in MIL-L-85762. . . . . . ~~[-21-]~~21

d. The Secrecy Order is Not Evidence of Inventiveness. . . . . ~~[-21-]~~21

II. CLAIM 2 OF THE '914 PATENT IS ANTICIPATED BY THE PRIOR ART. . . ~~[-22-]~~22

A. The Reetz Thesis (DE-301) Anticipates Claim 2. . . . . . . . . . . . . . . . . . . ~~[-24-]~~24

B. Task & Griffin III Anticipates Claim 2. . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-27-]~~27

III. THE REETZ THESIS WAS PUBLICLY AVAILABLE AND QUALIFIES AS PRIOR ART. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-28-]~~28

A. The Evidence Establishes the Public Availability of the Reetz Thesis. . . . ~~[-29-]~~29

B. Ms. Wiant's Testimony was not "Tainted," and Government Counsel did not Coach Her. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-32-]~~32

C. Honeywell's Proposed Draconian Remedy is Inappropriate and Unjustified. ~~[-34-]~~34

IV. CLAIM 2 IS INDEFINITE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-36-]~~37

V. CLAIM 2 IS NOT SUPPORTED BY THE WRITTEN DESCRIPTION. . . . . . . . ~~[-38-]~~38

VI. THE GOVERNMENT HOLDS AN IMPLIED LICENSE TO USE PRODUCTS SOLD TO IT BY HONEYWELL. . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-40-]~~41

VII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ~~[-43-]~~43

**TABLE OF AUTHORITIES**

**CASES**

IN

## CASES

*Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*,
1998 WL 151411 (D. Del. Mar. 13, 1998). . . . . 30

*Amazon.com Inc. v. BarnesandNoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001). . . . . 24

*Connell v. Sears, Roebuck & Co.*,
722 F.2d 1542 (Fed. Cir. 1983). . . . . 24

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988). . . . . 32

*In re Cronyn*,
890 F.2d 1158 (Fed. Cir. 1989). . . . . 29

*Gould v. American Hawaiian S.S. Co.*,
331 F. Supp. 981. . . . . 42

*Graham v. John Deere*,
383 U.S. 1 (1966). . . . . passim

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994). . . . . 16

*In re Hall*,
781 F.2d 897 (Fed. Cir. 1986). . . . . 29, 31, 32

*Honeywell Int'l, Inc. v. United States*,
66 Fed. Cl. 400 (Fed. Cl. 2005). . . . . 12

*In re Icon Health and Fitness, Inc.*,
496 F.3d 1374 (Fed. Cir. 2007). . . . . 6

*Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004). . . . . 21

*KSR Intern. Co. v. Teleflex Inc.*,
550 U.S. ___, 127 S. Ct. 1727 (2007). . . . . passim

*Miller v. Univ. City Studios, Inc.*,
650 F.2d 1365 (5th Cir. 1981). . . . . 36

*Moore v. State Farm Mut. Auto. Ins. Co.*,
2007 WL 1343338 (E.D. La.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Orthopedic Equipment Co., Inc. v. United States*,
702 F.2d 1005 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pfund v. United States*,
40 Fed. Cl. 313 (Fed. Cl. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Rouffet*,
149 F.3d 1350 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc.*,
565 F. Supp. 931 (D.N.J. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Shippen v. United States*,
654 F.2d 45 (Ct. Cl. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States Dept. of Energy v. White*,
653 F.2d 479 (C.C.P.A. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Adams*,
383 U.S. 39, 40 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Ryhnes*,
218 F.3d 310 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*United States v. Univis Lens Co.*,
316 U.S. 241 (1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Zacarias Moussaoui*,
No.01-455 (E.D. Va.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**STATUTES**

Del. Code Ann. tit. 8, § 259. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

35 U.S.C. § 102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 22, 29

35 U.S.C. § 103(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

35 U.S.C. § 112. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

| IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., and HONEYWELL INTELLECTUAL PROPERTIES, INC., Plaintiffs, | No. 02-1909C |
| v. | Judge Susan G. Braden |
| THE UNITED STATES, Defendant, | |
| and | |
| LOCKHEED MARTIN CORPORATION and L3 COMMUNICATIONS CORPORATION, Defendant-Intervenors. | |

**DEFENDANT THE UNITED STATES' POST-TRIAL REPLY MEMORANDUM REGARDING DEFENSES TO INFRINGEMENT**

In its August 24, 2007 Post-Trial Brief (cited herein as "Op. Br."), defendant the United States ("Government") set forth several independent bases for finding that claim 2[1] of U.S. Patent Number 6,467,914 ("the '914 patent") is invalid. First, the Government has asserted that the claim is invalid as anticipated under 35 U.S.C. § 102, or alternatively as obvious under 35 U.S.C.

[1]Honeywell claims that the Government has waived any later argument as to the invalidity of claims 1 and 3 of the '914 patent. HW Br. at 4. This is not the case; the Court found that claims 1 and 3 were not infringed by the accused devices. Since the Government is asserting invalidity as an affirmative defense to infringement (as opposed to a counterclaim), there is no basis for asserting the invalidity of these claims, as there is nothing for the Government to defend against. Nor does this Court possess jurisdiction to hear a counterclaim for a declaration of invalidity of claims 1 and 3. *Shippen v. United States*, 654 F.2d 45, 47 (Ct. Cl. 1981) (predecessor court has no jurisdiction over declaratory judgments).[.]

§ 103(b). Furthermore, the claim is unsupported by the original written description in violation of 35 U.S.C. § 112, and is also indefinite under that section. Finally, the Government asserts that it has an implied license to use certain products sold to it by legacy Honeywell, such as the F-16 CMFD displays. These defenses were supported by ample evidence at trial, more than sufficient to establish the facts supporting infringement with clear and convincing evidence.

In stark contrast to Defendants' opening briefs, the weaknesses in Honeywell's counterarguments are highlighted in its Opposition Brief (cited herein as "HW Br.") by several key misstatements of the record and incorrectly applied precedent. First, Honeywell completely refuses to address the damaging admissions its expert, Mr. Tannas, made throughout his trial testimony. Second, unable to seriously challenge the validity of the Government's prior art, Honeywell engages in an unprofessional attack on Government's counsel. And finally, though Honeywell may wish to believe that the Supreme Court's decision in *KSR* was limited, the unanimous decision of the Court is clearly of great import. By ignoring the skills and knowledge a person of ordinary skill in the art would bring to bear on a problem, Honeywell attempts to turn back the clock to a period prior to the Supreme Court's *KSR* decision.

Honeywell's nearly 160 page brief contains scores of errors, misstatements of the record, and other fallacies. However, for brevity and clarity's sake, the government cannot address each of these points in full. Some of Honeywell's arguments are addressed herein; others will be addressed in greater detail by L-3's brief. Finally, some the arguments made in the Government's opening brief stand on their own against HW's counterarguments. In other words, the mere fact that an argument is not repeated herein should not be construed as an abandonment of that argument.

Based on the trial record, and the numerous arguments made throughout the Government's and L-3's post-trial briefs, the Court should ultimately find that Claim 2 of the '914 patent is invalid, for one or more of the asserted reasons.

## I. CLAIM 2 OF THE '914 PATENT WOULD HAVE BEEN OBVIOUS

Honeywell's arguments asserting the nonobviousness of claim 2 are fraught with conceptual, factual, and legal errors. First, Honeywell ignores the Supreme Court's rejection of the teaching-suggstion-motivation test in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. __, 127 S. Ct. 1727, 1739 (2007). Second, Honeywell attempts to disparage the Government's obviousness case by inventing new claim elements and misapplying the relevant *Graham* inquiry. And finally, Honeywell completely misstates the history of the development of the field of NVG compatibility, in an attempt to convince the Court that conventional wisdom taught away from the '914 patent. None of these arguments are persuasive, as will be set forth below. The Government's case of obviousness, set out in full in its opening brief, withstands each of the counterarguments Honeywell throws at it.

### A. Honeywell Ignores the Holdings of *KSR* in Criticizing the Government's Case

As noted in the Government's opening post-trial brief, the Supreme Court in *KSR* struck down the Federal Circuit's judicially created "teaching-suggestion-motivation" test. *See KSR*, 127 S. Ct. at 1739 ("We begin by rejecting the rigid approach of the Court of Appeals. Throughout this Court's engagement with the question of obviousness, our cases have set forth an expansive and flexible approach inconsistent with the way the Court of Appeals applied its [teaching, suggestion, motivation] test here."). After *KSR*, it is no longer a *requirement* that a party challenging obviousness show a teaching, suggestion, or motivation to combine references,

though such evidence *can* be used as evidence of obviousness. In other words, TSM evidence can be used to show obviousness, but the lack thereof does not result in a finding of nonobviousness.

