# In the United States Court of Federal Claims

No. 02-1909
Filed under seal: December 5, 2012[*]
Reissued for publication: December 5, 2012

*****************************************

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC., | |
| Plaintiffs, | Damages for Patent Infringement, 28 U.S.C. § 1498(a); |
| v. | Burden of Proof; Causation; |
| UNITED STATES, | Invention Secrecy Act, 35 U.S.C. §§ 181-88; Military Specification; |
| Defendant, | Remand; Standard Essential Patent. |
| LOCKHEED MARTIN CORP., Defendant-Intervenor, and | |
| L-3 COMMUNICATIONS CORP., Defendant-Intervenor. | |

*****************************************

**Lawrence J. Gotts,** Latham & Watkins LLP, Washington, D.C., Counsel for Plaintiffs.

**Christopher L. Crumbley**, United States Department of Justice, Civil Division-Commercial Litigation Branch, Washington, D.C., Counsel for the Defendant.

**Thomas J. Madden**, Venable, LLP, Washington, D.C., Counsel for Lockheed Martin Corporation, Defendant-Intervenor.

**John Weldon Harbin**, King & Spalding LLP, Atlanta, Georgia, Counsel for L-3 Communications Corporation, Defendant-Intervenor.

## MEMORANDUM OPINION AND ORDER ON REMAND REGARDING
## THE INVENTION SECRECY ACT AND PATENT INFRINGEMENT DAMAGES

---

[*] On November 19, 2012, the court forwarded a sealed copy of this Memorandum Opinion and Order to the parties to delete any information considered to be confidential and/or privileged, and note any citation or editorial errors requiring correction. The court has incorporated some of these comments and corrected or clarified certain portions herein.

This Memorandum Opinion first addresses the issues to be adjudicated on remand under the Invention Secrecy Act, 35 U.S.C. §§ 181-88 ("the Invention Secrecy Act"), and then turns to patent infringement damages to which Honeywell is entitled under 28 U.S.C. § 1498(a).

To facilitate a review of this Memorandum Opinion and Order, the court has provided the following outline:

**I.      RELEVANT PROCEDURAL HISTORY AND SCOPE OF THE REMAND.**

**II.     DISCUSSION.**

    **A.      Issues To Be Adjudicated On Remand Under The Invention Secrecy Act.**

        **1.      "Whether [The Invention Secrecy Act] Requires That Government Use Must Result From The Disclosure" Of A Patent Application Subject To An Invention Secrecy Act Order.**

        **2.      Whether The Government's Use Of The '914 Patent In This Case Resulted From A Disclosure Of The '269 Application.**

            **a.      Relevant Facts.**

                **i.      Navy Air Defense Center Activities Regarding Night Vision Compatibility From 1974 To October 10, 1985.**

                **ii.      On October 10, 1985, The '269 Patent Application Was Filed With The United States Patent And Trademark Office.**

                **iii.      On January 24, 1986, MIL-L-85762 Issued.**

                **iv.      In Early 1986, A Panel On Aircraft Lighting Was Established To Amend MIL-L-85762.**

                **v.      On March 6, 1986, The Navy Reviewed The '269 Patent Application To Determine Whether An Invention Secrecy Order Should Issue.**

                **vi.      On April 2, 1986, An Invention Secrecy Act Order Issued On The '269 Patent Application.**

                **vii.      On August 26, 1988, MIL-L-85762A Issued.**

                **viii.      On September 7, 2000, The Invention Secrecy Act Order Regarding The '269 Application Was Rescinded And, On October 22, 2002, "Matured" Into The '914 Patent.**

        b.      The Parties' Arguments.

        c.      The Court's Resolution.

**B.    Patent Infringement Damages That Honeywell Has Established Under 28 U.S.C. § 1498.**

    1.      The Relevant Statutes And Governing Precedent.

    2.      The Expert Opinions Regarding Damages.

        a.      The Plaintiffs' Expert Opinions.

            i.      The Direct Testimony of Ms. Julie L. Davis.

            ii.      The Direct Testimony Of Colonel William S. Lawrence.

        b.      The Government's Expert Opinions.

            i.      The Direct Testimony Of Mr. Phillip Green.

            ii.      The Direct Testimony of Dr. Harry Lee Task.

    3.      Determination Of "Reasonable And Entire Compensation."

        a.      The Date Of The Hypothetical Negotiation.

        b.      The Parties To The Hypothetical Negotiation.

        c.      The "Reasonable" Royalty Rate.

        d.      Consideration Of The Relevant *Georgia-Pacific* Factors.

        e.      The Relevant Product Base.

            i.      Military Aircraft Displays Sold As A Component Of A Domestic Military Aircraft.

            ii.      Displays Sold As A Component Of Military Aircraft Sold Under The Foreign Military Sales Act.

            iii.      CMFD Display Generators.

            iv.      Night Vision Goggles.

            v.      Summary Of The Relevant Product Base In This Case.

    4.      Determination Of Delay Compensation.

        **a.**      **The Date Of Accrual.**

        **b.**      **The Rate Of Accrual.**

**III.**     **CONCLUSION.**

\* \* \*

**I.**     **RELEVANT PROCEDURAL HISTORY AND SCOPE OF THE REMAND.**

On December 18, 2002, Honeywell International Inc. and Honeywell Intellectual Properties Inc. (collectively hereafter "Honeywell"), filed a Complaint in the United States Court of Federal Claims alleging that the United States ("the Government") violated 28 U.S.C. § 1498(a) by infringing: U.S. Patent Application Serial No. 6,786,268 (the "'268 application");[1] U.S. Patent Application Serial No. 6,786,269 (the "'269 application"); and U.S. Patent No. 6,467,914 (the "'914 patent"). Compl. ¶¶ 1, 53-75. On September 17, 2003, the court granted Lockheed Martin Corp.'s ("Lockheed Martin") September 3, 2003 Unopposed Motion To Intervene.

On May 31, 2005, Honeywell filed an Amended Complaint ("Am. Compl.") adding a new Count I, that the Government also violated the Invention Secrecy Act, 35 U.S.C. §§ 181-88 ("the Invention Secrecy Act"). Am. Compl. ¶¶ 18-23.[2]

On July 5, 2006, the court issued an order reflecting the parties' agreement that only the designated display systems used in the F-16 Air Force Fighter Jet ("F-16"), the C-130H Aircraft ("C-130H"), and the C-130J Aircraft ("C-130J") would be subject to initial liability proceedings in this case. *See* Dkt. 206.

To date, the court has issued six memorandum opinions and orders in this case.

On June 14, 2005, the court issued a Memorandum Opinion and Order ascertaining jurisdiction. *See Honeywell Int'l Inc. v. United* States, 65 Fed. Cl. 809 (2005) ("*Honeywell I*"). In addition, on June 14, 2005, the court issued a Memorandum Opinion and Order construing claims of the '914 patent requested by the parties. *See Honeywell Int'l, Inc. v. United States*, 66 Fed. Cl. 400, 428-87 (2005) ("*Honeywell II*"). Thereafter, no party requested reconsideration nor appealed the court's claim constructions.

On April 28, 2006, the court issued a Memorandum Opinion and Order discussing the relevant technology at issue and determining that Honeywell established, by a preponderance of

---

[1] On December 23, 2004, Honeywell relinquished all claims in this case regarding the '268 patent application. *See* 12/23/04 Honeywell Claim Construction Brief at 1, n.1 (Dkt. 77).

[2] Honeywell's other claims, as alleged in the December 18, 2002 Complaint, were transferred to Count II (patent infringement claims under 28 U.S.C. § 1498(a)) and Count III (Fifth Amendment Takings Clause claim). Am. Compl. ¶¶ 24-31.

the evidence, that the contested limitations of a "plurality of filters at the local color display" and "substantially block" in claim 2 of the '914 patent were present in the military aircraft cockpit displays of: the F-16; the C-130J; and the C-130H. *See Honeywell Int'l, Inc. v. United States*, 70 Fed. Cl. 424, 437-46 (2006) ("*Honeywell III*") (discussing the relevant technology); *see also id.* at 465-68 (determining literal infringement); *see also id.* at 469-79 (determining infringement under the doctrine of equivalents, but only as to "plurality of filters at the local color display").

On April 14, 2008, the court granted Defendant-Intervenor L-3 Communications Corporation's ("L-3 Corp.") Motion To Intervene. *See Honeywell Int'l Inc. v. United* States, 81 Fed. Cl. 224 (2008) ("*Honeywell IV*"). On that date, the court also issued a Memorandum Opinion and Order determining that claim 2 of the '914 patent is invalid as obvious, under 35 U.S.C. § 103(a). *See Honeywell Int'l, Inc. v. United States*, 81 Fed. Cl. 514, 538-66 (2008) ("*Honeywell V*"). Therein, the court also determined that the "first sale doctrine" precluded Honeywell from recovering damages for the Government's use of the infringing color multifunction displays ("CMFDs") in the F-16, C-130J, and C-130H military aircraft. *Id.* at 577.

On April 14, 2008, the also court issued a separate Memorandum Opinion and Order, determining that Honeywell did not establish the "second element of Article III standing to assert a claim for just compensation under the Invention Secrecy Act, [35 U.S.C. §§ 181-88], *i.e.*, 'causation – a fairly traceable connection between [Honeywell's] injury and the complained-of conduct of the [Government].'" *Honeywell Int'l Inc. v. United States*, 81 Fed. Cl. 224, 233 (2008) ("*Honeywell VI*") (quoting *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 103 (1998)).

On July 23, 2008, the court issued an order entering judgment for the Government on Honeywell's Invention Secrecy Act and patent infringement claims, pursuant to RCFC 41(a)(2), and dismissing Honeywell's Takings Clause claims, pursuant to RCFC 58. *See* Dkt. 329.

On February 18, 2010, the United States Court of Appeals for the Federal Circuit reversed the court's rulings on invalidity and the "first sale doctrine" as to the '914 patent and remanded the case for the court to determine damages. *See Honeywell Int'l Inc. v. United States,* 596 F.3d 800, 813 (Fed. Cir. 2010). The appellate court also held that Honeywell had standing to assert a claim under the Invention Secrecy Act. *Id.* The Government, Lockheed Martin and L-3 Corp. subsequently filed petitions for rehearing and rehearing *en banc*. On May 25, 2010, the request for a panel rehearing was granted for the "limited purposes of revising portions of the discussion of the Invention Secrecy Act and to properly limit the scope of remand." *Honeywell Int'l Inc. v. United States,* 377 F. App'x 14, 15 (2010) (*per curiam*).

On May 25, 2010, the United States Court of Appeals for the Federal Circuit withdrew its February 18, 2010 opinion and replaced it with an opinion clarifying the scope of the remand. *See Honeywell Int'l Inc. v. United States*, 609 F.3d 1292, 1303 (2010) ("*Honeywell VII*"). Circuit Judge Mayer, however, dissented, expressing his view that: claim 2 of the '914 patent was invalid as obvious; the '269 application did not fully disclose the invention described in claim 2 of the '914 patent; and Honeywell was precluded from recovering damages for infringement under the "first sale doctrine." *Id.* at 1304-08.

On June 17, 2010, the mandate issued.  On October 8, 2010, L-3 Corp. filed a petition for *certiorari* with the United States Supreme Court.[3]  On March 10, 2011, this court stayed further proceedings, pending the resolution of L-3 Corp.'s petition.  On June 20, 2011, the United States Supreme Court denied L-3 Corp.'s petition.  *See L-3 Commun. Corp. v. Honeywell Int'l Inc.*, 131 S. Ct. 3021 (2011).

On September 8, 2011, the court issued a Scheduling Order to allow the parties to file supplemental briefing on the issues to be adjudicated on remand and address intervening cases by the United States Court of Appeals for the Federal Circuit regarding the evidence required to establish damages.[4]  On July 19 and July 25, 2012, the court held oral argument ("RTR at 1-376").

---

[3] The questions presented were: "1) [w]hether every element of a patent claim must have been disclosed in the prior art for the claim to be considered obvious, and thus unpatentable, under 35 U.S.C. § 103(a) [and] 2) [w]hether petitioners must prove their obviousness defense by clear and convincing evidence.   Petition for Writ of Certiorari at *i*, *L-3 Commun. Corp. v. Honeywell Int'l Inc.,* 131 S. Ct. 3021 (2011) (No. 10-491), 2010 WL 4035372, at *i*.

[4] As to the Invention Secrecy Act issues, on October 14, 2011, Honeywell filed a Supplemental Letter Memorandum ("10/14/11 Pl. SA Br.") and the Government filed a Supplemental Letter Memorandum ("10/14/11 Gov't SA Br.").   On October 28, 2011, Honeywell filed a Response ("10/28/11 Pl. SA Resp.") and the Government filed a Response ("10/28/11 Gov't SA Resp.").   These letter memoranda supplemented briefs previously filed with the court, *i.e.*, Honeywell's April 25, 2007 Post-Trial Brief Regarding Liability Under The [Invention] Secrecy Act ("4/25/07 Pl. SA Br."); the Government's April 25, 2007 Post-Trial Memorandum On Count I (the Invention Secrecy Act) ("4/25/07 Gov't SA Br."); Honeywell's June 8, 2007 Post-Trial Reply Memorandum Regarding [Invention] Secrecy Act Liability ("6/8/07 Pl. SA Reply"); and the Government's June 8, 2007 Post-Trial Reply Brief On Count I Invention Secrecy Act ("6/8/07 Gov't SA Reply").

As to damages, on November 4, 2011, Honeywell filed a Supplemental Brief Regarding Damages ("11/4/11 Pl. D Br."), the Government filed a Supplemental Brief On Damages ("11/4/11 Gov't D Br."), and L-3 Corp. filed a Supplemental Brief Regarding Damages And The Scope Of The Remand ("11/4/11 L-3 D Br.").   On November 18, 2011, Honeywell filed a Responsive Supplemental Brief ("11/18/11 Pl. D Resp."), the Government filed a Supplemental Reply ("11/18/11 Gov't D Reply"), Lockheed Martin filed a Response ("11/18/11 Lockheed Martin D Resp."); and L-3 Corp. filed a Response To Honeywell's Supplemental Brief on Damages ("11/18/11 L-3 D Resp.").   These briefs supplemented others previously filed with the court, *i.e.*, Honeywell's Motion For Partial Summary Judgment ("5/31/06 Pl. Mot. Partial S.J."); Honeywell's Post-Trial Brief Regarding Damages ("11/2/07 Pl. D Br."); the Government's Post-Trial Opposition Memorandum Regarding Damages ("11/30/07 Gov't D Reply"); Honeywell's Post-Trial Reply Brief Regarding Damages ("12/18/07 Pl. D Reply"); and L-3 Corp.'s Response To Plaintiff's Post-Trial Brief Regarding Damages ("11/30/07 L-3 D Resp.").

## II.    DISCUSSION.

### A.    Issues To Be Adjudicated On Remand Under The Invention Secrecy Act.

The remand of the United States Court of Appeals for the Federal Circuit states:

The *only remaining issue* [regarding Honeywell's Invention Secrecy Act claim] is the government's defense related to pre-issuance damages for "use by the Government of the invention resulting from his disclosure." On remand, the [United States] Court of Federal Claims should determine whether [the Invention Secrecy Act] requires that the government use must result from the disclosure, and, if so, whether it does in this case.

*Honeywell VII*, 609 F.3d at 1303 (in part quoting 35 U.S.C. § 183) (emphasis added).

The court interprets the remand first to require the court to determine, as a matter of law, whether section 183 of the Invention Secrecy Act, 35 U.S.C. §183, requires that Government use must result from the disclosure of a patent application, subject to an Invention Secrecy Act Order—and, then to determine, as a matter of fact, whether Honeywell established, by a preponderance of the evidence in this case, that the Government used an invention that was disclosed in the '269 application and subject to an Invention Secrecy Act Order from April 2, 1986 to September 7, 2000.

### 1.    "Whether [The Invention Secrecy Act] Requires That Government Use Must Result From The Disclosure" Of A Patent Application Subject To An Invention Secrecy Act Order.

The issue of law presented in the mandate implicitly concerns the scope of the Government's waiver of sovereign immunity in section 183. Last term, in *F.A.A. v. Cooper*, 132 S. Ct. 1441 (2012), the United States Supreme Court emphasized:

We have said on many occasions that a waiver of sovereign immunity must be unequivocally expressed in statutory text. *Legislative history cannot supply a waiver that is not clearly evident from the language of the statute*.

*Id*. at 1448 (internal citations and quotation marks omitted) (emphasis added).

Therefore, the parties' argument on remand regarding the legislative history of the Invention Secrecy Act misperceives the relevant legal inquiry.  As the Court directed in *Cooper*,[5]

> any ambiguities in the statutory language are to be construed in favor of immunity, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires.  *Ambiguity exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government.*

*Id.* (emphasis added).

In fact, a plausible interpretation of section 183 was provided by the United States Court of Appeals for the Federal Circuit in *Hornback v. United States*, 601 F.3d 1382 (Fed. Cir. 2010), holding that the Government is only liable for damages under section 183 "when the Government *wrongfully* uses the patented device during the period of [an Invention Secrecy Order.]").  *Id.* at 1387 (emphasis added) (quoting *McDonnell Douglas Corp. v. United States*, 670 F.2d 156, 163 (Fed. Cir. 1982)).[6]

---

[5] *See* 10/14/11 Pl. SA Br. at 2; 10/14/11 Gov't SA Br. at 2.  Indeed, the few federal appellate courts that have had an occasion to review the legislative history of the Invention Secrecy Act have observed that it "is so meager that it casts little light on the true intent of Congress."  *Farrand Optical Co. v. United States*, 317 F.2d 875, 880 (2d Cir. 1962), *aff'd by an equally divided panel in r'hg en banc*, 317 F.2d 875, 883 (2d Cir. 1962) (*en banc*); *see also Hornback*, 601 F.3d at 1387 (concluding that a different passage of H.R. 4687 was "ambiguous at best.").

[6] The court has found no other precedential decision is dispositive of the remand inquiry. *See, e.g., AT&T v. United States*, 231 Ct. Cl. 360, 362-70 (1982) (holding that statute of limitations under section 183 accrues when a patent is issued, not the date of the Notice of Allowability, and remanding the case for adjudication on the merits); *Lear Siegler, Inc. v. United States*, 225 Ct. Cl. 663, 667 (1981) (denying motion to dismiss a section 183 case, without prejudice, when the standard, announced in *Constant,* that proof of damages may not be speculative was not unexpectedly higher than should have been anticipated); *Constant v. United States*, 223 Ct. Cl. 148, 158-59 (1980) (holding that the Court of Claims has jurisdiction to adjudicate a claim under section 183, even if the issuance of the patent was not delayed due to an Invention Secrecy Act Order, but the damages alleged must be more than purely speculative).

Likewise, in the court's judgment, none of the non-precedential cases discussing the Invention Secrecy Act provide useful guidance.  *See Weiss v. United States*, 37 F. App'x. 518, 523-24 (Fed. Cir. 2002), *aff'g*, 146 F. Supp. 2d 113 (D. Mass. 2001) (affirming a trial court's determination that no evidence was presented that any actual or potential foreign or domestic customers "ever attempted to license the invention or that anyone was interested in licensing the invention."); *see also Hornback v. United States*, 1998 U.S. App. LEXIS 29024, at *2-4 (Fed. Cir. Nov. 18, 1998) (*per curiam*) (affirming dismissal of section 183 case, where the plaintiff failed to exhaust administrative remedies, prior to filing a case under the Invention Secrecy Act); *Farrand Optical Co. v. United States*, 197 F. Supp. 756 (S.D.N.Y. 1961), *rev'd*, 317 F.2d 875, 883 (2d Cir. 1962), *aff'd by an equally divided panel in r'hg en banc*, 317 F.2d 875, 883 (2d Cir.