Honeywell appears to be either unaware or unwilling to recognize this change in the law. Throughout its brief, Honeywell asserts that claim 2 is nonobvious because there is no "suggestion" of the combination of elements in the prior art. HW Br. at 1, 5, 21, 28, 43, 58, 60, 72. For example, Honeywell criticizes the use of Verney as prior art, because "there is no *suggestion* anywhere to substitute the Verney filter in a complementary filtering solution." Id. at 60 (emphasis added). This simply overlooks the Supreme Court's clear statement that such a suggestion need not come from the art itself, but rather can arise from the common sense and creativity of those in the art, and whether the "invention" was an obvious next step. *KSR*, 127 S. Ct. at 1742.

Not only is Honeywell's argument contrary to law, it is factually incorrect. The prior art contains numerous references that suggest the combination of a full color display and complementary filtering to achieve NVG compatibility. For example, Verney itself suggests that NVG compatibility could be achieved by using color CRTs while permitting narrow band emissions of light. DE-511 at GVT009-0782. Boehm also suggests that color LCDs could be used with complementary filtering techniques. DMX-4 at D000606.

Therefore, Honeywell is incorrect on both the law and the facts. Its criticism of the prior art for failing to contain a teaching, suggestion, or motivation to combine is invalid because such a requirement was struck down in *KSR*. Furthermore, suggestions to combine the prior art to reach the invention of Claim 2 actually *do* exist in the prior art, and therefore provide additional support to the Government's obviousness defense.

**B. Contrary to Honeywell's Assertion, the Government Undertook a *Graham* Analysis, Leading to a Conclusion of Obviousness**

Honeywell devotes considerable time and space to criticizing a non-existent fault in the Government's brief. Namely, Honeywell asserts that neither the Government nor L-3 conducted a three-part analysis as set forth in *Graham v. John Deere,* 383 U.S. 1 (1966). This is demonstrably false, as both parties set forth and followed the *Graham* factors, as did Dr. Task at trial. See Op. Br. at 5-6, 28-29; DE-500 at ¶¶40-82. As noted above, Honeywell's attempt to challenge the Government's case on this point merely reflects a lack of understanding of how *Graham* should be properly applied under the "flexible and expansive" approach of *KSR*.

1. Scope and Content of the Prior Art Was Evaluated in the Government's Opening Brief

The first *Graham* factor pertains to the scope and content of the prior art. The Government clearly assessed this in its opening brief, first by examining what types of prior art one of ordinary skill would investigate, and then summarizing in claim charts the content of that art. Op. Br. at 21-26 (scope); 27-28, 33-34 (charts). Why Honeywell believes that no such analysis was undertaken is unclear.

In fact, Honeywell must have understood the Government to have assessed the scope and content of the prior art, as it then proceeds to extensively criticize the scope of the art considered by the Government. For example, Honeywell criticizes the Government's use of Uchida, because it does not explicitly reference aircraft cockpits. HW Br. at 41-42. As set forth below, none of Honeywell's arguments are persuasive, and should not be allowed to exclude highly relevant art over insignificant and irrelevant details.

While Honeywell's arguments as to specific prior art references will be discussed below, one overarching theme must be discussed at the outset, because it is clearly contrary to the

Supreme Court's holding in *KSR*. Specifically, the Court rejected the Federal Circuit's requirement that prior art references must address the same problem as the patentee, before that art may be used in an obviousness analysis. 127 S. Ct. at 1742. To the contrary, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.*

Honeywell's brief falls victim to the same reasoning that led to the Supreme Court's reversal of the Federal Circuit. For example, Honeywell criticizes Uchida because it does not relate to aircraft displays. HW Br. at 41-42. Apparently, Honeywell believes that even though Uchida discusses full color displays, its disclosure would not have been relevant to the problem faced by the inventor of the '914 patent, namely night vision compatible full color displays. This is absurd. If, as in a recent case, the Federal Circuit concluded that bed springs were sufficiently close to the problems faced in the treadmill art, Uchida's full color displays are sufficiently close to the problem of the '914 patent to be considered. *See In re Icon Health and Fitness, Inc.*, 496 F.3d 1374, 1380 (Fed. Cir. 2007).

a. Complementary Filtering Was Known in the Prior Art

As was set forth in the Government's opening brief, one of skill in the art in 1985, when faced with the problem of achieving NVG compatible displays, would have turned to complementary filtering art. Op. Br. at 22-23. Therefore, references such as Reetz, Boehm, and the German patent would all have been within the scope of the prior art.

Honeywell attempts to exclude this highly relevant art by arguing first that the '914 patent does not use complementary filtering, and that "'914 filtering" is somehow different in character. HW Br. at 20-21. What exactly "'914 filtering" is, is not particularly clear, especially since the

inventor of the '914 patent specifically said the invention used complementary filtering. DE-54 at 347-48 (Cohen deposition).

Honeywell's perceived distinction between complementary filtering and "'914 filtering" appears to be expressed in the graph included on page 20 of Honeywell's brief. First of all, as was demonstrated by the Government at trial, this graph is incomplete as it does not include the filter disclosed in Verney, which is nearly identical to the CMFD Lamp Filter curve. Therefore, if there truly is something different about "'914 filtering," it is explicitly shown in the prior art through Verney. Second, the only apparent difference between the known concept of complementary filtering and whatever "'914 filtering" might be, is the wavelength cutoff of the filter. As Mr. Tannas himself admitted, there is nothing different about filtering in the red color band, versus filtering elsewhere in the spectrum. Tr. at 1347 ("Q. And there's nothing scientifically different about filtering a portion of the red color band from, for example, a portion of the blue color band, correct? A. No. []") (nonresponsive portion of answer omitted).

Turning to specific examples of prior art, Honeywell's brief becomes even more puzzling. Honeywell first admits that complementary filtering art such as Reetz, Verney and Boehm are within the scope and content of the prior art. HW Br. at 14. But then, plaintiffs begin to point out irrelevant features of the references, apparently in an attempt to exclude the references from the Court's consideration. For example, Honeywell criticizes Boehm for not discussing a full color display. HW Br. at 16. How this is relevant to whether Boehm is applicable as complementary filtering art is unclear. Defendants are not asserting that Boehm is art that shows a full color display; rather, it discloses complementary filtering that may be *combined with* other references that have a full color display. Similarly, Honeywell criticizes the

Reetz thesis for using a "shared-aperture filter," even though it has already admitted that the reference discloses complementary filtering. HW Br. art 14-15.

b. Full Color Displays Having Multiple Filters Were Known in the Prior Art

As set forth in the Government's opening brief, one of skill in the art would also investigate alternative display technologies in order to attempt to solve a problem such as that addressed by the '914 patent. This is supported not only by the trial testimony of those active in the art, such as Mr. Dunn, but also by prior art in the record, which explicitly encourages the exploration of alternative display technologies. Tr. at 253-55 (Dunn); DE-514; DMX-4.

Given this evidence, as well as the recent guidance from the Supreme Court in *KSR*, it is surprising that Honeywell asserts in its brief that references such as Uchida and the '963 patent are not within the scope and content of the prior art. HW Br. at 17-18. The sole support for this assertion is that the references do not disclose the use of their displays in a cockpit.

As noted above, such a limitation is absurd. It is hard to believe that one of skill in the art, when faced with a problem integrating a display into a cockpit, would not examine all sorts of display technologies, whether they had been previously used in a cockpit or not. In fact, Mr. Dunn's testimony at trial explicitly refutes Honeywell's contention. Tr. at 253-55.

The logical extension of Honeywell's argument borders on the ridiculous. If artisans working in the cockpit display field would not consider looking outside current cockpit displays to other types of display technologies, then no new types of displays would ever be installed in aircraft! If Honeywell's argument is correct, it is difficult to see how the first LCDs were ever installed in a cockpit, because Honeywell would have this Court believe that they would have never been investigated by cockpit display engineers.

c. Filters Were Known in the Prior Art and Appropriate Filters Could Have Been Selected

Finally, the Government established that the scope and content of the prior art would include various filters that were known in 1985, and one of skill in the art would be able to easily select the proper filters to achieve the appropriate level of filtering. Op. Br. at 24-26. Mr. Tannas himself admitted that the '914 patent did not invent the filter, and that the invention can be built with off-the-shelf technology. Tr. at 1347. One such filter is disclosed in the Verney reference, which is directed to filtering cockpit lighting which allowing red light to be emitted. DE-511.

Again, Honeywell at first admits that Verney is within the scope and content of the prior art, but then attempts to convince the Court to ignore its teachings. HW Br. at 13, 16-17. Once again, Honeywell draws distinctions which are minor and irrelevant, such as the fact that Verney suggests dimming the warning lights in combination with filtering. [(]HW Br. at 63.[)] Why it matters to Honeywell that Verney teaches dimming of warning lights is unclear, as the Government is not relying on Verney for this purpose. Nor does the fact that Verney dims the warning lights make the disclosure of the *filter* in Verney any less relevant to the present invention. One of skill in the art would have been aware of filters, especially filters used in cockpits, such as those disclosed in Verney. There is no reason to believe that this reference is outside the scope and content of the prior art.[ .]