Therefore, the court construes the text of section 183 to require that Government use of a patent application, subject to an Invention Secrecy Act Order, must result from the Government's disclosure of that application, *i.e.*, so that the use is "wrongful," before the Government is liable for monetary damages.

### 2.   Whether The Government's Use Of The '914 Patent In This Case Resulted From A Disclosure Of The '269 Application.

The court's prior decision under the Invention Secrecy Act was limited to the jurisdictional issue of Honeywell's standing.   *See Honeywell IV*, 81 Fed. Cl. at 230-33. Therefore, the court necessarily made no factual findings as to liability.   *Id.*   In this Memorandum Opinion, however, the court has made the requisite and relevant factual findings as to whether the Government is liable under the Invention Secrecy Act.

### a.   Relevant Facts.[7]

#### i.   Navy Air Defense Center Activities Regarding Night Vision Compatibility From 1974 To October 10, 1985.

In 1974, Mr. Reetz was employed as a civilian co-op student by the Naval Air Development Center ("NADC") at Warminster, Pennsylvania,[8] while he was enrolled at Drexel University.   SATR at 491-92 (Reetz).   In 1976, he received a B.A. in Physics from that

---

1962) (affirming that the trial court's jurisdiction under section 183 is to adjudicate the use of an invention prior to and after issuance of the patent).   Subsequently, the United States Court of Appeals for the Federal Circuit definitively rejected the final appellate disposition of *Farrand Optical*.   *See Hornback*, 601 F.3d at 1387 (holding that after an Invention Secrecy Act order has been terminated, damages may be assessed only under 28 U.S.C. § 1498).

[7] The relevant fact findings made herein are derived from documents introduced and testimony adduced at a July 24-27, 2006 evidentiary hearing ("SATR 1-1097"), primarily from the testimony of David McLure, Ferdinand Reetz III, and Laurie Bryner, all civilian electrical engineers employed by the United States Navy ("Navy").   Each of these individuals was appointed by a Tri-Service Committee to serve on a Panel on Aircraft Lighting to determine and issue, what became MIL-L-85762-A, an August 26, 1988 military standard: "Lighting, Aircraft, Interior, and Night Vision Imaging System (NVIS) Compatible."   SATR at 220-484 (McLure); SATR at 490-679, 775-915 (Reetz); SATR at 1043-91 (Bryner).   In addition, James Byrd, a civilian electrical engineer, employed by the United States Air Force, also testified about his work on this Panel.   SATR at 917-1043 (Byrd).   This opinion also cites to joint trial exhibits ("JTX 1-78"), plaintiff trial exhibits ("PTX 1-1902"), defense exhibits ("DE 1-725"), and defense Markman exhibits ("DMX 1-36").

[8] NADC was closed as part of a Base Realignment and Closure program undertaken by Congress in the 1990s and was reopened as the Naval Air Warfare Center ("NAVAIR") in Patuxent River, Maryland, where Mr. Reetz continued to serve from 1996 to date.   SATR at 491-92.

institution and continued his employment with NADC after graduation to date.  SATR at 491-92 (Reetz).

Beginning in 1980, Mr. Reetz was appointed as a Sensor Engineer at NADC with the "primary responsibility" for achieving "night-vision compatibility" (SATR at 492), *i.e.*, "systems that are used to see at night or detect the enemy[.]"  SATR at 495 (Reetz).  Mr. Reetz testified that "[o]ur business was to define the requirement for NVIS compatibility."  SATR at 500.  The Naval Air Systems Command was not interested in designing solutions, but developing specifications.  SATR at 503 (Reetz).  Mr. Reetz described the process in this way: "[w]e develop a requirement and we will put the requirement on the street.  And then it is up to the industry to tell us whether or not they can meet that requirement."  SATR at 504 (Reetz).

In June 1983, the Joint Logistics Command Group formed a Tri-Service Lighting Committee, with representatives from the Society of Automotive Engineers, to write a military standard ("MILSPEC") defining "NVIS compatible lighting requirements."  DE 303 at GVT012-3234; SATR at 311-16 (McLure); SATR at 497-98, 516, 601 (Reetz).

In August 1983, Mr. Reetz published a master's thesis that discussed a technique for achieving night vision goggle ("NVG") compatibility with cockpit lighting using complementary color filtering.[9]  DE 301; SATR at 779-80 (Reetz).  Mr. Reetz's thesis suggested that red lighting could be filtered with a Corning Glass Works CS-4-94 filter to achieve an "orange-ish/red kind of color" in the cockpit that is also compatible with NVGs.  DE 301 at GVT018-1045; SATR at 809 (Reetz).  His research, however, did not evaluate full color displays, lighting behind the filters, different display cutoffs, nor establishing a narrow band of red.  SATR at 811, 893-94 (Reetz).  Later that year, Mr. Reetz received a Masters in Engineering Science from Pennsylvania State University.  SATR at 491-92 (Reetz).

In May 1984, Mr. Reetz authored a paper building on his master's thesis based on recent flight tests where cockpit lighting modifications were made to certain NVGs by filtering various sources of light "to block long wavelengths (greater than approx. 600 [nm] light."  DE 324 at GVT012-2375-78; SATR at 562-73, 829 (Reetz).

On September 26, 1984, Richard Cohen, an employee of Allied Bendix Aerospace, a corporate component of Allied Corporation ("Allied"), a predecessor of Honeywell, attended an American Helicopter Society Symposium, where he learned that WAMCO manufactured a filter that allowed "some red" light into the cockpit and was compatible with NVGs.  DE 57 at H03235.  At the Symposium, WAMCO offered to provide these filters to Mr. Cohen and other industry attendees to evaluate them.  DE 57 at H03235.

On June 21, 1985, Mr. Cohen visited Army personnel at Fort Monmouth to present "Bendix Display/System Capabilities and our Night Vision Studies."  DE 58 at H01189.  On that

---

[9] According to Mr. Reetz, complementary color filtering was first used by the British military in 1980.  SATR at 778 (Reetz).  This technique required putting a filter on a NVG to block wavelengths below a certain level, then placing a filter on cockpit lights to block wavelengths above the same frequency.  SATR at 778-79 (Reetz).

occasion, Mr. Cohen described "our proprietary approaches to [NVG] compatibility" and "polarizer approach." DE 58 at H01190. The Army decided to explore how to award "Bendix a non-competitive contract" to learn more about this technique. DE 58 at H01190.

On July 25, 1985, the Naval Air Systems Command issued a Memorandum identifying "issues [that] will require further study," including "using different 'cut on' filters . . . a better understanding of head up displays, three-color cathode ray tubes (CRTs) . . . and other currently non-NVG compatible government furnished equipment (GFE) with various night vision systems." DE 318 at GVT019-1659; SATR at 305-09 (McLure). Another important issue identified, after "[c]oordination with industry experts," was how to introduce red light into the cockpit, without affecting the utility of NVGs. DE 318 at GVT019-1658 to -59. In addition, the July 25, 1985 Memorandum discussed the Navy's decision to use a type of NVG, known as "Cats Eyes," manufactured by GEC Avionics in England, with a 625-645 nm filter that "may permit the use of a portion of the visible red spectrum in the cockpit." DE 318 at GVT019-1658 to -59. The Navy was concerned that too much red light in the cockpit could adversely affect the pilot's view of the outside world. DE 318 at GVT019-1658. The advantage of "Cats Eyes" NVGs is that they did not require the pilot to move his head to "look around" the goggle tubes. SATR at 506 (Reetz). At this time, Ms. Bryner, a new Navy electrical engineer, was assigned to test performance of various NVGs, including whether the color of orangish-red could be used with the "Cats Eyes" goggles. SATR at 1049-60 (Bryner).

On September 4, 1985, Mr. Cohen requested a meeting with Mr. Reetz "to talk about NVG lighting methods." PTX 603 at GVT019-2832; SATR at 579-86 (Reetz). At the evidentiary hearing, Mr. Reetz testified that he had no independent knowledge about this meeting, but stated that it was not unusual for industry representatives to inquire about the status of the proposed MILSPEC and requirements. SATR at 579, 584-85, 874-75 (Reetz). Mr. Reetz also had no recollection about any specific discussion about a patent application or patent at this meeting particular, but recalled that Mr. Cohen talked about "certain polarizers." SATR at 588-89, 592 (Reetz); *see also* IDX-7 at 219, 235 (9/21/04 Cohen Dep.) (Mr. Cohen had no recollection either of the meeting or context, but believed he showed Mr. Reetz a "polarizer approach."

### ii.  On October 10, 1985, The '269 Patent Application Was Filed With The United States Patent And Trademark Office.

On October 10, 1985, Mr. Cohen filed a Form PTO-426, Serial No. 06/786,269 (the "'269 application") with the USPTO and assigned the invention described therein "concerning night vision goggles compatible with full color display" to his employer, Allied. DMX 36 at DE-1038, 1053.[10] Honeywell's May 31, 2005 Amended Complaint alleged that "none of the prior art systems permitted the use of a full color display[,] because light from the display interfered with the night vision device. The '269 patent application was filed to protect its pioneering invention that overcame this problem." Am Compl. ¶ 7.

---

[10] In late 1985, Allied merged with Signal Companies and became Allied Signal Corporation. *See Honeywell III*, 70 Fed. Cl. at 444.

On October 23, 1985 and January 28, 1986, Mr. Cohen made a presentation to Army personnel at Fort Monmouth, New Jersey, and employees of IBM at Owego, New York, regarding Allied's "approaches" to achieve NVG compatibility.  DE 64; DE 59.  At these presentations, Mr. Cohen recommended the use of a circular polarizer and time multiplexed approach to achieve NVG-compatibility with a full color display system, but did not discuss using a complementary filter approach for this purpose.  DE 59 at H02385-87; DE 64 at H00318-19.  This is consistent with Mr. Reetz's recollection that, at this time, Mr. Cohen was focused on the use of circular polarization to achieve NVG compatibility.  SATR at 588-89 (Reetz).

### iii.    On January 24, 1986, MIL-L-85762 Issued.

On January 24, 1986, the MIL-L-85762 "Military Specification Lighting, Aircraft, Interior, AN/ANVIS-6 Aviator's Night Vision Imaging System (ANVIS) Compatible" specification issued, requiring the use of NVGs with a minus blue filter having a 50% cut off frequency at 625 nm.  PTX 12; PTX 606 (9/17/87 Final Report: "Rationale Behind The Requirements Contained In Military Specification MIL-L-85762 and MIL-L-85762A"); SATR at 510, 607-08 (Reetz); SATR at 925-26 (Byrd).  This specification reflected the request of helicopter pilots to prohibit red light from entering the cockpit to maintain NVG performance.  PTX 12 at 4, 12; SATR at 553-54, 659, 777-78, 849-50 (Reetz); SATR at 922-23, 996 (Byrd); SATR at 10051, 1060, 1066 (Bryner).  Aircraft pilots, however, continued to express a need for red warning lights in the cockpit.  DE 303 at GVT012-3234.

### iv.    In Early 1986, A Panel On Aircraft Lighting Was Established To Amend MIL-L-85762.

Therefore, in early 1986, a second group was established by the Joint Logistics Command Group to "exchange information on aircraft lighting systems, identify problem areas and develop common solutions" and "[c]oordinate the development of data to determine the effects of red light and multi color displays on [NVG]s."  PTX 557 (Charter for Panel on Aircraft Lighting); SATR at 315-18, 348-351 (McLure); SATR at 608 (Reetz).  At that time, the military had not determined whether red indicators could be made NVG compatible, because they did not know which minus blue filter could be used or "what the industry was capable of manufacturing."  SATR at 561, 605-06, 897-98 (Reetz).

The initial members of the Panel on Aircraft Light included: Mr. Chesley S. Pieroway, Chairman; Mr. McLure; Mr. Reetz; and Mr. Bryd.  SATR at 327-29 (McLure).  Mr. McLure was assigned as the lead representative and sole voting member from the Navy.[11]  SATR at 298, 325-27, 347-48, 383 (McLure).  His primary responsibility was to obtain funding for different technical studies and contracts for NVGs SATR at 592-96 (Reetz) and coordinate the

---

[11] Mr. McLure joined NAVAIR as a civilian Navy electrical engineer after graduating from Ohio University in 1983.  SATR at 222-23 (McLure).  During his first two years in the Navy, he held a variety of assignments in different NAVAIR branches, including software, radar jammers, avionics, and reliability, before joining the electro-optics branch in mid-1985.  SATR at 224-25 (McLure).

development of a revised MIL-L-85762.  SATR at 406, 410 (McLure); (SATR at 406, 410 (McLure)); SATR at 1074 (Bryner).  The job of determining the Navy's technical position was assigned to Mr. Reetz, Ms. Bryner, and a Mr. Parker – not Mr. McLure.  SATR at 609 (Reetz). Mr. Reetz testified that on no occasion did Mr. McLure provide any technical comments on the revised MILSPEC.  SATR at 594 (Reetz).  Although, Mr. McLure's position required him to be involved with any issue related to NVGs, including the approval of overtime for this project, but he was not involved with any technical issues related to NVGs.  SATR at 385 (McLure).  If a technical opinion or vote of the Panel on Aircraft Lighting was required, Mr. Reetz, Ms. Bryner, or Mr. Parker would instruct Mr. McLure how to vote.  SATR at 609 (Reetz).

> **v.**     **On March 6, 1986, The Navy Reviewed The '269 Patent Application To Determine Whether An Invention Secrecy Order Should Issue.**

On November 6, 1985, Allied Bendix Aerospace received a Notice that an Invention Secrecy Act Order review had been initiated regarding the '269 application.  PTX 538.  In early 1986, the USPTO forwarded the '269 application to each military agency to determine whether an Invention Secrecy Act Order should be issued.  SATR at 26-27 (Honeywell counsel).  On March 4, 1986, Mr. McLure was assigned by the Navy to review the '269 application for this purpose.  PTX 501 ('269 application); SATR at 231-34 (McLure).  Mr. McLure testified that he reviewed "the OPNAV instructions, and if the ['269] patent [application] was something that had been developed under a U.S. government contract for which there was a particular security classification guide . . . then . . . perform [an] additional review to ensure that some of the detailed technical parameters and other things associated with the application were [not], in fact, classified."  SATR at 239 (McLure).  After that review, Mr. McLure advised the Navy of his concern that the '269 application disclosed a security "vulnerability" and returned the application to the NAVAIR patent office.  SATR at 234-35, 250-51, 270-71, 282 (McLure).[12]  Then, Mr. McLure signed a statement attesting that he understood "that information acquired from [reviewing the '269 application] may not be divulged or used for any purposes other than security."  PTX 503; SATR at 239-40 (McLure).

On March 13, 1986, Mr. McLure met with his supervisor, Commander Shelton[13] and Mr. Reetz, where the topic of "red lighting" was mentioned, but without a detailed technical

---

[12] On June 10, 1986, Mr. Charlie Townsend, NAVAIR's patent counsel, requested that Allied send him another copy of the '269 application. PTX 507.  Mr. McLure testified that he had no knowledge of this event.  SATR at 280-84 (McLure).  Honeywell argued that Mr. Townsend made this request, because he could not find the '269 application in the file, implying that Mr. McLure improperly retained the copy of the '269 application.  4/25/07 Pl. SA Br. at 9 note 3.  Honeywell, however, did not depose nor call Mr. Townsend at trial to ascertain why he made that request, since he readily could have obtained the '269 application directly from the USPTO.  Therefore, the court attaches no significance, either to Mr. Townsend's request or Honeywell's argument.

[13] Honeywell did not depose Commander Shelton nor call him as a witness.  SATR at 333.

discussion or any reference to the '269 application. PTX 603 at GVT019-2864; SATR at 328-33 (McLure); SATR at 594-96 (Reetz). This was one of a series of weekly meetings that took place to discuss how to fund and advance the Panel on Aircraft Lighting's effort to "[move] . . . the minus blue filter and introduction of red into the cockpit." SATR at 328-32 (McLure); SATR at 593-98 (Reetz).

Mr. Reetz's notes of March 28, 1986, stated that he "receive[d] NVGS spec comments from D. McLure." PTX 603 at GVT019-2867; SATR at 598-99 (Reetz).

### vi. On April 2, 1986, An Invention Secrecy Act Order Issued On The '269 Patent Application.

On April 2, 1986, at the request of the Office of the Navy's Research Code 308, Arlington, Virginia, the USPTO issued an Invention Secrecy Act Order delaying issuance of the '269 application for one more year, because "granting a patent would be detrimental to the national security." PTX 506; SATR at 275-76 (McLure). Prosecution of the '269 application, however, continued.

On April 3, 1986, however, NAVAIR was advised that sometime prior to receiving a November 6, 1985 Notice of the Invention Secrecy Act review, Allied Bendix Aerospace, distributed a brochure to the Department of Defense and defense contractors that "may have contained information pertaining to the subject matter of the [Application Serial No. 06/786,268 (the "'268 application")]." PTX 538.[14]

Since Allied Bendix Aerospace was planning to have an exhibit at an upcoming conference of the Aviator Association of America in Atlanta in August 1986, NAVAIR was asked "how the exhibit possibly pertaining to [the '268 application] subject matter should be handled." PTX 538. It was decided that Mr. McLure would meet with Allied Bendix Aerospace representatives on April 4, 1986 to "provide guidelines as to what is considered confidential." PTX 538; PTX 539; SATR at 278-80, 474 (McLure). At that meeting, Mr. McLure "determined that the exhibition did not disclose any classified information[.]" PTX 539.

On April 8 and 9, 1986, Mr. McLure met with Mr. Reetz, Mr. Byrd, Ms. Bryner, and other members of the Panel on Aviation Lighting to discuss NADC's "stud[y] to attempt to come up with a 'red' which would be compatible with . . . [night vision goggles] and thus get 'red' back in the cockpit." PTX 559 at GVT019-1977; SATR at 334-339, 348-51, 359-61, 394 (McLure); SATR at 613-18 (Reetz). The meeting minutes reflect that new military specification would "address . . . NVIS compatible . . . full color [displays] . . . and define a narrow band red."

---

[14] The '268 application's "DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS" used the terms "red spectrum," "narrow band bandpass filter," and "very narrow color band." PTX 535 at DE-1753. These same terms also appear in the '269 application, PTX 501 at DE-1046. Therefore, at least this part of the '268 application may have been in the public domain sometime prior to November 6, 1985, well before Mr. McLure's March 4, 1986 review of the '269 application and before a Secrecy Order imposed on the '268 patent on March 24, 1986. DMX 37 at DE-1919-21.

PTX 559 at GVT019-1977; SATR at 416-17 (McLure). Prior to this time, Mr. Reetz did not recall that the Panel used the specific term "narrow band red." SATR at 622-23 (Mr. Reetz testified that a "narrow red band 'means' a small portion of electromagnetic spectrum that includes red.); SATR at 893-94 (Reetz) (same).