2. The Differences Between the Prior Art and Claim 2 Were Assessed in the Government's Opening Brief

The Government also undertook the second inquiry of the *Graham* analysis, by assessing the differences between the teachings of the prior art and the claimed invention. Honeywell offhandedly dismisses the Government's inquiry, but provides no reason to do so.

a. The Prior Art Contains All Elements of Claim 2

In the Government's opening brief, two claim charts are provided which show that all elements of claim 2 may be found in the prior art, or in the admissions of Honeywell's expert Mr. Tannas. Op. Br. at 27-28, 33-34. Therefore, it is clear that the sole difference between the content of the prior art and the claimed invention is that the prior art must be combined. This situation is therefore very similar to that faced by the Court in *KSR*, in which "a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." 127 S. Ct. at 1742.

b. Honeywell's Asserted Differences are Contrary to the *Graham* Framework

For some inexplicable reason, Honeywell dismisses the Government's analysis out of hand. Honeywell posits that the prior art differs from claim 2 in three ways:

- a display that is both full color and NVG compatible;
- a filter at the display that passes a narrowband of the red color band, and a filter at the NVGs that blocks that narrowband; and
- an NVG compatible display having separate filters for red, green and blue.

HW Br. at 22.

Why Honeywell believes these to be acceptable distinctions for a *Graham* analysis is unclear. As can be seen above, the second two bullet points are actually combinations of two or more elements of claim 2 (i.e., a filter at the display, and a filter at the NVG), which Honeywell has apparently chosen to pair at random. The first "difference" is even more bizarre, as it appears to be the title of the patent, as opposed to elements of claim 2.

To pair up claim elements in order to conclude that the prior art is lacking in those combinations is a blatant attempt to determine the outcome of the *Graham* analysis before it even

begins. For example, in the *KSR* case, the patent claim was directed to an adjustable pedal with an electronic sensor. 127 S. Ct. at 1733. The prior art taught the use of adjustable pedals, and electronic sensors on pedals, but not both in combination. *Id.* at 1735. The Supreme Court found that the difference between the prior art and the claimed invention was merely that the "puzzle pieces" in the prior art had not been combined to reach the claimed invention. *Id.* at 1742.

If the decision in *KSR* had been up to Honeywell, however, the outcome would have been different. Following Honeywell's logic, the differences between the prior art and the invention would have been that the prior art did not show "a pedal that is both adjustable and has an electronic sensor." Honeywell would then conclude that since the art lacked that teaching, there would be no finding of obviousness. Put another way, by *defining* the differences between the prior art and the invention *as the invention itself*, Honeywell is able to ensure that there can be no finding of obviousness.

Of course, this is tautological nonsense. The inquiry in obviousness is not whether the elements are used together in the prior art, as Honeywell appears to believe - that is the domain of anticipation. Under an obviousness inquiry, it is acceptable for one prior art reference to disclose claim element A, while another discloses claim element B. So long as it is within the skill in the art to combine these references, a claim to AB is obvious.

#### 3. A Person of Ordinary Skill Could Have Combined the Prior Art to Arrive at the Claimed Invention

After rejecting Honeywell's faulty argument that the prior art differs greatly from the claimed invention, it is clear that, as the Government has asserted, the sole difference between the prior art and claim 2 is the combination of references. Since this combination is well within

the level of ordinary skill in the art (the third *Graham* inquiry), claim 2 should be held to be obvious.

a. The Government's Explanation of the Person of Ordinary Skill Follows the Court's Definition

Contrary to Honeywell's argument, the level of skill described by Dr. Task comports completely with the Court's definition of one of ordinary skill in the art. Using the Court's definition of the fields a person of skill in the art would be familiar with, Dr. Task is able to describe the particular understandings this hypothetical person would have of the art. Rather than being improper, Dr. Task's explanation should help the Court determine what modifications or combinations would have been obvious to a person of ordinary skill in 1985.

Honeywell's criticism of Dr. Task's analysis is ineffective. This Court described a person of ordinary skill in the art as a person "knowledgeable about [(1)] night vision compatible aids, [(2)] compatible instrument and panel lighting, and [(3)] manufacturing displays for military cockpits." *Honeywell Int'l, Inc. v. United States*, 66 Fed. Cl. 400, 428 (Fed. Cl. 2005). In describing the understanding of persons of ordinary skill at the time, Dr. Task listed subjects in which those persons would be competent:

> Specifically, the skilled artisan would have been well versed in or be able to easily understand optical filter techniques, optical filter types (band pass, low pass, high pass, etc.), color display emission spectra, full color display types (superposition of color images vs. spatial integration, for example), monochromatic display transducers, the relationship between wavelengths and color, radiometry, photometry, the wavelengths of the visible spectrum, and the spectral sensitivity of the specific night vision goggles (light amplifying devices) to be used. Knowledge of cockpit geometry might also be necessary to determine the level of blocking required of the filters such that the NVGs are not "overwhelmed." One of ordinary skill in the art would possess at least a B.S. in electrical or optical engineering or physics. Two to four years of experience in the areas identified above could also substitute for formal education.

DE-500 at ¶ 44. This type of explanation has been accepted by courts as instructive to the obviousness inquiry. *See Orthopedic Equipment Co., Inc. v. United States*, 702 F.2d 1005, 1011-12 (Fed. Cir. 1983). Each subject Honeywell complains of logically fits within the court's description.

To the contrary, it is Honeywell's description of the person of ordinary skill in the art that lacks merit. In an attempt to avoid obviousness, Honeywell tries to "dumb down" the person of ordinary skill by suggesting that since no one in the art "actually did" what claim 2 calls for, there was no one of skill in the art in 1985. HW Br. at 25, 26. This is wholly irrelevant to the person of ordinary skill.

First of all, if the court is looking into the issue of obviousness, it is presumed that no one in the art "actually did" what the invention calls for - otherwise, the claim would have been anticipated. Second, it is clear that persons of ordinary skill in the art, such as Mr. Reetz, existed in 1985. Finally, as was stated in the Government's opening brief, whether such a person existed is irrelevant, as the person of ordinary skill is merely a hypothetical person. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

b. The Relevant Art is Predictable and Could Have Easily Been Modified to Reach the '914 Invention

Honeywell's argument that one of skill in the art could not have combined the references to reach claim 2 seems grounded in the assertion that one of skill in the art would have been unable to take the complementary filters of the prior art and replace and/or modify them as necessary. It is unclear why Honeywell believes the filter art to be so unpredictable.

To the contrary, the witnesses who testified at trial acknowledged that filter technology was well known in 1985 and could have been easily modified. Tr. at 263 (Dunn: choosing filters

involved only "mathematics and physics"); Tr. at 142-147 (Bradford tried multiple filters on NVGs to determine the optimum one); Tr. at Tr. at 1080 (Tannas: "Engineers and one skilled in the art know that they could put filters on *anything at any time in any way*.") (emphasis added).

Honeywell makes two arguments for the unpredictability of the filter art. First, Honeywell asserts that since various documents state that NVG filter technology still needed to be investigated in 1985, it was not predictable that full color and NVG compatibility could both be achieved. HW Br. at 39. There is no reason to believe this is the case. Even if further investigation needed to be performed, routine investigation in a predictable field is a common way of optimizing results. The mere fact that investigation into optimum filters was necessary does not lead to the conclusion that the art was unpredictable, especially given the overwhelming testimonial evidence to the contrary.

Second, Honeywell attempts to find an admission from Dr. Task where none exists. Specifically, Honeywell misquotes Dr. Task in order to imply that he believes the technology of the '914 patent is "complex." HW Br. at 22. This quote comes from the Court's *Markman* hearing, and if read in context, it is clear that Dr. Task is saying the task of defining the "red color band" by wavelength is complex. Markman Tr. at 1109. This is certainly not the same thing as saying the overall technology of the '914 patent is complex. To the contrary, Dr. Task later testified that the filter field was so predictable that the invention would have been "excruciatingly obvious" to one of ordinary skill in the art.

Also supporting the predictability of the art is the German Patent, DE-505. As Dr. Task described, the German Patent provides a "recipe" for persons of ordinary skill in the art to apply complementary filtering. DE-500 ¶¶ 134-35. As a result, a display and a night vision aid may be

filtered to not interfere. Through a series of mathematical inequalities, the patent teaches how to vary the filter cut off depending on the longest wavelength an engineer wants to use. *Id.* at ¶¶134-35.[)] The German patent is further evidence for the predictability of the filter art - in other words, one of skill in the art would not have been surprised by unexpected results from setting a filter cutoff in any portion of the spectrum.

The predictability of the filter art is highly relevant because, as set forth in the Government's opening brief, an invention may be obvious if it is merely a combination of elements that have a predictable result. *KSR*, 127 S. Ct. at 1739. Engineering tradeoffs and scientific confirmation of what is believed to be true are not discoveries that are patentable. *See Pfund v. United States*, 40 Fed. Cl. 313, 355-56 (Fed. Cl. 1998), aff'd No. 98-5097, 1999 U.S. App. LEXIS 733 (Fed. Cir. Jan. 20, 1999). These principles apply squarely to this case. In fact, Honeywell expressly admits that the '914 patent is merely a "'design compromise' between NVG compatibility and a full color display." HW Br. at 11. It is exactly this type of tradeoff that is predictable and therefore obvious over the prior art. To contend that the filter art is so unpredictable that this would not be possible is contrary to the evidence.