On April 23, 1986, Mr. Reetz's travel log indicated that he and two other NAVAIR employees visited a Bendix/Allied facility to "investigate the daylight readability of [using a polarizer to filter a] display" proposed by the company. PTX 603 at GVT019-2872, GVT019-2994; SATR at 587-88 (Mr. Reetz recalled that during the meeting, Mr. Cohen "pulls us to the side and discusses with us an idea he had for making displays NIVS compatible . . . [by using] a circular polarizing technique."). Mr. Reetz's impression was that using a polarizer was "a pretty novel idea. It was not something that I don't think anybody else had thought of beforehand, so I remember that." SATR at 589. But, when the displays were taken outside in the sun "to investigate the daylight readability," they could not be read. SATR at 578-79 (Reetz). Mr. Reetz sent a copy of his report to the Naval Weapons Center. SATR at 626-27 (Reetz).

On August 14, 1986, a meeting was convened with Ms. Bryner and others to discuss Mr. Cohen's proposal to use polarizers in the cockpit of the CV-22 aircraft, then under development. DE 322. The group attending that meeting, however, determined that the polarizer concept was not effective, because too much light would be lost if the pilot turned his head and that the second polarizer on the goggles would limit light sensitivity. DE 322; SATR at 1088-89 (Bryner). Therefore, the group recommended the use of complementary color filters to admit red into the cockpit, a technique that Mr. Cohen did not suggest. DE 322; SATR at 1088-90 (Bryner).

Nevertheless, on September 19, 1986, Mr. McLure met with Mr. Reetz, Mr. Byrd, and others again to discuss the use of circular polarizers to achieve NVG-compatible lighting with full color displays for CV-22 aircraft. PTX 555; SATR at 365-66 (McLure); SATR at 629-31, 634-36 (Reetz). Specifically, "[t]he plan [was] to require the color CRTs to be compatible with '665' goggles, as defined in the new draft revision of MIL-L-85762, meaning that the CRTs will have a filter bonded on which cuts off the deep red and near [infrared] emissions. NVGs must still be modified, since standard ANVIS-6 goggles are not compatible with any red light." PTX 555 at GVT032-3096; SATR at 365, 368-71 (McLure). The polarized filter approach, however, again was determined to be unacceptable, because: it inherently degraded NVG sensitivity (up to 40%); did not provide lighting security; may not have been effective against reflections in the cockpit; and was patented by a "sole source." PTX 555; SATR at 371-72 (McLure).

On about September 29 or 30, 1986, Mr. McLure was appointed Chairman of the Panel on Aviation Lighting. PTX 560 at GVT019-1914; SATR at 378-80 (McLure). As Chairman, he viewed his role as "collecting the views of the Navy stakeholders, collating that position, and presenting [it] to the other panel members." SATR at 385 (McLure). On October 29, 1986, the Panel issued a "rough draft rationale document," authorizing the revision of the MIL-L-85762. PTX 14; SATR at 528 (Reetz). The main focus was "determining whether there is an acceptable level of blooming [in the cockpit]," so the pilot could see red warning signals. SATR at 605 (Reetz); DE 303 at GVT012-3234 to -35.

On November 11, 1986, Ms. Bryner issued a Memorandum concluding that the polarizer approach proposed by Mr. Cohen was unsatisfactory and suggested use of a WAMCO-type filter instead.  DE 322.

On April 7, 1987, Mr. McLure was asked by the Navy to review the '269 application. SATR at 285-87 (McLure).  He understood this assignment to require him to "read through [the patent application] again to ensure that nothing had changed or been modified . . . we would primarily be looking for vulnerabilities to fielded systems, that potentially could allow development of countermeasures kind of thing."  SATR at 436-37 (McLure).  On April 20, 1987, the existing Invention Secrecy Act Order was renewed.  PTX 509.

On September 17, 1987, a report authored by Mr. Reetz and sponsored by Mr. McLure issued: "Rationale Behind the Requirements Contained in Military Specifications MIL-L-85672 And MIL-L-85627A."  PTX 606.  This document stated that the "advent of [a] Class B NVIS, with a 665 nm filter, with a minus blue" allowed NAVAIR to conduct a number of flight tests, the results of which "indicat[ed] that a limited amount of red could be used in the cockpit."  PTX 606 at GVT012-2652; SATR at 528-30, 853 (Reetz).

On April 20, 1987, the USPTO withheld issuance of the '269 application for an additional year, because of "national interest" concerns, although the classification listed was "confidential," the lowest level.  PTX 509; Am. Compl. ¶ 10.

On November 13, 1987, Honeywell amended the '269 application and the USPTO examiner issued a Notice of Allowability as to claims 1-5.  DMX 36 at DE-1168.  The allowable claims recited the use of polarizers and a plurality of distinct monochromatic display generators. DMX 36 at DE-1168 (determining that claims 1-5 were allowable).

On March 25, 1988, Mr. McLure again reviewed the '269 application and made a "fresh determination" that the Invention Secrecy Act Order should be extended for another year.  PTX 505; SATR at 287-88 (McLure).

### vii.    On August 26, 1988, MIL-L-85762A Issued.

On August 26, 1988, the Tri-Service Lighting Committee issued MIL-L-85762A "Lighting, Aircraft, Interior, and Night Vision Imaging System (NVIS) Compatible" to achieve "compatibility of aircraft lighting in general with night vision goggles, includ[ing] electronic displays, warning lights, instrumentation" by using a 665 nm filter on the NVG, so that more colors in aircraft cockpit displays could be accommodated, including red.  PTX 13; SATR at 299-305 (McLure); SATR at 999 (Byrd); SATR at 1050-51 (Bryner).  MIL-L-85762A was a significant development, because it utilized a 665 (Class B) minus blue filter instead of a 625 (Class A) filter and changed the night vision requirements to accommodate a higher resolution of red in the cockpit.  SATR at 853 (Reetz).

**viii.** **On September 7, 2000, The Invention Secrecy Act Order Regarding The '269 Application Was Rescinded And, On October 22, 2002, "Matured" Into The '914 Patent.**

On September 7, 2000,[15] the Invention Secrecy Act Order on the '269 application was rescinded. DMX 36 at DE-1186. On November 15, 2000, the assigned USPTO examiner ("examiner") compared claims 1-5 of the '269 application, subject to the November 13, 1987 Notice of Allowability, to "a copending application [No. 09/632,760[16]] and [a] formerly copending application not referenced in this file." DMX 36 at DE-1190. In light of this development, the examiner withdrew the Notice of Allowability and rejected claims 1-5 of the '269 application because the USPTO had not been informed by Honeywell that it had multiple patent applications pending at the same time with the same disclosure and very similar claims. DMX 36 at DE-1190.

On February 14, 2001, Honeywell submitted an amendment to identify the previously undisclosed U.S. Patent 6,142,637 (the "'637 patent") and the '760 applications. DMX 36 at DE-1476. The '760 application was characterized by Honeywell as a "continuation of the application on which the '637 patent issued." DMX 36 at DE-1476. Honeywell petitioned for reconsideration of the examiner's rejection of claims 1-5 of the '269 application and/or allowance of "new method" claims 6-7 "directed to the method of operating an aircraft using night vision goggles in accordance with applicant's invention and as described in the specification." DMX 36 at DE-1476.

On March 20, 2001, the examiner again rejected claims 1-7 of the '269 application and rescinded the November 13, 1987 Notice of Allowability. DMX 36 at DE-1495 to -96. Honeywell did not contest this action nor appeal. Instead, on September 19, 2001, Honeywell filed an Amended Transmittal Letter with the examiner adding the name of a Dr. Craig R. Scoughton as a co-inventor of the '269 application. DMX 36 at DE-1497 to -98. In addition, Honeywell cancelled claims 2-7 of the '269 application and amended claim 1 to add the following new paragraph 1(d):

> first and second polarizing filters, the first polarizing filter filtering light output from the local source of light and the second polarizing filter filtering the light input to the night vision aid.

DMX 36 at DE-1501.

---

[15] In 1999, Allied Signal Company merged with Honeywell International Inc. *See Honeywell III,* 70 Fed. Cl. at 444. As a result, Honeywell International Inc.'s subsidiary, Honeywell Intellectual Properties, Inc., obtained all rights to the '269 application. *Id.*

[16] On August 4, 2000, Mr. Cohen filed Application Serial No. 09/632,760 (the "'760 application"), as a continuation of U.S. Application Serial No. 06/786,268. DMX 36 at DE-1543.

On February 27, 2002, the examiner also rejected this proposed amendment to claim 1 of the '269 application. DMX 36 at DE-1521.

Following an April 2, 2002 telephone interview with the examiner on April 4, 2002, Honeywell filed an Amendment After Final Rejection, cancelling the specification of the '269 application and substituting a specification from the previously allowed '760 application. DMX 36 at DE-1522. Next, Honeywell cancelled the existing '269 application drawing and abstract and requested that the drawing and abstract of the '760 application be substituted in place of the '269 application. DMX 36 at DE-1523. In addition, the examiner was instructed by Honeywell to "[c]ancel claim 1 and add new claims 8-10, where new claims 8-10 correspond to allowed claims in 15-17 in U.S. Application Serial No. 09/632,760." DMX 36 at DE-1523; DMX 36 at DE-1524 to -25 (new claims 8-10). Honeywell also "submitt[ed] an express abandonment of application Serial No. 09/632,760, thereby obviating any issues of double patenting." DMX 36 at DE-1525.

On June 4, 2002, however, the examiner again rejected Honeywell's proposed April 4, 2002 amendments on the following ground: "[t]he transfer of the drawings and specifications from 09/632,760 is technically infeasible, but the same matter would be entered if formally submitted in this application along with the claims." DMX 36 at DE-1528.

On June 24, 2002, after another telephone interview with the examiner, Honeywell filed an Amendment After Final Rejection, cancelling the specification in the '269 application and "formally submitt[ing]" the specification, drawing, and abstract of the '760 application, together with the text of claims 8-10 of the '760 application, but re-numbering the claims as 1-3. DMX 36 at DE-1671 to -75. Honeywell represented to the examiner that "[t]he '760 Application has now been abandoned, thereby obviating any issues of double patenting. Applicants are also cancelling the rejected claim 1 in this application, so that after entry of this Amendment the only claims being presented in this ['269] application are the claims allowed in the '760 Application." DMX 36 at DE-1674.

On July 1, 2002, the examiner issued a Notice of Allowance and Issue Fee Due of the '269 application. DMX 36 at DE-1729. According to Honeywell, the '269 application then "matured into the '914 patent." Am. Compl. ¶ 20. This entire process is summarized in a chart and comparative analysis of the claims in the '269 application and the '914 patent that issued. *See Honeywell VI*, 81 Fed. Cl. at 231-33.

On October 22, 2002, the '914 patent issued, pursuant to 35 U.S.C. § 154(b). DMX 36 at DE-1676-77, 1682-88.

### b. The Parties' Arguments.

The Government argues that Honeywell did not establish "government use" of the invention described in the '269 application because MIL-L-84762A was developed independently. 4/25/07 Gov't SA Br. at 11. Therefore, any "disclosure" of the '269 application was limited to Mr. McLure's review "looking for whether the ['269] application might disclose vulnerabilities of military equipment." 10/14/11 Gov't SA Br. at 3-4 (citing SATR at 250, 437-

40 (McLure); SATR at 732, 870-871 (Reetz)).   Mr. McLure testified that this review took approximately 20 minutes. SATR at 250 (McLure).   More importantly, Mr. McLure's unchallenged testimony was that he was required to maintain the confidentiality of all of the Invention Secrecy Act Order applications that he reviewed and did so.   SATR at 240, 432 (McLure).   Although it is true that Mr. McLure also was assigned by the Navy to the Panel on Aviation Lighting to draft MIL-L-84762A to ascertain how a full color NVG-compatible display in military aircraft might be accomplished, his role, was "bureaucratic, not technical," including his term as Chairman. 10/14/11 Gov't SA Br. at 4.   The record reflects that the Navy assigned all technical decisions regarding MIL-L-84762A to Mr. Reetz and others on his technical team and that Mr. McLure "provided no technical input into the specification."   6/8/07 Gov't SA Reply at 13-14; 10/14/11 Gov't SA Br. at 4.

Although the April 8-9, 1986 Panel on Aviation Lighting meeting minutes mentioned the generic term "narrow band red," neither the '269 application that Mr. McLure reviewed nor MIL-L-85762A contained that term.[17]   Moreover, the record also reflects that the Panel on Aviation Lighting and the industry were moving toward utilizing full-color NVG-compatible displays to introduce red into aircraft cockpits well before Mr. McLure's March 1986 review of the '269 application. 10/14/11 Gov't SA Br. at 5 (citing SATR at 542, 550, 777, 849-50, 879-80 (Reetz); SATR at 922-23 (Byrd)).   For example, prior to that review, Navy aircraft began to use full-color CRT displays that required red.   SATR at 1053 (Bryner).   The Navy also made a decision sometime prior to August 26, 1988 to use a type of goggle called "Cats Eyes."   SATR at 300-01 (McLure).   These goggles utilized a filter that allowed red light to be emitted in the cockpit.   DE 302 at GVT050-0004; SATR at 941-43, 963 (Byrd); SATR at 1051 (Bryner).   In addition, Smiths Industries ("Smiths"), a British display manufacturer, issued a Memorandum sometime during 1985-1986 that described a NVG-compatible full-color CRT display and provided comment about this development in a draft of the military specification under consideration by the Panel.   DE 302 at GVT050-0004.   This Memorandum also references the same trade-offs with filter selection that Ms. Bryner and Mr. Reetz considered in drafting MIL-L-84762A.   DE 302 at GVT050-0004.[18]

In sum, the Government contends that Honeywell failed to establish that, prior to issuing MIL-L-84762A, the Panel on Aviation Lighting had access to the '269 application; or there is any substantial similarity between the '269 application and MIL-L-84762A specification.

Honeywell responds that, even if the Government's interpretation of section 183 is correct,   the Government has not submitted any evidence to rebut Honeywell's *prima facie*

---

[17] Even if the court finds that the term "narrow band red" in the April 8-9, 1986 meeting minutes is facially similar to the term "narrow color band" that appears in the '269 application, the record evidences that the Government's decision to purchase display systems had nothing to do with the disclosure of the '269 application in the context of the Invention Secrecy Order review.  6/8/07 Gov't SA Reply at 15-17 (citing DE 3).

[18] A scanned copy of the 1985 Smiths memorandum was found in Mr. Byrd's file and marked confidential, but the record is not clear as to whether other Panel members had access to it.  SATR at 956-93 (Byrd).

showing that the issuance of the MIL-L-85762A resulted from the Government's disclosure of the '269 application. 4/25/07 Pl. SA Br. at 6, 16, 46-47; 6/8/07 Pl. SA Reply at 22; 10/14/11 Pl. SA Br. at 6. Honeywell notes that, in trade secret and copyright cases, federal courts routinely have looked to access or possession of protected information and the similarities between such information and the alleged infringing devices to ascertain liability. 4/25/07 Pl. SA Br. at 42-43. Therefore, the fact that Mr. McLure reviewed the '269 application is "sufficient to establish a connection between that patent application and the Government's infringing use of the invention," since direct evidence of copying is not required and Mr. McLure's "knowledge of the '269 application precludes any finding that the Government's development of the military standard was independent." 10/28/11 Pl. SA Resp. at 5. Furthermore, by moving the cutoff of the NVG minus blue filter from 625nm to 665 nm in MIL-L-85762A to allow for the emission of a "narrow band of red" from the aircraft cockpit display, the Government used the core of the invention disclosed and claimed in what became the '914 patent, *i.e.*, splitting the red color band (wavelengths from 620 nm to 780 nm) into two parts, lambda 1 (620 nm to 655 nm) for the aircraft cockpit display and lambda 2 (665 to 780nm) for the NVGs, to achieve a full color display in the aircraft cockpit, without significant degradation in NVG performance. 4/25/07 Pl. SA Br. at 53. Although there were other potential ways to achieve compatibility between NVGs and full color displays, by adopting MIL-L-85762A the Government elected to use the invention disclosed and claimed in the '914 patent, as evidenced by the fact that the 655 nm Class B minus blue filter described in the MIL-L-85762A specification is the same filter described in Claim 2(b) of the '914 patent. 4/25/07 Pl. SA Br. at 54.

Honeywell adds that the Government's argument overstates that the Panel on Aviation Lighting and industry already were moving toward full-color NVGs to allow red in the cockpit, prior to Mr. McLure's review of the '268 and '269 patent applications. 6/8/07 Pl. SA Reply at 8. [19] The fact that the military had to establish a committee to revise MIL-L-85762A to "investigate the possibility of using red lighting components" also undercuts the testimony of Government witnesses that they already knew how to make NVG compatible full color displays. 6/8/07 Pl. SA Reply at 7. In addition, the 1985-1986 Smiths Memorandum is irrelevant, because no evidence was introduced that anyone in the military reviewed or even had a copy of this document during the relevant time period. 6/8/07 Pl. SA Reply at 5. And, there is no clear record of what Mr. Cohen and Mr. Reetz discussed on September 4, 1985, so that the Government's contention that the flow of critical information about the status of the MIL-L-85762A was from Mr. Reetz to Mr. Cohen is nothing more than conjecture. 6/8/07 Pl. SA Reply at 7, 29.

### c.      The Court's Resolution.

The record on which Honeywell relies to establish Government use of the invention disclosed in the '269 application requires careful scrutiny.

---

[19] There is no evidence in the record that Mr. McLure ever reviewed the '268 application. Moreover, as previously mentioned, on December 23, 2004, Honeywell relinquished all claims concerning the '268 application. *See* Dkt. No. 77.

On March 4, 1986, Mr. McLure examined the '269 application, at the Navy's request, to determine whether it should be subject to an Invention Secrecy Act Order.  PTX 503.  Mr. McLure testified that his review was not focused on any technical aspect of the '269 application at all, since it was not developed under a Government program: "We did not evaluate the merits of the patent or the technical goodness of what was being proposed.  It was a simply a security review."   SATR at 437-38 (McLure).  Mr. McLure's contemporaneous notes confirm that, because the '269 application referenced "ANVIS vulnerability" (PTX 505), he recommended issuance of an Invention Secrecy Act Order, "not what was specifically in the application itself." SATR at 440 (McLure).

On April 8-9, 1986, the Panel on Aviation Lighting met and the minutes of that meeting reflect a discussion of nine items.  PTX 559 at GVT019-1974 to -83; PXT 562 at JA619955-56 (JACC Program Status Report on Night Vision Goggles following signup sheet for April 8-9, 1986 Panel on Aviation Lighting Meeting); SATR at 416-17 (McLure).  Honeywell has made much of the fact that in the minutes of one discussion group the term "narrow band red" appears, a little over a month after Mr. McLure first reviewed the '269 application.[20]  4/25/07 Pl. SA Br. at 12, 49 (citing 7/26/06 SATR at 622-23) (McLure).

In the court's judgment, Honeywell overstated the significance of this reference.  Aside from the fact that, at least some part of the '268 application appears to have been in the public domain,[21] Mr. McLure signed a sworn statement attesting, as follows: "I understand that information acquired from [the disclosure of the '269 application] may not be divulged or used for purposes other than security."  PTX 503; SATR at 240 (McLure).

---

[20] The minutes reflect that, on April 8, 1986, a presentation was made by John Parker from NADC to the Panel on Aviation Lighting to "review the objective of the NADC test programs and area of concern to determine the impact of increased levels of red lighting on the performance of NVIS.  Data resulting from the test will be used to recommend changes to MIL-L-85762.  The changes will address the allowable AR values for NVIS compatible green, yellow, full color and monochromatic CRTs, HUDs *and define a narrow band red*, including area." PTX 559 at GVT019-1977 (emphasis added).