**C. Honeywell's Attempts to Argue Against Obviousness are Unavailing**

1. There is No Teaching Away From the Invention in the Prior Art

Throughout its brief, Honeywell repeats its mantra that the prior art accepted that the only way to achieve compatibility was through the elimination of all red light from the cockpit. Honeywell focuses almost exclusively on the military specification MIL-L-85672, that requires cockpits to reduce or eliminate red lighting for NVG compatibility. According to Honeywell, the MIL Spec and other references were written because no one knew how to allow red light in the

cockpit when NVGs were being used. This is demonstrably false, and the evidence presented ever since the *Markman* hearing contradicts Honeywell's story.

Teaching away is a term used by courts to refer to situations in which the prior art or conventional wisdom discourage those in the field from arriving at the claimed invention. *See KSR*, 127 S. Ct. at 1739-40 (citing *United States v. Adams*, 383 U.S. 39, 40 (1966)). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). In the present case, contrary to Honeywell's contentions there can be no teaching away because there are several prior art references which recognize that narrowband red emissions are permissible with NVGs. DE-511 at GVT009-0782; DMX-4 at D000600; DE-508 at D000580; DE-514 at GVT018-1671. Verney, for example, explicitly states that "NVGs can tolerate narrow band emissions for all colors of light" and that it is possible to "block some of the infrared emissions similar to the approach used in the caution and warning lights." DE-511 at GVT009-0782.

As such, Verney and the other cited art in fact teach *toward* the invention claimed in the '914 patent, not away. Even if Honeywell is able to point to other art that does discourage the '914 invention (a contention that the Government disputes), the mere fact that some other art such as Verney teach toward the invention is sufficient to remedy any other teaching away.

It is also clear that Mr. Cohen, the inventor of the '914 patent, himself was taught *toward* the '914 invention, not away. Mr. Cohen's 1984 trip memorandum[2] shows that he learned about NVG compatibility and red lighting from others in the field. DE-57 at H03235. If there had been any teaching away from the '914 invention at the time, it would be reasonable to expect that Mr. Cohen would have recorded it in his memorandum.

Honeywell spends the vast majority of its discussion of teaching away focusing of the activities of the members of the Government committee that drafted the MIL-L-85762 specification. Contrary to Honeywell's argument, the evidence is clear that the committee members knew how to apply complementary filters at both the display and the NVGs to block all red light on a part, or block all or part of other color bands. Mr. Reetz testified at trial that those in the art understood there is a tradeoff between NVG performance and the wavelengths that may be used in the cockpit lighting. Tr. at 362-63 (Reetz). Indeed, this is the central concept of complementary filtering.

MIL-L-85762 set an initial tradeoff, based on a study of pilot preferences, that favored the performance of NVGs over more color in the cockpit. This does not imply in any way that the drafters did not know *how* to make any other tradeoff. Rather, it merely reflects the priorities of the military (and specifically, the Army) at the time. Honeywell admits that the design compromise still exists as the basis for the '914 patent . HW Br. at 11.

Furthermore, Honeywell's argument misses the distinction that was made at the time between red *floodlighting* (which was eliminated because it was unnecessary) and other red

[2]Honeywell criticizes the use of this memorandum, as it is apparently not a public document. However, the Government is not asserting the document as prior art, but rather as evidence of whether teaching away existed in the field in 1985.

lighting like warning lights. Honeywell cites that the Government spent $52 million prior to 1985 to remove red lighting from cockpits; this would have been done even if the '914 invention were in place, because the elimination of unnecessary red floodlighting was also done at the time. DE-500 at ¶¶222-24.

The fact that Mr. Reetz had to conduct studies to determine the optimum location for the filter cutoff does not imply that Mr. Reetz or the committee were unable to select other locations. Tr. at 354, 359-60, 362-63 (Reetz). If the pilots wanted more red in the cockpit, the NVGs filters would have to block the longer wavelength emissions. Tr. at 257-58; 362-63. However, this would result in a reduction in NVG sensitivity, and because most NVGs at the time were used in helicopters flying close to the ground, NVG sensitivity was at a premium. Tr. at 364. The committee therefore concluded that the tradeoff should be made to permit as much NVG sensitivity as possible, while sacrificing some cockpit lighting colors. Tr. at 361 (Reetz -- "85762 was written primarily with helicopters in mind."). As Dr. Task pointed out, this tradeoff was well recognized as a law of nature that cannot be changed. DE-500 at ¶ 218. MIL-L-85762 simply does not teach away from the idea that red light compatibility in the cockpit could be accomplished. Rather, it simply provides the results of the committee's investigation – that the military at the time was willing to sacrifice red light in order to have more NVG acuity for helicopter pilots as they flew close to terrain at night.

Honeywell cannot establish, through reliance on out-of-context statements in the prior art references or through implication as to the activities of the MIL-L-85762 drafting committee, that there was any teaching away from the invention in 1985. It is therefore easy to answer Honeywell's rhetorical question:

> [I]f it were obvious to those of ordinary skill in the art in October 1985 that a full-color, NVG-compatible display could be achieved, then why, in January 1986, did a committee of Government experts issue a military specification governing NVG compatible lighting (MIL-L-85762) that effectively ***banned red light and full color displays***, despite Dr. Task's opinion at the time that the MIL spec should retain red "if at all possible"?

HW Br. at 2.

The specification was written with the tradeoff it had, not because of any lack of knowledge on the part of the committee, but rather because other priorities (such as NVG sensitivity) were considered to be more important at the time than allowing a full range of colored lights in the cockpit. The fact that Dr. Task and other human factors representatives favored retaining red lighting is not surprising or damaging to the Government's position - in committees, a consensus often requires that some members' preferences are overruled based on the concerns of the majority of the members. Obviously, more members were concerned with the ability of pilots to see trees, than they were with retaining red warning lights. This is not a teaching away from the '914 invention - it is merely a recognition that engineering often requires tradeoffs in priorities.

2. Secondary Considerations Do Not Support Nonobviousness

The evidence produced by the Government at trial clearly establishes a *prima facie* case of obviousness. As summarized in the Government's opening brief, the strength of this evidence cannot be overcome by any showing of secondary considerations, even if such considerations exist. Op. Br. at 46. Nevertheless, Honeywell attempts to assert three secondary considerations - long-felt need, commercial success, and failure of others. The Government's arguments regarding lack of long-felt need and commercial success, as set forth in its prior brief, stand. *Id.*

a. There Was No Long-Felt Need for the '914 Patent

The Government's opening brief established that because full color displays had not yet been fielded in aircraft cockpits in 1985, there could not have been any long-felt need for the patented invention. *Id.* at 47. Honeywell's brief does nothing to rebut this argument. Rather, Honeywell focuses on the fact that the record shows that pilots had expressed a desire to retain red *lights* in the cockpit, such as red warning lights. HW Br. at 73-74.

The contradiction in Honeywell's argument is stunning. After arguing throughout its brief that the '914 patent pertains to *full color displays*, Honeywell now reverses course and asserts broadly that a long-felt need for *red light* in the cockpit is the same thing as a long-felt need for the '914 patent. This is a logical error from which Honeywell's argument for long-felt need cannot recover.

The fact of the matter is, that as of 1985 daylight readability and other technical concerns prevented full color displays from the cockpit. Since NVG compatibility was not the factor holding back the installation of these displays, it cannot be said that the '914 patent resolved any long-felt need for full color displays in the cockpit. "There was simply no 'long felt need' that the '914 patent addressed." D[e]E-500 at ¶218.

b. There is No Commercial Success Attributable to the Invention

The Government has previously addressed, and refuted, Honeywell's anticipated assertion of the secondary consideration of "commercial success." Op. Br. at 47-48. Honeywell's brief does nothing to weaken the Government's argument, because Honeywell still cannot show that there is any nexus between the night vision compatibility of the full color display and the commercial success of the display. While full color and night vision goggle compatibility are

requirements of the infringing displays, these are merely two of tens or hundreds of other requirements imposed by procurement documents. There is absolutely no reason to believe that the features of the '914 patent have led to any commercial success of the displays. Barring such a nexus, there can be no finding of commercial success. *See Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004).

c. Failure Of Others Is Not Reflected in MIL-L-85762

As discussed above, the MIL-L-85762 specification does not demonstrate in any way that Government personnel wished to arrive at the '914 invention but were unable to do so. Rather, the elimination of red light required by MIL-L-85762 merely reflects a design tradeoff at the time, namely that pilots preferred greater goggle sensitivity over the presence of red light in the cockpit. DE-500 at ¶¶216-17; Tr. at 362-63 (Reetz).

d. The Secrecy Order is Not Evidence of Inventiveness

On page 3 of its brief, Honeywell raises the rhetorical, and irrelevant, argument that because the patent was placed under secrecy order, it is not obvious. How Honeywell can believe this to be the case after the Secrecy Act trial is unclear. At that trial, Mr. David McLure testified that the Secrecy Order review has nothing to do with patentability; rather, personnel such as Mr. Mclure review the application to determine whether its disclosure would be harmful to national security. For example, the '914 patent as originally filed identified that NVGs have a vulnerability above a certain wavelength of light, which could be used to develop countermeasures against the NVG. Secrecy Act Tr. at 437 (McLure). This is also reflected on the face of the Secrecy Order itself, which explicitly states that "[t]his order should not be construed in any way to mean that the Government has adopted ... the invention disclosed ... and

*it is not any indication of the value of such invention*." DE-315 at NAV000039 (emphasis added).