On the next day, Ms. Bryner discussed "the effects of changing the minus-blue filter on NVIS from the present 625 nm cutoff to 665 nm to allow the use of a limited amount of red light in multi-color CRTS and indicators.  She reviewed some of the test data collected to date on the compatibility of 610 red (orange red) with the 665 NVIS filter and detailed some of the NADC's future plans."  PTX 559 at GVT019-1978.  Thereafter, assignments for additional testing were made with a note that "services and industry to submit red samples for T&E by NADC."  PTX 559 at GVT019-1980.

[21] On April 4, 1986, Mr. McLure met with Bendix representatives to discuss the circumstances of their prior and unrelated disclosure of the '268 application to the Department of Defense and defense contractors, sometime prior to November 6, 1985, and whether that disclosure would compromise the Invention Secrecy Act Order on the '269 application, since both had "virtually identical specifications" (SATR at 645 (Honeywell's Counsel)), and to clear an exhibit Bendix wanted to use in an upcoming Army Aviation Association of America Exhibition in Atlanta, Georgia.  PTX 538; PTX 539; SATR at 278-80 (McLure).

When pressed by the court at the evidentiary hearing, Mr. McLure insisted that he never disclosed any information about the '269 application:

> THE COURT:
>
> [My] impression of what Honeywell is . . . saying [is,] because you reviewed [Invention Secrecy Act '269 patent] applications, you gleaned some type of insights or confidential information from reviewing those, which then you imparted either to [the Panel on Aviation Lighting] or some other group that was involved in this procurement process . . . is there any reason that we should be concerned about any of that?
>
> MR. MCLURE:
>
> I mean, our contact, my contact, my contacts with the Army would have primarily consisted of the ANVIS program, which was another one of the -- which was another program effort, which I was working, which wouldn't have really involved -- the Army didn't have a vested interest in the ANVIS red lighting thing.  The original version of the MIL spec covered all their lighting requirements.   And it also covered the lighting requirements for the Navy and Marine Corps helicopter community, which I also worked for.  It was just one of my duties.
>
> THE COURT:
>
> . . . So is there anything in that application in your professional judgment that . . . set off a light in your head that made you . . . feel compelled to share whatever that information was in any way shape or form with the people at this lab?
>
> MR. MCLURE:
>
> I wouldn't have shared it either with the people in the lab or the people within the Navy.
>
> THE COURT:
>
> Was there anything about what you read in the ['269] application which struck you as being, you know, unique, profound?
>
> MR. MCLURE:
>
> To be honest, Your Honor, I had roughly two years experience, three years experience with the government at the time.  I probably would have barely understood the technical portion of the patent application.

SATR at 341-43; *see also* SATR at 231-33, 240-49, 380, 441-43, 451-52 (McLure) (same).

In the court's judgment, Honeywell's counsel's cross-examination was unsuccessful in undermining Mr. McLure's testimony.

| | |
|---|---|
| **HONEYWELL'S COUNSEL:** | On March 4th or thereabouts, you are presented with the '269 and '268 applications to perform the review to recommend or not recommend a secrecy order.  Do you recall that? |
| **MR. MCLURE:** | As I indicated previously, I certainly recall it from the testimony.  I don't directly recall reviewing those again. |
| **HONEYWELL'S COUNSEL:** | Okay.  Now, when you received those, those cover sheets that you then completed, they had the patent applications attached to them; is that right? |
| **MR. MCLURE:** | I don't have any direct recollection but they certainly, they certainly should have. That would be, that would be expected. |
| **HONEYWELL'S COUNSEL:** | Okay. |
| **MR. MCLURE:** | So I have no reason to dispute that. |
| **HONEYWELL'S COUNSEL:** | And to do the secrecy review, in fact, you needed to review the substance of the application or else you couldn't recommend anything one way or the other; is that right? |
| **MR. MCLURE:** | Yeah, that would be correct. |
| **HONEYWELL'S COUNSEL:** | Okay.  So you didn't tell your boss at that time that you weren't competent to do the review, did you? |
| **MR. MCLURE:** | No. |
| **HONEYWELL'S COUNSEL:** | And you didn't tell your boss back then that maybe you shouldn't do the review, because you were involved in the panel that's looking at the issue of night-vision goggle compatibility with full color displays, did you? |
| **MR. MCLURE:** | No. |

| HONEYWELL'S COUNSEL: | And you didn't suggest to your boss that maybe someone else should be the one reviewing the '269 and '268 patent applications because you were involved in the panel and that's what the panel was doing, did you? |
|---|---|
| MR. MCLURE: | No. |
| HONEYWELL'S COUNSEL: | Did it ever cross your mind to take some sort of action, other than digging into the '268 and '269 patent applications and reviewing them? |
| MR. MCLURE: | The patent -- patent applications and other public release documents are disseminated based on essentially whose technology area they are in.  If every member of NAVAIR recused themselves because something came in within their technology area, you would have no one to review applications. |

SATR at 391-93.

On numerous occasions during the evidentiary hearing, Mr. McLure emphasized that NAVAIR was responsible only for managing logistics of the engineering process; technical expertise was provided by others.  SATR at 448-50, 452 (McLure).  In that regard, Mr. McLure viewed his responsibility on the Panel on Aviation Lighting as "doing the coordination and getting all the smart people together.  And you spend a lot of time with charts up on the wall, with the experts arguing about sentences over what comes before what.  And your job is the overall coordination and organization."  SATR at 450 (McLure); *see also* SATR at 453-54 (McLure).  Mr. McLure specifically testified that he did not author nor direct the technical aspects of the revised MIL-SPEC, but coordinated recommendations from the military technical experts and industry as to what should be included.  SATR at 404-06, 451-52 (McLure).  Moreover, three other witnesses confirmed that, during the time Mr. McLure served as the Navy's representative on the Panel on Aviation Lighting, his assignment was not technical.  This period included his service as Chairman from September 1986 until August 26, 1988, the date that MIL-L-85762A issued.  SATR at 870-71 (Reetz); SATR at 1005-06 (Byrd); SATR at 1074 (Bryner).

The court considers the testimony of Mr. McLure to be credible and finds that he honored his obligation not to disclose or use information from the Invention Secrecy Act review of the '269 application.

Returning to the reference to the specific term "narrow red band" in the April 8, 1986 minutes of the Panel on Aviation Lighting, Mr. Reetz testified that this was not a term he had

used during this time period and but he also attached no particular significance to this term appearing in the minutes.

| | |
|---|---|
| HONEYWELL'S COUNSEL: | Were you investigating a narrow band of red as of April 8th, 1986? |
| MR REETZ: | I don't recall.  Time frame-wise, I don't know where that was. |
| THE COURT: | Why would you be investigating a narrow band of red? |
| MR. REETZ: | As I say, this particular paragraph we're talking about was trying to determine the proper color coordinates. |
| HONEYWELL'S COUNSEL: | What was your understanding, if any, of a narrow band of red in that time period? |

*  *  *

| | |
|---|---|
| HONEYWELL'S COUNSEL: | Did you have an understanding of the term narrow band of red in April time of 1986? |
| MR. REETZ: | I -- I considered that to be -- I don't know what, how would you define a narrow band of red?  I mean, you can have a narrow band of anything. |
| HONEYWELL'S COUNSEL: | Could you look at, lower on the page of this document under NADC red light test effort,[22] do you see that? |
| MR. REETZ: | Subparagraph D? |
| HONEYWELL'S COUNSEL: | Yes. |
| MR. REETZ: | Yes. |
| HONEYWELL'S COUNSEL: | And there is, the last two sentences, I will read those, they say, "The changes" -- by the way, I assume we're talking |

---

[22] This group was "conducting studies regarding coming up with a compatible red."  PTX 559 at GVT019-1977.

about changes to the MIL spec, right?  Why don't you read the whole paragraph to yourself first.  I'm sorry.

MR. REETZ:   Okay, right.  Oh, yes, I do remember reading this before.  This is a very confusing sentence, I have to admit.  I don't know what he is talking about.

HONEYWELL'S
COUNSEL:   Which sentence are you talking about?

MR. REETZ:   "The changes will address the allowable error of values for NVIS compatible, green, yellow, and monochromatic CRTs" -- that I understand – "HUDs" -- having designed a radiance for HUD – "define a narrow band of red including area."  I don't know what area he is talking about.

HONEYWELL'S
COUNSEL:   Right.  Is the term narrow band of red confusing to you?

MR. REETZ:   I don't know how -- I don't know how it is being used in this context.  I don't know what it means.

HONEYWELL'S
COUNSEL:   Is it a term you used in different contexts in that time period?

THE COURT:   What time period are we at now?

HONEYWELL'S
COUNSEL:   1985-86.

GOVERNMENT
COUNSEL:   And I would object as vague.  A term --

HONEYWELL'S
COUNSEL:   Your Honor, this question is not vague.

THE COURT:   I think the witness has said that he considers it to be vague.

HONEYWELL'S
COUNSEL:   Your Honor, he said that he thought the sentence was vague.  And I have a specific question on that term, whether the term narrow band red is something he used in that time.

| | |
|---|---|
| THE COURT: | What does narrow red band, color band red mean to you, if anything? |
| MR. REETZ: | It doesn't really -- I mean, you want me to define -- |
| THE COURT: | I am just asking you whether it means anything to you. And what is the meaning . . . if you understand what the term means.  If you don't, that's okay. |
| MR. REETZ: | To me, it would mean a small portion of electromagnetic spectrum that included red. |
| HONEYWELL'S COUNSEL: | Is that a term that you used in that time period, as you recall? |
| MR. REETZ: | Myself? |
| HONEYWELL'S COUNSEL: | Yes. |
| MR. REETZ: | No. |
| HONEYWELL'S COUNSEL: | Is it a term that you recall the committee using in that time period, other than in this memo? |
| MR. REETZ: | Other than in this memo? |
| HONEYWELL'S COUNSEL: | Yes. |
| MR. REETZ: | No. |

SATR at 619-23.

In fact, earlier in his testimony, Mr. Reetz emphasized that the Panel on Aviation Lighting was well aware that red light could be introduced into an NVG-compatible cockpit well before Mr. McLure's review of the '269 application and that changing the NVG filters to accommodate the introduction of red light was "not rocket science."  SATR at 549-50 (Reetz).[23] The court also finds the testimony of Mr. Reetz to be credible.

---

[23] Mr. Reetz also testified that he never saw the '269 application until well after the Invention Secrecy Act Order was lifted.  SATR at 639-49 (Reetz).

Honeywell argues that Mr. McLure's initial and subsequent Invention Secrecy Act review of the '269 application revealed that red could be introduced into aircraft cockpits by the use of a 665nm Class B minus blue filter in the aircraft displays. 4/25/07 Pl. SA Br. at 53-54. But, the claims of the '269 application contain no reference to any specific size of filter.[24]

---

[24] The claims asserted in the '269 application that Mr. McLure reviewed stated:

WHAT IS CLAIMED IS:

1. ~~Display system for use in association~~ [In combination] with a night vision aid and a local source of light; wherein the local source of light includes a plurality of distinct monochromatic color generators and local source light is blocked from interfering with the night vision aid, [a display system] characterized by:

a) a bandpass optical filter arranged to block light from at one of said color generators except at preferred range of frequencies;

b) a high pass optical filter arranged to block light from at least one other of said color generators, the high pass filter blocking light at the preferred range of frequencies; and

c) an optical filter associated with the night vision aid and positioned with respect to the night vision aid so as to filter light entering a light input of the night vision aid, said optical filter associated with the night vision aid having a characteristic of blocking light at said preferred range of frequencies.

2. Display system as described in claim 1, further characterized by:
first and second polarizing filters, the first polarizing filter filtering light output from the local source of light and the second polarizing filter filtering the light input to the night vision aid.

3. Display system as described in claim ~~3~~ [2], further characterized by:
the first and second filters being circular polarizers.

4. Display system as described in claim 1, further characterized by:
the local display being a multiple tube color display and the color generators being monochromatic cathode ray tubes of distinct colors used in the multiple tube color display.

5. Display system as described in claim 4, further characterized by:
first and second polarizing filters, the first polarizing filter filtering light output from the local source of light and the second polarizing filter filtering the light input to the night vision aid; and
the first and second filters being circular polarizers.

PTX 501 at DE-1049 to -50.

Moreover importantly, the '269 application does not claim "a plurality of filters at the local color display[,]," nor a "fourth filter cooperating with said plurality of filters to substantially block at least said narrow band of the red color band from being admitted into the night vision aid." Those claims, however, were disclosed in the '914 patent that issued on October 22, 2002, well after the Secrecy Act Order in the '269 patent was rescinded, and were the claims that the court determined were infringed by the military aircraft displays at issue in this case.   DMX 36 at DE-1688.

It is important at this juncture to focus on Honeywell's argument that the "MIL-L-85762A, embodies the 'geniusness' of the '914 patent, namely 'the splitting of the . . . red color band[.]'"   4/25/07 Pl. SA Br. at 53 (citing 8/4/05 TR 750-51 (Tannas)).   But, Honeywell's expert witness, Mr. Tannas did not testify that the MIL-L-85762A was derived from the "geniusness" of the '914 patent.   8/2/05 to 8/4/05 TR at 363-777 (Tannas).   Instead, the record evidences that it was the amendment of the '269 patent with the two specific claims that issued as the '914 patent that disclosed a method to achieve the requirements of MIL-L-85762A.

For these reasons, the court has determined that Honeywell failed to establish that the Government used the invention disclosed in the '269 application.   Assuming, *arguendo*, that such use did occur, it would not necessarily have been wrongful, since Honeywell's predecessor Bendix appears to have been responsible for the public disclosure of part of the '268 application, which had a "virtually identical specification" as the '269 application, sometime prior to November 6, 1985, well before Mr. McLure's March 4, 1986 Invention Secrecy Act review (PTX 538), as Honeywell's counsel conceded.   SATR at 645 (Honeywell's counsel).

Honeywell, however, subsequently obtained the '914 patent, that disclosed a method for achieving the requirements of the MIL-L-85762A.   But, the Government's use of that patent is subject to liability under 28 U.S.C. § 1498(a), not the Invention Secrecy Act.

---

The description of the preferred embodiments note in Figure 2, if a monochromatic cathode ray tube ("CRT") "projects an image in the red spectrum, a bandpass filter[] may be used with the CRT[] so that only light within a narrow range of frequencies may be transmitted to the screen."   PTX 501 at DE 1046 (ll. 16-19).   In addition, "in this arrangement the display unit of the offending color is filtered with a narrow band bandpass filter so that light transmitted by the display unit is only within a very narrow color band."   PTX 501 at DE-1046 (ll. 34-36). The abstract also states: "Local display light within the most offending frequency band (red) is filtered by a bandpass filter with a narrow frequency band and other display light so as to avoid the offending frequencies."   PTX 501 at DE-1051.

B.    **Patent Infringement Damages That Honeywell Has Established Under 28 U.S.C. § 1498.**

1.    **The Relevant Statutes And Governing Precedent.**

Section 1498(a) of Title 28 provides:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by an action against the United States in the United States Court of Federal Claims for the recovery of his *reasonable and entire compensation for such use* and manufacture.

28 U.S.C. § 1498(a) (emphasis added).

Therefore, as a matter of law, the Government may take a compulsory, compensable, and nonexclusive license in any United States patent.  *See Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed. Cir. 1984) (explaining the difference between an action under section 1498(a), however, and one under Title 35).  Because section 1498(a) entails an eminent domain remedy, the Government must pay "just compensation[.]"  *See Tektronix, Inc. v. United States*, 552 F.2d 343, 347 (Ct. Cl. 1977) ("'[J]ust compensation' means the full monetary equivalent of the property taken.  The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken."), *amended by* 557 F.2d 265 (Ct. Cl. 1977), *remanded to* 1977 WL 22761, *aff'd in relevant part, modified in part*, 575 F.2d 832 (Ct. Cl. 1978); *see also Calhoun v. United States*, 453 F.2d 1385, 1395 (Ct. Cl. 1972) (holding that the "reasonable and entire compensation" owed the patent holder is equivalent to just compensation under the Fifth Amendment).

In the context of 28 U.S.C. § 1498(a), "just compensation" appears to be the equivalent of a reasonable royalty rate, considered in light of factors discussed in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) ("*Georgia-Pacific*").  *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("This court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry.  Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue."); *see also Gargoyles, Inc. v. United States*, 113 F.3d 1572, 1580-81 (Fed. Cir. 1997) (affirming the trial court's use of the *Georgia-Pacific* factors in calculating the royalty for a violation of section 1498(a)).

These factors include:

1.    The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2.    The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee-who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention-would have been willing to pay as a royalty and yet be able

to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific*, 318 F. Supp. at 1120.

### 2.    The Expert Opinions Regarding Damages.[25]

#### a.    The Plaintiffs' Expert Opinions.

Honeywell proffered two expert damage witnesses: Ms. Julie L. Davis, a principal in the consulting firm of Davis & Hosfield Consulting, LLC; and Colonel William S. Lawrence, United States Marine Corps (Retired).

##### i.    The Direct Testimony of Ms. Julie L. Davis.[26]

Ms. Davis was retained by Honeywell's counsel to determine the amount of "reasonable and entire compensation" to which Honeywell is entitled, pursuant to 28 U.S.C. § 1498, and "just compensation" under the Invention Secrecy Act. PTX 1351 at ¶¶ 7-8. Instead of separating out the amount of damages due under each statute, Ms. Davis "assessed only a single royalty for each infringing display system, regardless of whether Honeywell's claim for damages for that system is pursuant to 28 U.S.C. § 1498, or the [Invention] Secrecy Act, 35 U.S.C. § 183, or both." PTX 1351 at ¶ 9. In Ms. Davis's opinion, under either statute "an appropriate measure of Honeywell's compensation is a reasonable royalty based on the Government's cost of procuring the infringing display systems," *i.e.*, the C-130J/color multipurpose display unit ("CMDU") display system, the C-130H/remote display unit ("RDU") display system, and the F-16/CMFD display system. PTX 1351 at ¶ 11.

Ms. Davis testified that, in a hypothetical negotiation that would take place in October 2002, before the date the '914 patent issued, the "reasonable royalty rate that would be agreed upon is 10% of the Government's cost of procuring the infringing display systems." PTX 1351

---

[25] In this case, in addition to the written direct testimony of the parties' experts on damages, the parties conducted cross-examination of the experts and proffered documents, including deposition transcripts, at an evidentiary hearing conducted on February 27-28, 2007 and March 1-2, 2007 ("DTR 1-2856"). The court also heard testimony relating to defenses at evidentiary hearings on damages on November 13-15, 2006, and December 11-15, 2006 ("DETR 1-1745").

[26] In 1978, Ms. Davis graduated *summa cum laude* from Kansas State University, with a B.S. in Business Administration and Accounting. She is a member of the American Institute of Certified Public Accountants, the American Bar Association, and the Licensing Executives Society. PTX 1351 at ¶4. Ms. Davis has worked on "numerous intellectual property cases" and "conducted complex studies of damages," including "evaluation of lost sales, lost profits, incremental profits, manufacturing and marketing capacities, fixed and variable costs, product line profitability, price erosion, reasonable royalty, unjust enrichment, and prejudgment interest." PTX 1351 at ¶ 2.

at ¶ 12.[27]  This base royalty rate was reached after Ms. Davis's consideration of: the demand for the benefits of the '914 patent technology (PTX 1351 at ¶¶ 99, 101-13); the lack of alternative technologies (PTX 1351 at ¶¶ 99, 114-120); the profitability of the products (PTX 1351 at ¶¶ 99, 121-28); and the licensing history of the parties.  PTX 1351 at ¶¶ 99, 129-32.