The Government's review of the '269 application for Secrecy Act purposes had absolutely *nothing* to do with any evaluation of the inventiveness of the invention claimed. For Honeywell to suggest otherwise is to ignore the clear testimony of Mr. McLure, and ignore the purpose of Secrecy Orders themselves.

## II. CLAIM 2 OF THE '914 PATENT IS ANTICIPATED BY THE PRIOR ART

At trial, the Government established all elements of an anticipation defense under 35 U.S.C. § 102, through Dr. Task's testimony and the evidentiary record. Dr. Task's written and live testimony established that all elements of Claim 2 are present in at least two prior art references, and he backed up this testimony with claim charts. The Government's opening Post-Trial Brief briefly summarized this testimony, but the strength of the anticipation defense is reflected primarily in the trial record.[3]

Perhaps not surprisingly, Honeywell returns to its frequent tactic of introducing into the claims requirements that appear nowhere in the Court's claim construction, or the claim terms themselves. In doing so, Honeywell apparently attempts to invent new limitations that the prior art references conveniently do not disclose. The transparency of this tactic is easily recognizable.

[3]Honeywell seems to imply that the relative brevity of Government's treatment of the anticipation defense in its brief compared to the obviousness discussion, and L-3's adoption of the Government's brief section, is somehow indicative of the weakness of the Government's position. This is not the case; the Government's case is strongly founded on Dr. Task's extensive trial testimony and the written record; there was simply no reason to expansively repeat this record in the brief.

For example, Honeywell criticizes both the Reetz reference (DE-301) and Task and Griffin III (DE-508) as not disclosing a display having "red, green, and blue primaries." [~~(~~HW Br. at 108~~)~~]. There is simply no foundation for this criticism. Claim 2 contains no reference to "primaries," and the Court has never construed the claim to incorporate such a requirement.

Amazingly, Honeywell's creation of this "primary" requirement is itself founded on another requirement Honeywell is improperly inserting into the claim. Specifically, "primaries" are allegedly implied by the claim's requirement of a "full color display." But *there is no requirement in Claim 2 for a full color display*, either. There is no other basis for this new "primary" claim limitation now asserted by Honeywell, and the Government's anticipation evidence cannot be challenged for omitting an element that does not appear in the claim.

It should be pointed out that again, Honeywell attempts to generate an "admission" that defendants have never made, by distorting and misreading the parties' previous briefs. According to Honeywell, L-3 admitted in its opening brief that "claim 2 requires at least blue and green primaries." [~~(~~HW Br. at 108~~)~~]. Yet, the passage cited by Honeywell to support this allegation contains no such admission. Rather, Honeywell cites out of context from a section which explicitly concludes that claim 2 *does not* require a full color display, and merely states that the '914 patent "discusses the integration of a NVG with 'full color displays.'" [~~(~~L-3 Op. Br. at 20~~)~~]. This general discussion of the specification of the patent is a far cry from admitting that a display having *primaries* is an element of claim 2, and is actually contrary to the point L-3 was making in its brief.

Furthermore, Honeywell's own actions speak loudly, and conclusively show that "primaries" were never considered a claim term by any party until Honeywell needed to defend

against an attack on the validity of the '914 patent. At the infringement trial, the parties engaged in an exercise not dissimilar from the current anticipation arguments - Honeywell was asserting that all elements of the claims were found in the infringing devices, just as the defendants are today asserting that all elements of claim 2 can be found in the prior art. Nowhere in the voluminous materials generated for the infringement trial, however, is a mention that Honeywell believed it must show the existence of "primaries" in the displays in order to fall within the scope of the claims. Having declined to present evidence to this element at the infringement trial, Honeywell cannot now turn around and criticize the Government and L-3 for not presenting similar evidence to prove anticipation. To permit Honeywell to do so would convert claim 2 into the proverbial, and prohibited, "nose of wax." *See Amazon.com Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.") (citing cases).

**A. The Reetz Thesis (DE-301) Anticipates Claim 2**

Turning to the specific anticipation references discussed by Dr. Task at trial, Honeywell criticizes the Reetz thesis on several grounds, none of which are convincing. The thesis clearly discloses all elements of claim 2, and therefore anticipates the claim.

First, Honeywell returns to its tired refrain of finding "admissions" where none exist. Honeywell cites the Government's opening brief as stating that "not all the elements of the claim appear in one reference," and points to the claim chart for Reetz as missing elements. Op. Br. at 27-28. Once again, this is a blatant attempt to mislead the Court; the section quoted is from the Government's discussion of *obviousness*, which necessarily assumes that the Court has found against the Government on anticipation. *See Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542,

1548 (Fed. Cir. 1983) ("anticipation is the epitome of obviousness"). It is not surprising that in the Government's obviousness section, we assumed that not all claim terms are found in one reference, as this is generally the definition of obviousness.

Honeywell also criticizes the IFF instrument described in Reetz as not being a "device" under the Court's claim construction. Honeywell's support for this argument is its speculation that the three IFF indicators may not be located near to one another, and if so they would not be considered a "device." [(HW Br. at 98)]. This speculative thought experiment proves nothing. It is obvious that the three indicators have a similar purpose, based on their labeling - IFF meaning "Identify Friend or Foe." From only this fact, it is obvious these indicators clearly operate together for a purpose - hardly the relationship between the landing gear tire and the display filter Honeywell presents as an analogy. [(HW Br. at 99)].

Honeywell's criticism that Reetz lacks a "first filter for filtering the blue color band" is similarly off the mark. The sole admissible[4] support for this argument is a statement by Dr. Task that he did not look for a "blue filter" in examining the Reetz reference. [(HW Br. at 100)]. This is hardly surprising, as claim 2 does not *call for* a "blue filter" at all! It is irrelevant whether Dr. Task looked for (or ultimately found) a "blue filter" in the Reetz reference, as the claim merely requires a "first filter for filtering the blue color band," which Dr. Task did find in the reference. Honeywell's attempt to confuse the issues by using loose language should be ignored.

For the first time, Honeywell makes the surprising argument that Reetz also does not have a "fourth filter" because the filter on the goggles in the Reetz thesis does not "substantially

---

[4]Honeywell also cites Dr. Task's deposition, PTX-834, for support, but as outlined in the Government's concurrently filed Motion to Strike, this is inadmissible and should be stricken from the brief.

block" the red color band. HW Br. at 102-03. This is allegedly supported by the fact that the Reetz goggle filters contain a pinhole that allows all light to enter the goggle. *Id.* Again, Honeywell is finding distinctions where none exist. The Court's claim construction merely requires that a goggle "function for its intended purpose" in order to be considered "substantially blocked." There is no evidence that the Reetz goggles did not function; to the contrary, they were evaluated positively. DE-301. Clearly the goggles functioned for their intended purpose, and therefore a "fourth filter" is disclosed in Reetz.

Finally, Honeywell saves the majority of its criticism for the alleged requirement that the Reetz reference disclose that the display emit a "perceptible" red color band. HW Br. at 101-02. For plaintiffs to embrace this "requirement" at this stage of the case is the utmost inconsistency. As with the requirement of "primaries" discussed above, at the infringement trial Honeywell presented no argument that "perceptible" light in the red color band was relevant to the infringement of claim 2. Rather, Mr. Tannas repeatedly asserted that there is no requirement in the claims for any "significant" portion of the light to be in the red color band.

Using the same test for infringement and anticipation, as we must, it is clear that the Reetz reference has a narrowband of the red color band. The CS-4-94 filter passes *some* light above 620 nanometers; therefore, a narrowband of the red color band must be present. To require that there be some "significant" amount of light necessary to satisfy the claim would be contrary to Honeywell's arguments at the infringement trial, as well as the Court's infringement determination. Tr. at 1193 (THE COURT: "Significant is not used in the claim.")

Once again, Honeywell attempts to turn claim 2 into a "nose of wax" by adding limitations to the claim now to avoid anticipation, which were never discussed during the

infringement stage of the case (or were expressly rejected). This cannot be permitted. The Reetz thesis clearly discloses all elements of claim 2, and therefore invalidates the claim.

**B. Task & Griffin III Anticipates Claim 2**

As an alternative ground for anticipation, the Government has presented ample evidence that Task & Griffin III (DE-508) discloses all elements of claim 2. Just as with the Reetz thesis, Honeywell makes nitpicking arguments and introduces new claim requirements unsupported by the claim construction, and is ultimately not convincing.