Ms. Davis also advised the court that the parties in the hypothetical negotiation would be Honeywell and the Government.  PTX 1351 at ¶ 78.  At that negotiation, Honeywell would offer a non-exclusive license on the '914 patent and the Government would accept, because the CMDU, RDU, and CMFD "display systems" already were purchased or were being used in the C-130J, C-130H, and F-16 aircraft and to cover any other systems purchased in the future utilizing the '914 patent technology.  PTX 1351 at ¶¶ 79-80.  Ms. Davis conceded that Lockheed Martin and/or L-3 Corp. may also be parties to the negotiation with respect to the C-130J/CMDU display system, because they had indemnity agreements with the Government,[28] but neither had any such agreements with respect to the C-130H/RDU or F-16/CMFD.  PTX 1351 at ¶¶ 83-85.  Since L-3 Corp. is the supplier of only a "single component of the display systems," however, it could not adequately represent the Government's interests at a hypothetical negotiation nor would it have an incentive to negotiate a license that would enable the Government to procure display systems utilizing '914 patent technology from L-3 Corp.'s competitors.  PTX 1351 at ¶ 86.

Therefore, to ascertain the relevant product base, Ms. Davis considered the Government's cost to procure the infringing military aircraft display systems, including night vision goggles and a local color display, as installed and delivered in the aircraft, instead of only looking at Lockheed Martin's procurement cost from L-3 Corp.  PTX 1351 at ¶¶ 89-95.  In addition, the display generators sold by Honeywell also should be included in the product base, because the F-16/CMFD cannot function without a display generator.  PTX 1351 at ¶ 97.

At the hypothetical negotiations, Ms. Davis assumed that foremost in Honeywell's mind would be the objective of obtaining a royalty rate consistent with the operating profit margins of its Aerospace segment that were 22% in 2000 and were 18% in 2002 (PTX 1337 (Honeywell 2002 SEC Form 10-K)).  PTX 1351 at ¶¶ 21, 134.  In support, Ms. Davis added that Honeywell would agree to a 10% royalty rate, but only if it applied to the total cost of procuring an entire

---

[27] In confirming the rate, Ms. Davis considered: Lockheed Martin's 20-25% profit on the sale of the C-130J (PTX 1259); Lockheed Martin's ███ profit on the production and support programs for the F-16 (PTX 1020 at 67-69); ITT's ███ average profit margin on Class B and C NVGs (PTX 1006); legacy Honeywell's ███ and ███ earned gross margins on the sale of CMFDs for the F-16 (PTX 138, PTX 1312 at H70131-34) and ███ average gross margin on display generator sales from 1996-1999 (DE 601, Supp. Ex. F-1 & F-2); a 2002 renegotiation between L-3 Corp. and Lockheed Martin in which L-3 Corp. sought profit margins of 12.9% or13.7% on CMDUs used in the C-130J (PTX 1344 at LMCD 0003698); and L-3 Corp.'s 13.4% and 12.7% respective profit margins on CMDU and RDU sales (PTX 1002, Damages Summary, Schedule F1).  PTX 1351 at ¶¶ 123-28.

[28] The record in this case, however, does not include any indemnification agreements.

military aircraft display system, including NVGs and the F-16 CMFD display generator, for a total per unit cost of:

> CMDU and NVGs on C-130J = $9,900 per display system
> RDU and NVGs on C-130H = $6,500 per display system
> CMFD, display generators, and NVGs on F-16 = $9,800 per display system

PTX 1351 at ¶ 136.

In addition, Ms. Davis proffered several reasons why this rate "would be justified." PTX 1351 at ¶ 136. First, "[t]he royalty could be viewed as an 'insurance policy' on an aircraft costing tens of millions of dollars and on pilots' and crew members' lives." PTX 1351 at ¶ 137. Second, the Government's demand for CMDUs was "independent of price," as shown by the fact that the Government purchases spare CMDUs at a price varying from $56,436 to $162,138 per unit. PTX 1351 at ¶ 138 (citing PTX 1003 (CMDU Sales Analysis, Schedule C2a)). Third, in 2002, the Government would place a "high priority" on the use of the '914 patent technology in light of post-9/11 conflicts, and would "not want to compromise its military capability by foregoing the use of full color, NVG compatible displays just to save $6500 to $9900 per display system." PTX 1351 at ¶ 139. Fourth, a royalty of $9,900 per C-130J/CMDU display system represents only a 0.03% to 0.015% increase of the $34 to $66 million total cost to purchase a C-130J aircraft. PTX 1351 at ¶ 140 (citing PTX 1334 at GVT100-007). Fifth, the Government would consider the litigation risk and royalties awarded in other section 1498(a) cases. PTX 1351 at ¶¶ 142, 146 (citing cases). Sixth, the Government would weigh the benefits of the '914 patent technology in light of future procurements, the lack of available non-infringing technologies that could meet the Government's specifications, the "high cost" of attempting to switch to a non-infringing alternative, the risk of owing an even higher royalty after litigation, and agree to pay a $6,500-$9,900 royalty per display system and then to pass on that royalty to the Government as an "allowable cost." PTX 1351 at ¶ 143. Seventh, in light of Lockheed Martin and L-3 Corp.'s estimated ▮▮▮▮▮▮ profit on sales of CMDUs to the Government; their ▮▮▮▮▮ profit on sales of RDUs; and ITT's ▮▮▮▮▮ profit on sales of NVGs, the royalties requested by Honeywell "could be absorbed," by Lockheed Martin without any material effect on its aircraft profitability, particularly since Ms. Davis looked at "operating profits, rather than incremental profits." PTX 1351 at ¶¶ 144-45.

Next, Ms. Davis considered her proposed 10% royalty base rate in light of the relevant factors enumerated in *Georgia-Pacific*. PTX 1351 at ¶¶ 149-73. As to factor 1, there is no established royalty for the '914 patent. PTX 1351 at ¶¶ 150-51. As to factor 2, the Government has not entered into any license for the use of "other patents comparable" to the '914 patent. PTX 1351 at ¶ 152. As to factor 3, the hypothetical negotiation was for a non-exclusive license between Honeywell and the Government, without restriction. PTX 1351 at ¶ 153. As to factor 4, Honeywell used the '914 patent technology in its own displays and therefore "it possibly had an alternative to L-3 [Corp.]'s CMDU." PTX 1351 at ¶ 154 (citing PTX 1295 at H72395-424). As to factor 5, Honeywell understood that the agreed royalty "would provide Honeywell with a pricing advantage . . . where [it] has a competitive display product," but such a royalty "may have implications for its separate negotiations with [other] display manufacturers, aircraft manufacturers or others with respect to direct commercial sales to non-U.S. Government

customers." PTX 1351 at ¶¶ 155-56. As to factor 6, Ms. Davis considered the effect that the '914 patent technology would have on promoting sales of other Lockheed Martin and L-3 Corp. products, *i.e.*, "convoyed sales." PTX 1351 at ¶ 157. Although Ms. Davis did not include "convoyed sales" in the royalty base, she considered them as a factor that favored "an even higher royalty." PTX 1351 at ¶ 162. As to factor 7, Ms. Davis assumed the hypothetical negotiation would be for the full term of the '914 patent, expiring on October 22, 2019. PTX 1351 at ¶ 163. As to factor 8, Ms. Davis looked to the "profitability, commercial success and popularity of the infringing display systems." PTX 1351 at ¶ 164. Ms. Davis considered factors 9 and 10 together, *i.e.*, that the "technology embodied in the '914 patent is a significant improvement over prior art," for which no "available alternative technology . . . could have [been] used to achieve the same results." PTX 1351 at ¶ 165. As to factor 11, Ms. Davis noted the continued incremental increase of the number of night vision displays from 2002 to the present. PTX 1351 at ¶¶ 166 (citing 6/26/06 TR 32, 724). As to factor 12, Ms. Davis was aware of no customary apportionment of profit in the industry and was unable to identify any comparable licenses. PTX 1351 at ¶¶ 168-70. As to factor 13, Ms. Davis was of the opinion that profits should not be apportioned between patented and non-patented elements of the entire display system because, but for the Government's use of the '914 patent technology, there would be "no demand or market for the CMDU, RDU, or CMFD displays." PTX 1351 at ¶ 171. Therefore, Ms. Davis concluded that "*all* of the profits from the sales of these displays [were] attributable to the ['914] invention." PTX 1351 at ¶ 171.

In sum, Ms. Davis calculated the total damages that the Government should pay Honeywell (without delay compensation), as follows:

| Infringing Display Systems | Total Damages |
|---|---|
| C-130J/CMDU Display Systems–Sales to U.S. Government | $5,966,400 |
| C-130J/CMDU Display Systems–Pre-September 2000 Direct Commercial Sales | $3,171,000 |
| C-130H/RDU Display Systems–Sales to U.S. Government | $2,242,800 |
| F-16/CMFD Display Systems–Sales to U.S. Government and Foreign Military Sales | $12,275,700 |
| **Total** | $23,655,900 |

PTX 1351 at ¶¶ 14, 174-92 (citing PTX 1002 (Damages Summary, Schedule B1, B2, C, D, E); PTX 1003-06 (Sales Data for CMDUs, RDUs, CMFDs, and NVGs)).

### ii.    The Direct Testimony Of Colonel William S. Lawrence.

Colonel Lawrence[29] testified:

> Based upon my experience, I believe the Government will typically choose to
> equip its military pilots with the best available technology rather than settle for
> "second best" technology or other alternatives just to save money.  This is
> particularly the case where aircraft costing tens of millions of dollars are involved
> and the incremental additional costs to add upgraded equipment are on the order
> of thousands or tens of thousands of dollars.  Stated another way, additional costs
> and expenses on the order of tens of thousands of dollars are usually not material
> when considering the feasibility of an [sic] multi-million dollar aircraft
> procurement or upgrade, and major decisions regarding which technology to
> implement are rarely made on the basis of such relatively low-cost expenditures.

PTX 1352 at ¶ 22.

### b.    The Government's Expert Opinions.

The Government also proffered two expert damage witnesses: Mr. Phillip Green, a
founding principal in the consulting firm of Hoffman, Alvarez & Company LLC; and Dr. Harry
Lee Task, Ph.D.

### i.    The Direct Testimony Of Mr. Phillip Green.[30]

Mr. Green was retained by the Government to provide an opinion regarding damages
owed Honeywell and to respond to Ms. Davis's expert opinion.  DE 601 at ¶ 1.  Mr. Green
applied the methodologies approved in *Tektronix* to establish a "basis for a royalty rate by
deducting from the infringer's proposed selling price for the infringing product, direct product,
marketing and administration costs, and normal profit margins to arrive at a residual profitability
margin that could then serve as a starting point for the determination of a royalty rate."  DX 601

---

[29] Colonel Lawrence had 40 years of experience as a pilot, of which 26 years were with
the United States Marine Corps.  PTX 1352 at ¶ 1.

[30] Mr. Green graduated from Rutgers College with a B.A. in history and received a
Masters in Business Administration from the Rutgers Graduate School of Management, with a
concentration in Accounting.  DE 601 at ¶ 157.  Mr. Green is a Certified Public Accountant and
licensed in the State of New York.  DE 601 at ¶ 157.  He also is a Certified Management
Accountant and accredited in Business Valuation by the American Institute of Certified Public
Accountants.  DE 601 at ¶ 157.  In October 1986, Mr. Green helped found the consulting firm of
Hoffman Alvary & Company, L.L.C., located in Newton, Massachusetts.  DE 601 at ¶ 156.
Prior to that time, he was a Senior Manager in the Dispute Analysis and Corporate Recovery
Services practice of Price Waterhouse LLP.  DE 601 at ¶ 156.  His practice has focused on
intellectual property matters, including "analyzing damages in infringement claims . . . as well as
valuing patent portfolios and helping clients to negotiate patent licenses."  DE 601 at ¶ 3.

at ¶ 17.  Mr. Green described the *Tektronix* methodology for calculating a royalty rate starting point, as follows:

> Infringer's Revenue Per Unit
> minus
> Direct or Variable Costs of Manufacturing Per Unit
> minus
> Fixed Costs, *i.e.*, Marketing and Administrative Costs, Per Unit
> minus
> Infringer's "Normal" Profit
> equals
> Residual Profit (starting point for royalty rate)

DE 601 at 12 (adapted from Figs. 3 and 4), ¶¶ 19-21.

Having considered the data provided by the Government, Mr. Green's opinion was that a reasonable royalty would range between $750 and $1,000 per CMDU and RDU so that, as of August 2006, damages would be between $842,250 and $1,123,000, excluding delay compensation.  DE 601 at ¶ 8(b)-(c).

Following the *Tektronix* analysis, Mr. Green ascertained that the starting point for determining a royalty rate required deducting L-3 Corp.'s 2002 "normal profit" from the profit L-3 Corp. earned on its RDU and CMDU sales.  DE 601 at ¶ 20 (concluding that "Defendant's Normal Profit" meant its "overall operating income"); DE 601 at ¶ 26 (explaining his methodology).  Mr. Green calculated this amount on L-3 Corp.'s RDU and CMDU sales to be between 12.7% and 13.4%.  DX 601 at ¶¶ 22-23.  Utilizing information available from L-3 Corp.'s Securities and Exchange Commission ("SEC") Form 10-K's for the years 2000-2002, he determined that L-3 Corp.'s "average normal profit" on sales was 11.5%.  DE 601 at ¶¶ 24-25.  Then, Mr. Green calculated the "residual share" of L-3 Corp.'s profits for RDUs and CMUs (using L-3 Corp.'s 2002 11.32% operating income instead of the 2000-2002 11.5% "average operating income") to arrive at a "residual share of profits" or royalty "starting point" of $683 per RDU unit and $984 per CMDU unit.  DE 601 at ¶¶ 26-28.

Next, Mr. Green analyzed 13 of the 15 *Georgia-Pacific* factors in five general categories, *i.e.,* market royalty rates (factors 1, 2, 12); those related to the patent (factors 7, 9, 10, 12); the patentee's profitability (factors 6, 8, 13); the accused infringer's profitability (factors 6, 11, 13); and the patentee's use of the technology (factors 3, 4, 5).  DE 601 at ¶ 32.  He considered factors 1, 3, 4, 6, 9-11, and 13-15 as "the most valuable in this case."  DE 601 at ¶ 45.

Mr. Green advised the court that, as to factor 1, Honeywell had no licensing agreement for the use of the '914 patent and the two internal agreements proffered by Honeywell were not relevant.  DE 601 at ¶¶ 46-56.

As to factor 2, Mr. Green indicated that he was not aware of any licenses entered into by the Government, Lockheed Martin, or L-3 Corp. for similar technologies to the '914 patent.  DE 601 at ¶ 57.

As to factor 3, Mr. Green assumed that Honeywell conceded that the purchasers of CMDUs, RDUs, and other displays also would receive an "implied license" to use NVGs. DE 601 at ¶¶ 58-59. Therefore, NVGs would not be included in the royalty base. DE 601 at ¶ 59.[31] Mr. Green also assumed that, since L-3 Corp. manufactured and sold the military aircraft displays prior to the issuance of the '914 patent, neither L-3 Corp. nor the Government received any "know how, technical assistance, marketing assistance, trademarks or other intellectual property from Honeywell." DE 601 at ¶ 61. Under a Government license of the '914 patent technology, L-3 Corp. would receive the right to manufacture and sell the licensed products, without the threat of litigation, *i.e.*, the "freedom to operate," so the royalty rates would be "lower than those that would be negotiated if other technology or technical assistance were necessary." DE 601 at ¶ 61. Mr. Green also assumed that a non-exclusive license would warrant a lower royalty rate. DE 601 at ¶ 62.

As to factor 4, Mr. Green advised that since Honeywell unsuccessfully attempted to solicit potential licenses for technology based on the '914 patent, a lower royalty rate would be warranted than if Honeywell attempted to retain its patent monopoly. DE 601 at ¶ 63.

As to factor 5, Mr. Green advised that since the Government was not a competitor of Honeywell, it would have negotiated a lower royalty rate than if the hypothetical negotiation took place between Honeywell and L-3 Corp. DE 601 at ¶ 64.

As to factor 6, Mr. Green testified that the documents did not evidence any "convoyed sales," as described by Ms. Davis, resulting from the technology covered by the '914 patent, other than spare parts. DE 601 at ¶¶ 65-66, 69. As to spare parts, Mr. Green did not see any indication that Honeywell or L-3 Corp. earned greater margins from those sales that would warrant a higher royalty rate. DE 601 at ¶ 66. Mr. Green also found no evidence that generators were sold by Honeywell because of the '914 patent, and therefore they should not be included in the royalty base. DE 601 at ¶ 67.[32]

As to factor 7, the fact that the '914 patent would have just issued at the time of the negotiation would weigh in favor of a higher royalty, assuming that the license would have been for the entire term of the patent. DE 601 at ¶ 70.

As to factor 8, Mr. Green accepted that Honeywell sold 1116 CMFD units to Lockheed Martin and the Government during 1996-1999, for a total of $56 million, but noted that

---

[31] Mr. Green advised that, if the court disagreed with this approach, in the alternative, any compensation due for the NVGs could be accounted for by an increase in the royalty rate (not the product base). DE 601 at ¶ 60.

[32] Therefore, Mr. Green advised that, if the court decides to consider the display generators, the profits earned would "influence the royalty rate negotiated, not the number of units to which the royalty is applied . . . [and] would <u>not</u> be included in the royalty base." DE 601 at ¶ 68. Mr. Green further noted that the gross margins were ███ on generators, *i.e.*, ██% higher than Honeywell's margin on overall product sales. DE 601 at ¶ 68.

Honeywell provided only data for gross profits of 22% and no data on its operating profits, thereby overstating the profits actually earned on the CMFD sales. DE 601 at ¶¶ 71-72. Honeywell's profits in 2002 on other components sold to the Government for the C-130J were in the ████ range. DE 601 at ¶ 75 (citing LMCD000606751-6761). Moreover, the fact that Honeywell "only earned gross profits of ████ greater than its normal gross profits from the sales of CMFDs including the patented display system . . . indicates that even to Honeywell, the technology was not especially valuable." DE 601 at ¶ 77.

Mr. Green considered factors 9 and 10 together, first noting that although the '914 patent is directed to allowing a local display to emit light in excess of 620nm and remain NVG compatible, the '914 patent does not claim invention of: CMDUs, RDUs, and CMFDs; night vision goggles; LCDs; projection displays; or any particular display technology. DE 601 at ¶ 78. Instead, the '914 patent simply describes "a way to have a full color display which is night-vision goggle compatible and still ha[ve] something which serve(s) as a red primary." DE 601 at ¶ 78 (quoting Honeywell's counsel at DETR at 867). In addition, Mr. Green advised the court that there were acceptable non-infringing substitutes and the U.S. Army operates aircraft with non-full color displays. DE 601 at ¶ 79 (citing PTX 1212 at 221-22 (7/31/06 Pierce Dep.)[33] and the 11/3/06 Expert Report of Dr. Harry Lee Task).