Absurdly, Honeywell makes the argument that a color display somehow loses its color nature, depending on which particular goggles are being used to view it. In other words, a display that is a "local color display" when used with ANVIS goggles (which the pilot can look around) becomes some other kind of display when used with PVS-5 goggles (which the pilot must raise up or cut off a facemask to look under). HW Br. at 105. This argument merits little response, as it is unclear why Honeywell believes that the display itself changes depending on the goggle set used with it. A display that "shows or exhibits at least one color perceptible to an observer or observers utilizing a night vision aid" would "show or exhibit" the same colors no matter what goggles are being worn by the pilot.

Honeywell goes on to argue that Task & Griffin do not disclose a "plurality of filters," when this is clearly wrong. The sole argument supporting Honeywell's position appears to be that the "plurality of filters" must be wavelength selective, and cannot pass or block light based on some other criteria. HW Br. at 105-06. Once again, this is a qualification that Honeywell is attempting to introduce into the claim at the last minute. No part of the Court's claim

construction requires wavelength selective filters; in fact, the '914 patent itself discloses other kinds of filtering, such as polarizers.

Once again, the "admission" that Honeywell discovers with respect to the "plurality of filters" element is illusory. According to Honeywell, L-3 allegedly admitted that "claim 2 *requires* wavelength selective filters" in its opening brief. HW Br. at 106 (emphasis added). A simple glance at the cited portion of Honeywell's brief shows that this is not the case. L-3 merely asserted that the claims *include* wavelength selective filters; this is a far cry from *requiring* the filters to be wavelength selective. L-3 Op. Br. at 71.

The counterarguments Honeywell makes with respect to the "narrowband of the red color band" and the "fourth filter" are identical to those made in the section on the Reetz thesis; as the Government showed above, neither argument is valid. Honeywell has therefore failed to mount an effective defense against either anticipatory prior art reference. The Court should find that claim 2 is invalid as anticipated by both the Reetz thesis and Task & Griffin III.

## III. THE REETZ THESIS WAS PUBLICLY AVAILABLE AND QUALIFIES AS PRIOR ART

In addition to its attack on the content of the prior art, Honeywell makes a collateral attack on the public availability of the Reetz thesis, in an attempt to prevent the Court from using the reference to invalidate the '914 patent.[5] Because it ignores the clear weight of the evidence, raises irrelevant points having no bearing on the ultimate question of availability, and engages in

[5]Notably, Honeywell raises no objection to the availability of the other references it was previously unwilling to stipulate to the public availability of, namely Task & Griffin III (DE-508) and Task IV (DE-509 and DE-510). Honeywell has therefore conceded the public availability of all the prior art at issue, save the Reetz thesis.

an *ad hominem* attack on the professionalism and ethics of Government counsel, Honeywell's attack should fail.

Evidence of publication of the Reetz masters thesis meets the legal standard for a prior "printed publication" under 35 U.S.C. § 102(b), and therefore the thesis qualifies as prior art. Through deposition testimony regarding library practices, the Government established that the Reetz masters thesis was publicly available in the Pennsylvania State University library ("Penn State library"), well before the October 1985 filing date of the '914 patent. The law requires "competent evidence of the general library practice . . . to establish an approximate time when a thesis became accessible." *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986) (holding that evidence that a single publication in a German library was indexed, cataloged and shelved constituted public availability). Publications must be "cataloged or indexed in a meaningful way" such that they are reasonably accessible to the public. *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989). Further, under *Hall*, evidence of the specific date a publication was made available is not required to establish clear and convincing evidence of public accessibility: "[r]eliance on an approximation found in the affidavits . . . works no injustice . . . ." *In re Hall*, 781 F.2d at 899 (accepting an approximation of the publicly available date where it was only two and a half months prior to the critical date).

**A. The Evidence Establishes the Public Availability of the Reetz Thesis**

The Government has clearly established that a typical procedure for cataloging and shelving theses at Penn State existed, through the depositions of two library employees familiar with library practices. [(DE-668 (Fidishun Dep.); DE-688 (Wiant Dep.)[)]. This evidence, together with the testimony of Mr. Reetz himself, clearly establishes that (1) Mr. Reetz attained

his masters degree from Penn State and wrote his masters thesis in 1983 (Secrecy Hr'g Tr. at 781; *Id.* at 491-92; Defenses Tr. at 412); (2) it was the University practice for the dean or an advisor to sign off on masters theses in July of the graduation year (DE-688 at 34); (3) the library receives the theses shortly after signing (DE-668 at 22-23); and (4) theses were indexed, catalogued, and shelved within, at most, three months of receipt at the Penn State library. (DE-688 at 26; DE-668 at 26-28.) Accordingly, the evidence shows that the Reetz masters thesis was publicly available by October of 1983, and would in no circumstances be left unshelved for two years.

Rather than acknowledge Ms. Wiant's highly relevant testimony, Honeywell mischaracterizes her testimony as unreliable because she claims to be "not good at recalling dates." [(HW Br. at 114)]. Honeywell quotes Ms. Wiant responding "I don't know" to questions concerning the timing of occurrences unrelated to the shelving of the Reetz thesis. [(*Id.* at 114-15)]. However, Ms. Wiant was very clear in her recollection of the actual procedures and processes that were used at the library during the relevant time period. [(DE-688 at 12-19; 24-25; 52-53)]. Honeywell's reliance on Ms. Wiant's allegedly poor recollection of dates is not only unfounded; it is irrelevant, as the Government is not attempting to establish her recollection of the exact date the Reetz thesis was shelved. Rather, as in *Hall*, the Government has established public availability through evidence of typical library practice - a subject Ms. Wiant is conversant in, and knowledgeable of, to this day.[6]

---

[6]Honeywell also argues that Dr. Fidishun's testimony is false and/or unreliable. Dr. Fidishun is head librarian at Penn State library. She started in 1995 and took special interest in the masters theses shelving process, learning the earlier practices from fellow employees. [(DE-668 at 27.)] Honeywell inaccurately relies on *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, in which the defendant attempted to solely rely on the testimony of the thesis

The Government also points out that Honeywell's attack on Ms. Wiant's credibility should be evaluated in view of the fact that Ms. Wiant was not brought to testify to these matters live at trial. If Honeywell truly wished to challenge Ms. Wiant's credibility, it should have brought Ms. Wiant before the Court so that her credibility could be judged in person, rather than on a paper record. Instead, Honeywell assisted counsel for Penn State in opposing the Government's trial subpoena, and forcing Ms. Wiant's testimony by deposition instead.

The evidence failing it, Honeywell once again resorts to rhetorical questions, asking: "how could Penn State possibly catalog, index, and shelve the Reetz thesis by October 1983, when the document is dated December 1983?" [(HW Br. at 112)]. Why Honeywell feels the need to ask this question is curious, as the answer is simple, and is clearly in the deposition testimony. Dr. Fidishun explained that such a situation may occur when a student submits his thesis but then subsequently changes his graduation date, which changes the date on the thesis. [(DE-668 at 200)]. Dr. Fidishun's explanation is corroborated by Ms. Wiant, who testified that the thesis was likely available before December 1983. [(DE-688 at 111-12)].

Honeywell's rhetorical question is even more curious, as it is completely irrelevant. Even if the Reetz masters thesis was handed to the library in December 1983, as the date on the document shows, library procedure would have the thesis indexed and shelved by March 1984, still well in advance of the critical date of the '914 patent. Moreover, even given a discrepancy in dates, the law supports such approximations. *In re Hall*, 781 F.2d at 899 (allowing an

---

author, and not on testimony from an independent library employee. 1998 WL 151411, at *10; [(HW Br. at 112.)]

approximated date only two and a half months before the critical date to be clear and convincing evidence of public accessibility).

Honeywell's final argument that there is no evidence of when the thesis was actually submitted to the library is also without merit. [(HW Br. at 115)]. In fact, Dr. Fidishun testified as to the process of thesis approval and shelving at the university. [(DE-668 22-23)]. Evidence of "routine business practice can be sufficient to prove that a reference was made accessible before a critical date." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560 (Fed. Cir. 1988) (citing *In re Hall*).

### B. Ms. Wiant's Testimony was not "Tainted," and Government Counsel did not Coach Her

In a last, desperate attempt to discredit Ms. Wiant, Honeywell once again returns to its tired tactic of dragging Government counsel through the mud and making allegations of witness coaching. These allegations are not well taken. The Government properly obtained Ms. Wiant's testimony based solely on her ***personal recollection***. The law surrounding reliance on such testimony is well founded. Ms. Wiant worked full time at the library that shelved the Reetz thesis for over 30 years, where she personally assisted in receiving, cataloging, and shelving the theses. [(DE-688 at 11-16)]. Indeed, it is hard to imagine that her testimony regarding library practices is based on anything but her personal knowledge obtained during her 37 years of employment.