As to factor 11, L-3 Corp. sold 902 CMDUs and 345 RDUs to Lockheed Martin or the Government for inclusion in C-130H and C-130J aircraft. DE 601 at ¶ 80. On these sales, L-3 Corp. had operating profits of 12.7% on RDU sales and 13.4%, or approximately 2% more than its normal operating profit, on CMDU sales. DE 601 at ¶ 80. In considering contracts to provide RDUs and CMDUs, the Government has allowed overall profits of no more than 12.5% on the displays. DE 601 at ¶ 81.[34]

Mr. Green considered factors 12 and 13 together, first noting that, where the patented technology does not cover the value of the entire device, apportioning all of the profits from the sale of a product to the patented technology "over-compensates" the patent owner. DE 601 at ¶ 82. Therefore, Mr. Green recommended estimating the portion of the profits that stem from the patented feature by comparing the total cost to manufacture the product with the cost to manufacture the accused feature. DE 601 at ¶ 82. In calculating the operating income attributable to the filter systems in L-3 Corp.'s CMDUs, Mr. Green decided that 12% of the total costs of manufacture was related to the accused feature. DE 601 at ¶ 85. Using this portion of total costs, he found that the patented technology added at most $693 per unit to operating income. DE 601 at ¶ 86. Performing the same calculation for L-3 Corp.'s RDUs, Mr. Green concluded that the '914 patent added at most $652 per unit to operating income. DE 601 at ¶ 87-90.

In sum, Mr. Green was of the opinion that the *Georgia-Pacific* factors had "little or no effect on the economic boundaries of the hypothetical negotiations[.]" DE 601 at ¶ 105.

---

[33] The cited pages of the Pierce deposition, however, do not refer to non-full color displays or non-infringing substitutes.

[34] Mr. Green, however, cited to no source for this statement.

Therefore, he advised the court that the royalty rate negotiated between Honeywell and L-3 Corp. only would have been "slightly higher than the financial benefits derived from [an] analytical approach" with a "starting point of between $683 and $894." DE 601 at ¶ 106. Since the *Georgia-Pacific* analysis indicates a royalty rate higher than the profits apportioned to the patented '914 technology, Mr. Green "concluded that the royalty rate negotiated would have been between $750 and $1000 per CMDU and RDU unit." DE 601 at ¶ 106.[35]

Moreover, Mr. Green's review of L-3 Corp. invoices and other documents also established that L-3 Corp. sold 902 CMDUs for use in the C-130J aircraft in the relevant time period, of which 294 CMDUs were installed in aircraft sold to foreign governments and not subject to 28 U.S.C. § 1498(a). DE 601 at ¶ 111.[36] Of the 294 CMDUs sold to foreign governments, however, 156 occurred prior to the September 7, 2000 termination of the Invention Secrecy Act Order. DE 601 at ¶ 112.

In sum, Mr. Green calculated the number of CMDU sales for the C-130J, as follows:

### L-3 Corp.'s CMDU Unit Sales for C-130J

|  | Pre Sept. 2000 | Post Sept. 2000- Oct. 21, 2002 | Post Oct. 21, 2002 | Total |
|---|---|---|---|---|
| US Government Sales | 244 | 128 | 530 | 902 |
| [Minus]: Non-US Government CMDU's | | | | |
|    Aircraft | 156 | 40 | 52 | 248 |
|    Spares | | 2 | 44 | 46 |
| Total L-3 CMDU Sales to US Government | 88 | 86 | 434 | 608 |

DE 601 at ¶ 112 & fig. 18.

As for the RDUs, Mr. Green noted that the parties stipulated that L-3 Corp. sold 345 RDU units for the C-130H. DE 601 at ¶ 113.

---

[35] Mr. Green was satisfied that these royalties were reasonable because they were *in excess* of the profits that L-3 Corp. realized per unit attributable to the filter components of $693 per CMDU, and $652 per RDU. DE 601 at ¶ 107. A royalty between $750 and $1000 per CMDU would give L-3 Corp. operating profits of 11.1% to 11.7% of sales. DE 601 at ¶ 108. This approximately equals L-3 Corp.'s 11.5% average operating profit margin. DE 601 at ¶ 108. In effect, this would attribute "all of the excess profits [L-3 Corp.] earn[ed] on CMDUs over its normal rates to the use of the '914 patent," without accounting for what effect the contribution of L-3 Corp.'s "own technology, design and manufacturing efforts to these products" might have had on the superior margins. DE 601 at ¶ 108. Mr. Green made a similar analysis of L-3 Corp.'s RDU operating profit margins. DE 601 at ¶ 109, He also concluded that a royalty rate of between $750 and $1,000 per unit would be appropriate for the CMFDs. DE 601 at ¶ 110.

[36] Of the remaining 608 CMDUs, 244 unit sales were made prior to termination of the September 7, 2000 Invention Secrecy Act Order regarding Honeywell's '269 application. DE 601 at ¶ 112.

Mr. Green also stated that Honeywell sold 1269 CMFDs for the F-16 aircraft, of which 1116 were sold to the Government.  DE 601 at ¶ 114 & fig. 19.  The remaining 153 CMFDs were sold for foreign military use abroad, and not subject to 28 U.S.C. § 1498(a).  DE 601 at ¶ 114 (citing 28 U.S.C. § 1498(c)).

Mr. Green calculated Honeywell's damages based on a royalty rate of $750 per CMDU and RDU unit. DE 601 at ¶ 115.

### Reasonable Royalty Calculation ($750 per Unit)

|  | Unit Sales | Royalty Per Unit | Royalty Damages |
|---|---|---|---|
| 28 U.S.C. § 1498(a) |  |  |  |
| CMDU | 608 | $750 | $456,000 |
| RDU | 345 | $750 | $258,750 |
|  |  |  | $714,750 |
| 35 U.S.C. § 183 |  |  |  |
| CMDU | 158 | $750 | $117,000 |
| Total CMDU & RDU Royalty Damages |  |  | $831,750 |
| 35 U.S.C. § 183 |  |  |  |
| CMFD | 14 | $750 | $10,500 |
| Total CMDU, RDU & CMFD Royalty Damages |  |  | $842,250 |

DE 601 at ¶ 115 & fig. 20.

Mr. Green also calculated Honeywell's damages based on a royalty rate of $1000 per CMDU and RDU unit.  Assuming that all these damages were determined by the court to be

reasonable, Honeywell would be entitled to $1,123,000, excluding delay compensation,[37] as set forth below:

### Reasonable Royalty Calculation ($1,000 per Unit)

|  | Unit Sales | Royalty Per Unit | Royalty Damages |
|---|---|---|---|
| 28 U.S.C. § 1498(a) |  |  |  |
| CMDU | 608 | $1000 | $608,000 |
| RDU | 345 | $1000 | $345,000 |
|  |  |  | $953,000 |
| 35 U.S.C. § 183 |  |  |  |
| CMDU | 156 | $1000 | $156,000 |
| Total CMDU & RDU Royalty Damages |  |  | $1,109,000 |
| 35 U.S.C. § 183 |  |  |  |
| CMFD | 14 | $1000 | $14,000 |
| Total CMDU, RDU & CMFD Royalty Damages |  |  | $1,123,000 |

DE 601 at ¶ 116 & fig. 21.

## ii.    The Direct Testimony of Dr. Harry Lee Task.[38]

Dr. Task was requested by the Government to provide an opinion on the "issues relevant to the damages phase of this case[.]" DE 600 at ¶ 1. Dr. Task testified that the '914 patent provided "little or no benefit, compared to non-infringing alternatives." DE 600 at ¶ 3. "The '914 patent was not the first to make color displays . . . compatible with the use of NVGs . . . . In fact, color in the cockpit, including warning lights and indicators that included red, were known and used with NVGs well before the '914 patent was filed in October 1985." DE 600 at ¶ 4. "Reduced to its most basic elements, the invention of claim 2 [of the '914 patent] allows light in the aircraft above 620[nm] to be compatible with the use of night vision goggles *only* if that light above 620[nm] comes from a display that uses three filters. The '914 patent does not enable anyone to 'own the night.'" DE 600 at ¶ 3.

Dr. Task's principal critique of Ms. Davis's damage analysis was her belief that "the technology embodied in . . . the '914 patent allows the use of both full color displays and night vision goggles in the vicinity of one another in an aircraft cockpit, whereby light from the full color display does not interfere with the operation of the night vision goggles and the display can

---

[37] Mr. Green stated that the appropriate delay compensation would be computed by using one-year Treasury bill interest rates. DE 601 at ¶ 117. These rates would be applied annually, using compound interest, based on the amount of royalties owed to Honeywell. DE 601 at ¶ 117.

[38] Dr. Task was proffered as an expert in the fields of human factors, optical science, displays, night vision goggles, and interaction and compatibility of displays with night vision goggles. DE 600 at ¶ 1.

be viewed by the pilot or other crew members in full color." DE 600 at ¶ 19 (quoting PTX 1351 at ¶¶ 46-47). The parties, however, did not request the court to construe the term "full color display," because that term is not used in claim 2 of the '914 patent. DE 600 at ¶ 19. Further, the "appearance and functional utility of the 'full color display' before and after the application of the invention has not been determined[.]" DE 600 at ¶ 19. Therefore, in Dr. Task's opinion, Ms. Davis "overstates the importance of the '914 invention." DE 600 at ¶ 19. Dr. Task also took issue with Ms. Davis's conclusion that the '914 patent technology was "an improvement over the prior art because, prior to the invention, night vision goggles could not be used effectively in the vicinity of full color displays, and there were no full color displays that were compatible with night vision goggles." DE 600 at ¶ 20 (quoting PTX 1351 at ¶¶ 46-47). Dr. Task stated that NVGs were used in the vicinity of full color displays prior to the '914 patent. DE 600 at ¶¶ 20-23 (discussing the prior art).

Dr. Task also disagreed with Ms. Davis's opinion that there were no acceptable non-infringing substitutes for the '914 patent technology. DE 600 at ¶¶ 26, 28-31. According to Dr. Task, "a color cathode-ray tube display using shadow mask or beam penetration technology" would not require "three filters to make them NVG compatible" and therefore would not infringe the '914 patent. DE 600 at ¶ 30 (citing DE 522 (Scoughton et al.)). Using "monochrome displays in the cockpit that do not emit light above 620[nm] and/or do not use three filters at the display" is another alternative. DE 600 at ¶ 31. Dr. Task added that the Army currently uses "Class A NVIS compatible cockpit displays with NVGs that have a minus-blue filter . . . [that] are preferable because they permit the use of Class A NVGs which are more sensitive and provide better quality viewing outside the cockpit than Class B NVGs." DE 600 at ¶ 31. The Army's continued use of Class A NVIS compatible cockpit displays with NVGs evidences the availability of alternatives that are "not only acceptable, but also preferred . . . in some applications." DE 600 at ¶ 31.

### 3.   Determination Of "Reasonable And Entire Compensation."

Since lost profits are not at issue here (7/19/12 RTR at 117), the court first is required to determine when a hypothetical negotiation for a license for the '914 patent would take place and identify the parties to that negotiation. Then, the court is required to determine the "reasonable and entire compensation" owed to Honeywell by: 1) calculating a base reasonable royalty rate; 2) considering that rate, in light of the *Georgia-Pacific* factors; and 3) identifying the product(s) to which the royalty rate should be applied.

### a.   The Date Of The Hypothetical Negotiation.

In this case, the '914 patent issued on October 22, 2002. DMX 36 at DE-1682 to -88. Therefore, the court has determined that a hypothetical negotiation to obtain a license for the '914 patent would occur no later than that date. *See* 28 U.S.C. § 1498(a); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (assuming a successfully negotiated agreement would commence "just before" infringement); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.3 (Fed. Cir. 1995) (en banc) (determining that the terms of a licensing agreement would be reached "at the time the infringement began"); *Decca Ltd. v. United States*, 640 F.2d

1156, 1167 (Ct. Cl. 1980) (holding that the value of a license is determined at the "time the Government takes the license").

### b.   The Parties To The Hypothetical Negotiation.

In this case, the court has determined that the hypothetical negotiation would be between Honeywell and the Government, albeit with the input of Lockheed Martin, the manufacturer of the military aircraft at issue, and that firm's principal aircraft display supplier, L-3 Corp.  *See Rite-Hite Corp.*, 56 F.3d at 1554 (holding that the "hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer[.]").

### c.   The "Reasonable" Royalty Rate.

Honeywell's expert, Ms. Davis, opined that a base 10% royalty rate is reasonable, based on: 1) the demand for the benefits of Honeywell's technology; 2) the absence of an alternative technology providing the same benefits; 3) the profitability of the products; and 4) the licensing history of the parties.  PTX 1351 at ¶¶ 134-48.  Ms. Davis assumed that Honeywell "would come into the hypothetical negotiation seeking a royalty consistent with the operating profit margins of [Honeywell's] Aerospace segment for the preceding years, 2000 and 2001." [39]  PTX 1351 at ¶ 134.  Therefore, Honeywell argued that, not only is Ms. Davis's approach consistent with governing precedent requiring that a reasonable royalty must be related to the relevant facts at issue, but also with authority delimiting how those factors would be discussed in a hypothetical negotiation at the relevant time.  11/2/07 Pl. D Br. at 12-16.

The Government criticized Ms. Davis for "arbitrarily picking a 10% rate out of thin air" and looked only at the justifications to support Honeywell's royalty demand, without explaining why a 10% royalty rate is quantitatively tied to the facts of this case.  11/18/11 Gov't D Reply at 12 (citing PTX 1351 at ¶¶ 134, 136).  In contrast, the Government's expert, Mr. Green, used an analytical approach supported by substantial evidence in the record to ascertain a reasonable starting point for the hypothetical negotiation.  11/18/11 Gov't D Reply at 12 (citing DE 601 at ¶¶ 15, 22-29).

L-3 Corp. added that without a reliable starting point, Honeywell's proposed royalty rate is arbitrary and its arguments for increasing or decreasing that rate are meaningless.  11/4/11 L-3 D Br. at 5.  The only reasonable damage calculation that survives the heightened scrutiny required by recent precedent is that provided by Mr. Green, who calculated a royalty based on L-3 Corp.'s display sales.  11/4/11 L-3 D Br. at 11-12.  In fact, Honeywell offered no evidence, other than the *ipse dixit* of Ms. Davis, as to the royalty rate the parties would use to start their negotiations to license the '914 patent or reasonably would settle on a 10% rate.  11/4/11 L-3 D Br. at 7.  L-3 Corp. further maintained that other military requirements not covered by the '914 patent, such as daylight readability, contribute far more to the profitability of the infringing displays than the '914 patent.  11/4/11 L-3 D Br. at 9-12.

---

[39] These profit margins were 22% and 18%, respectively.  PTX 1351 at ¶ 21.

Honeywell countered that Mr. Green calculated his royalty rate first by determining L-3 Corp.'s actual profits for the CMDU and RDU and then subtracting L-3 Corp.'s company-wide profits to yield the residual share of operating profit attributable to the Government's infringement. 11/18/11 Pl. D Resp. at 20 (citing DE 601 at ¶ 26, fig. 7); *see also Lucent*, 580 F.3d at 1324 ("[T]he analytical method[] focuses on the infringer's projections of profit for the infringing product.")). But, the evidence demonstrated that, if Mr. Green used the correct number for L-3 Corp.'s "normal profit," the "starting point" for his *Georgia-Pacific* analysis, the result would have been $2,239 per unit, rather than $894 per unit. 11/18/11 Pl. D Resp. at 20 (citing DTR 2414 (Green) (agreeing with a $2,239 or 5.2% residual profit, using L-3 Corp.'s profit for its Specialized Products segment, as "normal" profit)).[40] "By characterizing this amount as only slightly higher than its proposed royalty, the Government concedes that it would be willing to pay a reasonable royalty of more than $2,200 per unit." 11/18/11 Pl. D Resp. at 20 (citing 11/30/07 Gov't D Reply at 2).

The court's analysis begins with the United States Court of Appeals for the Federal Circuit instruction that "there must be a basis in fact to associate [a proposed reasonable royalty rate] to the particular hypothetical negotiation at issue in the case." *Uniloc*, 632 F.3d at 1317 (requiring that "expert testimony opining on a base reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place'") (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)); *see also Grain Processing Corp. v. American Maize–Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) ("To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture.").

In this case, Honeywell's expert, Ms. Davis, advised the court that, "[i]n view of . . . *high demand* and lack of alternative technologies, Honeywell would come into the hypothetical negotiation seeking a royalty consistent with the operating profit margins of its Aerospace segment for the proceeding years, 2000 and 2001." PTX 1351 at ¶ 134 (emphasis added). But, the record establishes that Honeywell was unsuccessful in obtaining a license for the '914 invention from likely commercial purchasers. PTX 564; PTX 568; PTX 570; PTX 571; PTX 572; PTX 577; PTX 578; PTX 579; PTX 580; PTX 581.[41] Ms. Davis also concluded that "the parties would reach agreement on a 10% royalty rate . . . [that] would be justified by" a number of considerations, particularly the relatively small amount of this rate size in comparison with the total cost of a C-130J aircraft. PTX 1351 at ¶¶ 136, 140. But, this was an impermissible application of the "entire market value" rule. *See Lucent*, 580 F.3d at 1337-38 (rejecting application of the entire market value rule to an entire product where the vast majority of its features do not infringe). In addition, Ms. Davis completely failed to consider the import of

---

[40] Prior to 2005, L-3 Corp.'s aircraft displays were manufactured by and accounted for in L-3 Corp's Aerospace segment. After 2005, those displays were manufactured by and accounted for in the company's Specialized Products segment. DTR at 2397-99 (Green).

[41] Ms. Davis's consideration of an "intra-company" Honeywell license with a 1.5%-9% royalty rate also is misplaced, since the technology at issue is not relevant to this case. PTX 1351 at ¶ 130.

MIL-L-85762A in creating a demand for the invention described in the '914 patent. Therefore, as a matter of law, Ms. Davis's analysis failed to adhere to the requirement that the expert damage testimony must be tied to the "claimed invention's footprint in the market." *Uniloc USA, Inc.*, 632 F.3d at 1317; *see also Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 285 (N.D.N.Y. 2009) (Rader, J., sitting by designation) (criticizing plaintiff's expert for failing to link customer demand for the base to the claimed invention). To finesse this problem, Honeywell's counsel argued that arriving at a 10% rate was reasonable in light of the royalty rates endorsed in other cases. RTR at 110-13, 122-24. But, that suggestion ignores the admonition of our appellate court not to assess a royalty rate based on unrelated technology. *See ResQNet.com, Inc.*, 594 F.3d at 870 (rejecting a comparison of licenses as improper where the licenses used for comparison bore "no relationship to the claimed invention").