The preparation of Ms. Wiant's affidavits was in no way improper. For her first affidavit, Penn State University counsel interviewed Ms. Wiant and drafted an affidavit, which she reviewed, revised for accuracy, and then signed. [(DE-688 at 50)]. As neither Ms. Wiant or her counsel are familiar with patent law (and specifically cases such as *In re Cronyn* and *In re Hall*),

however, it is not surprising that the first affidavit failed to discuss certain topics relevant to the factual findings necessary under the patent law. The Government therefore requested that Penn State counsel attempt to obtain another affidavit from Ms. Wiant.

In connection with its request, Government counsel provided a draft for Ms. Wiant's second affidavit, so that counsel could ensure that Ms. Wiant provided the type of information relevant to the public availability issue. Apparently, it is this draft that Honeywell objects to so strenuously, and which it believes led to a "tainting" of Ms. Wiant's memory. This is not the case, for several reasons.

First, Ms. Wiant was invited to change any portions of the draft affidavit that did not square with her personal memory, and was free to do so at any point. In fact, the draft contained several spaces in which information needed to be filled in, as to dates, and the location of the library card catalog, for example. Honeywell's brief in fact quotes a portion of an email from Government counsel to Penn State counsel requesting to speak with Ms. Wiant to ensure that she did not want to alter the affidavit, but plaintiffs conveniently pass over this fact. HW Br. at 121 (citing DE-695). Ms. Wiant herself testified that she requested that the draft affidavit be edited because it did not square with her personal recollection. [(]DE-688 at 58[)].

Second, Ms. Wiant was far from being a "pawn," a term that Honeywell insultingly uses in its brief to refer to the 37-year veteran of the Penn State library. Ms. Wiant said several times at her deposition that she was testifying based on her own personal recollection, and resisted repeated attempts by Honeywell counsel to have her admit that she was influenced by the Government or Dr. Fidishun. [(]DE-688 at 51-54; 64-65[)]. In fact, Ms. Wiant actually ***disagreed*** with the portion of the testimony of Dr. Fidishun she reviewed, stating that she

believed that Dr. Fidishun overstated the shelving time, and the correct time was less than one month. [(DE-688 at 51-53)]. These are hardly the statements of a "pawn"; rather, Ms. Wiant testified based on her

personal knowledge, as she took in masters theses in the early 1980s. [(DE-688 at 53)]. "I did a lot of the work on taking the theses in and so forth. I did everything back then." [(DE-688 at 25)]. In sum, there is nothing inconsistent between her first affidavit, her second affidavit, or her deposition testimony. Ms. Wiant's review of Dr. Fidishun's testimony did nothing to change Ms. Wiant's testimony in any way. It is proper for the court to rely on Ms. Wiant's testimony.

Moreover, Honeywell had ample opportunity during the deposition to cross-examine Ms. Wiant to test her credibility. [(DE-688 at 41-118, 121-25)]. Without hesitation, Ms. Wiant answered consistently with her affidavit. She never wavered from her original testimony and did not adopt any new beliefs after reviewing Dr. Fidishun's deposition. [(DE-688 at 118-21)]. The following question from Honeywell counsel, and Ms. Wiant's response, is typical:

> Q So is it fair to say had you not seen this description [in Dr. Fidishun's deposition], you would not have been able to give this description with this level of detail by yourself; is that right?
>
> A No. If someone would ask me how we did things between 1983 and 1985, this is the way it was done.

DE-688 at 58.

Honeywell's allegations of tainted testimony constitute nothing more than inflammatory accusations and speculation. Ms. Wiant testified truthfully and helpfully at deposition, and does not deserve the attacks leveled against her by Honeywell.

**C. Honeywell's Proposed Draconian Remedy is Inappropriate and Unjustified**

Though the evidence clearly shows that Ms. Wiant's testimony was not altered, and the

Government did not coach Ms. Wiant, Honeywell's proposed draconian remedy must also be addressed separately. Honeywell, without support in law or fact, asks the court to ignore Ms. Wiant's deposition because she was allowed to review a small portion of Dr. Fidishun's testimony prior to her second affidavit. ~~[(]~~HW Br. at 121~~[)]~~.

Exclusion of such testimony has been deemed a "draconian" remedy that should be exercised narrowly: "the damage wrought by the draconian remedy of exclusion outweighs any possible harm of supposedly tainted evidence." *United States Dept. of Energy v. White*, 653 F.2d 479, 490 (C.C.P.A. 1981). There, the court allowed testimony of a witness who was present at another witness's deposition, where the first witness's independent recollection could be called into question. *Id. See also United States v. Ryhnes*, 218 F.3d 310, 324-25 (4th Cir. 2000) (exclusion should be exercised narrowly as it implicates the defendant's right to a meritorious defense).

Honeywell invokes two inapposite cases to support its request. First, in a salacious attempt to draw parallels between the current case and the prosecution of a major terrorism suspect, Honeywell cites a transcript from *United States v. Zacarias Moussaoui*, No.01-455 (E.D. Va.); HW Br. at 121-22. Not only is the case itself completely distinguishable as being criminal in nature, as opposed to civil, there are at least two controlling factual distinctions. First, in *Moussaoui*, the court had entered a sequestration order that prohibited witnesses from viewing the trial transcripts of other witnesses. Exclusion of the witnesses' testimony was therefore predicated on the existence of, and the violation of, this court order. It goes without saying that a similar order has not been issued by the Court in the present case. Furthermore, in the *Moussaoui* case, Judge Brinkema stated that she could not determine to what degree the

witnesses' testimony had been tainted by reviewing the transcripts, and therefore exclusion was proper. In the present case, the evidence clearly shows that Ms. Wiant's testimony was not tainted or altered by reviewing a small portion of Dr. Fidishun's deposition transcript. Again, far from being altered, Ms. Wiant called on her personal recollection to contradict some of Dr. Fidishun's testimony.

Similarly, the other case cited by Honeywell to support its draconian remedy is predicated on a sequestration order, and is therefore inapposite. In *Miller v. Univ. City Studios, Inc.*, nine days of trial testimony was shared with a witness in violation of an express sequestration order. 650 F.2d 1365, 1373 (5th Cir. 1981). Again, in the present case, there is no sequestration order, and the magnitude of the transcript sharing does not rise to the level of that in Miller.

Excluding Ms. Wiant's testimony is simply not a proportional remedy to any potential taint in the present case, even if such taint could be shown to exist. Rather, cross-examination is a proper remedy to expose the alleged taint. *See Ryhnes*, 218 F.3d at 324-25. *See also Moore v. State Farm Mut. Auto. Ins. Co.*, 2007 WL 1343338 (E.D. La.), at 9 (holding that whether a witness was "coached" is a matter to be determined on cross-examination). Honeywell had its opportunity to cross-examine Ms. Wiant and failed to turn up anything improper; again, she repeatedly insisted that her testimony was truthful and based on her own personal knowledge gained during 37 years of employment. [(]DE-688 at at 51-54; 64-65, 73[)]. To call her credibility into question now, after Honeywell itself acted to help Penn State counsel keep Ms. Wiant from appearing live before the Court where her credibility could be determined, approaches game-playing.

[]

## IV. CLAIM 2 IS INDEFINITE

The Government's argument that Claim 2 is indefinite was set forth fully in its opening brief. [(Op. Br. at 59-61)]. Honeywell's opposition brief does nothing to take away from the evidence that one of skill in the art in 1985 would be unable to fully determine the metes and bounds of claim 2, as construed and applied in the present case. Stated again, one of skill in the art would be unable to determine with any degree of consistency whether a particular display had a red color band, and particularly whether light that is emitted in the red color band by the display is "measurable" or "perceptible."

Rather than address this argument head-on, Honeywell again makes a desperate attempt to misconstrue the record and claims that the Government is estopped from arguing indefiniteness. Apparently, Honeywell mistakenly believes that the Court completely adopted the Government's claim construction position on "red color band," and as such, the Government cannot now argue that that construction is indefinite.

Even assuming *arguendo* that Honeywell's reasoning had merit, it is beside the point. The Court clearly did not fully adopt the Government's claim construction position on "red color band." As the Court may recall, there was extensive argument, both at the *Markman* hearing and in the post-trial briefs, as to whether the "red color band" should be measured by peak wavelength (which the Government advocated) or dominant wavelength (which Honeywell advocated). The Court refused to adopt either of these methods of measurement, and instead applied the currently formulated "perceptible" or "measurable" test.

It is this key difference that renders Claim 2 indefinite, and therefore invalid. The Government at the *Markman* hearing advocated that a display had a "red color band" if, and only

if, its emission had a *peak wavelength* inside the appropriate wavelength range (found by the court to be 620 to 780 nm). Under this construction, claim 2 would have been definite; peak wavelength is the wavelength at which most light is emitted, and is easily measured and can be consistently determined by one of skill in the art. Therefore, one of skill in the art would have no trouble determining whether an emission contained a "red color band" under the Government's proposed definition.