The Government's expert proposed base royalty rate is equally problematic. Mr. Green's analytical method compared the difference between L-3 Corp.'s actual profits on the sale of infringing aircraft displays to L-3 Corp.'s company-wide "normal profit" – whatever that term means. DE 601 at ¶¶ 22-29. Mr. Green cited *Tektronix* to support this approach, because the residual profit margin that the plaintiff hoped to earn in that case on the sale of infringing goods was comparable to the licensing revenue that the plaintiff reasonably could have expected to earn . . . but for the infringement. *See Tektronix*, 552 F.2d at 350-51. But, Mr. Green's reliance on the "normal profit" for L-3 Corp., as a whole, yielded a substantially lower royalty rate than would be the case if he had used the operating profit margin of L-3 Corp.'s Specialized Products segment, the unit that manufactured and sold the infringing military aircraft display systems. DTR at 2411-14. In addition, Mr. Green justified the use of L-3 Corp.'s overall "normal profits" in his proposed base royalty rate, because he assumed that amount is relatively stable compared to the profit margins of many of the other products sold by the Aviation segment that are constantly changing or have nothing in common with the infringing products. DTR 2411. But if this is true, then it is also certainly the case that L-3 Corp.'s portfolio, as a whole, is constantly changing, as well.[42] Apparently, Mr. Green was satisfied that these changes would even out over time. DTR 2407-08 ("[O]perating profits of the company . . . are fairly consistent from year to year."). Most of the products sold by L-3 Corp., however, have no common features with the infringing military aircraft display, so the profits from sales of the products do not provide evidence "tied to the relevant facts and circumstances of the particular case at issue[.]" *Uniloc*, 632 F.3d at 1318; *see also ResQNet.com, Inc.*, 594 F.3d at 869 (same). In addition, Mr. Green

---

[42] According to L-3 Corp.'s March 11, 2003 SEC 10-K disclosures, the operating profit margin for L-3 Corp.'s Aviation segment fell from 32% to 14% between FY 2000 and 2002. DE 605 at 3 (dividing operating income by sales). Similarly, the operating profit margin for L-3 Corp.'s specialized products segment increased from 7.6% to 10% during this period. DE 605 at 3. The operating profit margin of Honeywell's Aerospace segment fell from 22% in 2000 to 15% in 2002. DE 610 at 1 (Honeywell International's March 6, 2003 SEC Form 10-K, dividing segment profit by net sales). The operating profit margin of L-3 Corp. as a whole was 11.7% in 2000 and 2001, and 11.3% in 2002. DE 605 at 3.

assumed there were substitutes for the invention disclosed in the '914 patent, but the record has scant evidence that such substitutes existed.[43]

For these reasons, the court has determined that expert opinions of both parties are not tied to the record and/or are contrary to law. *See Uniloc*, 632 F.3d at 1317 ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion."); *see also Apple, Inc. v. Motorola, Inc.*, 2012 WL 1959560 at *4 ("The size of the disparity [of damages] is a warning sign. Either one of the parties is off base, or the estimation of a reasonable royalty is guess work[.]"). As a result, the court is required to return to the record to ascertain whether a reasonable royalty rate can be ascertained. *See Dow Chem. Co. v. Mee Indus. Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003) ("[T]he . . . court's obligation to award some amount of damages does not mean that a patentee who puts little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not reasonable."); *see also Tektronix*, 552 F.2d at 348-49 (affirming the trial court's rejection of the methods proposed by parties' experts and determination that the best method of computing compensation would be to ascertain a reasonable royalty rate by applying the willing-buyer/willing-seller method discussed in *Georgia-Pacific*).

As previously discussed, Honeywell's efforts to license the '914 patent were unsuccessful. In addition, the record contains no market studies nor customer surveys "to ascertain whether the demand for [L-3 Corp.'s military aircraft displays was] driven by the patented technology." *LaserDynamics v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012).[44] What the record does show is that, between 1996 and 1999, Honeywell's gross profit on CMFD sales routinely achieved significantly higher margins than sales of military aircraft displays sold to the Government by L-3 Corp. Likewise, between 2000 and 2002, Honeywell's Aerospace segment had operating profit margins over twice that of L-3 Corp.'s Specialized Products segment,[45] although Honeywell, as a whole, reported losses of $945 million and $422

---

[43] Mr. Green's testimony as to Honeywell's entitlement to damages under 35 U.S.C. § 183 (DE 601 ¶¶ 112, 115-16) is moot in light of the court's liability decision under the Invention Secrecy Act.

[44] The evidentiary hearing on Honeywell's damage claim concluded on March 2, 2007. The appellate court issued *ResQNet.com* in 2010 and *Uniloc* in 2011. On remand, the court afforded the parties an opportunity to submit additional briefing in light of the new evidentiary guidance on damages discussed in these cases. No party, however, requested that the court reopen the record to allow supplemental evidence in light of the deficiencies in their damages proof. *See Apple, Inc. v. Motorola, Inc.*, 2012 WL 1959560 at *9 ("the only evidence that could be provided would be consumer-survey evidence; it is much too late for [plaintiff] to be permitted to conduct a survey.").

[45] Until 2005, L-3 Corp.'s Aviation segment sold the infringing displays, but after this date that business was moved to L-3's Corp's Specialized Products segment. DTR at 97-99. Therefore, Mr. Green advised the court that L-3 Corp.'s Specialized Products segment was the relevant business unit for purposes of the hypothetical negotiation.

million in 2002 and 2001, respectively. [46]   Nevertheless, on a segment-level comparison, Honeywell's Aerospace segment achieved higher profit margins than L-3 Corp.'s Specialized Products segment during the period leading up to the hypothetical negotiation that would have taken place on October 22, 2002.

If Honeywell negotiated with the Government for a non-exclusive license for the invention described in the '914 patent on October 22, 2002, after L-3 Corp.'s military aircraft displays already were in use, an argument could be made that Honeywell would have bargained for a royalty rate consistent with the average profit margin of its Aerospace segment in 2000 through 2002, *i.e.*, the years leading up to and including the hypothetical negotiation. But, since the steep decline in the profitability of both Honeywell's and L-3 Corp.'s aerospace businesses in 2001 and 2002 was due to factors unrelated to the profitability of selling the military aircraft displays at issue, the court has decided that it is more reasonable to consider the average profitability of L-3 Corp.'s Specialized Products segment and Honeywell's Aerospace segment over a three-year period. According to SEC Form 10-K disclosures for 2000, 2001, and 2002, the average operating profit margin of Honeywell's Aerospace segment was 18.6%, while L-3 Corp.'s Specialized Products segment was 9%. DE 610 at 1 (Honeywell Int'l March 6, 2003 SEC Form 10-K, dividing the Aerospace segment profit by Aerospace net segment sales); DE 605 at 3 (L-3 Corp. March 11, 2003 SEC Form 10-K, dividing the Specialized Products segment operating income by the Specialized Products segment sales). From this data, the court has ascertained that the sales of the CMDU and RDU military aircraft displays were more profitable than average for L-3 Corp.'s Specialized Products segment. *Compare* DE 602o (showing L-3 Corp.'s operating profits on CMDU and RDU sales) *with* DE 605 (showing segment data). Consequently, the negotiators necessarily would consider the profitability attributable to the invention disclosed in the '914 patent, as evidenced by the profit margins earned by Honeywell and L-3 Corp. on the sale of their aircraft displays.

In *Tektronix*, the United States Court of Appeals for the Federal Circuit affirmed a trial court's finding that a "residual [profit] share" could be determined by the amount by which the profit on the infringing product exceeded the infringer's average profit. *See Tektronix*, 552 F.3d at 350. In this case, L-3 Corp.'s gross profit on CMDU and RDU sales was 13.2%. DE 602o. As previously discussed, the average profit of L-3 Corp.'s Specialized Products segment for 2000-2002 was 9%. Therefore, the residual profit on CMDU and RDU sales would be 4.2%. In addition, the *Tektronix* court was persuaded by the trial court's reasoning that the plaintiff would have sought and received a greater royalty than the residual profit, which was less than a third of the plaintiff's profit on its non-Government sales of the product. *See Tektronix*, 552 F.3d at 350. In this case, however, the court has determined that no upward adjustment is warranted, even though Honeywell's Aerospace segment achieved a 19% profit, *i.e.*, more than four times higher than the residual profit on L-3 Corp.'s CMDU and RDU sales. The reason is that, unlike the patentee in *Tektronix*, Honeywell did not offer any evidence that it "took the risks and bore the expense of developing the [infringing products] and creating a market for them[.]" *Tektronix*,

---

[46] Honeywell explained that these losses resulted from declining aerospace business sales, primarily due to a general weakness in the economy and financial difficulties of the airline industry in the wake of the 9/11 terrorist attacks. DE 610 at 1.

552 F.2d at 350.  In the court's judgment, the record clearly established that the market was created by the requirements of the MIL-L-85762A, instead of any patent at issue in this case.

For these reasons, the court has determined that a reasonable base royalty rate in this case is 4.2%, to be further considered in light of the *Georgia-Pacific* factors.

### d.    Consideration Of The Relevant *Georgia-Pacific* Factors.

Ms. Davis, testified that Honeywell would come to a hypothetical negotiation seeking a royalty rate between 18%-22%, reflecting the operating profit margins on Honeywell's Aerospace segment for 2000 and 2001.  PTX 1351 at ¶¶ 21, 134.  In addition, Honeywell would be the beneficiary of such "plus" *Georgia-Pacific* factors as: (1) demand for the benefits of the patented technology; (2) lack of available alternative technologies for providing the same benefits; (3) profitability of the products; and (4) licensing history of the parties.  PTX 1351 at ¶ 136.  In addition, as to *Georgia-Pacific* factor 10, *i.e.,* "the benefits to those who have used the ['914 invention," Honeywell challenged Dr. Task's conclusion that the '914 patent provided "little benefit" compared to non-infringing displays.  12/18/07 Pl. D Reply at 12; *see also* DE 600 at ¶¶ 3, 14 (Dr. Task Written Direct).  To the contrary, Honeywell emphasized that the invention described in the '914 patent provided a marked technological advancement over the alternatives that Dr. Task proposed, *i.e.*, a cathode ray tube (CRT) display or a Class A NVG compatible display.  11/2/07 Pl. D Br. at 26-27.

The Government concedes that *Georgia-Pacific* factors 1, 3, 4, 6, 9-11, and 13-15 require a "slight upward adjustment" to Mr. Green's proposed $1.123 million "royalty starting point."  11/30/07 Gov't D Reply at 34 (citing DE 601 at ¶¶ 26-28).  For example, Honeywell's profitability and status as a direct competitor of L-3 Corp. favor a royalty rate higher than L-3 Corp.'s "residual share" of profits for RDUs and CMUs.  11/30/07 Gov't D Reply at 34 (citing DE 601 at ¶¶ 26-28(Green Written Direct)).  On the other hand, non-exclusive rights that would be conferred by a negotiated license, as well as the fact that Honeywell attempted, without any success, to license the '914 patent, weigh in favor of a lower royalty rate.  11/30/07 Gov't D Reply at 34.[47]  In addition, the *Georgia-Pacific* analysis performed by Ms. Davis warrants little weight, because she did not consider any factors contrary to her client's position, but instead relied on selective factors to justify a blanket overall 10% royalty rate.  11/30/07 Gov't D Reply at 35.  Moreover, the specific "benefits" of the '914 patent cited by Ms. Davis are "ephemeral and incapable of quantification, which she admitted at trial."  11/30/07 Gov't D Reply at 8 (citing DTR at 1995).  The Government thus concludes that, any potential benefits of or lack of alternatives to the '914 invention, are not relevant to the court's damages inquiry that must only consider what Honeywell lost, not what the Government gained.  Gov't D Reply at 6-13 (citing

---

[47]  In concluding that the combination of these factors weighed in favor of a "slight upward adjustment" of the base royalty rate, the Government's expert, Mr. Green, advised the court that: Honeywell's internal licenses; lack of "convoyed sales" associated with L-3 Corp.'s sale of infringing displays; and the insignificance of the innovation embodied in the '914 patent were "neutral" factors and would have no effect on the hypothetical negotiation.  11/30/07 Gov't D Reply at 34 (citing DE 601 at ¶¶ 91-92 & fig. 15 (Green Written Direct)).

*Leesona*, 599 F.2d at 969 ("The proper measure in eminent domain is what the owner has lost, not what the taker has gained.").

L-3 Corp. adds that Honeywell seeks a disproportionate damage award for a patent that does not teach anything, particularly when compared to the so-called infringing technology.[48] 11/30/07 L-3 D Resp. at 36. The hypothetical license "taken" by the Government in this case would have been nonexclusive and would not convey any technical know-how or other information that would assist the licensee to practice the invention. 11/30/07 L-3 D Resp. at 34.[49] As such, the royalty rate should be reduced. 11/30/07 L-3 D Resp. at 34 (citing DE 601 ¶ 61). A low royalty rate also is warranted, because L-3 Corp.'s predecessor and other display manufacturers already were making the accused displays prior to October 22, 2002, the date the '914 patent issued.[50] 11/30/07 L-3 D Resp. at 34 (citing DETR at 261 (Dunn)).[51] In addition, a low royalty rate is required, because of the large procurement involved in this case and the fact that the infringing product is comprised of many complex features that have substantial value, apart from the component that uses the patented '914 technology. 11/30/07 L-3 D Resp. at 35.

L-3 Corp. also contends that Honeywell's expert, Ms. Davis, attempted to justify a 10% rate with unsubstantiated assertions as to the qualitative benefit of the patented invention and the lack of non-infringing alternatives. 11/30/07 L-3 D Resp. at 46. Even assuming that the Government received a benefit for using the '914 patent technology, Honeywell dramatically overstated the '914 patent's contribution in providing those benefits. 11/30/07 L-3 D Resp. at 47. In addition, contrary to Ms. Davis's statement, non-infringing alternatives to the '914 patent

---

[48] L-3 Corp.'s continued challenge to the settled validity of the '914 patent is moot. *See Honeywell VII*, 609 F.3d at 1302 (holding that the Government failed to prove by clear and convincing evidence that claim 2 of the '914 patent is invalid).

[49] L-3 Corp. bases its assertion that a hypothetical license for use of the '914 patent would convey no technical know-how on the testimony of Dr. Task that the '914 patent provides no technical guidance (DE 600 ¶ 7) and the testimony of Mr. Tannas that the '914 patent provides nothing more than a "little clue" that one should split the red color band. DETR at 1352-54.

[50] Honeywell's expert Ms. Davis could not recall any evidence of research and development related to the '914 invention, any ramp-up of manufacturing facilities or any indication that Honeywell could fill the need for the large number of displays at issue in this case. 11/30/07 L-3 D Resp. at 36 (citing 2/28/07 DTR at 2205.). L-3 Corp. acknowledges that a patent that uses a continuation application to claim previously disclosed, but unclaimed features, of an invention "is not illegal *per se*," but the court should consider that Honeywell's only cost was in the form of patent attorney's fees. *See Bendix Corp. v. United States*, 676 F.2d 606, 615 (Ct. Cl. 1982) (justifying a higher royalty rate, but only where the patentee bore the development costs and business risks).

[51] The cited page of Mr. Dunn's testimony, however, does not establish that any other manufacturer independently made the accused displays prior to October 22, 2002, the date the '914 patent issued.

existed at the time of the hypothetical negotiation.  11/30/07 L-3 D Resp. at 49-51 (citing DE 600 ¶ 26 (Task Written Direct)).

The court's analysis begins with the observation that many of the *Georgia-Pacific* factors are relevant in circumstances where the patent owner and infringer are competitors – not where the Government becomes an infringer by use.  Therefore, it should be no surprise that *Georgia-Pacific* factors 1, 2, 3, 4, 5, 6, 8 (in part), 12, and 13 are not relevant in this case.  Factor 9 concerns the "utility and advantages" of the '914 invention and the element of factor 10 that concerns any benefit of use to the Government, Lockheed Martin, and L-3 Corp. of that use.  In section 1498 cases, however, any "advantage" to the Government, as a matter of law, is not favored in determining a reasonable royalty.  *See Dow Chemical Co. v. United States*, 226 F.3d 1334, 1348 (Fed. Cir. 2000) (holding that the trial court should not have "resorted to a benefit conferred method where means exist[ed]. . . for a more conventional and substantiated measure of damages" (internal quotations omitted)); *see also Decca*, 640 F.2d at 1172 (reversing a trial court's use of a "cost savings method" to determine damages).  For these reasons, the court has not considered those elements of factor 9 and factor 10.  The court's assessment of the other factors follows.

The court has determined that factor 7, *i.e.*, the duration of the license over the entire 15-year term of the '914 patent, is relevant.  In addition, the first element of factor 11 is irrelevant, *i.e.*, the extent to which the Government made use of the military infringing displays.  The Amended Complaint alleges that other military aircraft have used displays with the '914 technology, but whether those claims can be established awaits another day.  *See Honeywell Int'l, Inc. v. United States*, No. 02-1909, at 3 (Fed. Cl. July 5, 2006) (confirming that the parties designated the three display systems used in the F-16, the C-130H, and the C-130J as the subject of the first phase of liability proceedings); *see also* Stipulation and Final Judgment, *Honeywell Int'l, Inc. v. United States*, No. 02-1909, at 2-3 (Fed. Cl. July 3, 2008) (reserving Honeywell's "right to continue to pursue its claims with respect to all accused products").  Likewise, the court has determined that ascertaining what would be a "large number" or "voluminous" procurement to be highly speculative and, in any event, is not founded on any evidence that is in this record.

The court, however, returns to factor 10, *i.e.*, the "nature" of the '914 patent, which is a "standards essential patent."  *See* Daniel G. Swanson & William J. Baumol, *Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power*, 73 Antitrust L.J. 1, 7-11 (2005).  The record in this case evidences that, as early as June 21, 1985, Mr. Cohen actively was engaged in an effort to persuade the military to adopt a standard that would "use a full color display" by implementing his "pioneering ['269 patent] invention" to define the requirements of NVIS compatibility.  Am. Compl. ¶ 7.  But, on January 24, 1986, the potential market for the '269 application effectively was eliminated by the issuance of MIL-L-85762 that prohibited the introduction of red light into the cockpit, by the use of a 625 nm (Class A) filter.  PTX 12; PTX 606 at 4.

Thirty-two months later, the military reversed course in issuing MIL-L-85762A that allowed the introduction of red light into the cockpit by the use of a 665nm (Class B) minus blue filter on the NVG.  PTX 13; PTX 606 at 1.  But, the '269 application did not claim a method that accomplished this.  PTX 501.  Consequently, on August 4, 2000, Mr. Cohen filed a new '760

application that, through a complicated series of prosecution filings, evolved into the '914 patent on October 22, 2002, disclosing a technical method to achieve the requirement of the MIL-L-85762A standard, by "the splitting of the . . . red color band into a lamba 1 and lamba 2, sharing part of it with the display and part of it with the night vision goggle."  8/4/05 TR at 750-51 (Tannas).

In this case, the United States Court of Appeals for the Federal Circuit has held that the '914 patent was valid, not obvious, and that the process utilized by Honeywell did not affect validity of the '914 patent.  *See Honeywell VII*, 609 F.3d at 1297-1302.  But, the appellate court has not discussed in any 28 U.S.C. § 1498(a) case whether a patent written to cover a Government standard, arrived at with open industry participation, should be entitled to a royalty rate that is not adjusted downward, based on its "nature" as a "standards essential patent."  *See* Swanson & Baumol, *supra*, at 3-4 ("[A]dopting standards that depend on private IP rights carries the risk of creating a degree of market power that distorts competition and generates returns in excess of those contemplated by the IP laws.").

In recent years, standard setting activities and their interplay with patents has become a concern to the USPTO and other federal agencies.  For example, a 2007 Joint Report by the Antitrust Division of the Department of Justice and the Federal Trade Commission stated:

> When a standard that incorporates patented technology owned by a participant in the standard-setting process becomes established, switching may become difficult and expensive, causing that particular technology to gain market power. Patent holders may seek to take advantage of that market power by engaging in patent hold-up, excluding a competitor from a market or obtaining an unjustifiably higher price for its [*sic*] invention than would have been possible before the standard was set. This type of hold-up raises particular concerns when alternative technologies could have been included in the standard before it was set. Patent hold-up can cause other problems as well—it may induce users to postpone or avoid incorporating standardized technology in their products. These consumers could also be harmed when companies implementing the standard pass on increased royalties in the form of a higher price.

Joseph F. Wayland, Acting Asst. Att'y Gen., Antitrust Div., U.S. Dep't of Justice, Antitrust Policy in the Information Age: Protecting Innovation and Competition, Remarks as Prepared for the Fordham Competition Law Institute (Sept. 21, 2012), *available at* http://www.justice.gov/atr/public/speeches/287215.pdf.