In fact, even if the Court had adopted Honeywell's argument for *dominant wavelength*, there would not be the current definiteness problem with Claim 2. Again, dominant wavelength is easily and consistently determined by those of skill in the art, as Dr. Task and Mr. Tannas have both demonstrated to the Court numerous times.

However, by declining to adopt either construction, and instead relying on whether light is merely "perceptible" or "measurable" within the range of 620 to 780 nm, the Court's construction is indefinite. As Dr. Task testified, neither of these terms has a consistent meaning in the field - for example, what one person of skill in the art determines to be perceptible, another might not. DE-500 at ¶¶ 74-84; Op. Br. at 59-61. Therefore, contrary to Honeywell's assertion, the Court did not completely accept the Government's proffered claim construction, and therefore there is no estoppel issue involved with contending that claim 2 is indefinite. Honeywell's attempt to again warp the record to prevent valid argument on the merits must fail.

## V. CLAIM 2 IS NOT SUPPORTED BY THE WRITTEN DESCRIPTION

The Government's arguments and evidence clearly show that the originally filed '269 application did not contain a written description that supports the full scope of Claim 2 as

amended by Honeywell over 15 years after the application was filed.[7] The arguments by Honeywell to the contrary are an attempt to confuse the Court as to what was originally disclosed, and should be rejected.

Again, at the outset of its argument, Honeywell searches for admissions and finds them where none exist. [(]HW Br. at 123-24[)]. While L-3 filed a brief asserting prosecution history estoppel as a defense to infringement under the doctrine of equivalents, it is extremely difficult to see how this has any bearing on the current issues at hand. There is nothing inconsistent about pointing out that Honeywell has narrowed certain claim elements (which is the inquiry critical to prosecution history estoppel), while at the same time expanding the overall reach of the claim by removing other requirements, such as the requirement for a plurality of distinct monochromatic display transducers. There is no contradiction between L-3's doctrine of equivalents brief, and the Government's current position.

Turning to its actual arguments, Honeywell then attempts to confuse the Court by using facially similar words that are in fact substantially different concepts. As the Government pointed out in its opening brief, the original '269 application shows three display transducers, each of which emits an image in a different color - red, green, and blue. Dr. Task illustrated this with the a diagram, which Honeywell excerpted in its brief. HW Br. at 129.

---

[7]Honeywell cites a portion of the trial record, where Government counsel appears to agree with the Court's assertion that the written description defense is the weakest of those asserted. HW Br. at 124. Government counsel specifically remembers this exchange and believes the court reporter was mistaken, and that he actually said "It *isn't*, Your Honor." Nevertheless, as Honeywell has repeatedly reminded the Court when attempting to back away from admissions made by its counsel, opening statements are attorney argument, not evidence.

From this, Honeywell somehow leaps to the conclusion that Dr. Task has therefore admitted that the original specification had a disclosure of red, blue, and green ***color bands***, which are of course required by Claim 2. HW Br. at 129. Nothing could be further from the truth; in fact, the concept of "color bands" is never explicitly recognized in the original specification. The "red, blue, and green images" in the illustration above are simply not the same thing as "red, blue, and green color bands," as Honeywell would have the Court believe.

If Honeywell had included Dr. Task's entire slide DE-526-8 in its brief, rather than the excerpt, this distinction would be apparent. When viewed in toto, the slide distinguishes between physical devices which emit color images (which were disclosed in the original application) and ranges of wavelengths, which are conceptual and not physical objects (and which are claimed in the issued patent).

Dr. Task also presented another slide at trial, DE-526-5, which further illustrates that a "red image" is not the same thing as a "red color band." In fact, the illustrated display output would be a "green image," yet it contains a "red color band," as well as blue and green color bands.

Honeywell's obfuscations notwithstanding, the fact of the matter remains that the application as originally filed disclosed an invention that is radically different, and narrower than, the display system that was ultimately claimed. By removing all sorts of physical limitations that existed in the original disclosure, Honeywell was able to ensure that Claim 2 had as broad a scope as possible, because it contained as little structure as possible. This is the very thing that the written description requirement was established to prevent - an applicant who expands the scope of his patent beyond what was ever originally possessed by the inventor.

## VI. THE GOVERNMENT HOLDS AN IMPLIED LICENSE TO USE PRODUCTS SOLD TO IT BY HONEYWELL

In its response to the Government's implied license defense, Honeywell attempts to focus the Court's attention on a narrowly defined issue that misses the point of the Government's defense. Namely, Honeywell spends several pages discussing the ownership of the '914 patent (or, more accurately, the '269 application) at the time Honeywell sold the infringing F-16 CMFDs to the Government. HW Br. at 151-54. According to Honeywell's counterargument, since legacy Honeywell did not own the '269 application at the time it sold the CMFDs, it could not have given the Government an implied license to use the CMFDs. Id. at 151.

Honeywell's argument is off the mark. While Honeywell may not have held rights in the '914 patent, it cannot deny that when it sold the CMFD devices to the Government, it did convey a right; namely, the right for the Government to use the product free and clear of any future interference by Honeywell. This is the very essence of the first sale doctrine. The *Sanofi* case, cited by Honeywell, in fact supports the Government's position, as opposed to Honeywell's. *See Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc.*, 565 F. Supp. 931, 939 (D.N.J. 1983) Honeywell quotes the following passage in its brief:

> It is well settled that the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser *the right of unrestricted ownership as against the vendor*. But the purchaser does not acquire any right greater than those possessed by the owner of the patent.

565 F. Supp. at 939 (emphasis added).

Honeywell focuses on the second sentence of the passage, but the first sentence holds greater import to the present case. Honeywell, when it sold the CMFD, conveyed to the Government the right of unrestricted ownership against any future claims of infringement by

Honeywell. It is this right, and not a right specific to the '914 patent, that is conveyed with the first sale. By focusing in on the '914 patent exclusively, Honeywell ignores the broader right it granted the Government - the right to unrestricted ownership.

Honeywell's interpretation of the first sale doctrine leads to absurd results. According to Honeywell, the second sentence of the quoted passage above means that a vendor can only convey covenants not to sue on patents that it currently owns. However, this would mean that a vendor could make a sale of a product, subsequently apply for and obtain a patent on that product, and then turn around and sue the customer for infringing the patent. This is anathema to the first sale doctrine, and illustrates why Honeywell's sale of CMFDs granted the Government a general right to quiet enjoyment.

Honeywell's other arguments similarly fail. There is no requirement that there be a written license for the doctrine expressed in *AMP* to apply. As noted above, Honeywell cannot seriously contend that its sale of CMFDs to the Government did not carry with it certain rights. The *AMP* doctrine, discussed at length in the Government's opening brief, applies to these implied rights just as well as to written license agreements.

Nor does Honeywell's corporate name shell game matter in the end result. Apparently, plaintiffs believe that it is somehow relevant that Allied-Signal bought Honeywell, and adopted the name Honeywell, rather than the other way around. The fact of the matter is that the obligations of both corporations are assumed by the resulting corporation. Del. Code Ann. tit. 8, § 259; *see also Gould v. American Hawaiian S.S. Co.*, 331 F. Supp. 981, 998 (D. Del. 1971). Notably, Honeywell does not address this controlling state law issue in its brief, because it cannot. In the absence of such a law, a large company could hide behind corporate

semantics and be "acquired" by another company, shedding its prior obligations along the way.

Finally, and most importantly, Honeywell's argument ignores the equitable dimension of the current situation. The Government has already fully compensated legacy Honeywell for the sale of the CMFDs. It simply does not matter whether Allied Signal bought Honeywell or vice versa, or what the resulting corporation is called - the fact of the matter is that the current corporation has been compensated for the Government's use of the product. The Supreme Court's statement on this point in *Univis Lens* bears repeating:

> [T]he purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article, and that once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold.

*United States v. Univis Lens Co.*, 316 U.S. 241, 251-52 (1942).

Clearly, no matter which corporation bought the other, or how the merger was arranged on paper, the patentee (now called Honeywell) has "received his reward for the use of the invention" - namely, the sale price of the CMFDs. To allow Honeywell to double-recover this reward would be contrary to equity. The Government cannot be asked to pay damages on sales for which the plaintiff has already been compensated.

## VII. CONCLUSION

The Government has set forth in great detail, both at the defenses trial and in its post-trial brief, numerous grounds under which the Court may reasonably find that claim 2 of the '914 patent is invalid. The prior art cited to the Court establishes that claim 2 would have been obvious to one of skill in the art in 1985, if it was not in fact anticipated by the prior art. Furthermore, the claims has several deficiencies, such as indefiniteness and lack of adequate

written disclosure, which lead to a finding of invalidity. Finally, the Government cannot be held liable for the purchase of CMFDs from plaintiffs, because to do so would violate the doctrine of implied license, as well as be contrary to equity.

Submitted by,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

| Dated: November [9]13, 2007

s/*Christopher L. Crumbley*
CHRISTOPHER L. CRUMBLEY
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0415
Facsimile: (202) 307-0345

Attorneys for the United States

OF COUNSEL:
TREVOR M. JEFFERSON