The military and industry providers have a need to share information to establish standards that accomplish mutual technical objectives and promote efficiency.  The law allows an inventor to obtain a patent describing a method to achieve an industry standard that results from Government and industry collaboration.  But the law should not allow the owner of a standards essential patent to obtain royalties at a rate that chills future standard setting activity, particularly where the Government sets the standard, creating the market for the patent in the first place.

For these reasons, the court has determined that a downward adjustment of the 4.2% base royalty rate, based on the nature of the '914 patent, would be warranted under factor 10. But, neither the Government, Lockheed Martin, nor L-3 Corp. proffered any expert or other evidence of what that adjustment should be. As such, there is no record on which the court can make an independent adjustment, that would not be based in speculation.

For these reasons, the court has decided to offset factor 7 against factor 10, so that no adjustment to the 4.2% base royalty will be made.

### e.    The Relevant Product Base.

### i.    Military Aircraft Displays Sold As A Component Of A Domestic Military Aircraft.

Honeywell posits four factors that must be considered in determining the relevant product base. First, since the reasonable royalty rate is applied to what the Government took—the equivalent of a license under the '914 patent—the product base must include the Government's total cost of procuring a military aircraft display system from the direct supplier, *i.e.*, Lockheed Martin, "not the prices charged by [the] subcontractor [L-3 Corp.] to a direct supplier [Lockheed Martin] for a component that has not been installed and is not ready to be used by the Government." 11/2/07 Pl. D Br. at 37 (citing PTX 1351 at ¶¶ 92-96 (Davis Written Direct)), *see also* 11/02/07 Pl. D. Br. at 38-41. Second, the base must include the Government's cost of "purchasing the entire display system, including NVGs." 11/02/07 Pl. D Br. at 37 (citing PTX 1351 (Davis Written Direct) at ¶¶ 90-91); *see also* 11/02/07 Pl. D Br. at 41-43. Third, the base should not consider "what Honeywell may have been unable to sell as a result of the infringement." 11/02/07 Pl. D Br. at 38; *see also* 11/02/07 Pl. D. Br. at 43-44. Fourth, under the "entire market rule," the base should include display generators that were sold with the CMFDs for the F-16 display system. 11/02/07 Pl. D Br. at 38 (citing PTX 1351at ¶ 97); *see also* 11/02/07 Pl. D. Br. at 44-47.

In sum, Honeywell asserts that the cost for the Government to procure the military aircraft displays should not simply be "a markup of the price of the display component," but reflect the "value added" to the entire system. 11/2/07 Pl. D Br. at 39. That "value added" includes: "the design, development, testing, and integration of the display" into the military aircraft, "including testing to insure . . . the full color and NVG compatibility[.]" 11/2/07 Pl. D Br. at 39. In other words, the "the cost of the display system, as installed in the C-130J, C-130H or F-16 and ready for use by the Government[.]" 11/2/07 Pl. D Br. at 41.

The Government responds that, as a matter of law, the court is required to focus on what was taken from Honeywell, instead of any value received by the Government. 11/30/07 Gov't D Reply at 6-7, 10-13. Moreover, contrary to Honeywell's assertion, there is no general rule that the royalty base must *per se* include the Government's total procurement cost. 11/30/7 Gov't D Reply at 14-15. Likewise, Honeywell is not entitled to receive royalties based on an aircraft manufacturer's profit or markup. 11/30/07 Gov't D Reply at 15. Moreover, the Government's procurement cost is an unreliable base, primarily because Lockheed Martin does not separately price displays from the military aircraft in which they are installed. 11/30/07 Gov't D Reply at

16. Therefore, the Government and L-3 Corp. agree that the royalty base should be L-3 Corp.'s price for the displays sold to Lockheed Martin. 11/30/07 Gov't D Reply at 18; 11/30/07 L-3 D Reply at 20.[52]

The court's analysis of the relevant product base first looks to whether the patented feature drove demand for the infringing product. If so, the relevant product base includes the entire market. *See Lucent*, 580 F.3d at 1336 ("For the entire market value rule to apply, the patentee must prove that 'the patent-related feature is the basis for customer demand.' " (quoting *Rite-Hite*, 56 F.3d at 1549)). If not, the product base is limited to the "smallest salable patent-practicing unit[.]" *LaserDynamics*, 694 F.3d at 67-68; *see also Uniloc*, 632 F.3d at 1318 ("The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product *only* where the patented feature create[s] the 'basis for customer demand' or 'substantially creates the value of the component parts.'" (emphasis added)).

In this case, the "patent-related feature" includes both a full color display and night vision compatibility. DMX 36 at DE-1682 to -88 (the '914 patent). As the United States Air Force's 2000 Posture Statement explained that "be[ing] able to fly safely at night . . . means installing night vision goggles and related lighting into all our combat aircraft." PTX 1231 at JA633699; *see also* PTX 1352 at ¶¶ 57-67 (Col. Lawrence). In fact, full color capability was such a central feature of the infringing displays that was incorporated into the acronyms CMFD and CMDU. Honeywell also touted the color capability feature of CMFDs as part of the F-16 European Mid-life Update. PTX 1342 at 17 (F-16 Cockpit Gains Color Displays, March 1, 1994 Honeywell press release); *see also* PTX1250 (Lockheed Martin C-130 fact sheet describing the display's night vision compatibility as a "key feature," not just of the display but of the entire C-130 aircraft). The court, however, does not consider either of these press releases sufficient to meet Honeywell's burden to proffer "market studies" or "customer surveys" to satisfy its burden of proof that the entire aircraft should be considered in the product base. *See LaserDynamics*, 694 F.3d at 69.

Therefore, the court has determined that the product base includes 345 RDUs at $49,521 per unit. PTX 1351 at ¶ 184 (number of units); DE 601 at 113 (same); PTX 1002 at JA624520 (price per unit, achieved by dividing the sales total by the 235 units for which sales data are available); DE 602o (citing L-3 007246, showing the same sales total as JA624520)). In addition, the product base also includes 608 CMDUs at $43,104 per unit.[53] DE 601 at ¶ 111 & fig. 18 (number of units) (citing L-3 004347 to 006534, L-3 008125, L-3 005163 to 005187);

---

[52] Lockheed Martin adopted the arguments of the Government and L-3 Corp. 12/1/07 Lockheed D Reply at 1.

[53] Honeywell asserts that 609 CMDUs should be accounted for in the damages calculations. 11/2/07 Pl. D Br. at 49; PTX 1351 at ¶ 175. The Government responds that one of the serial numbers is duplicative of Honeywell's listing of CMDUs, meaning that one CMDU was listed twice. 11/30/07 Gov't D Reply at 39-40; DE 601 at ¶ 111. Honeywell responds that the duplicate serial number was a mistake, without any further explanation. 11/2/07 Pl. D Br. at 50. Because Honeywell has the burden of proof to establish damages, the court has determined that only 608 CMDUs should be considered in the damages calculation.

PTX 1351 at ¶ 175 (number of units) (citing PTX 1002 at JA624513); PTX 1002 at JA624519 (price per unit, achieved by dividing the sales total by the 640 units for which sales data are available); DE 602o (citing L-3 007210, L-3 007242, showing the same combined sales total as JA624519)).

> ii.    **Displays Sold As A Component Of Military Aircraft Sold Under The Foreign Military Sales Act.**

Next, Honeywell argues that the sales of 1244 CMFDs to foreign militaries must be included in the relevant product base. 11/2/07 Pl. D Br. at 55-56. Although those CMFDs were not used by the Government, their sales were for the benefit of the Government. 11/2/07 Pl. D Br. at 53 (citing PTX 1002, Damages Summary, Schedule D); *see also Hughes Aircraft Co. v. United States*, 534 F.2d 889, 899 (Ct. Cl. 1976) ("[T]he Government's foreign military sales and assistance activities" are considered to be "*for the U.S.* within the meaning of 28 U.S.C. § 1498.").

The Government responds that, as a matter of law, 28 U.S.C. § 1498 does not authorize the court to award damages for the sale of infringing products to foreign entities. 11/30/07 Gov't D Reply at 43. Although *Hughes Aircraft Co.* held that foreign military sales were considered "use for the [G]overnment," the statutory basis for that ruling was 22 U.S.C. § 2356, which is not at issue in this case, nor is there any evidence of any Government use within the United States. 11/30/07 Gov't D Reply at 44-45. Even if section 1498 applies, section 1498(c) provides that "[t]he provisions of this section shall not apply to any claim arising in a foreign country." 11/30/07 Gov't D Reply at 45. There is no evidence in the record that any foreign government ever used the infringing aircraft displays in the United States or used the CMFDs in combination with NVGs. 11/30/07 Gov't D Reply at 45. Moreover, any liability under section 1498 for use of the invention described in the '914 patent requires that the foreign military use of the patented system was authorized and consented to by the Government. 11/30/07 Gov't D Reply at 45. As a matter of fact, there is no evidence in the record that any CMFDs, other than the 14 units used in the United States, were used with the authorization and consent of the Government. 11/30/07 Gov't D Reply at 46.

Honeywell counters that there is no legal requirement that it must prove that the CMFDs actually were used with NVGs in the United States. Instead, liability under section 1498(a) is premised on availability for use. 12/18/07 Pl. D Reply at 52. Since the record establishes that the CMDUs were part of military aircraft that were purchased by foreign governments, pursuant to the Foreign Military Sales Act, the court is not required to adjudicate the issue of extraterritorial application of United States patent law. 12/18/07 Pl. D Reply at 52-53. Moreover, authorization and consent by the Government is implied by the military's participation in writing the specifications for the CMFD. JTX 43 at H57972-74, H57976-79 (Prime Item Development Specification for CMFD). In addition, the Government stipulated that the procurement contracts for CMFDs and NVGs included authorization and consent. 12/18/07 Pl. D Reply at 53 (citing PTX 104 at ¶¶ 1, 2).

The court's analysis begins with section 1498(a) that states:

For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and *with the authorization or consent of the Government*, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a) (emphasis added).

As a matter of law, the phrase "with the authorization or consent of the Government" requires an affirmative act of the Government. *See RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998) ("Waivers of sovereign immunity must be strictly construed in favor of the Government." (citations omitted)). When the Government sold F-16s with the accused CMFDs to foreign militaries in the 1990s, it could not have given "authorization or consent" to the "use . . . of an invention described in and covered by a patent of the United States," because the '914 patent had not issued. In addition, Honeywell cites no evidence that the Government explicitly granted "authorization or consent" for infringing use. Instead, Honeywell cites *Hughes Aircraft Co.*, 534 F.2d at 901, for the proposition that "authorization or consent on the part of the Government may be given in many ways other than by . . . direct form of communication[.]" The court views this as dicta. Moreover, in *Hughes Aircraft Co.*, the Department of Defense sent a letter to its British counterpart conveying express "authorization and consent" for infringing use. *Id.* at 899. There is no written evidence of "authorization and consent" in this case.

Therefore, the court has determined that the Government is not liable for foreign military use of the accused CMFDs.

### iii.    CMFD Display Generators.

As a matter of law, patent-infringing components also can include other components that function with them. *See Leesona*, 599 F.2d at 975 (including unpatented anodes, cathodes, and other peripherals in the royalty base, because "[m]ost importantly, . . . [plaintiff's] patents were needed to manufacture the battery cell, and without this battery no anodes, cathodes, or covers would be required"); *see also Tektronix*, 552 F.2d at 351-52 (including in the royalty base plug-ins that were physically separate but "financially dependent on the market created by the patented" component). Unpatented components, however, also may be included when "the unpatented and patented components together [a]re considered to be components of a single assembly or parts of a complete machine, or together constitute[] a functional unit." *Rite-Hite Corp.*, 56 F.3d at 1550. Because the CMFD is a "dumb" display that does not function without a generator, the latter is an integral and functional unit with the CMFD. PTX 1351 at ¶ 69 (Davis Written Direct); PTX 1079 at 43 (Burkhardt Dep.) (civilian United States Air Force engineer agreeing that "at least one display generator was needed to run one of those [CMFD] displays"); *see also* PTX 1158 at 185 (Head Dep.) (Lockheed Martin's Rule 30(b)(6) witness testifying that "in order to have those CMFDs function, there needs to be at least one display generator in that

aircraft").[54]  As such, the Government was aware that the purchase of a generator would be required for each CMFD unit.[55]

    For these reasons, the court has determined that the product base includes 14 display generators, one for each CMFD used by the United States Air Force, at $76,388 per unit.  PTX 1005 at JA624638 (showing per unit price) (citing HWE000042-HWE000054).

### iv.  Night Vision Goggles.

    Honeywell argues that, because the court relied on the presence of NVGs in determining infringement of the '914 patent, the cost of NVGs must be included in the relevant product base. 11/2/07 Pl. D Br. at 41 (citing *Honeywell III*, 70 Fed. Cl. at 468 (determining that the "substantially blocks" limitation of Claim 2 of the '914 patent refers to the light blocked by a filter "at the night vision aid").  In further support, Honeywell cites *Dynamics Corp. of America v. United States*, 5 Cl. Ct. 591, 600 (1984), wherein the claims at issue were "so intimately associated" with the components of an analog computer that the computer, as a whole, must be regarded as part of the compensable combination in determining a royalty base.  Since the court has determined that NVGs are necessary to the practice of the '914 invention, excluding them from the product base would be erroneous.  11/2/07 Pl. D Br. at 42 (citing DE 601 at ¶ 42 (Green Written Direct)).  Honeywell admits that, although NVGs in general have non-infringing uses, there is no evidence in the record that shows that class B or C NVGs "have substantial uses other than in combination with full color displays."  12/18/07 Pl. D Reply at 44.  If the court does not include the NVGs in the base, Honeywell suggests, in the alternative, that the court could account for the NVGs by raising the royalty rate.  11/2/07 Pl. D Br. at 43.

    The Government responds that NVGs should not be included in the relevant base, because: Honeywell never sold nor intended to sell NVGs; NVGs have numerous non-infringing uses apart from their combination with the filters; and it would be "a logistical nightmare" to include NVGs in a royalty calculation.  11/30/07 Gov't D Reply at 18-20.  The Government adds that no case holds that the relevant product base is dictated by the scope of the claims.  11/30/07 Gov't D Reply at 20-21.

    L-3 Corp. emphasizes that including NVGs in the relevant product base would compensate Honeywell for property that it did not lose.  *See Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 656 (Fed. Cir. 1985) ("The ultimate determining factor is

---

[54] The Government's assertion that the display generators can function with non-infringing devices is inapposite.  *See Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1372 (Fed. Cir. 2004) (including sales of non-patented syrup in the product base because "a functional relationship between a patented device and an unpatented material used with it is not precluded by the fact that the device can be used with other materials or that the unpatented material can be used with other devices").

[55] The Government procured the CMFD and the generator together as part of the Midlife Upgrade to the F-16.  PTX 1079 at 43 (Burkhardt Dep.); PTX 1351 at ¶ 64 (Davis Written Direct).

whether the patentee or its licensee can normally anticipate the sale of the unpatented components together with the patented components.").  As a result, awarding Honeywell a royalty based on each NVG procured by the Government would result in an inflated royalty base and a windfall to Honeywell.  11/30/07 L-3 D Resp. at 29.

The court begins by noting that "display system" claimed in the '914 patent consists of both a "local color display" (in this case, the CMDU, RDU, or CMFD) and a "night vision aid" (the NVG).  DMX 36 at DE-1688.  The display unit and the NVG "function together to achieve one result[.]"  *See Rite-Hite*, 56 F.3d at 1550.  The filter in the NVG and the filters in the display unit together achieve what the United States Court of Appeals for the Federal Circuit determined to be "the fundamental purpose of the invention [subject to the '914 patent, which is] to permit displays that convey information—*i.e.*, red warning lights—to crewmembers in an aircraft cockpit without such light overwhelming sensor elements in NVGs." *Honeywell VII*, 609 F.3d at 1302 (emphasis added).  On the other hand, the record establishes that NVGs were used by the military in the 1980s, well before the '914 patent issued.  PX 143 at ¶ 1.  In addition, the NVGs had substantial value to the Government apart from their use of the filter that infringed the '914 patent.  DE 601 ¶ 130; DETR at 223, 238, 262 (Dunn).  Although Honeywell adduced evidence that the class B filters found in some NVGs served primarily to allow the use of full-color displays in the cockpit (SATR 999 (Byrd); DTR 2473 (Green)), that alone does not establish by a preponderance of evidence that all NVGs with class B filters were purchased for use with the infringing display units.  In addition, there is no evidence in the record of how many NVGs were purchased for use exclusively with the infringing display units.  Recognizing this failure of proof, Honeywell's counsel suggested that the contribution of the NVGs could be accounted for by the court raising the royalty rate.  11/2/07 Pl. D Br. at 43.  But, Honeywell failed to provide any evidence of what that increase should be.

For these reasons, the court has determined that NVGs should not be included in the relevant product base.

### v.    Summary Of The Relevant Product Base In This Case.

The following chart summarizes the court's determination of the relevant product base, units, and price per unit to which the 4.2% royalty rate should be applied:

**Damages at 4.2% Royalty, Before Delay Compensation**

| Item | Units | Price Per Unit | Total | Damages |
|---|---|---|---|---|
| RDUs | 345 | $49,521 | $17,084,745 | $717,559 |
| CMDUs | 608 | $43,104 | $26,207,232 | $1,100,704 |
| CMFDs | 14 | $49,952 | $699,328 | $29,372 |
| CMFD display generators | 14 | $76,388 | $1,069,432 | $44,916 |
| **Total** | | | | **$1,892,551** |

###### 4.     Determination Of Delay Compensation.

###### a.     The Date Of Accrual.

In this case, the court has determined that compensation for delay should be determined as of October 22, 2002, the date when the '914 patent issued.  *See Decca*, 640 F.2d at 1168 ("Ordinarily, the court deems the value of the license to be payable as of the time the Government takes the license.  Hence, delay compensation begins to accrue, ordinarily, as of the date of the taking[.]"); *see also Waite v. United States*, 282 U.S. 508, 509 (1931) (allowing interest on damages for unlicensed Government use of a patented invention); *ITT Corp. v. United States*, 17 Cl. Ct. 199, 233 (1989) ("The Court has also ruled that where payment . . . is deferred . . . something more is constitutionally required to compensate the owner for the delay in payment.  This additional element is measurable in terms of 'reasonable interest' or its equivalent.").

###### b.     The Rate Of Accrual.

The United States Court of Appeals for the Federal Circuit has recognized that "compound interest may more nearly fit with the policy 'to accomplish complete justice as between the plaintiff and the United States.'"  *Dynamics Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985) (quoting *Waite*, 282 U.S. at 509).  Therefore, the court has determined that use of the T-bill rate provides a reasonable basis for determining delay compensation rates. *See ITT Corp*, 17 Cl. Ct. at 243 (applying 52-week T-bill rates where compound interest was an allowable method of delay compensation).

## III.   CONCLUSION.

The court has determined that section 183 of the Invention Secrecy Act, 35 U.S.C. § 183, requires that the Government use must result from the disclosure of a patent application, subject to an Invention Secrecy Act Order.

The court also has determined that Honeywell failed to establish that the Government used the invention disclosed in the '269 application.  Assuming *arguendo*, that use occurred, it would not have been wrongful.

The court, however, has determined that Honeywell is entitled to $1,892,551 in damages, pursuant to 28 U.S.C. § 1498(a), in addition to compensation for delay at the T-bill rate.

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**